UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      vs.                       ) CASE NO. 1:26-cr-00001
                                )
BRIAN J. COLE, JR.,             )
                                )
            Defendant.          )
_____  )


TRANSCRIPT OF BOND REVIEW HEARING
**BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
Wednesday - January 28, 2026
3:36 p.m. - 4:52 p.m.
Washington, DC

**FOR THE GOVERNMENT:**
Office of the United States Attorney
BY:  CHARLES ROBERT JONES and JOCELYN S. BALLANTINE
601 D Street, NW
Washington, DC 20530

**FOR THE DEFENDANT:**
McFadden & Shoreman, LLC
BY:  JOHN M. SHOREMAN
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036

Litson PLLC
BY:  JOSEPH ALEX LITTLE, IV and ZACHARY CARTER LAWSON
54 Music Square East, Suite 300
Nashville, Tennessee 37203

HDR LLC
BY:  MARIO BERNARD WILLIAMS
5600 Roswell Road, Building C, Suite 103
Sandy Springs, Georgia 30342

---

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
Transcript Produced from the Stenographic Record

(Call to Order of the Court at 3:36 p.m.)

DEPUTY CLERK:  This is Criminal Matter 26-1, *United States of America versus Brian Cole, Junior.*

May I have counsel approach the lectern and state your appearance for the record, beginning with the government.

MR. JONES:  Good afternoon, Your Honor.  Charles Jones and Jocelyn Ballantine for the United States.

THE COURT:  Good afternoon to both of you.

MR. SHOREMAN:  Good afternoon, Your Honor.  John Shoreman, Mario Williams, Zach Lawson and Alex Little.  Thank you, Your Honor.

THE COURT:  Good afternoon to you, Mr. Shoreman, and to the team as well.

Good afternoon, Mr. Cole.

THE DEFENDANT:  Good afternoon.

THE COURT:  Good to be with you all.

Mr. Cole, let me just say at the outset, I know you have appeared in front of a few different judges at this point, and there have been some magistrate judges that have overseen some of the preliminary matters in the case.  I'll be presiding over the case from here on out now that an indictment has been filed, so there will be fewer new faces as you come in and out of the courtroom, at least on this side of the bench.

In your last court appearance, you were arraigned under the federal indictment, so, in other words, the charges

were presented and you entered your plea of not guilty.  Today we're here for our first status conference in your case.  In other words, I'm going to have some conversation with the government, with your attorneys, and we're going to talk about where things stand and next steps.

Turning to the attorneys, I have a couple quick housekeeping matters for counsel.  We'll then proceed with the first status conference.

I have resolved, as you know, the detention challenge that was premised on the indictment and the preliminary hearing issue.  I understand defense counsel is challenging the merits of Judge Sharbaugh's detention determination.  I have reviewed the papers and all the evidence that is attached to them, and reviewed Judge Sharbaugh's decision closely.

And I'm going to let the parties have some time at the end of this hearing to present argument, and I can kind of direct you to what I'm most interested in at that point.

Anything else to put on my radar at the moment before I jump into the housekeeping issues that I mentioned?

MR. JONES:  Not from the government.

MR. SHOREMAN:  No, Your Honor.

THE COURT:  Let me just address counsel for both sides on two preliminary matters.

First, this is a case with some public attention attached to it.  I prefer to just say this at the outset to

avoid any issue.  This is not made in response to any particular thing that's happened, but let's be clear that this is a court of law.  It's not a pressroom.  I have very little patience for antics from counsel or otherwise.

So, you know, my interest is first and foremost going to be to ensure a fair process, that will be for the government, which is entitled to put its case on, and it will certainly be for Mr. Cole as well, whose rights will be respected.

And I'll treat you all with dignity.  I'll expect the parties to treat one another with dignity and civility.  So I'm going to leave it at that.  Again, like I said, it's not in response to anything in particular at this point, and let's not have to come back to it at any point.

Second, my policy is to have everything take place on the record.  I know different courts, different judges have different practices around this.  I like to just be clear on mine.  If at any point you think you need clarification on something or you're entitled to some sort of relief, do it in writing on the docket rather than through a phone call.

My chambers will not give information that route or through an email to chambers, we'll do it through the docket.

One caveat is for hearings, scheduling hearings, in which case you can correspond with my courtroom deputy, who will reach out to you when there is a need for that.  Okay?

But that won't relate to anything in substance.  All of that will happen on the record.

Those are my two housekeeping matters.  Why don't we jump into the status conference, and maybe I'll hear from the government on where we are at a minimum with respect to discovery.

MR. JONES:  Thank you, Your Honor.  The government has been providing discovery on a rolling basis.  On January 20th, the government met with the defense team, specifically on the topic of discovery, and explained our approach to what is a considerable amount of information.

And during the course of that conversation, we articulated the way we're approaching discovery.  The defense indicated to the government that they did not object to how the government plans to proceed.  So at least from the government's perspective, we plan to proceed consistent with what we discussed during that meeting.

And at this time, we don't have anything to raise with the Court, but should that happen, we would involve the Court at that time.

THE COURT:  Can you give me more details on what you mean by your approach and how you plan to proceed?

MR. JONES:  Sure.  So I don't know how detailed you want me to get, but with respect to --

THE COURT:  Maybe you can give me just a high level

understanding of what the discovery looks like and what needs to be provided and what's been provided to date or a timeline for providing it.

MR. JONES:  This case, obviously, involved a five-year investigation.  The FBI opened a file related to that investigation.  Mr. Cole, as a suspect, did not emerge until very late in that investigation.

And so the government's approach in terms of providing discovery to the defense team has been to create a new case, the FBI created a new case for Mr. Cole in particular, and then to re -- what the FBI calls serialize -- but essentially to copy all the information pertaining to Mr. Cole as sort of the first step into a new case file, that has been produced to the defense.

And that would include targeted legal process pertaining to Mr. Cole, things like his purchase history, cell phone data, the results of Rule 41 search warrants, those types of things.

What we are still in the process of figuring out the best way to provide to the defense is the broader legal process that was issued in the course of the case.  So, for example, a subpoena to a hardware store for all purchases between X date and X date.  In that case, the government didn't have reason to believe that Mr. Cole's identifiers were contained in that set of records, but the government still plans to provide it.  It's

just voluminous.

That's just one example of that kind of category of information that we are taking on next, as well as legal process that would have been targeted to individuals other than Mr. Cole during the course of the investigation, which is also a large universe of material that the government is in the process of preparing for the defense to be provided in discovery. And these are all in general terms the topics that I covered with the defense team.

THE COURT: Okay. Got it. Is that latter category, just getting it, kind of also you have got the case file as it relates to Mr. Cole in particular, but also, obviously, thinking about it from the lens of *Brady* and all of that?

MR. JONES: Exactly. As the Court might imagine, over the five years, the FBI looked at various individuals in connection with this investigation, and so we're in the process of preparing that material for production.

Of course, that's going to implicate personal identifying information, privacy considerations. At this time, we have a protective order in place, so we're planning to provide that material to the defense.

THE COURT: That's really helpful. Anything else that you want to put on my radar at this point?

MR. JONES: Nothing specific at this time, but the defense provided the government with at least a sort of

preliminary understanding of the areas that they are interested in beyond what I have been articulating here.

I think the most efficient way to deal with that will be for the parties to have an open line of communication, a dialogue on those topics, and if we get to an impasse where the Court would need to resolve a dispute, we can address it then.

THE COURT: That will be fine. Do you have a rough broader timeline for how long you think you will need to get through these various tranches of production to the other side and also a more immediate next step for us today?

MR. JONES: I think in terms of what I have summarized so far, we would be talking about weeks, several weeks to get that material prepared. What we're trying to be mindful of is to not bury the defense in material and to be thoughtful about the way that we produce it.

But I think we're talking about a matter of several weeks to get those categories of information turned over.

THE COURT: Have you discussed that timeline with the defense?

MR. JONES: I don't know if I put it in those terms.

THE COURT: I can ask them. That's fine.

What are you proposing in terms of a next status conference?

MR. JONES: We discussed prior to the start of the hearing setting a status date for 30 days out. The defense

indicated that they would be willing to toll the speedy trial clock between now and 30 days, and I think that that would allow the parties a little bit of extra time to discuss how this case will proceed from here.

THE COURT:  Okay.  Anything else?

MR. JONES:  That's all for now.

THE COURT:  Okay.  Let me hear from defense counsel.

MR. LITTLE:  I don't have anything to disagree with the government on, except to say that there is going to be a ton of discovery.

One of the things that we proposed that wasn't mentioned is we need a way to track the discovery that's being provided.  Most of this, if not all of it, is digital, and so it's not easily susceptible to Bates stamps or even load files, any of that sort of thing.

We have -- did you receive it today from us, our proposed spreadsheet?  We have provided the government with sort of a proposed running log that is already at 8,000 items that they have produced, so that we can sort of confirm we have it, that we're able to open it, that it was a valid file, that lists what the file is, so we don't have a dispute two months down the road that they say they gave us something and they didn't.  Just as an initial step, we're working on a log between the two of us that's pretty monumental.

In the course of those conversations, I understand

there is FBI files that the government has mentioned, which is, I think, expected.  One thing we've made a request that we want to put on the Court's radar is if there are other agency communications, and, in particular, interagency communications, we certainly think that would be discoverable and we want access to that information.

We're concerned there may be *Brady* hanging out at ATF or the Capitol Police or somewhere like that, and we want to make sure that that stuff is captured in what's being produced.

Similarly, I want to put on the Court's radar --

THE COURT:  Just give me a minute before you move on. Helpful to have context and understand what's going on, even though these are things that I'll expect you all to largely work out between the two of you, between the two sides.

Are you raising that because you anticipate there is going to be an issue, or have those conversations so far been ones you can work out, just in terms of the organization, the systems, and also the interagency component?

MR. LITTLE:  I think that given the amount of stuff that's out there, I think it's possible the government, through inadvertence, may not have what they need, so I want to put on the record that we made that request ahead of time that anything that's not just in the FBI more broadly is captured.

Similarly, we have made a request around CIPA, classified information.  If there is any information contained

in intelligence agency's files about this, it is certainly not I think crazy to believe that intelligence services may have been involved at least in tracking, reporting or looking for reporting about this incident after it happened, and so we want to make sure if there is any reporting that suggests potential perpetrators or things of that sort that we be allowed that. There may be CIPA issues implicated. The government hasn't raised that so I wanted to put that on the Court's radar as well.

THE COURT: They haven't mentioned it today. From where you're standing, have they given you any sort of indication that they are not willing to look at that?

MR. LITTLE: No, but I will say when I raised it, I think it was a new idea. I don't know that it was something that they had started to look for, so we want to again make clear they are looking for that as well.

The third category, which we raised on the discovery call that we want to put on the record is there was a very long congressional hearing about this a few weeks back. I understand it was a whole separate congressional investigation related specifically to this incident. There have been members of Congress who have talked about whistleblower information that they have obtained. This is a circumstance where we might be seeking subpoenas of different congressional materials, so that's something I want to put on the Court's radar now in

terms of housekeeping.

We'll certainly seek to do that sooner to let that process play out, but that is something we're trying to get our head around what might be in congressional files that wouldn't be in DOJ files that would be relevant that we would be entitled to.

THE COURT:  Okay.  All right.  Anything else?

MR. LITTLE:  I think that's the mass of things that we have today.

THE COURT:  Okay.  Let me give the government a chance to respond to anything it wants to respond to there.  I understand it's not like there was a request for relief on any of these things, but just give me any context you want to add.

MR. JONES:  Sure.  In our conversation a week ago, we spoke about those general topics at that level of generality. It's hard to address in the abstract.

I will say that just as a sort of baseline matter, of course, the government's discovery obligations are not the whole of government, they are defined by the scope of the prosecution team.  So that's something that when the government receives specific requests for materials we would then need to be able to assess whether those are materials that would be in the possession of the prosecution team.

At this time, we don't have any reason to believe that there are holdings in the U.S. intelligence community, but,

again, those are matters that I think would require more specific requests to be made so the government would be in a position to respond in an informed fashion.

THE COURT:  Got it.  I assume what you were just discussing was geared principally towards the intelligence comment, but things like ATF, Capitol Police, other law enforcement, I assume you guys are going to take a look and figure out if there is any information there?

MR. JONES:  Again, I think that that would depend on the agency and whether they would be considered part of the prosecution team for purposes of this investigation.

And, obviously, with respect to materials in the possession of Congress, that is not something that the government would view as in its possession for purposes of this criminal prosecution.

The last point, just because it was raised, is we discussed the idea of a joint log.  I will say the government, when it has produced materials in this case, it has provided letters summarizing the materials that were produced.  It's what we do in normal practice.

In principal, I don't have a problem looking at what the defense has provided.  I will just say that at this time I don't know that it's something that's necessary, and the government is not committing to, at this stage, to agreeing to a joint log beyond what the government would normally do, which

is to provide summary discovery letters.

THE COURT:  Got it.  I mean, obviously, there is, I would think, an interest on both sides in being pretty organized about this so there is not confusion later. Hopefully, you both have incentive to kind of work out a way to communicate back and forth.

I don't usually have to get into that type of issue, and I'm certainly not going to get into it in a hearing this early on.  I'm going to count on you all to work that out and be able to communicate back and forth clearly and also stay organized.

Let me hear from defense counsel on just timing and next steps as well.

MR. LITTLE:  We were in agreement with the 30 days.

THE COURT:  Okay.  In agreement with coming back in 30 days?

MR. LITTLE:  That's right.  As the government noted, they haven't produced everything.  We need to sort of wrap our head around what's produced and what's there.

I think 30 days is a reasonable amount of time.  It sounds like they will probably still be producing up until then.  Then we can at least get a sense of how long it's going to take us to review that and think about trial questions.

THE COURT:  At this point, you may not have a full sense of it if you don't have the discovery yet, but is the

defense team anticipating filing motions?

MR. LITTLE: Yes. I think there will be extensive motion practice on multiple issues. Just to raise a couple, the Court may be aware that the Supreme Court took cert recently in a case involving geofence warrants. We don't believe there were necessarily geofence warrants here, but there were cell phone dump warrants, which implicate some of the same Fourth Amendment issues, and so there will certainly be some Fourth Amendment practice I would suspect.

We do have concerns about the alleged confession. I would expect us to have motions practice around that. There are other issues specific to this case and the unusual nature of it that I think are particularly unusual that we may be raising as motions as well.

Right now, I can imagine four or five separate categories of motion practice.

THE COURT: Those will follow discovery?

MR. LITTLE: I think we will try to move the motions practice as quickly as we can on stuff that is not implicated by discovery. A few of the things I've mentioned are not implicated by discovery. We will try to get those before the Court as quickly as possible.

Some of them, like the phone dump warrants, the cell sites, that's going to require necessarily us to see the warrants. We don't have those in place.

Also, as you can imagine, given that they said there are multiple sort of persons of interest before our client, it's going to be maybe difficult for us to follow the fruit of the poisonous tree to kind of how they ended up looking at different pieces of information.

And so that's going to, I think, take longer than it might in a normal situation to trace back the original sort of point of attack from a Fourth Amendment perspective.

THE COURT:  That's helpful context to have.  I know some of my colleagues set trial dates this far out.  I don't do that.  We'll set a time to come back and we'll have a better sense of where we are.  And I like to set trial dates when they stick on my calendar, and I just don't think we have the context right now for that to be the case.

Have you all pre-cleared a date for our next status conference or do we need to open up the calendars?

MR. LITTLE:  We have not.

MR. SHOREMAN:  Is Friday, the 27th, available, Your Honor?

THE COURT:  I could have a hearing Friday, the 27th, in the late morning, so, say, 10:30 or 11:00 a.m. would work for me.  That works for the defense team?

MR. SHOREMAN:  That's fine for the defense.

THE COURT:  Does that work for the government?

MR. JONES:  It does.

THE COURT:  Let's say Friday, the 27th, at 10:30 a.m.

I am going to exclude the time between today and when we get back together on February 27th under 18 U.S.C. Section 3161(h).  I find it in the interest of justice to exclude the time, and that those interests outweigh the interests of the public and the parties in a speedier trial.

And the reason to exclude time is, of course, to give the parties the opportunity to exchange discovery thoroughly, look for appropriate discovery, *Brady* materials, et cetera, and for defense to have the opportunity to both organize itself, review those files themselves, and then also review those files and the discovery with Mr. Cole.

Are those reasons satisfactory from the government's perspective?

MR. JONES:  Yes, Your Honor.

THE COURT:  Okay.  Having completed the status conference, I did say I would give an opportunity for an argument on the merits of Judge Sharbaugh's detention decision.

I will tell you I have reviewed Judge Sharbaugh's decision carefully.  I have reviewed the original briefing, including the government's detention memo and the opposition and the attachments.  I have reviewed the motion to revoke from the defense and the evidence attached to it, including the Phillips report and letters.  I have reviewed the government's opposition and the evidence that's described throughout the

opposition.  I have reviewed the reply, and then the declarations that were filed from Mr. Cole's mother, sister and Dr. Black yesterday.  So I have those.  I don't need you to retread all of that ground.

It is defense counsel's motion, so I'll hear from defense counsel first.  And it won't surprise you to know I'm most interested in what you think Judge Sharbaugh did incorrectly.  Where is the error in his opinion?

Let me let you go ahead and start, and then I'll maybe direct you to a few things I'm most interested in.

MR. LITTLE:  So I mean, first, I think I would say this is a de novo determination.  So we're not in a position of this Court looking at that and saying I agree or I don't agree.  I think, as the Court knows, it has to make a de novo determination based on the record.

I think there are a few things about the record which are different than the way that the magistrate judge viewed the record.  And I think it's most notable when you look at this case it comes down to a question of dangerousness.  Under the statute, the government has to prove by clear and convincing evidence that there is no condition or combination of conditions that would protect the public from a crime.

The only crime that the government has accused my client of committing is a crime that occurred five years ago. I don't want to understate the seriousness of what they have

charged, but they point to really three factors to say this is why he needs to be locked up to keep the public safe.

The first is that the crime was very serious. The second was that there is continued evidence of bomb making. And the third was that there are reasons to doubt, they say, that he will abide by conditions of release.

That somewhat tracks the magistrate judge's reasoning in walking through those issues, but the second and third, I think, are entirely unsupported by the record, and certainly aren't supported by the record at a clear and convincing evidence standard. I could address a few of those.

THE COURT: Let me just start with, I mean, you have Judge Sharbaugh's opinion. I take your point about needing to undertake an independent review. That's why I tell you that I have looked at everything. But we do have an opinion that's helpful to kind of ground us in and you can kind of work off of to tell me where it went wrong.

I have his background section in his opinion where he describes various things, including the investigation and what pointed to Mr. Cole, what was found during the arrest, the cell phone and the cell phone wipes.

And then there is also the characterization of the police interview, which at least Judge Sharbaugh says you didn't contest the characterization, the government's characterization of, and I think I didn't see that either. So

I guess starting with just the facts, are we at least working off the same requisite set of facts, and, if not, tell me where we're not.

MR. LITTLE:  I don't think so, and there's a couple that are critical.  The idea that the cell phones wiped are at all tied to this is completely fictional.

The government doesn't tend to suggest how this individual, who now they have on the record is diagnosed, and if they had been the investigation into this I think they would have confirmed in their interviews, in their own files, is an individual who has extreme autism and OCD, and it is entirely consistent, as the doctor says, to do things like that in a compulsive way.

The phone wipes they are talking about happened two years after the alleged offense.  There is no connection to those and to any investigative step, any concern that he was a suspect.  In fact, there were pictures up within days of this suspect.  There wasn't any phone wiping done in 2021.  There wasn't any phone wiping done for the next two years.

And so the idea that they just sort of glom onto that as evidence -- they call it evidence of trying to hide his tracks.  I think it is --

THE COURT:  I have the point about the phone wipes largely occurring after 2022, if I understand correctly. What's the evidence before 2022?

MR. LITTLE:  There is no evidence of any sort of attempt to evade.  There are no phone wipes that were supposed to happen -- the first time they mention it is that this happened in 2022, and on and off for the next two years.

What I'm saying is there is an absence of evidence of any similar activity between the time of the alleged crime --

THE COURT:  Of any wipe prior to 2022?

MR. LITTLE:  That's exactly right.  Of any evasive activity at all.  And the magistrate judge didn't deal with this either, that on the one hand the government is claiming this is just an individual who is doing everything he can to deceive individuals around him about his guilt and hiding facts.

On the other end, he has pieces of metal pipes and receipts from Home Depot in his car for years.  And so they sort of when they want to point out that he's a scary guy, they point to he's got bombs.  On the other hand, they say, oh, but he was hiding things, but he didn't happen to hide those things.  I think there's just an incongruity in the way the magistrate court sort of failed to reconcile --

THE COURT:  I also have your point about the OCD diagnosis and the declaration that this could be consistent with OCD, but I don't know that that is the same thing from necessarily from showing, proving that it's disconnected from trying to hide something, or maybe you can tell me it is.

MR. LITTLE:  I guess my point is there is no evidence that it is connected, other than they say he committed a crime in the past, and so any subsequent act he makes to erase evidence must be connected to that.  Like, there is no -- they don't even posit a causal connection there between those two activities.

THE COURT:  It would be a much -- your argument would be at its strongest if you could show that, I suppose, there has been phone wipes for the past 20 years, right, and they have been happening all the time and then there just happened to be this event, and then it probably wouldn't be significant to point to something that happened in 2021 to say -- you know, you would have a good argument, but this did happen afterwards.

MR. LITTLE:  Yes, and I think we have a similar sort of fact.  The fact that I can't tell you what compelled him to do that at this time I don't think is evidence that it had to be this sort of idea that there was no reporting, there was no reason to believe he was a suspect.

There is just an absence of anything, and so even if you were to say I'll give it 51 percent likelihood, we're in clear and convincing evidence standard land.  And it's certainly not clear and convincing evidence to tie that.  But it also relates, I think a little bit, to the idea around this they say continued interest in bomb making.

They point to this discussion, which the entire review

is certainly suggestive, but of him sort of doing things with potassium chloride. And they say, well, here is evidence of continued interest post 2021 in bomb making.

We have put in through our declarations definitively that that happened well before this event. And the family characterized it as sort of exactly the way that he characterized it in the interview as science experiments.

THE COURT: You're talking about the declaration that was filed yesterday?

MR. LITTLE: Yes. And there is nothing that sort of, again, suggests that that actually happened in the time period the government points it to. And so there is no evidence of continued interest in bomb making activity. There is no interest in actual evasive action taken by this individual.

And so when you get down to it, all they are left with is he's alleged to have done a very bad thing and look at all the evidence we have. And on the flip side of that, you have a set of conditions --

THE COURT: Can I come back to the very bad thing? Some of these may be easy questions for you. If they are easy to kind of narrow the issues, that's productive. You don't need to get defensive about it.

I know that we have a rebuttable presumption in this case. I know you had some challenges to whether the rebuttable presumption applies in the first place before Judge Sharbaugh.

I think it was about whether there had been an indictment or not. I think he didn't think the indictment was necessarily required. I think you guys gave that much up in front of him, and now we actually have an indictment. So are you fighting that there is a rebuttable presumption in the first place?

MR. LITTLE: There is a rebuttable presumption under the statute.

THE COURT: Good. And then you do say in your briefing that Judge Sharbaugh acknowledged that the presumption was overcome.

MR. LITTLE: I think that's probably incorrect. He talks about it being met. At least looking at the --

THE COURT: He says "assuming it was overcome." All right.

MR. LITTLE: I think it would be difficult on our record to presume that it wasn't met. And I think to the extent the Court can look at the extensive evidence of third-party custodians or of lack of other criminal history, looking at the other case law in this circuit, that type of evidence that we put forward I don't think has ever been found not to meet the presumption, and so I'll leave it at that.

THE COURT: Understood. I know there is also case law, and you can tell me if you disagree with it, that says that even if the presumption is overcome, it's still something that a court has to consider. In other words, the fact that

Congress believes this is the type of offense that presumptively should come with detention is something that still stays in the background.

MR. LITTLE:  Absolutely, as part of the statutory scheme that also includes the requirement for clear and convincing evidence that he be a danger to the community absent there is no condition.  That's part of that equation.

So I think it says, hey, we think the sort of person who might do this is dangerous.  That fits in clearly with saying, but we do think if we can show there is conditions that would make that person not dangerous --

THE COURT:  Your argument is, sure, I understand there is a presumption, but if there was ever a case, this is it.

MR. LITTLE:  Absolutely.

THE COURT:  Okay.  I understand that you have evidence, and some of this I think wasn't before Judge Sharbaugh --

MR. LITTLE:  It was not.

THE COURT:  -- that the device couldn't have detonated.

MR. LITTLE:  That's right.

THE COURT:  And I think you rely on that with respect to the nature and circumstances of the offense principally.

MR. LITTLE:  I think it goes to the question of dangerousness, and so what the Court --

THE COURT:  The question of dangerousness is the overall thing.  That's the overall inquiry.  Of course, that's the ultimate inquiry.

MR. LITTLE:  It's not actually in this case, because what we're looking at with respect to that question of whether this thing, if he did it, was viable, is a question of what threat does he currently pose to the public.

So for the government to prevail, they have got to convince you beyond clear and convincing evidence that there is nothing that the Court can do in terms of conditions to stop my client from hurting someone.  That's the type of crime that he's charged with. There is no evidence they are suggesting that he's selling drugs or harming the community in any other way.

And so the question is how could he harm someone.  As we pointed out the first time around when they sat there for a month and did surveillance for a month between the time they thought he was a suspect or believed he was guilty of this and arrested him.  At the time of the arrest, they left guns in the home.  They certainly didn't think that guns were related to this case in any way.

The only evidence they have that this is a violent act related to these pieces of metal and this homemade powder, which they did not have at the time, there was nothing -- no such evidence at the time that they arrested him this past

year.

So what is their theory as to how he's going to endanger the public?  And this is the point where I do disagree with the magistrate judge's order, that somehow, well, he said he just snapped and we have to be careful that he's not going to snap again, and I can't be sure he's not going to snap again.

I think that is a completely counterfactual reading based on some things the government picked out about a suggestive interview as to what happened here.

THE COURT:  If I understand that excerpt from the magistrate judge was taken from the description of the interview.  Are you saying that that wasn't said, or are you --

MR. LITTLE:  I'm saying to the extent that the government -- like other things were said in that interview, which I think we have talked about that I was not trying -- when I did experiment with this other stuff it had nothing to do with this, the government just discounts.

They take the things from the interview that they like, but they don't want to sort of acknowledge the entire sort of whole of the interview.

And interviews like that, particularly when they are suggestive, particularly with the type of individual involved and his age, you have issues around consistency and is he understanding what he's putting forward.  I think even if you

take much of what the government has proffered though as true, none of it suggests present dangerousness.

To get back to that issue, the government, I guess, has to be saying that somehow if you were to put him under third-party custody, in some high-intensity supervision with GPS or other monitoring, that he would be able to escape from that monitoring, go to a store, purchase the components to buy a bomb, assemble them with no one noticing, and then leave that bomb somewhere.

That is entirely farcical based on the facts.  There is no chance that's going to happen.

THE COURT:  Does it have to be that it would be a bomb?  I mean, I think the government gets the benefit of future dangerousness generally, and I think that's the reason of focusing on the language about snapping.

MR. LITTLE:  I don't think that there is -- again, give me evidence that he's going to go -- does he use knives? Does he have an obsession with firearms?  There is no evidence of any of the things to suggest that there are types of dangerousness that could not be met with conditions.  Zero.

And so that's what -- I don't actually think -- I think I disagree with the Court's conclusion here, and I want to put this on the record.  I don't think that you can just say because we have evidence to suggest this crime is committed in the past that he is dangerous in all possible ways and we have

to therefore think about hypothetical ways that someone could be dangerous that they have never previously shown themselves to be.

THE COURT:  To be clear, I was never suggesting that. The statute lays out the factors that have to be considered, and all of them have be considered.  I think you are also leaning more heavily on some that you like and away from other that you don't like, and I think the government is leaning on some too.

I think just like you're suggesting that the government can't turn away from factors, you can't either.  I mean, the actual nature of the offense matters here.

MR. LITTLE:  Absolutely.  And that nature of the offense is the type of offense, this entirely susceptible conditions for exactly the reason I have described, because under those conditions, even if there was a situation, which is not likely based on his history in the past five years of complete -- no evidence of sort of criminal activity, particularly violent criminal activity --

THE COURT:  You are just shifting away from nature of the offense.  You are going to the factors you like.  You are talking about his history.  That's a totally different factor.

MR. LITTLE:  Take those natures of the offense, there is no world in which that offense could be recreated, or the things the government says led to that offense in the

present --

THE COURT:  I guess that's where I think you're narrowing.  I don't think the inquiry is consider the nature of the offense, and then once you understand the nature of the offense, the sole inquiry is whether that exact thing could be recreated.  That's not what the statute tells you to look at.

MR. LITTLE:  The case law certainly suggests if you have got a drug defendant, this is the type of ways they have harmed the community, we think they may still harm the community in that way.

THE COURT:  I guess I'm just saying I don't think -- I didn't even see this argument in your briefing, but I don't think the government is so hamstrung that it has to show that this exact offense would be created.  I think they also have the opportunity to show what the statute talks about, which is danger to people or the community.

MR. LITTLE:  With evidence.

THE COURT:  Of course.  There is a burden of persuasion.  They also have an evidentiary presumption.

MR. LITTLE:  But there is no evidence that he has ever used or shown an obsession with guns or knives.  There is no evidence that he has ever attempted --

THE COURT:  Can I ask you -- well, let me just ask you a question that I was trying to get at before.  I understand the point about the devices not being capable of exploding, but

let me give you the -- finish that sentence for me, "and therefore," tell me why that's so important.

MR. LITTLE: And therefore the Court, especially with conditions, can feel comforted that there is not certainly clear and convincing evidence --

THE COURT: Now you're just jumping to the conclusion. Is the idea that he couldn't do it even when he wanted to --

MR. LITTLE: Yes.

THE COURT: -- and therefore there is nothing to worry about? Is that the idea?

MR. LITTLE: There is a difference between creating inert props that could never explode and creating viable weapons.

THE COURT: This is where -- I think where you responded to this was in response to Judge Sharbaugh's point where he said this was luck, not lack of effort.

Take away the luck point, just focus with the not lack of effort point. Does the fact that it wasn't capable of actually exploding, what was actually constructed, take that to be true, assume it to be true, because that's your argument, show that this was not for lack of effort? That was his point, right?

MR. LITTLE: There is a difference between effort and ability. If you had an individual who had committed a crime with a gun that turned out to be an airsoft gun, and they tried

to commit acts with an airsoft, and the evidence showed that they didn't know the difference between an airsoft gun and a regular gun -- if you had a defendant who committed an armed robbery or something of the same effect with an airsoft gun, the evidence showed that they didn't know the difference between an airsoft gun and a regular gun, I certainly think that factor of the defendant's inability to understand would demonstrate they don't have the ability.

And maybe there they chose wrong.  It's easy for that person to get a real gun.  Here, there is a real question of ability that goes directly to dangerousness.  And that's why I think that aspect of --

THE COURT:  I do think that -- I'm not going to put words in the government's mouth, but I think that's what is going on here, right.  If you have someone who had a thought that something was a real automatic gun and instead it was a plastic one, but then they still went into that public place and tried to use it, I don't think you would look at that and say, well, no one was hurt and it was a plastic gun and this person is not a danger.

They were still willing to do all of that, and it was, again, as Judge Sharbaugh said, not for lack of effort.  I'm trying to understand exactly what the difference is here.

MR. LITTLE:  I think the difference is at what point do you sort of have to have show actual dangerousness.  If I

have a desire -- I don't want to concede at all that he did, because we don't think that he did and we don't think this is the right person, but if that were true, you then have to at least say he's dangerous because he had a desire to do something which is complicated, which is incapable of doing even if he wanted to.  I do think that goes to the dangerousness analysis in that manner.

THE COURT:  Can you explain your argument to me about the second factor.  I think that there is a back and forth between the defense and Judge Sharbaugh on this question of whether the weight of the evidence is relevant for the purposes of guilt or the purposes of dangerousness.

MR. LITTLE:  I think it depends on the type of case the government presents for detention.  If this were a case of whether or not the person is going to show up, I think evidence of guilt could suggest that the person might run because they are concerned about certain conviction.

And so if this were a flight case, it could be relevant there.  I think it depends on the type of case.  On a dangerousness case, I think the reason and the only way it's relevant is that it supports the government's argument the person is capable of being dangerous.  That's one piece of evidence, they are capable of being dangerous because I have got evidence that he was dangerous before.

And the same way that if you had someone who committed

crime A, and they showed evidence of crime B, C, D, the evidence and the strength of the evidence about crime B, C, D would suggest that the person is dangerous because they are capable of harming someone.

So I think the dangerousness equation here relates only to does that indicate that he was capable of doing this thing which suggests that he is dangerous. And even then, if you were to accept the government, however much weight they put on it, the government has a five-year gap --

THE COURT: I kind of -- I agree with you at the high level that maybe it turns on -- it's related to or the persuasive value and significance of it depends on the particular context.

I don't know that it's fair to say that it's more relevant in the flight context, although I think you constructed a way in which it could be relevant. It seems to me like it also depends on the first factor, the type of offense and the nature of the circumstance of the offense.

I could see how if you would say, look, the offense was tax fraud, there was no violence at all whatsoever, really putting a thumb on the needle, I guess if the government, in that circumstance, if they wanted to say, we've got so much evidence so the second factor wins, how much would that actually show a propensity for danger, right?

I guess they could argue, well, we've got a lot of

evidence so he's going to be incarcerated at the end of the day so it's less of an injustice, but they wouldn't have that kind of not only do we have a dangerous offense, but we have a lot of evidence.

It seems like that doesn't really work for you here because the offense that's being charged is an explosive offense, so one would think that the weight is actually pretty significant.  This is not a percentages game, but if there is a one percent chance someone did an explosive offense versus a higher percentage chance, that would bear on dangerousness.

My question is getting at how significant is this distinction between guilt and dangerousness in your particular context.

MR. LITTLE:  Massive.  So let me give you a different example.  There are federal murder offenses that have an unlimited or a very long statute of limitations.  If you had a crime charged here in federal court for a murder that occurred 25 years ago, and the government came in and said here is the DNA, he confessed to somebody last week, we have got him dead to rights, this guy is going down for a murder case, it's a federal death penalty offense that happened 30 years ago.  And the defense comes in and says let me tell you about those 30 years.  Turns out the guy is a literal saint, here is the lack of dangerousness, there is no evidence of any criminal history.

The fact that he was -- a very serious offense,

actually killed a human being, would have very little weight on a detention question because it ultimately is a question of that person's dangerousness.  They would be able to say, hey, one time you killed somebody.

THE COURT:  I think I get the point you're making, but aren't you just shifting to the other factors you like again?  I think you're shifting to the history and characteristics of the person and the seriousness of the danger, which are the third and fourth factors.

MR. LITTLE:  I'm saying the first factor can have a role, but it can no way be dispositive for exactly that reason.

THE COURT:  I was talking about the first and the second factor.

MR. LITTLE:  The second factor?  You're going to have to remind me where we are now.

THE COURT:  Is the weight of the evidence against the person.

MR. LITTLE:  But I think, again, the weight of the evidence only assists the Court in determining how dangerous they are presently, if it's a dangerous offense.

For example, in a white collar offense, if you have somebody again --

THE COURT:  I guess my point was this is not a white collar offense.

MR. LITTLE:  But then it collapses into dangerousness

for exactly this reason.

THE COURT:  But the ultimate inquiry is about safety of the community and people, so everything collapses into dangerousness.

MR. LITTLE:  It collapses into element one, the circumstances of the offense being the type that is dangerousness.  I guess that's the way to sort of expand that thought.  The it, in a particular case like this, collapses into an issue, one category of what is the charged conduct, what does that tell us about the person generally.

THE COURT:  Let me give you the opportunity to answer one question that is also important to me.  What facts do I have that were not in front of Judge Sharbaugh?

MR. LITTLE:  You have the confirmed diagnosis.  You have the opinion that OCD is consistent with that.  You have the fact that --

THE COURT:  You're talking about the Phillips statement and the Black statement?

MR. LITTLE:  All the declarations you have.

THE COURT:  The letters were in front of Judge Sharbaugh, the character letters?

MR. LITTLE:  Yes, but the most recent set of declarations, including the declarations of family laying out the timeline of when these things occurred, so those are all different.

THE COURT:  Is there anything else that I have that Judge Sharbaugh didn't have?

MR. LITTLE:  I don't think so.  I think those are the primary ones.  He had a bit of this.  We did emphasize it more in the reply that the proposed third-party custodian, her spouse is a former federal law enforcement officer.  That was mentioned briefly.  I don't think it made it in much discussion.  It was very briefly mentioned in the magistrate's order, but I think we expanded on that a bit.

It's not been mentioned, and it wasn't really argued originally, she said this in the transcript, but I think we pointed this out again in the reply, the third-party custodian, in fact, this whole family, his job was working in a bail bonding company that operates in multiple states.  You have a family that their whole professional livelihood --

THE COURT:  That point I have, and I think it was clear from the character letters, many of whom were business associates.

MR. LITTLE:  I think to the extent that we didn't argue that -- the government says in their third point that there is no evidence the third-party custodians can control him.  This is particularly a set of third-party custodians who not only risk the court, whatever sanctions would happen here if they didn't comply, but would have professional repercussions across their entire business in all of the 16

states they operate in.  I think that was not something that was sufficiently raised before.

THE COURT:  Got it.  That's helpful.  Any other points you want to raise on this?

MR. LITTLE:  Not at this time, Your Honor.

Oh, for the appellate record, we do think the 3060 issue that the Court has already ruled upon, to the extent that there is adverse decision here and we appeal, I think one of our things I want to preserve is what we raised in that original motion was if the government had -- if he had properly been discharged at the time that the sort of fake indictment was brought and properly been released, the government would only be able to redetain on new circumstances.

THE COURT:  You made those arguments in your pleadings.

MR. LITTLE:  There is no change in circumstances under 3164 that would sufficiently allow detention at this time.

THE COURT:  I'm not sure I have that, but it sounds like you're trying to build something for appeal.  You can go ahead and pursue whatever remedies you have available to you.

Let me hear from the government on this.

MR. JONES:  Your Honor, the answer to the initial question that you asked with respect to Judge Sharbaugh's opinion is that he didn't get anything wrong.  His analysis was careful, it was thorough, it was comprehensive, it addressed

every argument that's been raised by the defense.  There is nothing that has changed since he issued that opinion, and it is affirmatively correct and there is no reason to set it aside.

I think ultimately the three points that I would like to make in response to the arguments that the defense has made in their papers and today are:

One, these bombs were not "harmless," which is the word that the defense has used to characterize them.

Two, this conduct, the charged conduct was not isolated.  It was not isolated to January 5th of 2021.  It was part of a broader years-long continuum of conduct that should concern the Court in a variety of ways.

And the third point is that the defense, their attempts to explain or characterize the defendant's concerning behavior over the last few years, they fall far short of what would be reliable for the Court to consider in a case like this.  And I'm talking about these -- the four-sentence letter submitted by Dr. Black related to these diagnoses that were apparently made a month ago after the criminal case was initiated.

So I'll take those points in turn.  Of course we have briefed this extensively.  But with respect to the first point, the devices that the defendant is charged with using maliciously in this case to try to bomb the national

headquarters of the RNC and the DNC on January 5th, the government has never taken the position that the defendant is a professional bomb maker or that he is an expert bomb maker.

But what the record before the Court establishes quite clearly is that he is an amateur bomb maker with extensive interest and access to improvised explosive device materials. And an unskilled bomb maker poses a significant threat to the community, and, in fact, poses threats that perhaps somebody skilled in this area wouldn't pose.

The submission from the defense, the Phillips report, doesn't change the analysis for this Court. It doesn't change the analysis that Judge Sharbaugh conducted with respect to the nature of the offenses.

I'll note that the proffer was made at the initial detention hearing that there was a defense expert who would opine as Mr. Phillips did in this case, and Judge Sharbaugh deemed it not relevant to consider at that point.

But I think ultimately putting aside the factual disputes, which we have laid out why --

THE COURT: In other words, I don't want to focus too much on any one sentence, but sometimes it's just helpful to get reactions to and to understand parties' positions. Judge Sharbaugh has his sentence where he says "the bomb didn't go off," which is something obviously the government knows and Judge Sharbaugh knew, and he says, "that was luck, not lack of

effort."

And is your point essentially, if he were to have said, you know, it was not -- or it was luck and inability, not lack of effort, your point is that doesn't change anything?

MR. JONES:  It wouldn't change it if it was inability, but I don't think that the record --

THE COURT:  You're saying it's just not luck, it might have been lack of skill, but it doesn't matter is your point.

MR. JONES:  It doesn't matter as a matter of law. These were explosives under the law regardless.

THE COURT:  Go kind of to the facts, not the -- I think it's more helpful to understand specifically the argument as to dangerousness and safety.

MR. JONES:  So what the Court should keep in mind is that the devices, when they were disrupted, they were broken into pieces.  I mean, they were destroyed, and so the FBI explosives examiner who assessed them had to put them back together in essence.

And in his report, which was attached to the defense's submission, he provided a step-by-step set of instructions as to how you put those pieces back together to create a functional pipe bomb.  It had all of the components necessary to create a viable device.  And what we included in our papers, which is a diagram showing that construction was what the explosives examiner actually put together.

And so I think that factually supports conclusively the opinion of the explosives examiner, who is the only person who has actually assessed the devices, that they were viable. The dispute, I think, is about the probability that they would have exploded based on those powder samples with respect to black powder, whether it was explosive in one sample versus not explosive in another sample.

I think we have addressed those, and where the defense submission ignores inconvenient facts in the record about those samples, but putting that to the side, what the evidence here shows, and you can see it in the video of the defendant's actions on January 5th, is that he certainly believed that those devices were explosive.

There is a reason why he told the FBI that he only put one device in his backpack at a time, and there is a reason why when he had devices in that backpack, he was holding the backpack by the top strap away from his body to keep it stable. He was worried that those devices were volatile and might explode on him, and that's where he told the FBI that he set them to explode, he set those timers to explode 60 minutes later.

And so when the Court is assessing dangerousness, we're talking about the nature of these offenses in the context of the ultimate question, which is what kind of danger the defendant poses to the community if released, the Court has to

consider --

THE COURT:  You had three points.  Is there anything critical on the first point before we move?  I'm interested in the second one.

MR. JONES:  No, I think that covers the first point.

THE COURT:  I understood the second one to be kind of the pattern and the consistency throughout.  Can you do that, but also make it specifically -- obviously, I have read the pleadings, but specifically responsive, including -- I'm sure you saw the declarations that were filed yesterday.  They are not wholly new, but they do support some of the arguments that the -- I should say they are new declarations, but they are not wholly new ideas in the case.  They do support some of the timeline arguments that the defense has been trying to make.  Can you respond to those, but give me your argument at the same time?

MR. JONES:  Sure.  So I think first and foremost, what we're relying on here in seeking detention or asking the Court to deny the motion to revoke Judge Sharbaugh's order is a years-long, as I said earlier, continuum of conduct.  And so it stretches from, based on the declarations, it stretches back farther than the government even understood when we previously litigated these issues, because, apparently, back in 2018, the defendant was -- that was when he was experimenting with potassium chlorate.  That's been represented in the declaration

as an innocuous science experiment to make rocket fuel.  That was raised for the first time yesterday in the reply brief.

So it prompted the government to go back and look at what the defendant was purchasing around the same time in 2018, because, as I said, this is farther back than even we realized. And it showed us that the defendant purchased the beaker sets that he used, on his own admission, to create this potassium chlorate, which is an oxidizer used in IEDs, on the same day from Amazon as the sulfur dust that he used in the pipe bombs in 2021.

Later on, in 2018, he purchased copper pipes, he purchased steel pipes, he purchased a hacksaw, he purchased wires.  What didn't he purchase?  He didn't purchase fins or cones or the type of lightweight material that somebody like a hobbiest would purchase if they were going to make a model rocket at home.

The record here supports the conclusion, certainly to a clear and convincing standard, that what the defendant was experimenting with in 2018 was another very potent oxidizer that's commonly used in improvised explosive devices, and that I think sets the table for what the record shows happens over the ensuing years, which is that before January 5th of 2021, the defendant is experimenting with these materials.  Then he has this triggering event that prompts him to assemble these devices and to use them in an act of political violence in

2021.  That required him to do research in order to understand how to manufacture these pipe bombs.

It also required him to understand how to make homemade black powder, the different components that are used to make explosive black powder.  And then ultimately, on January 5th, he executed that plan.

THE COURT:  Can I ask you, you used the word "triggering event," which I think was described in the papers as taking the quote of snapping, which I understand is the description of the police interview.

I'm not meaning to oversimplify or put words in defense counsel's mouth, so I'll just put it in mine. If someone were to say, well, look, you have got evidence of one snap over the course of all of those years, your response would be?

MR. JONES:  My response would be that the defendant is now under extraordinarily difficult and challenging circumstances facing a public prosecution based on his conduct. That is not at all dissimilar from the type of circumstances that led him to snap.

In fact, it might be even more difficult for a person to deal with than in 2020, when he was simply aggrieved about his views on a political matter, and that was the snapping event back then.

And of course, all of this is in the context of

somebody who has an interest, demonstrated interest and proclivity for assembling these types of devices, accumulating the components used to create these materials.

And so I think when the Court is considering the ultimate question, the question is not with absolute certainty can the Court say that if you release the defendant he would never make another bomb, which is the way the defense has kind of characterized it, it is whether the Court can fashion conditions that would reasonably assure the community's safety.

And it's an assessment of the risk of danger that the defendant poses.  And here, the defendant's conduct, the sustained conduct, in combination with the wiping of the electronic devices -- and there is additional information on that topic that the government can proffer in response to what the defense has filed -- that leads the Court --

THE COURT:  It's hard for me to have you just say that without understanding what you mean.  I was going to ask you to respond to this kind of 2022, everything happened after 2022 with respect to the wiping.

Can you address that narrow point first?  Is that accurate?

MR. JONES:  When we talk about wiping, first of all, we're talking about factory resets of the device.  We're talking about wiping all user content on the phone.  We're not talking about wiping junk files.

There were, my understanding is, two factory resets of the device in December of 2020, so it would have been a couple of weeks before the defendant planted the pipe bombs. And then the next factory reset does not take place until August of 2022.

Now, the significance of that timeline is that for that 18-month period, there is record evidence that the defendant was continuing to purchase the components that he used to manufacture the pipe bombs. In fact, his purchasing accelerated. He bought more pipes and end caps after January 5th of 2021 than he did before January 5th of 2021.

But then when you get to the summer of 2022, mid 2022, his use of credit cards and debit cards to purchase those components stops, but what starts, the daily factory resetting of his electronic device. And that also coincides with in May of 2022, the defendant begins to regularly purchase a PC, a personal computer, a desktop or laptop, cleaner, called CCleaner. He started to spend hundreds of dollars on those products, which are designed to clear, among other --

THE COURT: Can I ask you to connect the dots to make it explicit in terms of dangerousness. I mean, one could look at those facts and say, okay, he was really interested in this a long time ago, realized he had snapped this one time, all those other purchases were foolish, and now he's like I feel terrible about this, I'm going to erase all of the proof I ever

did this.

MR. JONES:  The concern is that something in mid 2022 caused him to take extraordinary measures to conceal his digital activity.  Whether that was somebody learning or suspecting or what he was doing, it made him realize that he should no longer be purchasing components using traceable credit cards, and that if he was going to use his cell phone, he needed to factory reset it every day.

He also purchased, as I mentioned, the cleaning product for his computer, which would clear browsing data.  And when his devices, the desktop and laptop, were examined in this case, there was a browser called Brave, a secure browser that allows for --

THE COURT:  Doesn't this go more towards, like, maybe flight risk or wanting to evade law enforcement than it does to dangerousness?  I know you're not arguing the former, but help me understand why it goes to dangerousness.

MR. JONES:  It goes to go whether the Court can or should have confidence that the defendant will abide by conditions, and whether a third-party custodian could effectively monitor him given his penchant for concealing his digital activity.

THE COURT:  That's helpful.  Maybe we could turn to that.  And the law requires me to consider whether there is any condition or combination of conditions that would assure

safety, and I take that seriously.

And here it's not like the defense is coming in saying release on own recognizance. They are saying home confinement with a custodian and GPS. I know you have kind of already built some of this, but tell me why can't the government keep the community safe with all of those conditions?

MR. JONES: The fundamental problem with that proposed release plan is that it puts the defendant in substantially the same place that he was in when all of this happened. This is not somebody who was living on their own unsupervised in an apartment somewhere making bombs.

This is somebody who constructed these devices, apparently experimented with potassium chlorate with the knowledge of family members in their home and still was able to effect these criminal offenses, to plant explosive devices at the RNC and the DNC on the eve of a significant and high-security event the next day.

He was able to do all of that while living in his family's home with multiple family members, living the same kind of life and existence that the proposed release plan would return him to, which is to live a solitary plaintiff at the family's home and only leave to go to work. And so under the facts and circumstances of this case, those conditions are simply insufficient to assure the community's safety.

THE COURT: I don't know if you got all the way

through the third point you wanted to make, or if there is anything else you wanted to say on that.

MR. JONES:  The third point I think was simply to address the defense's attempt to explain everything away with these diagnoses.  And I have addressed to some extent the argument -- I guess I haven't really directly addressed the argument that the phone wiping is explained by OCD.

What's before the Court is, as I mentioned, a four-sentence letter written by a doctor yesterday, and it simply says that he examined the defendant for two days and he's diagnosed him with autism level one, which I think defense counsel characterized as extreme autism.  That is the mildest form of autism, as well as OCD.

And it simply says that repetitively deleting junk files from your phone is consistent with obsessive compulsive disorder.  Of course, that's not what the defendant did here, but that was what was -- that was the information provided to this doctor informing his opinion.

THE COURT:  Can you clarify that.  When you say "this is not what the defendant did here," can you finish that thought for me?

MR. JONES:  To be more precise, the defendant in factory resetting his phone was not clearing junk files.  He was deleting all user content on his device on a daily basis.

But be that as it may, repetitive behavior might be

consistent with OCD, sure, but on the facts and the record before this Court, it is far more consistent with concealing digital activity.

The defense has not made any proffer as to how the defendant's OCD diagnosis manifests in any other way other than wiping his cell phone, so there is no proffer that the defendant suffers from any other symptoms of OCD except for wiping his cell phone to explain the otherwise obviously incriminating nature of that kind of conduct.

THE COURT:  I heard you make an argument about the credibility of the declaration from Dr. Black that came in yesterday, and I think I have heard you make an argument that it could be consistent with OCD and also consistent with covering your tracks.

Are you -- is that your argument?  Is there another component of it, that it just doesn't matter if it's because of OCD?

MR. JONES:  No, I'm arguing that it's far more consistent with covering your tracks, which is the analysis that Judge Sharbaugh engaged in.  I mean, he considered the exact same question and he determined based on the facts in this case it was more consistent with concealing and hiding and obfuscating than it was explainable by innocuous explanations.

THE COURT:  Okay.  I think I have that argument.  Anything else?

MR. JONES:  The last one is simply that just because it's been referred to so many times in the pleadings and the proceeding that the defendant has been diagnosed with autism spectrum disorder level one, there has been no attempt to explain what, if any, relationship that diagnosis has to whether the defendant poses a danger to the community if released.

But what I will say is that the Court can review the interview, the Court can review the transcript and the video recording of the defendant's four-hour conversation with the FBI agents who arrested him on December 4th.  What you will see is a 30-year-old man who went into an FBI interview after being arrested and proceeded to give them a carefully planned cover story explaining the evidence that placed him in Washington, DC on the evening of January 5th of 2021.

That cover story was that he was going to DC to attend a protest at the Capitol, which would explain the evidence placing him in the area that night.  He stuck to that story for two hours before he finally admitted -- realized that there was no way out and admitted that it was in fact him that placed those pipe bombs.  That demonstrates that we're talking about somebody who does not have any appreciable deficit in any meaningful way that would affect the Court's analysis here.

And without any specific proffer from the defense, there is no reason for the Court to consider that diagnosis as

bearing on the ultimate question before the Court.

THE COURT:  Got it.  Your point is that autism level one or not, focused on keeping the community safe, he has shown what is needed to require detention?  Is that your point?  I'm trying to just make sure I understand whether that's what you're arguing or you're trying to say go watch the video and you're going to find that he doesn't look like he's autistic?

MR. JONES:  I'm saying that, in terms of dangerousness, there is nothing mitigating on this record about the defendant's diagnosis.  My point is simply that the defendant sat for that four-hour interview, and if you watch that interview, you will see a person who appears to have all of their intellectual faculties.  You can tell that because he is providing the FBI with a carefully planned cover story for his conduct, and he sticks to that story for hours.

This is not, contrary to the way it's been portrayed by the defense, this is not a situation where the FBI agents were simply saying things to the defendant and he was responding yes or no.  These were in his own words.  He is the one who provided a carefully planned cover story to the FBI and then eventually, when he realized, based off of the evidence that the FBI had gathered in the investigation that he didn't have a way out, he finally admitted what he had done.

There is no intellectual deficit on this record that should concern the Court in terms of dangerousness.

THE COURT: I appreciate your submissions.

I can give the defense a brief opportunity to rebut anything focused -- again, this is not a chance to make some broad plea. This is a chance to focus on error and facts that you think would be helpful for me at this point.

MR. LITTLE: The government asked why we didn't raise all the other ways that OCD might exhibit itself. Because they weren't relevant to this hearing. If they were relevant to this hearing, we would have put it forward.

We were specifically responding to what the government proffered as somehow as evidence of this dangerousness continuing because he was wiping his phone every day. I think that fact is just wildly sort of ends oriented. They say it shows something and they try to make a path as to how it shows something. It's inconsistent with all the evidence, which is this is not somebody who is sitting out there trying to hide something secretly from everybody, which also goes to the question of the alleged confession and the idea of autism.

To the extent there is future motions practice to suppress that alleged confession, I think you can read it differently. This is somebody who truthfully was telling the truth and then had his will overcome and then just said whatever the government wanted him to say. I don't think the Court needs to resolve that here. I don't think it helps the government though at all in any which way.

The reason we raised that issue is to address specifically some of the other things, those other categories the government says makes my client dangerous, and they are not there.

The last thing they talk about with some of these things.  Well, something caused him to do it.  They don't know what it is.  They are just asking the Court to assume that there is something that happened bad that my client did between 2021 and the present that the Court should be concerned of.

The fact remains on this record there is just no evidence of any continuing dangerousness that my client exhibited.

The last point I'll make is the idea around the third-party custodian, the fact that he allegedly committed this crime in the same situation.  When I was young, my sister almost burned down the house because she had a box of matches and she dropped it and burned down a room.  She continued to live in our house, and we kept the matches away from her because we had the knowledge that she couldn't be trusted with them.

This is an individual who the Court could certainly fashion taking away digital access.  The Court can fashion GPS. The Court can fashion certain types of supervision and reporting, all of which will directly address any of the things which allegedly allowed this to occur.

The government doesn't really have an answer to that other than to say, well, we disagree.  There is no reasoned basis to believe that the conditions could not sort of directly address the circumstances that allegedly allowed this to occur.

THE COURT:  All right.  Okay.  Appreciate your submissions.

I'm not going to rule from the bench on this.  I'm going to take this and what I have heard today under advisement, and I'll issue a written order.

MR. WILLIAMS:  Is there any way I have can two minutes to add one thing about something you said?

THE COURT:  Come on up, Mr. Williams.

MR. WILLIAMS:  I'll do it just real quick.  Your Honor, you hit the nail on the head when you said you take seriously whether there is a set of circumstances or conditions, strict conditions that could reasonably assure that this wouldn't happen.

And the starting point really is what is the standard we're going by, sufficient evidence to basically convince you to have a firm belief or a conviction that absolutely there is no set of strict conditions that would give you reasonable assurance that he's not going to create bombs, and the government said what we're fearing is is we see a pattern of accumulating components to use these materials to create bombs.

But what they won't address, other than to talk about

him doing it at a time when he didn't have any conditions, he didn't have any monitoring, he didn't have any conditions at all, is what is it about house arrest and ankle monitor, constant supervision, checking in weekly, and being in the supervision of people who now know or suspect, say, hey, I'm going to really watch you closely, what is it about those conditions that won't basically tell Your Honor, hey, he just tried to go to Wal-Mart and buy something?

Because as soon as he leaves the house -- they try to get around the leaving the house saying he wants to go work. We have already conceded we would give that up.  He would stay in that house.  So you're trying to say all of those conditions don't reasonably assure that that he won't go and accumulate bomb materials?  That doesn't make sense.  That's the law.  All this other stuff, Your Honor, I'm willing to concede.

THE COURT:  I think I have your point.  I understand the legal standard.  I stated it.  I take it very seriously that that's what's required.  I don't think it's so narrow as you said.  It's not just going to buy the exact same stuff that he's accused of.

MR. WILLIAMS:  Leaving the house to purchase anything, to do anything.

THE COURT:  I think I have got your point.  And I understand the conditions that are available, and I appreciate it.  Okay.

All right.  I will take the parties' arguments under advisement, and I'll issue a written order once I have come to a decision.

And I think we have handled everything else through the status conference, so we can go ahead and adjourn. Appreciate it.

(Proceedings concluded at 4:52 p.m.)


CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 30th day of January, 2026.


                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RDR-CRR
                              FEDERAL OFFICIAL COURT REPORTER

**/**

**/s** [1] - 59:16

**1**

**103** [1] - 1:21
**1050** [1] - 1:16
**10:30** [2] - 16:21, 17:1
**11:00** [1] - 16:21
**16** [1] - 38:25
**18** [1] - 17:3
**18-month** [1] - 48:7
**1:26-cr-00001** [1] - 1:5

**2**

**20** [1] - 22:9
**20036** [1] - 1:17
**2018** [4] - 44:23, 45:4, 45:11, 45:19
**2020** [2] - 46:22, 48:2
**2021** [11] - 20:18, 22:12, 23:3, 40:11, 45:10, 45:22, 46:1, 48:11, 53:15, 56:9
**2022** [11] - 20:24, 20:25, 21:4, 21:7, 47:18, 48:5, 48:12, 48:16, 49:2
**2026** [2] - 1:10, 59:14
**20530** [1] - 1:14
**20th** [1] - 5:8
**25** [1] - 35:18
**26-1** [1] - 2:2
**27th** [4] - 16:18, 16:20, 17:1, 17:3
**28** [1] - 1:10

**3**

**30** [7] - 8:25, 9:2, 14:14, 14:16, 14:20, 35:21, 35:22
**30-year-old** [1] - 53:12
**300** [1] - 1:19
**30342** [1] - 1:22
**3060** [1] - 39:6
**30th** [1] - 59:14
**3161(h)** [1] - 17:4
**3164** [1] - 39:17
**37203** [1] - 1:19
**3:36** [2] - 1:10, 2:1

**4**

**41** [1] - 6:17

**4:52** [2] - 1:10, 59:7
**4th** [1] - 53:11

**5**

**500** [1] - 1:16
**51** [1] - 22:20
**54** [1] - 1:19
**5600** [1] - 1:21
**5th** [8] - 40:11, 41:1, 43:12, 45:22, 46:6, 48:11, 53:15

**6**

**60** [1] - 43:20
**601** [1] - 1:13

**8**

**8,000** [1] - 9:18

**A**

**a.m** [2] - 16:21, 17:1
**abide** [2] - 19:6, 49:19
**ability** [3] - 31:24, 32:8, 32:11
**able** [8] - 9:20, 12:22, 14:10, 28:6, 36:3, 39:13, 50:14, 50:18
**above-entitled** [1] - 59:12
**absence** [2] - 21:5, 22:19
**absent** [1] - 25:6
**absolute** [1] - 47:5
**Absolutely** [1] - 25:4
**absolutely** [3] - 25:14, 29:13, 57:20
**abstract** [1] - 12:16
**accelerated** [1] - 48:10
**accept** [1] - 34:8
**access** [3] - 10:6, 41:6, 56:22
**accumulate** [1] - 58:13
**accumulating** [2] - 47:2, 57:24
**accurate** [2] - 47:21, 59:11
**accused** [2] - 18:23, 58:20
**acknowledge** [1] - 27:20
**acknowledged** [1] - 24:9
**act** [3] - 22:3, 26:22,

45:25
**action** [1] - 23:14
**actions** [1] - 43:12
**activities** [1] - 22:6
**activity** [8] - 21:6, 21:9, 23:13, 29:18, 29:19, 49:4, 49:22, 52:3
**acts** [1] - 32:1
**actual** [3] - 23:14, 29:12, 32:25
**add** [2] - 12:13, 57:11
**additional** [1] - 47:13
**address** [10] - 3:22, 8:6, 12:16, 19:11, 47:20, 51:4, 56:1, 56:24, 57:4, 57:25
**addressed** [4] - 39:25, 43:8, 51:5, 51:6
**adjourn** [1] - 59:5
**admission** [1] - 45:7
**admitted** [3] - 53:19, 53:20, 54:23
**adverse** [1] - 39:8
**advisement** [2] - 57:9, 59:2
**affect** [1] - 53:23
**affirmatively** [1] - 40:3
**afternoon** [6] - 2:6, 2:8, 2:9, 2:12, 2:14, 2:15
**afterwards** [1] - 22:13
**age** [1] - 27:24
**agency** [2] - 10:3, 13:10
**agency's** [1] - 11:1
**agents** [2] - 53:11, 54:17
**aggrieved** [1] - 46:22
**ago** [6] - 12:14, 18:24, 35:18, 35:21, 40:20, 48:23
**agree** [3] - 18:13, 34:10
**agreeing** [1] - 13:24
**agreement** [2] - 14:14, 14:15
**ahead** [4] - 10:22, 18:9, 39:20, 59:5
**airsoft** [5] - 31:25, 32:1, 32:2, 32:4, 32:6
**Alex** [1] - 2:10
**ALEX** [1] - 1:18
**ALI** [1] - 1:9
**alleged** [6] - 15:10, 20:15, 21:6, 23:16,

55:18, 55:20
**allegedly** [3] - 56:14, 56:25, 57:4
**allow** [2] - 9:3, 39:17
**allowed** [3] - 11:6, 56:25, 57:4
**allows** [1] - 49:13
**almost** [1] - 56:16
**amateur** [1] - 41:5
**Amazon** [1] - 45:9
**Amendment** [3] - 15:8, 15:9, 16:8
**America** [1] - 2:3
**AMERICA** [1] - 1:3
**AMIR** [1] - 1:9
**amount** [3] - 5:11, 10:19, 14:20
**analysis** [6] - 33:7, 39:24, 41:11, 41:12, 52:19, 53:23
**ankle** [1] - 58:3
**answer** [3] - 37:11, 39:22, 57:1
**anticipate** [1] - 10:15
**anticipating** [1] - 15:1
**antics** [1] - 4:4
**apartment** [1] - 50:11
**appeal** [2] - 39:8, 39:19
**appearance** [2] - 2:5, 2:24
**appeared** [1] - 2:18
**appellate** [1] - 39:6
**applies** [1] - 23:25
**appreciable** [1] - 53:22
**appreciate** [4] - 55:1, 57:5, 58:24, 59:6
**approach** [4] - 2:4, 5:10, 5:22, 6:8
**approaching** [1] - 5:13
**appropriate** [1] - 17:9
**area** [2] - 41:9, 53:18
**areas** [1] - 8:1
**argue** [2] - 34:25, 38:20
**argued** [1] - 38:10
**arguing** [3] - 49:16, 52:18, 54:6
**argument** [18] - 3:16, 17:18, 22:7, 22:13, 25:12, 30:12, 31:20, 33:8, 33:21, 40:1, 42:12, 44:15, 51:6, 51:7, 52:10, 52:12, 52:15, 52:24

**arguments** [5] - 39:14, 40:6, 44:11, 44:14, 59:1
**armed** [1] - 32:3
**arraigned** [1] - 2:24
**arrest** [3] - 19:20, 26:19, 58:3
**arrested** [4] - 26:19, 26:25, 53:11, 53:13
**articulated** [1] - 5:13
**articulating** [1] - 8:2
**aside** [2] - 40:4, 41:18
**aspect** [1] - 32:12
**assemble** [2] - 28:8, 45:24
**assembling** [1] - 47:2
**assess** [1] - 12:22
**assessed** [2] - 42:17, 43:3
**assessing** [1] - 43:22
**assessment** [1] - 47:10
**assists** [1] - 36:19
**associates** [1] - 38:18
**assume** [4] - 13:4, 13:7, 31:20, 56:7
**assuming** [1] - 24:13
**assurance** [1] - 57:22
**assure** [5] - 47:9, 49:25, 50:24, 57:16, 58:13
**ATF** [2] - 10:7, 13:6
**attached** [4] - 3:13, 3:25, 17:23, 42:19
**attachments** [1] - 17:22
**attack** [1] - 16:8
**attempt** [3] - 21:2, 51:4, 53:4
**attempted** [1] - 30:22
**attempts** [1] - 40:15
**attend** [1] - 53:16
**attention** [1] - 3:24
**Attorney** [1] - 1:12
**attorneys** [2] - 3:4, 3:6
**August** [1] - 48:4
**autism** [7] - 20:11, 51:11, 51:12, 51:13, 53:3, 54:2, 55:18
**autistic** [1] - 54:7
**automatic** [1] - 32:16
**available** [3] - 16:18, 39:20, 58:24
**Avenue** [1] - 1:16

**avoid** [1] - 4:1
**aware** [1] - 15:4

## B

**background** [2] - 19:18, 25:3
**backpack** [3] - 43:15, 43:16, 43:17
**bad** [3] - 23:16, 23:19, 56:8
**bail** [1] - 38:13
**BALLANTINE** [1] - 1:13
**Ballantine** [1] - 2:7
**based** [9] - 18:15, 27:9, 28:10, 29:17, 43:5, 44:21, 46:18, 52:21, 54:21
**baseline** [1] - 12:17
**basis** [3] - 5:8, 51:24, 57:3
**Bates** [1] - 9:14
**beaker** [1] - 45:6
**bear** [1] - 35:10
**bearing** [1] - 54:1
**BEFORE** [1] - 1:9
**beginning** [1] - 2:5
**begins** [1] - 48:16
**behavior** [2] - 40:16, 51:25
**belief** [1] - 57:20
**believes** [1] - 25:1
**bench** [2] - 2:23, 57:7
**benefit** [1] - 28:13
**BERNARD** [1] - 1:21
**best** [1] - 6:20
**better** [1] - 16:11
**between** [16] - 6:22, 9:2, 9:24, 10:14, 17:2, 21:6, 22:5, 26:17, 31:11, 31:23, 32:2, 32:6, 33:10, 35:12, 56:8
**beyond** [3] - 8:2, 13:25, 26:9
**bit** [4] - 9:3, 22:23, 38:4, 38:9
**black** [6] - 18:3, 40:19, 43:6, 46:4, 46:5, 52:11
**Black** [1] - 37:18
**body** [1] - 43:17
**bomb** [16] - 19:4, 22:24, 23:3, 23:13, 28:8, 28:9, 28:13, 40:25, 41:3, 41:5, 41:7, 41:23, 42:22, 47:7, 58:14

**bombs** [10] - 21:17, 40:8, 45:9, 46:2, 48:3, 48:9, 50:11, 53:21, 57:22, 57:24
**BOND** [1] - 1:9
**bonding** [1] - 38:14
**bought** [1] - 48:10
**box** [1] - 56:16
**Brady** [3] - 7:13, 10:7, 17:9
**Brave** [1] - 49:12
**BRIAN** [1] - 1:6
**Brian** [1] - 2:3
**brief** [2] - 45:2, 55:2
**briefed** [1] - 40:23
**briefing** [3] - 17:20, 24:9, 30:12
**briefly** [2] - 38:7, 38:8
**broad** [1] - 55:4
**broader** [3] - 6:20, 8:8, 40:12
**broadly** [1] - 10:23
**broken** [1] - 42:15
**brought** [1] - 39:12
**browser** [2] - 49:12
**browsing** [1] - 49:10
**build** [1] - 39:19
**Building** [1] - 1:21
**built** [1] - 50:5
**burden** [1] - 30:18
**burned** [2] - 56:16, 56:17
**bury** [1] - 8:14
**business** [2] - 38:17, 38:25
**buy** [3] - 28:7, 58:8, 58:19
**BY** [4] - 1:13, 1:16, 1:18, 1:21

## C

**calendar** [1] - 16:13
**calendars** [1] - 16:16
**capable** [6] - 30:25, 31:18, 33:22, 33:23, 34:4, 34:6
**Capitol** [3] - 10:8, 13:6, 53:17
**caps** [1] - 48:10
**captured** [2] - 10:9, 10:23
**car** [1] - 21:15
**cards** [3] - 48:13, 49:7
**careful** [2] - 27:5, 39:25
**carefully** [4] - 17:20, 53:13, 54:14, 54:20

**CARTER** [1] - 1:18
**case** [41] - 2:20, 2:21, 3:2, 3:24, 4:7, 4:24, 6:4, 6:9, 6:10, 6:13, 6:21, 6:23, 7:11, 9:4, 13:18, 15:5, 15:12, 16:14, 18:19, 23:24, 24:19, 24:22, 25:13, 26:4, 26:21, 30:7, 33:13, 33:14, 33:18, 33:19, 33:20, 35:20, 37:8, 40:17, 40:20, 40:25, 41:16, 44:13, 49:12, 50:23, 52:22
**CASE** [1] - 1:5
**categories** [3] - 8:17, 15:16, 56:2
**category** [4] - 7:2, 7:10, 11:17, 37:9
**causal** [1] - 22:5
**caused** [2] - 49:3, 56:6
**caveat** [1] - 4:23
**CCleaner** [1] - 48:18
**cell** [9] - 6:16, 15:7, 15:23, 19:20, 19:21, 20:5, 49:7, 52:6, 52:8
**cert** [1] - 15:4
**certain** [2] - 33:17, 56:23
**certainly** [16] - 4:8, 10:5, 11:1, 12:2, 14:8, 15:8, 19:9, 22:22, 23:1, 26:20, 30:7, 31:4, 32:6, 43:12, 45:17, 56:21
**certainty** [1] - 47:5
**CERTIFICATE** [1] - 59:9
**Certified** [1] - 1:24
**certify** [1] - 59:11
**cetera** [1] - 17:9
**challenge** [1] - 3:9
**challenges** [1] - 23:24
**challenging** [2] - 3:11, 46:17
**chambers** [2] - 4:21, 4:22
**chance** [6] - 12:10, 28:11, 35:9, 35:10, 55:3, 55:4
**change** [5] - 39:16, 41:11, 42:4, 42:5
**changed** [1] - 40:2
**character** [2] - 37:21, 38:17
**characteristics** [1] - 36:7

**characterization** [3] - 19:22, 19:24, 19:25
**characterize** [2] - 40:9, 40:15
**characterized** [4] - 23:6, 23:7, 47:8, 51:12
**charged** [7] - 19:1, 26:12, 35:6, 35:17, 37:9, 40:10, 40:24
**charges** [1] - 2:25
**CHARLES** [1] - 1:13
**Charles** [1] - 2:6
**checking** [1] - 58:4
**chlorate** [3] - 44:25, 45:8, 50:13
**chloride** [1] - 23:2
**chose** [1] - 32:9
**CIPA** [2] - 10:24, 11:7
**circuit** [1] - 24:19
**circumstance** [3] - 11:23, 34:18, 34:22
**circumstances** [9] - 25:23, 37:6, 39:13, 39:16, 46:18, 46:19, 50:23, 57:4, 57:15
**civility** [1] - 4:11
**claiming** [1] - 21:10
**clarification** [1] - 4:18
**clarify** [1] - 51:19
**classified** [1] - 10:25
**cleaner** [1] - 48:17
**cleaning** [1] - 49:9
**clear** [15] - 4:2, 4:17, 11:16, 18:20, 19:10, 22:21, 22:22, 25:5, 26:9, 29:4, 31:5, 38:17, 45:18, 48:19, 49:10
**cleared** [1] - 16:15
**clearing** [1] - 51:23
**clearly** [3] - 14:10, 25:9, 41:5
**CLERK** [1] - 2:2
**client** [6] - 16:2, 18:24, 26:11, 56:3, 56:8, 56:11
**clock** [1] - 9:2
**closely** [2] - 3:14, 58:6
**coincides** [1] - 48:15
**COLE** [1] - 1:6
**Cole** [12] - 2:3, 2:14, 2:17, 4:8, 6:6, 6:10, 6:12, 6:16, 7:5, 7:12, 17:12, 19:20
**Cole's** [2] - 6:24, 18:2

**collapses** [4] - 36:25, 37:3, 37:5, 37:8
**collar** [2] - 36:21, 36:24
**colleagues** [1] - 16:10
**Columbia** [1] - 59:11
**COLUMBIA** [1] - 1:1
**combination** [3] - 18:21, 47:12, 49:25
**comforted** [1] - 31:4
**coming** [2] - 14:15, 50:2
**comment** [1] - 13:6
**commit** [1] - 32:1
**committed** [6] - 22:2, 28:24, 31:24, 32:3, 33:25, 56:14
**committing** [2] - 13:24, 18:24
**commonly** [1] - 45:20
**communicate** [2] - 14:6, 14:10
**communication** [1] - 8:4
**communications** [2] - 10:4
**community** [12] - 12:25, 25:6, 26:13, 30:9, 30:10, 30:16, 37:3, 41:8, 43:25, 50:6, 53:6, 54:3
**community's** [2] - 47:9, 50:24
**company** [1] - 38:14
**compelled** [1] - 22:15
**complete** [1] - 29:18
**completed** [1] - 17:16
**completely** [2] - 20:6, 27:8
**complicated** [1] - 33:5
**comply** [1] - 38:24
**component** [2] - 10:18, 52:16
**components** [8] - 28:7, 42:22, 46:4, 47:3, 48:8, 48:14, 49:6, 57:24
**comprehensive** [1] - 39:25
**compulsive** [2] - 20:13, 51:15
**computer** [2] - 48:17, 49:10
**conceal** [1] - 49:3

**concealing** [3] - 49:21, 52:2, 52:22
**concede** [2] - 33:1, 58:15
**conceded** [1] - 58:11
**concern** [4] - 20:16, 40:13, 49:2, 54:25
**concerned** [3] - 10:7, 33:17, 56:9
**concerning** [1] - 40:15
**concerns** [1] - 15:10
**concluded** [1] - 59:7
**conclusion** [3] - 28:22, 31:6, 45:17
**conclusively** [1] - 43:1
**condition** [3] - 18:21, 25:7, 49:25
**conditions** [23] - 18:22, 19:6, 23:18, 25:10, 26:10, 28:20, 29:15, 29:16, 31:4, 47:9, 49:20, 49:25, 50:6, 50:23, 57:3, 57:16, 57:21, 58:1, 58:2, 58:7, 58:12, 58:24
**conduct** [10] - 37:9, 40:10, 40:12, 44:20, 46:18, 47:11, 47:12, 52:9, 54:15
**conducted** [1] - 41:12
**cones** [1] - 45:14
**conference** [7] - 3:2, 3:8, 5:4, 8:23, 16:16, 17:17, 59:5
**Conference** [1] - 59:13
**confessed** [1] - 35:19
**confession** [3] - 15:10, 55:18, 55:20
**confidence** [1] - 49:19
**confinement** [1] - 50:3
**confirm** [1] - 9:19
**confirmed** [2] - 20:10, 37:14
**conformance** [1] - 59:12
**confusion** [1] - 14:4
**Congress** [3] - 11:22, 13:13, 25:1
**congressional** [4] - 11:19, 11:20, 11:24, 12:4
**connect** [1] - 48:20

**connected** [2] - 22:2, 22:4
**Connecticut** [1] - 1:16
**connection** [3] - 7:16, 20:15, 22:5
**consider** [7] - 24:25, 30:3, 40:17, 41:17, 44:1, 49:24, 53:25
**considerable** [1] - 5:11
**considerations** [1] - 7:19
**considered** [4] - 13:10, 29:5, 29:6, 52:20
**considering** [1] - 47:4
**consistency** [2] - 27:24, 44:7
**consistent** [11] - 5:16, 20:12, 21:22, 37:15, 51:15, 52:1, 52:2, 52:13, 52:19, 52:22
**constant** [1] - 58:4
**constructed** [3] - 31:19, 34:16, 50:12
**construction** [1] - 42:24
**contained** [2] - 6:24, 10:25
**content** [2] - 47:24, 51:24
**contest** [1] - 19:24
**context** [9] - 10:12, 12:13, 16:9, 16:14, 34:13, 34:15, 35:13, 43:23, 46:25
**continued** [5] - 19:4, 22:24, 23:3, 23:13, 56:17
**continuing** [3] - 48:8, 55:12, 56:11
**continuum** [2] - 40:12, 44:20
**contrary** [1] - 54:16
**control** [1] - 38:21
**conversation** [4] - 3:3, 5:12, 12:14, 53:10
**conversations** [2] - 9:25, 10:16
**conviction** [2] - 33:17, 57:20
**convince** [2] - 26:9, 57:19
**convincing** [8] - 18:20, 19:10, 22:21, 22:22, 25:6, 26:9,

31:5, 45:18
**copper** [1] - 45:11
**copy** [1] - 6:12
**correct** [1] - 40:3
**correctly** [1] - 20:24
**correspond** [1] - 4:24
**counsel** [9] - 2:4, 3:7, 3:11, 3:22, 4:4, 9:7, 14:12, 18:6, 51:12
**counsel's** [2] - 18:5, 46:12
**count** [1] - 14:9
**counterfactual** [1] - 27:8
**couple** [4] - 3:6, 15:3, 20:4, 48:2
**course** [13] - 5:12, 6:21, 7:5, 7:18, 9:25, 12:18, 17:7, 26:2, 30:18, 40:22, 46:14, 46:25, 51:16
**Court** [45] - 1:24, 2:1, 5:19, 7:14, 8:6, 15:4, 15:22, 18:13, 18:14, 24:17, 25:25, 26:10, 31:3, 36:19, 39:7, 40:13, 40:17, 41:4, 41:11, 42:14, 43:22, 43:25, 44:18, 47:4, 47:6, 47:8, 47:15, 49:18, 51:8, 52:2, 53:8, 53:9, 53:25, 54:1, 54:25, 55:24, 56:7, 56:9, 56:21, 56:22, 56:23, 59:10, 59:10
**COURT** [91] - 1:1, 2:8, 2:12, 2:16, 3:22, 5:21, 5:25, 7:10, 7:22, 8:7, 8:18, 8:21, 9:5, 9:7, 10:11, 11:10, 12:7, 12:10, 13:4, 14:2, 14:15, 14:24, 15:17, 16:9, 16:20, 16:24, 17:1, 17:16, 19:12, 20:23, 21:7, 21:21, 22:7, 23:8, 23:19, 24:8, 24:13, 24:22, 25:12, 25:15, 25:19, 25:22, 26:1, 27:11, 28:12, 29:4, 29:20, 30:2, 30:11, 30:18, 30:23, 31:6, 31:9, 31:14, 32:13, 33:8, 34:10, 36:5, 36:12, 36:16, 36:23, 37:2, 37:11, 37:17, 37:20, 38:1, 38:16,

39:3, 39:14, 39:18, 41:20, 42:7, 42:11, 44:2, 44:6, 46:7, 47:16, 48:20, 49:14, 49:23, 50:25, 51:19, 52:10, 52:24, 54:2, 55:1, 57:5, 57:12, 58:16, 58:23, 59:17
**court** [6] - 2:24, 4:3, 21:20, 24:25, 35:17, 38:23
**Court's** [6] - 10:3, 10:10, 11:8, 11:25, 28:22, 53:23
**courtroom** [2] - 2:23, 4:24
**courts** [1] - 4:16
**cover** [4] - 53:13, 53:16, 54:14, 54:20
**covered** [1] - 7:9
**covering** [2] - 52:14, 52:19
**covers** [1] - 44:5
**crazy** [1] - 11:2
**create** [7] - 6:9, 42:21, 42:23, 45:7, 47:3, 57:22, 57:24
**created** [2] - 6:10, 30:14
**creating** [2] - 31:11, 31:12
**credibility** [1] - 52:11
**credit** [2] - 48:13, 49:7
**crime** [14] - 18:22, 18:23, 18:24, 19:3, 21:6, 22:2, 26:11, 28:24, 31:24, 34:1, 34:2, 35:17, 56:15
**criminal** [7] - 13:15, 24:18, 29:18, 29:19, 35:24, 40:20, 50:15
**Criminal** [1] - 2:2
**critical** [2] - 20:5, 44:3
**CRR** [1] - 59:16
**custodian** [5] - 38:5, 38:12, 49:20, 50:4, 56:14
**custodians** [3] - 24:18, 38:21, 38:22
**custody** [1] - 28:5

## D

**daily** [2] - 48:14, 51:24
**danger** [8] - 25:6, 30:16, 32:20, 34:24, 36:8, 43:24, 47:10,

53:6
**dangerous** [14] - 25:9, 25:11, 28:25, 29:2, 33:4, 33:22, 33:23, 33:24, 34:3, 34:7, 35:3, 36:19, 36:20, 56:3
**dangerousness** [28] - 18:19, 25:25, 26:1, 28:2, 28:14, 28:20, 32:11, 32:25, 33:7, 33:12, 33:20, 34:5, 35:10, 35:12, 35:24, 36:3, 36:25, 37:4, 37:7, 42:13, 43:22, 48:21, 49:16, 49:17, 54:9, 54:25, 55:11, 56:11
**data** [2] - 6:17, 49:10
**date** [5] - 6:2, 6:22, 6:23, 8:25, 16:15
**Dated** [1] - 59:14
**dates** [2] - 16:10, 16:12
**days** [7] - 8:25, 9:2, 14:14, 14:16, 14:20, 20:17, 51:10
**DC** [5] - 1:11, 1:14, 1:17, 53:14, 53:16
**de** [2] - 18:12, 18:14
**dead** [1] - 35:19
**deal** [3] - 8:3, 21:9, 46:22
**death** [1] - 35:21
**debit** [1] - 48:13
**deceive** [1] - 21:12
**December** [2] - 48:2, 53:11
**decision** [5] - 3:14, 17:18, 17:20, 39:8, 59:3
**declaration** [4] - 21:22, 23:8, 44:25, 52:11
**declarations** [8] - 18:2, 23:4, 37:19, 37:23, 44:10, 44:12, 44:21
**deemed** [1] - 41:17
**defendant** [27] - 30:8, 32:3, 40:24, 41:2, 43:25, 44:24, 45:4, 45:6, 45:18, 45:23, 46:16, 47:6, 47:11, 48:3, 48:8, 48:16, 49:19, 50:8, 51:10, 51:16, 51:20, 51:22, 52:7, 53:3, 53:6, 54:11, 54:18
**Defendant** [1] - 1:7

**DEFENDANT** [2] - 1:15, 2:15

**defendant's** [7] - 32:7, 40:15, 43:11, 47:11, 52:5, 53:10, 54:10

**defense** [42] - 3:11, 5:9, 5:13, 6:9, 6:14, 6:20, 7:7, 7:9, 7:21, 7:25, 8:14, 8:19, 8:25, 9:7, 13:22, 14:12, 15:1, 16:22, 16:23, 17:10, 17:23, 18:5, 18:6, 33:10, 35:22, 40:1, 40:6, 40:9, 40:14, 41:10, 41:15, 43:8, 44:14, 46:12, 47:7, 47:15, 50:2, 51:11, 52:4, 53:24, 54:17, 55:2

**defense's** [2] - 42:19, 51:4

**defensive** [1] - 23:22

**deficit** [2] - 53:22, 54:24

**defined** [1] - 12:19

**definitively** [1] - 23:4

**deleting** [2] - 51:14, 51:24

**demonstrate** [1] - 32:8

**demonstrated** [1] - 47:1

**demonstrates** [1] - 53:21

**deny** [1] - 44:19

**Depot** [1] - 21:15

**DEPUTY** [1] - 2:2

**deputy** [1] - 4:24

**described** [3] - 17:25, 29:15, 46:8

**describes** [1] - 19:19

**description** [2] - 27:12, 46:10

**designed** [1] - 48:19

**desire** [2] - 33:1, 33:4

**desktop** [2] - 48:17, 49:11

**destroyed** [1] - 42:16

**detailed** [1] - 5:23

**details** [1] - 5:21

**detention** [11] - 3:9, 3:12, 17:18, 17:21, 25:2, 33:14, 36:2, 39:17, 41:15, 44:18, 54:4

**determination** [3] - 3:12, 18:12, 18:15

**determined** [1] -

52:21

**determining** [1] - 36:19

**detonated** [1] - 25:20

**device** [8] - 25:19, 41:6, 42:23, 43:15, 47:23, 48:2, 48:15, 51:24

**devices** [14] - 30:25, 40:24, 42:15, 43:3, 43:13, 43:16, 43:18, 45:20, 45:25, 47:2, 47:13, 49:11, 50:12, 50:15

**diagnosed** [3] - 20:8, 51:11, 53:3

**diagnoses** [2] - 40:19, 51:5

**diagnosis** [6] - 21:22, 37:14, 52:5, 53:5, 53:25, 54:10

**diagram** [1] - 42:24

**dialogue** [1] - 8:5

**difference** [6] - 31:11, 31:23, 32:2, 32:5, 32:23, 32:24

**different** [11] - 2:18, 4:16, 4:17, 11:24, 16:5, 18:17, 29:22, 35:14, 37:25, 46:4

**differently** [1] - 55:21

**difficult** [4] - 16:3, 24:15, 46:17, 46:21

**digital** [5] - 9:13, 49:4, 49:22, 52:3, 56:22

**dignity** [2] - 4:10, 4:11

**Diplomate** [1] - 1:23

**direct** [2] - 3:17, 18:10

**directly** [4] - 32:11, 51:6, 56:24, 57:3

**disagree** [5] - 9:8, 24:23, 27:3, 28:22, 57:2

**discharged** [1] - 39:11

**disconnected** [1] - 21:24

**discounts** [1] - 27:18

**discoverable** [1] - 10:5

**discovery** [19] - 5:6, 5:8, 5:10, 5:13, 6:1, 6:9, 7:8, 9:10, 9:12, 11:17, 12:18, 14:1, 14:25, 15:17, 15:20, 15:21, 17:8, 17:9,

17:12

**discuss** [1] - 9:3

**discussed** [4] - 5:17, 8:18, 8:24, 13:17

**discussing** [1] - 13:5

**discussion** [2] - 22:25, 38:8

**disorder** [2] - 51:16, 53:4

**dispositive** [1] - 36:11

**dispute** [3] - 8:6, 9:21, 43:4

**disputes** [1] - 41:19

**disrupted** [1] - 42:15

**dissimilar** [1] - 46:19

**distinction** [1] - 35:12

**District** [2] - 59:10

**DISTRICT** [3] - 1:1, 1:1, 1:9

**DNA** [1] - 35:19

**DNC** [2] - 41:1, 50:16

**docket** [2] - 4:20, 4:22

**doctor** [3] - 20:12, 51:9, 51:18

**DOJ** [1] - 12:5

**dollars** [1] - 48:18

**done** [4] - 20:18, 20:19, 23:16, 54:23

**dots** [1] - 48:20

**doubt** [1] - 19:5

**down** [6] - 9:22, 18:19, 23:15, 35:20, 56:16, 56:17

**Dr** [3] - 18:3, 40:19, 52:11

**dropped** [1] - 56:17

**drug** [1] - 30:8

**drugs** [1] - 26:13

**dump** [2] - 15:7, 15:23

**during** [4] - 5:12, 5:17, 7:5, 19:20

**dust** [1] - 45:9

## E

**early** [1] - 14:9

**easily** [1] - 9:14

**East** [1] - 1:19

**easy** [3] - 23:20, 32:9

**effect** [2] - 32:4, 50:15

**effectively** [1] - 49:21

**efficient** [1] - 8:3

**effort** [7] - 31:16, 31:18, 31:21, 31:23,

32:22, 42:1, 42:4

**either** [3] - 19:25, 21:10, 29:11

**electronic** [2] - 47:13, 48:15

**element** [1] - 37:5

**email** [1] - 4:22

**emerge** [1] - 6:6

**emphasize** [1] - 38:4

**end** [4] - 3:16, 21:14, 35:1, 48:10

**endanger** [1] - 27:3

**ended** [1] - 16:4

**ends** [1] - 55:13

**enforcement** [3] - 13:7, 38:6, 49:15

**engaged** [1] - 52:20

**ensuing** [1] - 45:22

**ensure** [1] - 4:6

**entered** [1] - 3:1

**entire** [3] - 22:25, 27:20, 38:25

**entirely** [4] - 19:9, 20:11, 28:10, 29:14

**entitled** [4] - 4:7, 4:19, 12:6, 59:12

**equation** [2] - 25:7, 34:5

**erase** [2] - 22:3, 48:25

**error** [2] - 18:8, 55:4

**escape** [1] - 28:6

**especially** [1] - 31:3

**essence** [1] - 42:18

**essentially** [2] - 6:11, 42:2

**establishes** [1] - 41:4

**et** [1] - 17:9

**evade** [2] - 21:2, 49:15

**evasive** [2] - 21:8, 23:14

**eve** [1] - 50:16

**evening** [1] - 53:15

**event** [6] - 22:11, 23:5, 45:24, 46:8, 46:24, 50:17

**eventually** [1] - 54:21

**evidence** [61] - 3:13, 17:23, 17:25, 18:21, 19:4, 19:11, 20:21, 20:25, 21:1, 21:5, 22:1, 22:4, 22:16, 22:21, 22:22, 23:2, 23:12, 23:17, 24:17, 24:20, 25:6, 25:16, 26:9, 26:12, 26:22, 26:25, 28:17, 28:18,

28:24, 29:18, 30:17, 30:20, 30:22, 31:5, 32:1, 32:5, 33:11, 33:15, 33:23, 33:24, 34:1, 34:2, 34:23, 35:1, 35:4, 35:24, 36:16, 36:19, 38:21, 43:10, 46:13, 48:7, 53:14, 53:17, 54:21, 55:11, 55:15, 56:11, 57:19

**evidentiary** [1] - 30:19

**exact** [4] - 30:5, 30:14, 52:21, 58:19

**exactly** [7] - 7:14, 21:8, 23:6, 29:15, 32:23, 36:11, 37:1

**examined** [2] - 49:11, 51:10

**examiner** [3] - 42:17, 42:25, 43:2

**example** [4] - 6:21, 7:2, 35:15, 36:21

**except** [2] - 9:9, 52:7

**excerpt** [1] - 27:11

**exchange** [1] - 17:8

**exclude** [3] - 17:2, 17:4, 17:7

**executed** [1] - 46:6

**exhibit** [1] - 55:7

**exhibited** [1] - 56:12

**existence** [1] - 50:20

**expand** [1] - 37:7

**expanded** [1] - 38:9

**expect** [3] - 4:10, 10:13, 15:11

**expected** [1] - 10:2

**experiment** [2] - 27:17, 45:1

**experimented** [1] - 50:13

**experimenting** [3] - 44:24, 45:19, 45:23

**experiments** [1] - 23:7

**expert** [2] - 41:3, 41:15

**explain** [6] - 33:8, 40:15, 51:4, 52:8, 53:5, 53:17

**explainable** [1] - 52:23

**explained** [2] - 5:10, 51:7

**explaining** [1] - 53:14

**explanations** [1] - 52:23

**explicit** [1] - 48:21

explode [4] - 31:12, 43:19, 43:20
exploded [1] - 43:5
exploding [2] - 30:25, 31:19
explosive [9] - 35:6, 35:9, 41:6, 43:6, 43:7, 43:13, 45:20, 46:5, 50:15
explosives [4] - 42:10, 42:17, 42:25, 43:2
extensive [3] - 15:2, 24:17, 41:5
extensively [1] - 40:23
extent [6] - 24:17, 27:14, 38:19, 39:7, 51:5, 55:19
extra [1] - 9:3
extraordinarily [1] - 46:17
extraordinary [1] - 49:3
extreme [2] - 20:11, 51:12

**F**

faces [1] - 2:22
facing [1] - 46:18
fact [15] - 20:17, 22:15, 24:25, 31:18, 35:25, 37:16, 38:13, 41:8, 46:21, 48:9, 53:20, 55:13, 56:10, 56:14
factor [8] - 29:22, 32:7, 33:9, 34:17, 34:23, 36:10, 36:13, 36:14
factors [6] - 19:1, 29:5, 29:11, 29:21, 36:6, 36:9
factory [6] - 47:23, 48:1, 48:4, 48:14, 49:8, 51:23
facts [12] - 20:1, 20:2, 21:13, 28:10, 37:12, 42:11, 43:9, 48:22, 50:23, 52:1, 52:21, 55:4
factual [1] - 41:18
factually [1] - 43:1
faculties [1] - 54:13
failed [1] - 21:20
fair [2] - 4:6, 34:14
fake [1] - 39:11
fall [1] - 40:16
family [6] - 23:5,

37:23, 38:13, 38:15, 50:14, 50:19
family's [2] - 50:19, 50:22
far [6] - 8:12, 10:16, 16:10, 40:16, 52:2, 52:18
farcical [1] - 28:10
fashion [5] - 13:3, 47:8, 56:22, 56:23
FBI [15] - 6:5, 6:10, 6:11, 7:15, 10:1, 10:23, 42:16, 43:14, 43:19, 53:11, 53:12, 54:14, 54:17, 54:20, 54:22
fearing [1] - 57:23
February [1] - 17:3
federal [6] - 1:24, 2:25, 35:15, 35:17, 35:21, 38:6
Federal [1] - 59:10
FEDERAL [1] - 59:17
few [7] - 2:18, 11:19, 15:20, 18:10, 18:16, 19:11, 40:16
fewer [1] - 2:22
fictional [1] - 20:6
fighting [1] - 24:4
figure [1] - 13:8
figuring [1] - 6:19
file [5] - 6:5, 6:13, 7:11, 9:20, 9:21
filed [5] - 2:22, 18:2, 23:9, 44:10, 47:15
files [11] - 9:14, 10:1, 11:1, 12:4, 12:5, 17:11, 20:10, 47:25, 51:15, 51:23
filing [1] - 15:1
finally [2] - 53:19, 54:23
fine [3] - 8:7, 8:21, 16:23
finish [2] - 31:1, 51:20
fins [1] - 45:13
firearms [1] - 28:18
firm [1] - 57:20
first [22] - 3:2, 3:8, 3:24, 4:5, 6:13, 18:6, 18:11, 19:3, 21:3, 23:25, 24:5, 26:16, 34:17, 36:10, 36:12, 40:23, 44:3, 44:5, 44:17, 45:2, 47:20, 47:22
fits [1] - 25:9
five [6] - 6:4, 7:15, 15:15, 18:24, 29:17,

34:9
five-year [2] - 6:4, 34:9
flight [3] - 33:18, 34:15, 49:15
flip [1] - 23:17
focus [3] - 31:17, 41:20, 55:4
focused [2] - 54:3, 55:3
focusing [1] - 28:15
follow [2] - 15:17, 16:3
foolish [1] - 48:24
FOR [3] - 1:1, 1:12, 1:15
foregoing [1] - 59:11
foremost [2] - 4:5, 44:17
form [1] - 51:13
format [1] - 59:12
former [2] - 38:6, 49:16
forth [3] - 14:6, 14:10, 33:9
forward [3] - 24:20, 27:25, 55:9
four [5] - 15:15, 40:18, 51:9, 53:10, 54:11
four-hour [2] - 53:10, 54:11
four-sentence [2] - 40:18, 51:9
Fourth [3] - 15:8, 15:9, 16:8
fourth [1] - 36:9
fraud [1] - 34:20
Friday [3] - 16:18, 16:20, 17:1
front [4] - 2:18, 24:3, 37:13, 37:20
fruit [1] - 16:3
fuel [1] - 45:1
full [1] - 14:24
functional [1] - 42:22
fundamental [1] - 50:7
future [2] - 28:14, 55:19

**G**

game [1] - 35:8
gap [1] - 34:9
gathered [1] - 54:22
geared [1] - 13:5
general [2] - 7:8, 12:15
generality [1] - 12:15

generally [2] - 28:14, 37:10
geofence [2] - 15:5, 15:6
Georgia [1] - 1:22
given [4] - 10:19, 11:11, 16:1, 49:21
glom [1] - 20:20
GOVERNMENT [1] - 1:12
government [66] - 2:5, 3:4, 3:20, 4:7, 5:5, 5:7, 5:9, 5:14, 5:15, 6:23, 6:25, 7:6, 7:25, 9:9, 9:17, 10:1, 10:20, 11:7, 12:10, 12:19, 12:20, 13:2, 13:14, 13:17, 13:24, 13:25, 14:17, 16:24, 18:20, 18:23, 20:7, 21:10, 23:12, 26:8, 27:9, 27:15, 27:18, 28:1, 28:3, 28:13, 29:8, 29:11, 29:25, 30:13, 33:14, 34:8, 34:9, 34:21, 35:18, 38:20, 39:10, 39:12, 39:21, 41:2, 41:24, 44:22, 45:3, 47:14, 50:5, 55:6, 55:10, 55:23, 55:25, 56:3, 57:1, 57:23
government's [9] - 5:15, 6:8, 12:18, 17:13, 17:21, 17:24, 19:24, 32:14, 33:21
GPS [3] - 28:6, 50:4, 56:22
ground [2] - 18:4, 19:16
guess [10] - 20:1, 22:1, 28:3, 30:2, 30:11, 34:21, 34:25, 36:23, 37:7, 51:6
guilt [4] - 21:12, 33:12, 33:16, 35:12
guilty [2] - 3:1, 26:18
gun [10] - 31:25, 32:2, 32:3, 32:4, 32:6, 32:10, 32:16, 32:19
guns [3] - 26:19, 26:20, 30:21
guy [3] - 21:16, 35:20, 35:23
guys [2] - 13:7, 24:3

**H**

hacksaw [1] - 45:12
hamstrung [1] -

30:13
hand [2] - 21:10, 21:17
handled [1] - 59:4
hanging [1] - 10:7
hard [2] - 12:16, 47:16
hardware [1] - 6:22
harm [2] - 26:15, 30:9
harmed [1] - 30:9
harming [2] - 26:13, 34:4
harmless [1] - 40:8
HDR [1] - 1:20
head [3] - 12:4, 14:19, 57:14
headquarters [1] - 41:1
hear [5] - 5:4, 9:7, 14:12, 18:5, 39:21
heard [3] - 52:10, 52:12, 57:8
HEARING [1] - 1:9
hearing [9] - 3:10, 3:16, 8:25, 11:19, 14:8, 16:20, 41:15, 55:8, 55:9
hearings [2] - 4:23
heavily [1] - 29:7
help [1] - 49:16
helpful [9] - 7:22, 10:12, 16:9, 19:16, 39:3, 41:21, 42:12, 49:23, 55:5
helps [1] - 55:24
hereby [1] - 59:11
hide [4] - 20:21, 21:18, 21:25, 55:16
hiding [3] - 21:12, 21:18, 52:22
high [4] - 5:25, 28:5, 34:10, 50:17
high-intensity [1] - 28:5
high-security [1] - 50:17
higher [1] - 35:10
history [6] - 6:16, 24:18, 29:17, 29:22, 35:24, 36:7
hit [1] - 57:14
hobbiest [1] - 45:15
holding [1] - 43:16
holdings [1] - 12:25
home [6] - 26:20, 45:16, 50:3, 50:14, 50:19, 50:22
Home [1] - 21:15
homemade [2] -

26:23, 46:4

**Honor** [12] - 2:6, 2:9, 2:11, 3:21, 5:7, 16:19, 17:15, 39:5, 39:22, 57:14, 58:7, 58:15

**HONORABLE** [1] - 1:9

**hopefully** [1] - 14:5

**hour** [2] - 53:10, 54:11

**hours** [2] - 53:19, 54:15

**house** [7] - 56:16, 56:18, 58:3, 58:9, 58:10, 58:12, 58:21

**housekeeping** [4] - 3:7, 3:19, 5:3, 12:1

**human** [1] - 36:1

**hundreds** [1] - 48:18

**hurt** [1] - 32:19

**hurting** [1] - 26:11

**hypothetical** [1] - 29:1

## I

**idea** [10] - 11:14, 13:17, 20:5, 20:20, 22:17, 22:23, 31:7, 31:10, 55:18, 56:13

**ideas** [1] - 44:13

**identifiers** [1] - 6:24

**identifying** [1] - 7:19

**IEDs** [1] - 45:8

**ignores** [1] - 43:9

**imagine** [3] - 7:14, 15:15, 16:1

**immediate** [1] - 8:10

**impasse** [1] - 8:5

**implicate** [2] - 7:18, 15:7

**implicated** [3] - 11:7, 15:19, 15:21

**important** [2] - 31:2, 37:12

**improvised** [2] - 41:6, 45:20

**inability** [3] - 32:7, 42:3, 42:5

**inadvertence** [1] - 10:21

**incapable** [1] - 33:5

**incarcerated** [1] - 35:1

**incentive** [1] - 14:5

**incident** [2] - 11:4, 11:21

**include** [1] - 6:15

**included** [1] - 42:23

**includes** [1] - 25:5

**including** [5] - 17:21, 17:23, 19:19, 37:23, 44:9

**incongruity** [1] - 21:19

**inconsistent** [1] - 55:15

**inconvenient** [1] - 43:9

**incorrect** [1] - 24:11

**incorrectly** [1] - 18:8

**incriminating** [1] - 52:9

**independent** [1] - 19:14

**indicate** [1] - 34:6

**indicated** [2] - 5:14, 9:1

**indication** [1] - 11:12

**indictment** [7] - 2:21, 2:25, 3:10, 24:1, 24:2, 24:4, 39:11

**individual** [7] - 20:8, 20:11, 21:11, 23:14, 27:23, 31:24, 56:21

**individuals** [3] - 7:4, 7:15, 21:12

**inert** [1] - 31:12

**information** [14] - 4:21, 5:11, 6:12, 7:3, 7:19, 8:17, 10:6, 10:25, 11:22, 13:8, 16:5, 47:13, 51:17

**informed** [1] - 13:3

**informing** [1] - 51:18

**initial** [3] - 9:23, 39:22, 41:14

**initiated** [1] - 40:21

**injustice** [1] - 35:2

**innocuous** [2] - 45:1, 52:23

**inquiry** [5] - 26:2, 26:3, 30:3, 30:5, 37:2

**instead** [1] - 32:16

**instructions** [1] - 42:20

**insufficient** [1] - 50:24

**intellectual** [2] - 54:13, 54:24

**intelligence** [4] - 11:1, 11:2, 12:25, 13:5

**intensity** [1] - 28:5

**interagency** [2] - 10:4, 10:18

**interest** [11] - 4:5, 14:3, 16:2, 17:4, 22:24, 23:3, 23:13, 23:14, 41:6, 47:1

**interested** [6] - 3:17, 8:1, 18:7, 18:10, 44:3, 48:22

**interests** [2] - 17:5

**interview** [12] - 19:23, 23:7, 27:10, 27:13, 27:15, 27:19, 27:21, 46:10, 53:9, 53:12, 54:11, 54:12

**interviews** [2] - 20:10, 27:22

**investigation** [10] - 6:5, 6:6, 6:7, 7:5, 7:16, 11:20, 13:11, 19:19, 20:9, 54:22

**investigative** [1] - 20:16

**involve** [1] - 5:19

**involved** [3] - 6:4, 11:3, 27:23

**involving** [1] - 15:5

**isolated** [2] - 40:11

**issue** [10] - 3:11, 4:1, 10:16, 14:7, 28:3, 37:9, 39:7, 56:1, 57:9, 59:2

**issued** [2] - 6:21, 40:2

**issues** [9] - 3:19, 11:7, 15:3, 15:8, 15:12, 19:8, 23:21, 27:24, 44:23

**items** [1] - 9:18

**itself** [2] - 17:10, 55:7

**IV** [1] - 1:18

## J

**January** [11] - 1:10, 5:8, 40:11, 41:1, 43:12, 45:22, 46:6, 48:11, 53:15, 59:14

**job** [1] - 38:13

**Jocelyn** [1] - 2:7

**JOCELYN** [1] - 1:13

**John** [1] - 2:9

**JOHN** [1] - 1:16

**joint** [2] - 13:17, 13:25

**JONES** [32] - 1:13, 2:6, 3:20, 5:7, 5:23, 6:4, 7:14, 7:24, 8:11, 8:20, 8:24, 9:6, 12:14, 13:9, 16:25, 17:15, 39:22, 42:5, 42:9, 42:14, 44:5, 44:17, 46:16, 47:22, 49:2, 49:18, 50:7, 51:3, 51:22, 52:18, 53:1,

54:8

**Jones** [1] - 2:6

**JOSEPH** [1] - 1:18

**JR** [1] - 1:6

**Judge** [22] - 3:12, 3:14, 17:18, 17:19, 18:7, 19:13, 19:23, 23:25, 24:9, 25:16, 31:15, 32:22, 33:10, 37:13, 37:20, 38:2, 39:23, 41:12, 41:16, 41:25, 44:19, 52:20

**judge** [4] - 18:17, 21:9, 27:12, 41:22

**JUDGE** [1] - 1:9

**judge's** [2] - 19:7, 27:4

**judges** [3] - 2:18, 2:19, 4:16

**Judicial** [1] - 59:13

**jump** [2] - 3:19, 5:4

**jumping** [1] - 31:6

**Junior** [1] - 2:3

**junk** [3] - 47:25, 51:14, 51:23

**justice** [1] - 17:4

## K

**keep** [4] - 19:2, 42:14, 43:17, 50:5

**keeping** [1] - 54:3

**kept** [1] - 56:18

**killed** [2] - 36:1, 36:4

**kind** [18] - 3:16, 7:2, 7:11, 14:5, 16:4, 19:16, 23:21, 34:10, 35:2, 42:11, 43:24, 44:6, 47:7, 47:18, 50:4, 50:20, 52:9

**knives** [2] - 28:17, 30:21

**knowledge** [2] - 50:14, 56:19

**knows** [2] - 18:14, 41:24

## L

**lack** [9] - 24:18, 31:16, 31:17, 31:21, 32:22, 35:23, 41:25, 42:4, 42:8

**laid** [1] - 41:19

**land** [1] - 22:21

**language** [1] - 28:15

**laptop** [2] - 48:17, 49:11

**large** [1] - 7:6

**largely** [2] - 10:13,

20:24

**last** [7] - 2:24, 13:16, 35:19, 40:16, 53:1, 56:5, 56:13

**late** [2] - 6:7, 16:21

**latter** [1] - 7:10

**law** [11] - 4:3, 13:6, 24:19, 24:23, 30:7, 38:6, 42:9, 42:10, 49:15, 49:24, 58:14

**Lawson** [1] - 2:10

**LAWSON** [1] - 1:18

**laying** [1] - 37:23

**lays** [1] - 29:5

**leads** [1] - 47:15

**leaning** [2] - 29:7, 29:8

**learning** [1] - 49:4

**least** [9] - 2:23, 5:15, 7:25, 11:3, 14:22, 19:23, 20:1, 24:12, 33:4

**leave** [4] - 4:12, 24:21, 28:8, 50:22

**leaves** [1] - 58:9

**leaving** [2] - 58:10, 58:21

**lectern** [1] - 2:4

**led** [2] - 29:25, 46:20

**left** [2] - 23:15, 26:19

**legal** [4] - 6:15, 6:20, 7:3, 58:17

**lens** [1] - 7:13

**less** [1] - 35:2

**letter** [2] - 40:18, 51:9

**letters** [6] - 13:19, 14:1, 17:24, 37:20, 37:21, 38:17

**level** [6] - 5:25, 12:15, 34:11, 51:11, 53:4, 54:2

**life** [1] - 50:20

**lightweight** [1] - 45:14

**likelihood** [1] - 22:20

**likely** [1] - 29:17

**limitations** [1] - 35:16

**line** [1] - 8:4

**lists** [1] - 9:21

**literal** [1] - 35:23

**litigated** [1] - 44:23

**Litson** [1] - 1:18

**LITTLE** [53] - 1:18, 9:8, 10:19, 11:13, 12:8, 14:14, 14:17, 15:2, 15:18, 16:17, 18:11, 20:4, 21:1, 21:8, 22:1, 22:14,

23:10, 24:6, 24:11, 24:15, 25:4, 25:14, 25:18, 25:21, 25:24, 26:4, 27:14, 28:16, 29:13, 29:23, 30:7, 30:17, 30:20, 31:3, 31:8, 31:11, 31:23, 32:24, 33:13, 35:14, 36:10, 36:14, 36:18, 36:25, 37:5, 37:14, 37:19, 37:22, 38:3, 38:19, 39:5, 39:16, 55:6

**live** [2] - 50:21, 56:18
**livelihood** [1] - 38:15
**living** [3] - 50:10, 50:18, 50:19
**LLC** [2] - 1:15, 1:20
**load** [1] - 9:14
**locked** [1] - 19:2
**log** [4] - 9:18, 9:23, 13:17, 13:25
**look** [14] - 11:12, 11:15, 13:7, 17:9, 18:18, 23:16, 24:17, 30:6, 32:18, 34:19, 45:3, 46:13, 48:21, 54:7
**looked** [2] - 7:15, 19:15
**looking** [8] - 11:3, 11:16, 13:21, 16:4, 18:13, 24:12, 24:19, 26:5
**looks** [1] - 6:1
**luck** [5] - 31:16, 31:17, 41:25, 42:3, 42:7

## M

**magistrate** [7] - 2:19, 18:17, 19:7, 21:9, 21:20, 27:4, 27:12
**magistrate's** [1] - 38:8
**maker** [4] - 41:3, 41:5, 41:7
**maliciously** [1] - 40:25
**man** [1] - 53:12
**manifests** [1] - 52:5
**manner** [1] - 33:7
**manufacture** [2] - 46:2, 48:9
**MARIO** [1] - 1:21
**Mario** [1] - 2:10
**Mart** [1] - 58:8
**mass** [1] - 12:8
**massive** [1] - 35:14

**matches** [2] - 56:16, 56:18
**material** [6] - 7:6, 7:17, 7:21, 8:13, 8:14, 45:14
**materials** [12] - 11:24, 12:21, 12:22, 13:12, 13:18, 13:19, 17:9, 41:6, 45:23, 47:3, 57:24, 58:14
**matter** [8] - 8:16, 12:17, 42:8, 42:9, 46:23, 52:16, 59:12
**Matter** [1] - 2:2
**matters** [6] - 2:20, 3:7, 3:23, 5:3, 13:1, 29:12
**McFadden** [1] - 1:15
**mean** [10] - 5:22, 14:2, 18:11, 19:12, 28:13, 29:12, 42:16, 47:17, 48:21, 52:20
**meaning** [1] - 46:11
**meaningful** [1] - 53:23
**measures** [1] - 49:3
**meet** [1] - 24:21
**meeting** [1] - 5:17
**members** [3] - 11:21, 50:14, 50:19
**memo** [1] - 17:21
**mention** [1] - 21:3
**mentioned** [10] - 3:19, 9:12, 10:1, 11:10, 15:20, 38:7, 38:8, 38:10, 49:9, 51:8
**merits** [2] - 3:11, 17:18
**met** [4] - 5:9, 24:12, 24:16, 28:20
**metal** [2] - 21:14, 26:23
**mid** [2] - 48:12, 49:2
**might** [11] - 7:14, 11:23, 12:4, 16:7, 25:9, 33:16, 42:7, 43:18, 46:21, 51:25, 55:7
**mildest** [1] - 51:12
**mind** [1] - 42:14
**mindful** [1] - 8:13
**mine** [2] - 4:18, 46:12
**minimum** [1] - 5:5
**minute** [1] - 10:11
**minutes** [2] - 43:20, 57:10
**mitigating** [1] - 54:9
**model** [1] - 45:15

**moment** [1] - 3:18
**monitor** [2] - 49:21, 58:3
**monitoring** [3] - 28:6, 28:7, 58:2
**month** [3] - 26:17, 40:20
**months** [1] - 9:21
**monumental** [1] - 9:24
**morning** [1] - 16:21
**most** [7] - 3:17, 8:3, 9:13, 18:7, 18:10, 18:18, 37:22
**mother** [1] - 18:2
**motion** [6] - 15:3, 15:16, 17:22, 18:5, 39:10, 44:19
**motions** [5] - 15:1, 15:11, 15:14, 15:18, 55:19
**mouth** [2] - 32:14, 46:12
**move** [3] - 10:11, 15:18, 44:3
**MR** [90] - 2:6, 2:9, 3:20, 3:21, 5:7, 5:23, 6:4, 7:14, 7:24, 8:11, 8:20, 8:24, 9:6, 9:8, 10:19, 11:13, 12:8, 12:14, 13:9, 14:14, 14:17, 15:2, 15:18, 16:17, 16:18, 16:23, 16:25, 17:15, 18:11, 20:4, 21:1, 21:8, 22:1, 22:14, 23:10, 24:6, 24:11, 24:15, 25:4, 25:14, 25:18, 25:21, 25:24, 26:4, 27:14, 28:16, 29:13, 29:23, 30:7, 30:17, 30:20, 31:3, 31:8, 31:11, 31:23, 32:24, 33:13, 35:14, 36:10, 36:14, 36:18, 36:25, 37:5, 37:14, 37:19, 37:22, 38:3, 38:19, 39:5, 39:16, 39:22, 42:5, 42:9, 42:14, 44:5, 44:17, 46:16, 47:22, 49:2, 49:18, 50:7, 51:3, 51:22, 52:18, 53:1, 54:8, 55:6, 57:10, 57:13, 58:21
**multiple** [4] - 15:3, 16:2, 38:14, 50:19
**murder** [3] - 35:15, 35:17, 35:20
**Music** [1] - 1:19
**must** [1] - 22:4

## N

**nail** [1] - 57:14
**narrow** [3] - 23:21, 47:20, 58:18
**narrowing** [1] - 30:3
**Nashville** [1] - 1:19
**national** [1] - 40:25
**nature** [11] - 15:12, 25:23, 29:12, 29:13, 29:20, 30:3, 30:4, 34:18, 41:13, 43:23, 52:9
**natures** [1] - 29:23
**necessarily** [4] - 15:6, 15:24, 21:24, 24:2
**necessary** [2] - 13:23, 42:22
**need** [11] - 4:18, 4:25, 8:6, 8:8, 9:12, 10:21, 12:21, 14:18, 16:16, 18:3, 23:22
**needed** [2] - 49:8, 54:4
**needing** [1] - 19:13
**needle** [1] - 34:21
**needs** [3] - 6:1, 19:2, 55:24
**never** [5] - 29:2, 29:4, 31:12, 41:2, 47:7
**new** [9] - 2:22, 6:9, 6:10, 6:13, 11:14, 39:13, 44:11, 44:12, 44:13
**next** [10] - 3:5, 7:3, 8:10, 8:22, 14:13, 16:15, 20:19, 21:4, 48:4, 50:17
**night** [1] - 53:18
**NO** [1] - 1:5
**none** [1] - 28:2
**normal** [2] - 13:20, 16:7
**normally** [1] - 13:25
**notable** [1] - 18:18
**note** [1] - 41:14
**noted** [1] - 14:17
**nothing** [8] - 7:24, 23:10, 26:10, 26:24, 27:17, 31:9, 40:2, 54:9
**noticing** [1] - 28:8
**novo** [2] - 18:12, 18:14
**NW** [2] - 1:13, 1:16

## O

**obfuscating** [1] - 52:23
**object** [1] - 5:14
**obligations** [1] - 12:18
**obsession** [2] - 28:18, 30:21
**obsessive** [1] - 51:15
**obtained** [1] - 11:23
**obviously** [7] - 6:4, 7:12, 13:12, 14:2, 41:24, 44:8, 52:8
**occur** [2] - 56:25, 57:4
**occurred** [3] - 18:24, 35:17, 37:24
**occurring** [1] - 20:24
**OCD** [12] - 20:11, 21:21, 21:23, 37:15, 51:7, 51:13, 52:1, 52:5, 52:7, 52:13, 52:17, 55:7
**OF** [3] - 1:1, 1:3, 1:9
**offense** [26] - 20:15, 25:1, 25:23, 29:12, 29:14, 29:21, 29:23, 29:24, 29:25, 30:4, 30:5, 30:14, 34:18, 34:19, 35:3, 35:6, 35:7, 35:9, 35:21, 35:25, 36:20, 36:21, 36:24, 37:6
**offenses** [4] - 35:15, 41:13, 43:23, 50:15
**Office** [1] - 1:12
**officer** [1] - 38:6
**OFFICIAL** [1] - 59:17
**Official** [2] - 1:24, 59:10
**once** [2] - 30:4, 59:2
**one** [32] - 4:11, 4:23, 7:2, 9:11, 10:2, 21:10, 28:8, 32:17, 32:19, 33:22, 35:7, 35:9, 36:4, 37:5, 37:9, 37:12, 39:8, 40:8, 41:21, 43:6, 43:15, 44:4, 44:6, 46:13, 48:21, 48:23, 51:11, 53:1, 53:4, 54:3, 54:20, 57:11
**ones** [2] - 10:17, 38:4
**open** [3] - 8:4, 9:20, 16:16
**opened** [1] - 6:5
**operate** [1] - 39:1

operates [1] - 38:14
opine [1] - 41:16
opinion [9] - 18:8, 19:13, 19:15, 19:18, 37:15, 39:24, 40:2, 43:2, 51:18
opportunity [6] - 17:8, 17:10, 17:17, 30:15, 37:11, 55:2
opposition [3] - 17:21, 17:25, 18:1
order [7] - 7:20, 27:4, 38:9, 44:19, 46:1, 57:9, 59:2
Order [1] - 2:1
organization [1] - 10:17
organize [1] - 17:10
organized [2] - 14:4, 14:11
oriented [1] - 55:13
original [4] - 16:7, 17:20, 39:10, 59:11
originally [1] - 38:11
otherwise [2] - 4:4, 52:8
outset [2] - 2:17, 3:25
outweigh [1] - 17:5
overall [2] - 26:2
overcome [4] - 24:10, 24:13, 24:24, 55:22
overseen [1] - 2:19
oversimplify [1] - 46:11
own [5] - 20:10, 45:7, 50:3, 50:10, 54:19
oxidizer [2] - 45:8, 45:19

## P

p.m [4] - 1:10, 2:1, 59:7
page [1] - 59:12
papers [4] - 3:13, 40:7, 42:23, 46:8
part [4] - 13:10, 25:4, 25:7, 40:12
particular [8] - 4:2, 4:13, 6:10, 7:12, 10:4, 34:13, 35:12, 37:8
particularly [5] - 15:13, 27:22, 27:23, 29:19, 38:22
parties [6] - 3:15, 4:11, 8:4, 9:3, 17:6, 17:8
parties' [2] - 41:22,

59:1
party [8] - 24:18, 28:5, 38:5, 38:12, 38:21, 38:22, 49:20, 56:14
past [5] - 22:3, 22:9, 26:25, 28:25, 29:17
path [1] - 55:14
patience [1] - 4:4
pattern [2] - 44:7, 57:23
PC [1] - 48:16
penalty [1] - 35:21
penchant [1] - 49:21
people [3] - 30:16, 37:3, 58:5
percent [2] - 22:20, 35:9
percentage [1] - 35:10
percentages [1] - 35:8
perhaps [1] - 41:8
period [2] - 23:11, 48:7
perpetrators [1] - 11:6
person [15] - 25:8, 25:11, 32:10, 32:20, 33:3, 33:15, 33:16, 33:22, 34:3, 36:8, 36:17, 37:10, 43:2, 46:21, 54:12
person's [1] - 36:3
personal [2] - 7:18, 48:17
persons [1] - 16:2
perspective [3] - 5:16, 16:8, 17:14
persuasion [1] - 30:19
persuasive [1] - 34:12
pertaining [2] - 6:12, 6:16
Phillips [4] - 17:24, 37:17, 41:10, 41:16
phone [20] - 4:20, 6:17, 15:7, 15:23, 19:21, 20:14, 20:18, 20:19, 20:23, 21:2, 22:9, 47:24, 49:7, 51:7, 51:15, 51:23, 52:6, 52:8, 55:12
phones [1] - 20:5
picked [1] - 27:9
pictures [1] - 20:17
piece [1] - 33:22
pieces [5] - 16:5, 21:14, 26:23, 42:16,

42:21
pipe [6] - 42:22, 45:9, 46:2, 48:3, 48:9, 53:21
pipes [4] - 21:14, 45:11, 45:12, 48:10
place [8] - 4:15, 7:20, 15:25, 23:25, 24:5, 32:17, 48:4, 50:9
placed [2] - 53:14, 53:20
placing [1] - 53:18
Plaintiff [1] - 1:4
plaintiff [1] - 50:21
plan [5] - 5:16, 5:22, 46:6, 50:8, 50:20
planned [3] - 53:13, 54:14, 54:20
planning [1] - 7:20
plans [2] - 5:15, 6:25
plant [1] - 50:15
planted [1] - 48:3
plastic [2] - 32:17, 32:19
play [1] - 12:3
plea [2] - 3:1, 55:4
pleadings [3] - 39:15, 44:9, 53:2
PLLC [1] - 1:18
point [48] - 2:18, 3:17, 4:13, 4:14, 4:18, 7:23, 13:16, 14:24, 16:8, 19:1, 19:13, 20:23, 21:16, 21:17, 21:21, 22:1, 22:12, 22:25, 27:3, 30:25, 31:15, 31:17, 31:18, 31:21, 32:24, 36:5, 36:23, 38:16, 38:20, 40:14, 40:23, 41:17, 42:2, 42:4, 42:8, 44:3, 44:5, 47:20, 51:1, 51:3, 54:2, 54:4, 54:10, 55:5, 56:13, 57:18, 58:16, 58:23
pointed [3] - 19:20, 26:16, 38:12
points [5] - 23:12, 39:3, 40:5, 40:22, 44:2
poisonous [1] - 16:4
Police [2] - 10:8, 13:6
police [2] - 19:23, 46:10
policy [1] - 4:15
political [2] - 45:25, 46:23
portrayed [1] - 54:16
pose [2] - 26:7, 41:9

poses [5] - 41:7, 41:8, 43:25, 47:11, 53:6
posit [1] - 22:5
position [3] - 13:3, 18:12, 41:2
positions [1] - 41:22
possession [3] - 12:23, 13:13, 13:14
possible [3] - 10:20, 15:22, 28:25
post [1] - 23:3
potassium [4] - 23:2, 44:25, 45:7, 50:13
potent [1] - 45:19
potential [1] - 11:5
powder [5] - 26:23, 43:5, 43:6, 46:4, 46:5
practice [7] - 13:20, 15:3, 15:9, 15:11, 15:16, 15:19, 55:19
practices [1] - 4:17
pre [1] - 16:15
pre-cleared [1] - 16:15
precise [1] - 51:22
prefer [1] - 3:25
preliminary [4] - 2:20, 3:10, 3:23, 8:1
premised [1] - 3:10
prepared [1] - 8:13
preparing [2] - 7:7, 7:17
present [4] - 3:16, 28:2, 30:1, 56:9
presented [1] - 3:1
presently [1] - 36:20
presents [1] - 33:14
preserve [1] - 39:9
presiding [1] - 2:20
pressroom [1] - 4:3
presume [1] - 24:16
presumption [9] - 23:23, 23:25, 24:5, 24:6, 24:9, 24:21, 24:24, 25:13, 30:19
presumptively [1] - 25:2
pretty [3] - 9:24, 14:3, 35:7
prevail [1] - 26:8
previously [2] - 29:2, 44:22
primary [1] - 38:4
principal [1] - 13:21
principally [2] - 13:5, 25:23
privacy [1] - 7:19
probability [1] - 43:4
problem [2] - 13:21,

50:7
proceed [5] - 3:7, 5:15, 5:16, 5:22, 9:4
proceeded [1] - 53:13
proceeding [1] - 53:3
Proceedings [1] - 59:7
process [8] - 4:6, 6:15, 6:19, 6:20, 7:4, 7:7, 7:16, 12:3
proclivity [1] - 47:2
produce [1] - 8:15
Produced [1] - 1:25
produced [7] - 6:13, 9:19, 10:9, 13:18, 13:19, 14:18, 14:19
producing [1] - 14:21
product [1] - 49:10
production [2] - 7:17, 8:9
productive [1] - 23:21
products [1] - 48:19
professional [3] - 38:15, 38:24, 41:3
proffer [5] - 41:14, 47:14, 52:4, 52:6, 53:24
proffered [2] - 28:1, 55:11
prompted [1] - 45:3
prompts [1] - 45:24
proof [1] - 48:25
propensity [1] - 34:24
properly [2] - 39:10, 39:12
proposed [6] - 9:11, 9:17, 9:18, 38:5, 50:7, 50:20
proposing [1] - 8:22
props [1] - 31:12
prosecution [5] - 12:20, 12:23, 13:11, 13:15, 46:18
protect [1] - 18:22
protective [1] - 7:20
protest [1] - 53:17
prove [1] - 18:20
provide [4] - 6:20, 6:25, 7:21, 14:1
provided [11] - 6:2, 7:7, 7:25, 9:13, 9:17, 13:18, 13:22, 42:20, 51:17, 54:20
providing [4] - 5:8, 6:3, 6:8, 54:14

**proving** [1] - 21:24
**public** [8] - 3:24, 17:6, 18:22, 19:2, 26:7, 27:3, 32:17, 46:18
**purchase** [9] - 6:16, 28:7, 45:13, 45:15, 48:8, 48:13, 48:16, 58:21
**purchased** [6] - 45:6, 45:11, 45:12, 49:9
**purchases** [2] - 6:22, 48:24
**purchasing** [3] - 45:4, 48:9, 49:6
**purposes** [4] - 13:11, 13:14, 33:11, 33:12
**pursue** [1] - 39:20
**put** [23] - 3:18, 4:7, 7:23, 8:20, 10:3, 10:10, 10:21, 11:8, 11:18, 11:25, 23:4, 24:20, 28:4, 28:23, 32:13, 34:8, 42:17, 42:21, 42:25, 43:14, 46:11, 46:12, 55:9
**puts** [1] - 50:8
**putting** [4] - 27:25, 34:21, 41:18, 43:10

## Q

**questions** [2] - 14:23, 23:20
**quick** [2] - 3:6, 57:13
**quickly** [2] - 15:19, 15:22
**quite** [1] - 41:4
**quote** [1] - 46:9

## R

**radar** [6] - 3:18, 7:23, 10:3, 10:10, 11:8, 11:25
**raise** [4] - 5:18, 15:3, 39:4, 55:6
**raised** [9] - 11:8, 11:13, 11:17, 13:16, 39:2, 39:9, 40:1, 45:2, 56:1
**raising** [2] - 10:15, 15:14
**rather** [1] - 4:20
**RDR** [1] - 59:16
**RDR-CRR** [1] - 59:16
**re** [1] - 6:11
**reach** [1] - 4:25
**reactions** [1] - 41:22
**read** [2] - 44:8, 55:20

**reading** [1] - 27:8
**real** [4] - 32:10, 32:16, 57:13
**realize** [1] - 49:5
**realized** [4] - 45:5, 48:23, 53:19, 54:21
**really** [10] - 7:22, 19:1, 34:20, 35:5, 38:10, 48:22, 51:6, 57:1, 57:18, 58:6
**Realtime** [1] - 1:24
**reason** [14] - 6:23, 12:24, 17:7, 22:18, 28:14, 29:15, 33:20, 36:11, 37:1, 40:3, 43:14, 43:15, 53:25, 56:1
**reasonable** [2] - 14:20, 57:21
**reasonably** [3] - 47:9, 57:16, 58:13
**reasoned** [1] - 57:2
**reasoning** [1] - 19:7
**reasons** [2] - 17:13, 19:5
**rebut** [1] - 55:2
**rebuttable** [4] - 23:23, 23:24, 24:5, 24:6
**receipts** [1] - 21:15
**receive** [1] - 9:16
**receives** [1] - 12:21
**recent** [1] - 37:22
**recently** [1] - 15:5
**recognizance** [1] - 50:3
**reconcile** [1] - 21:20
**Record** [1] - 1:25
**record** [25] - 2:5, 4:16, 5:2, 10:22, 11:18, 18:15, 18:16, 18:18, 19:9, 19:10, 20:8, 24:16, 28:23, 39:6, 41:4, 42:6, 43:9, 45:17, 45:21, 48:7, 52:1, 54:9, 54:24, 56:10, 59:12
**recording** [1] - 53:10
**records** [1] - 6:25
**recreated** [2] - 29:24, 30:6
**redetain** [1] - 39:13
**REEVES** [2] - 1:23, 59:16
**Reeves** [2] - 59:10, 59:16
**referred** [1] - 53:2
**regardless** [1] - 42:10
**Registered** [1] - 1:23

**regular** [2] - 32:3, 32:6
**regularly** [1] - 48:16
**regulations** [1] - 59:12
**relate** [1] - 5:1
**related** [6] - 6:5, 11:21, 26:20, 26:23, 34:11, 40:19
**relates** [3] - 7:12, 22:23, 34:5
**relationship** [1] - 53:5
**release** [5] - 19:6, 47:6, 50:3, 50:8, 50:20
**released** [3] - 39:12, 43:25, 53:7
**relevant** [9] - 12:5, 33:11, 33:19, 33:21, 34:15, 34:16, 41:17, 55:8
**reliable** [1] - 40:17
**relief** [2] - 4:19, 12:12
**rely** [1] - 25:22
**relying** [1] - 44:18
**remains** [1] - 56:10
**remedies** [1] - 39:20
**remind** [1] - 36:15
**repercussions** [1] - 38:25
**repetitive** [1] - 51:25
**repetitively** [1] - 51:14
**reply** [4] - 18:1, 38:5, 38:12, 45:2
**report** [3] - 17:24, 41:10, 42:19
**REPORTER** [1] - 59:17
**Reporter** [4] - 1:23, 1:24, 1:24, 59:10
**reporting** [5] - 11:3, 11:4, 11:5, 22:17, 56:24
**represented** [1] - 44:25
**request** [4] - 10:2, 10:22, 10:24, 12:12
**requests** [2] - 12:21, 13:2
**require** [3] - 13:1, 15:24, 54:4
**required** [4] - 24:3, 46:1, 46:3, 58:18
**requirement** [1] - 25:5
**requires** [1] - 49:24
**requisite** [1] - 20:2

**research** [1] - 46:1
**reset** [2] - 48:4, 49:8
**resets** [2] - 47:23, 48:1
**resetting** [2] - 48:14, 51:23
**resolve** [2] - 8:6, 55:24
**resolved** [1] - 3:9
**respect** [10] - 5:5, 5:24, 13:12, 25:22, 26:5, 39:23, 40:23, 41:12, 43:5, 47:19
**respected** [1] - 4:9
**respond** [5] - 12:11, 13:3, 44:15, 47:18
**responded** [1] - 31:15
**responding** [2] - 54:19, 55:10
**response** [7] - 4:1, 4:13, 31:15, 40:6, 46:14, 46:16, 47:14
**responsive** [1] - 44:9
**results** [1] - 6:17
**retread** [1] - 18:4
**return** [1] - 50:21
**REVIEW** [1] - 1:9
**review** [7] - 14:23, 17:11, 19:14, 22:25, 53:8, 53:9
**reviewed** [7] - 3:12, 3:14, 17:19, 17:20, 17:22, 17:24, 18:1
**revoke** [2] - 17:22, 44:19
**rights** [2] - 4:8, 35:20
**risk** [3] - 38:23, 47:10, 49:15
**RNC** [2] - 41:1, 50:16
**Road** [1] - 1:21
**road** [1] - 9:22
**robbery** [1] - 32:4
**ROBERT** [1] - 1:13
**rocket** [2] - 45:1, 45:16
**role** [1] - 36:11
**rolling** [1] - 5:8
**room** [1] - 56:17
**Roswell** [1] - 1:21
**rough** [1] - 8:7
**route** [1] - 4:21
**Rule** [1] - 6:17
**rule** [1] - 57:7
**ruled** [1] - 39:7
**run** [1] - 33:16
**running** [1] - 9:18

## S

**safe** [3] - 19:2, 50:6, 54:3
**safety** [5] - 37:2, 42:13, 47:9, 50:1, 50:24
**saint** [1] - 35:23
**sample** [2] - 43:6, 43:7
**samples** [2] - 43:5, 43:10
**sanctions** [1] - 38:23
**Sandy** [1] - 1:22
**sat** [2] - 26:16, 54:11
**satisfactory** [1] - 17:13
**saw** [1] - 44:10
**scary** [1] - 21:16
**scheduling** [1] - 4:23
**scheme** [1] - 25:5
**science** [2] - 23:7, 45:1
**scope** [1] - 12:19
**search** [1] - 6:17
**second** [9] - 4:15, 19:4, 19:8, 33:9, 34:23, 36:13, 36:14, 44:4, 44:6
**secretly** [1] - 55:17
**section** [1] - 19:18
**Section** [1] - 17:3
**secure** [1] - 49:12
**security** [1] - 50:17
**see** [8] - 15:24, 19:25, 30:12, 34:19, 43:11, 53:11, 54:12, 57:23
**seek** [1] - 12:2
**seeking** [2] - 11:24, 44:18
**selling** [1] - 26:13
**sense** [4] - 14:22, 14:25, 16:12, 58:14
**sentence** [5] - 31:1, 40:18, 41:21, 41:23, 51:9
**separate** [2] - 11:20, 15:15
**serialize** [1] - 6:11
**serious** [2] - 19:3, 35:25
**seriously** [3] - 50:1, 57:15, 58:17
**seriousness** [2] - 18:25, 36:8
**services** [1] - 11:2
**set** [14] - 6:24, 16:10, 16:11, 16:12, 20:2, 23:18, 37:22, 38:22,

40:3, 42:20, 43:19, 43:20, 57:15, 57:21

**sets** [2] - 45:6, 45:21
**setting** [1] - 8:25
**several** [2] - 8:12, 8:16
**Sharbaugh** [15] - 18:7, 19:23, 23:25, 24:9, 25:17, 32:22, 33:10, 37:13, 37:21, 38:2, 41:12, 41:16, 41:23, 41:25, 52:20
**Sharbaugh's** [8] - 3:12, 3:14, 17:18, 17:19, 19:13, 31:15, 39:23, 44:19
**shifting** [3] - 29:20, 36:6, 36:7
**Shoreman** [3] - 1:15, 2:10, 2:12
**SHOREMAN** [5] - 1:16, 2:9, 3:21, 16:18, 16:23
**short** [1] - 40:16
**show** [8] - 22:8, 25:10, 30:13, 30:15, 31:21, 32:25, 33:15, 34:24
**showed** [4] - 32:1, 32:5, 34:1, 45:6
**showing** [2] - 21:24, 42:24
**shown** [3] - 29:2, 30:21, 54:3
**shows** [4] - 43:11, 45:21, 55:14
**side** [4] - 2:23, 8:9, 23:17, 43:10
**sides** [3] - 3:22, 10:14, 14:3
**significance** [2] - 34:12, 48:6
**significant** [5] - 22:11, 35:8, 35:11, 41:7, 50:16
**similar** [2] - 21:6, 22:14
**similarly** [2] - 10:10, 10:24
**simply** [8] - 46:22, 50:24, 51:3, 51:10, 51:14, 53:1, 54:10, 54:18
**sister** [2] - 18:2, 56:15
**sites** [1] - 15:24
**sitting** [1] - 55:16
**situation** [4] - 16:7, 29:16, 54:17, 56:15
**skill** [1] - 42:8

**skilled** [1] - 41:9
**snap** [4] - 27:6, 46:14, 46:20
**snapped** [2] - 27:5, 48:23
**snapping** [3] - 28:15, 46:9, 46:23
**sole** [1] - 30:5
**solitary** [1] - 50:21
**someone** [8] - 26:11, 26:15, 29:1, 32:15, 33:25, 34:4, 35:9, 46:13
**sometimes** [1] - 41:21
**somewhat** [1] - 19:7
**somewhere** [3] - 10:8, 28:9, 50:11
**SONJA** [2] - 1:23, 59:16
**Sonja** [2] - 59:10, 59:16
**soon** [1] - 58:9
**sooner** [1] - 12:2
**sort** [30] - 4:19, 6:12, 7:25, 9:15, 9:18, 9:19, 11:6, 11:11, 12:17, 14:18, 16:2, 16:7, 20:20, 21:1, 21:16, 21:20, 22:14, 22:17, 23:1, 23:6, 23:10, 25:8, 27:20, 27:21, 29:18, 32:25, 37:7, 39:11, 55:13, 57:3
**sounds** [2] - 14:21, 39:18
**specific** [5] - 7:24, 12:21, 13:2, 15:12, 53:24
**specifically** [7] - 5:9, 11:21, 42:12, 44:8, 44:9, 55:10, 56:2
**spectrum** [1] - 53:4
**speedier** [1] - 17:6
**speedy** [1] - 9:1
**spend** [1] - 48:18
**spouse** [1] - 38:6
**spreadsheet** [1] - 9:17
**Springs** [1] - 1:22
**Square** [1] - 1:19
**stable** [1] - 43:17
**stage** [1] - 13:24
**stamps** [1] - 9:14
**stand** [1] - 3:5
**standard** [5] - 19:11, 22:21, 45:18, 57:18, 58:17
**standing** [1] - 11:11
**start** [3] - 8:24, 18:9,

19:12
**started** [2] - 11:15, 48:18
**starting** [2] - 20:1, 57:18
**starts** [1] - 48:14
**state** [1] - 2:4
**statement** [2] - 37:18
**STATES** [2] - 1:1, 1:3
**states** [2] - 38:14, 39:1
**States** [5] - 1:12, 2:3, 2:7, 59:10, 59:13
**status** [8] - 3:2, 3:8, 5:4, 8:22, 8:25, 16:15, 17:16, 59:5
**statute** [6] - 18:20, 24:7, 29:5, 30:6, 30:15, 35:16
**statutory** [1] - 25:4
**stay** [2] - 14:10, 58:11
**stays** [1] - 25:3
**steel** [1] - 45:12
**stenographic** [1] - 59:11
**Stenographic** [1] - 1:25
**step** [6] - 6:13, 8:10, 9:23, 20:16, 42:20
**step-by-step** [1] - 42:20
**steps** [2] - 3:5, 14:13
**stick** [1] - 16:13
**sticks** [1] - 54:15
**still** [9] - 6:19, 6:25, 14:21, 24:24, 25:3, 30:9, 32:17, 32:21, 50:14
**stop** [1] - 26:10
**stops** [1] - 48:14
**store** [2] - 6:22, 28:7
**story** [6] - 53:14, 53:16, 53:18, 54:14, 54:15, 54:20
**strap** [1] - 43:17
**Street** [1] - 1:13
**strength** [1] - 34:2
**stretches** [2] - 44:21
**strict** [2] - 57:16, 57:21
**strongest** [1] - 22:8
**stuck** [1] - 53:18
**stuff** [6] - 10:9, 10:19, 15:19, 27:17, 58:15, 58:19
**submission** [3] - 41:10, 42:20, 43:9
**submissions** [2] - 55:1, 57:6

**submitted** [1] - 40:19
**subpoena** [1] - 6:22
**subpoenas** [1] - 11:24
**subsequent** [1] - 22:3
**substance** [1] - 5:1
**substantially** [1] - 50:8
**suffers** [1] - 52:7
**sufficient** [1] - 57:19
**sufficiently** [2] - 39:2, 39:17
**suggest** [5] - 20:7, 28:19, 28:24, 33:16, 34:3
**suggesting** [3] - 26:12, 29:4, 29:10
**suggestive** [3] - 23:1, 27:10, 27:23
**suggests** [5] - 11:5, 23:11, 28:2, 30:7, 34:7
**Suite** [3] - 1:16, 1:19, 1:21
**sulfur** [1] - 45:9
**summarized** [1] - 8:11
**summarizing** [1] - 13:19
**summary** [1] - 14:1
**summer** [1] - 48:12
**supervision** [4] - 28:5, 56:23, 58:4, 58:5
**support** [2] - 44:11, 44:13
**supported** [1] - 19:10
**supports** [3] - 33:21, 43:1, 45:17
**suppose** [1] - 22:8
**supposed** [1] - 21:2
**suppress** [1] - 55:20
**Supreme** [1] - 15:4
**surprise** [1] - 18:6
**surveillance** [1] - 26:17
**susceptible** [2] - 9:14, 29:14
**suspect** [7] - 6:6, 15:9, 20:17, 20:18, 22:18, 26:18, 58:5
**suspecting** [1] - 49:5
**sustained** [1] - 47:12
**symptoms** [1] - 52:7
**systems** [1] - 10:18

**T**

**table** [1] - 45:21
**talks** [2] - 24:12, 30:15
**targeted** [2] - 6:15, 7:4
**tax** [1] - 34:20
**team** [9] - 2:13, 5:9, 6:9, 7:9, 12:20, 12:23, 13:11, 15:1, 16:22
**tend** [1] - 20:7
**Tennessee** [1] - 1:19
**terms** [11] - 6:8, 7:8, 8:11, 8:20, 8:22, 10:17, 12:1, 26:10, 48:21, 54:8, 54:25
**terrible** [1] - 48:25
**THE** [94] - 1:1, 1:9, 1:12, 1:15, 2:8, 2:12, 2:15, 2:16, 3:22, 5:21, 5:25, 7:10, 7:22, 8:7, 8:18, 8:21, 9:5, 9:7, 10:11, 11:10, 12:7, 12:10, 13:4, 14:2, 14:15, 14:24, 15:17, 16:9, 16:20, 16:24, 17:1, 17:16, 19:12, 20:23, 21:7, 21:21, 22:7, 23:8, 23:19, 24:8, 24:13, 24:22, 25:12, 25:15, 25:19, 25:22, 26:1, 27:11, 28:12, 29:4, 29:20, 30:2, 30:11, 30:18, 30:23, 31:6, 31:9, 31:14, 32:13, 33:8, 34:10, 36:5, 36:12, 36:16, 36:23, 37:2, 37:11, 37:17, 37:20, 38:1, 38:16, 39:3, 39:14, 39:18, 41:20, 42:7, 42:11, 44:2, 44:6, 46:7, 47:16, 48:20, 49:14, 49:23, 50:25, 51:19, 52:10, 52:24, 54:2, 55:1, 57:5, 57:12, 58:16, 58:23
**themselves** [2] - 17:11, 29:2
**theory** [1] - 27:2
**therefore** [4] - 29:1, 31:2, 31:3, 31:9
**thinking** [1] - 7:13
**third** [16] - 11:17, 19:5, 19:8, 24:18, 28:5, 36:9, 38:5, 38:12, 38:20, 38:21, 38:22, 40:14, 49:20,

51:1, 51:3, 56:14
**third-party** [8] - 24:18, 28:5, 38:5, 38:12, 38:21, 38:22, 49:20, 56:14
**thorough** [1] - 39:25
**thoroughly** [1] - 17:8
**thoughtful** [1] - 8:14
**threat** [2] - 26:7, 41:7
**threats** [1] - 41:8
**three** [3] - 19:1, 40:5, 44:2
**throughout** [2] - 17:25, 44:7
**thumb** [1] - 34:21
**tie** [1] - 22:22
**tied** [1] - 20:6
**timeline** [6] - 6:2, 8:8, 8:18, 37:24, 44:14, 48:6
**timers** [1] - 43:20
**timing** [1] - 14:12
**today** [8] - 3:1, 8:10, 9:16, 11:10, 12:9, 17:2, 40:7, 57:8
**together** [4] - 17:3, 42:18, 42:21, 42:25
**toll** [1] - 9:1
**ton** [1] - 9:10
**took** [1] - 15:4
**top** [1] - 43:17
**topic** [2] - 5:10, 47:14
**topics** [3] - 7:8, 8:5, 12:15
**totally** [1] - 29:22
**towards** [2] - 13:5, 49:14
**trace** [1] - 16:7
**traceable** [1] - 49:6
**track** [1] - 9:12
**tracking** [1] - 11:3
**tracks** [4] - 19:7, 20:22, 52:14, 52:19
**tranches** [1] - 8:9
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:9
**transcript** [5] - 38:11, 53:9, 59:11, 59:11, 59:12
**treat** [2] - 4:10, 4:11
**tree** [1] - 16:4
**trial** [5] - 9:1, 14:23, 16:10, 16:12, 17:6
**tried** [3] - 31:25, 32:18, 58:8
**triggering** [2] - 45:24, 46:8
**true** [5] - 28:1, 31:20,

33:3, 59:11
**trusted** [1] - 56:19
**truth** [1] - 55:22
**truthfully** [1] - 55:21
**try** [5] - 15:18, 15:21, 40:25, 55:14, 58:9
**trying** [13] - 8:13, 12:3, 20:21, 21:25, 27:16, 30:24, 32:23, 39:19, 44:14, 54:5, 54:6, 55:16, 58:12
**turn** [3] - 29:11, 40:22, 49:23
**turned** [2] - 8:17, 31:25
**Turning** [1] - 3:6
**turns** [2] - 34:11, 35:23
**two** [15] - 3:23, 5:3, 9:21, 9:24, 10:14, 20:14, 20:19, 21:4, 22:5, 40:10, 48:1, 51:10, 53:19, 57:10
**type** [13] - 14:7, 24:19, 25:1, 26:11, 27:23, 29:14, 30:8, 33:13, 33:19, 34:17, 37:6, 45:14, 46:19
**types** [4] - 6:17, 28:19, 47:2, 56:23

## U

**U.S** [1] - 12:25
**U.S.C** [1] - 17:3
**ultimate** [5] - 26:3, 37:2, 43:24, 47:5, 54:1
**ultimately** [4] - 36:2, 40:5, 41:18, 46:5
**under** [12] - 2:25, 17:3, 18:19, 24:6, 28:4, 29:16, 39:16, 42:10, 46:17, 50:22, 57:8, 59:1
**understate** [1] - 18:25
**understood** [3] - 24:22, 44:6, 44:22
**undertake** [1] - 19:14
**UNITED** [2] - 1:1, 1:3
**United** [5] - 1:12, 2:2, 2:7, 59:10, 59:13
**universe** [1] - 7:6
**unlimited** [1] - 35:16
**unskilled** [1] - 41:7
**unsupervised** [1] - 50:10
**unsupported** [1] - 19:9

**unusual** [2] - 15:12, 15:13
**up** [9] - 14:21, 16:4, 16:16, 19:2, 20:17, 24:3, 33:15, 57:12, 58:11
**user** [2] - 47:24, 51:24

## V

**valid** [1] - 9:20
**value** [1] - 34:12
**variety** [1] - 40:13
**various** [3] - 7:15, 8:9, 19:19
**versus** [3] - 2:3, 35:9, 43:6
**viable** [4] - 26:6, 31:12, 42:23, 43:3
**video** [3] - 43:11, 53:9, 54:6
**view** [1] - 13:14
**viewed** [1] - 18:17
**views** [1] - 46:23
**violence** [2] - 34:20, 45:25
**violent** [2] - 26:22, 29:19
**volatile** [1] - 43:18
**voluminous** [1] - 7:1
**vs** [1] - 1:5

## W

**Wal** [1] - 58:8
**Wal-Mart** [1] - 58:8
**walking** [1] - 19:8
**wants** [2] - 12:11, 58:10
**warrants** [6] - 6:17, 15:5, 15:6, 15:7, 15:23, 15:25
**Washington** [4] - 1:11, 1:14, 1:17, 53:14
**watch** [3] - 54:6, 54:11, 58:6
**ways** [5] - 28:25, 29:1, 30:8, 40:13, 55:7
**weapons** [1] - 31:13
**Wednesday** [1] - 1:10
**week** [2] - 12:14, 35:19
**weekly** [1] - 58:4
**weeks** [5] - 8:12, 8:17, 11:19, 48:3
**weight** [6] - 33:11,

34:8, 35:7, 36:1, 36:16, 36:18
**whatsoever** [1] - 34:20
**whistleblower** [1] - 11:22
**white** [2] - 36:21, 36:23
**whole** [5] - 11:20, 12:19, 27:21, 38:13, 38:15
**wholly** [2] - 44:11, 44:13
**wildly** [1] - 55:13
**Williams** [2] - 2:10, 57:12
**WILLIAMS** [4] - 1:21, 57:10, 57:13, 58:21
**willing** [4] - 9:1, 11:12, 32:21, 58:15
**wins** [1] - 34:23
**wipe** [1] - 21:7
**wiped** [1] - 20:5
**wipes** [5] - 19:21, 20:14, 20:23, 21:2, 22:9
**wiping** [11] - 20:18, 20:19, 47:12, 47:19, 47:22, 47:24, 47:25, 51:7, 52:6, 52:8, 55:12
**wires** [1] - 45:13
**word** [2] - 40:9, 46:7
**words** [7] - 2:25, 3:3, 24:25, 32:14, 41:20, 46:11, 54:19
**works** [1] - 16:22
**world** [1] - 29:24
**worried** [1] - 43:18
**worry** [1] - 31:9
**wrap** [1] - 14:18
**writing** [1] - 4:20
**written** [3] - 51:9, 57:9, 59:2

## Y

**year** [3] - 6:4, 27:1, 34:9
**years** [16] - 7:15, 18:24, 20:15, 20:19, 21:4, 21:15, 22:9, 29:17, 35:18, 35:21, 35:23, 40:12, 40:16, 44:20, 45:22, 46:14
**years-long** [2] - 40:12, 44:20
**yesterday** [6] - 18:3, 23:9, 44:10, 45:2, 51:9, 52:12

**young** [1] - 56:15

## Z

**Zach** [1] - 2:10
**ZACHARY** [1] - 1:18
**zero** [1] - 28:20