## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**                                          **CAFN: 1:26-cr-0001-AHA-1**

**BRIAN J. COLE, Jr.,**

**DEFENDANT.**

## <u>DEFENDANT MR. COLE'S MOTION TO DISMISS ALL CHARGES AGAINST HIM FOR LACK OF JURISDICTION BECAUSE THE PRESIDENTIAL PARDON APPLIES TO THE ALLEGED ACTS</u>

Brian Cole files this Motion requesting the following relief:

- Order that the charges brought against the Defendant must be dismissed, as a matter of law, because President Trump's January 20, 2025 Presidential Pardon applies to Mr. Cole's alleged, accused of conduct.

## <u>INTRODUCTION</u>

By the government's own telling, this is exactly the kind of case that President Trump's January 20, 2025 Presidential Pardon was invoked to reach. The following statements have been attributed to the government, statements (facts) that inextricably—and undeniably—relate to Mr. Cole's alleged conduct in regard to the events that occurred at or near the United States Capitol on January 6, 2021:

1. The government alleges that Mr. Cole drove into Washington, D.C. "to attend a protest concerning the outcome of the 2020 election" in support of then-President Trump" ECF 17 at 13;

2. The government itself ties this timing and location directly to January 6 "[A]lthough the defendant acquired the bombmaking components in the months leading up to January 5, 2021, he chose to plant them at the headquarters of the nation's two major political parties in downtown Washington, D.C., *on the eve of the January 6 certification of the electoral vote*" ECF. 17 at 13, 19 (emphasis added);

3. The government says that the found devices were then discovered at approximately 1:00 p.m. and 1:15 p.m. on January 6, 2021, prompting an emergency response by the United States Capitol Police Hazardous Devices Section and diverting resources from the Capitol complex as Congress met to certify the electoral vote;

4. House Select Subcommittee on January 6 Chairman Barry Loudermilk held a hearing as recent as January 2026 "to focus on the pipe bombs left at the Democratic and Republican National Committee headquarters on January 5, 2021";

5.  Two House subcommittees found that the RNC and DNC devices "marked a serious security failure **associated with January 6**," that "the significance of the pipe bombs to how the events of January 6 unfolded cannot be overstated," and that "the explosive devices played a critical role in how the events of that day unfolded" *See* Staff of H. Subcomm. on Oversight & H. Subcomm. on Admin. State, Reg. Reform, and Antitrust, 119th Cong., *Four Years Later: Examining the State of the Investigation into the RNC and DNC Pipe Bombs* (Jan. 2, 2025) (Interim Report), at 53 (emphasis added); and

6.  The former Capitol Police Chief even testified that the devices were "part of a coordinated plan related to the attack on the Capitol." ECF 17 at 13, 19.

Those are just a few examples, on top of the countless articles referring to Mr. Cole as the "J6 Pipe Bomber"—on the government's own narrative, Mr. Cole's alleged conduct is not at the margins of the Pardon; the alleged conduct sits at its center. Against that backdrop, there is no serious dispute that the government itself, and the political branches more broadly, have consistently treated the alleged conduct here as part of the "events . . . at or near the United States Capitol on January 6, 2021."

## THE PARDON AT ISSUE

On January 20, 2025, President Donald J. Trump issued a sweeping Presidential Pardon addressing conduct regarding the events of January 6, 2021:

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

This proclamation ends a grave national injustice that has been perpetrated upon the American people over the last four years and begins a process of national reconciliation.

Acting pursuant to the grant of authority in Article II, Section 2, of the Constitution of the United States, I do hereby:

(a) commute the sentences of the following individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021, to time served as of January 20, 2025:

- Stewart Rhodes

- Kelly Meggs

- Kenneth Harrelson

- Thomas Caldwell

- Jessica Watkins

- Roberto Minuta

- Edward Vallejo

- David Moerschel

- Joseph Hackett

- Ethan Nordean

- Joseph Biggs

- Zachary Rehl

- Dominic Pezzola

- Jeremy Bertino

(b)  grant a full, complete and unconditional pardon to all other individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021;

The Attorney General shall administer and effectuate the immediate issuance of certificates of pardon to all individuals described in section (b) above, and shall ensure that all individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021, who are currently held in prison are released immediately.  The Bureau of Prisons shall immediately implement all instructions from the Department of Justice regarding this directive.

I further direct the Attorney General to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021.  The Bureau of Prisons shall immediately implement all instructions from the Department of Justice regarding this directive.

IN WITNESS WHEREOF, I have hereunto set my hand this

twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

## **RELEVANT FACTUAL BACKGROUND**

On December 3, 2025, the government filed a criminal complaint charging Brian J. Cole, Jr. with violating 18 U.S.C. § 844(d) and § 844(i), based on alleged conduct surrounding January 5–6, 2021. *See* ECF 1. Mr. Cole was arrested on December 4, 2025 and made his initial appearance the next day. On December 28,

2025, the government moved for pretrial detention and filed a detailed memorandum outlining its theory of the case. *See* ECF 17.

Mr. Cole disputes the allegations and maintains his innocence. For this motion, however, the critical point is how the government itself describes his alleged conduct—when it occurred, where it occurred, and what it was allegedly about.

## A. The Government's Own Story Demonstrates that the Pardon applies to Mr. Cole

According to the supporting affidavit, at approximately 1:00 p.m. on January 6, 2021, law enforcement received a report of a suspected improvised explosive device ("IED") near the Republican National Committee ("RNC") headquarters in Washington, D.C. A second suspected device was reported around 1:15 p.m. near the Democratic National Committee ("DNC") headquarters, "just a few blocks away." ECF 1-1 at 1.

Both headquarters are described as national political party offices on Capitol Hill, "used in interstate commerce and in activity affecting interstate commerce." Id. at 2. The United States Capitol Police Hazardous Devices Section responded and rendered both devices safe. The FBI later concluded that the recovered items were two destructive devices and that they were located in the "vicinity" of the RNC and DNC. Id. at 1; *see also* ECF 17 at 7–8.

Thus, under the government's own account, the devices at issue in this case were discovered and neutralized on the afternoon of January 6, 2021, at the national party headquarters on Capitol Hill—literally "at or near" the United States Capitol—as the day's larger events unfolded.

The government alleges that on the evening of January 5, 2021, Mr. Cole drove his 2017 Nissan Sentra from Virginia into downtown Washington, D.C. His car was captured by a license plate reader at approximately 7:10 p.m. on the South Capitol Street exit from I-395, less than one-half mile from where the "pipe bomber" was first seen on foot on surveillance footage near First Street and North Carolina Avenue, S.E. ECF 1-1 at 6–7; ECF 17 at 2–3.

Around 7:34 p.m., cameras captured an individual in that same Capitol Hill neighborhood, carrying a backpack and wearing a gray hooded sweatshirt, dark pants, gloves, a mask, and Nike Air Max Speed Turf shoes. A height analysis put the individual at about 5'7" (±1.1"); Mr. Cole is 5'6" and wears corrective eyeglasses, which the individual on the video is seen adjusting. ECF 1-1 at 2–3; ECF 17 at 2–3.

Historical cell-site data show Mr. Cole's phone interacting with towers in a pattern the FBI says is "consistent with" that individual's route between roughly 7:39 p.m. and 8:24 p.m. through the streets surrounding the RNC and DNC headquarters. ECF 1-1 at 4–6; ECF 17 at 4–6.

The government says that at approximately 7:54 p.m. on January 5, 2021, the individual placed the first device "in the immediate vicinity of the DNC headquarters," and at about 8:16 p.m. placed the second "in the immediate vicinity of the RNC headquarters," roughly 0.2 miles away. ECF 17 at 2, 5.

Crucially, the government itself ties this timing and location directly to January 6:

> "[A]lthough the defendant acquired the bombmaking components in the months leading up to January 5, 2021, he chose to plant them at the headquarters of the nation's two major political parties in downtown Washington, D.C., *on the eve of the January 6 certification of the electoral vote*."

ECF 17 at 19 (emphasis added).

According to the government, Mr. Cole set both devices to 60-minute timers, left them in place near the party headquarters on Capitol Hill, and then departed the city, returning to Virginia. Id. at 15–16, 20. The devices did not explode and no one was injured, but the government called that outcome as "luck, not lack of effort." Id. at 20.

The government alleges months of preparation. It points to purchases between 2018 and 2020 of each category of component ultimately found in the January 6 devices: 1" x 8" pipe nipples and associated end caps from a particular manufacturer, red and black 14-gauge wire, alligator clips, nine-volt batteries and connectors, white

kitchen timers, and steel wool, largely from Home Depot, Lowes, Walmart, and Micro Center in northern Virginia. ECF 1-1 at 3–4; ECF 17 at 8–11. It also cites purchases of tools "for manufacturing of pipe bombs" and claims that similar components were found during searches of Mr. Cole's home and vehicle. ECF 17 at 10–11, 12–13.

The government ties all of this alleged activity to the downtown Washington political party headquarters and the January 6 certification. The government's own narrative also squarely places Mr. Cole's alleged actions in the political and temporal setting of January 6, 2021.

In short, even on the government's telling, the alleged conduct, inter alia:

- was motivated by grievances about the 2020 presidential election;

- was directed at the headquarters of the two national political parties on Capitol Hill; and

- was timed "on the eve of the January 6 certification of the electoral college vote." Id. at 19.

The government's own filings place Mr. Cole's alleged actions—by time (January 6, 2021), place (Capitol Hill party headquarters near the Capitol), and purpose (response to the 2020 election and January 6

certification)—squarely within that described category. The legal consequences of that fact are addressed below.

## ARGUMENT WITH CITATIONS TO AUTHORITIES

Brian Cole's conduct is so inextricably and demonstrably tethered to the "events at or near the United States Capitol on January 6, 2021" that he must be pardoned pursuant to the applicable Presidential Pardon of January 20, 2025. Relevantly, the Constitution provides that the President "shall have power grant reprieves and pardons for offences against the United States, except in cases of impeachment." Ex parte Garland, 71 U.S. (4 Wall.) 333, 380 (1867). The breadth of the President's pardon power is "**unlimited**, with the exception stated [impeachment]**. It extends to every offence known to the law**…." Id. Moreover, it applies not only to convictions but also to all pre-conviction legal proceedings: the pardon power "may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment." Id.

In fact, "if granted before conviction, [the Presidential Pardon] prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity." Id., at 380-81; see also United States v. Batchelor, 19 C.M.R.

452, 500 (U.S. A.B.R. 1955) (stating, "[t]his power of pardon, which may be exercised before legal proceedings are taken as well as following conviction and judgment.")

Despite the immense scope of the President's pardon power, this Court and other courts have the authority to interpret the scope of a pardon. In this context, this Court has stated that it "does not presume to review the validity of the pardon, only its proper scope." United States v. Wilson, No. 25-3041, 2025 U.S. App. LEXIS 7884 at 4-5, 2025 WL 999985, at *2 (D.C. Cir. Apr. 2, 2025) (hereinafter *Wilson II*"). Moreover, while "[n]either the legislative nor the judicial branches can exercise or alter the President's pardon power… [c]ourts have long exercised their authority to interpret and apply Presidential pardons." United States v. Costianes, 782 F. Supp. 3d 253, 260 (D. Md. 2025).

With respect to "[w]hether pardon or amnesty is contemplated or intended and, if so, the persons and offenses covered, depend on the terms thereof – **the ordinary rules of statutory construction being applied thereto."** United States v. Batchelor, 19 C.M.R. 452, 501 (U.S. A.B.R. 1955).Thus, "[t]he same rule of construction must be applied as in the construction of statutes, and the whole proclamation must be considered to find the Presidential intent." Batchelor, 19 C.M.R. at 501; *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012). In sum, this Court's "plain duty is to construe the

proclamation like any public act or law, and to apply to it the well-settled rules of interpretation, irrespective of any opinion, or even knowledge, of the private but unexpressed intention of its authors. Such is the rule even with respect to a private pardon of an individual offender…" Batchelor, 19 C.M.R. at 501. Finally, it is axiomatic that when the ordinary meaning of words is clear and unambiguous, interpretation of those words is prohibited. Id.

Here, regarding President Trump's Pardon at issue, according to several courts, "[t]he language in the Pardon is plain, and the terms are clear and unambiguous. The Pardon was granted to 'individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021.'" Id. Furthermore, as another court easily concluded, "[f]or an offense to fall within [the Pardon's] scope, it must be tethered to a specific time—January 6, 2021—and place—at or near the U.S. Capitol." Id.

The scope of a Presidential Pardon is not all-encompassing, however, as demonstrated by the fact that "[t]he pardon does not cover offenses **wholly independent** of events at the Capitol on January 6, **even if uncovered during investigation of January 6 offenses. What matters is the relationship between the offenses**." United States v. Wilson, No. 25-3041, 2025 LX 222162, at *4 (D.C. Cir. Apr. 2, 2025). Finally, an agency is not entitled to interpretative deference "of

an executive order it is charged with administering" if an agency's interpretation is unreasonable. <u>Costianes</u>, 782 F. Supp. 3d at 265.

In sum, several principles emerge from the decisions regarding the Pardon: (1) the Pardon "was meant to apply to offenses factually tethered to the events of January 6, 2021, rather than to incidental offshoots of the January 6 investigations." <u>United States v. Wilson</u>, (Wilson I) No. 25-cv-545 (DLF), 2025 LX 161250, at *14 (D.D.C. Mar. 13, 2025); (2) the phrase "related to" is not limited to conduct that took place *physically inside* the Capitol, at the *precise moment* of the joint session, or even the singular date of January 6—it encompasses conduct that is close enough in time, place, and subject matter to be part of the same events. <u>Id</u>. at 14–55; <u>Costianes</u>, 782 F. Supp. 3d at 263–64; and (3) what disqualifies an offense is not that it is different in form from the typical January 6 prosecution, but that it is "wholly independent of events at the Capitol on January 6"—*i.e.*, it occurs at a different time and place and "bear[s] no relationship" in its elements or subject matter to the January 6 events. <u>Wilson II</u>, 2025 U.S. App. LEXIS at 4-5.

With the above established, applying governing law to the plain, unambiguous language of the President Trump's Pardon demonstrates that the Pardon applies to Mr. Cole because his alleged conduct is inextricably tethered to the events at or near the United States Capitol on January 6, 2021.

Foremost, and mindful that courts interpret the language of a Presidential Pardon pursuant to fundamental rules of statutory construction: "[t]here is no canon against **using common sense** in construing laws **as saying what they obviously mean**." Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1312 n.4 (11th Cir. 2013). In fact, "**the fifth canon of statutory interpretation requires judges to use a little common sense**." John Paul Stevens, *The Shakespeare Canon of Statutory Construction*, 140 U. PA. L. REV. 1373, 1383 (1992). **This Circuit agrees**. See United States v. Villanueva-Sotelo, 380 U.S. App. D.C. 11, 35, 515 F.3d 1234, 1258 (2008) (Dissent, Hon J. Karen LeCraft Henderson) (citing, "The *first* principle of statutory construction, however, is to apply common sense in the reading of language. *See United States v. Howell*, 78 U.S. 432, 436, 20 L. Ed. 195 (1870) ("[O]ne of the first canons of construction teaches us to avoid if possible [a result] which is at war with the common sense . . . ."); Roschen v. Ward, 279 U.S. 337, 339, 49 S. Ct. 336, 73 L. Ed. 722 (1929) ("[T]here is no canon against **using common sense** in construing laws as saying what they obviously mean.")

## A. Under governing law, as applied to the material facts, the Pardon applies to Mr. Cole

In this case, whether it's the statement by the House Select Subcommittee on January 6 Chairman Barry Loudermilk, or by the Staff of H. Subcomm. on Oversight & H. Subcomm. on Admin. State, Reg. Reform, and Antitrust, or by the government

in its briefing during this case, or by officials and commentators within the litany of articles about the "J6 Bomber"—the government (and everyone else) has repeatedly demonstrated its belief that the alleged, accused of conduct of Mr. Cole is inextricably tied to the events that occurred at or near the Capitol on January 6, 2021. (**Compare** Pardon language, **with** ECF. 17 at 13, 19, **with** Staff of H. Subcomm. on Oversight & H. Subcomm. on Admin. State, Reg. Reform, and Antitrust, 119th Cong., *Four Years Later: Examining the State of the Investigation into the RNC and DNC Pipe Bombs* (Jan. 2, 2025) (Interim Report.)

*First*, the government's own telling of the facts here explicitly frames this case in relation to the January 6 certification process. The government claims that, although Mr. Cole allegedly acquired bomb components over several months, "he chose to plant them at the headquarters of the nation's two major political parties in downtown Washington, D.C., *on the eve of the January 6 certification of the electoral vote*." ECF. 17 at 19 (emphasis added). That is not happenstance sequencing in time. It is the government's theory of Mr. Cole's alleged motive and context. According to the government, the timing was chosen because of what was scheduled to occur at the Capitol on January 6.

*Second*, the government concedes that the alleged danger, law-enforcement response, and public impact of the devices all unfolded during the January 6 events. The complaint alleges that the devices were discovered at approximately

1:00 p.m. and 1:15 p.m. on January 6, 2021, near the RNC and DNC headquarters. ECF. 1-1 at 1. The United States Capitol Police Hazardous Devices Section responded, and the FBI assessed the items as destructive devices located in the "vicinity" of those national party offices. *Id*. at 1–2; ECF. 17 at 4-5. By the government's own story, then, the "event" here was not complete on the night of January 5 because the alleged hazard persisted into January 6 and was addressed in real time as part of the Capitol security crisis.

*Third*, the government's theory of motive places Mr. Cole's alleged actions in the same political controversy that animated the January 6 crowd. In the government's words, Mr. Cole allegedly said that he drove into Washington, D.C. "to attend a protest concerning the outcome of the 2020 election" in support of then-President Trump, felt "bewildered" by how claims of election irregularities were treated, and believed national leaders on "both sides" were ignoring those grievances and labeling citizens "conspiracy theorists" and "bad people." ECF. 17 at 13-14. The government also says that Mr. Cole allegedly targeted the national RNC and DNC headquarters because "they were in charge" and he "really [didn't] like either party at this point." Id. at 16–17.

In other words, even accepting the government's version of facts, this case arises from a politically charged response to the 2020 presidential election, directed at national political institutions, timed to coincide with the January 6

certification, and culminating in an incident that law enforcement and Congress itself have consistently treated as part of the January 6 security events. *See* ECF. 17 at 19 & n.3 (citing U.S. House interim report investigating the RNC and DNC explosive devices as part of the broader January 6 inquiry).

The President's Pardon unequivocally applies to Mr. Cole, because in no manner is Mr. Cole's alleged conduct **wholly independent** of events at the Capitol on January 6. (See <u>Wilson</u>, No. 25-3041, 2025 LX 222162, at *4, reasoning that only conduct wholly independent of the January 6, 2021 events is not covered.).**The case of January 6, 2021 rioter, David Dempsey, further strengthens Mr. Cole's position**.

### B. If Dempsey was covered by the Pardon, Mr. Cole is absolutely covered by the same Pardon.

Dempsey "viciously assaulted and injured police officers defending the Lower West Terrace Tunnel with a variety of implements he refashioned as weapons." (See Ex. 1,  Government's Sentencing Memorandum for David Dempsey.) The government further noted that Dempsey "[i]s among the few out of thousands of January 6 rioters who engaged in such protracted and vicious attacks. He also has **a lengthy criminal record**, with numerous convictions that **far outstrip criminal history category VI**, the highest possible category." <u>Id</u>. Dempsey used body armor during his assaults and at least one assault and battery, the record reflects, caused "serious bodily injury." <u>Id</u>.

The following, from the sentencing memorandum, is worthy of a long block quote, so readers can truly absorb and wonder how this man, Dempsey, got a pardon after being sentenced to 20 years:

> "Dempsey was one of the most violent rioters, during one of the most violent stretches of time, at the scene of the most violent confrontations at the Capitol on January 6, 2021. Unlike other rioters who slowly pushed their way through the crowd towards the Capitol, Dempsey climbed atop his fellow rioters, using them like human scaffolding, thrusting himself to the front. Once he reached the mouth of the tunnel, Dempsey began a prolonged attack, fighting with his hands, feet, flag poles, crutches, pepper spray, broken pieces of furniture, and anything else he could get his hands on, as weapons against the police. Dempsey's violence reached such extremes that, at one point, he attacked a fellow rioter who was trying to disarm him.
>
> At approximately 4:11 p.m., Dempsey unleashed a torrent of pepper spray directly at Metropolitan Police Department (MPD) Detective Phuson Nguyen, just as another rioter had compromised the detective's gas mask. The searing spray burned Detective Nguyen's lungs, throat, eyes, and face and left him gasping for breath, fearing he might lose consciousness and be overwhelmed by the mob.
>
> Moments later, Dempsey struck MPD Sergeant Mastony's head with such ferocity using a metal crutch that it cracked the protective shield of his gas mask, causing Sergeant Mastony to collapse in a daze, his ears ringing. The blow cut Sergeant Mastony's head, caused significant bruising, and made Sergeant Mastony believe he had suffered a concussion. Though Dempsey has pled guilty only for his assaults on Detective Nguyen and Sergeant Mastony, his violent assault on other officers defending the Capitol was relentless: swinging pole like weapons more than 20 times, spraying chemical agents at least three times, hurling objects at officers at least ten times, stomping on the heads of police officers as he perched above them five times, attempting to steal a riot shield and baton, and incessantly hurling threats and insults at police while rallying other rioters to join his onslaught.
>
> Dempsey's actions on January 6 were consistent with his earlier declaration, captured on video, of wishing to **see political figures hanging from a noose**, and also consistent with his documented history of political violence in California. Dempsey's extensive criminal history— which includes an

assault with pepper spray at a political rally in 2019—is understated by criminal history category VI….” (See Ex. 1, Government Sentencing Memorandum for David Dempsey.)



(“David Dempsey in front of gallows at the Capitol on Jan. 6, 2021.U.S. District Court.”)

If anyone is a domestic terrorist, its Dempsey **per definition**: “For purposes of that guideline, the term "federal crime of **terrorism**" is **defined** by 18 U.S.C. § 2332b(g)(5), which requires that the offense: (1) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and (2) "is a violation of an enumerated statute.” United States v. Ramirez, 16 F.4th 844, 848 (11th Cir. 2021) That's terrorism defined; that's Dempsey. And this man, Dempsey (a white male), received a full, complete,

and unconditional pardon from the President. Remember, regarding the President's Padon at issue, Dempsey could have been listed as a person whose 20-year sentence was commuted. (See Presential Pardon, supra.) But instead, Dempsey received a full pardon regarding his 20 year sentence.

Without question, the Pardon applies to Mr. Cole, who--in reality--caused zero harm to anyone, and has zero history of violence (political or otherwise)— also mindful that the devices in question could never have exploded. (See ECF 48-1, expert report.) That said, another example of extreme conduct by a person who was found conspiring against the government is the conduct of Kenneth Harrelson, whose sentence was commuted, demonstrating that it makes zero sense to seek the conviction of Mr. Cole, when said conviction must be commuted anyways under the precedent set by commuting Harrelson and other maniacal rioters.

### C. Harrelson's commuted sentence demonstrates that government is wasting time trying to convict Mr. Cole because he surely would deserve a commuted sentence based on the commuted sentence of Harrelson and others who transported assault rifles and ammunition, inter alia, to Washington D.C.

The Presidential Pardon at issue expressly commuted Kennth Harrelson (a white male) for felonious conduct of which he engaged in on January 5, 2021 **because that conduct was related to the events** at or near the United States Capitol on January 6, 2021. (See The Pardon At Issue, supra.)

Briefly, on May 26, 2023 Kenneth Harrelson was sentenced on counts 3, 4, 9 of the government's superseding indictment. (See U.S. v Rhodes III, et al, 1:22-cr-00015, ECF 167, Superseding indictment, Count 3, 4, and 9 [Dist. Columbia]); (Id., minute entry for 05/26/2023, stating "Minute Entry for proceedings held before Judge Amit P. Mehta: Sentencing held on 5/26/2023 as to KENNETH HARRELSON (3). As to Counts **3s, 4s, and 9s** of [the] Superseding Indictment, the Defendant is **sentenced to concurrent terms of 48 months of incarceration** followed by 24 months of supervised release. Bond Status of Defendant: remains in-custody….")

Relevantly, Counts 3, 4, 9—for which Harrelson was convicted and sentenced—incorporated allegations/paragraphs, inter alia, 18-134 of said superseding indictment. Significantly, paragraph 62 made the following allegations against Harrelson regarding the transport of **firearms**, **ammunition** and related items into the D.C. metro area on January 5, 2021:

> Between January 1 and 5, 2021, RHODES, MEGGS, HARRELSON, WATKINS, James, HACKETT, MOERSCHEL, Ulrich, VALLEJO, and other co-conspirators **transported firearms, ammunition, and related items to the Washington, D.C., metropolitan area**.

(See <u>U.S. v Rhodes III, et al</u>, ECF 167 ¶ 62.) Paragraph 69 further accused

Harrlson of conduct on January 5, 2021 related to preparing firearms and

ammunition for use by rioters:

> On January 5, 2021, MEGGS, HARRELSON, HACKETT, MOERSCHEL,
>
> CALDWELL, and others provided the QRF, including VALLEJO, with
>
> firearms, ammunition, and related items.

(See <u>U.S. v Rhodes III, et al</u>, ECF 167 ¶ 69.)

That established, the prison sentence with respect to Harrelson's heinous

conduct from January 1-5, 2021 was commuted as relating to the events of January

6, 2021—despite allegations of stockpiling/transporting firearms and ammunition

for potential use ugainst U.S. **Citizens from January 1-5, 2021**, and **despite said**

**conduct occurring prior to January 6, 2021**. See <u>Costianes</u>, 782 F. Supp. 3d at

263–64; see also <u>Wilson I</u>,  2025 LX 161250, at 14-15. Again, if Harrelson

received a commuted sentence for transporting firearms and ammunition for use

against our government, then the government seems to be wasting our time trying

to convict Mr. Cole for **allegedly** transporting explosive materials to the D.C. area,

especially given the fact that these devices, as a matter of science, could never

have exploded and in actuality did not explode, on top of zero persons being

injured, and Mr. Cole there **being zero allegations** of Mr. Cole ever participating

in the actual violence that occurred at the Capitol on January 6, 2021. The Pardon

applies to Mr. Cole.

## **<u>CONCLUSION</u>**

The Pardon—like it or not—applies to Mr. Cole, based on the ordinary and

plain meaning of the Pardon's language as applied to the relevant facts in this

case. Wherefore, for the reasons stated above, Mr. Cole requestS that this

Motion be granted and the charges against him dismissed, in their entirety.


**/s/ MARIO B. WILLIAMS**              **/s/JOHN SHOREMAN**
Mario B. Williams                      John M Shoreman
**Ga. Bar No. 235254**                 **DC Bar #407626**


**HUMANITY DIGNITY AND RIGHTS LLC**
**MCFADDEN & SHOREMAN P.C.**

Life Time Work - Buckhead - at Phipps Plaza

3480 Peachtree Road, NE, Second (2nd) Floor

Atlanta, Georgia 30326

Tel.: 470-257-2485

Email: mwilliams@hdrattorneys.com

***Counsel for Brian Cole Jr***