Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
[redacted]
San Francisco, CA [redacted]

(415) 661-0162 (Office)
(415) 215-4191 (Cell)
Email : rleo@jrcsf.com

September 24, 2026

**Re: United States of America v. Brian Cole, Jr.**
**Criminal No: 26-cr-0001**

This report is in the case of *United States v. Brian Cole, Jr.*

## I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly a tenured Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For more than two decades, I have conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. I have analyzed thousands of cases involving interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications. My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court on multiple occasions. To date, I have consulted with criminal and civil attorneys on 2,500 cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness 435 times in state, federal, and military courts in thirty-eight (38) states plus the District of Columbia, including 43 times in federal courts (9 of which were in military courts). I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report.

## II. Materials Reviewed

- Audio of Interrogation of Brian Cole, Jr. (December 4, 2025).
- Transcript of Interrogation of Brian Cole, Jr. (December 4, 2025). Bates Stamped: 005038-005106
- Indictment (Filed 4/14/26)
- Government's Memorandum in Support of Pretrial Detention
- Protective Order Governing Discovery
- Filed Copy of Defendant's Motion to Suppress

## III. Overview of Case Specific Opinions

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability. I will then discuss these issues as they relate to the interrogations of Brian Cole on December 4, 2025 . In my professional opinion:

1) It has been well-documented in the empirical social science research literature that a substantial number of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit.

2) The interrogation of Brian Cole on December 4, 2025 is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that can explain how and why innocent individuals are sometimes moved to make and/or agree to false and unreliable statements, admissions and/or confessions.

3) The interrogation of Brian Cole on December 4, 2025 contained examples of psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to sometimes cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to risk eliciting involuntary statements, admissions and/or confessions.

4) The interrogation of Brian Cole on December 4, 2025 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions

and/or confessions (*i.e.*, *situational* risk factors). These included: Reid-based guilt-presumptive interrogation; false and exaggerated evidence ploys; *minimization* and *maximization*; and implied (if not explicit) promises of leniency and implied threats.

5) If I am asked to testify at Mr. Cole's trial, I anticipate that I will testify both generally and specifically. Generally, I anticipate that I will testify about the counter-intuitive phenomena of police interrogation, psychological coercion and false and unreliable statements, admissions and/or confessions to police. I will describe social science research on the social psychology of police interrogation; the techniques that police are trained to use; the techniques that social science research shows they do use; how and why these interrogation techniques are designed to work to move suspects from denial to admission; how and why they can become psychologically coercive and lead to involuntary statements, admissions and/or confessions; how and why they can, and sometimes do, lead to false and unreliable confessions from the innocent; which techniques increase the risk of eliciting false and unreliable confessions and why; the problem of police interrogation contamination and how it relates to police elicitation of false confessions; and the indicia, patterns and characteristics of false and unreliable statements, admissions and/or confessions. I will also identify specific interrogation techniques and practices used during the interrogation of Mr. Cole on December 4, 2025, why they are significant in light of social science research, and, based on that empirical scientific research, how they increase the risk of eliciting false and/or unreliable statements, admissions and/or confessions during police interrogation.

## IV. The Scientific Study of Police Interrogation and False Statements, Admissions and Confessions[1]

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social

[1]There is a substantial empirical research literature on the scientific study of police interrogation, psychological coercion and false statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, No. 1, pp. 7–53. Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association); Richard A. Leo (2009), "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

scientific community. Significantly, these principles, methods, and findings are generally accepted in the social science community,[2] beyond common knowledge,[3] and therefore numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation.[4]

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[5] The fact that police-induced false confessions can and do occur has been well-documented and is no longer disputed by anyone in the law enforcement or academic communities. Social scientists have documented hundreds of false confessions in America since the early 1970s,[6] but this is surely an underestimate and thus the tip of a much larger iceberg for multiple reasons. First, false confessions are difficult for researchers to discover because neither law enforcement nor any

---

[2] *See* Saul Kassin, Allison Redlich, Fabiana Alceste and Timothy Luke (2018). "On the General Acceptance of Confessions Research: Opinions of the Scientific Community" *American Psychologist*, 73, 63-80.

[3] See Fabiana Alceste, Timothy Luke, Allison Redlich, Johanna Hellgren, Aria Amrom, and Saul Kassin (2020). "The Psychology of Confessions: A Comparison of Expert and Lay opinions." *Applied Cognitive Psychology*, 25, 39-51.

[4] *See Gray v. City of* Chicago, No. 1:18-cv-02624, Dkts. 489 & 503 (N.D. Ill. May 14, 2023) at *11 (N.D. Ill. May 14, 2023) (Admitting the testimony of Dr. Melissa Russano, "If ever there were a subject that is helpful to the jury, it is on the subject of false confessions."); *Andersen v. City of Chicago*, No 16 C 1963, 2020 WL 1848081, at *2 (N.D. Ill. Apr. 13, 2020) (finding false-confession expert Dr. Saul M. Kassin qualified to speak on false confession risk factors); *Hunt v. Vantlin*, No. 3:14-cv-00092-JMS-MPB, 2019 WL 8267074 at *4-5 (S.D. Ind. Sept. 26, 2019) (finding that a false confessions expert may opine on "the circumstances under which police interrogation tactics are likely to produce false confessions"); *Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at *9, 16 (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession, and "Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case."); *Kluppelb*erg *v. Burge*, 13 C 3963, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Dr. Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge,* 11 C 8996 2013 WL 1966381 at *3 (N.D. Ill. May 10, 2013) ("Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case."); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Dr. Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997), *aff'd,* 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe).

[5] *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, No. 1, pp. 7–53; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[6] The largest published study of false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

private organization keep a comprehensive database of the interrogations that have produced them.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been far more police-induced false confessions than researchers have been able to discover and classify as false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[7] In a more recent survey, police reported that more than 26% of suspects at least partially falsely confessed.[8] If either of these estimate is accurate, American police elicit many of thousands of false confessions every year.

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[9] Police detectives receive specialized training in psychological interrogation techniques; most people, including most jurors, do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission).

In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

---

[7] Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" *Law and Human Behavior*, 31, 381-400.

[8] Laure Brimbal, Sean Roche, M. Hunter and Martaindale (2024). Interviewing and Interrogation Practices and Beliefs, 20 Years Later: A National Self-Report Survey of American Police." *Law and Human Behavior*, 48, 247-261.

[9] *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008). "An Empirical Basis for the Admission of Expert Testimony on False Confessions" *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011). "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" *Psychology, Crime and Law*, 17, 239 -260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010). "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" *The Journal of Legal Empirical Studies,* 7, 231-247.

## V. The Social Psychology of Police Interrogation[10]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the primary purpose of all interrogation (as opposed to interviews). To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[11] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting false confessions or statements.

Dating back to the early 1940s, psychological interrogation methods in the United States have been structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.[12] Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them

---

[10] There is a substantial empirical scientific research literature on the social psychology of police interrogation, psychological coercion and false statements, admissions and/or confessions. For reviews of this literature, see Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, No. 1, pp. 7–53. Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest (2020), UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press). Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009), "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[11] Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room" in William O'Donohue, ED. (2004). *Handbook of Forensic Psychology* (San Diego: Academic Press) at 897-996.

[12] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATON AND CONFESSIONS, 3rd Edition (The Williams and Wilkins Company).

only on suspects believed to be guilty.[13] When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation. The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself. To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent. Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished. The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion. By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that

---

[13] *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition ( Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime and the suspect's role in the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation. [14] Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements. *Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities. Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in the most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to

---

[14] *See* Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Baltimore, MD: Williams & Wilkins) at 332. ("The goal of interrogation is therefore to decrease the suspect's perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* inducements can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[15] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

High-end inducements are psychologically coercive. Psychologically coercive interrogations are problematic because they induce both involuntary and unreliable information, statements, admissions and/or confessions by causing suspects to feel trapped, hopeless, frightened and/or that they have no meaningful choice but to comply with the demands of their interrogator(s). To evaluate whether a particular interrogation was psychologically coercive, an

---

[15] This technique is sometimes referred to in the academic literature as *minimization* and *maximization* techniques. *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, No. 1, pp. 7–53.; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator.

## VI. How Interrogation Is Intended to Affect a Suspect's Perceptions

To understand how and why police-induced false confessions occur, one must first understand how interrogation is intended to influence and manipulate a suspect's perceptions, reasoning, and decision-making. Police interrogation is designed for the guilty, not the innocent. The purpose of interrogating a suspect (unlike the interviewing of witnesses or victims) is to elicit an incriminating statement, admission, and/or confession that will assist the state in its prosecution of the crime; accordingly, police are admonished in their training to interrogate only those whom they believe to be guilty.[16] Because police expect the suspect to deny his guilt, the goal of interrogation is to break down the suspect's resistance and move him to admission. As discussed above, police typically achieve this result by accusing the suspect of committing the crime, attacking the suspect's alibi or version of events, cutting off the suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt. The purpose of these techniques is to break down the suspect's confidence in his denials by convincing him that he is caught, that no one will believe his assertions of innocence, and that objective evidence of his guilt is so overwhelming that it will inevitably lead to his arrest and conviction, regardless of what he says or does during interrogation.

To elicit an admission or confession, however, it is often not sufficient simply to break down a suspect's resistance. Interrogators also try to persuade the suspect that given the circumstances in which he now finds himself—he is caught, all the evidence is against him, and

---

[16] *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

there is no way out of his predicament—there are positive reasons for confessing that will improve his otherwise hopeless situation. In other words, interrogators seek not only to overcome a suspect's denials, but also to convince him of the positive benefits of compliance and confession.[17] Interrogators sometimes do this by focusing the suspect's attention on the processing of his case in the criminal justice system and implying or stating the benefits of cooperation and confession versus the disadvantages of continued denial and resistance. Interrogators sometimes do this by trying to focus the suspect's attention on how certain actors in the criminal justice system (police, prosecutors, judges, juries) can either help or hurt the suspect, depending on what he says in the interrogation room, or how they will react to the suspect's unsympathetic and implausible denials versus a confession that demonstrates remorse and accepts responsibility for the offense. Sometimes interrogators do this by trying to persuade the suspect that the alleged crime could be framed in a way that minimizes the suspect's culpability if he were to admit the underlying act (*e.g.*, a homicide could be portrayed as an accident or an act of self-defense), but that it will be framed in the way that maximizes his culpability if he does not admit during the interrogation to the underlying act (*e.g.*, a homicide will be portrayed as an intentional and premeditated murder). And sometimes interrogators do this by using explicit promises of prosecutorial leniency in exchange for a confession or statement that fits an interrogator's theory of the case and explicit threats of harsher treatment or punishment in the absence of a confession or statement that fits an interrogator's theory of the case.

Involuntary false confessions to police typically occur when detectives use inappropriate, improper, and/or coercive interrogation techniques that cause a suspect to feel hopeless and perceive that he has no choice but to comply with the detectives' demands if he wishes to put an end to the interrogation.[18] False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. However, these types of traditionally coercive techniques no longer appear to be common in the United States. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

## VII. The Three Sequential Police Errors

---

[17] *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[18] *See* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

**That Can Lead to False (But Sometimes Detailed) Confessions**[19]

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime. False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to an interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true. This is called *the misclassification error*. It is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[20]

The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence

---

[19]There is a substantial empirical research literature on the scientific study of police interrogation, psychological coercion and false statements, admissions and/or confessions. For reviews of this literature*, see*: Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, Pp. 7–53. Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest (2020), UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009), "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[20] *See* Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 3-12 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case…. All too often, time and effort are unnecessarily expended in the interrogation of a suspected innocent person when an alibi check could have readily established the fact of his innocence."). *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him, sometimes resulting in false confessions from innocent suspects. This is called *the coercion error*. However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.[21]

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit. Although the "Reid" Manual[22] did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, of promises of leniency," suggesting that interrogators do know that suspects can be made to falsely confess to crimes they did not commit.

Properly-trained interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.[23] Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly-trained interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime. This is called *the contamination error*. Instead, properly trained interrogators will let the suspect supply the details of the case independently. Properly-trained interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[24]

---

[21] Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins), at 114-115, 198-200.

[22] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[23] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[24] Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2 at 429-496. This observation has been made in the police interrogation training literature as well. *See also*

## VIII. Risk Factors for False Confession in Brian Cole's Custodial Interrogation on December 4, 2025

The interrogation of Brian Cole on December 4, 2025 contained interrogation techniques and practices, as well as other factors, that decades of empirical social science research has shown increase the risk of eliciting false, unreliable and involuntary statements, admissions and/or confessions. These include: Reid-based, guilt-presumptive interrogation, *minimization* and *maximization*, threats and promises, and psychological coercion.

### 1) *The Reid Method of Guilt-Presumptive, Confirmatory and Confession-Driven Interrogation*

The interrogating Agents' questioning of Brian Cole on December 4, 2025 was primarily a police interrogation, not a mere police interview. Police are trained both to "interview" and to "interrogate," which they regard as two very different forms of investigative information-gathering activity, even though police often use the terms interchangeably in public and in court. These two concepts are thus derived from police training and are analytically distinct. A police interview consists of open-ended, non-accusatory, and non-leading questions; police are supposed to let the subject do most of the talking, and the goal is to get the truth to develop a case. Police interviews are not supposed to be suggestive or involve any pressure or persuasion. Police typically interview victims, witnesses, and potential suspects. They can occur at any stage of the investigative process.

A police interrogation is very different from a police interview. Though there may be exceptions and though an interrogation may begin as an interview, police are trained to interrogate only suspects. A police interrogation is not supposed to occur at the beginning of an investigation. Rather, police are trained to interrogate only after police have done an initial investigation – "investigate before you interrogate" is one of the mantras of the Reid Method[25] -- and have reasonably concluded that the suspect has committed the crime under investigation. Police interrogation is therefore guilt-presumptive and accusatory. Police are trained in specialized interrogation techniques that are based on pressure and persuasion. The goal of a police interrogation is to move the suspect from the denials that police anticipate to the admission of guilt that they seek, ideally to a full confession narrative. Police interrogators are trained to make accusations, challenge denials, monologue, pressure and persuade the suspect to the extent necessary until the suspect breaks and starts making incriminating statements.

The interrogating Agents' questioning of Brian Cole on December 4, 2025 is properly characterized as primarily a police interrogation, not a police interview. This was primarily an

---

Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[25] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 3-18.

interrogation because it was guilt-presumptive, accusatory, involved the use of multiple and repetitive interrogation techniques that rely on pressure and persuasion, and the Agents' clear goal was to elicit an admission of guilt with a narrative that fits their pre-existing assumptions that Mr. Cole allegedly transported and planted explosive devices. As I will discuss in more detail below, the Agents used numerous Reid-based interrogation techniques, including accusations, attacks on denials, evidence ploys, and *minimization.*

Scholars have suggested that three processes are at work in Reid-based interrogation: isolation, confrontation and *minimization.*[26] All three were present in the Agents' interrogation of Brian Cole on December 4, 2025 . Over the course of their interrogation of Brian Cole, the Agents isolated Mr. Cole by arresting him; repeatedly confronted him by accusing him of transporting and planting explosive devices; expressed unwavering confidence in their belief that he did so; attacked and undermined his denials; applied interpersonal pressure to raise Mr. Cole's anxiety if he continued to deny their accusations; repeatedly told him that evidence established his guilt; and implicitly sought to minimize his perception of his culpability, and by implication the consequences he was facing (by suggesting, for example, that everyone makes mistakes, that they were not judging Mr. Cole, and that he is not a bad guy) if he confessed but that he would be a bad guy if he did not. As the Reid Method instructs, the Agents used Reid-based interrogation techniques to increase Mr. Cole's anxiety associated with denials and decrease his perception of the consequences of confessing.[27]

There is consensus in the scientific community about the Reid Method of interrogation and its effects.[28] Substantial empirical research has documented that Reid-based methods of interrogation can easily become psychologically coercive,[29] and that they increase the risk of eliciting false confessions from the innocent. [30] Reid-based interrogation techniques run the risk of causing the suspect to feel intimidated, trapped and hopeless, and ultimately to perceive that he or she has no choice but to agree with the interrogator(s) and confess in order to escape the aversive pressures of the guilt-presumptive accusatory interrogation and/or to minimize his or her blameworthiness and consequences by confessing. As I will discuss in greater detail below, the Agents' use of Reid-based techniques and methods during their interrogation of Brian Cole

[26] Saul Kassin and Gisli Gudjonsson (2004). "The Psychology of Confessions: A Review of the Literature and Issues." *Psychological Science in the Public Interest*, Vol. 5, 33-67 (see page 43).

[27] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 327-347.

[28] Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, No. 1, pp. 7–53.

[29] Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[30] Wyatt Kozinski (2018). "The Reid Interrogation Technique and False Confessions: A Time for Change." *Seattle Journal for Social Justice*, 16, 301-345; Richard A. Leo (2008) POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

on December 4, 2025 could have made him feel hopelessly trapped if he did not stop denying their accusations that he transported and planted explosive devices, and instead agree with their accusations that he did, and increased the risk that he would make and/or agree to involuntary and/or unreliable statements.

2) *Minimization and Maximization*

A common interrogation strategy is to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by implying or communicating that the consequences of confessing will not be that serious or as serious if the suspect confesses. Interrogation techniques and strategies that implicitly or explicitly minimize the legal seriousness of the crime are associated with and known to increase the risk of eliciting involuntary and/or unreliable statements, admissions and/or confessions. Such *minimization* techniques and strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[31] Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – *i.e*., suggest that the suspect will be perceived in the worst possible way or face a bad possible outcome if he or she does not make or agree to an incriminating statement – are also associated with and known to increase the risk of eliciting involuntary and/or unreliable confessions. Such *maximization* strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess. *Minimization* and *maximization* interrogation strategies are, in effect, two sides of the same coin and thus work together: if the suspect confesses to the minimized scenario (implying reduced culpability and/or reduced punishment in exchange for compliance and confession), the suspect avoids the maximized scenario (implying increased culpability and/or punishment in the absence of compliance and confession).

In their interrogation of Brian Cole, The Agents used *minimization* and *maximization* interrogation techniques. The Agents, for example, tried to minimize Mr. Cole's blameworthiness by suggesting that he merely made a mistake, that he is not a bad guy, and that they would not judge him; conversely, the Agents suggested that the only way to avoid having others spin conspiracy theories about him was by agreeing to the Agents' accusations. The clear implication from these interrogation techniques and strategies was that Mr. Cole would be perceived as less culpable if he agreed with the Agents' accusations, and that, conversely, he would be viewed as more culpable – potentially far more culpable -- if he did not agree with and admit to the Agents' accusations. Not only would he be viewed as more culpable if he continued to deny the accusations, but, by implication, the consequences would be worse. The Agents made this even clearer in other parts of the interrogation, as I will detail later in this report.

There are numerous examples of *minimization* and *maximization* in the interrogation of Brian Cole on December 4, 2025:

[31] *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, No. 1, pp. 7–53

**Example No. 1: Page 55, Lines 22-23**

[redacted] …[redacted] and I are not here to judge you

**Example No. 2: Page 63, Line 23**

[redacted] Everyone makes mistakes

**Example No. 3: Page 70, Lines 24-25**

[redacted] …We're not judging you, you know?

**Example No. 4 (December 4, 2025 ): Page 71, Lines 18-20**

[redacted] If you don't tell us the reason, other people are going to create the reason for you

**Example No. 5: Page 83, Lines 1-4**

[redacted] And they are going to say you are a bad guy. I don't think you are a bad guy at all. I think you are a guy that just got out of routine one night. The one night you got out of your routine.

**Example No. 6: Page 83, Lines 12-19**

[redacted] We want to be able to – we want to be able to tell the story why you did it. Okay? You've seen – You've been on YouTube. You've been on Reddit. You see how people spin conspiracy theories…Don't let other people explain why you did things

Social science research has repeatedly demonstrated that *minimization* interrogation techniques sometimes imply that the suspect will receive help, leniency, immunity, freedom and/or a different benefit in exchange for compliance and confession, and, conversely, that *maximization* techniques sometimes also imply harsher treatment of punishment in the absence of compliance and confession. The Agents' use of *minimization* and *maximization* techniques and strategies increased the risk that Brian Cole's will would be overborne during his guilt-presumptive accusatory interrogation on December 4, 2025 , as well as the risk that he would make or agree to false and/or unreliable incriminating statements, admissions and/or confessions.

3) *Promises and Threats*

As discussed earlier in this report, the use of implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) in exchange for compliance and confession and implicit and/or explicit threats (for example, of physical harm, a higher charge,

longer sentence or harsher punishment) in the absence of compliance and confession significantly increases the risk of eliciting false and/or unreliable statements, admissions, and/or confessions. Empirical social science research has repeatedly demonstrated that promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes of false confessions.[32] Threats and promises are two sides of the same coin: Every threat implies a promise (if one complies to avoid the threat) and every promise implies a threat (if one fails to comply with the promise).

In the interrogation of Brian Cole on December 4, 2025, the Agents repeatedly implied and/or suggested that Mr. Cole would receive less punishment or no punishment at all, that he would be able to resolve his case, that he would be in less or no trouble, and he would be able to go on with his life if he admitted to the Agents' accusations. More specifically, for example, they told him that the only way to resolve and get out of his situation and make it "go away" was by admitting to the accusations, that he would help himself by agreeing to their accusations, that he would be able to put this behind him, that it would help him and his family and that his family would not have to be dragged down to Washington, D.C. and be interviewed – but only if he agreed to their accusations (i.e., confessed). These were clearly implied, if not explicit, suggestions and/or promises of leniency (or their functional equivalent) in exchange for confession. These promises, and their functional equivalent, also implied a threat of greater punishment if Mr. Cole did not admit to the Agents' accusations – that he would not be able to resolve and get out of his situation, put it behind him or make it "go away," that he would not be able to help himself, that it would not help him and his family, and that his family would have to be dragged down to Washington, D.C. and be interviewed. These were clearly implied, if not explicit, threats of harsher treatment/punishment in the absence of compliance and confession. In addition, the Agents implicitly threatened Mr. Cole when they asked him if he understood that lying to federal agents is a crime (after they had accused him repeatedly of lying to them every time he denied their accusations). The Agents' promises of leniency and freedom (in exchange for compliance and confession) and threats of harsher treatment/punishment (in the absence of compliance and confession) were numerous and repeated throughout Mr. Cole's interrogation:

**Example No. 1: (December 4, 2025), Page 6, Lines 17-21**

[redacted] …And you should understand, like, you know, you being forthright with us, you know, being up front with us, you know, will really benefit you in the long run. Just so we can this situation resolved

**Example No. 2 (December 4, 2025): Page 74, Lines 5-12**

[redacted] And you can help yourself right now. You can help yourself by telling us the truth. So we can get out of this situation

[32] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Mr. Cole: There, there isn't – there is no way out of this situation. I don't get how –

[redacted] We're telling you how to get out of this situation. Tell us the truth of what happened that night

**Example No. 3 (December 4, 2025): Page 76, Lines 8-10**

[redacted] We're here and this is your chance, you only chance to explain to us why you did it.

**Example No. 4 (December 4, 2025): Page 84, Lines 19-21**

[redacted] You need to explain to us so we can have this behind us. I'm telling you, you need to explain to us so we can put this behind us.

**Example No. 5 (December 4, 2025 ): Page 85, Lines 6-7**

[redacted] You coming forward today will help you in multiple ways

**Example No. 6 (December 4, 2025 ): Page 85, Lines 17-19**

[redacted] The only way it can go away is by you owning what you did and dealing with it

**Example No. 7 (December 4, 2025): Page 90, Lines 15-23**

[redacted] If you do tell us the truth, we can tell our bosses and the people that are involved in this case that he was straightforward with us on day one. So hopefully that will help you down the line when you have to deal with the consequences of this action. All of those things, all of those things will help you and your family

**Example No. 8 (December 4, 2025): Page 92, Lines 16-18**

[redacted] And, Brian, you understand lying to federal agents is breaking the law. That's another crime. Do you understand that?

**Example No. 9 (December 4, 2025): Page 94, Lines 2-7**

[redacted] Well, we can – listen, if you're willing to walk us through every detail of that night with the truth, we can get your family – we might not have to bring them all down into DC. They might be interviewed, but we might not have to drag them all here. Okay? We can tell – we can tell your story. It's over. Okay?

In addition, the Agents repeatedly told Mr. Cole that they were not accusing him of anything, which implied that they were not accusing him of committing a crime (see, for example, Page 7, Line 5; Page 60, Line 14; and Page 84, Line 2), which, especially in the context of the above promises and threats, implied that he would receive leniency if he cooperated because he was not being accused. One might call this technique an implied promise of more favorable treatment via gaslighting.

The use of explicit and implicit threats of harm (in the absence of compliance and confession) as well as explicit and implicit promises of leniency, immunity and/or a tangible benefit (in exchange for compliance and confession) significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession. Indeed, as empirical social science research has repeatedly demonstrated, threats of harm or harsher punishment and promises of leniency and immunity are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. There may be no psychological interrogation technique more potent than the use of threats and promises. Threats and promises (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, threats and promises contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. The implicit and explicit promises and implicit threats that the Agents repeatedly suggested and/or made during Mr. Cole's interrogation on December 4, 2025 increased the likelihood of eliciting false compliance and a false statement, admission and/or confession from him.

4) *Psychological Coercion*

As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.[33] In my professional opinion, the interrogation was psychologically coercive. As just discussed, the interrogation on December 4, 2025 by the Agents contained a number of implied -- and sometimes explicit -- promises of leniency (if Mr. Cole agreed to the Agents' narrative and confessed to their accusations) and implied threats of harsher treatment and/or punishment (if Mr. Cole did not agree to the Agents' narrative and confess to the Agents' desired narrative). These interrogation techniques are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements. Avoiding promises of leniency (whether implicit or explicit) in exchange for compliance and confession, and avoiding threats of harm (whether implicit or

[33] *See* Saul Kassin, Hayley Cleary, Gisli Gudjonsson, Richard A. Leo, Christian Meissner, Allison Redlich and Kyle Scherr (2025). "Police-Induced Confessions, 2.0: Risk Factors and Recommendations." *Law and Human Behavior*. Vol. 49, No. 1, pp. 7–53.; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

explicit) in the absence of compliance/confession (whether implied or explicit) are among the most fundamental prohibitions in American police interrogation,[34] second only to the prohibition against using physical violence on suspects to elicit confessions.[35] Promises and threats are psychologically coercive and thus taint the rest of an interrogation.[36]

The Agents' interrogation techniques, methods, and pressures appear to have caused Mr. Cole, who was in mental and physical distress throughout much of the December 4, 2025 interrogation, to perceive that he was not able to put an end to the interrogation if he did not answer the Agents' questions and satisfy their accusations with some kind of admission, even as he repeatedly denied the Agents' accusations and insisted that he was innocent. It appears that Mr. Cole was especially vulnerable to the Agents' psychological coercion because he told the Agents that he was scared (P. 4), out of his depth (P. 19), freaking out (P. 60), trying to keep himself together (P. 72), the verge of throwing up (P. 75), and that he had a giant pain in his stomach (P. 87), among other things. It is also clear from the recording that Mr. Cole was hyperventilating at times during the interrogation because he was in such distress. It would have taken a lot less psychological pressure to coerce someone in Mr. Cole's state of mind to make and/or agree to an involuntary, false, and/or unreliable statement, admission and/or confession.

## IX. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1) It has been well-documented in the empirical social science research literature that a substantial number of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit.

2) The interrogation of Brian Cole on December 4, 2025 is consistent with the empirical social science research on the types of interrogation techniques, methods, and practices that can explain how and why innocent individuals are sometimes moved to make and/or agree to false and unreliable statements, admissions and/or confessions.

3) The interrogation of Brian Cole on December 4, 2025 contained examples of psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to sometimes cause suspects to perceive that they have no meaningful choice but to

---

[34] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[35] *Id.*

[36] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

comply with the demands and requests of their interrogators, and that are known to risk eliciting involuntary statements, admissions and/or confessions.

4) The interrogation of Brian Cole on December 4, 2025 involved the use of psychological interrogation techniques, methods, and strategies that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors). These included: Reid-based guilt-presumptive interrogation; false and exaggerated evidence ploys; *minimization* and *maximization*; and implied (if not explicit) promises of leniency and implied threats.

5) If I am asked to testify at Mr. Cole's trial, I anticipate that I will testify both generally and specifically. Generally, I anticipate that I will testify about the counter-intuitive phenomena of police interrogation, psychological coercion and false and unreliable statements, admissions and/or confessions to police. I will describe social science research on the social psychology of police interrogation; the techniques that police are trained to use; the techniques that social science research shows they do use; how and why these interrogation techniques are designed to work to move suspects from denial to admission; how and why they can become psychologically coercive and lead to involuntary statements, admissions and/or confessions; how and why they can, and sometimes do, lead to false and unreliable confessions from the innocent; which techniques increase the risk of eliciting false and unreliable confessions and why; the problem of police interrogation contamination and how it relates to police elicitation of false confessions; and the indicia, patterns and characteristics of false and unreliable statements, admissions and/or confessions. I will also identify specific interrogation techniques and practices used during the interrogation of Mr. Cole on December 4, 2025, why they are significant in light of social science research, and, based on that empirical scientific research, how they increase the risk of eliciting false and/or unreliable statements, admissions and/or confessions during police interrogation.

The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and Psychology