SMGroup

# Autism Spectrum Disorders in the Criminal Justice System: Police Interviewing, the Courtroom and the Prison Environment

**Allely CS***

Centre for Health Sciences Research, University of Salford, England and Gillberg Neuropsychiatry Centre, University of Gothenburg, Sweden.

***Corresponding author:** Clare S Allely, Lecturer in Psychology. Centre for Health Sciences Research, University of Salford, Salford, M6 6PU and affiliate member of the Gillberg Neuropsychiatry Centre, Sahlgrenska Academy, University of Gothenburg, Gothenburg, Sweden. E-mail: c.s.allely@salford.ac.uk

**Published Date:** October 30, 2015

## INTRODUCTION

### Autism Spectrum Disorders (ASD) and Offending Behaviour

Research suggests that the prevalence of Autism Spectrum Disorders **(ASD)** is higher in the prison population when compared to the general population (e.g., [1]). However, there is relatively little empirical research investigating the association between violent crime and ASD with most peer reviewed literature exploring offenders with ASD involving case reports and criminal groups (e.g., [2-12]). Empirical research with this group of offenders is limited (e.g., [13,14]). Importantly, compared to the general population, follow-up studies suggest that there is no increased likelihood of committing violent crime in individuals with ASD [15,16] and, in fact, they are less likely to commit violent crime [17,18]. Additionally, a review of studies investigating violent offending in individuals with ASD found that a significant factor contributing to the offending was the existence of co-morbid psychiatric disorders [19]. Crucially, studies suggest that individuals with developmental disabilities such as ASDs are actually more at-risk of being the victim rather than the perpetrator of crime (e.g., [20,21]).

## AUTISM SPECTRUM DISORDERS AND POLICE INTERVIEWING

During the police interview, individuals with high functioning ASD may not immediately be considered vulnerable as they can present as intellectually able and display a good use of language, which masks any underlying social impairments (e.g., R v Maxwell, 2007). Individuals with ASD



Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

may experience significant difficulties in their ability to understand and cope with the demands the police make of them. Given the context of the closed social situation of an interrogative interview, the individual with ASD may also experience high levels of distress [22] which is then negatively misinterpreted. The National Autistic Society (2005) [23] carried out a study where the findings indicated that over 90% of police and solicitors have had no training to help them recognize and understand the behavioral symptoms of ASD [24]. It has been recommended that mental health professionals should provide expert evidence on ASD [25]. Compared to other interviewees without ASD, those with ASD may be more compliant and deferential than other interviewees, despite being intellectually able to understand questions and provide articulate responses [26]. Individuals with ASD may also have a heightened fear of authority figures that put them in situations where the interviewer's questioning style and manner is experienced as pressurizing [27]. For instance, the individual with ASD upon hearing the statement made by the investigating officer (police interviewer) "just admit it and it will all be over" may produce an inadvertent confession to a crime [28] just simply in order to get away from the situation that is causing them so much distress.

Research supports the view that individuals with ASD may be at increased risk of developing anxiety disorders [29,30] and are more at risk of developing depression and having low levels of self-esteem [31,32]. Higher levels of suspicion or mistrust of others may be exhibited in individuals with ASD [33]. These factors in some individuals with ASD may result in them questioning and resisting police demands and to exhibit responses which are considered 'rigid and unwavering' [22]. Moreover, changes to routine or a novel situation (such as being taken to a police interview room or being taken in for questioning in a police car) can produce significant distress in many individuals with ASD and these reactions may be considered by police officers as being hostile, strong indicators that the individual has criminal intent, or indications of substance abuse. There is guidance for the police when interviewing an individual with ASD which also lists ten common ASD behaviors which an officer may encounter including behaviors such as: impaired or no ability to speak; lack of eye contact; an insistence on sameness; an attachment to objects which is considered obsessive; self-stimulating behavior such as hand flapping, body rocking, or attachment to objects; inappropriate behavior (for instance, laughing during a serious situation such as a police interview or during court proceedings); no sense of fear in response to danger; hypo- or hyper sensitivity in response to pain; tantrums (often referred to as 'meltdowns') or escalated behavior for no apparent reason and a preference to be alone [34]. A description of some of these behaviors is also provided:

"One characteristic of ASD poses a particular problem in encounters with law enforcement. 'Escalation,' or meltdown, describes the response of a person with ASD under stress or in an unfamiliar situation. Overwhelmed by the barrage of sensory information, a person with ASD may attempt to flee the uncomfortable situation, become combative, or simply shut down. The individual may 'cover [] his or her ears and shriek [], not knowing how or where to get help.



Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

”This expression of fear, frustration, and confusion frequently appears like a child’s tantrum that has ‘escalated’ out of the control of adult caregivers”. [Excerpt originally from “What Happened to ‘Paul’s Law’?: Insights on Advocating for Better Training and Better Outcomes in Encounters Between Law Enforcement and Persons with Autism Spectrum Disorders, by Elizabeth Hervey Osborn, 79 Univ. of Colorado Law Review Issue 1, 333 (Winter 2008)] [34].

Advice is provided on not only identifying behaviors commonly exhibited in individuals with ASD but also on how police should respond to a call, restrain and interview potential suspects (or witnesses) [34]. The advice on how to respond to a call helps ensure the safety of not only the police officers involved but the individual themselves. Advice includes the following:

• Make sure the individual is unarmed and maintain a safe distance

• Model the behavior you want the person to display

• Use a quiet non-threatening voice

• Use simple language

• Avoid touching, if possible

• Allow for delayed response

• Turn off lights and sirens, if possible

• Talk to people who know the person with autism, such as caregivers

• Allow an agitated individual with ASD to calm down without your intervention, if possible, and give them extra personal space [35].

An example of a scenario would be when an individual with ASD is stopped by police for speeding. They may unintentionally “communicate defiance and lack of respect in the mind of the officers.” [36]. For instance, after being pulled over and asked by police “Do you know how fast you were going?”, an individual with ASD may respond “Yes” [37].

## Memory in Individuals with Autism Spectrum Disorder

Over the last half a century, there have been a growing number of studies which have found that individuals with ASD experience specific memory impairments which ultimately influences the way they perceive, understand, interpret and also reconstruct everything around them [38]. Interestingly, there have been a few studies which have also found that some individuals with ASD exhibit some difficulty in remembering the temporal order of events. Therefore the ability to recall the temporal sequence and relationship between events is impaired while recall is unimpaired. Empirical investigation of the ability of individuals with ASD to recall complex sequences of events or detail is sparse [39].

Recently, researchers have highlighted the unique memory profile of individuals with ASD


Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

in that some memory processes are impaired while others appear to be spared [40]. So while some of the memory processes are intact including: cued recall (e.g., [41]), priming (e.g., [42]), recognition (e.g., [43]) and memory for facts (e.g., [44]) others are impaired [40] such as source monitoring (e.g., [45]) episodic recollection and the ability to recall personally experienced events (e.g., [46,47]). One study found an impaired ability to consciously recollect events in individuals with ASD and that this group has a tendency to guide their memory based on feelings of familiarity [46]. This may lead to something being incorrectly judged to have been witnessed when that suggested detail creates a feeling of familiarity. A predisposition towards complying with the interviewer in order to please them may also be more likely in individuals with ASD [48] as a result of, for instance, their potential increased social anxiety stemming from their impaired social skills (e.g., [49]).

## Interviewing Techniques

One of the most popularly used forms of interviewing techniques is the Cognitive Interview **(CI).** One of the main elements of CI is referred to as 'context reinstatement'. Context reinstatement involves the interviewer providing the witness with verbal instructions in order to aid the witness in mentally recreating what they experienced during the actual event (both the personal and physical context). The effectiveness of this technique led to the United Kingdom's Home Office (2002) publishing guidelines which recommend the use of the CI when interviewing witnesses who are considered vulnerable (which include individuals with ASD). However, studies have indicated that the CI is not particularly effective for individuals with ASD. In the first study to investigate the CI for use with ASD individuals, Maras and Bowler (2010) [50] investigated 26 adults with ASD compared to 26 matched typical adults. Participants were asked to watch a video of an enacted crime, and were then interviewed using either the CI method, or a Structured Interview **(SI)** without the CI mnemonics. Findings suggested that individuals with ASD, when interviewed using the SI method, are as accurate and report similar level of details when compared to the group of typical adults. There were no differences between the groups on the quantity or quality of their reports when interviewed with a SI. However, the ASD group was significantly less accurate (reporting more incorrect details) and failed to increase the number of correct details when interviewed with a CI when compared to their typical counterparts. One suggestion for this may be that the instructions given during the 'context reinstatement' (e.g., when asked to recall all the contextual details surrounding the event) 'overloads' witnesses with ASD who already have significant difficulties with filtering out information which is relevant from all the irrelevant information they experience [51]. This study highlights that the CI should be used with caution on individuals with ASD [50].

Another study found that, in some contexts, individuals with ASD may exhibit greater levels of compliance which may mean that they are at greater risk of complying with interrogative pressures. In their study, North and colleagues (2008) [22] compared 26 individuals with high functioning


Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

ASD with 27 gender- and IQ-matched controls on measures of interrogative suggestibility (The Gudjonsson Suggestibility Scale 2, GSS 2; [52]) and compliance (The Gudjonsson Compliance Scale **(GCS**; [53]). In addition they measured levels of anxiety, depression, the extent to which they feared negative evaluation by others and also trait suspiciousness/tendencies to mistrust others using the Paranoia Scale [54]. Findings revealed no significant differences between the groups on the measure of suggestibility (individuals with ASD were not found to yield more readily to misleading information or to respond to direct negative feedback by the interviewer). However, the group with ASD had higher scores on measures of depression, anxiety, fear of negative social evaluation and paranoia. Importantly, the group with ASD was rated as significantly more compliant than the controls based on both parental and self-report. In a police interview this may lead the individual with ASD to make statements which are erroneous and self-incriminating [55]. The high compliance score, when compared to the gender-and IQ-matched controls, in the ASD group members may also suggest that they would be more easily led, manipulated, or coerced into engaging in criminal behaviors by others [56]. This theory would be consistent with Howlin's (1997) [57] taxonomy theory of deliberate exploitation by others as one possible explanation for why individuals with ASD engage in criminal behavior [22]. A small number of studies have investigated suggestibility to misinformation (e.g., hearing false details about a previously witnessed event) and suggestive questioning styles (e.g., 'Describe her pink jumper?') in both children and adults with ASD. Findings across all the studies were consistent in that individuals with ASD were not found to be any more suggestible than those individuals without ASD on the same intellectual level [58-60].

The Self-Administered Interview **(SAI)** technique is a modified version of the CI. With the SAI, unlike the CI, there is no interactive social element of the interview. This allows the interviewee to record their memories themselves, guided by specific instructions and questions and this interviewing process might be more effective in facilitating the recall in individuals with ASD. Empirical research does not support this however. For instance, Maras and colleagues (2014) [51] found that SAI is not effective for witnesses with ASD. Interestingly though, they found that the component of the SAI which involves the 'sketch plan' did elicit more correct details from the ASD group, although compared to the comparison group, to a lesser degree. Participants are asked, in the 'sketch plan' component, to generate a graphical representation of the general layout of the scene they had previously seen [51]. Moreover, Mattison and colleagues (2014) [61] also explored this in their study comprising of 45 children with ASD and 45 matched typically developing children. They found that 'articulated sketching' (which involves asking the child to sketch anything that they feel would aid them in their ability to remember what they saw) in order to reinstate the context does appear to aid children with ASD in their recall of an event. Specifically it increased how much information they could recall without increasing the number of inaccurately reported details [61].



Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

## AUTISM SPECTRUM DISORDER IN THE COURTROOM

Relatively little research in the United Kingdom and across the world has focussed on investigating the prevalence of learning disabilities in defendants. Defendants with learning disabilities may be particularly vulnerable during court proceedings [62]. The existence of two components are required to determine an individual's criminal responsibility, namely, criminal act (actus reus) and criminal intent or intent to cause harm (mens rea). In a criminal case, the prosecution is required to evidence that these two components are present in order to substantiate their argument that the offender is criminally responsible. Current standard practice for the defense of mental illness in the majority of Anglo-American jurisdiction is based on the McNaughten rules which states that: "A person is not responsible for criminal conduct if at the time of the act he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong" [63,64].

In Australia, forensic psychiatrist, Dr Sale instigated forensic attention to ASDs following his conclusion that Martin Bryant, the murderer of 37 people at Port Arthur in Tasmania in 1996, had Asperger's Syndrome **(AS)** [65]. Following this case, there have been increasing attempts in courts in Australia and in other countries to argue for the individual with Asperger's lack of criminal responsibility or to argue that their culpability is not equal to neuro-typical defendants [27]. Understanding and recognising the potential impact that ASD has on criminal responsibility, mental capacity, fitness to plead and the ability to bear witness is important [66]. There is a paucity of studies and literature relating to this which has resulted in an inadequate understanding of the importance of considering ASD in relation to these different legal aspects. For instance, regarding mens rea, it could be considered that some individuals with ASD have an impaired understanding of the consequences of their actions to such a degree that they cannot be considered to be morally (or criminally) responsible for their offending behavior [6,67]. The broad capacity which is required by United States courts to determine fitness to plead would be significantly complicated (if not impossible) to establish in many individuals with ASD, particularly those with AS [6]. This difficulty is also the case when applying the criteria in British courts to this particular group of defendants which further emphasises the need for research in this area to aid clinicians when making decisions about fitness to plead [13].

Individuals with ASD can have impaired impulse control and empathy which results in the individual failing to appreciate the consequences of their behavior and act ''without thinking'' [68,27] and have reduced ability or none to inhibit inappropriate behavior [69,39]. Despite these well-known impairments, individuals with ASD or AS are usually considered fit to stand trial due to the fact that the threshold for fitness to stand trial, in the majority of jurisdictions, is fairly low [25]. However, there are many features of ASD that may have a negative impact on the judge and jurors' perception of the individual. For instance, the language of individuals with ASD


Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

can be easily misinterpreted and viewed as eccentric, tangential and unnecessarily formal [27]. They may inadvertently give the impression that they are not interested and/or arrogant during court proceedings. Understanding that these behavioral characteristics stem from autism traits is important in order to reduce the negative impact this could have on the individual in terms of how they are interpreted and treated in the criminal justice system [70], or how they are judged during the court proceedings [39] by both the judge and the jury. In some individuals with high functioning ASD, they may exhibit a lack of inter subjective resonance, or empathy given their impaired ability to understand the subjective experiences of others [71,72]. Numerous neuro-imaging studies indicate that there are a variety of brain regions which are considered to underlie social cognitive processing. Specifically, brain regions which are believed to be impacted by ASD include: the amygdala, the prefrontal cortex and the fusiform gyrus [73,74]. Information on the possible neuropsychiatric abnormalities associated with the social cognitive impairments often exhibited in individuals with ASD, such as Theory-Of-Mind **(ToM)** deficits, may be important information for understanding some criminal behavior [68] and may potentially be of relevance for determining culpability. ToM refers to the ability to attribute mental states (such as beliefs, intents, pretending, desires, or knowledge) to themselves and others and to understand that others have beliefs, desires, intentions, and perspectives which are different from their own.

Lastly, The Advocacy Training Council and the Legal Education Foundation funded the development of a toolkit which brings together policy, research and guidance on: memory issues in autism; witness testimony in autism; questioning someone who has autism and sensory issues in autism [75]. For instance, some of the guidance includes avoiding complex questions which may cause confusion. One of the advice points suggests avoiding stacked and multi-part questions (e.g. 'Was Paul at the park when you arrived and did he stay there?') and instead recommends that the interviewer asks one point per question (e.g., 'Was Paul at the park when you arrived? Did Paul stay in the park?') [75].

## THE IMPACT OF THE PRISON ENVIRONMENT ON INDIVIDUALS WITH ASD

Relatively few studies have investigated the difficulties experienced by offenders with ASD when they enter the prison system (e.g., [68]). It is yet unknown what the prevalence rate of ASDs in prisons are [76]. Hostility, violence, gang activity are just some of the negative aspects of the prison environment [77,78]. The prison environment can be more complex and challenging for individuals with ASD due to a number of different autism traits (e.g., obsessions, compulsions, difficulties in communicating with others) that can result in problems in their day-to-day living. It has been suggested that individuals with ASD may be more vulnerable to experiencing bullying, exploitation, social isolation and altercations with other inmates [23]. Having a developmental disability has also been indicated to increase the risk of sexual victimization in prison [79] and to reduce levels of empathy from the prison staff [80,81]. The sensory sensitivities that many


Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

individuals with ASD experience may be compounded in the prison environment. In prison there is harsh lighting and it is usually very noisy [82].

A recent review of studies investigating the services and experiences of individuals with neurodevelopment disorders (particularly ASD) identified a paucity of studies in this area - only four [83] but two did not focus on the experience of the prison environment on individuals with ASD. One was an evaluation of a screening instrument for autism spectrum disorders in prisoners [84] and the other explored the knowledge and understanding of the autism spectrum amongst prisoners [85]. Allely (2015) [86] even more recently, conducted a thorough review of the literature and only four studies were identified which looked at the experiences of individuals with ASD in prison. One of the studies which specifically looked at the experience of individuals with ASD [87] was identified in the earlier review by Underwood and colleagues (2013) [83]. The other three studies identified in this recent review were not in the previous review [88-90]. In 1977 Ross Gordon (2002) [88] started a life sentence in an English prison for committing murder. After almost 25 years in prison, Gordon wrote an account of his prison experience. He came to prison with a diagnosis of schizophrenia and antisocial personality disorder. However, when evaluated by the prison psychiatrist for informing parole, he was told he actually met the diagnostic criteria for AS. Identifying his misdiagnosis was considered by Gordon to be one positive aspect of prison. However, he wrote about a number of negative aspects of prison such as how he frequently felt scared and found it difficult to understand the non-literal language used by other inmates [88]. Another study carried out by Allen and colleagues (2008) [89] involved a qualitative approach to exploring the experiences of four participants with ASD who had served some time in prison. All four participants reported general difficulties including: missing their family, having difficulties making friends with other inmates, or problems with roommates and prison staff. Arguably these negative experiences are reported by all prisoners. However, these experiences potentially have a greater detrimental impact on individuals with ASD compared to individuals without a diagnosis of ASD. Positive aspects of prison were reported such as the structure it provided. In response to what could be improved on, participants primarily suggested an increased understanding of AS among prison staff to increase quality of support. In another study, Paterson (2008) [87] explored two cases of prisoners with AS in the United Kingdom to investigate difficulties faced and the perceptions of prison life in individuals with ASDs. Limited resources available for inmates with ASDs were highlighted in this study. This study provided insight into how ASDs traits such as obsessive compulsive traits, poor social skills, poor empathy ability, and difficulty with reading social situations can impact on how the offender is able to cope in the prison environment. Additionally, Morris (2009) [90] carried out the only study to date which explored the experience of inmates with ASD (specifically AS) while they were in prison rather than retrospectively. Qualitative interviews were conducted with five inmates (four male and one female, all Caucasian), from the Oregon Department of Corrections. Relational problems (relationship difficulties with both inmates and prison staff) and the lack of freedom were the two main areas where the individuals experienced difficulties. Some of the perceived benefits



Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

included reduced financial stress, increased safety, more time to reflect on and appreciate life, access to medication and the routine/structure provided in prison [90].

The National Autistic Society (2007) [91] and The Royal College of Psychiatrists (2006: 24) [66] both highlighted that for individuals with ASD, the routine and familiarity provided by secure establishments are reassuring and may even be seen as a relief. Upon their release this may lead to difficulties as their routine and what they considered reassuring is taken away. Therefore, appropriate support and attention is required to prevent the revolving door effect [91].

### Knowledge and Understanding of the Autism Spectrum Disorder amongst Prison Staff

To date, there has only been one study which has explored prison staffs' knowledge and understanding of ASD [92]. In part of a review of the literature, Allely (2015) [86] identified only one peer reviewed study which explored the knowledge and understanding of ASD amongst prison staff [85]. McAdam [85] identified five prisoners with a diagnosis of an ASD (four with a diagnosis of AS and one with autism) over six months in one of the largest prisons in England. Two of the five seemed to need little support but the other three struggled significantly with the prison environment. Overall, the study by McAdam (2009) [85] emphasised that in prison, many individuals with ASD do not receive the appropriate care that they need.

## SUMMARY

Overall, there is a growing recognition of ASD within the criminal justice system [93]. There is increased recognition that the ability to negotiate the criminal justice process may be particularly complex and difficult for individuals with ASD. This can be exacerbated by the hidden nature of their impairments in that their relatively good verbal abilities may mask their underlying socio-communicative impairments [89]. Therefore, when being interviewed by police or while being questioned during court proceedings, vulnerabilities in adults are not always identified [94]. Additionally, Mayes (2003) [95] and Freckelton (2012; 2013) [96,97] argue that some autism traits almost certainly impact on a individual's fitness to plead, their culpability, their criminal responsibility and also their ability to cope with custodial disposals. Nevertheless, not all Courts take into consideration expert witnesses' statements regarding the impairments faced by their clients with ASD [98]. Lastly, studies indicate that in the prison environment, individuals with ASD are more vulnerable to bullying and social isolation. However, very few studies to date have investigated this and there has been no empirical investigation, only case reports involving very small samples investigated primarily using questionnaires and/or observation.

## RESOURCES

**Autism: A guide for criminal justice professionals:** This guide provides background information about ASDs and is useful for professionals working in the Criminal Justice System (such as police officers, solicitors, barristers, magistrates, justices of the peace, the judiciary and the courts) who may come into contact with individuals with ASD.


Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

**Bull R. The investigative interviewing of children and other vulnerable witnesses:** psychological research and working/professional practice. Legal and Criminological Psychology. 2010; 15: 5–23.

**Lashley J. Autism Spectrum Disorders:** A Special Needs Subject Response Guide for Police Officers©. 2009.

Planning to Question Someone with an Autism Spectrum Disorder including Asperger Syndrome. The Advocate's Gateway. Toolkits. 2013. Can be assessed on: http://www.theadvocatesgateway.org/images/toolkits/3AUTISM211013.pdf

## References


1. Scragg P, Shah A. Prevalence of Asperger's syndrome in a secure hospital. Br J Psychiatry. 1994; 165: 679-682.
2. Chen PS, Chen SJ, Yang YK, Yeh TL, Chen CC. Asperger's disorder: a case report of repeated stealing and the collecting behaviours of an adolescent patient. Acta Psychiatr Scand. 2003; 107: 73-75.
3. Chesterman P, Rutter S. Case report: Asperger's Syndrome and sexual offending. Journal of Forensic Psychiatry. 1993; 4: 555-562.
4. Everall IP, LeCouteur A. Firesetting in an adolescent boy with Asperger's syndrome. Br J Psychiatry. 1990; 157: 284-287.
5. Simblett GJ, Wilson DN. Asperger's syndrome: three cases and a discussion. J Intellect Disabil Res. 1993; 37 : 85-94.
6. Barry-Walsh J B, Mullen P E. Forensic aspects of Asperger's Syndrome. Journal of Forensic Psychiatry and Psychology. 2004; 15: 96–107.
7. Mawson D, Grounds A, Tantam D. Violence and Asperger's syndrome: a case study. Br J Psychiatry. 1985; 147: 566-569.
8. Silva JA, Ferrari MM, Leong GB. What happened to Jeffrey? A neuropsychiatric developmental analysis of serial killing behavior. Proceedings of the American Academy of Forensic Sciences, Volume 8; Atlanta, Colorado Springs, USA: American Academy of Forensic Sciences. 2004
9. Baron-Cohen S. An assessment of violence in a young man with Asperger's syndrome. J Child Psychol Psychiatry. 1988; 29: 351-360.
10. Cooper SA, Mohamed WN, Collacott RA. Possible Asperger's syndrome in a mentally handicapped transvestite offender. J Intellect Disabil Res. 1993; 37 : 189-194.
11. Hall I, Bernal J. Asperger's syndrome and violence. Br J Psychiatry. 1995; 166: 262.
12. Kohn Y, Fahum T, Ratzoni G, Apter A. Aggression and sexual offense in Asperger's syndrome. Isr J Psychiatry Relat Sci. 1998; 35: 293-299.
13. Dein K, Woodbury-Smith M (2010) Asperger syndrome and criminal behaviour. Advances in Psychiatric Treatment 16: 37-43.
14. Browning A, Caulfield L (2011) The prevalence and treatment of people with Asperger's Syndrome in the criminal justice system. Criminology and Criminal Justice 11: 165-180.
15. Ghaziuddin M, Tsai L, Ghaziuddin N. Brief report: violence in Asperger syndrome, a critique. J Autism Dev Disord. 1991; 21: 349-354.
16. Hippler K, Viding E, Klicpera C, Happé F. No increase in criminal convictions in Hans Asperger's original cohort. J Autism Dev Disord. 2010; 40: 774-780.
17. Mouridsen SE, Rich B, Isager T, Nedergaard NJ. Pervasive developmental disorders and criminal behaviour: a case control study. Int J Offender Ther Comp Criminol. 2008; 52: 196-205.
18. Woodbury-Smith MR, Clare ICH, Holland AT, Kearns A. High functioning autistic spectrum disorders, offending and other law-breaking: Findings from a community sample. The Journal of Forensic Psychiatry and Psychology. 2006; 17: 108–120.
19. Newman SS, Ghaziuddin M. Violent crime in Asperger syndrome: the role of psychiatric comorbidity. J Autism Dev Disord. 2008; 38: 1848-1852.
20. Sobsey D, Wells D, Lucardie R, Mansell S. Violence and disability: An annotated bibliography. Baltimore: Brookes. 1995.




Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

21. Modell SJ, Mak S. A preliminary assessment of police officers' knowledge and perceptions of persons with disabilities. Intellect Dev Disabil. 2008; 46: 183-189.

22. North A, Russell A, Gudjonsson G. High functioning autism spectrum disorders: an investigation of psychological vulnerabilities during interrogative interview. Journal of Forensic Psychiatry and Psychology. 2008; 19: 323–334.

23. National Autistic Society. Autism: A Guide for Criminal Justice Professionals. 2005.

24. Adams-Spink G. Justice System ignores autism. 2005.

25. Freckelton I, Selby H. Expert Evidence: Law, Practice, Procedure and Advocacy. Sydney: Thomson. 2009.

26. North A, Russell A, Gudjonsson S. An Investigation of Potential vulnerability during police interrogation of adults with autism spectrum disorder: A focus on interrogative suggestibility and compliance. Proceedings of 1st International Symposium on Autism Spectrum Disorders in a Forensic Context. Copenhagen, Demark. 2005.

27. Freckelton Sc I, List D. Asperger's disorder, criminal responsibility and criminal culpability. Psychiatry, Psychology and Law. 2009; 16: 16-40.

28. Mahoney M. Asperger's Syndrome and the Criminal Law: The Special Case of Child Pornography. 2009.

29. Green J, Gilchrist A, Burton D, Cox A. Social and psychiatric functioning in adolescents with Asperger syndrome compared with conduct disorder. J Autism Dev Disord. 2000; 30: 279-293.

30. Sofronoff K, Attwood T, Hinton S. A randomised controlled trial of a CBT intervention for anxiety in children with Asperger syndrome. J Child Psychol Psychiatry. 2005; 46: 1152-1160.

31. Ghaziuddin M, Weidmer-Mikhail E, Ghaziuddin N. Comorbidity of Asperger syndrome: a preliminary report. J Intellect Disabil Res. 1998; 42 : 279-283.

32. Howlin P. Autistic disorders. In: P Howlin, O Udwin, editors. Outcomes in neurodevelopmental and genetic disorders. Cambridge: Cambridge University Press. 2002; 136–168.

33. Blackshaw AJ, Kinderman P, Hare DJ, Hatton C. Theory of mind, causal attribution and paranoia in Asperger syndrome. Autism. 2001; 5: 147-163.

34. AELE Law Enforcement Legal Ctr. Police Interaction with Autistic Persons: The Need for Training. AELE Monthly Law Journal. 2009; 7; 101-111.

35. Debbaudt D. Autism & Law Enforcement Roll Call Briefing Handout. 2005.

36. Murrie DC, Warren JI, Kristiansson M, Dietz PE. Asperger's Syndrome in forensic settings. International Journal of Forensic Mental Health. 2002; 1: 59–70.

37. Hendrick J, Weissman P. The Whole Child: Developmental Education for the Early Years, 8th Edition. New York: Prentice Hall. 2005.

38. Maras KL, Bowler DM. Eyewitness testimony in autism spectrum disorder: a review. J Autism Dev Disord. 2014; 44: 2682-2697.

39. Woodbury-Smith M, Dein K. Autism spectrum disorder (ASD) and unlawful behaviour: where do we go from here? J Autism Dev Disord. 2014; 44: 2734-2741.

40. Maras KL, Bowler DM. Eyewitness testimony in autism spectrum disorder: a review. J Autism Dev Disord. 2014; 44: 2682-2697.

41. Bennetto L, Pennington BF, Rogers SJ. Intact and impaired memory functions in autism. Child Dev. 1996; 67: 1816-1835.

42. Gardiner JM, Bowler DM, Grice SJ. Further evidence of preserved priming and impaired recall in adults with Asperger's syndrome. J Autism Dev Disord. 2003; 33: 259-269.

43. Bowler DM, Gaigg SB, Gardiner JM. Effects of related and unrelated context on recall and recognition by adults with high-functioning autism spectrum disorder. Neuropsychologia. 2008; 46: 993-999.

44. Bowler DM, Gaigg SB. Memory in ASD: Enduring themes and future prospects. In: J Boucher, DM Bowler, editors. Memory in Autism. Cambridge: Cambridge University Press. 2008; 330-349.

45. Bowler D M, Gardiner J M, Berthollier N. Source memory in adolescents and adults with Asperger's syndrome. Journal of Autism and Developmental Disorders. 2004; 34: 533-542.

46. Bowler DM, Gardiner JM, Grice SJ. Episodic memory and remembering in adults with Asperger syndrome. J Autism Dev Disord. 2000; 30: 295-304.

47. Bowler DM, Gardiner JM, Gaigg SB. Factors affecting conscious awareness in the recollective experience of adults with Asperger's syndrome. Conscious Cogn. 2007; 16: 124-143.

48. Maras KL, Bowler DM. Brief report: Suggestibility, compliance and psychological traits in high-functioning adults with autism



Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

spectrum disorder. Research in Autism Spectrum Disorders. 2012; 6: 1168-1175.

49. Kuusikko S, Pollock-Wurman R, Jussila K, Carter AS, Mattila ML. Social anxiety in high-functioning children and adolescents with Autism and Asperger syndrome. J Autism Dev Disord. 2008; 38: 1697-1709.

50. Maras KL, Bowler DM. The cognitive interview for eyewitnesses with autism spectrum disorder. J Autism Dev Disord. 2010; 40: 1350-1360.

51. Maras KL, Mulcahy S, Memon A, Picariello F, Bowler DM. Evaluating the effectiveness of the self-administered interview for witnesses with autism spectrum disorder. Applied Cognitive Psychology. 2014; 28: 693–701.

52. Gudjonsson GH. The Gudjonsson Suggestibility Scales manual. UK: Psychology Press. 1997.

53. Gudjonsson GH. Compliance in an interrogation situation: A new scale. Personality and Individual Differences. 1989; 10: 535–540.

54. Fenigstein A, Vanable PA. Paranoia and self-consciousness. J Pers Soc Psychol. 1992; 62: 129-138.

55. Gudjonsson GH. The psychology of interrogations and confessions: A handbook. Chichester: John Wiley & Sons. 2003.

56. Gudjonsson GH, Sigurdsson JF. The motivation for offending and personality. Legal and Criminological Psychology. 2004; 9: 69–81.

57. Howlin P. Autism: Preparing for adulthood. London: Routledge. 1997.

58. Bruck M, London K, Landa R, Goodman J. Autobiographical memory and suggestibility in children with autism spectrum disorder. Dev Psychopathol. 2007; 19: 73-95.

59. McCrory E, Henry LA, Happé F. Eye-witness memory and suggestibility in children with Asperger syndrome. J Child Psychol Psychiatry. 2007; 48: 482-489.

60. Maras K, Bowler DM. Brief report: Schema consistent misinformation effects in eyewitnesses with autism spectrum disorder. J Autism Dev Disord. 2011; 41: 815-820.

61. Mattison ML, Dando CJ, Ormerod TC. Sketching to remember: episodic free recall task support for child witnesses and victims with autism spectrum disorder. J Autism Dev Disord. 2015; 45: 1751-1765.

62. Talbot J, Jacobson J. Adult defendants with learning disabilities and the criminal courts. Journal of Learning Disabilities and Offending Behaviour. 2010; 1: 16-26.

63. Wettstein RM, Mulvey EP, Rogers R. A prospective comparison of four insanity defense standards. Am J Psychiatry. 1991; 148: 21-27.

64. Katz N, Zemishlany Z. Criminal responsibility in Asperger's syndrome. Isr J Psychiatry Relat Sci. 2006; 43: 166-173.

65. Mullen PE. Forensic Report. 2008.

66. Royal College of Psychiatrists. Psychiatric services of adolescents and adults with Asperger syndrome and other autistic spectrum disorders. London: Council Report CR136. 2006.

67. Schwartz-Watts DM. Asperger's disorder and murder. J Am Acad Psychiatry Law. 2005; 33: 390-393.

68. Haskins BG, Silva JA. Asperger's disorder and criminal behavior: forensic-psychiatric considerations. J Am Acad Psychiatry Law. 2006; 34: 374-384.

69. Blair RJ. Neurocognitive models of aggression, the antisocial personality disorders, and psychopathy. J Neurol Neurosurg Psychiatry. 2001; 71: 727-731.

70. Archer N, Hurley EA. A justice system failing the autistic community. Journal of Intellectual Disabilities and Offending Behaviour. 2013; 4: 7.

71. Gillberg CL. The Emanuel Miller Memorial Lecture 1991. Autism and autistic-like conditions: subclasses among disorders of empathy. J Child Psychol Psychiatry. 1992; 33: 813-842.

72. Baron-Cohen S. The Essential Difference: The Truth About the Male and Female Brain. New York: Basic Books. 2003.

73. Baron-Cohen S, Ring HA, Wheelwright S, Bullmore ET, Brammer MJ. Social intelligence in the normal and autistic brain: an fMRI study. Eur J Neurosci. 1999; 11: 1891-1898.

74. Critchley HD, Daly EM, Bullmore ET, Williams SC, Van Amelsvoort T. The functional neuroanatomy of social behaviour: changes in cerebral blood flow when people with autistic disorder process facial expressions. Brain. 2000; 123: 2203-2212.

75. Crane L, Maras K, Forshaw S, Griffiths H, Henry L, et al. Witnesses and Defendants with Autism: Memory and Sensory Issues. Toolkit for The Advocate's Gateway. 2015.



Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

76. Robinson L, Spencer MD, Thomson LD, Stanfield AC, Owens DG. Evaluation of a screening instrument for autism spectrum disorders in prisoners. PLoS One. 2012; 7: e36078.

77. Love C, Morrison E. Forensic psychiatric nursing struggling to happen, failing to thrive. Forensic Nurse. 2002.

78. Martin T. Something special: forensic psychiatric nursing. J Psychiatr Ment Health Nurs. 2001; 8: 25-32.

79. English K, Heil P. Prison rape: What we know today. Corrections Compendium. 2005; 30: 1-7.

80. Glaser W, Deane K. Normalisation in an abnormal world: A study of prisoners with an intellectual disability. International Journal of Offender Therapy and Comparative Criminology. 1999; 43: 338-356.

81. Shively R. Treating offenders with mental retardation and developmental disabilities. Corrections Today. 2004; 66: 84-87.

82. Freckelton I. Autism Spectrum Disorders and the Criminal Law. In: Mohammad-Reza Mohammadi, editor. A Comprehensive Book on Autism Spectrum Disorders. Croatia: InTech. 2011.

83. Underwood L, Forrester A, Chaplin E, McCarthy J. Prisoners with neurodevelopmental disorders. Journal of Intellectual Disabilities and Offending Behaviour. 2013; 4: 17-23.

84. Robinson L, Spencer MD, Thomson LD, Stanfield AC, Owens DG. Evaluation of a screening instrument for autism spectrum disorders in prisoners. PLoS One. 2012; 7: e36078.

85. McAdam P. Knowledge and understanding of the autism spectrum amongst prison staff. Good Autism Practice (GAP). 2009; 10: 19-25.

86. Allely CS. Experiences of prison inmates with Autism Spectrum Disorders and the knowledge and understanding of the spectrum amongst prison staff: A review. Journal of Intellectual Disabilities and Offending Behavior. 2015; 6.

87. Paterson P. How well do young offenders with Asperger syndrome cope in custody? British Journal of Learning Disabilities. 2008; 36: 54-58.

88. Gordon R. Asperger Syndrome: One prisoner's experience. Prison Service Journal. 2002; 143: 2-4.

89. Allen D, Evans C, Hider A, Hawkins S, Peckett H. Offending behaviour in adults with Asperger syndrome. J Autism Dev Disord. 2008; 38: 748-758.

90. Morris A. Offenders with Asperger's syndrome: Experiences from within prison (Doctoral dissertation). Pacific University. 2009.

91. National Autistic Society. Youth Justice The Next Steps? A Response from The National Autistic Society. 2007.

92. Myers F. On the borderline? People with learning disabilities and/or autistic spectrum disorders in secure, forensic and other specialist settings. Edinburgh: Scottish Development Centre for Mental Health. 2004.

93. Crane L, Henry L, Maras K, Wilcock R. Police interviewing of witnesses and defendants with autism: What is best practice? The National Autistic Society. 2015.

94. Burton M, Evans R, Sanders A. Are Special Measures for Vulnerable and Intimidated Witnesses Working? Evidence from the Criminal Justice Agencies. London: Home Office. 2006.

95. Mayes TA. Persons with autism and criminal justice: core concepts and leading cases. Journal of Positive Behavior Intervention. 2003; 5: 92-100.

96. Freckelton SC. Expert evidence by mental health professionals: the communication challenge posed by evidence about Autism Spectrum Disorder, brain injuries and Huntingdon's disease. International Journal of Law and Psychiatry. 2012; 35: 372-379.

97. Freckelton I. Autism spectrum disorder: forensic issues and challenges for mental health professionals and courts. J Appl Res Intellect Disabil. 2013; 26: 420-434.

98. King C, Murphy GH. A systematic review of people with autism spectrum disorder and the criminal justice system. J Autism Dev Disord. 2014; 44: 2717-2733.




Copyright © Allely CS.This book chapter is open access distributed under the Creative Commons Attribution 4.0 International License, which allows users to download, copy and build upon published articles even for commercial purposes, as long as the author and publisher are properly credited.

The Autism Blog

# Autistic Meltdowns, Shutdowns and Burnout

November 24, 2025

*By Susan Kelso*

Also in This Section...

Overview

About The Autism Blog

Seattle Children's Autism Center

Autism Resources



*Susan is a member of Autism Speaks' Autism Response Team (ART), a specialized information and referral team providing information and resources to the autism community and beyond. Susan has developed and written curricula and articles about important issues related to transition and life skills; healthcare; and relationships and sexuality within the young adult and adult autism communities. She has a special interest in mental health-related issues faced by autistic people, and sharing information to increase understanding, acceptance and effective care in this area.*

You might have heard the term "meltdown" or "autistic meltdown." But there are two other important things that can happen too: autistic shutdown and autistic burnout.

When someone you care about is having a meltdown, a shutdown or burnout, it can be hard to know what caused it or how to help. You might feel unsure or helpless.

Many people confuse these experiences with other things. For example:

- A **meltdown** is not the same as a tantrum.
- A **shutdown** is not someone being stubborn or ignoring you.
- **Burnout** is not the same as depression.

It's important to know the difference, because the reasons these things happen — and the ways to help — are not the same.

Meltdowns, shutdowns and burnout are all connected. Sometimes, after a few meltdowns (or one really big one), a person might have a shutdown, where they stop talking, moving or reacting for a while. If shutdowns keep happening or last a long time, it can lead to burnout, which is when someone feels completely exhausted and can't handle any more stress.

The information you're about to read comes from professionals in the field and from autistic people themselves, who have shared their real experiences. Listening to them helps everyone understand what's really going on — and helps us respond with kindness, patience and support.

## Autistic Meltdowns

Your child may have experienced an **autistic meltdown.** These may look like a tantrum, with crying, trying to escape the situation and even aggressive behaviors and self-harm. It's important to know that a meltdown is not the same as a tantrum, and it's not a form of manipulation. Rather, meltdowns are an automatic response to an overwhelming situation like sensory overload, high social communication demands or unpredictable changes in routine. Those who are having a meltdown temporarily lose control of their behavior.

Helping autistic kids during meltdowns is important. A meltdown happens when feelings get too big to handle and the demands of the situation exceed a child's ability to cope. When this happens, kids need extra support. The best thing you can do is stay patient and kind. Meltdowns usually need time to pass, but during a meltdown, you can help your child by:

- Staying calm and showing support.
- Making the area safe by moving away from what caused the meltdown.
- Giving your child space while letting them know you are there for them.

This article offers helpful tips: 10 things that helped me during meltdowns as an autistic child.

Autistic people report that they can feel a meltdown coming and that it may be prevented by intervening when symptoms first appear. Meltdowns are exhausting. After the meltdown is over, there are a few helpful things you can do:

- Stay calm and keep your tone gentle.
- Give your child time to rest and recover.
- Offer comfort, like a hug or a weighted item, if your child wants it.
- Help your child find a calming activity, including stimming and preferred items.
- Talk about what happened only after your child is ready.

## Autistic Shutdown

Sometimes, your child may withdraw and stop talking. They might speak less than usual or not at all. They may lose interest in their favorite things and want to be alone. This can happen after a hard time with many meltdowns, big emotions or too much noise and activity. When this happens, your child might be having an **autistic shutdown.**

A shutdown is **not** your child being rude or trying to avoid you. It's their body's way of protecting itself. Shutdowns can happen when someone feels too much stress or pain, or has too many things to process at once. During a shutdown, their brain is trying to rest and recover before things get even harder.

It can be hard to tell when someone is having a shutdown because it happens inside their body and mind. Unlike meltdowns, which you can see or hear, shutdowns may be quiet. Both meltdowns and shutdowns can happen to autistic people of any age.

Supporting someone who is shut down can look like:

- Help them move to a quieter or more comfortable place.
- Make sure people nearby speak kindly. Even if your child isn't talking, they may still understand what others say.
- Give them space and time to be alone.
- Be kind and patient. Don't blame them for shutting down.

Some ways to prevent shutdowns include:

- Use visual supports like picture schedules, social stories or "first-then" charts to make things clear and predictable.
- Practice stress management skills like deep breathing or calming activities.
- Watch for warning signs such as your child talking less or pulling away and help them use calming tools before things get too overwhelming.

## Autistic Burnout

Autistic kids can get very tired when they have to deal with a world that doesn't always support their needs. They can feel overwhelmed when there are too many challenges, sudden changes, loud or bright places or social expectations. Sometimes, autistic kids try to mask, which means trying to act like non-autistic kids instead of being themselves. Masking can be very exhausting.

When the demands on a child get too much for them to handle, it can lead to **autistic burnout.** Burnout can look like more meltdowns, feeling very tired, not wanting to talk or play, getting upset easily or forgetting skills they already learned.

Here are some ways to help your child who is experiencing burnout, as well as preventing burnout:

- Plan ahead for changes. Use tools like visual schedules, social stories or "first/then" boards to help your child know what will happen.
- Use sensory tools. Headphones, sunglasses or weighted vests can help your child feel calmer when things are loud or busy.
- Let your child be themselves. Don't expect them to always act like other kids. Encourage them to unmask.
- Keep routines predictable. Following a routine can make your child feel safer and less stressed.
- Give time to relax. Let your child have quiet time or play with favorite toys and activities to recharge.

For more information, you can read this article: Autistic burnout: When navigating a neurotypical world becomes too much. Even though it's written by and for autistic adults, much of the information can also help autistic kids and teens.



©2026 Seattle Children's Hospital
4800 Sand Point Way NE, Seattle, WA 98105
206-987-2000 | 866-987-2000 (toll-free) | 206-987-0391 (TTY)

Seattle Children's complies with applicable federal and other civil rights laws and does not discriminate, exclude people or treat them differently based on race, color, religion (creed), sex, gender identity or expression, sexual orientation, national origin (ancestry), age, disability, or any other status protected by applicable federal, state or local law. Financial assistance for medically necessary services is based on family income and hospital resources and is provided to children under age 21 whose primary residence is in Washington, Alaska, Montana or Idaho.

frontiers | Frontiers in Psychology

TYPE Original Research
PUBLISHED 22 March 2023
DOI 10.3389/fpsyg.2023.1117415

Check for updates

OPEN ACCESS

EDITED BY
Jacqueline Evans,
Florida International University,
United States

REVIEWED BY
Steven Stagg,
Anglia Ruskin University,
United Kingdom
Angela D. Evans,
Brock University,
Canada

*CORRESPONDENCE
Ralph Bagnall
✉ rb2069@bath.ac.uk

SPECIALTY SECTION
This article was submitted to Forensic and Legal Psychology, a section of the journal Frontiers in Psychology

RECEIVED 06 December 2022
ACCEPTED 28 February 2023
PUBLISHED 22 March 2023

CITATION
Bagnall R, Cadman A, Russell A, Brosnan M, Otte M and Maras KL (2023) Police suspect interviews with autistic adults: The impact of truth telling versus deception on testimony. *Front. Psychol.* 14:1117415.
doi: 10.3389/fpsyg.2023.1117415

COPYRIGHT
© 2023 Bagnall, Cadman, Russell, Brosnan, Otte and Maras. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) and the copyright owner(s) are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.

# Police suspect interviews with autistic adults: The impact of truth telling versus deception on testimony

Ralph Bagnall[1]*, Aimee Cadman[1], Ailsa Russell[1], Mark Brosnan[1], Marco Otte[2] and Katie L. Maras[1]

[1]Centre for Applied Autism Research, Department of Psychology, University of Bath, Bath, United Kingdom, [2]Vrije Universiteit Amsterdam, Amsterdam, Netherlands

Investigative interviews by police are socially and cognitively demanding encounters, likely presenting significant challenges to those on the autism spectrum. Behavioral and communication differences mean that autistic people may also be more likely to be perceived as deceptive in the context of an investigative interview. In the present study, 32 autistic and 33 (age and IQ-matched) non-autistic adults took part in a novel virtual burglary scenario in either an 'innocent' or 'guilty' condition. In a subsequent mock-police interview, innocent suspects were instructed to tell the truth about what they did, while guilty suspects were instructed to lie in order to convince the interviewer of their innocence. In the mock-interviews, innocent autistic mock-suspects reported fewer details that would support their innocence than non-autistic mock-suspects, although both innocent and guilty autistic and non-autistic mock-suspects reported similar levels of investigation-relevant information and had similar levels of statement-evidence consistency. In post-interview questionnaires, innocent and guilty autistic mock-suspects self-reported greater difficulty in understanding interview questions, higher anxiety and perceived the interview as less supportive than non-autistic participants. Implications for investigative interviewing with autistic suspects and cues to deception are discussed.

KEYWORDS

**investigative interviewing, autism (ASD), deception, social perception, virtual environment**

## Introduction

Whether a suspect appears to be telling the truth or lying during an investigative interview has far-reaching implications; from the perceived reliability of their statement by police to how they are viewed by jurors in court (Denault, 2020; Haworth, 2020). However, accuracy for detecting deception is broadly at chance level, often based upon faint or unreliable nonverbal and paraverbal cues such as eye contact and vocal pitch (Bond and DePaulo, 2006; Sporer and Schwandt, 2006). Verbal deception cues have proved a more reliable and promising direction for investigative interviewing research. Richness of detail is one such verbal indicator of veracity (Nahari, 2016) as liars use self-regulation strategies such as keeping a story simple and avoiding verifiable details that could reveal deceit (Hartwig et al., 2014; Nahari, 2018). Further, in the criminal justice system (CJS), evidence typically links a suspect to an alleged offence, meaning a suspect's account can be compared against available evidence (Police and Criminal Evidence

Act: PACE. Home Office, 1984/2008). Thus, lying suspects may display verbal deception cues such as contradicting this evidence ('statement-evidence inconsistencies') (Hartwig et al., 2005; Vredeveldt et al., 2014), viewed as indicative of deception by investigative officers in the field (Deeb et al., 2018).

However, the impact of such verbal deception cues within investigative interviews is, to date, based upon neurotypical population samples. Thus, whether such deception cues are applicable to neurodivergent adults is yet to be examined. Concerningly, individuals on the autism spectrum (henceforth autism) appear to be overrepresented in the CJS (Justice Inspectorates, 2021). Autism is a lifelong neurodevelopmental condition characterized by persistent difficulties with social communication and interaction, as well as restricted and repetitive behaviors, interests and activities (American Psychiatric Association, 2013; World Health Organization, 2018). Relatedly, social communication and memory differences in autism present substantial challenges for providing best evidence' during investigative interviews (Maras, 2021). Autistic mock-witnesses often provide less detailed free-recall accounts (Maras and Bowler, 2011, 2012; Henry et al., 2020) due in part to autism-common difficulties with episodic memory retrieval, exacerbated by insufficiently specific, structured questioning (Maras, 2021). More broadly, autistic individuals may produce less coherent and causally connected narrative versions of events with fewer key contextualizing details (Barnes and Baron-Cohen, 2012; Baixauli et al., 2016; but see Henry et al., 2020). Indeed, autistic adults more often fail to recognize and report extricating details that would help demonstrate their innocence of mock-criminal offences (Young and Brewer, 2020). Thus, even when being truthful, autistic suspects may display verbal cues associated with deception in neurotypical populations, such as statement-evidence inconsistencies (Vredeveldt et al., 2014), a lack of verifiable extricating information (Nahari, 2018) and sparsely detailed accounts (Vrij et al., 2014). Verbal responses containing insufficient information may be interpreted as evasive or deceptive, leading to repeated questioning and challenges by investigators (Gudjonsson et al., 2007) which, in turn may lead to further breakdown in communication (O'Mahony et al., 2012) and even false confessions (Gudjonsson, 2021). These issues are likely to be further exacerbated by the stress of a suspect interview experience, as autistic people may experience investigative interviews as highly socially and cognitively demanding (Herrington and Roberts, 2012; Maras et al., 2020).

Understanding the verbal behavior of autistic suspects who are actively deceptive is also crucial for effective investigative interviewing practice. While there is a substantial body of research showing that autistic children have difficulty with lying, relatively little is known about deception in autistic adulthood (Bagnall et al., 2022). Over the past few years, there have, however, been high-profile criminal cases in the United Kingdom (UK) in which autistic defendants have deceived others (e.g., Murray, 2020; De Simone, 2021). Like non-autistic individuals, some autistic adults without co-occurring intellectual disability tell verbal lies for self-protective purposes (Davidson and Henderson, 2010; Jaarsma et al., 2012) and can successfully deceive in computerized paradigms (van Tiel et al., 2021). Autistic adults also report an inclination to lie in everyday situations comparable with non-autistic adults, though such deception may require greater cognitive effort than neurotypical peers (Bagnall et al., under review). Deception, during even mock-suspect interviews, can be highly cognitively demanding (Caso et al., 2005). Common (though not universal) autism difficulties in taking others' perspectives—or Theory of Mind (ToM: Baron-Cohen, 1997; but see Milton, 2012)—and social decision-making (Woodcock et al., 2020; Brosnan and Ashwin, 2022) may suggest that autistic adults' verbal deception cues are more pronounced than those of non-autistic adults. Indeed, while many autistic children can and do tell spontaneous verbal lies, they tend to have greater difficulty than non-autistic children maintaining these lies during subsequent follow-up statements (Li et al., 2011). Identifying how verbal deception cues are displayed by (both truthful and lying) autistic mock-suspects is crucial for the development of best practice investigative interviewing.

In summary, socio-cognitive and sensory processing differences in autism raise numerous concerns relating to the investigative interviewing of autistic suspects. Ensuring that police suspect interviews are conducted fairly and ethically requires understanding if (and how) autistic peoples' accounts are affected, and if this depends on whether they are being truthful or deceptive. Recognizing how those on the autism spectrum experience investigative interviews is also crucial for identifying relevant areas of support (e.g., supportive interviewing practices or adjustments to custody – see Holloway et al., 2020; Maras et al., 2020). We address these issues in the present study. We predicted that, during a mock-suspect interview, autistic adults' deceptive accounts would present more pronounced verbal cues to deception (i.e., greater inconsistencies, sparser accounts) than those of non-autistic adults. We also expected that autistic adults' truthful accounts would more frequently display verbal deception cues (i.e., greater inconsistencies, sparser accounts and fewer verifiable extricating details) than neurotypical adults' truthful accounts. We also anticipated that experiencing the mock-suspect interview process would be more challenging for autistic than non-autistic adults (i.e., difficulty understanding questions, level of anxiety, how supported they feel).

## Methods

### Participants

A power analysis using G*Power (Faul et al., 2007) indicated that a total sample size of 64 would provide 80% power to detect a medium-large effects of interview performance. This is consistent with previous studies reporting medium (partial $\eta^2 = 0.07$) to large ($d = 0.94$) effect sizes in the difference of verbal information provided by autistic and non-autistic participants during mock-forensic interviews (Maras et al., 2020; Young and Brewer, 2020).

Participants were recruited *via* research participant databases, as well as physical and digital advertisements. All participants stated that they met the eligibility criteria of normal or corrected to normal vision and hearing, adequate computer ability, fluency in spoken and written English and no previous real-life experience of a police suspect interview. The final sample was comprised 32 autistic participants ($M = 35.25$ years, SD = 14.93), including 13 females, 16 males and three non-binary individuals and 33 non-autistic participants ($M = 35.15$ years, SD = 17.55) including 21 females and 12 males. Autistic participants provided documentary evidence of their formal autism diagnosis meeting Diagnostic and Statistical Manual of Mental Disorders (4th ed.; DSM-IV; American Psychiatric Association, 2000) or DSM-5 criteria (American Psychiatric Association, 2013). As

expected, the autistic group ($M = 33.97$, $SD = 6.54$) scored significantly higher than non-autistic participants ($M = 15.70$, $SD = 8.76$) on the Autism Spectrum Quotient (AQ-50; Baron-Cohen et al., 2001), $t(63) = 9.51$, $p < 0.001$, $d = 2.36$. The autistic group were significantly above the proposed autism threshold score of 26 (Woodbury-Smith et al., 2005), $t(31) = 6.90$, $p < 0.001$, Hedges' $g = 1.22$, and the non-autistic group were significantly below this threshold, $t(32) = -6.76$, $p < 0.001$, Hedges' $g = -1.78$. Four participants who considered themselves to be non-autistic scored above 26 on the AQ-50 (scores of 26, 28, 34, and 40). Three autistic participants had AQ-50 scores below the 26 thresholds (scores of 18, 23, and 25). In the interest of reflecting diversity in autistic and neurotypical samples, these participants were retained in the dataset and analysis.[1]

As both age (Debey et al., 2015) and cognitive ability (Sarzyńska et al., 2017; Littrell et al., 2021; though see Wright et al., 2012) have each been associated with deceptive behavior, we assessed whether the groups were matched on these characteristics. We also examined participants' previous level of experience playing computer games,[2] as the mock-criminal and non-criminal tasks were performed within an interactive virtual environment (see 'Procedure' section of Method). A series of two-way analyses of variance (ANOVAs) were performed to examine group characteristics of age, IQ and previous gaming experience (see Table 1). There were no main effects of Group (autistic vs. non-autistic) or Condition (innocent vs. guilty), or a Group X Condition interaction for age (all $ps > 0.921$, all partial $\eta^2s < 0.001$). While there was no main effect of Group or Group X Condition interaction for IQ ($ps > 0.170$, partial $\eta^2s < 0.031$), there was a significant main effect of Condition in which participants in the Guilty condition ($M = 120.96$) had significantly higher IQ scores than participants in the Innocent condition ($M = 114.96$), $F(1, 61) = 5.36$, $p = 0.024$, partial $\eta^2 = 0.081$. There were no main effects of Group or Condition, or a Group X Condition interaction for gaming experience (all $ps > 0.068$, all partial $\eta^2s < 0.053$). However, controlling for IQ led to a significant main effect of gaming experience on Group and Condition ($ps < 0.047$, partial $\eta^2s > 0.064$), but no Group X Condition interaction ($p = 0.610$, partial $\eta^2 = 0.004$). Consequently, we controlled for gaming experience as well as IQ when comparing innocent and guilty conditions in the subsequent analyses.

The study received ethical approval from the Psychology Ethics committee at the University of Bath (21–239).

TABLE 1 Autistic and non-autistic group mean scores for age, IQ, and gaming experience within interview conditions (standard deviations in parenthesis).

| | Autistic adults ($n$ = 32) | | Non-autistic adults ($n$ = 33) | |
|---|---|---|---|---|
| Innocent ($n$ = 32) | ($n$ = 17) | | ($n$ = 15) | |
| Age | 34.88 | −15.11 | 35.13 | −16.41 |
| IQ[a] | 113.47 | −11.64 | 116.46 | −11.23 |
| Gaming experience | 2.65 | −1.54 | 2.2 | −1.27 |
| Guilty ($n$ = 33) | ($n$ = 15) | | ($n$ = 18) | |
| Age | 35.67 | −15.24 | 35.17 | −18.92 |
| IQ[a] | 118.86 | −8.77 | 123.05 | −9.64 |
| Gaming experience | 2.33 | −1.4 | 1.61 | −0.79 |

[a]IQ was measured using vocabulary and matrix reasoning subtests on the Wechsler Abbreviated Scale of Intelligence (WASI-II: Wechsler, 2011).

## Procedure

### Virtual environment

The study used an experimental paradigm in which participants either undertook a simulated 'criminal' or 'non-criminal' task in a virtual environment (VE). To our knowledge, this is the first investigative interviewing study to use VE technology. We adapted a VE originally developed by Nee et al. (2019), especially for the purposes of the present study. The original VE was developed and for this project updated using Unity Pro (2019) as the main development platform. The geometry of different sections within the VE was either created especially for the present study or purchased from the Unity Asset Store and adapted where required. For the creation and animation of humanoid avatar, we used the Character Creator (v3) and iClone (v7) software by Reallusion. The flow of the application through the different sections, on-screen messaging and data logging were accomplished through custom-designed C# code inside Unity Pro.

The adapted VE was piloted throughout the development to ensure usability. In the final VE, participants explored three distinct environments: a city, a suburban area and a residential property. The VE was presented using a high-performance gaming laptop computer, with headphones for immersive environmental audio (e.g., footsteps, passing cars, birdsong, etc.). Figure 1 presents an image from within the VE.

### VE task and post-task

Participants took part in the study individually in a dedicated laboratory space at the University of Bath. Participants were randomly allocated to either a *guilty/criminal* or *innocent/non-criminal* VE condition with associated task and instructions[3] (appearing in-game as 'text messages'). In the both the *guilty* and the *innocent* conditions, participants received seven key text messages within the VE. In the *guilty* condition the messages were from their purported 'criminal collaborator' whose instructions participants follow to steal a laptop from a residential property. In the *innocent* condition the messages were from a 'friend' who asks the participant to locate (though not touch or remove) a missing laptop. Following these instructions created seven pieces of incriminating evidence against the participants, identical in both *innocent* and *guilty* conditions (see Appendix 1).

Post-VE task, participants completed Lessiter et al.'s (2001) ITC-Sense of Presence Inventory (ITC-SOPI) to measure level of immersion during the VE, the AQ-50 and rated their frequency of gaming experience (as reported earlier) in Qualtrics. The first author

1 The pattern of results remained the same when statistical analyses were performed with and without these participants in the dataset.

2 Gaming experience was assessed by participants rating how often they play computer games on a 1–5 Likert scale: 1=Never; 2=Once or twice per month; 3=Less than 50% of days; 4=50% or more of days; 5=Every day.

3 Participants first received a brief training session for how to navigate the VE (e.g., mouse/keypad buttons) in a separate virtual location to the main *criminal* or *non-criminal* task.



FIGURE 1
Image from within the virtual environment.

then administered the WASI-II vocabulary and matrix reasoning subtests.

## Mock-suspect interview

Participants (in innocent and guilty conditions) received written instructions stating they were to be interviewed as a suspect in a burglary investigation and that they needed to attempt to convince the interviewer of their innocence (e.g., Hartwig et al., 2014). Participants were informed that it was likely that the police held some evidence against them, so they should establish a plausible story. To encourage motivation, participants were instructed that if they were successfully able to convince the interviewer, they would be entered into a lottery draw to win £50 in Amazon vouchers (in actual fact, all participants were entered into the draw). Participants had 10 min to prepare before being escorted to a separate interview room.

All interviews were conducted by the second author (then blind to all research questions, hypotheses and participants' diagnosis and veracity condition), who received training by the first author in investigative interviewing practice. The interviews followed a novel script which was responsive to the content of participants' verbal accounts and was based upon UK investigative interviewing protocol.[4] All the interviews proceeded in three phases: (1) *obtain mock-suspects' initial account*; (2) *probe questions of topics from initial account* and (3) *disclosure of incriminating evidence* (see Appendix 2) while being audio and video recorded.

## Post-interview task

Participants completed a Qualtrics questionnaire on a 7-point scale (1 = Not at all; 4 = Neutral; 7 = Completely) which provided the dependent variables (DVs) to assess *interview motivation*: (1) participants' motivation to appear convincing; (2) the truthfulness of participants' accounts and (3) the deceptiveness of participants' accounts and *interview experience* (1) the difficulty of the interviewer's questions; (2) participants' level of anxiety during the interview and (3) how supported participants' felt to provide a full account. Participants were also asked to rate the extent to which they remembered the details of the VE task on the aforementioned 7-point scale. At the end of the study, all participants were fully debriefed and were reimbursed at £10 per hour (the study typically lasted 90 min).

## Interview coding

Interviews transcripts were coded to produce three DVs for *interview performance.*

(1) *Statement-evidence consistency* (total scores = 0–7) measured how consistent participants' (in innocent and guilty conditions) accounts were with the seven pieces of incriminating evidence (see Hartwig et al., 2005). For example, if a participant described getting off the bus near the burgled property, they would score 1 point as this was consistent with the evidence held by the interviewer (i.e. CCTV footage from bus stop). If a participant failed to mention or denied getting off the bus, they would score 0 for that piece of incriminating evidence.

(2) *Extricating information* (total scores = 0–7) measured whether participants (innocent condition only) explained that each of the seven pieces of incriminating evidence were due to their 'friend' having asked them to perform those actions. For example, a participant would score 1 point if they specified their friend had asked them to enter the property. If the participant failed to mention this, they would score 0 for this piece of evidence linking them to the crime scene.

(3) *Investigation-relevant information (IRI)* (total score range: 20–223) measured the level of detail in participants' innocent

4 The UK uses the PEACE model interview, P, Planning and preparation; E, Engage and explain; A, Account, clarify and challenge; C, Closure; E, Evaluation (College of Policing, 2022). In the present study, only the Account, clarify and challenge phase was implemented.

and guilty mock-suspect accounts. The 'PALIT' (Person, Action, Location, Item, Temporal) coding scheme was used (see Oxburgh et al., 2012; Farrugia and Gabbert, 2020a). For example, '*I went to the bus stop at 1.30pm*' (1 × Action; 1 × Location; 1 × Temporal) '*and saw a woman wearing a black coat*' (1 × Action; 1 × Person; 2 × Item). Each item of information was only coded once with all repetitions ignored. PALIT details were summed to produce a total IRI score for each participant.

Twenty per cent of the interviews ($n = 14$) were double-coded with intraclass correlations performed for statement-evidence consistency ($r = 0.929$, $p < 0.001$; $\alpha = 0.929$), extricating information ($r = 0.945$, $p = 0.008$; $\alpha = 0.945$) and quantity of investigation-relevant information (IRI) ($r = 0.958$, $p < 0.001$; $\alpha = 0.978$), all of which showed excellent interrater reliability (Cicchetti, 1994).

## Statistical analysis

All statistical analyses were performed using SPSS (version 28). All analyses comparing innocent and guilty conditions controlled for participants' IQ and level of previous gaming experience as covariates. First, *task immersion, duration and motivation* (see Table 2) was assessed using a series of two-way ANCOVAs in a 2 (Group: autistic vs. non-autistic) X 2 (Condition: innocent vs. guilty) design. Second, we examined *interview performance* (i.e., statement-evidence consistency; extricating information; IRI detail). Statement-evidence consistency and IRI detail were each investigated using a two-way ANCOVA. A *t*-test was conducted to examine whether quantity of extricating information differed between autistic and non-autistic groups (innocent condition only). Finally, *interview experience* (i.e. difficulty of questioning; interview anxiety and perception of support) was analyzed using a series of two-way ANCOVAs.

Data inspection revealed one significant outlier in truthfulness scores, two significant outliers in VE task memory and one significant outlier in extricating information scores (>3 standard deviations from mean). The overall pattern of results remained whether these outliers were included or excluded from the analysis, so they were therefore retained in the dataset. Non-normal distribution was observed in a number of variables, which a series of transformations failed to substantially improve. Heterogeneity of variance was also detected in statement-evidence consistency scores (Levine's test, $p < 0.001$). Accordingly, bootstrapped 95% Bias corrected accelerated (BCa) confidence intervals (CIs) for estimated group means and/or mean differences were produced to account for violations (Field and Wilcox, 2017).

TABLE 2 Autistic and non-autistic group estimated mean scores in task immersion, duration and motivation.

| | Autistic adults ($n$= 32) | | | | Non-autistic adults ($n$= 33) | | | |
|---|---|---|---|---|---|---|---|---|
| | $M_{adj}$ | SE | BCa 95% CI | | $M_{adj}$ | SE | BCa 95% CI | |
| | | | Lower | Upper | | | Lower | Upper |
| Innocent ($n$ = 32) | | | | | | | | |
| ITC engagement | 3.33 | 0.21 | 2.92 | 3.81 | 3.53 | 0.11 | 3.27 | 3.76 |
| ITC ecological validity | 2.75 | 0.22 | 2.33 | 3.15 | 3.19 | 0.22 | 2.78 | 3.59 |
| ITC negative effects | 2.57 | 0.24 | 2.13 | 3.09 | 2.01 | 0.26 | 1.53 | 2.5 |
| ITC spatial presence | 2.88 | 0.23 | 2.46 | 3.35 | 3.1 | 0.14 | 2.83 | 3.38 |
| VE task memory | 5.74 | 0.18 | 5.4 | 6.1 | 5.87 | 0.27 | 5.19 | 6.34 |
| Interview duration [b] | 971.64 | 100.9 | 790.38 | 1189.59 | 894.92 | 59.2 | 778.95 | 1017.24 |
| Interview motivation | 5.63 | 0.32 | 4.87 | 6.31 | 5.73 | 0.33 | 4.99 | 6.33 |
| Interview truthfulness | 6.76 | 0.15 | 6.5 | 7.05 | 6.95 | 0.09 | 6.76 | 7.15 |
| Interview deceptiveness | 1.31 | 0.18 | 1 | 1.68 | 1.14 | 0.12 | 0.96 | 1.37 |
| Guilty ($n$ = 33) | | | | | | | | |
| ITC engagement | 3.26 | 0.15 | 2.95 | 3.56 | 3.32 | 0.17 | 3.03 | 3.64 |
| ITC ecological validity | 3.01 | 0.23 | 2.59 | 3.43 | 2.86 | 0.21 | 2.44 | 3.3 |
| ITC negative effects | 2.29 | 0.23 | 1.8 | 2.83 | 2.27 | 0.28 | 1.77 | 2.81 |
| ITC spatial presence | 2.82 | 0.19 | 2.4 | 3.2 | 2.93 | 0.21 | 2.52 | 3.36 |
| VE task memory | 5.59 | 0.29 | 4.95 | 6.09 | 5.7 | 0.2 | 5.29 | 6.09 |
| Interview duration | 746.07 | 82.56 | 616.57 | 908.51 | 646.41 | 62.85 | 519.66 | 770.01 |
| Interview motivation | 5.49 | 0.32 | 4.87 | 6.13 | 5.95 | 0.28 | 5.35 | 6.43 |
| Interview truthfulness | 3.11 | 0.36 | 2.42 | 3.82 | 3.13 | 0.35 | 2.47 | 3.79 |
| Interview deceptiveness | 5.28 | 0.3 | 4.59 | 5.92 | 5.24 | 0.23 | 4.74 | 5.72 |

BCa bootstrapped standard errors (SEs) and confidence intervals (CIs) for $M_{adj}$ scores based on 1,000 resamples. [a]Gaming experience controlled for with IQ only. [b]Interview length is presented in seconds. ITC-Sense of Presence Inventory; VE, Virtual environment.

## Results

### Immersion, duration, and motivation

We first examined task immersion, duration and motivation (see Table 2). Innocent participants' interviews were longer than guilty participants' interviews, $F(1, 59) = 8.95$, $p = 0.004$, partial $\eta^2 = 0.132$, $M$ difference = 237.05 s, BCa 95% CI (78.49, 395.60). Innocent participants self-reported as being more truthful than guilty participants, $F(1, 59) = 169.85$, $p < 0.001$, partial $\eta^2 = 0.742$, $M$ difference = 3.73, BCa 95% CI (3.16, 4.31). Guilty participants self-reported as being more deceptive in the interview than innocent participants, $F(1, 59) = 299.12$, $p < 0.001$, partial $\eta^2 = 0.835$, $M$ difference = 4.03, BCa 95% CI (3.57, 4.50). All other main effects of diagnostic group and veracity condition and Group X Condition interactions were non-significant ($ps > 0.175$, partial $\eta^2$s < 0.083). Therefore, autistic and non-autistic participants (across veracity conditions) were well matched in criminal and non-criminal VE task immersion, memory of the VE task and motivation to appear convincing during the interview. This indicates that our experimental manipulations (e.g., guilty participants needing to lie during the mock-suspect interview) were effective.

### Interview performance

Next, we compared autistic and non-autistic participants' interview performance in guilty and innocent conditions (see Table 3).

#### Statement-evidence consistency

There was a significant main effect of Condition $F(1, 59) = 33.65$, $p < 0.001$, partial $\eta^2 = 0.363$, in which innocent participants' accounts ($M = 6.57$) were significantly more consistent with the available evidence than guilty participants' ($M = 4.29$), $M$ difference = 2.28, BCa 95% CI (1.69, 3.03). There was no effect of Group or Group X Condition interaction ($ps > 0.221$, $\eta^2$s < 0.025). See Figure 2.

#### Extricating information

Innocent autistic participants drew upon significantly fewer extricating details ($M = 5.71$) than innocent non-autistic participants ($M = 6.73$), $t(30) = -2.45$, $p = 0.012$, $d = -0.826$, $M$ difference = −1.03, BCa 95% CI (−1.87, −0.26). See Figure 3.

#### Investigation-relevant information (IRI)

There was a significant main effect of Condition $F(1, 59) = 29.96$, $p < 0.001$, partial $\eta^2 = 0.314$, for the proportion of IRI provided by participants, whereby innocent participants ($M = 132.74$) provided more detailed accounts than guilty participants ($M = 77.72$), $M$ difference = 55.01, BCa 95% CI (30.63, 78.43). There was no significant effect of or Group X Condition interaction ($ps > 0.079$, partial $\eta^2$s < 0.051). See Figure 4.

### Interview experience

Finally, we compared autistic and non-autistic participants' interview experience (see Table 3).

#### Difficulty of questioning

Autistic participants reported that they found the interview questions significantly more difficult ($M = 4.25$) than non-autistic participants ($M = 3.16$), $F(1, 59) = 6.97$, $p = 0.011$, partial $\eta^2 = 0.106$, $M$ difference = 1.09, BCa 95% CI (0.17, 2.01). There was no effect of Condition or Group X Condition interaction ($ps > 0.404$, $\eta^2$s < 0.012).

TABLE 3 Autistic and non-autistic group estimated mean scores for interview performance and experience.

| | Autistic adults ($n$= 32) | | | | Non-autistic adults ($n$= 33) | | | |
|---|---|---|---|---|---|---|---|---|
| | $M_{adj}$ | SE | BCa 95% CI | | $M_{adj}$ | SE | BCa 95% CI | |
| | | | Lower | Upper | | | Lower | Upper |
| Innocent ($n$ = 32) | | | | | | | | |
| Evidence consistency | 6.31 | 0.24 | 5.78 | 6.79 | 6.84 | 0.13 | 6.52 | 7.07 |
| Extricating information[a] | 5.71 | 0.37 | 4.95 | 6.42 | 6.73 | 0.15 | 6.41 | 7.00 |
| IRI detail | 118.23 | 11.67 | 97.01 | 143.33 | 147.24 | 9.29 | 128.99 | 165.06 |
| Difficulty of questioning | 3.99 | 0.41 | 3.11 | 4.69 | 3.07 | 0.47 | 2.09 | 3.95 |
| Interview anxiety | 4.57 | 0.35 | 3.86 | 5.23 | 3.36 | 0.47 | 2.43 | 4.26 |
| Perception of support | 4.09 | 0.38 | 3.31 | 4.91 | 5.25 | 0.30 | 4.62 | 5.88 |
| Guilty ($n$ = 33) | | | | | | | | |
| Evidence consistency | 4.08 | 0.49 | 2.95 | 5.07 | 4.50 | 0.49 | 3.42 | 5.41 |
| IRI detail | 80.82 | 11.00 | 60.93 | 102.07 | 74.62 | 9.17 | 57.70 | 90.99 |
| Difficulty of questioning | 4.51 | 0.46 | 3.51 | 5.38 | 3.25 | 0.29 | 2.67 | 3.79 |
| Interview anxiety | 5.00 | 0.42 | 4.03 | 5.77 | 4.54 | 0.32 | 3.88 | 5.22 |
| Perception of support | 4.79 | 0.44 | 3.88 | 5.68 | 5.34 | 0.31 | 4.71 | 5.92 |

BCa bootstrapped standard errors (SEs) and confidence intervals (CIs) for $M_{adj}$ scores based on 1,000 resamples. [a]Extricating information was only measured in the innocent condition (therefore not controlled for IQ or gaming experience), so original means and SE are presented. IRI: Investigation-relevant information.




FIGURE 2
Mean statement evidence consistency scores for autistic and non-autistic groups in innocent and guilty conditions (with BCa 95% confidence error bars).




FIGURE 3
Mean extricating information scores for autistic and non-autistic groups in the innocent condition (with BCa 95% confidence error bars).

### Interview anxiety

Autistic participants found the interview significantly more anxiety inducing ($M = 4.79$) than non-autistic participants ($M = 3.95$), $F(1, 59) = 4.41$, $p = 0.040$, partial $\eta^2 = 0.069$, $M$ difference = 0.84, BCa 95% CI (0.07, 1.58). There was no effect of Condition or Group X Condition interaction ($p > 0.06$, $\eta^2 < 0.069$).

### Perception of support

Autistic participants felt significantly less supported ($M = 4.44$) by the interviewer than non-autistic participants ($M = 5.30$), $F(1, 59) = 5.62$, $p = 0.021$, partial $\eta^2 = 0.087$, $M$ difference = −0.86, BCa 95% CI (−1.60, −0.14) There was no main effect of Condition or Group X Condition interaction ($ps > 0.292$, $\eta^2$s < 0.019).

## Discussion

In the present study, we examined verbal deception cues displayed by autistic adults during a mock-police suspect interview. We found that autistic mock-suspects displayed similar verbal deception cues (in




FIGURE 4
Mean IRI scores for autistic and non-autistic groups in innocent and guilty conditions (with BCa 95% confidence error bars).

terms of statement-evidence consistency and investigation-relevant information) to the non-autistic group regardless of whether they were telling the truth or being deceptive. To our knowledge this was the first study in which autistic adults (without co-occurring intellectual disability) actively demonstrated the ability to tell verbal lies (see Bagnall et al., 2022). Specifically, the degree to which mock-suspects lied through omitting incriminating actions during the VE task (therefore contradicting the incriminating evidence) was similar regardless of diagnostic group. Further, a similar proportion of investigation-relevant information (IRI) was reported by autistic and non-autistic mock-suspects who lied, with both diagnostic groups providing sparser verbal accounts than mock-suspects who told the truth. This is consistent with reality monitoring theory (Johnson and Raye, 1981), in which information derived from *internal sources* (e.g., imagination) is less detail-rich than information from *external sources* (e.g., experienced events). These findings therefore suggest an at least surface-level consistency between autistic and non-autistic verbal deception.

However, we also found that *innocent* autistic-mock-suspects displayed verbal cues associated with deception. Consistent with findings from Young and Brewer (2020), autistic-mock-suspects who told the truth reported fewer items of verifiable, extricating information to support their innocence. This is concerning given that providing fewer verifiable details during interview is not only consistent with liars' strategies to avoid disprovable claims (Nahari, 2018), it also makes veracity judgments more difficult (Porter and Salvanelli, 2020) and may narrow the options for further investigation and elimination from enquiries (College of Policing, 2021). As such, our findings emphasize that investigative interviewers should be cautious when interpreting gaps or missing elements in autistic suspects' accounts. Indeed, previous studies report that expressive language capacity predicts autistic adults' verbal specificity during interviews (Norris and Maras, 2022) and ToM (ability to take others' perspectives) relates to their likelihood of providing extricating innocence-supporting detail (Young and Brewer, 2020). Consequently, more supportive interview techniques appear necessary to help autistic suspects report all information relevant to an investigation (more on this point later in the "Discussion").

Contrary to our expectations, autistic mock-suspects' statements were not significantly less consistent with the seven pieces of incriminating evidence nor contained significantly less IRI than those of non-autistic mock-suspects. It is of note that innocent autistic-mock-suspects' statement-evidence consistency was indeed lower than the non-autistic group (with a small effect size of partial $\eta^2 = 0.017$), as was proportion of IRI (a medium effect size of partial $\eta^2 = 0.066$). The present study was powered to detect medium-large effects of interview performance, meaning that a larger sample may have been necessary to detect these smaller effects. Overall, however, our findings indicate that autistic adults may display certain verbal deception cues when telling the truth during police suspect interviews.

Further, autistic participants (in both innocent and guilty conditions) found interview questions harder to answer, felt more anxious and perceived the interview as less supportive to their needs. While investigative interviews elicit anxiety in neurotypical populations (Vanderhallen et al., 2011) this may be particularly problematic for autistic suspects. Elevated anxiety is associated with poorer executive functioning in autistic adolescents (Hollocks et al., 2014), and broader socio-cognitive processing difficulties (Velikonja et al., 2019) may impact autistic suspects' ability to provide best evidence. It should be noted that, although autistic participants reported significantly poorer interview experiences than non-autistic participants, average scores still tended to fall in a 'neutral' rating. However, the mock-interviewer was specifically trained and instructed to adopt an encouraging and non-confrontational questioning style. Interviews with vulnerable suspects carried out during genuine investigations are often less accommodating. Inappropriate (e.g., forced choice) questions and minimisation tactics have been found to be more commonly used with suspects who have mental health conditions than suspects without such conditions (Farrugia and Gabbert, 2020b). Autistic people have also described feeling overwhelmed by the frequency

and length of real-life suspect interviews, as well as difficulty concentrating on questions and experiencing pressure from investigators (Allen et al., 2008). Our present findings therefore likely underplay the difficulty of a real-life suspect interview for an autistic person and the degree to which subsequent verbal behaviors (associated with deception) may be exacerbated. Future research should further investigate the experience of police suspect interviews for autistic people, and the factors which contribute to atypical behavior as well as the elicitation of accurate and reliable information.

It should also be noted that increased anxiety may potentially contribute to autistic people displaying stress-adaptive (though atypical) behaviors during a suspect interview. For example, autistic people (automatically and voluntarily) use gaze aversion and repetitive movement to self-regulate hyperarousal (Collis et al., 2022; Stuart et al., 2022). Concerningly, these nonverbal behaviors are also stereotypically associated with deception (Hartwig and Bond, 2011; Vrij, 2019). Lim et al. (2022) examined whether the presence of specific autism-typical verbal, paraverbal and nonverbal behaviors (gaze aversion, repetitive movement, literal interpretation of figurative language, poor reciprocity and flat affect) predicted truthful autistic mock-suspects as being (incorrectly) perceived as deceptive. Autistic mock-suspects were rated by observers as more deceptive and less credible than non-autistic controls, though none of the hypothesized autism-typical behaviors predicted deception judgments (nor did behaviors significantly differ in prevalence between diagnostic groups). Understanding which verbal, paraverbal and nonverbal characteristics displayed by autistic people are most influential for inaccurate deception judgments, and how these may be exacerbated by police suspect interviews, is a key direction for future research.

The present research is not without limitations. Our participant sample was of above average intelligence (based upon IQ scores), and as such the autistic group is not reflective of the full heterogeneity of the autism spectrum. Indeed, it is estimated that between 13 to 20% of autistic people have co-occurring intellectual disability (Ghirardi et al., 2018; Rydzewska et al., 2019). Given that people with intellectual disabilities may be overrepresented in the CJS (Hellenbach et al., 2017; Chester, 2018), better understanding of specific vulnerabilities for autistic people with co-occurring developmental conditions during investigative interviews is needed. However, given the greater social and cognitive difficulties associated with intellectual disability (Smith et al., 2020), the issues raised in the present study may only be more pronounced for autistic people with co-occurring intellectual disability. It is also important to acknowledge that, unlike in a 'real' investigative interview in the UK, autistic mock-suspects were not entitled to support *via* an Appropriate Adult nor legal advisor (Home Office, 1984/2008) either of which may have helped improve interview performance and reduce anxiety. Though as appropriate support is often not provided to autistic adults in custody (Slavny-Cross et al., 2022), our findings emphasise the vulnerabilities of autistic suspects when support is absent.

The potential effects of employing a virtual environment (VE) paradigm should also be considered. It is possible that undertaking a mock-crime or a non-criminal task in a VE (rather than *via* an 'in-person' task) contributed to participants perceiving the task and subsequent mock-suspect interview as more simulative. In which case, guilty participants may have perceived their mock-crime to be less transgressive and innocent participants felt it less important they convey their innocence. However, previous studies have shown computer game-based (mock-crime and non-criminal) tasks to be effective when participants are required to generate truthful and deceptive accounts during a subsequent mock-investigative interview (e.g., Dando and Bull, 2011). Further, virtual recreations of tasks such as public speaking can induce comparable levels of stress response to real-life equivalent tasks (Kothgassner et al., 2016) and such immersive technologies often provide valid alternatives to *in vivo* (real-life) exposure (Wechsler et al., 2019; Liberatore and Wagner, 2021). It should be noted that we used a desktop-based VE paradigm in the present study, and VEs presented on head-mounted displays (e.g. 3D virtual reality) can produce greater spatial presence and immersion (Shu et al., 2019). The potential effects of using a desktop-based VE (rather than 3D virtual reality) in the present study is unclear. A more realistic criminal and non-criminal task (i.e., in 3D virtual reality) may elicit a greater sense of ecological validity and influence mock-suspects' perception of a subsequent mock-suspect interview (e.g., feel a greater desire to convey their innocence). However, given that autistic participants in the present study experienced the mock-interviews as more demanding than non-autistic participants, such group differences may only be more pronounced if a more realistic simulation were used. Future research may therefore benefit from presenting VEs using head-mounted displays (i.e., in 3D virtual reality) to further examine potential vulnerabilities for autistic people during suspect interview settings.

These limitations notwithstanding, the present research has several implications for practice. Our findings highlight the additional complexity for investigators when interviewing autistic suspects, as verbal deception cues may be displayed whether the interviewee is truthful or lying. Existing witness and suspect interview models provide future directions for more supportive practice to benefit both interviewer and interviewee. The Witness-Aimed First Account (WAFA) approach reduces social and cognitive demand through autistic mock-witnesses generating segmented event memories prior to 'free recall', resulting in more detailed and accurate accounts while also being making autistic mock-witnesses feel more socially comfortable (Maras et al., 2020). In turn, this approach may aid recall of relevant, verifying information while reducing stress-induced paraverbal and nonverbal behaviors (i.e., deception cues). Further, the 'Model Statement'—an example of a detailed statement on an unrelated topic presented to a suspect pre-interview (Leal et al., 2015)—may help account for autistic peoples' difficulty in gauging relevance and quantity of required information. An interviewer being more explicit and specific about what is expected of autistic suspects during interview may assist the suspect's understanding of questioning. Further research is needed to ascertain the validity of such models for detecting truth and lies in autistic suspects.

However, adaptations to interview practice with autistic suspects are dependent upon pre-interview identification of 'vulnerability'. Although custody staff and interviewing officers are guided to consider signs of potential vulnerability (College of Policing, 2022), an autistic suspect may not be correctly identified due to a lack of specific questions about autism during the 'booking in' phase in custody (Sims, 2017) or because a detainee chooses not

to disclose being autistic out of concern of stigma (Crane et al., 2016). A lack of awareness of a suspect's autism may lead to harsher interpretations of their behavior during interview (Maras et al., 2019; Logos et al., 2021; Lim et al., 2022). Custody staff should therefore make additional efforts to identify potential autistic detainees (Holloway et al., 2022) and interviewers should be conscious of avoiding a guilt-presumptive questioning style (Lidén et al., 2018). Despite PACE guidelines (section 11C) in the UK stating that vulnerable suspects' accounts may be inadvertently "unreliable" or "misleading," and that "corroboration of any facts admitted" should be obtained and an appropriate adult provided, there is little further specific guidance for interviewers relating to this issue. Extending this guidance with evidence-based examples highlighting the heterogeneity of autistic verbal, paraverbal and nonverbal behavior and embedding it in policy and training is an important future direction for CJS practice.

## Conclusion

In the present study, we found that investigative interviews are more socially and cognitively demanding for autistic than neurotypical mock-suspects. In addition, verbal cues associated with deception can be displayed by autistic mock-suspects even when truthful. The development of autism-focused suspect interview techniques is therefore crucial to resolve the (interrelated) issues of interviewee welfare and provision of best evidence. Discriminating between *difficulty* and *deception* in autistic suspects' interview accounts is a challenging though necessary task for researchers and practitioners alike.

## Data availability statement

The raw data supporting the conclusions of this article will be made available by the authors, without undue reservation.

## Ethics statement

The studies involving human participants were reviewed and approved by Psychological Research Ethics Committee at the University of Bath. The participants provided their written informed consent to participate in this study.

## Author contributions

RB, AR, MB, MO, and KM contributed to the conceptualization and design of the study. RB and AC collected and coded the data. RB performed the statistical analysis and wrote the first draft of the manuscript. All authors contributed to the article and approved the submitted version.

## Funding

This work was conducted as part of PhD research undertaken by RB, funded by the Economic and Social Research Council (2096910).

## Acknowledgments

We thank all of the research participants who took part in the present study. We are also grateful to Autistica who kindly distributed advertisements to their Network members.

## Conflict of interest

The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

## Publisher's note

All claims expressed in this article are solely those of the authors and do not necessarily represent those of their affiliated organizations, or those of the publisher, the editors and the reviewers. Any product that may be evaluated in this article, or claim that may be made by its manufacturer, is not guaranteed or endorsed by the publisher.

## Supplementary material

The Supplementary material for this article can be found online at: https://www.frontiersin.org/articles/10.3389/fpsyg.2023.1117415/full#supplementary-material

## References

Allen, D., Evans, C., Hider, A., Hawkins, S., Peckett, H., and Morgan, H. (2008). Offending behaviour in adults with Asperger syndrome. *J. Autism Dev. Disord.* 38, 748–758. doi: 10.1007/s10803-007-0442-9

American Psychiatric Association. (2000). *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)*. Washington DC: American Psychiatric Press.

American Psychiatric Association (2013). *Diagnostic and Statistical Manual of Mental Disorders. 5th Edn* Arlington, VA: American Psychiatric Publishing.

Bagnall, R., Russell, A., Brosnan, M., and Maras, K. (2022). Deceptive behaviour in autism: a scoping review. *Autism* 26, 293–307. doi: 10.1177/13623613211057974

Baixauli, I., Colomer, C., Roselló, B., and Miranda, A. (2016). Narratives of children with high-functioning autism spectrum disorder: a meta-analysis. *Res. Dev. Disabil.* 59, 234–254. doi: 10.1016/j.ridd.2016.09.007

Barnes, J. L., and Baron-Cohen, S. (2012). The big picture: storytelling ability in adults with autism spectrum conditions. *J. Autism Dev. Disord.* 42, 1557–1565. doi: 10.1007/s10803-011-1388-5

Baron-Cohen, S. (1997). *Mindblindness: An Essay on Autism and Theory of Mind*. Cambridge, MA: MIT Press.

Baron-Cohen, S., Wheelwright, S., Skinner, R., Martin, J., and Clubley, E. (2001). The autism-spectrum quotient (AQ): evidence from asperger syndrome/high-functioning autism, males and females, scientists and mathematicians. *J. Autism Dev. Disord.* 31, 5–17. doi: 10.1023/A:1005653411471

Bond, C. F. Jr., and DePaulo, B. M. (2006). Accuracy of deception judgments. *Personal. Soc. Psychol. Rev.* 10, 214–234. doi: 10.1207/s15327957pspr1003_2

Brosnan, M., and Ashwin, C. (2022). Thinking, fast and slow on the autism spectrum. *Autism* 1-11:136236132211324. doi: 10.1177/13623613221132437

Caso, L., Gnisci, A., Vrij, A., and Mann, S. (2005). Processes underlying deception: an empirical analysis of truth and lies when manipulating the stakes. *J. Investig. Psychol. Offender Profiling* 2, 195–202. doi: 10.1002/jip.32

Chester, V. (2018). People with intellectual and developmental disorders in the United Kingdom criminal justice system. *East Asian Arch. Psychiatr.* 28, 150–158.

Cicchetti, D. V. (1994). Guidelines, criteria, and rules of thumb for evaluating normed and standardized assessment instruments in psychology. *Psychol. Assess.* 6, 284–290. doi: 10.1037/1040-3590.6.4.284

College of Policing (2021). Shift work and overtime across a career in law enforcement: A 15-year study. *Policing* 44, 200–212.

College of Policing (2022). Investigative interviewing. Available at: https://www.college.police.uk/app/investigation/investigative-interviewing/investigative-interviewing (Accessed March 06, 2023).

Collis, E., Gavin, J., Russell, A., and Brosnan, M. (2022). Autistic adults' experience of restricted repetitive behaviours. *Res. Autism Spectr. Disord.* 90:101895. doi: 10.1016/j.rasd.2021.101895

Crane, L., Maras, K. L., Hawken, T., Mulcahy, S., and Memon, A. (2016). Experiences of autism spectrum disorder and policing in England and Wales: surveying police and the autism community. *J. Autism Dev. Disord.* 46, 2028–2041. doi: 10.1007/s10803-016-2729-1

Dando, C. J., and Bull, R. (2011). Maximising opportunities to detect verbal deception: training police officers to interview tactically. *J. Investig. Psychol. Offender Profiling* 8, 189–202. doi: 10.1002/jip.145

Davidson, J., and Henderson, V. L. (2010). 'Coming out' on the spectrum: autism, identity and disclosure. *Soc. Cult. Geogr.* 11, 155–170. doi: 10.1080/14649360903525240

De Simone, D. (2021). Ben Hannan: The neo-Nazi who joined the metropolitan police. Available at: https://www.bbc.co.uk/news/uk-56414713 (Accessed March 06, 2023).

Debey, E., De Schryver, M., Logan, G. D., Suchotzki, K., and Verschuere, B. (2015). From junior to senior Pinocchio: a cross-sectional lifespan investigation of deception. *Acta Psychol.* 160, 58–68. doi: 10.1016/j.actpsy.2015.06.007

Deeb, H., Vrij, A., Hope, L., Mann, S., Granhag, P. A., and Strömwall, L. A. (2018). Police officers' perceptions of statement inconsistency. *Crim. Justice Behav.* 45, 644–665. doi: 10.1177/0093854818758808

Denault, V. (2020). Misconceptions about nonverbal cues to deception: a covert threat to the justice system? *Front. Psychol.* 11:573460. doi: 10.3389/fpsyg.2020.573460

Farrugia, L., and Gabbert, F. (2020a). Forensic interviewing of mentally disordered suspects: the impact of interview style on investigation outcomes. *Curr. Psychol.* 41, 1–9. doi: 10.1007/s12144-020-00747-8

Farrugia, L., and Gabbert, F. (2020b). Vulnerable suspects in police interviews: exploring current practice in England and Wales. *J. Investig. Psychol. Offender Profiling* 17, 17–30. doi: 10.1002/jip.1537

Faul, F., Erdfelder, E., Lang, A. G., and Buchner, A. (2007). G* power 3: a flexible statistical power analysis program for the social, behavioral, and biomedical sciences. *Behav. Res. Methods* 39, 175–191. doi: 10.3758/BF03193146

Field, A. P., and Wilcox, R. R. (2017). Robust statistical methods: a primer for clinical psychology and experimental psychopathology researchers. *Behav. Res. Ther.* 98, 19–38. doi: 10.1016/j.brat.2017.05.013

Ghirardi, L., Brikell, I., Kuja-Halkola, R., Freitag, C. M., Franke, B., Asherson, P., et al. (2018). The familial co-aggregation of ASD and ADHD: a register-based cohort study. *Mol. Psychiatry* 23, 257–262. doi: 10.1038/mp.2017.17

Gudjonsson, G. H. (2021). The science-based pathways to understanding false confessions and wrongful convictions. *Front. Psychol.* 12:633936. doi: 10.3389/fpsyg.2021.633936

Gudjonsson, G. H., Young, S., and Bramham, J. (2007). Interrogative suggestibility in adults diagnosed with attention-deficit hyperactivity disorder (ADHD). A potential vulnerability during police questioning. *Personal. Individ. Differ.* 43, 737–745. doi: 10.1016/j.paid.2007.01.014

Hartwig, M., and Bond, C. F. Jr. (2011). Why do lie-catchers fail? A lens model meta-analysis of human lie judgments. *Psychol. Bull.* 137, 643–659. doi: 10.1037/a0023589

Hartwig, M., Granhag, P. A., and Luke, T. (2014). Strategic use of evidence during investigative interviews: the state of the science. *Credibil. Assess.* 14, 1–36. doi: 10.1016/B978-0-12-394433-7.00001-4

Hartwig, M., Granhag, P. A., Strömwall, L. A., and Vrij, A. (2005). Detecting deception via strategic disclosure of evidence. *Law Hum. Behav.* 29, 469–484. doi: 10.1007/s10979-005-5521-x

Haworth, K. (2020). "Police interviews in the judicial process: police interviews as evidence" in *The Routledge Handbook of Forensic Linguistics* (Milton Park: Routledge), 144–158.

Hellenbach, M., Karatzias, T., and Brown, M. (2017). Intellectual disabilities among prisoners: prevalence and mental and physical health comorbidities. *J. Appl. Res. Intellect. Disabil.* 30, 230–241. doi: 10.1111/jar.12234

Henry, L. A., Crane, L., Fesser, E., Harvey, A., Palmer, L., and Wilcock, R. (2020). The narrative coherence of witness transcripts in children on the autism spectrum. *Res. Dev. Disabil.* 96:103518. doi: 10.1016/j.ridd.2019.103518

Herrington, V., and Roberts, K. (2012). Addressing psychological vulnerability in the police suspect interview. *Policing J. Policy Prac.* 6, 177–186. doi: 10.1093/police/par057

Hollocks, M. J., Jones, C. R., Pickles, A., Baird, G., Happé, F., Charman, T., et al. (2014). The association between social cognition and executive functioning and symptoms of anxiety and depression in adolescents with autism spectrum disorders. *Autism Res.* 7, 216–228. doi: 10.1002/aur.1361

Holloway, C., Munro, N., Cossburn, K., and Ropar, D. (2022). A pilot study of co-produced autism training for police custody staff: Evaluating the impact on perceived knowledge change and behaviour intentions. *Policing Int. J.* 45, 434–447. doi: 10.1108/PIJPSM-11-2021-0159

Holloway, C. A., Munro, N., Jackson, J., Phillips, S., and Ropar, D. (2020). Exploring the autistic and police perspectives of the custody process through a participative walkthrough. *Res. Dev. Disabil.* 97:103545. doi: 10.1016/j.ridd.2019.103545

Home Office. (1984/2008). *Police and Criminal Evidence Act (PACE, 1984) and Codes of Practice*. GOV.UK: London.

Justice Inspectorates. (2021). Neurodiversity in the criminal justice system: A review of evidence. Available at: https://www.justiceinspectorates.gov.uk/hmicfrs/publications/neurodiversity-in-the-criminal-justice-system/ (Accessed March 06, 2023).

Jaarsma, P., Gelhaus, P., and Welin, S. (2012). Living the categorical imperative: autistic perspectives on lying and truth telling–between Kant and care ethics. *Med. Health Care Philos.* 15, 271–277. doi: 10.1007/s11019-011-9363-7

Johnson, M. K., and Raye, C. L. (1981). Reality monitoring. *Psychol. Rev.* 88, 67–85. doi: 10.1037/0033-295X.88.1.67

Kothgassner, O. D., Felnhofer, A., Hlavacs, H., Beutl, L., Palme, R., Kryspin-Exner, I., et al. (2016). Salivary cortisol and cardiovascular reactivity to a public speaking task in a virtual and real-life environment. *Comput. Hum. Behav.* 62, 124–135. doi: 10.1016/j.chb.2016.03.081

Leal, S., Vrij, A., Warmelink, L., Vernham, Z., and Fisher, R. P. (2015). You cannot hide your telephone lies: providing a model statement as an aid to detect deception in insurance telephone calls. *Leg. Criminol. Psychol.* 20, 129–146. doi: 10.1111/lcrp.12017

Lessiter, J., Freeman, J., Keogh, E., and Davidoff, J. (2001). A cross-media presence questionnaire: the ITC-sense of presence inventory. *Presence Teleoperat. Virtual Environ.* 10, 282–297. doi: 10.1162/105474601300343612

Li, A. S., Kelley, E. A., Evans, A. D., and Lee, K. (2011). Exploring the ability to deceive in children with autism spectrum disorders. *J. Autism Dev. Disord.* 41, 185–195. doi: 10.1007/s10803-010-1045-4

Liberatore, M. J., and Wagner, W. P. (2021). Virtual, mixed, and augmented reality: a systematic review for immersive systems research. *Virtual Reality* 25, 773–799. doi: 10.1007/s10055-020-00492-0

Lidén, M., Gräns, M., and Juslin, P. (2018). The presumption of guilt in suspect interrogations: apprehension as a trigger of confirmation bias and debiasing techniques. *Law Hum. Behav.* 42, 336–354. doi: 10.1037/lhb0000287

Lim, A., Young, R. L., and Brewer, N. (2022). Autistic adults may be erroneously perceived as deceptive and lacking credibility. *J. Autism Dev. Disord.* 52, 490–507. doi: 10.1007/s10803-021-04963-4

Littrell, S., Risko, E. F., and Fugelsang, J. A. (2021). The bullshitting frequency scale: development and psychometric properties. *Br. J. Soc. Psychol.* 60, 248–270. doi: 10.1111/bjso.12379

Logos, K., Brewer, N., and Young, R. L. (2021). Countering biased judgments of individuals who display autism-characteristic behavior in forensic settings. *Hum. Commun. Res.* 47, 215–247. doi: 10.1093/hcr/hqab002

Maras, K. (2021). "Obtaining testimony from autistic people" in *Handbook of Autism Spectrum Disorder and the Law* (Cham: Springer), 145–183.

Maras, K., and Bowler, D. M. (2011). Brief report: schema consistent misinformation effects in eyewitnesses with autism spectrum disorder. *J. Autism Dev. Disord.* 41, 815–820. doi: 10.1007/s10803-010-1089-5

Maras, K. L., and Bowler, D. M. (2012). Context reinstatement effects on eyewitness memory in autism spectrum disorder. *Br. J. Psychol.* 103, 330–342. doi: 10.1111/j.2044-8295.2011.02077.x

Maras, K., Dando, C., Stephenson, H., Lambrechts, A., Anns, S., and Gaigg, S. (2020). The witness-aimed first account (WAFA): a new technique for interviewing autistic witnesses and victims. *Autism* 24, 1449–1467. doi: 10.1177/1362361320908986

Maras, K., Marshall, I., and Sands, C. (2019). Mock juror perceptions of credibility and culpability in an autistic defendant. *J. Autism Dev. Disord.* 49, 996–1010. doi: 10.1007/s10803-018-3803-7

Milton, D. E. (2012). On the ontological status of autism: the 'double empathy problem'. *Disabil. Soc.* 27, 883–887. doi: 10.1080/09687599.2012.710008

Murray, J. (2020). Tate modern attacker loses appeal against sentence. Available at: https://www.theguardian.com/uk-news/2020/dec/09/tate-modern-attacker-loses-appeal-against-sentence-jonty-bravery (Accessed March 06, 2023).

Nahari, G. (2016). When the long road is the shortcut: a comparison between two coding methods for content-based lie detection tools. *Psychol. Crime Law* 22, 1000–1014. doi: 10.1080/1068316X.2016.1207770

Nahari, G. (2018). "The applicability of the verifiability approach to the real world" in *Detecting Concealed Information and Deception* (Cambridge, MA: Academic Press), 329–349.

Nee, C., van Gelder, J. L., Otte, M., Vernham, Z., and Meenaghan, A. (2019). Learning on the job: studying expertise in residential burglars using virtual environments. *Criminology* 57, 481–511. doi: 10.1111/1745-9125.12210

Norris, J. E., and Maras, K. (2022). Supporting autistic adults' episodic memory recall in interviews: the role of executive functions, theory of mind, and language abilities. *Autism* 26, 513–524. doi: 10.1177/13623613211030772

O'Mahony, B. M., Milne, B., and Grant, T. (2012). To challenge, or not to challenge? Best practice when interviewing vulnerable suspects. *Policing A J. Policy Prac.* 6, 301–313. doi: 10.1093/police/pas027

Oxburgh, G., Ost, J., and Cherryman, J. (2012). Police interviews with suspected child sex offenders: does use of empathy and question type influence the amount of investigation relevant information obtained? *Psychol. Crime Law* 18, 259–273. doi: 10.1080/1068316X.2010.481624

Porter, C. N., and Salvanelli, G. (2020). Eliciting information and cues to deception using a model statement: examining the effect of presentation modality. *J. Investig. Psychol. Offender Profiling* 17, 101–117. doi: 10.1002/jip.1541

Rydzewska, E., Hughes-McCormack, L. A., Gillberg, C., Henderson, A., Mac Intyre, C., Rintoul, J., et al. (2019). Prevalence of sensory impairments, physical and intellectual disabilities, and mental health in children and young people with self/proxy-reported autism: observational study of a whole country population. *Autism* 23, 1201–1209. doi: 10.1177/1362361318791279

Sarzyńska, J., Falkiewicz, M., Riegel, M., Babula, J., Margulies, D. S., Nęcka, E., et al. (2017). More intelligent extraverts are more likely to deceive. *PLoS One* 12:e0176591. doi: 10.1371/journal.pone.0176591

Shu, Y., Huang, Y. Z., Chang, S. H., and Chen, M. Y. (2019). Do virtual reality head-mounted displays make a difference? A comparison of presence and self-efficacy between head-mounted displays and desktop computer-facilitated virtual environments. *Virtual Reality* 23, 437–446. doi: 10.1007/s10055-018-0376-x

Sims, P. (2017). Supporting autistic people in police custody. Available at: https://www.autism.org.uk/advice-and-guidance/professional-practice/police-custody (Accessed March 06, 2023).

Slavny-Cross, R., Allison, C., Griffiths, S., and Baron-Cohen, S. (2022). Autism and the criminal justice system: an analysis of 93 cases. *Autism Res.* 15, 904–914. doi: 10.1002/aur.2690

Smith, M., Manduchi, B., Burke, É., Carroll, R., McCallion, P., and McCarron, M. (2020). Communication difficulties in adults with intellectual disability: results from a national cross-sectional study. *Res. Dev. Disabil.* 97:103557. doi: 10.1016/j.ridd.2019.103557

Sporer, S. L., and Schwandt, B. (2006). Paraverbal indicators of deception: a meta-analytic synthesis. *Appl. Cogn. Psychol.* 20, 421–446. doi: 10.1002/acp.1190

Stuart, N., Whitehouse, A., Palermo, R., Bothe, E., and Badcock, N. (2022). Eye gaze in autism Spectrum disorder: a review of neural evidence for the eye avoidance hypothesis. *J. Autism Dev. Disord.* 4, 1–22. doi: 10.1007/s10803-022-05443-z

Van Tiel, B., Deliens, G., Geelhand, P., Murillo Oosterwijk, A., and Kissine, M. (2021). Strategic deception in adults with autism spectrum disorder. *J. Autism Dev. Disord.* 51, 255–266. doi: 10.1007/s10803-020-04525-0

Vanderhallen, M., Vervaeke, G., and Holmberg, U. (2011). Witness and suspect perceptions of working alliance and interviewing style. *J. Investig. Psychol. Offender Profiling* 8, 110–130. doi: 10.1002/jip.138

Velikonja, T., Fett, A. K., and Velthorst, E. (2019). Patterns of nonsocial and social cognitive functioning in adults with autism spectrum disorder: a systematic review and meta-analysis. *JAMA Psychiat.* 76, 135–151. doi: 10.1001/jamapsychiatry.2018.3645

Vredeveldt, A., van Koppen, P. J., and Granhag, P. A. (2014). The inconsistent suspect: a systematic review of different types of consistency in truth tellers and liars. *Investigat. Interview.* 10, 183–207. doi: 10.1007/978-1-4614-9642-7_10

Vrij, A. (2019). Deception and truth detection when analyzing nonverbal and verbal cues. *Appl. Cogn. Psychol.* 33, 160–167. doi: 10.1002/acp.3457

Vrij, A., Mann, S., Jundi, S., Hillman, J., and Hope, L. (2014). Detection of concealment in an information-gathering interview. *Appl. Cogn. Psychol.* 28, 860–866. doi: 10.1002/acp.3051

Wechsler, D. (2011). *Wechsler Abbreviated Scale of Intelligence–Second Edition (WASI-II)*. San Antonio, TX: NCS Pearson.

Wechsler, T. F., Kümpers, F., and Mühlberger, A. (2019). Inferiority or even superiority of virtual reality exposure therapy in phobias?—a systematic review and quantitative meta-analysis on randomized controlled trials specifically comparing the efficacy of virtual reality exposure to gold standard in vivo exposure in agoraphobia, specific phobia, and social phobia. *Front. Psychol.* 10:1758. doi: 10.3389/fpsyg.2019.01758

Woodbury-Smith, M. R., Robinson, J., Wheelwright, S., and Baron-Cohen, S. (2005). Screening adults for Asperger syndrome using the AQ: a preliminary study of its diagnostic validity in clinical practice. *J. Autism Dev. Disord.* 35, 331–335. doi: 10.1007/s10803-005-3300-7

Woodcock, K. A., Cheung, C., González Marx, D., and Mandy, W. (2020). Social decision making in autistic adolescents: the role of theory of mind, executive functioning and emotion regulation. *J. Autism Dev. Disord.* 50, 2501–2512. doi: 10.1007/s10803-019-03975-5

World Health Organization. (2018). *The International Classification of Mental and Behavioural Disorders*. Geneva: World Health Organization

Wright, G. R., Berry, C. J., and Bird, G. (2012). "You can't kid a kidder": association between production and detection of deception in an interactive deception task. *Front. Hum. Neurosci.* 6:87. doi: 10.3389/fnhum.2012.00087

Young, R. L., and Brewer, N. (2020). Brief report: perspective taking deficits, autism spectrum disorder, and allaying police officers' suspicions about criminal involvement. *J. Autism Dev. Disord.* 50, 2234–2239. doi: 10.1007/s10803-019-03968-4

*Original Article*

autism

Autism
2019, Vol. 23(7) 1782–1792
© The Author(s) 2019
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/1362361319829628
journals.sagepub.com/home/aut
SAGE

# 'People should be allowed to do what they like': Autistic adults' views and experiences of stimming

**Steven K Kapp[1], Robyn Steward[2], Laura Crane[2], Daisy Elliott[1], Chris Elphick[1], Elizabeth Pellicano[2,3] and Ginny Russell[1]**

**Abstract**
'Stereotyped or repetitive motor movements' are characterised as core features in the diagnosis of autism, yet many autistic adults (and the neurodiversity movement) have reclaimed them as 'stimming'. Supported by a growing body of scientific research, autistic adults argue that these behaviours may serve as useful coping mechanisms, yet little research has examined stimming from the perspective of autistic adults. Through interviews and focus groups, we asked 32 autistic adults to share their perceptions and experiences of stimming, including the reasons they stim, any value doing so may hold for them and their perceptions of others' reactions to stimming. Using thematic analysis, we identified two themes: stimming as (1) a self-regulatory mechanism and (2) lacking in social acceptance, but can become accepted through understanding. Autistic adults highlighted the importance of stimming as an adaptive mechanism that helps them to soothe or communicate intense emotions or thoughts and thus objected to treatment that aims to eliminate the behaviour.

**Keywords**
adults, autism, neurodiversity, repetitive behaviour, repetitive movements, self-stimulatory behaviour, stereotypies, stimming

Research suggests that non-autistic people often misunderstand the behaviour of autistic people (Faso, Sasson, & Pinkham, 2015; Sheppard, Pillai, Wong, Ropar, & Mitchell, 2016), likely contributing to autistic people's socio-communicative challenges. This particularly applies to 'motor stereotypies' such as 'hand or finger flapping' or 'complex whole-body movements' (American Psychiatric Association (APA), 2013). Since the initial accounts of autism (Asperger, 1944/1991; Kanner, 1943), these behaviours have been considered as self-stimulatory acts that shut out external stimuli and interfere with the person's (and others') focus (Lilley, in press). In addition, treatments to control (i.e. to eliminate, modify or reduce) 'motor stereotypies' remain popular clinically and in research (Lanovaz, Robertson, Soerono, & Watkins, 2013; Lilley, in press). Autistic adults have led resistance to these efforts (Lilley, in press), reclaiming 'self-stimulatory behaviour' as 'stimming' (e.g. Nolan & McBride, 2015). As autistic adults may understand one another better than non-autistic people understand them (Gernsbacher, Stevenson, & Dern, 2017; Gillespie-Lynch, Kapp, Brooks, Pickens, & Schwartzman, 2017; Komeda, 2015; Milton, 2014), this study sought to examine autistic adults' perceptions and experiences of stimming.

Theoretical perspectives suggest that stimming has a sensorimotor basis. Delacato (1974) theorised that excessive, insufficient and inefficient sensory processing causes all autistic behaviours (grouped into 'sensoryisms'), producing stimming as a controllable response. Similarly, Ornitz (1974) and Ornitz and Ritvo (1968) described autism as a syndrome of perceptual inconstancy, with motor output (like stimming) needed to modulate inconsistent sensory input. In support of this theory, autistic people have shown high behavioural and neurological variability to the same basic stimuli over time (Colbert, Koegler, & Markham, 1959; Haigh, 2018). Furthermore, more recent theories

[1]University of Exeter, UK
[2]University College London, UK
[3]Macquarie University, Australia

**Corresponding author:**
Steven K Kapp, University of Exeter, Egenis, Byrne House, St German's Road, Exeter EX4 4PJ, UK.
Email: s.k.kapp@exeter.ac.uk

have suggested that stimming may provide familiar and reliable self-generated feedback in response to difficulties with unpredictable, overwhelming and novel circumstances (e.g. Lawson, Rees, & Friston, 2014; Pellicano & Burr, 2012). As such, stimming may provide not only relief from excessive sensory stimulation, but also emotional excitation such as anxiety (Leekam, Prior, & Uljarevic, 2011). Consistent with these suggestions, autistic adults report that stimming provides a soothing rhythm that helps them cope with distorted or overstimulating perception and resultant distress (Davidson, 2010) and can help manage uncertainty and anxiety (e.g. Joyce, Honey, Leekam, Barrett, & Rodgers, 2017).

Reflecting the aims of popular interventions, language surrounding the topic of stimming is often pejorative (Jaswal & Ahktar, 2018). Researchers sometimes assume that stimming falls within voluntary control and has asocial or antisocial motivations (Jaswal & Ahktar, 2018; Lilley, in press). For example, a prominent review of repetitive behaviours in autistic people attributed the onset of stimming to a 'self-imposed restricted environment' (Leekam et al., 2011, p. 577). Stimming has become so associated with autism that some scientists and clinicians use the term 'stims' interchangeably with 'autistic behaviour' (Donnellan, Hill, & Leary, 2013). Furthermore, therapies continue to treat stimming despite lacking strong evidence of efficacy or ethics (Jaswal & Akhtar, 2018; Lilley, in press). While researchers increasingly acknowledge limitations in the understanding of, and interventions for, stimming (e.g. Harrop, 2015; Patterson, Smith, & Jelen, 2010), treatments may remain popular, in part because many parents regard it as noticeable and stigmatising (Kinnear, Link, Ballan, & Fischbach, 2016).

Autistic people have become increasingly mobilised and vocal in defence of stimming. Autism rights or neurodiversity activists believe that stims may serve as coping mechanisms, thus opposing attempts to eliminate non-injurious forms of stimming (e.g. Orsini & Smith, 2010). They decry practices such as 'quiet hands' (which teaches the suppression of hand flapping), instead using 'loud hands' as a metaphor both for using such non-verbal behaviour to communicate and for cultural resistance more broadly (Bascom, 2012). In addition, autistic scholar-activists denounce attempts to reduce their bodily autonomy (Nolan & McBride, 2015; Richter, 2017) and declarations of their stimming as unacceptable or as necessarily involuntary (Yergeau, 2016).

This research, co-produced by autistic self-advocates alongside researchers who do not identify as autistic, sought to further understand the issue of stimming from autistic adults' perspectives. It builds on the only empirical study, at least to our knowledge, to have directly elicited autistic adults' views about this topic. Steward (2015), in an online survey study of 100 autistic adults, highlighted a wide range of reasons for stimming, including a coping mechanism to reduce anxiety (72%) or overstimulation (57%), or to calm down (69%). Furthermore, 80% of survey respondents reported that they generally or sometimes enjoyed stimming (with another 11% indicating that their enjoyment depended on the particular stim), yet 72% had been told not to do it.

Here, we sought to extend Steward's (2015) work by eliciting autistic adults' views using in-depth semi-structured interviews and focus groups. Specifically, we aimed to examine autistic adults' (1) understanding of repetitive or 'stimming' behaviours, (2) perceptions of the reasons underpinning such behaviours (i.e. why they stim) and (3) views on the value, if any, of such behaviours.

## Method

### *Participants*

A total of 31 autistic adults (20 male, 10 female and 1 non-binary), between the ages of 21 and 56 years, participated in the study. Of them, 19 took part in interviews and 12 took part in focus groups (see Table 1). Recruitment took place in two regions of England (the Southwest and London). To sample autistic adults with wide-ranging needs, the Southwest team recruited interview participants through residential homes specialising in housing autistic adults, a training centre for autistic adults and existing networks. Recruitment for focus groups took place through existing networks of both research teams.

Participants had an independent clinical diagnosis of an autism spectrum condition, according to International Classification of Diseases, Tenth Revision (ICD-10; World Health Organization, 1992) or *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.; DSM-5) criteria (APA, 2013). Diagnoses included Asperger's syndrome ($n=16$), autism ($n=9$) and autism spectrum disorder ($n=6$). In total, 21 participants received their diagnosis in adulthood and 10 in childhood. Of the sample, 16 were currently unemployed (including one looking for work), 10 were in some form of employment (including three in voluntary employment) and 5 were students.

### *Interview and focus group protocols*

The individual (more detailed) interviews and (lengthier) focus groups provided complementary approaches to triangulate data on stimming. Ethical approval was granted by the University of Exeter's Social Studies and International Studies' College Ethics Committee (201516-066) and UCL Institute of Education's Research Ethics Committee (REC 924). Participants provided written, informed consent prior to taking part. Interviews and focus groups were digitally recorded and transcribed verbatim,

**Table 1.** Participant information.

| Participant | Gender | Age range | Focus group or interview (in person unless stated otherwise) |
|---|---|---|---|
| Rebecca | F | 21–30 | Focus group |
| Sinead | F | 41–50 | Focus group |
| Fiona | F | 31–40 | Focus group |
| Greg | M | 41–50 | Focus group |
| Layla | F | 21–30 | Focus group |
| Ian | M | 41–50 | Focus group |
| Alex | Non-binary | 31–40 | Focus group |
| Philip | M | 21–30 | Focus group |
| Ethan | M | 21–30 | Focus group |
| Martin | M | 31–40 | Focus group |
| Roger | M | 21–30 | Focus group |
| Clive | M | 31–40 | Focus group |
| Anthony | M | 21–30 | Interview (e-mail, instant messaging) |
| Alana | F | 41–50 | Interview (e-mail) |
| Jared | M | 21–30 | Interview |
| Miles | M | 31–40 | Interview |
| William | M | 31–40 | Interview |
| Claire | F | 31–40 | Interview |
| Joseph | M | 41–50 | Interview |
| Rueben | M | 41–50 | Interview |
| Rose | F | 51–56 | Interview |
| Luke | M | 21–30 | Interview |
| Sam | M | 41–50 | Interview |
| Roman | M | 51–56 | Interview |
| Sally | F | 21–30 | Interview |
| Abby | F | 21–30 | Interview |
| Lucy | F | 41–50 | Interview |
| Michael | M | 41–50 | Interview |
| Victor | M | 51–56 | Interview |
| Max | M | 31–40 | Interview |
| Ed | M | 21–30 | Interview |

with quotations presented verbatim in section 'Results'. To preserve anonymity, pseudonyms are used throughout the article.

*Interviews.* In total, 19 autistic adults took part in individual semi-structured interviews, conducted by G.R., D.E. and C.E.; of these, 17 interviews took place in person (in a dedicated, quiet room), 1 took place by e-mail and 1 took place by both e-mail and instant messaging. Participants had the option to have a parent/carer present during the interview, and five chose to exercise it (all in person). Questions about stimming (which took approximately 15 min) took place as part of a larger interview (which took approximately an hour), which also included questions about their strengths (that form the basis of a separate manuscript; see Table 2 for the interview topic guide).

**Table 2.** Interview schedule used in interviews and focus groups, with main questions and prompts.

| Key question | Prompts |
|---|---|
| Do you do any stims, or repetitive movements? | Which ones do you do? Which ones do you do the most? What kind of movements do you class as stimming? What do you do when you stim? Do you use something to stim with? How often do you stim? How long do you stim for? |
| What triggers your stims? | Can you give me an example of any situations that might cause you to stim? When do you stim? What is the reason you do them, do you think? |
| Is it helpful/ useful? | Does stimming make you feel better? In what way? |
| What would happen if you could not stim? | Has anyone ever told you not to stim? How would/does it make you feel? What would/do you do and not do? Why? |

*Focus groups.* Following the interviews, we invited new participants to take part in one of two face-to-face focus groups on stimming ($n=6$ per group), lasting approximately 60–90 min, in a location convenient for participants. Groups were led by facilitators (G.R., R.S. and S.K.K. for one group; R.S. and E.P. for the other), who, at key moments during the discussion, fed the main points back to the group to confirm their interpretation of key messages. They also encouraged all participants to contribute to discussion. Focus groups were conducted according to a semi-structured interview schedule, with sticky note activities used to aid discussion and enable everyone to contribute. The first sticky note activity involved asking participants to note examples of 'stimming' or 'repetitive movements', which were subsequently discussed as a group (see Table 2 for questions). A final sticky note activity instructed participants to write down potential causes of their stims. Other sticky note activities and discussion also centred on fidgeting (in comparison to stimming), the focus of a separate paper.

## *Data analysis*

We did not differentiate data collected from interviews and focus groups in our analysis, as per other qualitative research studies. Data were analysed thematically, following Braun and Clarke (2006). We adopted an inductive approach to data analysis, an experiential orientation to data and a critical realist theoretical perspective (c.f. Braun & Clarke, 2012), to systematically examine adults' subjective accounts of their meanings and experiences. Quotations were used to illustrate identified themes. Motivated by the literature (especially from autistic adults' perspectives) suggesting that diagnostic symptoms of repetitive motor movements sometimes function as a coping mechanism,




**Figure 1.** Stimming as a self-regulatory mechanism.

we coded the data deductively with regard to the meaning and forms of, the reasons for and the utility of, stimming. We also analysed data inductively for any other identified patterns.

The team read the interview and focus group transcripts, with two authors (S.K.K. and G.R.) immersing themselves in the data by reading them twice and taking notes on striking and recurring observations. G.R. developed a coding framework with suggestions from the study team, and D.E. used it to code the data. S.K.K. read all the data extracts (organised by code) and fitted them into larger categories, giving each a new title and a written summary. S.K.K. then generated a draft thematic map, reviewed by G.R. and D.E., which was subsequently revised, before writing the analysis and sending it to the study team for comment and discussion. The study team's training in social science (psychology for S.K.K., G.R., L.C. and E.P., and sociology for S.K.K., G.R., C.E. and D.E.) and positionalities as autistic researchers (S.K.K. and R.S.) informed our analysis.

## Results

Participants discussed what stimming comprised and how it affected their lives. In most cases, they described stimming as a series of repetitive movements such as hand flapping, rocking and flicking (see Theme 1). Two major themes were identified: 'Stimming as a self-regulatory mechanism' (see Figure 1) and '(De)stigmatisation of stimming' (see Figure 2), each comprising several subthemes (themes and subthemes were robust to both interviews and focus groups).




**Figure 2.** (De)stigmatisation of stimming.

### *Theme 1: stimming as a self-regulatory mechanism*

Stimming was identified as a repetitive, usually rhythmic behaviour that was commonly expressed through body movements (variously described as hand flapping, finger flicking, hair pulling or pinching, feet flexing, spinning, necklace playing) but also vocalisations (e.g. muttering, grunting, stuttering, whistling, singing). Many participants said they experienced it as involuntary and unconscious, at least at the beginning of the behaviour. Although many described stimming as automatic and uncontrollable, no participants consistently and inherently disliked their stims (as opposed to their social consequences). Indeed, most participants described stimming itself as comfortable or calming, suggesting a self-regulatory function (which some participants explicitly identified). The accounts of our participants suggested that stimming created a feedback loop that regulated excess emotion and was self-perpetuated because of the soothing comfort or control afforded by the behaviour.

Our analysis revealed four subthemes, including overwhelming environment, sensory overload, noisy thoughts and uncontainable emotion. These were interrelated: an overwhelming environment was described as producing sensory overload and sometimes contributing to noisy thoughts. Externally generated senses (like loud noises and sudden movements from children during lunchtimes at school) or internally generated thoughts (such as nagging worries about work) could independently or together cause excessive uncontainable emotions (such as anxiety), resulting in the self-regulatory mechanism of rhythmic behaviour known as stimming. A schematic illustration of this process is shown in Figure 1.

As one participant (Luke) explained, the regulatory aspect of stimming worked through attending to a single point of focus over which one had control, to self-regulate by blocking or reducing excessive input. He suggested that the cause of this either comes externally (through sensory bombardment) or internally (through a flood of thoughts). He described how he controlled stimulation by rotating his wrist. The rhythm enabled him to self-regulate his mind and body according to the timing of the predictable movement:

> it helps you talk to yourself at a rhythmical pace, so when I'm doing this I can sort of think in the rhythm that I'm moving my hand … which is very helpful because it means like when you've got your internal monologue it doesn't all come in at once and you find yourself sort of shouting at yourself in your head to get everything done.

In turn, this self-stimulating motion calmed the body 'in time with the pendulum': 'it sort of metronomes everything in your body to sort of go at that speed … So it just sort of helps quell everything, because you're at the same rhythm with everything'.

Below we report our four subthemes in the context of stimming as a regulatory mechanism.

*Subthemes 1 and 2: overwhelming environment and sensory overload.* Very often, participants described external causes of stimming such as confusing, unpredictable, overwhelming environments. This inextricably led to excessive sensory stimulation, contributing to stressful emotional states. They described sensory hypersensitivities as relating to interpersonal difficulties that may generate the need for a coping mechanism like stimming.

Returning to Luke, he described the long hours of working to support people with 'so-called severe autism' as producing 'a lot of sensory information' that led him to stim 'quite a lot', especially at mealtimes with the service users (while at work). The following example illustrates the demands of simultaneous multisensory processing (visual, gustatory (taste) and auditory) amid a context of long work hours and social responsibility for others' well-being:

> I need to be looking out for them, but I've got lots of sort of taste senses coming in and I've got lots of sound stuff, I was like tuning in to conversations or whatever and sort of keeping an eye out in case somebody comes up the stairs wanting their meal now, wanting supporting, whatever.

Thus, he usually stimmed when in a room to himself but sometimes could not help the hand not used for eating 'just rolling itself around like in a sort of circular motion', forcing him to explain his behaviour and request more breaks.

The social acceptability of stimming in the current context (see Theme 2), and the extent to which individuals had awareness of and voluntary control over the action, influenced whether stimming took place. Task demands and physical and mental states (e.g. energy levels and emotional well-being) also reportedly influenced stimming. These factors affected how people used stimming to engage with or withdraw from the environment. For example, Max was 'slightly closing my eyes a fair bit during this interview', which he described as a stim that helped him concentrate:

> The eye close is to cut off additional stimuli so I don't get tired, or sometimes when I can particularly obsessively focus on the one thing that needs to happen. So contrary to what would appear common sense, I close my eyes quite a few times during dances which I didn't understand because I needed to have the other person lead me more than trying to see what's happening.

None of the participants described instances of too little sensory input or sensory hyposensitivities as a causal factor for stimming or generally, but many attributed stimming to what Victor called 'sensory overload'.

*Subtheme 3: noisy thoughts.* Participants described dysregulated, excessive or distracting thoughts that led to stimming, sometimes associated with specific stims. For example, Alex described songs playing in his head that triggered distressing memories, leading to quick rolls forward and backward on his wheelchair and repeating a word associated with the memory.

These thoughts were often triggered by their surroundings and interacted with sensory stimulation. Several of their experiences suggested that the noisy thoughts that led to stimming were less preventable than sensory-based causes. This was due to greater ability to modify their environment than their mental state. For example, Rose described hypersensitivity to noise that threatened to raise her heartbeat but explained that she could avoid this, for example, by sitting in her car during her lunch break for 'peace and quiet'. In doing this, she stated, 'I've got the environment how I want it and my stress, on the whole now, is more self-inflicted, like having an assignment to do', which triggered stims like leg jiggling, finger tapping and body rocking.

*Subtheme 4: uncontainable emotion.* Most participants identified an abundance of at least one emotional state as the most proximal cause of stimming. No accounts contradicted this pathway. The descriptor *uncontainable* refers to the magnitude of the emotional state, causing its expression through stimming behaviour. Stimming served a communicative, as well as a regulatory, function. Some participants described stimming in response to positive emotional states (e.g. excitement) and others in response to negative emotional states (e.g. anxiety). Valence of emotions (positive or negative) varied but the potency of the emotion itself emerged as a consistent pattern, with stimming calming a state of hyperarousal. As Rebecca explained, '[s]timming is just a release of any high emotion, so really anxious, really agitated, really happy, really excited, just any high emotion, that's when I stim'. Stimming appeared to function to calm.

For some participants, particular stims always responded to a particular emotion, which meant that the behaviours may have effectively communicated the person's feelings (and those close to them may come to understand this meaning). For example, with regard to head-picking, Sinead explained 'my son and husband get really upset if I'm doing that because it means that I'm really emotional and stressed'. Emotional valence may shape the specific form that the

same general behaviour takes. For example, several participants explained that they flap their hands both when excited or happy as well as when distressed, and two (Alana and Ethan) detailed that hand flapping due to positive states involves hands open and arms out in a waving-like motion, unlike hands and arms kept further down towards oneself (when in a more negative state).

Although usually described as instinctive and reactive, according to several participants, stimming could also be under conscious control and used actively to prevent emotional dysregulation. Sally said she learned about stimming's soothing benefits through resources (e.g. YouTube videos) that help autistic people stim:

> And I started kind of incorporating it more in my life, and it actually managed to help me stave off some panic attacks. For example, I never used to wave my hands that much, but I've started doing it more and it actually helps, like if I'm in a crowded elevator or something.

## *Theme 2: (de)stigmatisation of stimming*

The second theme concerned (1) the negative reactions that people perceived when stimming and (2) destigmatisation through acceptance based on social understanding of their stims. Participants described feeling a variety of resentful emotions when told by others to stop stimming, including anger, nervousness, frustration, belittlement, shame and confusion. They expressed that others might feel annoyed, stressed or alarmed by their stims, and stated that observers might view them as strange, aggressive, sad, ridiculous or childish. Many wished to avoid drawing negative attention and, in response to feeling marginalised, attempted to suppress their stims in public. They also reported stimming when alone, for this reason.

Other participants reported transmuting stims into a more socially acceptable form that provided similar feedback. For example, Ethan replaced arm stims with dancing, shaking hands, tennis, chess and sailing. Alternatively, participants tried concealing stimming from view. Repression of stimming happened more as a function of whether people said they felt understood. Participants encountered accepting attitudes from others more often in private than in public. This was because of greater understanding (through others' familiarity with them or their knowledge of autism and the reasons for stimming). Several only stimmed freely when they had total privacy (i.e. on their own) or among selected (accepting) family or friends.

Figure 2 illustrates the conceptual map developed to try to represent both dimensions of (de)stigmatisation that participants described. Influences could act either to lead to devaluation or increase acceptance of stimming. Subtheme 1 includes promoters of devaluation and Subtheme 2 concerns acceptance, with the path mediated through understanding.

*Subtheme 1: devaluation.* Several participants internalised the stigmatisation of stimming, with ambivalent attitudes despite recognising the utility of their stims. Rose reported hiding stims (e.g. stimming on her leg rather than on her desk at university) and 'if I thought anyone could see what I was doing, I could have stopped it'. She taught her students to do the same: 'I'd try and get students not to display' if 'they didn't want to be seen as different', telling them 'You're disturbing everyone, you're causing attention' for actions like jiggling their legs and fidgeting with their watch. Nevertheless, she admitted stimming 'helps me keep me calm … it cuts down what is going on around, it helps me focus' and that suppressing her stims made her feel 'just sort of more on edge'. Pointedly, Rose critiqued intervention based in 'ABA' (applied behavioural analysis) in which 'they basically condition them like Pavlov's dogs to stop stimming', remarking,

> to me it was abuse, because stopping those children stimming when they're trying to calm themselves down or cope with a situation, because even if they manage all the environment around them, there might be situations that they find stressful, and if they haven't got the ability to calm them down, then they could be relying on other people for the rest of their lives or have a breakdown …

In addition to stims that made them feel devalued for appearing 'weird', participants described stims that caused (unintentional) harm to themselves or others. They largely recognised that others would not accept harmful stimming and tried to suppress stimming that caused self-harm.

*Harm.* Participants gave several examples of stimming behaviours that caused physical harm to themselves (with no evidence of intentional self-injury), which they did not find helpful, regardless of social context. For example, Max explained that he repeatedly pressed his fingers together when anxious for sensory feedback, but did not find it helpful 'because you can get into a loop and you can start really making your fingers leathery if you're not careful'. Nevertheless, all participants gave examples of stims they found inherently helpful, although they did not necessarily like it when others noticed their engagement in the behaviour.

Participants described the annoyance and distraction their stimming may cause others. Greg described obliviously clicking his nails at home, including near the ear of his wife, who has 'good hearing' and 'really hates that'. Similarly, Sinead described inadvertently bringing pain to her husband: 'apparently, I did pinch around his nails or something like that, I don't know'. Sinead's husband brought the behaviour to her attention when he became 'really sore … [T]hat's a bit distressing to find out you're causing harm to somebody without realising you're doing that'. The exception came from Sam, who stimmed to antagonise support staff at home. Other participants talked about having struggled to interpret their stimming as

harmful even when others express irritation. They discussed disruption as avoidable if others did not focus on their stimming activity, or if others became more open-minded. Several participants made declarative statements that their stims were not 'affecting' or 'hurting' anyone, or 'doing any harm' and so stated they should be accepted. Similarly, Claire said she could understand attempts by others to stop stimming 'if it's harmful to somebody else or it's annoying to somebody else, but if it's absolutely got no bearing on another person whatsoever I think people should be allowed to do what they like'.

*Age*. Participants reported that stimming became less socially acceptable as one got older. Layla defined stimming in this way: 'I think of stims as the kind of behaviours that either autistic people [do] or what you do when you're a young child and that you normally grow out of'. Several participants offered compatible narratives from their own experience, in that they stimmed happily as young children but by secondary school (11–16 years) norms changed, and they hid or transmuted stimming once aware of negative judgement. This may also reflect greater self-awareness: '[P]robably the people that saw me doing it [hand flapping], peers that might have judged me badly, but until I got to secondary school I didn't realise that other people were judging me badly for it' (Clive).

Participants' comparisons between childhood and adulthood referred to how stigmatisation of stimming infantilises autistic people, who may fear they come across as 'immature' (Roger). When told not to stim as an adult, Clive said he feels 'belittled', as though he is 'five' being told off for 'genuine misbehaviour'. '[I]t makes me feel that age again … I shouldn't feel like I'm in reception class again learning basic things'. Sinead flashbacked to the highs of stimming she used to freely enjoy:

> I remember as a child spinning all the time and loving spinning and loving swinging and feeling that movement all the time, but then I also realised that there was a point where it wasn't acceptable to be spinning anymore … so it actually still feels glorious if there's nobody around and I can skip or I can spin and it's like I'm breaking the rules.

*Subtheme 2: acceptance.* Acceptance enabled participants the freedom to stim openly. Anthony said no one had ever told him not to stim, explaining, 'I'm in a very autism-accepting environment and gr[e]w up in a special school'. This attitude liberated him to stim (e.g. hand flapping, foot shaking, rocking) 'as often as I'm excited or anxious' even though his stimming included the extreme dysregulation of a 'meltdown phase' (in which he rocked, but 'standing and rocking, not sitting').

*Promoting acceptance through understanding*. Understanding held the key to acceptance of non-harmful stimming in autistic adults, according to our analysis. Greg's wife used to work for an autism advocacy organisation, so with reference to his stimming, 'because she understands it, she knows why I'm doing it … she lets me get on with it most of the time …' She further practised her professional skills by helping him to write an e-mail explaining his autism and stimming in the workplace, which achieved its goal and boosted his productivity as he worried less about stimming.

Other participants did not fare as well with their family. For example, Rebecca's aunt, uncle and grandmother attempted to stop her hand flapping both verbally and physically. She said that she felt '[a]ngry that they've been told a thousand times why I do it, the reason behind it, that it's not affecting anyone'. In response to another focus group member's comment, 'It's probably because they don't understand', she remarked, 'But, they should because they're my family'.

## Discussion

Through interviews and focus groups, autistic adults with various support needs shared remarkably similar perceptions of repetitive, stereotyped behaviours known as 'stimming'. A robust pattern emerged of stimming as a self-regulatory mechanism, which acted to create a calming feedback loop. According to participants, intense emotions could have either a positive (e.g. happy or excited) or a negative (e.g. anxious or distressed) valence, and the corresponding stims could have a different manifestation depending on valence. Stimming was therefore reported to be a useful behaviour, serving to contain or control excess emotion, and the social acceptability of stimming was perceived to depend on a number of cultural factors including age, familiarity and understanding of autism. Although no scientific literature (to our knowledge) directly examines a reported communicative function of stimming, our findings support accounts of autistic activists, which suggest that the language of stimming may assist with learning to recognise the inner emotional states of autistic adults (Bascom, 2012; Lindsmith, 2014; Schaber, 2014).

None of the participants reported their stimming behaviours to be thoroughly detrimental, although they regularly encountered negative social judgements that made them feel self-conscious about stimming around others. Indeed, participants commonly responded to the negative attention their stims attracted by suppressing stimming behaviours: transmuting them into a more socially acceptable form that provided similar feedback, or concealing them away from others' view. Not all participants reported voluntary control over their stimming, but even those who said they could suppress their stims described depleting, effortful costs. In parallel, autistic bloggers have described strains of suppressing stimming, such as invoking Baumeister's (2002) ego depletion model of self-control (which describes self-control as a limited resource like a muscle;

Kim, 2013) and describing how their performance suffered after transitioning to a new and more independent context (e.g. going to university; Gross, 2011) while they suppressed their urge to stim.

Participants professed no desire for self-injurious stims and largely wished to avoid stimming in ways harmful to others. Although the sample was recruited from the general community, rather than a subsection of activists (and thus seemed to vary greatly in their identities regarding autism), this finding is consistent with the neurodiversity movement's opposition to eliminating all stimming with the exception of behaviours harmful to inclusion and quality of life (c.f. Ne'eman, 2010; Robertson, 2010). Our participants' perspective is consistent with the practice of making stims a target of treatment only when injurious, which (according to the DSM-5) would call for a co-occurring diagnosis of stereotypic movement disorder (APA, 2013). Seeking to extinguish functional stimming would violate the medical ethics of the principle to 'do no harm' (c.f. Nicolaidis, 2012).

Participants described stimming as helping to calm or soothe overwhelming sensations or emotions, which is consistent with self-reports of autistic individuals (e.g. Joyce et al., 2017; Steward, 2015). We also extend the literature by providing accounts that suggest stimming helps with concentration and learning. Stimming seemed to give autistic people a mechanism of behavioural control to self-regulate a state of emotional hyperarousal, amid a bombardment of overwhelming sensations or thoughts, consistent with classical and modern theories of autism (e.g. Delacato, 1974; Ornitz, 1974; Pellicano & Burr, 2012). Self-reported experiences may shed light on the empirically supported theory of autism as a syndrome of perceptual inconstancy (Ornitz & Ritvo, 1968), as participants may not perceive their sensory and social surroundings as intensely when stimming. Moreover, stimming may help process dynamic, simultaneous and unpredictable sensations (such as in the care home where Luke worked), which may dovetail with theories that seek to explain why autistic people often struggle with sensory processing and novelty (e.g. Pellicano & Burr, 2012).

Participants in the current sample reported that others' understanding held the key to social acceptance of their stims. This may apply particularly as they age, because they reported that negative reactions became more common as they grew up. Behaviours like rocking and hand flapping typify infancy but become less common as children get older (Leekam et al., 2011). Such stims may function to help infants transition to volitional motor activity (Thelen, 1979), yet many autistic people struggle with the initiation and execution of intentional skilled movements into adulthood (Biscaldi et al., 2014; Wild, Poliakoff, Jerrison, & Gowen, 2012). Such evidence links with theories of autism as affecting rhythms (Amos, 2013; Tordjman et al., 2015) and Luke's description of stimming as coordinating thoughts and activity at the pace of his movements to 'quell everything, because you're at the same rhythm with everything'. Therefore, stimming may have underappreciated benefits in assisting autistic people (even adults) with motor control.

Our findings overlap with the perspectives of occupational therapy and sensory integration theory that stimming may result from sensory dysregulation (Lilley, in press; Miller, Anzalone, Lane, Cermak, & Osten, 2007) but do not necessarily suggest a similar route for intervention. Instead, the views and experiences of participants suggest that modifying the environment (so it does not provoke stimming) and promoting social acceptance are key. Potentially, this could address the underlying processing difficulties experienced by our sample, but not seek to reduce non-injurious stimming for its own sake. Ultimately, our findings make us assess repetitive motor behaviours in a different light to that cast by medical texts (Jaswal & Akhtar, 2018; Lilley, in press). The autism field would be best placed to take a more nuanced look at why autistic people perform repetitive motor behaviours so frequently to inform subsequent revisions of diagnostic criteria. Rather than aiming to obliviate all stims, perhaps support for interventions that aid non-harmful stimming and reduce prejudice is the way forward.

Potentially, other people's imitation of their stims may facilitate autistic people's self-other awareness (see Kapp, 2016, p. 70) and help bridge the difficulties autistic and non-autistic people share in understanding one another, which Milton (2012) terms the 'double empathy problem'. Interventions should facilitate true reciprocity that helps *non*-autistic people understand and respect stimming (Gernsbacher, 2006; Pellicano, 2013).

### *Strengths and limitations*

The study is the first in-depth examination of stimming from the perspective of autistic people. While positive accounts of stimming mostly stem from self-selected, highly articulate and self-aware segments of the autistic community, such as writers of autobiographies (e.g. Davidson, 2010), participants in advocacy organisations (e.g. Savarese, 2010) and scholars (Nolan & McBride, 2015; Richter, 2017), this study actively recruited predominantly non-activist participants largely in their own settings (e.g. group supported living accommodation, their parents' house, a training centre). Past studies emphasise anecdotes from North America, where behavioural therapies aimed at reducing stimming appear more common (e.g. Orsini & Smith, 2010). Recruiting participants from their communities in a country (the United Kingdom) where stimming might be more socially acceptable than in the United States (*BBC News*, 2013), we found stigmatisation and misunderstandings still commonly reported by

autistic adults. E-mail and instant messaging (in addition to in-person) options for interviews enhanced the geographical diversity of the sample within the United Kingdom. While it is common for interview and focus group data to be analysed together (e.g. Bauer, Yang, & Austin, 2004; Eysenbach & Köhler, 2002), it is not known whether differences in our data collection methods affected the results. Furthermore, the absence of systematic data on the participants' clinical functioning and diagnoses, and the lack of participants with severe intellectual disabilities or minimal language, poses limitations. The study findings also may not transfer to children, non-speaking autistic people or autistic people living outside the United Kingdom.

## Conclusion and future directions

The results have implications for supporting autistic people. They suggest that many autistic adults agree with the neurodiversity movement's opposition to eliminating all forms of stimming across all contexts (e.g. traditional uses of early intensive behavioural intervention) and desire for society to accept non-harmful forms of stimming (Bascom, 2012; Lilley, in press). Indeed, we found potential evidence of the spread of the movement through the report of teaching oneself how to stim via online resources. Our study suggests that carers, staff and autistic adults themselves may prevent the need for stimming in certain cases, such as environmental adjustments to reduce the risk of sensory overload. The point of intervention could therefore be shifted to the overwhelming environment rather than the autistic person themselves. Yet participants described stimming caused by uncontrollable thoughts as more difficult to prevent. Possibly, participants struggled to change their thoughts because of the 'rigid thinking patterns' characteristic of autistic people (APA, 2013); autistic adults often report low ability to reframe bothersome thoughts to prevent or alleviate distress (Samson, Huber, & Gross, 2012). Future researchers could investigate autistic people's accounts regarding the supposed internal causes of their stims, including sensory (hyper)sensitivities, cognitive inflexibility and emotional dysregulation, and whether these should be addressed.

Other future directions include investigating the role of stimming and potentially related behaviours beyond autism. For example, one might compare 'stimming' in autistic people with 'fidgeting' in non-autistic people, as some scholars (e.g. Jaswal & Akhtar, 2018) and autistic advocates (e.g. Lindsmith, 2014) suggest that everyone stims as a coping mechanism. Research beyond autism suggests that children often do not regard their own or others' repetitive behaviours as problematic (Harris, Mahone, & Singer, 2008) and that they may offer benefits (e.g. concentration for children with attention deficit hyperactivity disorder (ADHD); Hartanto, Krafft, Iosif, & Schweitzer, 2016). Greater understanding of such repetitive behaviours may, therefore, help elucidate appropriate support for a variety of people.

### Author note

Data from participants who consented will be deposited in the UK Data Service, in 2019.


### Acknowledgments

We are grateful to all of our participants for taking part in this study. We thank carers for their support during interviews and an autism training centre, Chee Wong, and Dr Melissa Bovis for their assistance with the focus groups. The reviewers provided invaluable feedback, as did Dr Jean Harrington on the figures for and drafting of the manuscript.

### Declaration of conflicting interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship and/or publication of this article.

### Funding

The author(s) disclosed receipt of the following financial support for the research, authorship and/or publication of this article: Steven K Kapp, Daisy Elliott, Chris Elphick, and Ginny Russell were supported by the Wellcome Trust [108676/Z/15/Z]. Elizabeth Pellicano was supported by a 2015 Philip Leverhulme Prize from the Leverhulme Trust.



### ORCID iDs

Laura Crane https://orcid.org/0000-0002-4161-3490
Elizabeth Pellicano https://orcid.org/0000-0002-7246-8003


### References


American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Washington, DC: Author.

Amos, P. (2013). Rhythm and timing in autism: Learning to dance. *Frontiers in Integrative Neuroscience*, *7*, 27.

Asperger, H. (1991). 'Autistic psychopathy' in childhood. In U. Frith (Ed. & Trans.), *Autism and Asperger syndrome* (pp. 37–92). New York: Cambridge University Press. (Original work published 1944)

Bascom, J. (2012). *Loud hands: Autistic people, speaking*. Washington, DC: Autistic Press.

Bauer, K. W., Yang, Y. W., & Austin, S. B. (2004). 'How can we stay healthy when you're throwing all of this in front of us?' Findings from focus groups and interviews in middle schools on environmental influences on nutrition and physical activity. *Health Education & Behavior*, *31*(1), 34–46.

Baumeister, R. F. (2002). Ego depletion and self-control failure: An energy model of the self's executive function. *Self and Identity*, *1*, 129–136. doi:10.1080/152988602317319302

*BBC News*. (2013, June 5). Stimming: What autistic people do to feel calmer. *BBC News*. Retrieved from https://www.bbc.co.uk/news/blogs-ouch-22771894

Biscaldi, M., Rauh, R., Irion, L., Jung, N. H., Mall, V., Fleischhaker, C., . . . Klein, C. (2014). Deficits in motor abilities and developmental fractionation of imitation performance in high-functioning autism spectrum disorders. *European Child & Adolescent Psychiatry*, *23*(7), 599–610.

Braun, V., & Clarke, V. (2006). Using thematic analysis in psychology. *Qualitative Research in Psychology*, *3*, 77–101. doi:10.1191/1478088706qp063oa

Braun, V., & Clarke, V. (2012). Thematic analysis. In H. Cooper (Ed.), *APA handbook of research methods in psychology: Research designs: Quantitative, qualitative, neuropsychological, and biological* (*Vol. 2*) (pp. 57–71). Washington, DC: American Psychological Association.

Colbert, E. G., Koegler, R. R., & Markham, C. H. (1959). Vestibular dysfunction in childhood schizophrenia. *Archives of General Psychiatry*, *1*, 600–617. doi:10.1001/archpsyc.1959.03590060062006

Davidson, J. (2010). 'It cuts both ways': A relational approach to access and accommodation for autism. *Social Science & Medicine*, *70*, 305–312. doi:10.1016/j.socscimed.2009.10.017

Delacato, C. H. (1974). *The ultimate stranger: The autistic child*. Novato, CA: Arena Press.

Donnellan, A. M., Hill, D. A., & Leary, M. R. (2013). Rethinking autism: Implications of sensory and movement differences for understanding and support. *Frontiers in Integrative Neuroscience*, *6*, 124. doi:10.3389/fnint.2012.00124

Eysenbach, G., & Köhler, C. (2002). How do consumers search for and appraise health information on the World Wide Web? Qualitative study using focus groups, usability tests, and in-depth interviews. *BMJ*, *324*, 573–577.

Faso, D. J., Sasson, N. J., & Pinkham, A. E. (2015). Evaluating posed and evoked facial expressions of emotion from adults with autism spectrum disorder. *Journal of Autism and Developmental Disorders*, *45*(1), 75–89. doi:10.1007/s10803-014-2194-7

Gernsbacher, M. A. (2006). Toward a behavior of reciprocity. *The Journal of Developmental Processes*, *1*, 138–152.

Gernsbacher, M. A., Stevenson, J. L., & Dern, S. (2017). Specificity, contexts, and reference groups matter when assessing autistic traits. *PLoS ONE*, *12*(2), e0171931. doi:10.1371/journal.pone.0171931

Gillespie-Lynch, K., Kapp, S. K., Brooks, P. J., Pickens, J., & Schwartzman, B. (2017). Whose expertise is it? Evidence for autistic adults as critical autism experts. *Frontiers in Psychology*, *8*, 438. doi:10.3389/fpsyg.2017.00438

Gross, Z. (2011, April 4). *About stimming*. Retrieved from http://www.thinkingautismguide.com/2011/04/about-stimming.html

Haigh, S. M. (2018). Variable sensory perception in autism. *European Journal of Neuroscience*, *47*, 602–609.

Harris, K. M., Mahone, E. M., & Singer, H. S. (2008). Nonautistic motor stereotypies: Clinical features and longitudinal follow-up. *Pediatric Neurology*, *38*, 267–272. doi:10.1016/j.pediatrneurol.2007.12.008

Harrop, C. (2015). Evidence-based, parent-mediated interventions for young children with autism spectrum disorder: The case of restricted and repetitive behaviors. *Autism*, *19*, 662–672.

Hartanto, T. A., Krafft, C. E., Iosif, A. M., & Schweitzer, J. B. (2016). A trial-by-trial analysis reveals more intense physical activity is associated with better cognitive control performance in attention-deficit/hyperactivity disorder. *Child Neuropsychology*, *22*, 618–626. doi:10.1080/09297049.2015.1044511

Jaswal, V. K., & Akhtar, N. (2018). Being vs. appearing socially uninterested: Challenging assumptions about social motivation in autism. *Behavioral and Brain Sciences*, *2018*, 1–84. doi:10.1017/S0140525X18001826

Joyce, C., Honey, E., Leekam, S. R., Barrett, S. L., & Rodgers, J. (2017). Anxiety, intolerance of uncertainty and restricted and repetitive behaviour: Insights directly from young people with ASD. *Journal of Autism and Developmental Disorders*, *47*, 3789–3802. doi:10.1007/s10803-017-3027-2

Kanner, L. (1943). Autistic disturbances of affective contact. *Nervous Child*, *2*, 217–250.

Kapp, S. K. (2016). *Social justice and autism: Links to personality and advocacy* (Doctoral dissertation). Available from eScholarship. (UMI No. 14816)

Kim, C. (2013, June 18). A cognitive defense of stimming (or why 'quiet hands' makes math harder) [Blog post]. *Musingsofanaspie*. Retrieved from https://musingsofanaspie.com/2013/06/18/a-cognitive-defense-of-stimming-or-why-quiet-hands-makes-math-harder/

Kinnear, S. H., Link, B. G., Ballan, M. S., & Fischbach, R. L. (2016). Understanding the experience of stigma for parents of children with autism spectrum disorder and the role stigma plays in families' lives. *Journal of Autism and Developmental Disorders*, *46*, 942–953.

Komeda, H. (2015). Similarity hypothesis: Understanding of others with autism spectrum disorders by individuals with autism spectrum disorders. *Frontiers in Human Neuroscience*, *9*, 124. doi:10.3389/fnhum.2015.00124

Lanovaz, M. J., Robertson, K. M., Soerono, K., & Watkins, N. (2013). Effects of reducing stereotypy on other behaviors: A systematic review. *Research in Autism Spectrum Disorders*, *7*, 1234–1243.

Lawson, R. P., Rees, G., & Friston, K. J. (2014). An aberrant precision account of autism. *Frontiers in Human Neuroscience*, *8*, 302. doi:10.3389/fnhum.2014.00302

Leekam, S. R., Prior, M. R., & Uljarevic, M. (2011). Restricted and repetitive behaviours in autism spectrum disorders: A review of research in the last decade. *Psychological Bulletin*, *137*, 562–593. doi:10.1037/a0023341

Lilley, R. (2018). *What's in a flap? The curious history of autism and hand stereotypies*. Manuscript submitted for publication.

Lindsmith, K. (2014, May 16). *Stimming 101, or: How I learned to stop worrying and love the stim*. Retrieved from https://kirstenlindsmith.wordpress.com/2014/05/16/stimming-101-or-how-i-learned-to-stop-worrying-and-love-the-stim/

Miller, L. J., Anzalone, M. E., Lane, S. J., Cermak, S. A., & Osten, E. T. (2007). Concept evolution in sensory integration: A proposed nosology for diagnosis. *The American Journal of Occupational Therapy*, *61*, 135–140.

Milton, D. E. (2012). On the ontological status of autism: The 'double empathy problem'. *Disability & Society*, *27*, 883–887. doi:10.1080/09687599.2012.710008

Milton, D. E. (2014). Autistic expertise: A critical reflection on the production of knowledge in autism studies. *Autism*, *18*, 794–802. doi:10.1177/1362361314525281

Ne'eman, A. (2010). The future (and the past) of autism advocacy, or why the ASA's magazine. The advocate, wouldn't publish this piece. *Disability Studies Quarterly*, *30*(1). Retrieved from http://dsq-sds.org/article/view/1059

Nicolaidis, C. (2012). What can physicians learn from the neurodiversity movement? *Virtual Mentor: American Medical Association Journal of Ethics*, *14*, 503–510.

Nolan, J., & McBride, M. (2015). Embodied semiosis: Autistic 'stimming' as sensory praxis. In P. P. Trifonas (Ed.), *International handbook of semiotics* (pp. 1069–1078). Dordrecht, The Netherlands: Springer.

Ornitz, E. M. (1974). The modulation of sensory input and motor output in autistic children. *Journal of Autism and Childhood Schizophrenia*, *4*, 197–215. doi:10.1007/BF02115226

Ornitz, E. M., & Ritvo, E. R. (1968). Perceptual inconstancy in early infantile autism: The syndrome of early infant autism and its variants including certain cases of childhood schizophrenia. *Archives of General Psychiatry*, *18*, 76–98. doi:10.1001/archpsyc.1968.01740010078010

Orsini, M., & Smith, M. (2010). Social movements, knowledge and public policy: The case of autism activism in Canada and the US. *Critical Policy Studies*, *4*, 38–57. doi:10.1080/19460171003714989

Patterson, S. Y., Smith, V., & Jelen, M. (2010). Behavioural intervention practices for stereotypic and repetitive behaviour in individuals with autism spectrum disorder: A systematic review. *Developmental Medicine and Child Neurology*, *52*(4), 318–327.

Pellicano, E. (2013). Editorial. *Autism*, *17*, 131–132. doi:10.1177/1362361313479218

Pellicano, E., & Burr, D. (2012). When the world becomes 'too real': A Bayesian explanation of autistic perception. *Trends in Cognitive Sciences*, *16*, 504–510. doi:10.1016/j.tics.2012.08.009

Richter, Z. A. (2017). Melting down the family unit: A neuroqueer critique of table-readiness. In M. Rembis (Ed.), *Disabling domesticity* (pp. 335–348). New York: Palgrave Macmillan.

Robertson, S. M. (2010). Neurodiversity, quality of life, and autistic adults: Shifting research and professional focuses onto real-life challenges. *Disability Studies Quarterly*, *30*(1). Retrieved from http://www.dsq-sds.org/article/view/1069/1234

Samson, A. C., Huber, O., & Gross, J. J. (2012). Emotion regulation in Asperger's syndrome and high-functioning autism. *Emotion*, *12*, 659–665. doi:10.1037/a0027975

Savarese, E. T. (2010). What we have to tell you: A roundtable with self-advocates from AutCom. *Disability Studies Quarterly*, *30*(1). Retrieved from http://dsq-sds.org/article/view/1073

Schaber, A. (2014, January 25). Ask an autistic #1 – What is stimming? *Gemythest* (Video file). Retrieved from https://www.youtube.com/watch?v=WexCWZPJE6A&t=322s

Sheppard, E., Pillai, D., Wong, G. T. -L., Ropar, D., & Mitchell, P. (2016). How easy is it to read the minds of people with autism spectrum disorder? *Journal of Autism and Developmental Disorders*, *46*, 1247–1254.

Steward, R. L. (2015). *Repetitive stereotyped behaviour or 'stimming': An online survey of 100 people on the autism spectrum*. Paper Presented at the 2015 International Meeting for Autism Research. Retrieved from https://insar.confex.com/insar/2015/webprogram/Paper20115.html

Thelen, E. (1979). Rhythmical stereotypies in normal human infants. *Animal Behaviour*, *27*, 699–715. doi:10.1016/0003-3472(79)90006-X

Tordjman, S., Davlantis, K. S., Georgieff, N., Geoffray, M. M., Speranza, M., Anderson, G. M., & . . . Vernay-Leconte, J. (2015). Autism as a disorder of biological and behavioral rhythms: Toward new therapeutic perspectives. *Frontiers in Pediatrics*, *3*, 1.

Wild, K. S., Poliakoff, E., Jerrison, A., & Gowen, E. (2012). Goal-directed and goal-less imitation in autism spectrum disorder. *Journal of Autism and Developmental Disorders*, *42*, 1739–1749. doi:10.1007/s10803-011-1417-4

World Health Organization. (1992). *The ICD-10 Classification of Mental and Behavioural Disorders: Diagnostic Criteria for Research* (*Vol. 2*). Geneva, Switzerland: Author.

Yergeau, M. (2016). Occupying autism: Rhetoric, involuntarity, and the meaning of autistic lives. In P. Block, D. Kasnitz, A. Nishida, & N. Pollard (Eds.), *Occupying disability: Critical approaches to community, justice, and decolonizing disability* (pp. 83–95). Dordrecht, The Netherlands: Springer.

Policy Insights from the
Behavioral and Brain Sciences
2014, Vol. 1(1) 112–121
© The Author(s) 2014
DOI: 10.1177/2372732214548678
bbs.sagepub.com
SAGE

# False Confessions: Causes, Consequences, and Implications for Reform

**Saul M. Kassin**[1]

**Abstract**

In recent years, DNA exoneration cases have shed light on the problem of false confessions and the wrongful convictions that result. Drawing on basic psychological principles and methods, an extensive body of research has focused on the psychology of confessions. This article describes the processes of interrogation by which police assess whether a suspect is lying or telling the truth and the techniques used to elicit confessions from those deemed deceptive. The problem of false confessions emphasizes personal and situational factors that put innocent people at risk in the interrogation room. Turning from the causes of false confessions to their consequences, research shows that confession evidence can bias juries, judges, lay witnesses, and forensic examiners. Finally, empirically based proposals for the reform of policy and practice include a call for the mandatory video recording of interrogations, blind testing in forensic crime labs, and use of confession experts in court.

**Keywords**

police interrogation, false confessions, social pressure, wrongful convictions, confirmation biases

## Tweet

The psychology of interrogation reveals police techniques that can lead innocent people to confess, often producing wrongful convictions.

## Key Points

- False confessions undermine justice, causing innocent people to get convicted for crimes they did not commit.
- False confession risk increases for susceptible suspects (e.g., juveniles, people with cognitive impairments or mental health problems) through the use of certain interrogation tactics—even if lawful (e.g., lengthy isolation, lies about evidence, minimization tactics that imply leniency).
- Mandatory videotaping of interrogations is necessary to lessen wrongful convictions based on false confessions.

## Introduction

In the criminal justice system, confession evidence is common, persuasive, and so incriminating that, to quote one legal scholar, "the introduction of a confession makes the other aspects of a trial in court superfluous" (McCormick, 1972, p. 316). Confessions are not, however, infallible. Over the years, countless numbers of innocent people have been wrongfully convicted, imprisoned, and sometimes sentenced to death after confessing to crimes they did not commit. This phenomenon has long been recognized (Munsterberg, 1908), although the extent of the problem was unclear (e.g., Kassin & Wrightsman, 1985; *Miranda v. Arizona*, 1966). Then in 1992, the Innocence Project was founded to use new DNA technology for testing biological evidence in disputed convictions. At present, nearly 30% of more than 300 DNA exonerations have involved a false confession (www.innocenceproject.org/).

DNA exonerations represent only a fraction of all wrongful convictions. Confessions have proved false in other ways as well—as when it turns out that the confessed crime was never committed; when new evidence shows it was physically impossible for the confessor to have committed the crime; when the real perpetrator is captured; and when other non-DNA evidence establishes the confessor's innocence (Drizin & Leo, 2004). Contrary to the commonsense belief that people do not confess to crimes they did not commit, history exposes many such cases—not only in the United States but also elsewhere (see Kassin et al., 2010).

The study of confession evidence is conceptually grounded in psychological science. To understand why someone would confess to a crime he or she did not commit,

[1]City University of New York, NY, USA

**Corresponding Author:**
Saul M. Kassin, Department of Psychology, John Jay College of Criminal Justice, 524 W. 59 Street, New York, NY 10019, USA.
Email: skassin@jjay.cuny.edu

it is necessary to understand the effects of reward and punishment on behavior, human decision making, memory and forgetting, self-regulation, social influence, social perception, childhood and adolescence, personality, and psychopathology. A wide range of methodologies also informs the study of confessions. Individual and aggregated *case studies*, involving singular instances of proven false confessions, reveal that they occur with some frequency; share certain common features; and occur in some types of people and situations more than others. Other empirical methods include *naturalistic observations* of live and videotaped police interrogations; *archival records* that enable comparisons of actual confessions and other evidence; *self-report methods*, used to estimate the incidence of various interrogation tactics and false confessions within various populations; and *laboratory and field experiments* that assess pre-interrogation judgments of truth and deception, the effects of certain interrogation tactics on true and false confessions, and the impact of confession evidence on others in the system.

To fully understand confession evidence, one must understand the following: (a) the processes of police interrogation (i.e., initial interviews used to assess whether a suspect is lying or telling the truth, the presentation of *Miranda* warnings, and the techniques used to elicit admissions and confessions); (b) the problem of false confessions (i.e., personal characteristics of suspects who are vulnerable, the interrogation techniques that prove coercive, and the paradoxical role that innocence plays in the mind of the innocent suspect); and (c) the consequences of confessions once taken, even if false (i.e., effects on juries, judges, lay witnesses, and forensic examiners). These research literatures suggest empirically based proposals for reforming policy and practice in ways that will prevent false confessions and their adverse effects.

## Processes of Interrogation

*Criminal Interrogations and Confessions*, the cornerstone manual on interrogation (Inbau, Reid, Buckley, & Jayne, 2013), trains police in the two-step “Reid technique.” First, a neutral, information-gathering interview is conducted to determine whether the suspect is lying; then a multistep accusatory interrogation is designed to elicit a confession.

### *Phase 1: The Pre-Interrogation Interview*

When investigating crimes, police often identify suspects for interrogation, sometimes through witnesses, informants, or tangible evidence. Often, however, this identification derives from hunches formed during an interview. To assess whether a suspect is telling the truth, investigators conduct a preliminary interview in which they ask special “behavior-provoking” questions and observe the suspect’s verbal and nonverbal reactions, attending to cues such as eye contact, pauses, qualified denials, posture, and fidgeting. This judgment of truth or deception becomes a pivot point in an investigation, determining whether a suspect is released or interrogated. Inbau et al. (2013) claim that trained interrogators can judge truth and deception at exceedingly high levels of accuracy.

Can police, from training and experience, discriminate between truths and lies? Research laboratories all over the world have shown that laypersons on average are not adept at truth and lie detection; the behavioral cues touted by the Reid technique are faint and not diagnostic; training in general does not appreciably improve performance compared with naïve control groups; and so-called experts (police, judges, psychiatrists, customs inspectors) perform only slightly better, if at all (for reviews, see Bond & DePaulo, 2006; DePaulo et al., 2003; Vrij, 2008; Vrij, Granhag, & Porter, 2010).

Some have argued that basic research does not generalize because most laboratory-based studies involve college students randomly assigned to lie or tell the truth who are unmotivated by the low stakes of the situation (Buckley, 2012; O’Sullivan, Frank, Hurley, & Tiwana, 2009). Yet, a recent statistical analysis of studies across 144 samples containing 9,380 speakers, providing a total of 26,866 messages, and spanning more than 40 years refutes this claim. Across studies, deception detectability did not differ according to whether the speaker was a college student or non-student; whether the speaker’s motivation to evade detection was high or low; whether the truths and lies were accompanied by high or low levels of emotion; or whether they were told in a monologue, a social interaction, or a face-to-face interview (Hartwig & Bond, 2014).

Two studies specifically evaluated the Reid technique of lie detection, and the results are not impressive. In one, some participants but not others committed a mock crime and were incentivized to evade detection. All participants were then interviewed using the recommended protocol. Yet, responses to the behavior-provoking questions did not significantly distinguish between truth tellers and liars (Vrij, Mann, & Fisher, 2006). Similarly, no evidence supports the diagnostic value of the behavioral cues that investigators are trained to observe. In a test of this hypothesis, some participants, but not others, were randomly trained in using Reid’s “behavioral symptoms.” All participants then watched videotaped interviews of mock suspects—some who committed mock crimes, others who did not. All of them denied involvement. As in the typical layperson experiment, observers could not reliably differentiate between true and false denials. What is more, those who trained were significantly less accurate, more confident, and more biased toward seeing deception (Kassin & Fong, 1999). A follow-up study using these same taped interviews showed that experienced police detectives exhibited the same erroneous and biased responses. In short, police tend to prejudge guilt, with confidence, which is frequently in error (Meissner & Kassin, 2002).

### *Phase 2: The Nine-Step Interrogation*

During the early 20th century, American police often used “third-degree” methods of interrogation—inflicting physical

pain and discomfort to extract confessions (e.g., prolonged confinement and isolation; explicit threats of harm or punishment; deprivations of sleep, food, and other needs; extreme sensory discomfort; and physical violence). After the Supreme Court—as in *Brown v. Mississippi* (1936)—ruled inadmissible those confessions extracted by physical coercion, a psychological approach to interrogation developed that relied instead on trickery and deception (for an historical overview, see Leo, 2008). Specifically, this approach is designed to overcome the resistance of suspects presumed guilty. To achieve this goal, police isolate the suspect in a small, windowless room, a non-supportive environment that increases the incentive to escape. Next, a nine-step process combines positive and negative incentives using the tactics of "maximization" and "minimization" (Kamisar, 1963; Kassin, 1997; Starr, 2013).

Maximization tactics convey the interrogator's certain belief that the suspect is guilty and that denials will fail. Such tactics include making an accusation, interrupting denials, overriding objections, and citing evidence, real or manufactured, to shift the suspect's mental state from confident to hopeless. In contrast, minimization tactics are designed to provide the weakening suspect with moral justification and face-saving excuses for the crime in question. Using this approach, the interrogator offers sympathy and understanding, minimizes the crime, and offers the suspect motivation "themes"—for example, suggesting that a murder was spontaneous, provoked, peer-pressured, or accidental rather than the work of a cold-blooded premeditated killer. Finally, once a suspect is persuaded to admit guilt, the trained interrogator seeks to convert the admission into a full, detailed, narrative confession—on tape or in writing.

These techniques are commonly used. Observations of 182 live and videotaped interrogations at three California police departments revealed that detectives averaged 5.62 different techniques per interrogation, with Reid-like approaches particularly common (Leo, 1996). Similar practices are found in Canada (King & Snook, 2009) and juvenile interrogations in the United States. (Feld, 2013). In a survey, 631 North American police estimated their most frequent tactics, in order: Physically isolate the suspect, typically in a small private room; identify contradictions in the suspect's account; try to establish rapport to gain the suspect's trust; confront the suspect with evidence of guilt; and appeal to self-interests (Kassin et al., 2007).

## The Problem of False Confessions

DNA exonerations represent but a small fraction of all wrongful convictions. Although calculating a precise incidence rate is not possible, false confessions occur in different ways and for different reasons. Drawing on legal history and the social psychology of influence, researchers distinguish three types of false confession: voluntary, coerced-compliant, and coerced-internalized (Kassin & Wrightsman, 1985). This taxonomy has provided a useful framework for the study of false confessions (see, for example, Gudjonsson, 2003).

*Voluntary false confessions* arise when innocent people offer self-incriminating statements without pressure from police (often to protect someone else or to gain attention in high-profile crimes, as when 200 people confessed to the 1,932 kidnapping of Charles Lindbergh's baby son). Other false confessions are induced through a process of interrogation. *Coerced-compliant false confessions* occur when knowingly innocent people move from denial to confession as an act of behavioral compliance—to escape the stress of a harsh interrogation or because they are led to perceive that confession will prove less punishing than continued denial. In contrast, *coerced-internalized false confessions* occur when innocent people, subjected to misleading claims about the evidence, become confused, question their own innocence, infer their own guilt, and sometimes confabulate false memories to support that inference.

To understand and prevent this non-intuitive behavior, researchers try to identify risk factors present in vulnerable suspects and in the use of certain perilous interrogation tactics. In addition, research has examined the paradox that *innocence* may put *innocents* at risk.

### Personal Risk Factors

Some people resist influence more than others when confronted by authorities pressing for a confession. In particular, research has identified three strong sources of vulnerability: youth, intellectual disability, and psychological disorders—such as autism and attention-deficit/hyperactivity disorder (Gudjonsson, 2003).

Juveniles are notably vulnerable suspects (Owen-Kostelnik, Reppucci, & Meyer, 2006). Within a sample of 125 cases, youth under age 18 composed 32% of known false confessors (Drizin & Leo, 2004; National Registry of Exonerations reports a similar rate of 28%). In addition, juveniles are more likely than adults to be wrongfully convicted because of a false confession (Gross, Jacoby, Matheson, Montgomery, & Patel, 2005). Other types of research support these statistics. In a popular laboratory paradigm that urges innocent participants to confess to causing a computer crash, false confession rates varied with age: 78% among 12- to 13-year-olds, 72% among 15- to 16-year-olds, and 59% among young adults (Redlich & Goodman, 2003). Similar age differences were found in responses to hypothetical vignettes (Goldstein, Condie, Kalbeitzer, Osman, & Geier, 2003). High self-reported rates of false confessions to actual crimes are also found among adolescents throughout Europe (Gudjonsson, Sigurdsson, & Sigfusdottir, 2009) and in the United States (Malloy, Shulman, & Cauffman, 2014).

Developmental neuroscience research sheds light on why juveniles are malleable and at risk: Children's brains are not fully formed until young adulthood (National Institute of

Mental Health, 2001). With the adolescent brain being a work in progress, juveniles exhibit *immaturity of judgment*, focusing myopically—as adults often do (Madon, Yang, Smalarz, Guyll, & Scherr, 2013)—on short-term gains and losses rather than on the longer-term consequences of their actions (Cauffman & Steinberg, 2000). This tendency is manifested in a lack of impulse control, inability to delay gratification, and the discounting of delayed rewards—all abetting false confession as an expedient way of a difficult situation.

### *Situational Risk Factors*

Two structural aspects of a typical police interrogation are notable. First, interrogation is by definition a guilt-presumptive social interaction led by an authority figure who has formed a strong belief about the suspect and who single-mindedly measures success by confession. The guilt-presumption that marks the start of interrogation thus provides fertile ground for the operation of cognitive and behavioral confirmation biases. In an experiment that demonstrated the point, some participants, but not others, committed a mock crime. Then all were questioned by interrogators, who by random assignment were induced presumed guilt or innocence. Interrogators who presumed guilt asked more incriminating questions, conducted more coercive interrogations, and tried harder to get the suspect to confess. In turn, this more aggressive style made the suspects sound defensive and led observers who later heard the tapes to judge them guilty, even when innocent (Kassin, Goldstein, & Savitsky, 2003; for replications, see Hill, Memon, & McGeorge, 2008; Narchet, Meissner, & Russano, 2011).

The second striking feature of interrogation concerns the "Milgram-like" nature of the process itself. In the first of his classic obedience experiments, Milgram (1963) found that 65% of participants obeyed an experimenter's commands to deliver increasingly painful electric shocks to a confederate—up to 450 V (for reviews, see Blass, 2004; Milgram, 1974). The parallels between police interrogations and these experiments are striking. In both, the subject is isolated—without access to friends, family, or other means of social support. In both, the subject encounters an authority figure—a psychology experimenter or a detective. In both, the subject then engages a contract-like agreement to proceed—volunteering and receiving payment in Milgram's paradigm; signing a waiver of *Miranda* rights in the interrogation setting. In both situations, the authority figure uses deception to reframe the subject's actions and makes a series of unwavering demands. Milgram used four scripted prompts; Reid-trained interrogators use nine steps. In both, full obedience is achieved through the elicitation of gradually escalating acts of compliance, culminating in 450 V in Milgram—and, of course, a full confession in a police interrogation.

Shifting from a macro-level analysis of interrogation to a micro-level analysis, three specific risk factors can lead innocent people to confess. The first concerns physical custody and interrogation time. Observational studies in the United States show most interrogations lasting from 30 min to 2 hr (Feld, 2013; Leo, 1996). In a survey, 631 North American police estimated the average interrogation as 1.60 hr and their longest lasting an average of 4.21 hr (Kassin et al., 2007). Yet, cases involving false confessions contrast sharply with these norms. In 125 proven false confessions, 34% of interrogations lasted 6 to 12 hr, 39% lasted 12 to 24 hr, and the average length was 16.3 hr (Drizin & Leo, 2004).

People understandably capitulate after lengthy interrogations. The needs for belonging and affiliation, especially in times of stress, comprise a fundamental human motive (Baumeister & Leary, 1996). People under stress seek out others for the psychological and physiological benefits that social support provides. Prolonged isolation is thus a form of deprivation. Depending on interrogation length and conditions, sleep deprivation may also become relevant. Sleep deprivation can lower people's resistance to influence and impair sustained attention, flexibility of thinking, suggestibility in response to leading questions, and complex decision making (Blagrove, 1996). One recent study has linked sleep deprivation to false and distorted memories (Frenda, Patihis, Loftus, Lewis, & Fenn, 2014). Hence, researchers have concluded that sleep deprivation strongly impairs human functioning (Harrison & Horne, 2000; Pilcher & Huffcutt, 1996).

A second interrogation tactic that can lead innocent people to confess is presenting false evidence. In convincing suspects that denial is futile, American police are permitted by law to lie about the presence of incriminating evidence (e.g., a fingerprint, hair sample, eyewitness identification, or failed polygraph)—even if that evidence does not exist. Yet, research warns of the risk. Two types of evidence support this conclusion. First, numerous proven false confession cases have featured the false evidence ploy. In one illustrative case, 17-year-old Marty Tankleff was accused of murdering his parents despite a complete absence of evidence. Tankleff denied the accusation for several hours. Then, his interrogator told him that his hair was found on his mother; that forensic testing indicated that he had showered, washing off blood; and that his hospitalized father had emerged from his coma to identify Marty as his assailant (in fact, his father never regained consciousness). Tankleff became disoriented and confessed. Although he quickly came to his senses and retracted the confession, Tankleff was convicted and spent 18 years in prison until his conviction was vacated and he was set free (Firstman & Salpeter, 2008).

Controlled experiments clearly indicate that false evidence increases false confessions. In the first of these studies, participants were accused of hitting a forbidden computer key during a typing task and crashing a computer (Kassin & Kiechel, 1996). A confederate eyewitness confronted some participants, but not others, claiming to have seen the participant hit the key. Despite their innocence and initial denials,

participants were then asked to sign a confession and queried to determine whether they also believed in their own culpability. The effects were striking: The presentation of false evidence nearly doubled the number of students who signed a confession and internalized belief in their guilt.

Follow-up studies have replicated these basic effects—to the extent that the alleged transgression was plausible (Horselenberg et al., 2006), even when participants were told that confession would bear a financial or other consequence (Horselenberg, Merckelbach, & Josephs, 2003; Redlich & Goodman, 2003), and even among informants pressured to report on a confession supposedly made by another person (Swanner, Beike, & Cole, 2010). Using a different paradigm, Nash and Wade (2009) used digital editing software to fabricate video evidence of participants in a computerized gambling experiment "stealing" money from the "bank" during a losing round. Presented with this false evidence, all participants confessed and most internalized the confession (see also Wright, Wade, & Watson, 2013).

A third situational risk factor concerns minimization. In addition to confrontation, trained interrogators minimize the crime through "theme development" offering the suspect moral justification and face-saving excuses, suggesting their actions were spontaneous, accidental, provoked, or otherwise attributable to external factors. These themes are used to lessen the anxiety associated with confession and do so by implying leniency in punishment. To demonstrate, participants in one study read a transcript of a murder suspect's interrogation (Kassin & McNall, 1991). Three versions of the transcript were produced, where the detective (a) explicitly promised leniency in exchange for confession, (b) used the technique of minimization, or (c) used no special technique. After reading one of these versions, participants estimated the sentence that they thought would be imposed on the suspect. The result is as follows: As if explicit promises had been made, minimization lowered sentencing expectations relative to the control condition.

A laboratory paradigm was then used to assess the behavioral effects of minimization (Russano, Meissner, Narchet, & Kassin, 2005). Participants, paired with a confederate for a problem-solving study, were directed to work alone on some problems and jointly on others. In the guilty condition, the confederate asked for help on a solo problem, inducing a "crime." In the innocent condition, the confederate did not make this request. The experimenter soon alleged too much similarity in their solutions, separated them, and accused the participant of cheating—a possible violation of the university honor code. To get the participant to sign a confession, the experimenter made an explicit promise of leniency, made minimizing remarks, used both tactics, or used no tactics. Overall, the confession rate was higher among guilty participants, when leniency was promised, and when minimization was used. In short, minimization statements may not communicate an explicit offer of leniency, but they nevertheless lead people to act on the inference that leniency will follow from confession.

### *Does Innocence Put Innocents at Risk?*

Anecdotal evidence from wrongful conviction cases suggests that innocence is accompanied by a mental state that can increase the risk of false confession (Kassin, 2005). Innocent people naively believe that truth and justice will prevail. Hence, innocent participants in a mock crime experiment were more likely than perpetrators to waive their *Miranda* rights even to an officer who was accusatory, hostile, and closed-minded (Kassin & Norwick, 2004; also see Moore & Gagnier, 2008). Innocent people are generally open, rather than strategic in their interactions with police (Hartwig, Granhag, Strömwall, & Vrij, 2005); they offer up alibis freely, without regard for the fact that police may view these with suspicion (Olson & Charman, 2012); and they become less physiologically aroused by the stress of interrogation (Guyll et al., 2013). The reassurance that accompanies innocence may stem from a generalized "belief in a just world," where people get what they deserve and deserve what they get (Lerner, 1980), and by an "illusion of transparency" by which we overestimate the extent to which our inner states—in this case, innocence—are known to others (Gilovich, Savitsky, & Medvec, 1998).

Feeling reassured can have unintended consequences for the innocent suspect who is interrogated. Interrogators often use an apparently benign bluff technique, pretending to have evidence, without asserting outright that it implicates the suspect (e.g., stating that biological evidence was sent to a laboratory for testing). Underlying the bluff is the theory that perpetrators will fear the inevitability of detection, succumb, and confess; not fearing that alleged evidence, innocents should not succumb and confess. Yet, in two experiments, innocent participants were substantially more likely to confess to pressing a forbidden key, causing a computer to crash, when told that their keystrokes had been recorded for later review. In a third experiment, they were more likely to confess to willful cheating when told that a surveillance camera had taped their session. In both sets of studies, innocent participants explained that the bluff implied future exoneration—which, paradoxically, made it easier to confess (Perillo & Kassin, 2011).

## The Power of Confession Evidence

Inevitably, some innocent people will be targeted for suspicion and harshly interrogated, and will waive their rights and confess. Arguably, tragedy could be avoided if the resulting false confessions were detected by authorities and corrected. However, the combination of wrongful convictions and empirical research casts doubt as to the efficacy of this presumed safety net.

The problem begins with the fact that people are not accurate judges of confessions. In a study that assessed the commonsense belief that "I'd know a false confession if I saw one," male prison inmates took part in a pair of videotaped interviews. Each inmate gave two statements: a true narrative confession to the crime for which he was incarcerated and a newly concocted false confession to a crime, identified by the experimenter, that he did not commit (Kassin, Meissner, & Norwick, 2005). Through his procedure, videotapes were compiled of 10 inmates, each giving a true or false confession to one of five crimes. College students and police investigators judged these statements and the results paralleled those described earlier for judgments of true and false denials. Neither group exhibited much accuracy; the police were more confident in their performance (this result was replicated for juvenile offenders; Honts, Kassin, & Craig, 2014).

## *Persuasive Confessions in the Courtroom*

Research on the impact of confessions at trial has highlighted the persuasive power of this evidence. Mock jury studies have shown that confessions have a more incriminating effect than other potent forms of evidence (Kassin & Neumann, 1997) and that people do not fully discount confessions, even when they see those confessions as coerced and even when it is legally and logically appropriate to do so (e.g., Kassin & Wrightsman, 1980; Neuschatz, Lawson, Swanner, Meissner, & Neuschatz, 2008).

In a mock jury experiment that illustrates the impact of confessions, participants were presented with one of three versions of a murder trial transcript (Kassin & Sukel, 1997). In a low-pressure version, the defendant confessed to police immediately on questioning. In a high-pressure version, the defendant was interrogated aggressively for a long period of time. A control version contained no confession in evidence. In the high-pressure condition, participants reasonably perceived the confession to be involuntary and said that it did not influence their verdicts. Yet, this confession significantly increased the conviction rate. This precise pattern of results—that high-pressure confessions seen as coerced still boost the rate of guilty verdicts—recently replicated in an experiment involving 132 experienced judges (Wallace & Kassin, 2012). These findings bring to life Drizin and Leo's (2004) description of confessions as "inherently prejudicial and highly damaging to a defendant, even if it is the product of coercive interrogation, even if it is supported by no other evidence, and even if it is ultimately proven false beyond any reasonable doubt" (p. 959).

There are two reasons why confessions overwhelm judges and juries (Kassin, 2012). First, false confession seems implausible to the average person as a matter of *common sense*. Although people recognize the coerciveness of certain interrogation tactics, they do not perceive an accompanying risk of false confession or the factors that would increase it (Blandon-Gitlin, Sperry, & Leo, 2010; Henkel, Coffman, & Dailey, 2008; Leo & Liu, 2009). The second reason is that false confessions typically contain not only an admission of guilt but also numerous *content cues* commonly associated with truth telling. In an analyzed sample of 38 proven false confessions, most contained accurate details about the crime that police had communicated to the suspect, inadvertently or purposefully, through the process of interrogation (Garrett, 2010). Moreover, a content analysis of 20 false confessions showed that besides containing visual and auditory details that formed a story of what each suspect allegedly did, many included statements of motivation, assertions of voluntariness, hand-drawn sketches, and apologies and expressions of remorse (Appleby, Hasel, & Kassin, 2013).

## *Do Confessions Corrupt Other Evidence?*

Basic research in social cognition suggests a second troubling mechanism by which confessions exert influence: by tainting the perceptions of eyewitnesses, alibis, forensic examiners, and others who are supposed to contribute independent evidence to the courts. This results in the operation of *forensic confirmation biases* (Kassin, Dror, & Kukucka, 2013).

It is clear that expectations color an individual's subsequent perceptions and behaviors in a self-perpetuating cycle (Nickerson, 1998). The effects on laypersons can prove substantial. In a study involving eyewitnesses, participants witnessed a staged theft and then made an identification decision from a target-absent lineup. Two days later, they received additional information and an opportunity to change their decision. When told that another suspect had confessed, 61% of the participants changed their initial decision and identified the suspect who had allegedly confessed. Those told that the identified individual had confessed became more confident in their decision. Among participants who had correctly indicated that the culprit was not present in the original lineup, nearly half went on to identify an innocent person after being told that someone had confessed (Hasel & Kassin, 2009). A similar effect recently appeared in a study of alibis who had vouched for a participant accused of theft—until that participant was said to have confessed (Marion, Kukucka, Collins, Kassin, & Burke, 2014).

Knowing that a suspect has confessed, a powerfully incriminating fact, can also corrupt contemporaneous judgments—such as lay people's perceptions of whether degraded speech recordings betray incriminating remarks (Lange, Thomas, Dana, & Dawes, 2011), whether a suspect's handwriting sample is similar to that appearing in a bank robbery note (Kukucka & Kassin, 2014), whether polygraph examiners interpret ambiguous physiological charts as indicating deception (Elaad, Ginton, & Ben-Shakhar, 1994), and whether latent fingerprint experts judge two samples as a match or not (Dror & Charlton, 2006). Even the interpretation of complex DNA mixtures is subject to contextual bias (Dror & Hampikian, 2011).

The biasing effect of confessions is not a mere laboratory phenomenon. An analysis of the first 241 DNA exonerations tested whether confessions prompt additional evidentiary errors, by examining other contributing factors present in DNA exoneration cases containing a false confession (Kassin, Bogart, & Kerner, 2012). Additional errors were present in 78% of these cases—significantly more than in non-confession cases. Specifically, false confessions were accompanied by invalid or improper forensic science (63%), mistaken eyewitness identifications (29%), and snitches or informants (19%). Consistent with the causal hypothesis that the false confessions influenced these other errors, the confession was obtained first rather than later in the investigation in two thirds of these cases. To sum up, by creating a strong expectation of guilt, confessions can taint the perceptions, memories, and judgments of lay and expert witnesses, thereby creating an illusion of corroboration for the confession itself.

## Implications for Reform

The research reviewed in this article compels proposals for reform designed to protect vulnerable suspect populations and to ban or limit the use of coercive interrogation practices. The most important safeguard, however, is to require the video recording of all suspect interviews and interrogations—the entire process, not just the confession. This was the primary recommendation in a recent White Paper: "Without equivocation, our most essential recommendation is to lift the veil of secrecy from the interrogation process in favor of the principle of transparency" (Kassin et al., 2010).

The process of reform is underway. A growing number of states, up to 17, now require the recording of interrogations in major felony investigations. In a marked departure from past practice, the U.S. Justice Department recently announced that the FBI and other federal law enforcement agencies would also be required to videotape interrogations in their entirety (Schmidt, 2014). Interviews with police detectives who adopted the practice have shown that the reaction has been uniformly favorable (Sullivan, 2004; Sullivan, Vail, & Anderson, 2008). However, what are the actual effects on behavior?

Two sets of benefits should follow from video recording. First, it will increase accountability among police and thereby, deter their use of particularly coercive interrogation tactics. This effect recently appeared in a mock crime and investigation field study involving experienced officers from a midsized police department (Kassin, Kukucka, Lawson, & DeCarlo, 2014). The second benefit comes from providing an accurate factual record for judges and juries to assess the voluntariness and credibility of confessions presented in court. In this regard, not only must entire sessions be recorded, but the camera must adopt a neutral "equal focus" perspective that shows both the accused and his or her interrogators. In several studies, mock interrogations were taped from three different camera angles so that the suspect, the interrogator, or both were visible. Consistently, participants who see the equal-focus perspective render more informed attributions of voluntariness and guilt, making them better fact finders (Lassiter, Diamond, Schmidt, & Elek, 2007; Lassiter, Geers, Handley, Weiland, & Munhall, 2002).

Finally, it is important to note that although video recording is an important step to deter false confessions, two additional measures should be taken to slow the rippling effects of these confessions once produced. The first problem concerns the empirical fact that confessions can corrupt other evidence from lay witnesses and experts alike. The simplest way to protect against this bias is to ensure that eyewitnesses and crime-lab examiners are "blind" as to the presence or absence of a confession (Kassin et al., 2013; Saks, Risinger, Rosenthal, & Thompson, 2003). A second means of protection concerns the use of expert testimony at trial. Current research can inform the courts about vulnerable suspects and perilous interrogation techniques. Over the years, however, U.S. courts have varied in their willingness to admit such testimony. Yet in several recent briefs submitted to state supreme courts (e.g., *People of New York v. Thomas*, 2013), the American Psychological Association (APA) has concluded from existing research that judges and juries have difficulty assessing confession evidence, that the phenomenon of false confession is counterintuitive, that the science concerning risk factors is reliable, and that psychological experts would assist the triers of fact.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

### References

Appleby, S. C., Hasel, L. E., & Kassin, S. M. (2013). Police-induced confessions: An empirical analysis of their content and impact. *Psychology, Crime & Law*, *19*, 111-128.

Baumeister, R. F., & Leary, M. R. (1996). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. *Psychological Bulletin*, *117*, 497-529.

Blagrove, M. (1996). Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied*, *2*, 48-59.

Blandon-Gitlin, I., Sperry, K., & Leo, R. A. (2010). Jurors believe interrogation tactics are not likely to elicit false confessions: Will expert witness testimony inform them otherwise? *Psychology, Crime & Law*, *17*, 239-260.

Blass, T. (2004). *The man who shocked the world*. New York, NY: Basic Books.

Bond, C. F., Jr., & DePaulo, B. M. (2006). Accuracy of deception judgments. *Personality and Social Psychology Review*, *10*, 214-234.

Brief for the American Psychological Association as Amici Supporting Appellant, *People of the State of New York v. Adrian Thomas*, (2013).

Brown v. Mississippi, 297 U.S. 278. (1936).

Buckley, J. P. (2012). Detection of deception researchers need to collaborate with experienced practitioners. *Journal of Applied Research in Memory and Cognition*, *1*, 126-127.

Cauffman, E., & Steinberg, L. (2000). (Im)maturity of judgment in adolescence: Why adolescents are less culpable than adults. *Behavioral Sciences & the Law*, *18*, 741-760.

DePaulo, B. M., Lindsay, J. J., Malone, B. E., Muhlenbruck, L., Charlton, K., & Cooper, H. (2003). Cues to deception. *Psychological Bulletin*, *129*, 74-112.

Drizin, S. A., & Leo, R. A. (2004). The problem of false confessions in the post-DNA world. *North Carolina Law Review*, *82*, 891-1007.

Dror, I. E., & Charlton, D. (2006). Why experts make errors. *Journal of Forensic Identification*, *56*, 600-616.

Dror, I. E., & Hampikian, G. (2011). Subjectivity and bias in forensic DNA mixture interpretation. *Science & Justice*, *51*, 204-208.

Elaad, E., Ginton, A., & Ben-Shakhar, G. (1994).The effects of prior expectations and outcome knowledge on polygraph examiners' decisions. *Journal of Behavioral Decision Making*, *7*, 279-292.

Feld, B. C. (2013). *Kids, cops, and confessions: Inside the interrogation room*. New York: New York University Press.

Firstman, R., & Salpeter, J. (2008). *A criminal injustice: A true crime, a false confession, and the fight to free Marty Tankleff*. New York: Ballantine Books.

Frenda, S. J., Patihis, L., Loftus, E. F., Lewis, H. C., & Fenn, K. M. (2014). Sleep deprivation and false memories. *Psychological Science*. Advance online publication. doi:10.1177/0956797614534694

Garrett, B. L. (2010). The substance of false confessions. *Stanford Law Review*, *62*, 1051-1119.

Gilovich, T., Savitsky, K., & Medvec, V. (1998). The illusion of transparency: Biased assessments of others' ability to read one's emotional states. *Journal of Personality and Social Psychology*, *75*, 332-346.

Goldstein, N. E. S., Condie, L. O., Kalbeitzer, R., Osman, D., & Geier, J. L. (2003). Juvenile offenders' Miranda rights comprehension and self-reported likelihood of offering false confessions. *Assessment*, *10*, 359-369.

Gross, S. R., Jacoby, K., Matheson, D. J., Montgomery, N., & Patel, S. (2005). Exonerations in the U.S. 1989 through 2003. *Journal of Criminal Law and Criminology*, *95*, 523-553.

Gudjonsson, G. H. (2003). *The psychology of interrogations and confessions: A handbook*. Chichester, UK: John Wiley.

Gudjonsson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D. (2009). Interrogation and false confessions among adolescents in seven European countries: What background and psychological variables best discriminate between false confessors and non-false confessors? *Psychology, Crime & Law*, *15*, 711-728.

Guyll, M., Madon, S., Yang, Y., Lannin, D. G., Scherr, K., & Greathouse, S. (2013). Innocence and resisting confession during interrogation: Effects on physiologic activity. *Law and Human Behavior*, *37*, 366-375.

Harrison, Y., & Horne, J. A. (2000). The impact of sleep deprivation on decision making: A review. *Journal of Experimental Psychology: Applied*, *6*, 236-249.

Hartwig, M., & Bond, C. F., Jr. (2014). Lie detection from multiple cues: A meta-analysis. *Applied Cognitive Psychology*. Advance online publication. doi:10.1002/acp.3052

Hartwig, M., Granhag, P. A., Strömwall, L., & Vrij, A. (2005). Detecting deception via strategic closure of evidence. *Law and Human Behavior*, *29*, 469-484.

Hasel, L. E., & Kassin, S. M. (2009). On the presumption of evidentiary independence: Can confessions corrupt eyewitness identifications? *Psychological Science*, *20*, 122-126.

Henkel, L. A., Coffman, K. A. J., & Dailey, E. M. (2008).A survey of people's attitudes and beliefs about false confessions. *Behavioral Sciences & the Law*, *26*, 555-584.

Hill, C., Memon, A., & McGeorge, P. (2008). The role of confirmation bias in suspect interviews: A systematic evaluation. *Legal & Criminological Psychology*, *13*, 357-371.

Honts, C. R., Kassin, S. M., & Craig, R. (2014). "I'd know a false confession if I saw one": A constructive replication with juveniles. *Psychology, Crime & Law*, *20*, 695-704.

Horselenberg, R., Merckelbach, H., & Josephs, S. (2003). Individual differences and false confessions: A conceptual replication of Kassin and Kiechel (1996). *Psychology, Crime & Law*, *9*, 1-8.

Horselenberg, R., Merckelbach, H., Smeets, T., Franssens, D., Peters, G., & Zeles, G. (2006). False confessions in the lab: Do plausibility and consequences matter? *Psychology, Crime & Law*, *12*, 61-75.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2013). *Criminal interrogation and confessions* (5th ed.). Burlington, MA: Jones & Bartlett Learning.

Kamisar, Y. (1963). What is an "involuntary" confession? Some comments on Inbau and Reid's criminal interrogation and confessions. *Rutgers Law Review*, *17*, 728-732.

Kassin, S. M. (1997). The psychology of confession evidence. *American Psychologist*, *52*, 221-233.

Kassin, S. M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American Psychologist*, *60*, 215-228.

Kassin, S. M. (2012). Why confessions trump innocence. *American Psychologist*, *67*, 431-445.

Kassin, S. M., Bogart, D., & Kerner, J. (2012). Confessions that corrupt: Evidence from the DNA exoneration case files. *Psychological Science*, *23*, 41-45.

Kassin, S. M., Drizin, S. A., Grisso, T., Gudjonsson, G. H., Leo, R. A., & Redlich, A. D. (2010). Police-induced confessions: Risk factors and recommendations (Official White Paper of the American Psychology–Law Society). *Law and Human Behavior*, *34*, 3-38.

Kassin, S. M., Dror, I., & Kukucka, J. (2013). The forensic confirmation bias: Problems, perspectives, and proposed solutions. *Journal of Applied Research in Memory and Cognition*, *2*, 42-52.

Kassin, S. M., & Fong, C. T. (1999). "I'm innocent!": Effects of training on judgments of truth and deception in the interrogation room. *Law and Human Behavior*, *23*, 499-516.

Kassin, S. M., Goldstein, C. C., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior*, *27*, 187-203.

Kassin, S. M., & Kiechel, K. L. (1996). The social psychology of false confessions: Compliance, internalization, and confabulation. *Psychological Science*, *7*, 125-128.

Kassin, S. M., Kukucka, J., Lawson, V. Z., & DeCarlo, J. (2014). Does video recording alter the behavior of police during

interrogation? A mock crime-and-investigation study. *Law and Human Behavior*, *38*, 73-83.

Kassin, S. M., Leo, R. A., Meissner, C. A., Richman, K. D., Colwell, L. H., Leach, A-M., & La Fon, D. (2007). Police interviewing and interrogation: A self-report survey of police practices and beliefs. *Law and Human Behavior*, *31*, 381-400.

Kassin, S. M., & McNall, K. (1991). Police interrogations and confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior*, *15*, 233-251.

Kassin, S. M., Meissner, C. A., & Norwick, R. J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior*, *29*, 211-227.

Kassin, S. M., & Neumann, K. (1997). On the power of confession evidence: An experimental test of the "fundamental difference" hypothesis. *Law and Human Behavior*, *21*, 469-484.

Kassin, S. M., & Norwick, R. (2004). Why people waive their Miranda rights: The power of innocence. *Law and Human Behavior*, *28*, 211-221.

Kassin, S. M., & Sukel, H. (1997). Coerced confessions and the jury: An experimental test of the harmless error rule. *Law and Human Behavior*, *21*, 27-46.

Kassin, S. M., & Wrightsman, L. S. (1980). Prior confessions and mock juror verdicts. *Journal of Applied Social Psychology*, *10*, 133-146.

Kassin, S. M., & Wrightsman, L. S. (1985). Confession evidence. In S. Kassin & L. Wrightsman (Eds.), *The psychology of evidence and trial procedure* (pp. 67-94). Beverly Hills, CA: SAGE.

King, L., & Snook, B. (2009). Peering inside a Canadian interrogation room: An examination of the Reid model of interrogation, influence tactics, and coercive strategies. *Criminal Justice and Behavior*, *36*, 674-694.

Kukucka, J., & Kassin, S. M. (2014). Do confessions taint perceptions of handwriting evidence? An empirical test of the forensic confirmation bias. *Law and Human Behavior*, *38*, 256-270.

Lange, N. D., Thomas, R. P., Dana, J., & Dawes, R. M. (2011). Contextual biases in the interpretation of auditory evidence. *Law and Human Behavior*, *35*, 178-187.

Lassiter, G. D., Diamond, S. S., Schmidt, H. C., & Elek, J. K. (2007). Evaluating videotaped confessions: Expertise provides no defense against the camera-perspective effect. *Psychological Science*, *18*, 224-226.

Lassiter, G. D., Geers, A. L., Handley, I. M., Weiland, P. E., & Munhall, P. J. (2002). Videotaped confessions and interrogations: A change in camera perspective alters verdicts in simulated trials. *Journal of Applied Psychology*, *87*, 867-874.

Leo, R. A. (1996). Inside the interrogation room. *Journal of Criminal Law and Criminology*, *86*, 266-303.

Leo, R. A. (2008). *Police interrogation and American justice*. Cambridge, MA: Harvard University Press.

Leo, R. A., & Liu, B. (2009). What do potential jurors know about police interrogation techniques and false confessions? *Behavioral Sciences & the Law*, *27*, 381-399.

Lerner, M. J. (1980). *The belief in a just world*. New York, NY: Plenum.

Madon, S., Yang, Y., Smalarz, L., Guyll, M., & Scherr, K. C. (2013). How factors present during the immediate interrogation situation produce short-sighted confession decisions. *Law and Human Behavior*, *37*, 60-74.

Malloy, L. C., Shulman, E. P., & Cauffman, E. (2014). Interrogations, confessions, and guilty pleas among serious adolescent offenders. *Law and Human Behavior*, *38*, 181-193.

Marion, S., Kukucka, J., Collins, C., Kassin, S., & Burke, T. (2014, March). *Recanted corroborations: The impact of confessions on alibi evidence*. Poster presented at the Meeting of the Association for Psychological Science, San Francisco, CA.

McCormick, C. T. (1972). *Handbook of the law of evidence* (2nd ed.). Saint Paul, MN: West.

Meissner, C. A., & Kassin, S. M. (2002). "He's guilty!": Investigator bias in judgments of truth and deception. *Law and Human Behavior*, *26*, 469-480.

Milgram, S. (1963). Behavioral study of obedience. *Journal of Abnormal and Social Psychology*, *67*, 371-378.

Milgram, S. (1974). *Obedience to authority: An experimental view*. New York, NY: Harper & Row.

Miranda v. Arizona, 384 U.S. 436 (1966).

Moore, T. E., & Gagnier, K. (2008). "You can talk if you want to": Is the police caution on the right to silence comprehensible? *Criminal Reports*, *5*, 233-249.

Munsterberg, H. (1908). *On the witness stand*. Garden City, NY: Doubleday.

Narchet, F. M., Meissner, C. A., & Russano, M. B. (2011). Modeling the influence of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior*, *35*, 452-465.

Nash, R. A., & Wade, K. A. (2009). Innocent but proven guilty: Using false video evidence to elicit false confessions and create false beliefs. *Applied Cognitive Psychology*, *23*, 624-637.

National Institute of Mental Health (2001). Teenage brain: A work in progress (NIH Publ. No. 01-4929).

Neuschatz, J. S., Lawson, D. S., Swanner, J. K., Meissner, C. A., & Neuschatz, J. S. (2008). The effects of accomplice witnesses and jailhouse informants on jury decision making. *Law and Human Behavior*, *32*, 137-149.

Nickerson, R. S. (1998). Confirmation bias: A ubiquitous phenomenon in many guises. *Review of General Psychology*, *2*, 175-220.

Olson, E. A., & Charman, S. D. (2012). "But can you prove it?" Examining the quality of innocent suspects' alibis. *Psychology, Crime & Law*, *18*, 453-471.

O'Sullivan, M., Frank, M. G., Hurley, C. M., & Tiwana, J. (2009). Police lie detection accuracy: The effect of lie scenario. *Law and Human Behavior*, *33*, 530-538.

Owen-Kostelnik, J., Reppucci, N. D., & Meyer, J. D. (2006). Testimony and interrogation of minors: Assumptions about maturity and morality. *American Psychologist*, *61*, 286-304.

Perillo, J. T., & Kassin, S. M. (2011). Inside interrogation: The lie, the bluff, and false confessions. *Law and Human Behavior*, *35*, 327-337.

Pilcher, J. J., & Huffcut, A. (1996). Effects of sleep deprivation on performance: A meta-analysis. *Sleep*, *19*, 318-326.

Redlich, A. D., & Goodman, G. S. (2003). Taking responsibility for an act not committed: Influence of age and suggestibility. *Law and Human Behavior*, *27*, 141-156.

Russano, M. B., Meissner, C. A., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science*, *16*, 481-486.

Saks, M. J., Risinger, D. M., Rosenthal, R., & Thompson, W. C. (2003). Context effects in forensic science: A review and application of the science of science to crime laboratory practice in the United States. *Science & Justice*, *43*, 77-90.

Schmidt, M. S. (2014, May 22). In policy change, justice dept. to require recording of interrogations. *The New York Times*. Retrieved from http://www.nytimes.com/2014/05/23/us/politics/justice-dept-to-reverse-ban-on-recording-interrogations.html

Starr, D. (2013, December 9). The interview. *The New Yorker*, pp. 42-49.

Sullivan, T. P. (2004). *Police experiences with recording custodial interrogations*. Chicago, IL: Center on Wrongful Convictions, Northwestern University Law School.

Sullivan, T. P., Vail, A. W., & Anderson, H. W. (2008).The case for recording police interrogation. *Litigation*, *34*, 1-8.

Swanner, J. K., Beike, D., & Cole, A. (2010). Snitching, lies, and computer crashes: An experimental test of secondary confessions. *Law and Human Behavior*, *34*, 53-65.

Vrij, A. (2008). *Detecting lies and deceit: Pitfalls and opportunities*. Chichester, UK: John Wiley.

Vrij, A., Granhag, P. A., & Porter, S. (2010). Pitfalls and opportunities in nonverbal and verbal lie detection. *Psychological Science in the Public Interest*, *11*, 89-121.

Vrij, A., Mann, S., & Fisher, R. P. (2006). An empirical test of the behaviour analysis interview. *Law and Human Behavior*, *30*, 329-345.

Wallace, D. B., & Kassin, S. M. (2012). Harmless error analysis: How do judges respond to confession errors? *Law and Human Behavior*, *36*, 151-157.

Wright, D. S., Wade, K. A., & Watson, D. G. (2013). Delay and déjà vu: Timing and repetition increase the power of false evidence. *Psychonomic Bulletin & Review*, *20*, 812-818.

Law Hum Behav (2010) 34:3–38
DOI 10.1007/s10979-009-9188-6

ORIGINAL ARTICLE

# Police-Induced Confessions: Risk Factors and Recommendations

**Saul M. Kassin · Steven A. Drizin · Thomas Grisso · Gisli H. Gudjonsson · Richard A. Leo · Allison D. Redlich**

Published online: 15 July 2009
© American Psychology-Law Society/Division 41 of the American Psychological Association 2009

**Abstract** Recent DNA exonerations have shed light on the problem that people sometimes confess to crimes they did not commit. Drawing on police practices, laws concerning the admissibility of confession evidence, core principles of psychology, and forensic studies involving multiple methodologies, this White Paper summarizes what is known about police-induced confessions. In this review, we identify suspect characteristics (e.g., adolescence; intellectual disability; mental illness; and certain personality traits), interrogation tactics (e.g., excessive interrogation time; presentations of false evidence; and minimization), and the phenomenology of innocence (e.g., the tendency to waive *Miranda* rights) that influence confessions as well as their effects on judges and juries. This article concludes with a strong recommendation for the mandatory electronic recording of interrogations and considers other possibilities for the reform of interrogation practices and the protection of vulnerable suspect populations.

**Keywords** Police interviews · Interrogations · Confessions

S. M. Kassin (✉)
John Jay College of Criminal Justice, City University of New York, New York, NY, USA
e-mail: skassin@jjay.cuny.edu

S. A. Drizin
Northwestern University School of Law and Center on Wrongful Convictions, Chicago, IL, USA

T. Grisso
University of Massachusetts Medical School, Worcester, MA, USA

G. H. Gudjonsson
Institute of Psychiatry, King's College, London, UK

R. A. Leo
University of San Francisco School of Law, San Francisco, CA, USA

A. D. Redlich
State University of New York at Albany, Albany, NY, USA

In recent years, a disturbing number of high-profile cases, such as the Central Park jogger case, have surfaced involving innocent people who had confessed and were convicted at trial, only later to be exonerated (Drizin & Leo, 2004; Gudjonsson, 1992, 2003; Kassin, 1997; Kassin & Gudjonsson, 2004; Lassiter, 2004; Leo & Ofshe, 1998). Although the precise incidence rate is not known, research suggests that false confessions and admissions are present in 15–20% of all DNA exonerations (Garrett, 2008; Scheck, Neufeld, & Dwyer, 2000; http://www.innocenceproject.org/). Moreover, because this sample does not include those false confessions that are disproved before trial, many that result in guilty pleas, those in which DNA evidence is not available, those given to minor crimes that receive no post-conviction scrutiny, and those in juvenile proceedings that contain confidentiality provisions, the cases that are discovered most surely represent the tip of an iceberg.

In this new era of DNA exonerations, researchers and policy makers have come to realize the enormous role that psychological science can play in the study and prevention of wrongful convictions. In cases involving wrongfully convicted defendants, the most common reason (found in three-quarters of the cases) has been eyewitness misidentification. Eyewitness researchers have thus succeeded at identifying the problems and proposing concrete reforms. Indeed, following upon an AP-LS White Paper on the subject (Wells et al., 1998), the U.S. Department of Justice assembled a working group of research

psychologists, prosecutors, police officers, and lawyers, ultimately publishing guidelines for law enforcement on how to minimize eyewitness identification error (Technical Working Group for Eyewitness Evidence, 1999; see Doyle, 2005; Wells et al., 2000). While other problems have been revealed—for example, involving flaws in various forensic sciences (see Faigman, Kaye, Saks, & Sanders, 2002), the number of cases involving confessions—long considered the "gold standard" in evidence—has proved surprising (http://www.innocenceproject.org/).

Wrongful convictions based on false confessions raise serious questions concerning a chain of events by which innocent citizens are judged deceptive in interviews and misidentified for interrogation; waive their rights to silence and to counsel; and are induced into making false narrative confessions that form a sufficient basis for subsequent conviction. This White Paper summarizes much of what we know about this phenomenon. It draws on core psychological principles of influence as well as relevant forensic psychology studies involving an array of methodologies. It identifies various risk factors for false confessions, especially in police interviewing, interrogation, and the elicitation of confessions. It also offers recommendations for reform.

Citing the impact on policy and practice of the eyewitness White Paper, Wiggins and Wheaton (2004) called for a similar consensus-based statement on confessions. Fulfilling this call, the objectives of this White Paper are threefold. The first is to review the state of the science on interviewing and interrogation by bringing together a multidisciplinary group of scholars from three perspectives: (1) clinical psychology (focused on individual differences in personality and psychopathology); (2) experimental psychology (focused on the influence of social, cognitive, and developmental processes); and (3) criminology (focused on the empirical study of criminal justice as well as criminal law, procedure, and legal practice). Our second objective is to identify the dispositional characteristics (e.g., traits associated with *Miranda* waivers, compliance, and suggestibility; adolescence; mental retardation; and psychopathology) and situational-interrogation factors (e.g., prolonged detention and isolation; confrontation; presentations of false evidence; and minimization) that influence the voluntariness and reliability of confessions. Our third objective is to make policy recommendations designed to reduce both the likelihood of police-induced false confessions and the number of wrongful convictions based on these confessions.

## BACKGROUND

The pages of American legal history are rich in stories about false confessions. These stories date back to the Salem witch trials of 1692, during which about 50 women confessed to witchcraft, some, in the words of one observer, after being "tyed… Neck and Heels till the Blood was ready to come out of their Noses" (Karlsen, 1989, p. 101). Psychologists' interest as well can be traced to its early days as a science. One hundred years ago, in *On the Witness Stand*, Hugo Munsterberg (1908) devoted an entire chapter to the topic of "Untrue Confessions." In this chapter, he discussed the Salem witch trials, reported on a contemporary Chicago confession that he believed to be false, and sought to explain the causes of this phenomenon (e.g., he used such words as "hope," "fear," "promises," "threats," "suggestion," "calculations," "passive yielding," "shock," "fatigue," "emotional excitement," "melancholia," "auto-hypnosis," "dissociation," and "self-destructive despair").

## DNA Exonerations and Discoveries in the U.S.

In 1989, Gary Dotson was the first wrongfully convicted individual to be proven innocent through the then-new science of DNA testing. Almost two decades later, more than 200 individuals have been exonerated by post-conviction DNA testing and released from prison, some from death row. In 15–20% of these cases, police-induced false confessions were involved (Garrett, 2008; www.innocenceproject.org). A disturbing number of these have occurred in high-profile cases, such as New York City's Central Park Jogger case, where five false confessions were taken within a single investigation. In that case, five teenagers confessed during lengthy interrogations to the 1989 brutal assault and rape of a young woman in Central Park. Each boy retracted his statement immediately upon arrest, saying he had confessed because he expected to go home afterward. All the boys were convicted and sent to prison, only to be exonerated in 2002 when the real rapist gave a confession, accurately detailed, that was confirmed by DNA evidence (*People of the State of New York v. Kharey Wise et al.*, 2002).

Post-conviction DNA tests and exonerations have offered a window into the causes of wrongful conviction. Researchers and legal scholars have long documented the problem and its sources of error (Borchard, 1932; Frank & Frank, 1957; see Leo, 2005 for a review). Yet criminal justice officials, commentators, and the public have tended until recently to be highly skeptical of its occurrence, especially in death penalty cases (Bedau & Radelet, 1987). The steady stream of post-conviction DNA exonerations in the last two decades has begun to transform this perception. Indeed, these cases have established the leading causes of error in the criminal justice system to be eyewitness misidentification, faulty forensic science, false informant testimony, and false confessions (Garrett, 2008).

### The Problem of False Confessions

A false confession is an admission to a criminal act—usually accompanied by a narrative of how and why the crime occurred—that the confessor did not commit. False confessions are difficult to discover because neither the state nor any organization keeps records of them, and they are not usually publicized. Even if they are discovered, false confessions are hard to establish because of the difficulty of proving the confessor's innocence. The literature on wrongful convictions, however, shows that there are several ways to determine whether a confession is false. Confessions may be deemed false when: (1) it is later discovered that no crime was committed (e.g., the presumed murder victim is found alive, the autopsy on a "shaken baby" reveals a natural cause of death); (2) additional evidence shows it was physically impossible for the confessor to have committed the crime (e.g., he or she was demonstrably elsewhere at the time or too young to have produced the semen found on the victim); (3) the real perpetrator, having no connection to the defendant, is apprehended and linked to the crime (e.g., by intimate knowledge of nonpublic crime details, ballistics, or physical evidence); or (4) scientific evidence affirmatively establishes the confessor's innocence (e.g., he or she is excluded by DNA test results on semen, blood, hair, or saliva).

Drizin and Leo (2004) analyzed 125 cases of proven false confession in the U.S. between 1971 and 2002, the largest sample ever studied. Ninety-three percent of the false confessors were men. Overall, 81% of the confessions occurred in murder cases, followed by rape (8%) and arson (3%). The most common bases for exoneration were the real perpetrator was identified (74%) or that new scientific evidence was discovered (46%). With respect to personal vulnerabilities, the sample was younger than the total population of murderers and rapists: A total of 63% of false confessors were under the age of 25, and 32% were under 18; yet of all persons arrested for murder and rape, only 8 and 16%, respectively, are juveniles (Snyder, 2006). In addition, 22% were mentally retarded, and 10% had a diagnosed mental illness. Surprisingly, multiple false confessions to the same crime were obtained in 30% of the cases, wherein one false confession was used to prompt others. In total, 81% of false confessors in this sample whose cases went to trial were wrongfully convicted.

Although other researchers have also documented false confessions in recent years, there is no known incidence rate, and to our knowledge empirically based estimates have never been published. There are several reasons why an incidence rate cannot be determined. First, researchers cannot identify the universe of false confessions because no governmental or private organization keeps track of this information. As noted earlier, the sample of discovered cases is thus incomplete. Second, even if one could identify a nonrandom set of hotly contested and possibly false confessions, it is often difficult if not impossible as a practical matter to obtain the primary case materials (e.g., police reports; pretrial and trial transcripts; and electronic recordings of the interrogations) needed to determine "ground truth" with sufficient certainty to prove that the confessor is innocent. Also, it is important to note that although most case studies are based in the U.S. and England, proven false confessions have been documented in countries all over the world—including Canada (CBC News, August 10, 2005), Norway (Gudjonsson, 2003), Finland (Santtila, Alkiora, Ekholm, & Niemi, 1999), Germany (Otto, 2006), Iceland (Sigurdsson & Gudjonsson, 2004), Ireland (Inglis, 2004), The Netherlands (Wagenaar, 2002), Australia (Egan, 2006), New Zealand (Sherrer, 2005), China (Kahn, 2005), and Japan (Onishi, 2007).

For estimating the extent of the problem, self-report methods have also been used. Sigurdsson and Gudjonsson (2001) conducted two self-report studies of prison inmates in Iceland and found that 12% claimed to have made a false confession to police at some time in their lives, a pattern that the authors saw as part of the criminal lifestyle. In a more recent study of Icelandic inmates, the rate of self-reported false confessions had increased (Gudjonsson, Sigurdsson, Einarsson, Bragason, & Newton, 2008). Similar studies have been conducted in student samples within Iceland and Denmark. Among those interrogated by police, the self-reported false confession rates ranged from 3.7 to 7% among college and older university students (Gudjonsson, Sigurdsson, Asgeirsdottir, & Sigfusdottir, 2006; Gudjonsson, Sigurdsson, & Einarsson, 2004; Steingrimsdottir, Hreinsdottir, Gudjonsson, Sigurdsson, & Nielsen, 2007; Gudjonsson, Sigurdsson, Bragason, Einarsson, & Valdimarsdottir, 2004). In a North American survey of 631 police investigators, respondents estimated from their own experience that 4.78% of innocent suspects confess during interrogation (Kassin et al., 2007). Retrospective self-reports and observer estimates are subject to various cognitive and motivational biases and should be treated with caution as measures of a false confession rate. In general, however, they reinforce the wrongful conviction data indicating that a small but significant minority of innocent people confess under interrogation.

## POLICE INTERROGATIONS IN CONTEXT

The practices of interrogation and the elicitation of confessions are subject to historical, cultural, political, legal, and other contextual influences. Indeed, although this article is focused on confessions to police within in a

criminal justice framework, it is important to note that similar processes occur, involving varying degrees of pressure, within the disparate frameworks of military intelligence gathering and corporate loss-prevention investigations. Focused on criminal justice, we examine American interrogation practices of the past and present; the role played by *Miranda* rights; the admissibility and use of confession evidence in the courts; and current practices not only in the U.S. but in other countries as well.

### "Third-Degree" Practices of the Past

From the late nineteenth century through the 1930s, American police occasionally employed "third-degree" methods of interrogation—inflicting physical or mental pain and suffering to extract confessions and other types of information from crime suspects. These techniques ranged from the direct and explicit use of physical assaults to tactics that were both physically and psychologically coercive to lesser forms of duress. Among the most commonly used "third-degree" techniques were physical violence (e.g., beating, kicking, or mauling suspects); torture (e.g., simulating suffocation by holding a suspect's head in water, putting lighted cigars or pokers against a suspect's body); hitting suspects with a rubber hose (which seldom left marks); prolonged incommunicado confinement; deprivations of sleep, food, and other needs; extreme sensory discomfort (e.g., forcing a suspect to stand for hours on end, shining a bright, blinding light on the suspect); and explicit threats of physical harm (for a review, see Leo, 2004). These methods were varied and commonplace (Hopkins, 1931), resulting in large numbers of coerced false confessions (Wickersham Commission Report, 1931).

The use of third-degree methods declined precipitously from the 1930s through the 1960s. They have long since become the exception rather than the rule in American police work, having been replaced by interrogation techniques that are more professional and psychologically oriented. The twin pillars of modern interrogation are behavioral lie-detection methods and psychological interrogation techniques, both of which have been developed and memorialized in interrogation training manuals. By the middle of the 1960s, police interrogation practices had become entirely psychological in nature (Wald, Ayres, Hess, Schantz, & Whitebread, 1967). The President's Commission on Criminal Justice and the Administration of Justice declared in 1967: "Today the third degree is virtually non-existent" (Zimring & Hawkins, 1986, p. 132). Still, as the United States Supreme Court recognized in *Miranda v. Arizona* (1966), psychological interrogation is inherently compelling, if not coercive, to the extent that it relies on sustained pressure, manipulation, trickery, and deceit.

### Current Law Enforcement Objectives and Practices in the U.S.

American police typically receive brief instruction on interrogation in the academy and then more sustained and specialized training when promoted from patrol to detective. Interrogation is an evidence-gathering activity that is supposed to occur after detectives have conducted an initial investigation and determined, to a reasonable degree of certainty, that the suspect to be questioned committed the crime.

Sometimes this determination is reasonably based on witnesses, informants, or tangible evidence. Often, however, it is based on a clinical hunch formed during a pre-interrogation interview in which special "behavior-provoking" questions are asked (e.g., "What do you think should happen to the person who committed this crime?") and changes are observed in aspects of the suspect's behavior that allegedly betray lying (e.g., gaze aversion, frozen posture, and fidgety movements). Yet in laboratories all over the world, research has consistently shown that most commonsense behavioral cues are not diagnostic of truth and deception (DePaulo et al., 2003). Hence, it is not surprising as an empirical matter that laypeople on average are only 54% accurate at distinguishing truth and deception; that training does not produce reliable improvement; and that police investigators, judges, customs inspectors, and other professionals perform only slightly better, if at all—albeit with high levels of confidence (for reviews, see Bond & DePaulo, 2006; Meissner & Kassin, 2002; Vrij, 2008).

The purpose of interrogation is therefore not to discern the truth, determine if the suspect committed the crime, or evaluate his or her denials. Rather, police are trained to interrogate only those suspects whose culpability they "establish" on the basis of their initial investigation (Gordon & Fleisher, 2006; Inbau, Reid, Buckley, & Jayne, 2001). For a person under suspicion, this initial impression is critical because it determines whether police proceed to interrogation with a strong presumption of guilt which, in turn, predisposes an inclination to ask confirmatory questions, use persuasive tactics, and seek confessions (Hill, Memon, & McGeorge, 2008; Kassin, Goldstein, & Savitsky, 2003). In short, the single-minded purpose of interrogation is to elicit incriminating statements, admissions, and perhaps a full confession in an effort to secure the conviction of offenders (Leo, 2008).

Designed to overcome the anticipated resistance of individual suspects who are presumed guilty, police interrogation is said to be stress-inducing by design—structured to promote a sense of isolation and increase the anxiety and despair associated with denial relative to confession. To achieve these goals, police employ a number of tactics. As

described in Inbau et al.'s (2001) *Criminal Interrogation and Confessions*, the most influential approach is the so-called Reid technique (named after John E. Reid who, along with Fred Inbau, developed this approach in the 1940s and published the first edition of their manual in 1962). First, investigators are advised to isolate the suspect in a small private room, which increases his or her anxiety and incentive to escape. A nine-step process then ensues in which an interrogator employs both negative and positive incentives. On one hand, the interrogator confronts the suspect with accusations of guilt, assertions that may be bolstered by evidence, real or manufactured, and refuses to accept alibis and denials. On the other hand, the interrogator offers sympathy and moral justification, introducing "themes" that minimize the crime and lead suspects to see confession as an expedient means of escape. The use of this technique has been documented in naturalistic observational studies (Feld, 2006b; Leo, 1996b; Simon, 1991; Wald et al., 1967) and in recent surveys of North American investigators (Kassin et al., 2007; Meyer & Reppucci, 2007).

## Miranda Warnings, Rights, and Waivers

One of the U.S. legal system's greatest efforts to protect suspects from conditions that might produce involuntary and unreliable confessions is found in the U.S. Supreme Court decision in *Miranda v. Arizona* (1966). The Court was chiefly concerned with cases in which the powers of the state, represented by law enforcement, threatened to overbear the will of citizen suspects, thus threatening their Constitutional right to avoid self-incrimination.

In *Miranda*, the Court offered a remedy, requiring that police officers had to inform suspects of their rights to remain silent and to the availability of legal counsel prior to confessions. This requirement aimed to strike a balance against the inherently threatening power of the police in relation to the disadvantaged position of the suspect, thus reducing coercion of confessions. In cases involving challenges to the validity of the waiver of rights, courts were to apply a test regarding the admissibility of the confession at trial. Statements made by defendants would be inadmissible if a waiver of the rights to silence and counsel was not made "voluntarily, knowingly, and intelligently." One year after the *Miranda* decision, *In re Gault* (1967) extended these rights and procedures to youth when they faced delinquency allegations in juvenile court.

Forty years later, there is no research evidence that *Miranda* and *Gault* achieved their ultimate objective. Police officers routinely offer the familiar warnings to suspects prior to taking their statements. But research has not unequivocally determined whether confessions became more or less likely, are any more or less reliable, or are occurring in ways that are more or less "voluntary, knowing, and intelligent" than in the years prior to *Miranda*. Several years ago, Paul Cassell, an outspoken critic of *Miranda*, had maintained (based on pre–post studies as well as international comparisons) that the confession and conviction rates have dropped significantly as a direct result of the warning and waiver requirements, thus triggering the release of dangerous criminals (Cassell, 1996a, 1996b; Cassell & Hayman, 1996). Yet others countered that his analysis was based on selective data gathering methods and unwarranted inferences (Donahue, 1998; Feeney, 2000; Thomas & Leo, 2002); that these declines, if real, were insubstantial (Schulhofer, 1996); that four out of five suspects waive their rights and submit to questioning (Leo, 1996a, 1996b); and that the costs to law enforcement were outweighed by social benefits—for example, that *Miranda* has had a civilizing effect on police practices and has increased public awareness of constitutional rights (Leo, 1996c; Thomas, 1996).

In recent years, the U.S. Supreme Court has upheld the basic warning-and-waiver requirement (*Dickerson v. United States*, 2000)—for example, refusing to accept confessions given after a warning that was tactically delayed to produce an earlier inadmissible statement (*Missouri v. Seibert*, 2004). Practically speaking, however, research has suggested that the Court's presumption concerning the protections afforded by *Miranda* warnings is questionable. At minimum, a valid waiver of rights requires that police officers provide suspects an understandable description of their rights and that suspects must understand these warnings to waive them validly. What empirical evidence do we have that *Miranda's* procedural safeguards produce these conditions?

First, the *rights* of which suspects must be informed were clearly defined in Miranda, but the *warnings* were not. The *Miranda* decision included an appendix wherein the Court offered an example of the warnings that were suggested, but police departments were free to devise their own warnings. A recent study examined 560 *Miranda* warning forms used by police throughout the U.S. (Rogers, Harrison, Shuman, Sewell, & Hazelwood, 2007). A host of variations in content and format were identified, and metric analysis of their wording revealed reading-level requirements ranging from third-grade level to the verbal complexity of postgraduate textbooks (see Kahn, Zapf, & Cooper, 2006, for similar results; also see Rogers, Hazelwood, Sewell, Harrison, & Shuman, 2008). Moreover, *Miranda* warning forms varied considerably in what they conveyed. For example, only 32% of the forms told suspects that legal counsel could be obtained without charge. Thus, many warning forms raise serious doubts about the knowing and intelligent waiver of rights by almost any suspect who is "informed" by them.

Second, studies have repeatedly shown that a substantial proportion of adults with mental disabilities, and "average" adolescents below age 16 have impaired understanding of *Miranda* warnings when they are exposed to them. Even adults and youth who understand them sometimes do not grasp their basic implications. Many of these studies have examined actual adult or juvenile defendants, using reliable procedures that allow the quality of an individual's understanding to be scored according to specified criteria. For example, do people after warnings factually understand that "I don't have to talk" and that "I can get an attorney to be here now and during any questioning by police?" To answer this question, respondents have been examined in the relatively benign circumstance of a testing session with a researcher rather than in the context of an accusatory, highly stressful interrogation using standardized *Miranda* warnings that have about an average sixth- to seventh-grade reading level. Thus, the results obtained in these studies represent people's grasp of the *Miranda* warnings under relatively favorable circumstances. Under these conditions, average adults exhibit a reasonably good understanding of their rights (Grisso, 1980, 1981). But studies of adults with serious psychological disorders (Cooper & Zapf, 2008; Rogers, Harrison, Hazelwood, & Sewell, 2007) or with mental retardation (Clare & Gudjonsson, 1991; Everington & Fulero, 1999; Fulero & Everington, 1995; O'Connell, Garmoe, & Goldstein, 2005) have found substantial impairments in understanding of *Miranda* warnings compared to nonimpaired adult defendants.

Many studies have examined adolescents' understanding of *Miranda* warnings, and the results have been very consistent (Abramovitch, Higgins-Biss, & Biss, 1993; Abramovitch, Peterson-Badali, & Rohan, 1995: Colwell et al., 2005; Goldstein, Condie, Kalbeitzer, Osman, & Geier, 2003; Grisso, 1980, 1981; Redlich, Silverman, & Steiner, 2003; Viljoen, Klaver, & Roesch, 2005; Viljoen & Roesch, 2005; Wall & Furlong, 1985). In one comprehensive study, 55% of 430 youth of ages 10–16 misunderstood one or more of the *Miranda* warnings (for example, "That means I can't talk until they tell me to"). Across these studies, the understanding of adolescents ages 15–17 with near-average levels of verbal intelligence tends not to have been inferior to that of adults. But youth of that age with IQ scores below 85, and average youth below age 14, performed much poorer, often misunderstanding two or more of the warnings.

Some studies have shown that many defendants, especially adolescents, who seem to have an adequate factual understanding of *Miranda* warnings, do not grasp their relevance to the situation they are in (e.g., Grisso, 1980, 1981; Viljoen, Zapf, & Roesch, 2007). For example, one may factually understand that "I can have an attorney before and during questioning" yet not know what an attorney is or what role an attorney would play. Others may understand the attorney's role but disbelieve that it would apply in their own situation—as when youth cannot imagine that an adult would take their side against other adults, or when a person with paranoid tendencies believes that any attorney, even his own, would oppose him.

The ability to grasp the relevance of the warnings beyond having a mere factual understanding of what they say is sometimes referred to as having a "rational understanding" or "appreciation" of the warnings. Many states, however, require only a factual understanding of *Miranda* rights for a "knowing and intelligent" waiver (e.g., *People v. Daoud*, 2000). In those states that apply a strict factual understanding standard, youth who technically understand the warnings (e.g., "I can have an attorney to talk to" or "I can stay silent") but harbor faulty beliefs that may distort the significance of these warnings ("An attorney will tell the court whatever I say" or "You have to tell the truth in court, so eventually I'll have to talk if they want me to") are considered capable of having made a valid waiver, even if they have no recognition of the meanings of the words or a distorted view of their implications.

Even among those with adequate understanding, suspects will vary in their capacities to "think" and "decide" about waiving their rights. Whether decision-making capacities are deemed relevant for a "voluntary, knowing, and intelligent" waiver will depend on courts' interpretations of "intelligent" or "voluntary." Several studies have thus examined the decision-making process of persons faced with hypothetical *Miranda* waiver decisions.

Studies of adolescents indicate that youth under age 15 on average perform differently from older adolescents and adults. They are more likely to believe that they should waive their rights and tell what they have done, partly because they are still young enough to believe that they should never disobey authority. Studies have also shown that they are more likely to decide about waiver on the basis of the potential for immediate negative consequences—for example, whether they will be permitted to go home if they waive their rights—rather than considering the longer-range consequences associated with penalties for a delinquency adjudication (Grisso, 1981; Grisso et al., 2003). Young adolescents presented with hypothetical waiver decisions are less likely than older adolescents to engage in reasoning that involves adjustment of their decisions based on the amount of evidence against them or the seriousness of the allegations (Abramovitch, Peterson-Badali, & Rohan, 1995). These results regarding the likelihood of immature decision-making processes are consistent with research on the development of psychosocial abilities of young adolescents in everyday circumstances (Steinberg & Cauffman, 1996) and other

legal contexts (Grisso & Schwartz, 2000; Owen-Kostelnik, Reppucci, & Meyer, 2006).

Other *Miranda* decision-making studies have examined the suggestibility of persons with disabilities (Clare & Gudjonsson, 1995: Everington & Fulero, 1999; O'Connell, Garmoe, & Goldstein, 2005) and adolescents (Goldstein et al., 2003; Redlich et al., 2003; Singh & Gudjonsson, 1992). Suggestibility refers to a predisposition to accept information communicated by others and to incorporate that information into one's beliefs and memories. In general, these studies indicate that persons with mental retardation and adolescents in general are more susceptible to suggestion in the context of making hypothetical waiver decisions, and that greater suggestibility is related to poorer comprehension of the warnings. These results take on special significance in light of observational studies of police behavior when obtaining *Miranda* waiver decisions from adolescents (Feld, 2006a, 2006b) and adults (Leo, 1996b). As described elsewhere in this article, police officers often approach suspects with "friendly" suggestions regarding both the significance of the *Miranda* waiver procedure and their decision. In either case, results indicate that adults with disabilities and adolescents in general are prone to adjust their behaviors and decisions accordingly.

In a formal sense, whether one waives his or her rights voluntarily, knowingly, and intelligently does not have a direct bearing on the likelihood of false confessions (Kassin, 2005; White, 2001). The decision to waive one's rights in a police interrogation does not necessarily lead to a confession, much less a false confession. Nevertheless, research cited earlier regarding the lack of attentiveness of persons with disabilities and adolescents to long-range consequences suggests an increased risk that they would also comply with requests for a confession—whether true of false—to obtain the presumed short-term reward (e.g., release to go home). In addition, some studies have found that poor comprehension of *Miranda* warnings is itself predictive of a propensity to give false confessions (Clare & Gudjonsson, 1995; Goldstein et al., 2003). Sometimes this stems from low intelligence or a desire to comply; at other times it appears to be related to a naïve belief that one's actual innocence will eventually prevail—a belief that is not confined to adolescents or persons with disabilities (Kassin & Norwick, 2004).

Finally, many states require the presence of a parent or other interested adult when youth make decisions about their *Miranda* rights (Oberlander, Goldstein, & Goldstein, 2003). These rules are intended to offer youth assistance in thinking through the decision while recognizing that caretakers cannot themselves waive their children's rights in delinquency or criminal investigations. Studies have shown, however, that the presence of parents at *Miranda* waiver events typically does not result in any advice at all or, when it does, provides added pressure for the youth to waive rights and make a statement (Grisso & Ring, 1979). The presence of parents may be advisable, but it does not offer a remedy for the difficulties youth face in comprehending or responding to requests for a waiver of their rights.

In summary, research suggests that adults with mental disabilities, as well as adolescents, are particularly at risk when it comes to understanding the meaning of *Miranda* warnings. In addition, they often lack the capacity to weigh the consequences of rights waiver, and are more susceptible to waiving their rights as a matter of mere compliance with authority.

## Overview of Confession Evidence in the Courts

American courts have long treated confession evidence with both respect and skepticism. Judicial respect for confessions emanates from the power of confession evidence and the critical role that confessions play in solving crimes. The U.S. Supreme Court has recognized that confession evidence is perhaps the most powerful evidence of guilt admissible in court (*Miranda v. Arizona*, 1966)—so powerful, in fact, that "the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained" (*Colorado v. Connelly*, 1986, p. 182 citing McCormick, 1972, p. 316).

Judicial skepticism of confession evidence stems from the historical fact that some law enforcement officers, aware that confession evidence can assure conviction, have abused their power in the interrogation room. As the U.S. Supreme Court stated in *Escobedo v. Illinois* (1964): "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation" (pp. 488–489).

Judicial concern with juror over-reliance on confession evidence gave rise to a series of evolving rules designed to curb possible abuses in the interrogation room, exclude unreliable confessions from trial, and prevent wrongful convictions. These doctrines, which developed both in the common law of evidence and under the Constitution as interpreted by the U.S. Supreme Court, fell into two distinct sets of legal rules: corroboration rules and the voluntariness rules (Ayling, 1984; Leo, Drizin, Neufeld, Hal, & Vatner, 2006).

### *Corroboration Rules*

The corroboration rule, which requires that confessions be corroborated by independent evidence, was the

American take on the English rule known as the *corpus delicti* rule. *Corpus delicti* literally means "body of the crime"—that is, the material substance upon which a crime has been committed" (Garner, 2004, p. 310). The rule was founded at common law in England in the wake of *Perry's Case*, a seventeenth-century case in which a mother and two brothers were convicted and executed based upon a confession to a murder that was later discovered to be false when the supposed murder victim turned up alive (Leo et al., 2006). America's version of *Perry's Case* is the infamous 1819 case of Stephen and Jesse Boorn, two brothers who were convicted and sentenced to death in Manchester, Vermont for the murder of their brother-in-law Russell Colvin. Fortunately for the two men, both of whom had confessed to the killing under intense pressure from authorities, their lawyers located Colvin alive before their hangings took place (Warden, 2005).

In American homicide cases, in response to *Boorn*, the rule came to mean that no individual can be convicted of a murder without proof that a death occurred, namely the existence of a "dead body." As the rule evolved in the courts over time, it was applied to all crimes and required that before a confession could be admitted to a jury, prosecutors had to prove: (1) that a death, injury, or loss had occurred and (2) that criminal agency was responsible for that death, injury, or loss (Leo et al., 2006). The rule was designed to serve three purposes: to prevent false confessions, to provide incentives to police to continue to investigate after obtaining a confession, and to safeguard against the tendency of juries to view confessions as dispositive of guilt regardless of the circumstances under which they were obtained (Ayling, 1984).

The *corpus delicti* rule does not require corroboration that the defendant committed the crime, nor does it demand any proof of the requisite mental state or any other elements of the crime. Moreover, the rule only requires corroboration of the fact that a crime occurred; it does not require that the facts contained in the confession be corroborated. Given the relative ease of establishing the *corpus delicti* in most criminal cases (e.g., producing a dead body in a homicide case and showing that death was not self-inflicted or the result of an accident), and the weight that most jurors attach to confession evidence, prosecutors can still obtain many convictions from unreliable confessions. The rule thus makes it easier in some cases for prosecutors to convict both the guilty and the innocent (Leo et al., 2006).

At the same time, in a certain class of cases, the *corpus delicti* rule may bar the admission of reliable confessions. Because the rule requires that prosecutors prove that there be death or injury resulting from a criminal act, prosecutors may have a hard time getting confessions admitted when the evidence is unclear as to whether any injury had occurred (e.g., child molestation without physical evidence) or whether it resulted from an accident or natural causes as opposed to a criminal act (e.g., child death by smothering or Sudden Infant Death Syndrome; see Taylor, 2005).

For these reasons and others, the rule has been severely criticized. In *Smith v. United States* (1954), the U.S. Supreme Court criticized the *corpus delicti* rule for "serv[ing] an extremely limited function" (p. 153). The Court noted that the rule was originally designed to protect individuals who had confessed to crimes that never occurred but that it does little to protect against the far more frequent problem wherein a suspect confesses to a crime committed by someone else. In short, the rule did "nothing to ensure that a particular defendant was the perpetrator of a crime" (*State v. Mauchley*, 2003, p. 483).

In place of the *corpus delicti* rule, the Supreme Court, in two decisions released on the same day—*Smith* and *Opper v. United States* (1954)—announced a new rule, dubbed the trustworthiness rule, which requires corroboration of the confession itself rather than the fact that a crime occurred. Under the trustworthiness rule, which was adopted by several states, the government may not introduce a confession unless it provides "substantial independent evidence which would tend to establish the trustworthiness of the confession" (*State v. Mauchley*, 2003, p. 48; citing Opper).

In theory, the trustworthiness standard is a marked improvement on the *corpus delicti* rule in its ability to prevent false confessions from entering the stream of evidence at trial. In practice, however, the rule has not worked to screen out false confessions. Because investigators sometimes suggest and incorporate crime details into a suspect's confession, whether deliberately or inadvertently, many false confessions appear highly credible to the secondhand observer. Without an electronic recording of the entire interrogation process, courts are thus left to decide a swearing contest between the suspect and the detective over the source of the details contained within the confession. Moreover, the quantum of corroboration in most jurisdictions that apply the trustworthiness doctrine is very low, allowing many unreliable confessions to go before the jury (Leo et al., 2006).

### *Rules Prohibiting Involuntary Confession*

Until the late eighteenth century, out-of-court confessions were admissible as evidence even if they were the involuntary product of police coercion. In 1783, however, in *The King v. Warrickshall*, an English Court recognized the inherent lack of reliability of involuntary confessions and established the first exclusionary rule:

> Confessions are received in evidence, or rejected as inadmissible, under a consideration whether they are or are not intitled [sic] to credit. A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt …but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape…that no credit ought to be given it; and therefore it should be rejected (*King v. Warrickshall*, 1783, pp. 234–235).

The basis for excluding involuntary confessions in *Warrickshall* was a concern that confessions procured by torture or other forms of coercion must be prohibited because of the risk that such tactics could cause an innocent person to confess. In other words, involuntary confessions were to be prohibited because they were unreliable. Following *Warrickshall*, in the late 1800s, the U.S. Supreme Court adopted this reliability rationale for excluding involuntary confessions in a series of decisions (*Hopt v. Utah*, 1884; *Pierce v. United States*, 1896; *Sparf v. United States*, 1895; *Wilson v. United States*, 1896).

The Supreme Court adopted a second rationale for excluding involuntary confessions in 1897, in *Bram v. United States.* In *Bram*, the Court for the first time linked the voluntariness doctrine to the Fifth Amendment's provision that "no person shall be compelled in any criminal case to be a witness against himself." This privilege against self-incrimination was not rooted in a concern about the reliability of confessions. Rather, its origins were grounded in the rule of *nemo tenetursepsum prodere* ("no one is bound to inform on himself"), a rule dating back to the English ecclesiastical courts which sought to protect individual free will from state intrusion (Leo et al., 2006). The rule of *nemo tenetur*, which was adopted in the colonies and incorporated into the Fifth Amendment, applied only to self-incriminating statements in court, and had never been applied to extrajudicial confessions. By mixing two unrelated voluntariness doctrines, *Bram* rewrote history and provoked considerable confusion by courts and academics alike (Wigmore, 1970). Still, it gave birth to a new basis for excluding involuntary confession evidence—the protection of individual free will.

A third basis for excluding involuntary confessions began to emerge in 1936, in the case of *Brown v. Mississippi*, to deter unfair and oppressive police practices. In *Brown*, three black tenant farmers who had been accused of murdering a white farmer were whipped, pummeled, and tortured until they provided detailed confessions. The Court unanimously reversed the convictions of all three defendants, holding that confessions procured by physical abuse and torture were involuntary. The Court established the Fourteenth Amendment's due process clause as the constitutional test for assessing the admissibility of confessions in state cases. In addition to common law standards, trial judges would now have to apply a federal due process standard when evaluating the admissibility of confession evidence, looking to the "totality of the circumstances" to determine if the confession was 'made freely, voluntarily and without compulsion or inducement of any sort'"(*Haynes v. Washington*, 1963, quoting *Wilson v. United States*, 1896). As such, the Court proposed to consider personal characteristics of the individual suspect (e.g., age, intelligence, mental stability, and prior contact with law enforcement) as well as the conditions of detention and interrogation tactics that were used (e.g., threats, promises, and lies).

This deterrence rationale, implied in *Brown*, was made even more explicit in *Haley v. Ohio*, a case involving a 15-year-old black boy who was questioned throughout the night by teams of detectives, isolated for 3 days, and repeatedly denied access to his lawyer (*Haley v. Ohio*, 1948). While the majority held that the confession was obtained "by means which the law should not sanction" (pp. 600–601), Justice Frankfurter, in his concurrence, went a step further, stating that the confession must be held inadmissible "[t]o remove the inducement to resort to such methods this Court has repeatedly denied use of the fruits of illicit methods" (p. 607).

As these cases suggest, the Supreme Court relied on different and sometimes conflicting rationales for excluding involuntary confessions throughout the twentieth century (Kamisar, 1963; White, 1998). It was not always clear which of the three justifications the Court would rely on when evaluating the voluntariness of a confession. Nevertheless, the Court did appear to designate certain interrogation methods—including physical force, threats of harm or punishment, lengthy or incommunicado questioning, solitary confinement, denial of food or sleep, and promises of leniency—as presumptively coercive and therefore unconstitutional (White, 2001). The Court also considered the individual suspect's personal characteristics, such as age, intelligence, education, mental stability, and prior contact with law enforcement, in determining whether a confession was voluntary. The template of the due process voluntariness test thus involved a balancing of whether police interrogation pressures, interacting with a suspect's personal dispositions, were sufficient to render a confession involuntary (Schulhofer, 1981).

The "totality of the circumstances" test, while affording judges flexibility in practice, has offered little protection to suspects. Without bright lines for courts to follow, and without a complete and accurate record of what transpired during the interrogation process, the end result has been largely unfettered and unreviewable discretion by judges. In practice, when judges apply the test, "they exclude only the most egregiously obtained confessions and then only

haphazardly" (Feld, 1999, p. 118). The absence of a litmus test has also encouraged law enforcement officers to push the envelope with respect to the use of arguably coercive psychological interrogation techniques (Penney, 1998). Unlike its sweeping condemnation of *physical* abuse in *Brown v. Mississippi*, the Court's overall attitude toward *psychological* interrogation techniques has been far less condemnatory. In particular, the Court's attitudes toward the use of maximization and minimization (Kassin & McNall, 1991) and the false evidence ploy and other forms of deception (Kassin & Kiechel, 1996)—techniques that have frequently been linked to false confessions (Kassin & Gudjonsson, 2004)—has been largely permissive. A discussion of some of these cases follows.

### *Cases Addressing Interrogation Tactics: Maximization and Minimization*

Today's interrogators seek to manipulate a suspect into thinking that it is in his or her best interest to confess. To achieve this change in perceptions of subjective utilities, they use a variety of techniques, referred to broadly as "maximization" and "minimization" (Kassin & McNall, 1991). Maximization involves a cluster of tactics designed to convey the interrogator's rock-solid belief that the suspect is guilty and that all denials will fail. Such tactics include making an accusation, overriding objections, and citing evidence, real or manufactured, to shift the suspect's mental state from confident to hopeless. Toward this end, it is particularly common for interrogators to communicate as a means of inducement, implicitly or explicitly, a threat of harsher consequences in response to the suspect's denials (Leo & Ofshe, 2001).

In contrast, minimization tactics are designed to provide the suspect with moral justification and face-saving excuses for having committed the crime in question. Using this approach, the interrogator offers sympathy and understanding; normalizes and minimizes the crime, often suggesting that he or she would have behaved similarly; and offers the suspect a choice of alternative explanations—for example, suggesting to the suspect that the murder was spontaneous, provoked, peer-pressured, or accidental rather than the work of a cold-blooded premeditated killer. As we will see later, research has shown that this tactic communicates by implication that leniency in punishment is forthcoming upon confession.

As the 1897 case of *Bram v. United States* demonstrates, minimization has been part of the arsenal of police interrogation tactics for over a century. In *Bram*, the authorities induced the defendant to confess based on the kind of unspoken promise that anchors the modern psychological interrogation: "Bram, I am satisfied that you killed the captain. But some of us here think you could not have done the crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders" (*Bram v. United States*, 1897, p. 539). This statement contained no direct threats or promises; rather, it combined elements of maximization (the interrogator's stated certainty in the suspect's guilt) and minimization (the suggestion that he will be punished less severely if he confesses and names an accomplice). Using language that condemns the latter, the Supreme Court reversed Bram's conviction, holding that a confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight" (pp. 542–543).

Although a strict interpretation of *Bram* seemed to suggest a ban on minimization, courts throughout the twentieth century followed a practice of evading, contradicting, disregarding, and ultimately discarding *Bram* (Hirsch, 2005a). Briefly in the 1960s, it appeared that the Supreme Court was ready to revitalize *Bram* and to apply it broadly to the psychological interrogation techniques taught by such legendary police reformers as Chicago's Fred Inbau and John Reid. Indeed, the landmark case of *Miranda v. Arizona* (1966), described earlier, cited *Bram* and condemned the Reid technique and other tactics that "are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty" (p. 450). This newfound concern with the impact of psychological interrogation tactics, however, was short lived. In the immediate aftermath of *Miranda*, the Supreme Court adopted a more deferential attitude toward law enforcement in its confession jurisprudence. In particular, *Arizona v. Fulminante* (1991) in dicta may have sounded the death knell for *Bram.* Responding to a party's invocation of *Bram*, the Court casually remarked that "under current precedent [Bram] does not state the standard for determining the voluntariness of a confession" (p. 286). However, White (1997) noted that "as Fulminante's holding indicates, some promises may be sufficient in and of themselves to render a confession involuntary; other promises may or may not be permissible depending upon the circumstances" (p. 150).

### *Cases Addressing Interrogation Tactics: Trickery and Deception*

The false evidence ploy is a controversial tactic occasionally used by police. Not all interrogation trainers approve of this practice (Gohara, 2006), the use of which has been implicated in the vast majority of documented police-induced false confessions (Kassin, 2005). In several pre-*Miranda* voluntariness cases, the U.S. Supreme Court recognized that deception can induce involuntary confessions, although the Court never held that such tactics would automatically invalidate a confession. In *Leyra v. Denno* (1954), for

example, Leyra asked to see a physician because he was suffering from sinus problems and police brought in a psychiatrist who posed as a general physician. The Supreme Court held that the "subtle and suggestive" questioning by the psychiatrist amounted to a continued interrogation of the suspect without his knowledge. This deception and other circumstances of the interrogation rendered Leyra's confession involuntary. Similarly, in *Spano v. New York* (1959), the suspect considered one of the interrogating officers to be a friend. The Court held that the officer's false statements, in which he suggested that the suspect's actions might cost the officer his job, were a key factor in rendering the resulting confession involuntary. In *Miranda v. Arizona* (1966), the Supreme Court discussed the use of trickery and deception and noted that the deceptive tactics recommended in standard interrogation manuals fostered a coercive environment. Again, the Court did not specifically prohibit such tactics, choosing instead to offer suspects some relief from the coercive effect by empowering them with rights which could be used to bring interrogation to a halt. The criticism of deception may have fanned hopes that the Court would deal a more direct blow to this controversial tactic in future cases. But such hopes were quickly quashed.

Three years later, in *Frazier v. Cupp* (1969), the Supreme Court addressed interrogation trickery and issued a decision that to this day has been interpreted by police and the courts as a green light to deception. In *Frazier*, police used a standard false evidence ploy—telling Frazier that another man whom he and the victim had been seen with on the night of the crime had confessed to their involvement. The investigating detective also used minimization, suggesting to Frazier that he had started a fight with the victim because the victim made homosexual advances toward him. Despite the use of these deceptive tactics, the Court held that Frazier's confession was voluntary. This ruling established that police deception by itself is not sufficient to render a confession involuntary. Rather, according to *Frazier*, deception is but one factor among many that a court should consider. Some state courts have distinguished between mere false assertions, which are permissible, and the fabrication of reports, tapes, and other evidence—which is not. In the Florida case of *State v. Cayward* (1989), the defendant's confession was suppressed because police had typed up a phony crime laboratory report that placed Cayward's DNA on the victim. However, the court's concern was not that the manufactured evidence might prompt an innocent person to confess but that it might find its way into court as evidence. Similarly, New Jersey confessions were suppressed when produced by a fake, staged audiotape of an alleged eyewitness account (*State v. Patton*, 1993) and a fake crime lab report identifying the suspect's DNA at the crime scene (*State v. Chirokovskcic*, 2004). This is where the law remains today despite numerous cautionary notes from academics and researchers on the use of deception (Gohara, 2006; Gudjonsson, 2003; Kassin, 2005; Kassin & Gudjonsson, 2004; Skolnick & Leo, 1992; but see Grano, 1994; Slobogin, 2007).

**Practices in England**

Interrogations and confession evidence are regulated in England and Wales by the Police and Criminal Evidence Act of 1984 (PACE; Home Office, 1985), which became effective in January 1986. The Act is supplemented by five Codes of Practice, referred to as Codes A (on stop and search), B (entry and searches of premises), C (detention and questioning of suspects), D (on identification parades), and E (tape recording of interviews). The Codes provide guidance to police officers concerning procedures and the appropriate treatment of suspects. Code C is particularly relevant to issues surrounding "fitness to be interviewed," as it provides guidance "on practice for the detention, treatment and questioning of persons by police officers" (Home Office, 2003, p. 47).

The most important interview procedures set out in PACE and its Codes of Practice are that: Suspects who are detained at a police station must be informed of their legal rights; in any 24-h period the detainee must be allowed a continuous period of rest of at least 8 hours; detainees who are vulnerable in terms of their age or mental functioning should have access to a responsible adult (known as an 'appropriate adult'), whose function is to give advice, further communication, and ensure that the interview is conducted properly and fairly; and all interviews shall be electronically recorded.

Compared to the approach typically taken in the U.S. (e.g., using the Reid technique), investigative interview practices in England are less confrontational. Williamson (2007) discussed in detail how psychological science has influenced the training of police officers and their interviewing practice, making it fairer and more transparent. Prior to 1992, investigators in Britain received no formal training and the chief purpose of interviewing suspects was to obtain confessions. Following some high-profile miscarriages of justice, such as the "Guildford Four" and "Birmingham Six," the Association of Chief Police Officers for England and Wales (ACPO) published the first national training program for police officers interviewing both suspects and witnesses. This new approach was developed through a collaboration of police officers, psychologists, and lawyers. The mnemonic PEACE was used to describe the five distinct parts of the new interview approach ("Preparation and Planning," "Engage and Explain," "Account," "Closure," and "Evaluate"). The theory underlying this approach, particularly in cases of witnesses, victims, and cooperative suspects, can be traced

to Fisher and Geiselman's (1992) work on the "Cognitive Interview" (Milne & Bull, 1999; for research evidence, see Clarke & Milne, 2001; Williamson, 2006). Recent analyses of police–suspect interviews in England have revealed that the confrontation-based tactics of maximization and minimization are in fact seldom used (Soukara, Bull, Vrij, Turner, & Cherryman, in press; Bull & Soukara, 2009).

## POLICE-INDUCED FALSE CONFESSIONS

As described earlier, the process of interrogation is designed to overcome the anticipated resistance of individual suspects who are presumed guilty and to obtain legally admissible confessions. The single-minded objective, therefore, is to increase the anxiety and despair associated with denial and reduce the anxiety associated with confession. To achieve these goals, police employ a number of tactics that involve isolating the suspect and then employing both negative and positive incentives. On the negative side, interrogators confront the suspect with accusations of guilt, assertions that are made with certainty and often bolstered by evidence, real or manufactured, and a refusal to accept alibis and denials. On the positive side, interrogators offer sympathy and moral justification, introducing "themes" that normalize and minimize the crime and lead suspects to see confession as an expedient means of escape. In this section, we describe some core principles of psychology relevant to understanding the suspect's decision making in this situation; then we describe the problem of false confessions and the situational and dispositional factors that put innocent people at risk.

### Types of False Confessions

Although it is not possible to calculate a precise incidence rate, it is clear that false confessions occur in different ways and for different reasons. Drawing on the pages of legal history, and borrowing from social-psychological theories of influence, Kassin and Wrightsman (1985) proposed a taxonomy that distinguished among three types of false confession: voluntary, coerced-compliant, and coerced-internalized (see also Kassin, 1997; Wrightsman & Kassin, 1993). This classification scheme has provided a useful framework for the study of false confessions and has since been used, critiqued, extended, and refined by others (Gudjonsson, 2003; Inbau et al., 2001; McCann, 1998; Ofshe & Leo, 1997a, 1997b).

#### *Voluntary False Confessions*

Sometimes innocent people have claimed responsibility for crimes they did not commit without prompting or pressure from police. This has occurred in several high-profile cases. After Charles Lindbergh's infant son was kidnapped in 1932, 200 people volunteered confessions. When "Black Dahlia" actress Elizabeth Short was murdered and her body mutilated in 1947, more than 50 men and women confessed. In the 1980s, Henry Lee Lucas in Texas falsely confessed to hundreds of unsolved murders, making him the most prolific serial confessor in history. In 2006, John Mark Karr volunteered a confession, replete with details, to the unsolved murder of young JonBenet Ramsey. There are a host of reasons why people have volunteered false confessions—such as a pathological desire for notoriety, especially in high-profile cases reported in the news media; a conscious or unconscious need for self-punishment to expiate feelings of guilt over prior transgressions; an inability to distinguish fact from fantasy due to a breakdown in reality monitoring, a common feature of major mental illness; and a desire to protect the actual perpetrator—the most prevalent reason for false admissions (Gudjonsson et al., 2004; Sigurdsson & Gudjonsson, 1996, 1997, 2001). Radelet, Bedau, and Putnam (1992) described one case in which an innocent man confessed to a murder to impress his girlfriend. Gudjonsson (2003) described another case in which a man confessed to murder because he was angry at police for a prior arrest and wanted to mislead them in an act of revenge.

#### *Compliant False Confessions*

In contrast to voluntary false confessions, compliant false confessions are those in which suspects are induced through interrogation to confess to a crime they did not commit. In these cases, the suspect acquiesces to the demand for a confession to escape a stressful situation, avoid punishment, or gain a promised or implied reward. Demonstrating the form of influence observed in classic studies of social influence (e.g., Asch, 1956; Milgram, 1974), this type of confession is an act of mere public compliance by a suspect who knows that he or she is innocent but bows to social pressure, often coming to believe that the short-term benefits of confession relative to denial outweigh the long-term costs. Based on a review of a number of cases, Gudjonsson (2003) identified some very specific incentives for this type of compliance—such as being allowed to sleep, eat, make a phone call, go home, or, in the case of drug addicts, feed a drug habit. The desire to bring the interview to an end and avoid additional confinement may be particularly pressing for people who are young, desperate, socially dependent, or phobic of being locked up in a police station. The pages of legal history are filled with stories of compliant false confessions. In the 1989 Central Park jogger case described earlier, five

teenagers confessed after lengthy interrogations. All immediately retracted their confessions but were convicted at trial and sent to prison—only to be exonerated 13 years later (*People of the State of New York v. Kharey Wise et al.*, 2002).

### *Internalized False Confessions*

In the third type of false confession, innocent but malleable suspects, told that there is incontrovertible evidence of their involvement, come not only to capitulate in their behavior but also to believe that they may have committed the crime in question, sometimes confabulating false memories in the process. Gudjonsson and MacKeith (1982) argued that this kind of false confession occurs when people develop such a profound distrust of their own memory that they become vulnerable to influence from external sources. Noting that the innocent confessor's belief is seldom fully internalized, Ofshe and Leo (1997a) have suggested that the term "persuaded false confession" is a more accurate description of the phenomenon. The case of 14-year-old Michael Crowe, whose sister Stephanie was stabbed to death in her bedroom, illustrates this type of persuasion. After a series of interrogation sessions, during which time police presented Crowe with compelling false physical evidence of his guilt, he concluded that he was a killer, saying: "I'm not sure how I did it. All I know is I did it." Eventually, he was convinced that he had a split personality—that "bad Michael" acted out of a jealous rage while "good Michael" blocked the incident from memory. The charges against Crowe were later dropped when a drifter in the neighborhood that night was found with Stephanie's blood on his clothing (Drizin & Colgan, 2004).

## Relevant Core Principles of Psychology

Earlier we reviewed the tactics of a modern American interrogation and the ways in which the U.S. Supreme Court has treated these tactics with respect to the voluntariness and admissibility of the confessions they elicit. As noted, the goal of interrogation is to alter a suspect's decision making by increasing the anxiety associated with denial and reducing the anxiety associated with confession (for an excellent description of a suspect's decision-making process in this situation, see Ofshe & Leo, 1997b).

Long before the first empirical studies of confessions were conducted, the core processes of relevance to this situation were familiar to generations of behavioral scientists. Dating back to Thorndike's (1911) law of effect, psychologists have known that people are highly responsive to reinforcement and subject to the laws of conditioning, and that behavior is influenced more by perceptions of short-term than long-term consequences. Of distal relevance to a psychological analysis of interrogation are the thousands of operant animal studies of reinforcement schedules, punishment, appetitive, avoidance, and escape learning, as well as behavioral modification applications in clinics, schools, and workplaces. Looking through this behaviorist lens, it seems that interrogators have sometimes shaped suspects to confess to particular narrative accounts of crimes like they were rats in a Skinner box (see Herrnstein, 1970; Skinner, 1938).

More proximally relevant to an analysis of choice behavior in the interrogation room are studies of human decision making in a behavioral economics paradigm. A voluminous body of research has shown that people make choices that they think will maximize their well-being given the constraints they face, making the best of the situation they are in—what Herrnstein has called the "matching law" (Herrnstein, Rachlin, & Laibson, 1997). With respect to a suspect's response to interrogation, studies on the discounting of rewards and costs show that people tend to be impulsive in their orientation, preferring outcomes that are immediate rather than delayed, with delayed outcomes depreciating over time in their subjective value (Rachlin, 2000). In particular, animals and humans clearly prefer delayed punishment to immediate aversive stimulation (Deluty, 1978; Navarick, 1982). These impulsive tendencies are especially evident in juvenile populations and among cigarette smokers, alcoholics, and other substance users (e.g., Baker, Johnson, & Bickel, 2003; Bickel & Marsch, 2001; Bickel, Odum, & Madden, 1999; Kollins, 2003; Reynolds, Richards, Horn, & Karraker, 2004).

Rooted in the observation that people are inherently social beings, a second set of core principles is that individuals are highly vulnerable to influence from change agents who seek their compliance. Of direct relevance to an analysis of interrogation are the extensive literatures on attitudes and persuasion (Petty & Cacioppo, 1986), informational and normative influences (e.g., Asch, 1956; Sherif, 1936), the use of sequential request strategies, as in the foot-in-the-door effect (Cialdini, 2001), and the gradual escalation of commands, issued by figures of authority, to effectively obtain self- and other-defeating acts of obedience (Milgram, 1974). Conceptually, Latane's (1981) social impact theory provides a predictive mathematical model that can account for the influence of police interrogators—who bring *power*, *proximity*, and *number* to bear on their exchange with suspects (for a range of social psychological perspectives on interrogation, see Bem, 1966; Davis & O'Donahue, 2004; Zimbardo, 1967).

A third set of core principles consists of the "seven sins of memory" that Schacter (2001) identified from cognitive and neuroscience research—a list that includes memory transience, misattribution effects, suggestibility, and bias.

When Kassin and Wrightsman (1985) first identified coerced-internalized or coerced-persuaded false confessions, they were puzzled. At the time, existing models of memory could not account for the phenomenon whereby innocent suspects would come to internalize responsibility for crimes they did not commit and confabulate memories about these nonevents. These cases occur when a suspect is dispositionally or situationally rendered vulnerable to manipulation and the interrogator then misrepresents the evidence, a common ploy. In light of a now extensive research literature on misinformation effects and the creation of illusory beliefs and memories (e.g., Loftus, 1997, 2005), experts can now better grasp the process by which people come to accept guilt for a crime they did not commit as well as the conditions under which this may occur (see Kassin, 2008).

## Situational Risk Factors

Among the situational risk factors associated with false confessions, three will be singled out: interrogation time, the presentation of false evidence, and minimization. These factors are highlighted because of the consistency in which they appear in cases involving proven false confessions.

### *Physical Custody and Isolation*

To ensure privacy and control, and to increase the stress associated with denial in an incommunicado setting, interrogators are trained to remove suspects from their familiar surroundings and question them in the police station—often in a special interrogation room. Consistent with guidelines articulated by Inbau et al. (2001), most interrogations are brief. Observational studies in the U.S. and Britain have consistently shown that the vast majority of interrogations last approximately from 30 minutes up to 2 hours (Baldwin, 1993; Irving, 1980; Leo, 1996b; Wald et al., 1967). In a recent self-report survey, 631 North American police investigators estimated from their experience that the mean length of a typical interrogation is 1.60 hours. Consistent with cautionary advice from Inbau et al. (2001) against exceeding 4 hours in a single session, these same respondents estimated on average that their longest interrogations lasted 4.21 hours (Kassin et al., 2007). Suggesting that time is a concern among practitioners, one former Reid technique investigator has defined interrogations that exceed 6 hours as "coercive" (Blair, 2005). In their study of 125 proven false confessions, Drizin and Leo (2004) thus found, in cases in which interrogation time was recorded, that 34% lasted 6–12 hours, that 39% lasted 12–24 hours, and that the mean was 16.3 hours.

It is not particularly surprising that false confessions tend to occur after long periods of time—which indicates a dogged persistence in the face of denial. The human needs for belonging, affiliation, and social support, especially in times of stress, are a fundamental human motive (Baumeister & Leary, 1996). People under stress seek desperately to affiliate with others for the psychological, physiological, and health benefits that social support provides (Rofe, 1984; Schachter, 1959; Uchino, Cacioppo, & Kiecolt-Glaser, 1996). Hence, prolonged isolation from significant others in this situation constitutes a form of deprivation that can heighten a suspect's distress and incentive to remove himself or herself from the situation. Depending on the number of hours and conditions of interrogation, sleep deprivation may also become a source of concern. Controlled laboratory experiments have shown that sleep deprivation, which may accompany prolonged periods of isolation, can heighten susceptibility to influence and impair decision-making abilities in complex tasks. The range of effects is varied, with studies showing that sleep deprivation markedly impairs the ability to sustain attention, flexibility of thinking, and suggestibility in response to leading questions (Blagrove, 1996; for a review, see Harrison & Horne, 2000). This research literature is not all based in the laboratory. For example, performance decrements have been observed in medical interns (e.g., Veasey, Rosen, Barzansky, Rosen, & Owens, 2002; Weinger & Ancoli-Israel, 2002)—as when sleep deprivation increased the number of errors that resident surgeons made in a virtual reality surgery simulation (Taffinder, McManus, Gul, Russell, & Darzi, 1998). Also demonstrably affected are motorists (Lyznicki, Doege, Davis, & Williams, 1998) and F-117 fighter pilots (Caldwell, Caldwell, Brown, & Smith, 2004). Combining the results in a meta-analysis, Pilcher and Huffcut (1996) thus concluded that: "overall sleep deprivation strongly impairs human functioning." The use of sleep deprivation in interrogation is hardly a novel idea. In *Psychology and Torture*, Suedfeld (1990) noted that sleep deprivation is historically one of the most potent methods used to soften up prisoners of war and extract confessions from them. Indeed, Amnesty International reports that most torture victims interviewed report having been deprived of sleep for 24 hours or more.

### *Presentations of False Evidence*

Once suspects are isolated, interrogators, armed with a strong presumption of guilt, seek to communicate that resistance is futile. This begins the confrontation process, during which interrogators exploit the psychology of inevitability to drive suspects into a state of despair. Basic research shows that once people see an outcome as inevitable, cognitive and motivational forces conspire to

promote their acceptance, compliance with, and even approval of the outcome (Aronson, 1999). In the case of interrogation, this process also involves interrupting the suspect's denials, overcoming objections, and refuting alibis. At times, American police will overcome a suspect's denials by presenting supposedly incontrovertible evidence of his or her guilt (e.g., a fingerprint, blood or hair sample, eyewitness identification, or failed polygraph)—even if that evidence does not exist. In the U.S., it is permissible for police to outright lie to suspects about the evidence (*Frazier v. Cupp*, 1969)—a tactic that is recommended in training (Inbau et al., 2001), and occasionally used (Kassin et al., 2007; Leo, 1996b).

Yet basic psychological research warns of the risk of this manipulation. Over the years, across a range of subdisciplines, basic research has revealed that misinformation renders people vulnerable to manipulation. To cite but a few highly recognized classics in the field, experiments have shown that presentations of false information—via confederates, witnesses, counterfeit test results, bogus norms, false physiological feedback, and the like—can substantially alter subjects' visual judgments (Asch, 1956; Sherif, 1936), beliefs (Anderson, Lepper, & Ross, 1980), perceptions of other people (Tajfel, Billig, Bundy, & Flament, 1971), behaviors toward other people (Rosenthal & Jacobson, 1968), emotional states (Schachter & Singer, 1962), physical attraction (Valins, 1966), self-assessments (Crocker, Voelkl, Testa, & Major, 1991), memories for observed and experienced events (Loftus, 2005), and even certain medical outcomes, as seen in studies of the placebo effect (Brown, 1998; Price, Finniss, & Benedetti, 2008). Scientific evidence for human malleability in the face of misinformation is broad and pervasive.

The forensic literature on confessions reinforces and extends this classic point, indicating that presentations of false evidence can lead people to confess to crimes they did not commit. This literature is derived from two sources of information. First, studies of actual cases reveal that the false evidence ploy, which is not permitted in Great Britain and most other European nations, is found in numerous wrongful convictions in the U.S., including DNA exonerations, in which there were confessions in evidence (Drizin & Leo, 2004; Leo & Ofshe, 1998). That this tactic appears in proven false confession cases makes sense. In self-report studies, actual suspects state that the reason they confessed is that they perceived themselves to be trapped by the weight of evidence (Gudjonsson & Sigurdsson, 1999; Moston, Stephenson, & Williamson, 1992).

Concerns about the polygraph are illustrative in this regard. Although it is best known for its use as a lie-detector test, and has value as an investigative tool, posttest "failure" feedback is often used to pressure suspects and can prompt false confessions. This problem is so common that Lykken (1998) coined the term "fourth degree" to describe the tactic (p. 235), and the National Research Council Committee to Review the Scientific Evidence on the Polygraph (2003) warned of the risk of polygraph-induced false confessions. In a laboratory demonstration that illustrates the point, Meyer and Youngjohn (1991) elicited false confessions to the theft of an experimenter's pencil from 17% of subjects told that they had failed a polygraph test on that question.

The second source of evidence is found in laboratory experiments that have tested the causal hypothesis that false evidence leads innocent people to confess to prohibited acts they did not commit. In one study, Kassin and Kiechel (1996) accused college students typing on a keyboard of causing the computer to crash by pressing a key they were instructed to avoid. Despite their innocence and initial denials, subjects were asked to sign a confession. In some sessions but not others, a confederate said she witnessed the subject hit the forbidden key. This false evidence nearly doubled the number of students who signed a written confession, from 48 to 94%.

Follow-up studies have replicated this effect to the extent that the charge was plausible (Horselenberg et al., 2006; Klaver, Lee, & Rose, 2008), even when the confession was said to bear a financial or other consequence (Horselenberg, Merckelbach, & Josephs, 2003; Redlich & Goodman, 2003), and even among informants who are pressured to report on a confession allegedly made by another person (Swanner, Beike, & Cole, in press). The effect has been particularly evident among stress-induced males (Forrest, Wadkins, & Miller, 2002) and children and juveniles who tend to be both more compliant and suggestible than adults (Candel, Merckelbach, Loyen, & Reyskens, 2005; Redlich & Goodman, 2003). Using a completely different paradigm, Nash and Wade (2009) used digital editing software to fabricate video evidence of participants in a computerized gambling experiment "stealing" money from the "bank" during a losing round. Presented with this false evidence, all participants confessed—and most internalized the belief in their own guilt.

One needs to be cautious in generalizing from laboratory experiments. Yet numerous false confession cases have featured the use and apparent influence of the false evidence ploy. In one illustrative case, in 1989, 17-year-old Marty Tankleff was accused of murdering his parents despite the complete absence of evidence against him. Tankleff vehemently denied the charges for several hours—until his interrogator told him that his hair was found within his mother's grasp, that a "humidity test" indicated he had showered (hence, the presence of only one spot of blood on his shoulder), and that his hospitalized father had emerged from his coma to say that Marty was his assailant—all of which were untrue (the father never

regained consciousness and died shortly thereafter). Following these lies, Tankleff became disoriented and confessed. Solely on the basis of that confession, Tankleff was convicted, only to have his conviction vacated and the charges dismissed 19 years later (Firstman & Salpeter, 2008; Lambert, 2008).

*Minimization: Promises Implied But Not Spoken*

In addition to thrusting the suspect into a state of despair by the processes of confrontation, interrogators are trained to minimize the crime through "theme development," a process of providing moral justification or face-saving excuses, making confession seem like an expedient means of escape. Interrogators are thus trained to suggest to suspects that their actions were spontaneous, accidental, provoked, peer-pressured, drug-induced, or otherwise justifiable by external factors. In the Central Park jogger case, every boy gave a false confession that placed his cohorts at center stage and minimized his own involvement (e.g., 16-year-old Kharey Wise said he felt pressured by peers)—and each said afterward that he thought he would go home after confessing based on statements made by police.

Minimization tactics that imply leniency may well lead innocent people who feel trapped to confess. Two core areas of psychology compel this conclusion. The first concerns the principle of reinforcement. As noted earlier, generations of basic behavioral scientists, dating back to Thorndike (1911), and formalized by Skinner (1938), have found that people are highly responsive to reinforcement and the perceived consequences of their behavior. More recent studies of human decision making have added that people are particularly influenced by outcomes that are immediate rather than delayed, the latter depreciating over time in their subjective value (Rachlin, 2000). The second core principle concerns the cognitive psychology of pragmatic implication. Over the years, researchers have found that when people read text or hear speech, they tend to process information "between the lines" and recall not what was stated per se, but what was *pragmatically implied.* Hence, people who read that "The burglar goes to the house" often mistakenly recall later that the burglar actually broke into the house; those who hear that "The flimsy shelf weakened under the weight of the books" often mistakenly recall that the shelf actually broke (Chan & McDermott, 2006; Harris & Monaco, 1978; Hilton, 1995). These findings indicate that pragmatic inferences can change the meaning of a communication, leading listeners to infer something that is "neither explicitly stated nor necessarily implied" (Brewer, 1977).

Taken together, basic research showing that people are highly influenced by perceived reinforcements and that people process the pragmatic implications of a communication suggests the possibility that suspects infer leniency in treatment from minimizing remarks that depict the crime as spontaneous, accidental, pressured by others, or otherwise excusable—even in the absence of an explicit promise. To test this hypothesis, Kassin and McNall (1991) had subjects read a transcript of an interrogation of a murder suspect (the text was taken from an actual New York City interrogation). The transcripts were edited to produce three versions in which the detective made a contingent explicit promise of leniency, used the technique of minimization by blaming the victim, or did not use either technique. Subjects read one version and then estimated the sentence that they thought would be imposed on the suspect. The result: As if explicit promises had been made, minimization lowered sentencing expectations compared to conditions in which no technique was used.

More recently, researchers have found that minimization can also lead innocent people to confess. Using the computer crash paradigm described earlier, Klaver, Lee, and Rose (2008) found that minimization remarks significantly increased the false confession rate when the accusation concerning the forbidden key press was plausible. Russano, Meissner, Kassin, and Narchet (2005) devised a newer laboratory paradigm to not only assess the behavioral effects of minimization but to assess the diagnosticity of the resulting confession (a technique has "diagnosticity" to the extent that it increases the ratio of true to false confessions). In their study, subjects were paired with a confederate for a problem-solving study and instructed to work alone on some problems and jointly on others. In the *guilty* condition, the confederate sought help on a problem that was supposed to be solved alone, inducing a violation of the experimental prohibition. In the *innocent* condition, the confederate did not make this request to induce the crime. The experimenter soon "discovered" a similarity in their solutions, separated the subject and confederate, and accused the subject of cheating. The experimenter tried to get the subject to sign an admission by overtly promising leniency (a deal in which research credit would be given in exchange for a return session without penalty), making minimizing remarks ("I'm sure you didn't realize what a big deal it was"), using both tactics, or using no tactics. Overall, the confession rate was higher among guilty subjects than innocent, when leniency was promised than when it was not, and when minimization was used than when it was not. Importantly, diagnosticity—defined as the rate of true confessions to false confessions—was highest at 7.67 when no tactics were used (46% of guilty suspects confessed vs. only 6% of innocents) and minimization—just like an explicit offer of leniency—reduced diagnosticity to 4.50 by increasing not only the rate of true confessions (from 46 to 81%) but even more so the rate of false confessions (which tripled from 6 to 18%). In short,

minimization provides police with a loophole in the rules of evidence by serving as the implicit but functional equivalent to a promise of leniency (which itself renders a confession inadmissible). The net result is to put innocents at risk to make false confessions.

It is important to note that minimization and the risk it engenders is not a mere laboratory phenomenon. Analyzing more than 125 electronically recorded interrogations and transcripts, Ofshe and Leo (1997a, 1997b) found that police often use techniques that serve to communicate promises and threats through pragmatic implication. These investigators focused specifically on what they called *high-end inducements*—appeals that communicate to a suspect that he or she will receive less punishment, a lower prison sentence, or some form of prosecutorial or judicial leniency upon confession and/or a higher charge or longer prison sentence in the absence of confession. In some homicide cases, for example, interrogators suggested that if the suspect admits to the killing it would be framed as unintentional, as an accident, or as an act of justifiable self-defense—not as premeditated cold-blooded murder, the portrayal that would follow from continued denial. This is a variant of the "maximization"/"minimization" technique described by Kassin and McNall (1991), which communicates through pragmatic implication that the suspect will receive more lenient treatment if he or she confesses but harsher punishment if he or she does not.

## Dispositional Risk Factors

In any discussion of dispositional risk factors for false confession, the two most commonly cited concerns are a suspect's age (i.e., juvenile status) and mental impairment (i.e., mental illness, mental retardation). These common citations are because of the staggering overrepresentation of these groups in the population of proven false confessions. For example, of the first 200 DNA exonerations in the U.S., 35% of the false confessors were 18 years or younger and/or had a developmental disability. In their sample of wrongful convictions, Gross, Jacoby, Matheson, Montgomery, and Patel (2005) found that 44% of the exonerated juveniles and 69% of exonerated persons with mental disabilities were wrongly convicted because of false confessions.

### *Adolescence and Immaturity*

There is strong evidence that juveniles are at risk for involuntary and false confessions in the interrogation room (for reviews see Drizin & Colgan, 2004; Owens-Kostelnik, Reppucci, & Meyer, 2006; Redlich, 2007; Redlich & Drizin, 2007; Redlich, Silverman, Chen, & Steiner, 2004). Juveniles are over represented in the pool of identified false confession cases: 35% of the proven false confessors in the Drizin and Leo (2004) sample were younger than age 18, and within this sample of juveniles, 55% were aged 15 or younger. Comparatively, of all persons arrested for murder and rape, only 8 and 16%, respectively, are juveniles (Snyder, 2006). Numerous high-profile cases, such as the Central Park Jogger case (Kassin, 2002), have demonstrated the risks of combining young age, and the attributes that are associated with it (e.g., suggestibility, heightened obedience to authority, and immature decision-making abilities), and the psychologically oriented interrogation tactics described earlier. Hence, Inbau et al. (2001) concede that minors are at special risk for false confession and advise caution when interrogating a juvenile. Referring to the presentation of fictitious evidence, for example, they note: "This technique should be avoided when interrogating a youthful suspect with low social maturity" (p. 429).

The field of developmental psychology was born over a century ago in the influential writings of James Baldwin, Charles Darwin, G. Stanley Hall, and William Stern (see Parke, Ornstein, Rieser, & Zahn-Waxler, 1994). Since that time, basic research has shown that children and adolescents are cognitively and psychosocially less mature than adults—and that this immaturity manifests in impulsive decision making, decreased ability to consider long-term consequences, engagement in risky behaviors, and increased susceptibility to negative influences. Specifically, this body of research indicates that early adolescence marks the onset of puberty, heightening emotional arousability, sensation seeking, and reward orientation; that mid-adolescence is a period of increased vulnerability to risk-taking and problems in affect and behavior; and that late adolescence is a period in which the frontal lobes continue to mature, facilitating regulatory competence and executive functioning (for reviews, see Steinberg, 2005; Steinberg & Morris, 2001). Recent neurological research on brain development dovetails with findings from behavioral studies. Specifically, these studies have shown continued maturation during adolescence in the limbic system (emotion regulation) and in the prefrontal cortex (planning and self-control), with gray matter thinning and white matter increasing (Steinberg, 2007).

The developmental capabilities and limitations of adolescents are highly relevant to behavior in the interrogation room. In *Roper v. Simmons* (2005), Justice Kennedy cited three general differences between juveniles and adults in support of the Court's reasoning for abolishing the death penalty for juveniles. First, he addressed the lessened maturity and responsibility of juveniles compared to adults with specific mention to the 18-year bright-line requirements for marriage without parental consent, jury duty, and voting. Second, Justice Kennedy noted that "juveniles are

more vulnerable or susceptible to negative influences and outside pressures, including peer pressure" (p. 15). Consistent with this portrait, Drizin and Leo (2004) found in their sample of false confessions that several involved two or more juveniles (out of 38 multiple false confession cases, half involved juveniles). In recommending that police "play one [suspect] against the other," Inbau et al. (2001) note that this tactic may be especially effective on young, first-time offenders (pp. 292–293). Third, Justice Kennedy recognized that juveniles' personality or "character" is not as well developed as adults. In light of the volatility of adolescence, it is interesting that Inbau et al. (2001) also suggest "themes" for confession that exploit a juvenile's restless energy, boredom, low resistance to temptation, and lack of supervision.

Drawing on basic principles of developmental psychology, there is now a wealth of forensically oriented research indicating that juveniles—suspects, defendants, and witnesses—have age-related limitations of relevance to the legal system in comparison to adults. For example, individuals younger than 16 years generally have impairments in adjudicative competence (e.g., the ability to help in one's own defense) and comprehension of legal terms (Grisso et al., 2003; Saywitz, Nathanson, & Snyder, 1993). In a subset of studies particularly germane to interrogations, several researchers employing a range of methodologies have shown that the risk of false confession is heightened during childhood and adolescence relative to adulthood. Of particular note, as described earlier, juveniles are more likely than adults to exhibit deficits in their understanding and appreciation of the *Miranda* rights that were explicitly put into place to protect people subject to "inherently coercive" interrogations (see Grisso, 1981; Redlich et al., 2003).

In the first set of studies, laboratory-based experiments have examined juveniles' responses in mock crimes and interrogations. Using the Kassin and Kiechel (1996) computer crash paradigm, Redlich and Goodman (2003) found that juveniles aged 12- and 13-years-old, and 15- and 16-years-old, were more likely to confess than young adults (aged 18–26 years), especially when confronted with false evidence of their culpability. In fact, a majority of the younger participants, in contrast to adults, complied with the request to sign a false confession without uttering a word. In another laboratory experiment, researchers examined the effect of positive and negative reinforcement on children aged 5 through 8 years (Billings et al., 2007). Reinforcement strongly affected children's likelihood of making false statements: Of those in the reinforcement condition, 52% made false admissions of guilty knowledge and 30% made false admissions of having witnessed the crime (within a span of 3.5 minutes!). In contrast, of children in the control condition, only 36 and 10% made false guilty knowledge and admissions, respectively. These findings mirror the vast majority of studies on the interview-relevant abilities of child-victim/witnesses (e.g., Garven, Wood, & Malpass, 2000).

In a second set of studies, youths have made decisions in response to hypothetical scenarios. Goldstein et al. (2003) investigated male juvenile offenders' self-reported likelihood of providing false confessions across different interrogation situations and found that younger age significantly predicted false confessions (25% surmised that they would definitely confess despite innocence to at least one of the situations). Similarly, Grisso et al. (2003) examined juveniles' and young adults' responses to a hypothetical mock-interrogation situation—specifically, whether they would confess to police, remain silent, or deny the offense. Compared to individuals aged 16 and older, those between 11 and 15 were significantly more likely to report that they would confess.

In a third set of studies, juveniles have been asked to self-report on actual interrogation experiences. In a sample of 114 justice-involved juveniles, Viljoen, Klaver, and Roesch (2005) found that suspects who were 15-years old and younger, compared to those who were 16- and 17-years old, were significantly more likely to waive their right to counsel and to confess. Overall, only 11 (less than 10%) said they had asked for an attorney during police questioning (see also Redlich et al., 2004) and 9 (6%) said they had at some point falsely confessed. A survey of over 10,000 Icelandic students aged 16–24 years similarly revealed that of those with interrogation experiences, 7% claimed to have falsely confessed, with the rates being higher among those with more than one interrogation experience (Gudjonsson, Sigurdsson, Asgeirsdottir, & Sigfusdottir, 2006). In a massive and more recent effort, more than 23,000 juveniles from grades 8, 9, and 10 (average age of 15.5 years) were surveyed from seven countries—Iceland, Norway, Finland, Latvia, Lithuania, Russia, and Bulgaria. Overall, 11.5% (2,726) reported having been interrogated by police. Within this group, 14% reported having given a false confession (Gudjonsson, Sigurdsson, Asgeirsdottir, & Sigfusdottir, in press).

### *Cognitive and Intellectual Disabilities*

Much of what is true of juveniles is similarly true for persons with intellectual disabilities—another group that is over-represented in false confession cases (see Gudjonsson, 2003; Gudjonsson & MacKeith, 1994). Hence, in *Atkins v. Virginia* (2002), the U.S. Supreme Court explicitly cited the possibility of false confession as a rationale underlying their decision to exclude this group categorically from capital punishment. The case of Earl Washington is illustrative of the problem. Reported to have an IQ ranging

from 57 to 69 and interrogated over the course of 2 days, Washington "confessed" to five crimes, one being the rape and murder of a woman (charges resulting from the other four confessions were dismissed because of inconsistencies). Although he could not provide even basic details (e.g., that the victim was raped or her race) and although much of his statement was inconsistent with the evidence, Washington—who was easily led by suggestive questions and deferred to authority figures—was convicted, sentenced to death, and incarcerated for 18 years before being exonerated (Hourihan, 1995).

Mental retardation represents a constellation of symptoms, disorders, and adaptive functioning. The condition is defined by an IQ score of 70 or below and a range of impairments, such as adapting to societal norms, communication, social and interpersonal skills, and self-direction (American Psychiatric Association, 1994). In training police recruits, Perske (2004) identifies from research a number of tendencies exhibited by people who are mentally retarded. Collectively suggesting a heightened susceptibility to influence, the list includes the tendencies to rely on authority figures for solutions to everyday problems; please persons in authority; seek out friends; feign competence; exhibit a short attention span; experience memory gaps; lack impulse control; and accept blame for negative outcomes.

Some researchers have provided evidence for the diminished capacity of persons with cognitive disabilities in studies pertaining to interrogation (Fulero & Everington, 2004). Across four studies of *Miranda* comprehension, findings are quite consistent in showing that persons with mental retardation have significant deficits in their understanding and appreciation of *Miranda* warnings (Cloud, Shepard, Barkoff, & Shur, 2002; Everington & Fulero, 1999; Fulero & Everington, 1995; O'Connell, Garmoe, & Goldstein, 2005). For example, O'Connell et al. (2005) found that 50% of people with mild mental retardation in their sample could not correctly paraphrase *any* of the five *Miranda* components (see also Everington & Fulero, 1999). In comparison, less than 1% of adults in the general population score similarly low (Grisso, 1996). Moreover, research on the capacity of persons with mental retardation to learn and retain the knowledge and skills necessary to be competent suspects and defendants demonstrates that a significant number cannot meet this threshold, even with education (Anderson & Hewitt, 2002).

Everington and Fulero (1999) also examined the suggestibility of persons with mental retardation. Using the Gudjonsson Suggestibility Scale (GSS; a measure of interrogative suggestibility), they found that people with mental retardation were more likely to yield to leading questions and change their answers in response to mild negative feedback (see also O'Connell et al., 2005). Gudjonsson (1991) examined GSS scores among three groups: alleged false confessors, alleged true confessors, and suspects who resisted confession during questioning. He found the alleged false confessors to have the lowest IQ scores as well as the highest suggestibility scores compared to the other two groups (Gudjonsson & Clare, 1995). Finally, Clare and Gudjonsson (1995) examined perceptions of a videotaped suspect who provides a true and false confession during an interrogation and found that 38% of perceivers with intellectual disabilities, compared to only 5% of those without intellectual disabilities, believed the suspect would be allowed to go home while awaiting trial. Additionally, only 52% believed that the suspect should obtain legal advice if innocent, compared to 90% of others.

*Personality and Psychopathology*

In terms of susceptibility to false confession, it is important to consider other individual factors of relevance to a person's decision to confess. Gudjonsson (2003) discusses a number of personal risk factors, including enduring personality traits (e.g., suggestibility, compliance) as well as psychopathology and personality disorders—categories within the DSM-IV Axis I and II diagnostic framework that are relevant to false confessions.

A number of large-scale studies of false confessions, carried out in Iceland, show the importance of antisocial personality traits and history of offending both among prison inmates (Sigurdsson & Gudjonsson, 2001) and community samples (Gudjonsson, Sigurdsson, Asgeirsdottir, & Sigfusdottir, 2006, 2007; Gudjonsson, Sigurdsson, Bragason, et al., 2004; Gudjonsson et al., 2004). There have also been cases in which the personality disorder was considered crucial to understanding the false confession (Gudjonsson, 2006; Gudjonsson & Grisso, 2008). One interpretation of this finding is that persons with antisocial personality disorder, or antisocial traits, are more likely to be involved in offending, more often interviewed by police, and prone to lie for short-term instrumental gain, and are less concerned about the consequences of their behavior. This increases their tendency to make false denials as well as false confessions depending on their need at the time.

Psychopathology seems to be linked to false confessions in that persons with mental illness are over-represented in these cases. Psychological disorder is often accompanied by faulty reality monitoring, distorted perception, impaired judgment, anxiety, mood disturbance, poor self-control, and feelings of guilt. Gudjonsson (2003) provided a number of examples of cases where false confessions were directly related to specific disorders. Following the release of the Birmingham Six in 1991, research conducted for the British Royal Commission on Criminal Justice found that about 7% of suspects detained at police stations had a

history of mental illness and that many more were in an abnormal mental state due to anxiety and mood disturbance (Gudjonsson, Clare, Rutter, & Pearse, 1993). Similar findings were found in a recent study among suspects at Icelandic police stations (Sigurdsson, Gudjonsson, Einarsson, & Gudjonsson, 2006). In the U.S., research has consistently shown that rates of serious mental illness in the criminal justice system are at least two to five times higher than rates in the general population (e.g., James & Glaze, 2006; Lamb & Weinberger, 1998). To further compound the problem, the majority (75–80%) of offenders with mental illness have co-occurring substance abuse or dependence disorders (Abram, Teplin, & McClelland, 2003), which is an additional risk factor for false confessions (see Sigurdsson & Gudjonsson, 2001).

There is currently little research available to show how different disorders (e.g., anxiety, depression, and schizophrenia) potentially impair the suspect's capacity to waive legal rights and navigate his or her way through a police interview (Redlich, 2004). However, there is recent evidence from two separate studies to suggest that depressed mood is linked to a susceptibility to provide false confession to police (Gudjonsson et al., 2006; Sigurdsson et al., 2006). Gudjonsson et al. (2007) also recently found that multiple exposures to unpleasant or traumatic life events were significantly associated with self-reported false confessions during interrogation. Rogers et al. (2007a) found that most mentally disordered offenders exhibited insufficient understanding of *Miranda*, particularly when the warnings required increased levels of reading comprehension. Finally, Redlich (2007) found that offenders with mental illness self-reported a 22% lifetime false confession rate—notably higher than the 12% found in samples of prison inmates without mental illness (Sigurdsson & Gudjonsson, 1996).

An important type of psychopathology in relation to false confessions is attention deficit hyperactivity disorder (ADHD), which consists of three primary symptoms: inattention, hyperactivity, and impulsivity (American Psychiatric Association, 1994). This condition is commonly found among offenders (Young, 2007). Moreover, research shows that people with ADHD cope during questioning by answering a disproportionate number of questions with "don't know" replies—which may lead police to be suspicious of their answers (Gudjonsson, Young, & Bramham, 2007). They may also exhibit high levels of compliance. Gudjonsson et al. (2008) found that the rate of self-reported false confessions was significantly higher among prisoners who were currently symptomatic for attention deficit hyperactivity disorder (ADHD) than among the other prisoners (41 and 18%, respectively). These findings highlight the potential vulnerability during questioning of people who are currently symptomatic for ADHD.

### *Protections for Vulnerable Suspects in England*

When the police interview mentally disordered persons and juveniles in England and Wales, there are special legal provisions available to ensure that their statements to police are reliable and properly obtained—for example, in the presence of "appropriate adults." The current legal provisions are detailed in the Codes of Practice (Home Office, 2003). Even when the police adhere to all the legal provisions, a judge may consider it unsafe and unfair to allow the statement to go before the jury. Here the crucial issue may be whether or not the defendant was "mentally fit" when interviewed. The term "fitness for interview" was first introduced formally in the current Codes of Practice, which became effective in 2003.

Fitness for interview is closely linked to the concept of "legal competencies," which refers to an individual's physical, mental, and social vulnerabilities that may adversely affect his or her capacity to cope with the investigative and judicial process (Grisso, 1986). Historically, legal competence constructs relating to confession evidence have focused primarily on the functional deficits of juveniles (Drizin & Colgan, 2004), and adult defendants with mental retardation (Fulero & Everington, 2004) and mental illnesses (Melton, Petrila, Poythress, & Slobogin, 1997). Increasingly, the construct of legal competence in criminal cases is also being applied to defendants with "personality disorder" (Gudjonsson & Grisso, 2008). The introduction of "fitness to be interviewed" within the current Codes of Practice in England and Wales is a significant step toward protecting vulnerable suspect populations (Gudjonsson, 2005). Indeed, a similar framework has been introduced in New Zealand and Australia (Gall & Freckelton, 1999).

## Innocence as a Risk Factor

On September 20, 2006, Jeffrey Mark Deskovic was released from a maximum-security prison in New York, where he spent 15 years for a murder he said he committed but did not. Why did he confess? "Believing in the criminal justice system and being fearful for myself, I told them what they wanted to hear," Deskovic said. Certain that DNA testing on the semen would establish his innocence, he added: "I thought it was all going to be okay in the end" (Santos, 2006, p. A1).

On the basis of anecdotal and research evidence, Kassin (2005) suggested the ironic hypothesis that *innocence* itself may put *innocents* at risk. Specifically, it appears that people who stand falsely accused tend to believe that truth and justice will prevail and that their innocence will become transparent to investigators, juries, and others. As a result, they cooperate fully with police, often failing to

realize that they are suspects not witnesses, by waiving their rights to silence and a lawyer and speaking freely to defend themselves. Thus, although mock criminals vary their disclosures according to whether the interrogator seems informed about the evidence, innocents are uniformly forthcoming—regardless of how informed the interrogator seems (Hartwig, Granhag, Strömwall, & Kronkvist, 2006; Hartwig, Granhag, Strömwall, & Vrij, 2005).

Based on observations of live and videotaped interrogations, Leo (1996b) found that four out of five suspects waive their rights and submit to questioning—and that people who have no prior record of crime are the most likely to do so. In light of known recidivism rates, this result suggested that innocent people in particular are at risk to waive their rights. Kassin and Norwick (2004) tested this hypothesis in a controlled laboratory setting in which some subjects but not others committed a mock theft of $100. Upon questioning, subjects who were innocent were more likely to sign a waiver than those who were guilty, 81 to 36%. Afterward, most innocent subjects said that they waived their rights precisely because they were innocent: "I did nothing wrong," "I had nothing to hide." The feeling of reassurance that accompanies innocence may be rooted in a generalized and perhaps motivated belief in a just world in which human beings get what they deserve and deserve what they get (Lerner, 1980). It may also stem from the "illusion of transparency," a tendency for people to overestimate the extent to which their true thoughts, emotions, and other inner states can be seen by others (Gilovich, Savitsky, & Medvec, 1998; Miller & McFarland, 1987). Whatever the mechanism, it is clear that *Miranda* warnings may not adequately protect the citizens who need it most—those accused of crimes they did not commit (Kassin, 2005).

These findings suggest that people have a naïve faith in the power of innocence to set them free. This phenomenology was evident in the classic case of Peter Reilly, an 18-year-old who falsely confessed to the murder of his mother. When asked years later why he did not invoke his *Miranda* rights, Reilly said, "My state of mind was that I hadn't done anything wrong and I felt that only a criminal really needed an attorney, and this was all going to come out in the wash" (Connery, 1996, p. 93). Innocence may lead innocents to forego other important safeguards as well. Consider the case of Kirk Bloodsworth, the first death row inmate to be exonerated by DNA. In 1985, based solely on eyewitness identifications, Bloodsworth was convicted for the rape and murder of a 9-year-old girl. He was exonerated by DNA 8 years later and ultimately vindicated when the true perpetrator was identified. The day of his arrest, Bloodsworth was warned that there would be cameras present and asked if he wanted to cover his head with a blanket. He refused, saying he did nothing wrong and was not going to hide—even though potential witnesses might see him on TV (Junkin, 2004).

## THE CONSEQUENCES OF CONFESSION

It is inevitable that some number of innocent people will be targeted for suspicion and subjected to excessively persuasive interrogation tactics, and many of them will naively and in opposition to their own self-interest waive their rights and confess. One might argue that this unfortunate chain of events is tolerable, not tragic, to the extent that the resulting false confessions are detected by authorities at some point and corrected. Essential to this presumed safety net is the belief that police, prosecutors, judges, and juries are capable of distinguishing true and false confessions.

The process begins with the police. Numerous false confession cases reveal that once a suspect confesses, police often close their investigation, deem the case solved, and overlook exculpatory evidence or other possible leads–even if the confession is internally inconsistent, contradicted by external evidence, or the product of coercive interrogation (Drizin & Leo, 2004; Leo & Ofshe, 1998). This trust in confessions may extend to prosecutors as well, many of whom express skepticism about police-induced false confessions, stubbornly refusing to admit to such an occurrence even after DNA evidence has unequivocally established the defendant's innocence (Findley & Scott, 2006; Hirsch, 2005b; Kassin & Gudjonsson, 2004). Upon confession, prosecutors tend to charge suspects with the highest number and types of offenses, set bail higher, and are far less likely to initiate or accept a plea bargain to a reduced charge (Drizin & Leo, 2004; Leo & Ofshe, 1998; but see Redlich, in press).

Part of the problem is that confessions can taint other evidence. In one case, for example, Pennsylvania defendant Barry Laughman confessed to rape and murder, which was later contradicted by blood typing evidence. Clearly influenced by the confession, the state forensic chemist went on to concoct four "theories," none grounded in science, to explain away the mismatch. Sixteen years later, Laughman was set free (http://www.innocenceproject.org). Recent empirical studies have demonstrated the problem as well. In one study, Dror and Charlton (2006) presented five latent fingerprint experts with pairs of prints from a crime scene and suspect in an actual case in which they had previously made a match or exclusion judgment. The prints were accompanied either by no extraneous information, an instruction that the suspect had confessed (suggesting a match), or an instruction that the suspect was in custody at the time (suggesting an exclusion). The misinformation

produced a change in 17% of the original, previously correct judgments. In a second study, Hasel and Kassin (2009) staged a theft and took photographic identification decisions from a large number of eyewitnesses who were present. One week later, individual witnesses were told that the person they had identified denied guilt, or that he confessed, or that a specific other lineup member confessed. Influenced by this information, many witnesses went on to change their identification decisions, selecting the confessor with confidence, when given the opportunity to do so.

Not surprisingly, confessions are particularly potent in the courtroom. When a suspect in the U.S. retracts his or her confession, pleads not guilty, and goes to trial, a sequence of two decisions is set into motion. First, a judge determines whether the confession was voluntary and hence admissible as evidence. Then a jury, hearing the admissible confession, determines whether the defendant is guilty beyond a reasonable doubt. But can people distinguish between true and false confessions? And what effect does this evidence have within the context of a trial?

Research on the impact of confessions throughout the criminal justice system is unequivocal. Mock jury studies have shown that confessions have more impact than other potent forms of evidence (Kassin & Neumann, 1997) and that people do not fully discount confessions—even when they are judged to be coerced (Kassin & Wrightsman, 1980) and even when the confessions are presented secondhand by an informant who is motivated to lie (Neuschatz, Lawson, Swanner, Meissner, & Neuschatz, 2008). For example, Kassin and Sukel (1997) presented mock jurors with one of three versions of a murder trial transcript. In a low-pressure version, the defendant was said to have confessed to police immediately upon questioning. In a high-pressure version, participants read that the suspect was in pain and interrogated aggressively by a detective who waved his gun in a menacing manner. A control version contained no confession in evidence. Presented with the high-pressure confession, participants appeared to respond in the legally prescribed manner. They judged the statement to be involuntary and said it did not influence their decisions. Yet when it came to the all-important verdict measure, this confession significantly increased the conviction rate. This increase occurred even in a condition in which subjects were specifically admonished to disregard confessions they found to be coerced. Similar results have recently been reported in mock jury studies involving defendants who are minors (Redlich, Ghetti, & Quas, 2008; Redlich, Quas, & Ghetti, 2008).

This point concerning the power of confession evidence is bolstered by recent survey evidence indicating that although laypeople understand that certain interrogation tactics are psychologically coercive, they do not believe that these tactics elicit false confessions (Leo & Liu, 2009). Archival analyses of actual cases also reinforce this point. When proven false confessors pleaded not guilty and proceeded to trial, the jury conviction rates ranged from 73% (Leo & Ofshe, 1998) to 81% (Drizin & Leo, 2004). These figures led Drizin and Leo to describe confessions as "inherently prejudicial and highly damaging to a defendant, even if it is the product of coercive interrogation, even if it is supported by no other evidence, and even if it is ultimately proven false beyond any reasonable doubt" (p. 959).

There are at least three reasons why people cannot easily identify as false the confessions of innocent suspects. First, generalized common sense leads people to trust confessions the way they trust other behaviors that counter self-interest. Over the years, and across a wide range of contexts, social psychologists have found that social perceivers fall prey to the fundamental attribution error—that is, they tend to make dispositional attributions for a person's actions, taking behavior at face value, while neglecting the role of situational factors (Jones, 1990; Ross, 1977). Gilbert and Malone (1995) offered several explanations for this bias, the most compelling of which is that people draw quick and relatively automatic dispositional inferences from behavior and then fail to adjust or correct for the presence of situational constraints. Common sense further compels the belief that people present themselves in ways that are self-serving and that confessions must therefore be particularly diagnostic of guilt. Indeed, most people reasonably believe that they would never confess to a crime they did not commit and have only rudimentary understanding of the predispositional and situational factors that would lead someone to do so (Henkel, Coffman, & Dailey, 2008).

A second reason is that people are typically not adept at deception detection. We saw earlier that neither lay people nor professionals distinguish truths from lies at high levels of accuracy. This problem extends to judgments of true and false confessions. To demonstrate, Kassin, Meissner, and Norwick (2005) videotaped male prison inmates providing true confessions to the crimes for which they were incarcerated and concocting false confessions to crimes selected by the experimenter that they did not commit. When college students and police investigators later judged these statements from videotapes or audiotapes, the results showed that neither group was particularly adept, exhibiting accuracy rates that ranged from 42 to 64%—typically not much better than chance performance. These findings suggest people cannot readily distinguish true and false confessions and that law enforcement experience does not improve performance. This latter result is not surprising, as many of the behavioral cues that typically form part of the basis for training (e.g., gaze aversion, postural cues, and

grooming gestures) are not statistically correlated with truth-telling or deception (DePaulo et al., 2003).

On the assumption that "I'd know a false confession if I saw one," there is a third reason for concern: Police-induced false confessions often contain *content* cues presumed to be associated with truthfulness. In many documented false confessions, the statements ultimately presented in court contained not only an admission of guilt but vivid details about the crime, the scene, and the victim that became known to the innocent suspect through leading questions, photographs, visits to the crime scene, and other secondhand sources invisible to the naïve observer. To further complicate matters, many false confessors state not just what they allegedly did, and how they did it, but *why*—as they self-report on revenge, jealousy, provocation, financial desperation, peer pressure, and other prototypical motives for crime. Some of these statements even contain apologies and expressions of remorse. To the naïve spectator, such statements appear to be voluntary, textured with detail, and the product of personal experience. Uninformed, however, this spectator mistakes illusion for reality, not realizing that the taped confession is scripted by the police theory of the case, rehearsed during hours of unrecorded questioning, directed by the questioner, and ultimately enacted on paper, tape, or camera by the suspect (see Kassin, 2006).

## RECOMMENDATIONS FOR REFORM

Confession is a potent form of evidence that triggers a chain of events from arrest, prosecution, and conviction, through post-conviction resistance to change in the face of exculpatory information. Recent DNA exonerations have shed light on the problem that innocent people, confident in the power of their innocence to prevail, sometimes confess to crimes they did not commit. Research has identified two sets of risks factors. The first pertains to the circumstances of interrogation, situational factors such as a lengthy custody and isolation, possibly accompanied by a deprivation of sleep and other need states; presentations of false evidence, a form of trickery that is designed to link the suspect to the crime and lead him or her to feel trapped by the evidence; and minimization tactics that lead the suspect and others to infer leniency even in the absence of an explicit promise. The second set of risk factors pertains to dispositional characteristics that render certain suspects highly vulnerable to influence and false confessions—namely, adolescence and immaturity; cognitive and intellectual impairments; and personality characteristics and mental illness.

In light of the wrongful convictions involving false confessions that have recently surfaced, as well as advances in psychological research on interviewing, interrogations, and confessions, there are renewed calls for caution regarding confessions and the reform of interrogation practices not seen since the Wickersham Commission Report (1931) and U.S. Supreme Court opinion in *Miranda* (1966). Professionals from varying perspectives may differ in their perceptions of both the problems and the proposed solutions. Hence, it is our hope that the recommendations to follow will inspire a true collaborative effort among law enforcement professionals, district attorneys, defense lawyers, judges, social scientists, and policy makers to scrutinize the systemic factors that put innocent people at risk and devise effective safeguards.

### Electronic Recording of Interrogations

Without equivocation, our most essential recommendation is to lift the veil of secrecy from the interrogation process in favor of the principle of transparency. Specifically, *all custodial interviews and interrogations of felony suspects should be videotaped in their entirety and with a camera angle that focuses equally on the suspect and interrogator.* Stated as a matter of requirement, such a policy evokes strong resistance in some pockets of the law enforcement community. Yet it has also drawn advocates from a wide and diverse range of professional, ideological, and political perspectives (e.g., American Bar Association, 2004; Boetig, Vinson, & Weidel, 2006; Cassell, 1996a; Drizin & Colgan, 2001; Geller, 1994; Gudjonsson, 2003; Leo, 1996c; Slobogin, 2003; Sullivan, 2004; The Justice Project, 2007).

In England, under the Police and Criminal Evidence Act of 1984, the mandatory requirement for tape-recording police interviews was introduced to safeguard the legal rights of suspects and the integrity of the process. At first resisted by police, this requirement has positively transformed the ways in which police interviews are conducted and evaluated. Over the years, the need for taping has pressed for action within the U.S. as well. In *Convicting the Innocent*, a classic study of wrongful convictions, Edwin Borchard (1932) expressed concern that police abuses during interrogations led to involuntary and unreliable confessions. His solution, utilizing the technology of the time, was to make "[phonographic records" [of interrogations] which shall alone be introducible in court" (pp. 370–371).

Throughout the twentieth century, other advocates for recording were less concerned with preventing false confessions and more concerned with increasing the accuracy of the justice system by eliminating the swearing contests between police officers and suspects over what occurred during the interrogation (Kamisar, 1977; Weisberg, 1961). Still others saw that recording interrogations held

Case 1:26-cr-00001-AHA Document 102-3 Filed 09/29/26 Page 71 of 150



tremendous benefits for law enforcement by discouraging note-taking and other practices that could inhibit suspects, helping police officers obtain voluntary confessions, nabbing accomplices, and protecting officers from false allegations of abuse (Geller, 1993; O'Hara, 1956). Despite these calls for recording, by the turn of the twentieth century only two states, by virtue of state Supreme Court decisions—Alaska (*Stephan v. State*, 1985) and Minnesota (*State v. Scales*, 1994)—required law enforcement officers to electronically record suspect interrogations. The pace of reform in this area, however, is picking up and once again a concern about false confessions seems to be the impetus. In the post-DNA age, and particularly in the past 5 years, as the number of wrongful convictions based on false confessions has continued to climb, concerns about the reliability of confession evidence have led to a renewed push for recording requirements (Drizin & Reich, 2004). As a result of statutes and court rulings, seven additional jurisdictions—Illinois, Maine, New Mexico, New Jersey, Wisconsin, North Carolina, and the District of Columbia—have joined Minnesota and Alaska, in requiring recordings of custodial interrogations in some circumstances (Robertson, 2007; Sullivan, 2004). In several other states, supreme courts have stopped short of requiring recording but either have issued strongly worded opinions endorsing recording—e.g., New Hampshire (*State v. Barnett*, 2002) and Iowa (*State v. Hajtic*, 2007)—or, in the case of Massachusetts, held that where law enforcement officers have no excuse for the failure to record interrogation, defendants are entitled to a strongly worded instruction admonishing jurors to treat unrecorded confessions with caution (*Commonwealth v. DiGiambattista*, 2004).

In addition to recent developments in state courts and legislatures, there is a growing movement among law enforcement agencies around the country to record interrogations voluntarily. Over the past 70 years, the idea has been anathema to many in law enforcement—including the FBI, which prohibits electronic recording, and John Reid & Associates, which used to vigorously oppose the practice of recording interrogations (Inbau et al., 2001; but see Buckley & Jayne's [2005] recent publication, *Electronic Recording of Interrogations*; for an historical review, see Drizin & Reich, 2004). Yet there are now signs that police opposition is thawing (e.g., Boetig et al., 2006). Several years ago, a National Institute of Justice study found that one-third of large police and sheriff's departments throughout the U.S. were already videotaping at least some interrogations or confessions and that their experiences with the practice were positive (Geller, 1993). A more recent survey of more than 465 law enforcement agencies in states that do not require electronic recording of interrogations has revealed that the practice is widespread. Without any legislative or judicial compulsion, police departments in many states routinely record interviews and interrogations in major felony investigations. Without exception, they have declared strong support for the practice (Sullivan, 2004; Sullivan, Vail, & Anderson, 2008).

There are numerous advantages to a videotaping policy. To begin, the presence of a camera may deter interrogators from using the most egregious, psychologically coercive tactics—and deter frivolous defense claims of coercion where none existed. Second, a videotaped record provides trial judges (ruling on voluntariness) and juries (determining guilt) an *objective* and *accurate* record of the process by which a statement was taken—a common source of dispute that results from ordinary forgetting and self-serving distortions in memory. In a study that demonstrates the problem, Lamb, Orbach, Sternberg, Hershkowitz, and Horowitz (2000) compared interviewers' verbatim contemporaneous accounts of 20 forensic interviews with alleged child sex abuse victims with tape recordings of these same sessions. Results showed that more than half of the interviewers' utterances and one quarter of the details that the children provided did not appear in their verbatim notes. Even more troubling was that interviewers made frequent and serious source attribution errors—for example, often citing the children, not their own prompting questions, as the source of details. This latter danger was inadvertently realized by D.C. Detective James Trainum (2007) who—in an article entitled "I took a false confession – so don't tell me it doesn't happen!"—recounted a case in which a suspect who had confessed to him was later exonerated: "Years later, during a review of the videotapes, we discovered our mistake. We had fallen into a classic trap. We believed so much in our suspect's guilt that we ignored all evidence to the contrary. To demonstrate the strength of our case, we showed the suspect our evidence, and unintentionally fed her details that she was able to parrot back to us at a later time. It was a classic false confession case and without the video we would never have known" (see also Trainum, 2008). Similarly, Police Commander Neil Nelson, of St. Paul, Minnesota, said that he too once elicited a false confession, which he came to doubt by reviewing the interrogation tape: "You realize maybe you gave too much detail as you tried to encourage him and he just regurgitated it back" (Wills, 2005; quoted online by Neil Nelson & Associates; http://www.neilnelson.com/pressroom.html).

To further complicate matters of recollection, police interrogations are not prototypical social interactions but, rather, extraordinarily stressful events for those who stand accused. In a study that illustrates the risk to accurate retrieval, Morgan et al. (2004) randomly assigned trainees in a military survival school to undergo a realistic high-stress or low-stress mock interrogation. Twenty-four hours later, he found that those in the high-stress condition had

difficulty even identifying their interrogators in a lineup. In real criminal cases, questions constantly arise about whether rights were administered and waived, whether the suspect was cooperative or evasive, whether detectives physically intimidated the suspect, whether promises or threats were made or implied, and whether the details in a confession emanated from the police or suspect, are among the many issues that become resolvable (in Great Britain, as well, taping virtually eliminated the concern that police officers were attributing to suspects admissions that would later be disputed; see Roberts, 2007).

In recent years, Sullivan (2004, 2007) has tirelessly interviewed law enforcement officials from hundreds of police and sheriff's departments that have recorded custodial interrogations and found that they enthusiastically favored the practice. Among the collateral benefits they often cited were that recording permitted detectives to focus on the suspect rather than take copious notes, increased accountability, provided an instant replay of the suspect's statement that sometimes revealed incriminating comments that were initially overlooked, reduced the amount of time detectives spent in court defending their interrogation practices, and increased public trust in law enforcement. Countering the most common apprehensions, the respondents in these interview studies reported that videotaping interrogations did not prove costly or inhibit suspects from talking to police or incriminating themselves. Typical of this uniformly positive reaction, Detective Trainum (2007) notes: "When videotaping was first forced upon us by the D.C. City Council, we fought it tooth and nail. Now, in the words of a top commander, we would not do it any other way."

It is beyond the scope of this article to draft a model rule that would address such specific details as what conditions should activate a recording requirement, how the recordings should be preserved, whether exceptions to the rule should be made (e.g., if the equipment malfunctions, if the suspect refuses to make a recorded statement), and what consequences would follow from the failure to record (e.g., whether the suspect's statement would be excluded or admitted to the jury with a cautionary instruction). As a matter of policy, however, research does suggest that it is important not only that entire sessions be recorded, triggered by custodial detention, but that the camera adopt a neutral "equal focus" perspective that shows both the accused and his or her interrogators. In 20-plus years of research on illusory causation effects in attribution, Lassiter and his colleagues have taped mock interrogations from three different camera angles so that the suspect, the interrogator, or both were visible. Lay participants who saw only the suspect judged the situation as less coercive than those focused on the interrogator. By directing visual attention toward the accused, the camera can thus lead jurors to underestimate the amount of pressure actually exerted by the "hidden" detective (Lassiter & Irvine, 1986; Lassiter, Slaw, Briggs, & Scanlan, 1992). Additional studies have confirmed that people are more attuned to the situational factors that elicit confessions whenever the interrogator is on camera than when the focus is solely on the suspect (Lassiter & Geers, 2004; Lassiter, Geers, Munhall, Handley, & Beers, 2001). Under these more balanced circumstances, juries make more informed attributions of voluntariness and guilt when they see not only the final confession but the conditions under which it was elicited (Lassiter, Geers, Handley, Weiland, & Munhall, 2002). Indeed, even the perceptions of experienced trial judges are influenced by variations in camera perspective (Lassiter, Diamond, Schmidt, & Elek, 2007).

### Reform of Interrogation Practices

In light of recent events, the time is ripe for police, district attorneys, defense lawyers, judges, researchers, and policymakers to evaluate current methods of interrogation. All parties would agree that the surgical objective of interrogation is to secure confessions from perpetrators but not from innocent suspects. Hence, the process of interrogation should be structured in theory and in practice to produce outcomes that are accurate, as measured by the observed ratio of true to false confessions. Yet except for physical brutality or deprivation, threats of harm or punishment, promises of leniency or immunity, and flagrant violations of a suspect's constitutional rights, there are no clear criteria by which to regulate the process. Instead, American courts historically have taken a "totality of the circumstances" approach to voluntariness and admissibility. Because *Miranda* does not adequately safeguard the innocent, we believe that the time is right to revisit the factors that comprise those circumstances.

As illustrated by the Reid technique and other similar approaches, the modern American police interrogation is, by definition, a guilt-presumptive and confrontational process—aspects of which put innocent people at risk. There are two ways to approach questions of reform. One is to completely reconceptualize this model at a macro level and propose that the process be converted from "confrontational" to "investigative." Several years ago, after a number of high-profile false confessions, the British moved in this direction, transitioning police from a classic interrogation to a process of "investigative interviewing." The Police and Criminal Evidence (PACE) Act of 1984 sought to reduce the use of psychologically manipulative tactics. In a post-PACE study, Irving and McKenzie (1989) found that the use of psychologically manipulative tactics had significantly declined—without a corresponding drop in the frequency of confessions. The post-PACE confession rate

is also somewhat higher in the UK than in the U.S. (Gudjonsson, 2003). In 1993, the Royal Commission on Criminal Justice further reformed the practice of interrogation by proposing the PEACE model described earlier ("Preparation and Planning," "Engage and Explain," "Account," "Closure," and "Evaluate"), the purpose of which is fact finding rather than confession. Observational research suggests that such investigative interviews enable police to inculpate offenders—and youthful suspects as well (Hershkowitz, Horowitz, Lamb, Orbach, & Sternberg, 2004; Lamb, Orbach, Hershkowitz, Horowitz, & Abbott, 2007)—by obtaining from them useful, evidence-generating information about the crime (for reviews, see Bull & Soukara, 2009; Williamson, 2006).

Similar techniques have been taught and employed in the U.S. as well, where Nelson (2007) reports from experience that it is highly effective. Recent laboratory research has also proved promising in this regard. In one series of experiments, interviewers more effectively exposed deceptive mock criminals when they strategically withheld incriminating evidence than when they confronted the suspects with that evidence (Hartwig et al., 2005, 2006). In an experiment using the Russano et al. (2005) cheating paradigm described earlier, Rigoni and Meissner (2008) independently varied and compared accusatorial and inquisitorial methods and found that the latter produced more diagnostic outcomes—lowering the rate of false confessions without producing a corresponding decrease in the rate of true confessions. Although more systematic research is needed, it is clear that investigative interviewing offers a potentially effective macro alternative to the classic American interrogation. Indeed, New Zealand and Norway have recently adopted the PEACE approach to investigative interviewing as a matter of national policy.

A second approach to the question of reform is to address specific risk factors inherent within a confrontational framework for interrogation. On the basis of converging evidence from actual false confession cases, basic principles of psychology, and forensic research, the existing literature suggests that certain interrogation practices alone and in combination with each other pose a risk to the innocent—whether they are dispositionally vulnerable or not. Focused in this way, but stopping short of making specific recommendations, we propose that the following considerations serve as a starting point for collaborative discussion.

*Custody and Interrogation Time*

As noted earlier, the human needs for belonging, affiliation, and social support, especially in times of stress, are a fundamental human motive. Prolonged isolation from significant others thus constitutes a form of deprivation that can heighten a suspect's distress and increase his or her incentive to escape the situation. Excessive time in custody may also be accompanied by fatigue and feelings of helplessness and despair as well as the deprivation of sleep, food, and other biological needs. The vast majority of interrogations last from 30 minutes up to 2 hours (Baldwin, 1993; Irving, 1980; Kassin et al., 2007; Leo, 1996b; Wald et al., 1967). Inbau et al. (2001) cautioned against surpassing 4 hours, and Blair (2005) argued that interrogations exceeding 6 hours are "legally coercive." Yet research shows that in proven false confession cases the interrogations had lasted for an average of 16.3 hours (Drizin & Leo, 2004). Following PACE in Great Britain, policy discussions should begin with a proposal for the imposition of time limits, or at least flexible guidelines, when it comes to detention and interrogation, as well as periodic breaks from questioning for rest and meals. At a minimum, police departments should consider placing internal time limits on the process that can be exceeded—initially and at regular intervals thereafter, if needed—only with authorization from a supervisor of detectives.

*Presentations of False Evidence*

A second problem concerns the tactic of presenting false evidence, which is often depicted as incontrovertible, and which takes the form of outright lying to suspects—for example, about an eyewitness identification that was not actually made; an alibi who did not actually implicate the suspect; fingerprints, hair, or blood that was not actually found; or polygraph tests that they did not actually fail. In *Frazier v. Cupp* (1969), the U.S. Supreme Court reviewed a case in which police falsely told the defendant that his cousin (whom he said he was with), had confessed, which immediately prompted the defendant to confess. The Court sanctioned this type of deception—seeing it as relevant to its inquiry on voluntariness but not a reason to disqualify the resulting confession. Although some state courts have distinguished between mere false assertions, which are permissible, and the fabrication of reports, tapes, and other evidence, which are not, the Supreme Court has not revisited the issue.

From a convergence of three sources, there is strong support for the proposition that outright lies can put innocents at risk to confess by leading them to feel trapped by the inevitability of evidence against them. These three sources are: (1) the aggregation of actual false confession cases, many of which involved use of the false evidence ploy; (2) one hundred-plus years of basic psychology research, which proves without equivocation that misinformation can substantially alter people's visual perceptions, beliefs, motivations, emotions, attitudes, memories, self-assessments, and even certain physiological outcomes, as seen in

studies of the placebo effect; and (3) numerous experiments, from different laboratories, demonstrating that presentations of false evidence increase the rate at which innocent research participants agree to confess to prohibited acts they did not commit. As noted earlier, scientific evidence for the malleability of people's perceptions, decisions, and behavior when confronted with misinformation is broad and pervasive. With regard to a specific variant of the problem, it is also worth noting that the National Research Council Committee to Review the Scientific Evidence on the Polygraph (2003) recently expressed concern over the risk of false confessions produced by telling suspects they had failed the polygraph (see also Lykken, 1998).

Over the years, legal scholars have debated the merits of trickery and deception in the interrogation room (e.g., Magid, 2001; Slobogin, 2007; Thomas, 2007) and some law enforcement professionals have argued that lying is sometimes a necessary evil, effective, and without risk to the innocent (Inbau et al., 2001). To this argument, two important points must be noted. First, direct observations and self-report surveys of American police suggest that the presentation of false evidence is a tactic that is occasionally used (e.g., Feld, 2006a, 2006b; Kassin et al., 2007; Leo, 1996b). Some interrogators no doubt rely on this ploy more than others do. Yet in a position paper on false confessions, the Wisconsin Criminal Justice Study Commission (2007) concluded that "Experienced interrogators appear to agree that false evidence ploys are relatively rare" (p. 6). Second, it is instructive that in Great Britain, where police have long been prohibited from deceiving suspects about the evidence, relying instead on the investigative interviewing tactics described earlier, there has been no evidence of a decline in confession rates (Clarke & Milne, 2001; Gudjonsson, 2003; Williamson, 2006).

In light of the demonstrated risks to the innocent, we believe that the false evidence ploy, which is designed to thrust suspects into a state of inevitability and despair, should be addressed. The strongest response would be an outright ban on the tactic, rendering all resulting confessions per se inadmissible—as they are if elicited by promises, threats, and physical violence (such a ban currently exists in England, Iceland, and Germany; suspects are differently protected in Spain and Italy, where defense counsel must be present for questioning). A second approach, representing a relatively weak response, would involve calling for no direct action, merely a change of attitude in light of scientific research that will lead the courts to weigh the false evidence ploy more heavily when judging voluntariness and reliability according to a "totality of the circumstances."

Representing a compromise between an outright ban and inaction, we urge police, prosecutors, and the courts, in light of past wrongful convictions and empirical research, to heighten their sensitivity to the risks that false evidence poses to the innocent suspect. One way to achieve this compromise would be to curtail some variants of the false evidence ploy but not others—or in the case of some suspects but not others. As noted earlier, some state courts have distinguished between mere false assertions and the fabrication of reports, tapes, photographs, and other evidence, the latter being impermissible. This particular distinction seems arbitrary. False evidence puts innocents at risk to the extent that a suspect is vulnerable (e.g., by virtue of his or her youth, naiveté, intellectual deficiency, or acute emotional state) and to the extent that the alleged evidence it is presented as incontrovertible, sufficient as a basis for prosecution, and impossible to overcome. By this criterion, which the courts would have to apply on a case-by-case basis, a confession produced by telling an adult suspect that his cousin had confessed, the ploy used in *Frazier v. Cupp* (1969), might well be admissible. Yet a confession produced by telling a traumatized 14-year-old boy that his hair was found in his murdered sister's grasp, that her blood was found in his bedroom, and that he failed an infallible lie detector test—the multiple lies presented to false confessor Michael Crowe—would be excluded (White, 2001).

### *Minimization Tactics*

A third area of concern involves the use of minimization techniques (often called "themes," "scenarios," or "inducements") that can communicate promises of leniency indirectly through pragmatic implication. While American federal constitutional law has long prohibited the use of explicit promises of leniency (*Bram v. United States*, 1897; *Leyra v. Denno*, 1954; *Lynumn v. Illinois*, 1963), uses of minimization are less clear. There is some legal support for the proposition that implicit promises of leniency are also prohibited in federal constitutional law (White, 1997), although a majority of states hold that a promise of leniency is only one factor to be considered in determining whether a confession is involuntary (White, 2003).

Multiple sources support the proposition that implicit promises can put innocents at risk to confess by leading them to perceive that the only way to lessen or escape punishment is by complying with the interrogator's demand for confession, especially when minimization is used on suspects who are also led to believe that their continued denial is futile and that prosecution is inevitable. These sources are: (1) the aggregation of actual false confession cases, the vast majority of which involved the use of minimization or explicit promises of leniency (Drizin & Leo, 2004; Leo & Ofshe, 1998; Ofshe & Leo, 1997a, 1997b; White, 2001); (2) basic psychological

research indicating, first, that people are highly responsive to reinforcement and make choices designed to maximize their outcomes (Hastie & Dawes, 2001), and second that people can infer certain consequences in the absence of explicit promises and threats by pragmatic implication (Chan & McDermott, 2006; Harris & Monaco, 1978; Hilton, 1995); and (3) experiments specifically demonstrating that minimization increases the rate at which research participants infer leniency in punishment and confess, even if they are innocent (Kassin & McNall, 1991; Klaver, Lee, & Rose, 2008; Russano et al., 2005).

In light of the demonstrated risks to the innocent, we believe that techniques of minimization, as embodied in the "themes" that interrogators are trained to develop, which communicate promises of leniency via pragmatic implication, should be scrutinized. Some law enforcement professionals have argued that minimization is a necessary interrogation technique (Inbau et al., 2001). As with the false evidence ploy, there are several possible approaches to the regulation of minimization techniques—ranging from the recommendation that no action be taken to an outright ban on minimization. Between these extreme positions one might argue that some uses of minimization but not others should be limited or modified.

Minimization techniques come in essentially three forms: those that minimize the *moral* consequences of confessing, those that minimize the *psychological* consequences of confessing, and those that minimize the *legal* consequences of confessing (Inbau et al., 2001; Ofshe & Leo, 1997a, 1997b). One possible compromise between the two extreme positions noted above would be to permit moral and psychological forms of minimization, but ban legal minimization that communicates promises of leniency via pragmatic implication. With this distinction in mind, interrogators would be permitted, for example, to tell a suspect that he or she will feel better after confession (psychological minimization) or that he or she is still a good person (moral minimization), but not that the legal consequences of his actions will be minimized if he confesses (e.g., as may be implied by self-defense and other themes). More research is thus needed to distinguish among the different tactics that interrogators are trained to use (e.g., the provocation, peer pressure, and accident scenarios), and the pragmatic inferences that these tactics lead suspects to draw concerning the consequences of confession.

## Protection of Vulnerable Suspect Populations

There is a strong consensus among psychologists, legal scholars, and practitioners that juveniles and individuals with cognitive impairments or psychological disorders are particularly susceptible to false confession under pressure. Yet little action has been taken to modulate the methods by which these vulnerable groups are questioned when placed into custody as crime suspects. More than 45 years ago, the 1962 President's Panel on Mental Retardation questioned whether confessions from defendants with mental retardation should ever be admissible at trial (see Appelbaum & Appelbaum, 1994). In 1991, Fred Inbau wrote that "special protections must be afforded to juveniles and to all other persons of below-average intelligence, to minimize the risk of untruthful admissions due to their vulnerability to suggestive questioning" (1991, pp. 9–10). More recently, Inbau et al. (2001) advised against use of the false evidence ploy with youthful suspects or those with diminished mental capacity: "These suspects may not have the fortitude or confidence to challenge such evidence and, depending on the nature of the crime, may become confused as to their own possible involvement" (p. 429; also see Buckley, 2006).

It is uniformly clear to all parties that vulnerable suspect populations—namely, juveniles and people who are cognitively impaired or psychologically disordered—need to be protected in the interrogation room. In operational terms, we believe that there are two possible ways to protect these vulnerable populations. The first concerns the mandatory presence of an attorney. A least with regard to juveniles, a parent, guardian, or other interested adult is required in some states to protect young suspects who face interrogation. Yet research suggests that the presence of an interested adult does not increase the rate at which juveniles assert their constitutional rights because these adults, often passive, frequently urge their youths to cooperate with police—a tendency observed both in the U.S. (Grisso & Ring, 1979; Oberlander & Goldstein, 2001) and in the UK, where the law provides for access to an "appropriate adult" (Pearse & Gudjonsson, 1996). For this reason, juveniles—at least those under the age of 16 (at present, the research evidence is less clear when it comes to older adolescents)—should be accompanied and advised by a professional advocate, preferably an attorney, trained to serve in this role (see Gudjonsson, 2003).

As a second possible means of protection, law enforcement personnel who conduct interviews and interrogations should receive special training—not only on the limits of human lie detection, false confessions, and the perils of confirmation biases—but on the added risks to individuals who are young, immature, mentally retarded, psychologically disordered, or in other ways vulnerable to manipulation. In a survey of 332 Baltimore police officers, Meyer and Reppucci (2007) found that while respondents understood in general terms that adolescents lack maturity of judgment and are more malleable than adults, they did not by implication believe that juvenile suspects were at greater risk in the interrogation room. Hence, they reported using roughly the same Reid-like techniques with juveniles

as they do with adults (e.g., confrontation, repetition, refusal to accept denials, false evidence, minimization, and use of alternative questions). Interestingly, one-third of these respondents stated that police could benefit from special training with regard to the interrogation of juvenile suspects. In light of research described earlier, as well as Inbau et al.'s (2001) cautionary notes on the interrogation of minors and their heightened risk for false confession, we agree.

## Summary and Conclusion

In 1932, Edwin Borchard published *Convicting the innocent: Sixty-five actual errors of criminal justice*, in which several false confession cases were included. Addressing the question of how these errors were uncovered, he noted how "sheer good luck" played a prominent role and lamented on "how many unfortunate victims of error have no such luck, it is impossible to say, but there are probably many." Today's generation of post-conviction exonerations well illustrate the role that sheer good luck plays (e.g., as when DNA, long ago collected, was preserved; as when the true perpetrator finds a conscience and comes forward). With increased scientific attention to the problem of false confessions, and the reforms recommended in this article, we believe it possible to reduce the serendipitous nature of these discoveries and to increase both the diagnosticity of suspects' statements and the ability of police, prosecutors, judges, and juries to make accurate decisions on the basis of these statements.

**Acknowledgment** For their helpful comments on earlier drafts of this manuscript, the authors are indebted to Ray Bull, Michael Lamb, Dan Lassiter, Timothy Moore, Edward Mulvey, Richard Petty, Daniel Schacter, Laurence Steinberg, Gary Wells, and two anonymous reviewers. We also want to thank Bill Thompson, AP-LS Chair of the Scientific Review Committee, not only for his useful comments but for his invaluable support and advice throughout the process.

## REFERENCES

Abram, K. M., Teplin, L. A., & McClelland, G. M. (2003). Comorbidity of severe psychiatric disorders and substance use disorders among women in jail. *American Journal of Psychiatry, 160*, 1007–1010.

Abramovitch, R., Higgins-Biss, K., & Biss, S. (1993). Young persons' comprehension of waivers in criminal proceedings. *Canadian Journal of Criminology, 35*, 309–322.

Abramovitch, R., Peterson-Badali, M., & Rohan, M. (1995). Young people's understanding and assertion of their rights to silence and legal counsel. *Canadian Journal of Criminology, 37*, 1–18.

American Bar Association. (2004). *Resolution 8A—Videotaping custodial interrogations*. Approved February 9, 2004.

American Psychiatric Association. (1994). *Diagnostic and Statistical Manual of Mental Disorders-IV*. Washington, DC: American Psychiatric Association.

Anderson, C. A., Lepper, M. R., & Ross, L. (1980). Perseverance of social theories: The role of explanation in the persistence of discredited information. *Journal of Personality and Social Psychology, 39*, 1037–1049.

Anderson, S. D., & Hewitt, J. (2002). The effect of competency restoration training on defendants with mental retardation found not competent to proceed. *Law and Human Behavior, 26*, 343–351.

Appelbaum, K. L., & Appelbaum, P. S. (1994). Criminal justice-related competencies in defendants with mental retardation. *Journal of Psychiatry and Law, 22*, 483–503.

Arizona v. Fulminante, 499 U.S. 279 (1991).

Aronson, E. (1999). *The social animal*. New York: Worth/Freeman.

Asch, S. E. (1956). Studies of independence and conformity: A minority of one against a unanimous majority. *Psychological Monographs, 70*, 416.

Atkins v. Virginia, 536, U.S. 304 (2002).

Ayling, C. J. (1984). Corroborating false confessions: An empirical analysis of legal safeguards against false confessions. *Wisconsin Law Review, 1984*, 1121–1204.

Baker, F., Johnson, M. W., & Bickel, W. K. (2003). Delay discounting differs between current and never-smokers across commodities, sign, and magnitudes. *Journal of Abnormal Psychology, 112*, 382–392.

Baldwin, J. (1993). Police interview techniques: Establishing truth or proof? *British Journal of Criminology, 33*, 325–352.

Baumeister, R. F., & Leary, M. R. (1996). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. *Psychological Bulletin, 117*, 497–529.

Bedau, H. A., & Radelet, M. L. (1987). Miscarriages of justice in potentially capital cases. *Stanford Law Review, 40*, 21–179.

Bem, D. J. (1966). Inducing belief in false confessions. *Journal of Personality and Social Psychology, 3*, 707–710.

Bickel, W. K., & Marsch, L. A. (2001). Toward a behavioral economic understanding of drug dependence: Delay discounting processes. *Addiction, 96*, 73–86.

Bickel, W. K., Odum, A. L., & Madden, G. L. (1999). Impulsivity and cigarette smoking: Delay discounting in current, never, and ex-smokers. *Psychopharmacology, 146*, 447–454.

Billings, F. J., Taylor, T., Burns, J., Corey, D. L., Garven, S., & Wood, J. M. (2007). Can reinforcement induce children to falsely incriminate themselves? *Law and Human Behavior, 31*, 125–139.

Blagrove, M. (1996). Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied, 2*, 48–59.

Blair, J. P. (2005). A test of the unusual false confession perspective using cases of proven false confessions. *Criminal Law Bulletin, 41*, 127–144.

Boetig, B. P., Vinson, D. M., & Weidel, B. R. (2006). Revealing incommunicado. *FBI Law Enforcement Bulletin, 75*(12), 1–8.

Bond, C. F., & DePaulo, B. M. (2006). Accuracy of deception judgments. *Personality & Social Psychology Review, 10*, 214–234.

Borchard, E. M. (1932). *Convicting the innocent: Errors of criminal justice*. New Haven, CT: Yale University Press.

Bram v. United States, 168 U.S. 532 (1897).

Brewer, W. F. (1977). Memory for pragmatic implications of sentences. *Memory and Cognition, 5*, 673–678.

Brown v. Mississippi, 297 U.S. 278 (1936).

Brown, W. A. (1998). The placebo effect. *Scientific American, 278*, 90–95.

Buckley, D. M., & Jayne, B. C. (2005). *Electronic recording of interrogations*. Eagle River, WI: Hahn Printing, Inc.

Buckley, J. (2006). The Reid technique of interviewing and interrogation. In T. Williamson (Ed.), *Investigative interviewing: Rights, research, regulation* (pp. 190–206). Devon, UK: Willan.

Bull, R., & Soukara, S. (2009). A set of studies of what really happens in police interviews with suspects. In G. D. Lassiter & C. A. Meissner (Eds.), *Interrogations and confessions: Research, practice, and policy*. Washington, DC: American Psychological Association.

Caldwell, J. A., Caldwell, J. L., Brown, D. L., & Smith, J. K. (2004). The effects of 37 hours of continuous wakefulness on the physiological arousal, cognitive performance, self-reported mood, and simulator flight performance of F-117A pilots. *Military Psychology, 16*, 163–181.

Candel, I., Merckelbach, H., Loyen, S., & Reyskens, H. (2005). "I hit the Shift-key and then the computer crashed": Children and false admissions. *Personality and Individual Differences, 38*, 1381–1387.

Cassell, P. G. (1996a). Miranda's social costs: An empirical reassessment. *Northwestern University Law Review, 90*, 387–499.

Cassell, P. G. (1996b). All benefits, no costs: The grand illusion of Miranda's defenders. *Northwestern University Law Review, 90*, 1084–1124.

Cassell, P. G., & Hayman, B. S. (1996). Police interrogation in the 1990s: An empirical study of the effects of Miranda. *UCLA Law Review, 43*, 839–931.

Chan, J. C. K., & McDermott, K. B. (2006). Remembering pragmatic inferences. *Applied Cognitive Psychology, 20*, 633–639.

Cialdini, R. B. (2001). *Influence: Science and practice* (4th ed.). Needham Heights, MA: Allyn & Bacon.

Clare, I., & Gudjonsson, G. H. (1991). Recall and understanding of the caution and rights in police detention among persons of average intellectual ability and persons with a mild mental handicap. *Issues in Criminological and Legal Psychology, 1*, 34–42.

Clare, I., & Gudjonsson, G. H. (1995). The vulnerability of suspects with intellectual disabilities during police interviews: A review and experimental study of decision-making. *Mental Handicap Research, 8*, 110–128.

Clarke, C., & Milne, R. (2001). *National evaluation of the PEACE investigative interviewing course. Police Research Award Scheme*. London: Home Office.

Cloud, M., Shepard, G. B., Barkoff, A. N., & Shur, J. V. (2002). Words without meaning: The Constitution, confessions, and mentally retarded suspects. *University of Chicago Law Review, 69*, 495–624.

Colorado v. Connelly, 479 U.S. 157 (1986).

Colwell, L., Cruise, K., Guy, L., McCoy, W., Fernandez, K., & Ross, H. (2005). The influence of psychosocial maturity on male juvenile offenders' comprehension and understanding of the Miranda warning. *Journal of the American Academy of Psychiatry and Law, 33*, 444–454.

Commonwealth v. DiGiambattista, 813 N.E.2d 516 (Mass. 2004).

Connery, D. S. (Ed.). (1996). *Convicting the innocent*. Cambridge, MA: Brookline.

Cooper, V. G., & Zapf, P. A. (2008). Psychiatric patients' comprehension of *Miranda* rights. *Law and Human Behavior, 32*, 390–405.

Crocker, J., Voelkl, K., Testa, M., & Major, B. (1991). Social stigma: The affective consequences of attributional ambiguity. *Journal of Personality and Social Psychology, 60*, 218–228.

Davis, D., & O'Donahue, W. (2004). The road to perdition: Extreme influence tactics in the interrogation room. In W. O'Donahue (Ed.), *Handbook of forensic psychology* (pp. 897–996). San Diego, CA: Academic Press.

Deluty, M. Z. (1978). Self-control and impulsiveness involving aversive events. *Journal of Experimental Psychology: Animal Behavior Processes, 4*, 250–266.

DePaulo, B. M., Lindsay, J. J., Malone, B. E., Muhlenbruck, L., Charlton, K., & Cooper, H. (2003). Cues to deception. *Psychological Bulletin, 129*, 74–112.

Dickerson v. United States, 530 U.S. 428 (2000).

Donahue, J. (1998). Did *Miranda* diminish police effectiveness. *Stanford Law Review, 50*, 1147–1180.

Doyle, J. (2005). *True witness: Cops, courts, science, and the battle against misidentification*. New York: Palgrave Macmillan.

Drizin, S. A., & Colgan, B. A. (2001). Let the cameras roll: Mandatory videotaping of interrogations is the solution to Illinois' problem of false confessions. *Loyola University Chicago Law Journal, 32*, 337–424.

Drizin, S. A., & Colgan, B. (2004). Tales from the juvenile confession front: A guide to how standard police interrogation tactics can produce coerced and false confessions from juvenile suspects. In G. D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 127–162). New York: Kluwer Academic/Plenum.

Drizin, S. A., & Leo, R. A. (2004). The problem of false confessions in the post-DNA world. *North Carolina Law Review, 82*, 891–1007.

Drizin, S. A., & Reich, M. J. (2004). Heeding the lessons of history: The need for mandatory recording of police interrogations to accurately assess the reliability and voluntariness of confessions. *Drake Law Review, 52*, 619–646.

Dror, I. E., & Charlton, D. (2006). Why experts make errors. *Journal of Forensic Identification, 56*, 600–616.

Egan, C. (2006, February 22). A murderer no more. *The Australian Newspaper*, p. 13.

Escobedo v. Illinois, 378 U.S. 478 (1964).

Everington, C., & Fulero, S. (1999). Competence to confess: Measuring understanding and suggestibility of defendants with mental retardation. *Mental Retardation, 37*, 212–220.

Faigman, D. L., Kaye, D. H., Saks, M. J., & Sanders, J. (2002). *Science in the law: Forensic science issues*. St. Paul, MN: West.

Feeney, F. (2000). Police clearances: A poor way to measure the impact of *Miranda* on the police. *Rutgers Law Review, 32*, 1–114.

Feld, B. (1999). *Bad kids: Race and the transformation of the juvenile court*. New York: Oxford University Press.

Feld, B. (2006a). Juveniles' competence to exercise Miranda rights: An empirical study of policy and practice. *Minnesota Law Review, 91*, 26–100.

Feld, B. (2006b). Police interrogations of juveniles: An empirical study of policy and practice. *Journal of Criminal Law and Criminology, 97*, 219–316.

Findley, K. A., & Scott, M. S. (2006). The multiple dimensions of tunnel vision in criminal cases. *Wisconsin Law Review, 2006*, 291–397.

Firstman, R., & Salpeter, J. (2008). *A criminal injustice: A true crime, a false confession, and the fight to free Marty Tankleff*. New York: Ballantine Books.

Fisher, R. P., & Geiselman, R. E. (1992). *Memory enhancing techniques for investigative interviewing: The cognitive interview*. Springfield, IL: Thomas.

Forrest, K. D., Wadkins, T. A., & Miller, R. L. (2002). The role of preexisting stress on false confessions: An empirical study. *Journal of Credibility Assessment and Witness Psychology, 3*, 23–45.

Frank, J., & Frank, B. (1957). *Not guilty*. New York: Doubleday.

Frazier v. Cupp, 394 U.S. 731 (1969).

Fulero, S., & Everington, C. (1995). Assessing competency to waive Miranda rights in defendants with mental retardation. *Law and Human Behavior, 19*, 533–545.

Fulero, S., & Everington, C. (2004). Mental retardation, competency to waive Miranda rights, and false confessions. In G. D. Lassiter

Case 1:26-cr-00001-AHA Document 102-3 Filed 09/29/26 Page 78 of 150



(Ed.), *Interrogations, confessions, and entrapment* (pp. 163–179). New York: Kluwer Academic/Plenum.
Gall, J. A., & Freckelton, I. (1999). Fitness for interview: Current trends, views and an approach to the assessment procedure. *Journal of Clinical Forensic Medicine, 6*, 213–223.
Garner, B. A. (Ed.). (2004). *Black's law dictionary* (8th ed.). Eagan, MN: West.
Garrett, B. (2008). Judging innocence. *Columbia Law Review, 108*, 55–142.
Garven, S., Wood, J. M., & Malpass, R. S. (2000). Allegations of wrongdoing: The effects of reinforcement on children's mundane and fantastic claims. *Journal of Applied Psychology, 85*, 38–49.
Geller, W. A. (1993). *Videotaping interrogations and confessions: National Institute of Justice Research in Brief*. Washington, DC: U.S. Department of Justice.
Geller, W. A. (1994, January). Videotaping interrogations and confessions. *FBI Law Enforcement Bulletin.*
Gilbert, D. T., & Malone, P. S. (1995). The correspondence bias. *Psychological Bulletin, 117*, 21–38.
Gilovich, T., Savitsky, K., & Medvec, V. H. (1998). The illusion of transparency: Biased assessments of others' ability to read one's emotional states. *Journal of Personality and Social Psychology, 75*, 332–346.
Gohara, M. (2006). A lie for a lie: False confessions and the case for reconsidering the legality of deceptive interrogation techniques. *Fordham Urban Law Journal, 33*, 791–842.
Goldstein, N., Condie, L., Kalbeitzer, R., Osman, D., & Geier, J. (2003). Juvenile offenders' Miranda rights comprehension and self-reported likelihood of false confessions. *Assessment, 10*, 359–369.
Gordon, N. J., & Fleisher, W. L. (2006). *Effective interviewing and interrogation techniques* (2nd ed.). San Diego, CA: Academic Press.
Grano, J. D. (1994). *Confessions, truth, and the law*. Ann Arbor, MI: University of Michigan Press.
Grisso, T. (1980). Juveniles' capacities to waive Miranda rights: An empirical analysis. *California Law Review, 68*, 1134–1166.
Grisso, T. (1981). *Juveniles' waiver of rights: Legal and psychological competence*. New York: Plenum.
Grisso, T. (1986). *Evaluating competencies. Forensic assessments and instruments*. New York: Plenum.
Grisso, T. (1996). Society's retributive response to juvenile violence: A developmental perspective. *Law and Human Behavior, 20*, 229–247.
Grisso, T., & Ring, J. (1979). Parents' attitudes toward juveniles' rights in interrogation. *Criminal Justice and Behavior, 6*, 221–226.
Grisso, T., & Schwartz, R. (Eds.). (2000). *Youth on trial: A developmental perspective on juvenile justice*. Chicago: University of Chicago Press.
Grisso, T., Steinberg, L., Woolard, J., Cauffman, E., Scott, E., Graham, S., et al. (2003). Juveniles' competence to stand trial: A comparison of adolescents' and adults' capacities as trial defendants. *Law and Human Behavior, 27*(4), 333–363.
Gross, S. R., Jacoby, K., Matheson, D. J., Montgomery, N., & Patel, S. (2005). Exonerations in the United States, 1989 through 2003. *Journal of Criminal Law & Criminology, 95*, 523–553.
Gudjonsson, G. H. (1991). The effects of intelligence and memory on group differences in suggestibility and compliance. *Personality and Individual Differences, 5*, 503–505.
Gudjonsson, G. H. (1992). *The psychology of interrogations, confessions, and testimony*. London: Wiley.
Gudjonsson, G. H. (2003). *The psychology of interrogations and confessions: A handbook*. Chichester, England: Wiley.
Gudjonsson, G. H. (2005). Fitness to be interviewed. In J. Payne-James, R. W. Byard, T. S. Corey, & C. Henderson (Eds.), *Encyclopedia of forensic and legal medicine* (Vol. 2, pp. 169–174). London: Elsevier.
Gudjonsson, G. H. (2006). Disputed confessions and miscarriages of justice in Britain: Expert psychological and psychiatric evidence in the court of appeal. *The Manitoba Law Journal, 31*, 489–521.
Gudjonsson, G. H., Clare, I., Rutter, S., & Pearse, J. (1993). *Persons at risk during interviews in police custody: The identification of vulnerabilities*. London: HMSO.
Gudjonsson, G. H., & Clare, I. C. H. (1995). The relationship between confabulation and intellectual ability, memory, interrogative suggestibility, and acquiescence. *Personality and Individual Differences, 3*, 333–338.
Gudjonsson, G. H., & Grisso, T. (2008). Legal competencies in relation to confession evidence. In A. R. Felthous & H. Sass (Eds.), *International handbook on psychopathic disorders and the law* (Vol. 2, pp. 177–187). New York: Wiley.
Gudjonsson, G. H., & MacKeith, J. A. C. (1982). False confessions: Psychological effects of interrogation. In A. Trankell (Ed.), *Reconstructing the past: The role of psychologists in criminal trials* (pp. 253–269). Deventer, The Netherlands: Kluwer.
Gudjonsson, G. H., & MacKeith, J. A. C. (1994). Learning disability and the Police and Criminal Evidence Act of 1984. Protection during investigative interviewing: A video-recorded false confession to double murder. *Journal of Forensic Psychiatry, 5*, 35–49.
Gudjonsson, G. H., & Sigurdsson, J. F. (1999). The Gudjonsson Confession Questionnaire-Revised (GCQ-R). Factor structure and its relationship with personality. *Personality and Individual Differences, 27*, 953–968.
Gudjonsson, G. H., Sigurdsson, J. F., Asgeirsdottir, B. B., & Sigfusdottir, I. D. (2006). Custodial interrogation, false confession, and individual differences: A national study among Icelandic youth. *Personality and Individuals Differences, 41*, 49–59.
Gudjonsson, G. H., Sigurdsson, J. F., Asgeirsdottir, B. B., & Sigfusdottir, I. D. (2007a). Custodial interrogation: What are the background factors associated with claimed false confessions? *The Journal of Forensic Psychiatry and Psychology, 18*, 266–275.
Gudjonsson, G. H., Sigurdsson, J. F., Asgeirsdottir, B. B., & Sigfusdottir, I. D. (in press). Interrogation and false confession among adolescents in seven European countries: What background and psychological variables best discriminate between false confessors and non-false confessors? *Psychology*, *Crime*, *and Law*.
Gudjonsson, G. H., Sigurdsson, J. F., Bragason, O., Einarsson, E., & Valdimarsdottir, E. B. (2004). Confessions and denials and the relationship with personality. *Legal and Criminological Psychology, 9*, 121–133.
Gudjonsson, G. H., Sigurdsson, J. F., & Einarsson, E. (2004). The role of personality in relation to confessions and denials. *Psychology, Crime and Law, 10*, 125–135.
Gudjonsson, G. H., Sigurdsson, J. F., Einarsson, E., Bragason, O. O., & Newton, A. K. (2008). Interrogative suggestibility, compliance and false confessions among prison inmates and their relationship with attention deficit hyperactivity disorder (ADHD) symptoms. *Psychological Medicine, 38*, 1037–1044.
Gudjonsson, G. H., Young, S., & Bramham, J. (2007b). Interrogative suggestibility in adults diagnosed with attention-deficit hyperactivity disorder (ADHD). A potential vulnerability during police questioning. *Personality and Individual Differences, 43*, 737–745.
Haley v. Ohio, 332 U.S. 596 (1948).

Harris, R. J., & Monaco, G. E. (1978). Psychology of pragmatic implication: Information processing between the lines. *Journal of Experimental Psychology: General, 107*, 1–22.

Harrison, Y., & Horne, J. A. (2000). The impact of sleep deprivation on decision making: A review. *Journal of Experimental Psychology: Applied, 6*, 236–249.

Hartwig, M., Granhag, P. A., Strömwall, L. A., & Kronkvist, O. (2006). Strategic use of evidence during police interviews: When training to detect deception works. *Law and Human Behavior, 30*, 603–619.

Hartwig, M., Granhag, P. A., Strömwall, L., & Vrij, A. (2005). Detecting deception via strategic closure of evidence. *Law and Human Behavior, 29*, 469–484.

Hasel, L. E., & Kassin, S. M. (2009). On the presumption of evidentiary independence: Can confessions corrupt eyewitness identifications? *Psychological Science, 20*, 122–126.

Hastie, R., & Dawes, R. (2001). *Rational choice in an uncertain world: The psychology of judgment and decision-making*. Thousand Oaks, CA: Sage.

Henkel, L. A., Coffman, K. A. J., & Dailey, E. M. (2008). A survey of people's attitudes and beliefs about false confessions. *Behavioral Sciences and the Law, 26*, 555–584.

Herrnstein, R. J. (1970). On the law of effect. *Journal of the Experimental Analysis of Behavior, 7*, 243–266.

Herrnstein, R. J., Rachlin, H., & Laibson, D. I. (Eds.). (1997). *The matching law: Papers in psychology and economics*. New York: Russell Sage Foundation.

Hershkowitz, I., Horowitz, D., Lamb, M. E., Orbach, Y., & Sternberg, K. J. (2004). Interviewing youthful suspects in alleged sex crimes: A descriptive analysis. *Child Abuse and Neglect, 28*, 423–438.

Hill, C., Memon, A., & McGeorge, P. (2008). The role of confirmation bias in suspect interviews: A systematic evaluation. *Legal and Criminological Psychology, 13*, 357–371.

Hilton, D. J. (1995). The social context of reasoning: Conversational inference and rational judgment. *Psychological Bulletin, 118*, 248–271.

Hirsch, A. (2005a). Threats, promises, and false confessions: Lessons of slavery. *Howard Law Journal, 49*, 31–60.

Hirsch, A. (2005b). The tragedy of false confessions and a common sense proposal (book review). *North Dakota Law Review, 81*, 343–350.

Home Office. (1985). *Police and Criminal Evidence Act 1984*. London: HMSO.

Home Office. (2003). *Police and Criminal Evidence Act 1984. Codes of Practice A-E Revised Edition*. London: HMSO.

Hopkins, E. J. (1931). *Our lawless police: A study of the unlawful enforcement of the law*. New York: Viking Press.

Hopt v. Utah, 110 U.S. 574 (1884).

Horselenberg, R., Merckelbach, H., & Josephs, S. (2003). Individual differences and false confessions: A conceptual replication of Kassin and Kiechel (1996). *Psychology, Crime and Law, 9*, 1–18.

Horselenberg, R., Merckelbach, H., Smeets, T., Franssens, D., Ygram Peters, G.-J., & Zeles, G. (2006). False confessions in the lab: Do plausibility and consequences matter? *Psychology, Crime and Law, 12*, 61–75.

Hourihan, P. (1995). Earl Washington's confession: Mental retardation and the law of confessions. *Virginia Law Review, 81*, 1473–1501.

*Haynes v. Washington*, 373 U.S. 503 (1963).

*In re Gault*, 387 U.S. 1 (1967).

Inbau, F. E. (1991). Miranda's immunization of low intelligence offenders. *The Prosecutor: Journal of the National District Attorney's Association, 24*(Spring), 9–10.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2001). *Criminal interrogation and confessions* (4th ed.). Gaithersberg, MD: Aspen.

Inglis, T. (2004). *Truth power and lies: Irish society and the case of the Kerry babies*. Dublin: University College Dublin Press.

Irving, B. (1980). *Police interrogation. A case study of current practice. Research Studies No 2*. London: HMSO.

Irving, B., & McKenzie, I. K. (1989). *Police interrogation: The effects of the Police and Criminal Evidence Act*. London: Police Foundation G.B.

James, D. J., & Glaze, L. E. (2006). *Mental health problems of prison and jail inmates*. Washington, DC: U.S. Dept of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Jones, E. E. (1990). *Interpersonal perception*. New York: Freeman.

Junkin, T. (2004). *Bloodsworth: The true story of the first death row inmate exonerated by DNA*. Chapel Hill, NC: Algonquin Books.

The Justice Project. (2007). *Electronic recording of custodial interrogations: A policy review*. Washington, DC: The Justice Project.

Kahn, J. (2005, September 21). Deep flaws, and little justice, in China's court system. *The New York Times*.

Kahn, R., Zapf, P., & Cooper, V. (2006). Readability of Miranda warnings and waivers: Implications for evaluating Miranda comprehension. *Law & Psychology Review, 30*, 119–142.

Kamisar, Y. (1963). What is an "involuntary" confession? Some comments on Inbau and Reid's criminal interrogation and confessions. *Rutgers Law Review, 17*, 728–732.

Kamisar, Y. (1977). Foreword: Brewer v. Williams—A hard look at a discomfiting record. *Georgetown Law Journal, 66*, 209–243.

Karlsen, C. F. (1989). *The devil in the shape of a woman: Witchcraft in colonial New England*. New York: Vintage.

Kassin, S. M. (1997). The psychology of confession evidence. *American Psychologist, 52*, 221–233.

Kassin, S. M. (2002, November 1). False confessions and the jogger case, *New York Times*, p. A31.

Kassin, S. M. (2005). On the psychology of confessions: Does *innocence* put *innocents* at risk? *American Psychologist, 60*, 215–228.

Kassin, S. M. (2006). A critical appraisal of modern police interrogations. In T. Williamson (Ed.), *Investigative interviewing: Rights, research, regulation* (pp. 207–228). Devon, UK: Willan.

Kassin, S. M. (2008). False confessions: Causes, consequences, and implications for reform. *Current Directions in Psychological Science, 17*(4), 249–253.

Kassin, S. M., Goldstein, C. J., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27*, 187–203.

Kassin, S. M., & Gudjonsson, G. H. (2004). The psychology of confession evidence: A review of the literature and issues. *Psychological Science in the Public Interest, 5*, 35–69.

Kassin, S. M., & Kiechel, K. L. (1996). The social psychology of false confessions: Compliance, internalization, and confabulation. *Psychological Science, 7*, 125–128.

Kassin, S. M., Leo, R. A., Meissner, C. A., Richman, K. D., Colwell, L. H., Leach, A.-M., et al. (2007). Police interviewing and interrogation: A Self-report survey of police practices and beliefs. *Law and Human Behavior, 31*, 381–400.

Kassin, S. M., & McNall, K. (1991). Police interrogations and confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior, 15*, 233–251.

Kassin, S. M., Meissner, C. A., & Norwick, R. J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior, 29*, 211–227.

Kassin, S. M., & Neumann, K. (1997). On the power of confession evidence: An experimental test of the “fundamental difference” hypothesis. *Law and Human Behavior, 21*, 469–484.
Kassin, S., & Norwick, R. (2004). Why people waive their Miranda rights: The power of innocence. *Law and Human Behavior, 28*, 211–221.
Kassin, S. M., & Sukel, H. (1997). Coerced confessions and the jury: An experimental test of the “harmless error” rule. *Law and Human Behavior, 21*, 27–46.
Kassin, S. M., & Wrightsman, L. S. (1980). Prior confessions and mock juror verdicts. *Journal of Applied Social Psychology, 10*, 133–146.
Kassin, S. M., & Wrightsman, L. S. (1985). Confession evidence. In S. Kassin & L. Wrightsman (Eds.), *The psychology of evidence and trial procedure* (pp. 67–94). Beverly Hills, CA: Sage.
The King v. Warrickshall (1793), 168 Eng. Rep. 234, 234-35 (K.B. 1783).
Klaver, J., Lee, Z., & Rose, V. G. (2008). Effects of personality, interrogation techniques and plausibility in an experimental false confession paradigm. *Legal and Criminological Psychology, 13*, 71–88.
Kollins, S. H. (2003). Delay discounting is associated with substance use in college students. *Addictive Behaviors, 28*, 1167–1173.
Lamb, H. R., & Weinberger, L. E. (1998). Persons with severe mental illness in jails and prisons: A review. *Psychiatric Services, 49*, 483–492.
Lamb, M. E., Orbach, Y., Hershkowitz, I., Horowitz, D., & Abbott, C. B. (2007). Does the type of prompt affect the accuracy of information provided by alleged victims of abuse in forensic interviews? *Applied Cognitive Psychology, 21*, 1117–1130.
Lamb, M. E., Orbach, Y., Sternberg, K. J., Hershkowitz, I., & Horowitz, D. (2000). Accuracy of investigators’ verbatim notes of their forensic interviews with alleged child abuse victims. *Law and Human Behavior, 24*, 699–707.
Lambert, B. (2008, July 1). Freed after 17 years in prison, L.I. man will not face new trial. *The New York Times*, p. A1.
Lassiter, G. D. (Ed.). (2004). *Interrogations, confessions, and entrapment*. New York: Kluwer Academic.
Lassiter, G. D., Diamond, S. S., Schmidt, H. C., & Elek, J. K. (2007). Evaluating videotaped confessions: Expertise provides no defense against the camera-perspective effect. *Psychological Science, 18*, 224–226.
Lassiter, G. D., & Geers, A. L. (2004). Evaluation of confession evidence: Effects of presentation format. In G. D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 197–214). New York: Kluwer Academic.
Lassiter, G. D., Geers, A. L., Handley, I. M., Weiland, P. E., & Munhall, P. J. (2002). Videotaped confessions and interrogations: A change in camera perspective alters verdicts in simulated trials. *Journal of Applied Psychology, 87*, 867–874.
Lassiter, G. D., Geers, A. L., Munhall, P. J., Handley, I. M., & Beers, M. J. (2001). Videotaped confessions: Is guilt in the eye of the camera? *Advances in Experimental Social Psychology, 33*, 189–254.
Lassiter, G. D., & Irvine, A. A. (1986). Videotaped confessions: The impact of camera point of view on judgments of coercion. *Journal of Applied Social Psychology, 16*, 268–276.
Lassiter, G. D., Slaw, R. D., Briggs, M. A., & Scanlan, C. R. (1992). The potential for bias in videotaped confessions. *Journal of Applied Social Psychology, 22*, 1838–1851.
Latane, B. (1981). The psychology of social impact. *American Psychologist, 36*, 343–356.
Leo, R. A. (1996a). Miranda’s revenge: Police interrogation as a confidence game. *Law and Society Review, 30*, 259–288.
Leo, R. A. (1996b). Inside the interrogation room. *Journal of Criminal Law and Criminology, 86*, 266–303.
Leo, R. A. (1996c). The impact of Miranda revisited. *The Journal of Criminal Law and Criminology, 86*, 621–692.
Leo, R. A. (2004). The third degree and the origins of psychological police interrogation in the United States. In G. D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 37–84). New York: Kluwer Academic.
Leo, R. A. (2005). Re-thinking the study of miscarriages of justice: Developing a criminology of wrongful conviction. *Journal of Contemporary Criminal Justice, 21*, 201–223.
Leo, R. A. (2008). *Police interrogation and American justice*. Cambridge, MA: Harvard University Press.
Leo, R. A., Drizin, S., Neufeld, P., Hall, B., & Vatner, A. (2006). Bringing reliability back in: False confessions and legal safeguards in the twenty-first century. *Wisconsin Law Review, 2006*, 479–539.
Leo, R. A., & Liu, B. (2009). What do potential jurors know about police interrogation techniques and false confessions? *Behavioral Sciences and the Law, 27*(3), 381–399.
Leo, R. A., & Ofshe, R. J. (1998). The consequences of false confessions: Deprivations of liberty and miscarriages of justice in the age of psychological interrogation. *Journal of Criminal Law and Criminology, 88*, 429–496.
Leo, R. A., & Ofshe, R. J. (2001). The truth about false confessions and advocacy scholarship. *The Criminal Law Bulletin, 37*, 293–370.
Lerner, M. J. (1980). *The belief in a just world*. New York: Plenum.
Leyra v. Denno, 347 U.S. 556 (1954).
Loftus, E. F. (1997). Creating false memories. *Scientific American, 277*, 70–75.
Loftus, E. F. (2005). Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning & Memory, 12*, 361–366.
Lykken, D. T. (1998). *A tremor in the blood: Uses and abuses of the lie detector*. Reading, MA: Perseus Books.
Lynumn v. Illinois, 372 U.S. 528 (1963).
Lyznicki, J. M., Doege, T. C., Davis, R. M., & Williams, M. A. (1998). Sleepiness, driving, and motor vehicle crashes. *Journal of the American Medical Association, 279*, 1908–1913.
Magid, L. (2001). Deceptive police interrogation practices: How far is too far? *Michigan Law Review, 99*, 1168.
McCann, J. T. (1998). A conceptual framework for identifying various types of confessions. *Behavioral Sciences and the Law, 16*, 441–453.
McCormick, C. T. (1972). *Handbook of the law of evidence* (2nd ed.). St. Paul, MN: West.
Meissner, C. A., & Kassin, S. M. (2002). “He’s guilty!”: Investigator bias in judgments of truth and deception. *Law and Human Behavior, 26*, 469–480.
Melton, G., Petrila, J., Poythress, N., & Slobogin, C. (1997). *Psychological evaluations for the courts* (2nd ed.). New York: Guilford.
Meyer, J. R., & Reppucci, N. D. (2007). Police practices and perceptions regarding juvenile interrogations and interrogative suggestibility. *Behavioral Sciences and the Law, 25*, 757–780.
Meyer, R. G., & Youngjohn, J. R. (1991). Effects of feedback and validity expectancy on response in a lie detector interview. *Forensic Reports, 4*, 235–244.
Milgram, S. (1974). *Obedience to authority: An experimental view*. New York: Harper & Row.
Miller, D. T., & McFarland, C. (1987). Pluralistic ignorance: When similarity is interpreted as dissimilarity. *Journal of Personality and Social Psychology, 53*, 298–305.
Milne, R., & Bull, R. (1999). *Investigative interviewing: Psychology and practice*. Chichester, England: Wiley.
Miranda v. Arizona, 384 U.S. 436 (1966).
Missouri v. Seibert, 542 U.S. (2004).

Morgan, C. A., Hazlett, G., Doran, A., Garrett, S., Hoyt, G., Thomas, P., et al. (2004). Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Law and Psychiatry, 27*, 265–279.

Moston, S., Stephenson, G. M., & Williamson, T. (1992). The effects of case characteristics on suspect behaviour during police questioning. *British Journal of Criminology, 32*, 23–39.

Munsterberg, H. (1908). *On the witness stand*. Garden City, NY: Doubleday.

Nash, R. A., & Wade, K. A. (2009). Innocent but proven guilty: Using false video evidence to elicit false confessions and create false beliefs. *Applied Cognitive Psychology, 23*, 624–637.

National Research Council, Committee to Review the Scientific Evidence on the Polygraph, Division of Behavioral and Social Sciences and Education. (2003). *The polygraph and lie detection*. Washington, DC: National Academies Press.

Navarick, D. J. (1982). Negative reinforcement and choice in humans. *Learning and Motivation, 13*, 361–377.

Nelson, N. P. (2007, March). *Interviewing using the RIP technique*. Paper presented at "Off the Witness Stand, Using Psychology in the Practice of Justice," John Jay College of Criminal Justice, New York City.

Neuschatz, J. S., Lawson, D. S., Swanner, J. K., Meissner, C. A., & Neuschatz, J. S. (2008). The effects of accomplice witnesses and jailhouse informants on jury decision making. *Law and Human Behavior, 32*, 137–149.

Oberlander, L., Goldstein, N., & Goldstein, A. (2003). Competence to confess. In I. Wiener & A. Goldstein (Eds.), *Handbook of psychology: Volume 22, forensic psychology* (pp. 335–357). Hoboken, NJ: Wiley.

Oberlander, L. B., & Goldstein, N. E. (2001). A review and update on the practice of evaluating Miranda comprehension. *Behavioral Sciences and the Law, 19*, 453–471.

O'Connell, M. J., Garmoe, W., & Goldstein, N. E. S. (2005). Miranda comprehension in adults with mental retardation and the effects of feedback style on suggestibility. *Law and Human Behavior, 29*, 359–369.

Ofshe, R. J., & Leo, R. A. (1997a). The social psychology of police interrogation: The theory and classification of true and false confessions. *Studies in Law, Politics, and Society, 16*, 189–251.

Ofshe, R. J., & Leo, R. A. (1997b). The decision to confess falsely: Rational choice and irrational action. *Denver University Law Review, 74*, 979–1122.

O'Hara, C. (1956). *Fundamentals of criminal investigation*. Springfield, IL: Charles C. Thomas.

Onishi, N. (2007, May 11). Pressed by police, even innocent confess in Japan. *The New York Times*.

Opper v. United States, 348 U.S. 84 (1954).

Otto, H. D. (2006). *"Im namen des irrtums!" Fehlurteile in mordprozessen*. Mänchen: F.A. Herbig.

Owen-Kostelnik, J., Reppucci, N. D., & Meyer, J. D. (2006). Testimony and interrogation of minors: Assumptions about maturity and morality. *American Psychologist, 61*, 286–304.

Parke, R. D., Ornstein, P. A., Reiser, J. J., & Zahn-Waxler, C. (1994). *A century of developmental psychology*. Washington, DC: APA.

Pearse, J., & Gudjonsson, G. H. (1996). Police interviewing techniques at two south London police stations. *Psychology, Crime and Law, 3*, 63–74.

Penney, S. (1998). Theories of confession admissibility: A historical view. *American Journal of Criminal Law, 25*, 309–383.

People of the State of New York v. Kharey Wise, Kevin Richardson, Antron McCray, Yusef Salaam, & Raymond Santana: Affirmation in Response to Motion to Vacate Judgment of Conviction (2002). Indictment No. 4762/89, December 5, 2002.

People v. Daoud, 614 N.W.2d 152 (Mich. S. Ct., 2000).

Perske, R. (2004). Understanding persons with intellectual disabilities in the criminal justice system: Indicators of progress? *Mental Retardation, 42*, 484–487.

Petty, R. E., & Cacioppo, J. T. (1986). *Communication and persuasion: Central and peripheral routes to attitude change*. New York: Springer.

Pierce v. United States, 160 U.S. 355 (1896).

Pilcher, J. J., & Huffcut, A. (1996). Effects of sleep deprivation on performance: A meta-analysis. *Sleep, 19*, 318–326.

Price, D. D., Finniss, D. G., & Benedetti, F. (2008). A comprehensive review of the placebo effect: Recent advances and current thought. *Annual Review of Psychology, 59*, 565–590.

Rachlin, H. (2000). *The science of self-control*. Cambridge, MA: Harvard University Press.

Radelet, M., Bedau, H., & Putnam, C. (1992). *In spite of innocence: Erroneous convictions in capital cases*. Boston: Northeastern University Press.

Redlich, A. D. (2004). Mental illness, police interrogations, and the potential for false confession. *Psychiatric Services, 55*, 19–21.

Redlich, A. D. (2007). Double jeopardy in the interrogation room: Young age and mental illness. *American Psychologist, 62*, 609–611.

Redlich, A. D. (in press). False confessions and false guilty pleas. In G. D. Lassiter & C. A. Meissner (Eds.), *Interrogations and confessions: Current research, practice and policy*. Washington, DC: APA Books.

Redlich, A. D., & Drizin, S. (2007). Police interrogation of youth. In C. L. Kessler & L. Kraus (Eds.), *The mental health needs of young offenders: Forging paths toward reintegration and rehabilitation* (pp. 61–78). Cambridge, England: Cambridge University Press.

Redlich, A. D., Ghetti, S., & Quas, J. A. (2008a). Perceptions of children during a police interview: A comparison of suspects and alleged victims. *Journal of Applied Social Psychology, 38*, 705–735.

Redlich, A. D., & Goodman, G. S. (2003). Taking responsibility for an act not committed: Influence of age and suggestibility. *Law and Human Behavior, 27*, 141–156.

Redlich, A. D., Quas, J. A., & Ghetti, S. (2008b). Perceptions of children during a police interview: Guilt, confessions, and interview fairness. *Psychology, Crime and Law, 14*, 201–223.

Redlich, A. D., Silverman, M., Chen, J., & Steiner, H. (2004). The police interrogation of children and adolescents. In G. D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 107–125). New York: Kluwer Academic.

Redlich, A. D., Silverman, M., & Steiner, H. (2003). Pre-adjudicative and adjudicative competence in juveniles and young adults. *Behavioral Sciences and the Law, 21*, 393–410.

Reynolds, B., Richards, J. B., Horn, K., & Karraker, K. (2004). Delay discounting and probability discounting as related to cigarette smoking status in adults. *Behavioral Processes, 65*, 35–42.

Rigoni, M. E., & Meissner, C. A. (2008). *Is it time for a revolution in the interrogation room? Empirically validating inquisitorial methods*. Paper presented at Meeting of the American Psychology-Law Society, Jacksonville, FL.

Roberts, P. (2007). Law and criminal investigation. In T. Newburn, T. Williamson, & A. Wright (Eds.), *Handbook of criminal investigation* (pp. 92–145). Devon, UK: Willan.

Robertson, G. D. (July 24, 2007 NC 01:44:29). NC lawmakers approve lineup, interrogation recording standards. *AP-Alerts.*

Rofe, Y. (1984). Stress and affiliation: A utility theory. *Psychological Review, 91*, 235–250.

Rogers, R., Harrison, K., Hazelwood, L., & Sewell, K. (2007a). Knowing and intelligent: A study of Miranda warnings in mentally disordered defendants. *Law and Human Behavior, 31*, 401–418.

Rogers, R., Harrison, K., Shuman, D., Sewell, K., & Hazelwood, L. (2007b). An analysis of Miranda warnings and waivers: Comprehension and coverage. *Law and Human Behavior, 31*, 177–192.

Rogers, R., Hazelwood, L., Sewell, K., Harrison, K., & Shuman, D. (2008). The language of Miranda warnings in American jurisdictions: A replication and vocabulary analysis. *Law and Human Behavior, 32*, 124–136.

Roper v. Simmons, 543 U.S. 551 (2005).

Rosenthal, R., & Jacobson, L. (1968). *Pygmalion in the classroom: Teacher expectation and pupils' intellectual development*. New York: Holt Rinehart & Winston.

Ross, L. (1977). The intuitive psychologist and his shortcomings: Distortions in the attribution process. *Advances in Experimental Social Psychology, 10*, 174–221.

Russano, M. B., Meissner, C. A., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16*, 481–486.

Santos, F. (2006, September 21). DNA evidence frees a man imprisoned for half his life. *New York Times*, p. A1.

Santtila, P., Alkiora, P., Ekholm, M., & Niemi, P. (1999). False confessions to robbery: The role of suggestibility, anxiety, memory disturbance and withdrawal symptoms. *The Journal of Forensic Psychiatry, 10*, 399–415.

Saywitz, K., Nathanson, R., & Snyder, L. S. (1993). Credibility of child witnesses: The role of communicative competence. *Topics in Language Disorders, 13*, 59–78.

Schachter, S. (1959). *The psychology of affiliation: Experimental studies of the sources of gregariousness*. Stanford, CA: Stanford University Press.

Schachter, S., & Singer, J. (1962). Cognitive, social, and physiological determinants of emotional state. *Psychological Review, 69*, 379–399.

Schacter, D. L. (2001). *The seven sins of memory: How the mind forgets and remembers*. Boston: Houghton Mifflin.

Scheck, B., Neufeld, P., & Dwyer, J. (2000). *Actual innocence*. Garden City, NY: Doubleday.

Schulhofer, S. (1981). Confessions and the court. *Michigan Law Review, 79*, 865–893.

Schulhofer, S. J. (1996). Miranda's practical effect: Substantial benefits and vanishingly small social costs. *Northwestern University Law Review, 90*, 500–564.

Sherif, M. (1936). *The psychology of social norms*. New York: Harper.

Sherrer, H. (2005). Murdered woman's innocent boyfriend exonerated after bizarre "confession" is exposed as false. *Justice: Denied*, January 2005.

Sigurdsson, J., & Gudjonsson, G. (1997). The criminal history of 'false confessors' and other prison inmates. *Journal of Forensic Psychiatry, 8*, 447–455.

Sigurdsson, J. F., & Gudjonsson, G. H. (1996). The psychological characteristics of false confessors: A study among Icelandic prison inmates and juvenile offenders. *Personality and Individual Differences, 20*, 321–329.

Sigurdsson, J. F., & Gudjonsson, G. H. (2001). False confessions: The relative importance of psychological, criminological and substance abuse variables. *Psychology, Crime and Law, 7*, 275–289.

Sigurdsson, J. F., & Gudjonsson, G. H. (2004). Forensic psychology in Iceland: A survey of members of the Icelandic Psychological Society. *Scandinavian Journal of Psychology, 45*, 325–329.

Sigurdsson, J. F., Gudjonsson, G. H., Einarsson, E., & Gudjonsson, G. (2006). Differences in personality and mental state between suspects and witnesses immediately after being interviewed by the police. *Psychology, Crime and Law, 12*, 619–628.

Simon, D. (1991). *Homicide: A year on the killing streets*. New York: Ivy Books.

Singh, K., & Gudjonsson, G. (1992). Interrogative suggestibility among adolescent boys and its relationship to intelligence, memory, and cognitive set. *Journal of Adolescence, 15*, 155–161.

Skinner, B. F. (1938). *The behavior of organisms*. New York: Appleton-Century-Crofts.

Skolnick, J. H., & Leo, R. A. (1992). The ethics of deceptive interrogation. *Criminal Justice Ethics, 11*, 3–12.

Slobogin, C. (2003). Toward taping. *Ohio State Journal of Criminal Law, 1*, 309–322.

Slobogin, C. (2007). Lying and confessing. *Texas Tech Law Review, 39*, 1275–1292.

Smith v. United States, 348 U.S. 147 (1954).

Snyder, H. (2006). *Juvenile arrests 2004*. Washington, DC: Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs.

Soukara, S., Bull, R., Vrij, A., Turner, M., & Cherryman, C. (in press). A study of what really happens in police interviews with suspects. *Psychology*, *Crime and Law.*

Spano v. New York, 360 U.S. 315 (1959).

Sparf v. United States, 156 U.S. 51 (1895).

State v. Barnett, 789 A.2d 629–633 (N.H. 2002).

State v. Cayward, 552 So. 2d 921 (Fla. 1989).

State v. Chirokovskcic, 860 A.2d 986 (N.J.Super.2004).

State v. Hajtic, 724 N.W.2d 449,455 (Ia. 2006).

State v. Mauchley, 67 P.3d 477 (Utah 2003).

State v. Patton, 826 A.2d 783, N.J. Super. A.D. (2003).

State v. Scales, 518 N.W.2d 587 (Minn. 1994).

Stephan v. State, 711 P.2d 1156 (Alaska 1985).

Steinberg, L. (2005). Cognitive and affective development in adolescence. *Trends in Cognitive Sciences, 9*, 69–74.

Steinberg, L. (2007). Risk taking in adolescence: New perspectives from brain and behavioral science. *Current Directions in Psychological Science, 16*, 55–59.

Steinberg, L., & Cauffman, E. (1996). Maturity of judgment in adolescence: Psychosocial factors in adolescent decision making. *Law and Human Behavior, 20*, 249–272.

Steinberg, L., & Morris, A. S. (2001). Adolescent development. *Annual Review of Psychology, 52*, 83–110.

Steingrimsdottir, G., Hreinsdottir, H., Gudjonsson, G. H., Sigurdsson, J. F., & Nielsen, T. (2007). False confessions and the relationship with offending behaviour and personality among Danish adolescents. *Legal and Criminological Psychology, 12*, 287–296.

Suedfeld, P. (Ed.). (1990). *Psychology and torture*. Washington, DC: Hemisphere.

Sullivan, T. (2007, April). Federal law enforcement agencies should record custodial interrogations. *The Champion*, 8–12.

Sullivan, T. P. (2004). *Police experiences with recording custodial interrogations*. Chicago: Northwestern University Law School, Center on Wrongful Convictions.

Sullivan, Y. P., Vail, A. W., & Anderson, H. W. (2008). The case for recording police interrogation. *Litigation, 34*(3), 1–8.

Swanner, J. K., Beike, D. R., & Cole, A. T. (in press). Snitching, lies and computer crashes: An experimental investigation of secondary confessions. *Law and Human Behavior.*

Taffinder, N. J., McManus, I. C., Gul, Y., Russell, R. C., & Darzi, A. (1998). Effect of sleep deprivation on surgeons' dexterity on laparoscopy simulator. *Lancet, 352*, 1191.

Tajfel, H., Billig, M. G., Bundy, R. P., & Flament, C. (1971). Social categorization and intergroup behavior. *European Journal of Social Psychology, 1*, 149–178.

Taylor, B. D. (2005). Evidence beyond confession: Abolish Arizona's corpus delicti rule. *Arizona Attorney, 41*, 22–28.

Technical Working Group for Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. Washington, DC: U.S. Department of Justice, Office of Justice Programs.

Thomas, G. C. (1996). Is Miranda a real-world failure? A plea for more (and better) empirical evidence. *UCLA Law Review, 43*, 821.

Thomas, G. C. (2007). Regulating police deception during interrogation. *Texas Tech Law Review*, *39*.

Thomas, G. C., & Leo, R. A. (2002). The effects of *Miranda v. Arizona*: "Embedded" in our national culture? *Crime and Justice: A Review of Research, 29*(20), 3–271.

Thorndike, E. L. (1911). *Animal intelligence: Experimental studies*. New York: MacMillan.

Trainum, J. (2007, September 20). I took a false confession—So don't tell me it doesn't happen! *The California Majority Report*. http://www.camajorityreport.com/index.php?module=articles&func=display&ptid=9&aid=2306.

Trainum, J. (2008, October 24). The case for videotaping interrogations: A suspect's false confession to a murder opened an officer's eyes. *The Los Angeles Times.*

Uchino, B. N., Cacioppo, J. T., & Kiecolt-Glaser, J. K. (1996). The relationship between social support and physiological processes: A review with emphasis on underlying mechanisms and implications for health. *Psychological Bulletin, 119*, 488–531.

Valins, S. (1966). Cognitive effects of false heart-rate feedback. *Journal of Personality and Social Psychology, 4*, 400–408.

Veasey, S., Rosen, R., Barzansky, B., Rosen, I., & Owens, J. (2002). Sleep loss and fatigue in residency training: A reappraisal. *Journal of the American Medical Association, 288*, 1116–1124.

Viljoen, J., Klaver, J., & Roesch, R. (2005). Legal decisions of preadolescent and adolescent defendants: Predictors of confessions, pleas, communication with attorneys, and appeals. *Law and Human Behavior, 29*, 253–278.

Viljoen, J., & Roesch, R. (2005). Competence to waive interrogation rights and adjudicative competence in adolescent defendants: Cognitive development, attorney contact, and psychological symptoms. *Law and Human Behavior, 29*, 723–742.

Viljoen, J., Zapf, P., & Roesch, R. (2007). Adjudicative competence and comprehension of Miranda rights in adolescent defendants: A comparison of legal standards. *Behavioral Sciences and the Law, 25*, 1–19.

Vrij, A. (2008). *Detecting lies and deceit: Pitfalls and opportunities*. Chichester, England: Wiley.

Wagenaar, W. A. (2002). False confessions after repeated interrogation: The Putten murder case. *European Review, 10*, 519–537.

Wald, M., Ayres, R., Hess, D. W., Schantz, M., & Whitebread, C. H. (1967). Interrogations in New Haven: The impact of Miranda. *The Yale Law Journal, 76*, 1519–1648.

Wall, S., & Furlong, J. (1985). Comprehension of Miranda rights by urban adolescents with law-related education. *Psychological Reports, 56*, 359–372.

Warden, R. (2005). *Wilkie Collins's the dead alive: The novel, the case, and wrongful convictions*. Evanston, IL: Northwestern University Press.

Weinger, M. B., & Ancoli-Israel, S. (2002). Sleep deprivation and clinical performance. *Journal of American Medical Association, 287*, 955–957.

Weisberg, B. (1961). Police interrogation of arrested persons: A skeptical view. In C. R. Sowle (Ed.), *Police power and individual freedom* (pp. 153–181). Chicago: Aldine.

Wells, G. L., Malpass, R. S., Lindsay, R. C. L., Fisher, R. P., Turtle, J. W., & Fulero, S. M. (2000). From the lab to the police station: A successful application of eyewitness research. *American Psychologist, 55*, 581–598.

Wells, G. L., Small, M., Penrod, S., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22*, 1–39.

White, W. S. (1997). False confessions and the constitution: Safeguards against untrustworthy confessions. *Harvard Civil Rights-Civil Liberties Law Review, 32*, 105–157.

White, W. S. (1998). What is an involuntary confession now? *Rutgers Law Review, 200*, 1–2057.

White, W. S. (2001). *Miranda's waning protections: Police interrogation practices after Dickerson*. Ann Arbor, MI: University of Michigan Press.

White, W. S. (2003). Confessions in capital cases. *University of Illinois Law Review, 2003*, 979–1036.

Wickersham Commission Report (1931). National Commission on Law Observance and Law Enforcement. (1931). *Report on lawlessness in law enforcement*. Washington, DC: U.S. Government Printing Office.

Wiggins, E. C., & Wheaton, S. (2004). So what's a concerned psychologist to Do? Translating the research on interrogations, confessions and entrapment into policy. In G. D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 265–280). New York: Springer.

Wigmore, J. H. (1970). *Evidence in trials at common law* (3rd ed.). Little, Brown: Boston.

Williamson, T. (Ed.). (2006). *Investigative interviewing: Rights, research, regulation*. Devon, UK: Willan.

Williamson, T. (2007). Psychology and criminal investigations. In T. Newburn, T. Williamson, & A. Wright (Eds.), *Handbook of criminal investigation* (pp. 68–91). Devon, UK: Willan.

Wills, C. (2005, July 17). Taped interrogations can still be false. *Los Angeles Times* (online edition).

Wilson v. United States, 162 U.S. 613 (1896).

Wisconsin Criminal Justice Study Commission. (2007). *Position paper on false confessions.* Madison, WI. www.wcjsc.org/Position_Paper_on_False_Confessions.pdf

Wrightsman, L. S., & Kassin, S. M. (1993). *Confessions in the courtroom*. Newbury Park, CA: Sage.

Young, S. (2007). Forensic aspects of ADHD. In M. Fitzgerald, M. Bellgrove, & M. Gill (Eds.), *Handbook of attention deficit hyperactive disorder*. Chichester, England: Wiley.

Zimbardo, P. G. (1967). The psychology of police confessions. *Psychology Today, 1*(17–20), 25–27.

Zimring, F. E., & Hawkins, G. (1986). *Capital punishment and the American agenda*. Cambridge, England: Cambridge University Press.

Copyright of Law & Human Behavior is the property of Springer Science & Business Media B.V. and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

Journal of Autism and Developmental Disorders (2022) 52:3061–3075
https://doi.org/10.1007/s10803-021-05186-3

ORIGINAL PAPER

# In Our Own Words: The Complex Sensory Experiences of Autistic Adults

K. MacLennan[1] · S. O'Brien[1] · T. Tavassoli[1]

Accepted: 30 June 2021 / Published online: 13 July 2021
© The Author(s) 2021

**Abstract**
Autistic adults commonly experience sensory reactivity differences. Sensory hyperreactivity is frequently researched, whilst hyporeactivity and seeking, and experiences across domains, e.g., vision, are often neglected. Therefore, we aimed to understand more about the sensory experiences of autistic adults. We conducted a mixed-methods study, co-produced with stakeholders; recruiting 49 autistic adults who completed an online survey. Firstly, quantitative results and content analysis enhanced our understanding of sensory input/contexts associated with sensory hyperreactivity, hyporeactivity, and seeking across modalities. Secondly, thematic analysis developed themes relating to 'Outcomes', 'Control', 'Tolerance and management', and 'The role of other people', informing a theoretical model of sensory reactivity differences in autistic adults. These findings have implications for support services and improving quality of life for autistic adults.

**Keywords** Autism · Autistic · Adult · Sensory · Participatory · Qualitative

## Introduction

Autism Spectrum Conditions (ASC) are neurodevelopmental conditions typically characterised by social communication differences, and restricted and repetitive interests and/or behaviours (RRBs) (DSM-5 American Psychiatric Association, 2013). Sensory reactivity differences, a sub-criterion under RRBs, are suggested to be present in up to 94% of autistic adults[1] (Crane et al., 2009). Sensory reactivity differences can occur across multiple sensory domains, such as vision or touch, and are characterised by hyperreactivity, hyporeactivity, and sensory seeking (DSM-5 American Psychiatric Association, 2013). Individuals who are sensory hyperreactive often experience sensory input more intensely compared to others, and may find it painful, dysregulating, or overwhelming (Lane, 2002). Individuals who are sensory hyporeactive often have a delayed response, or may not notice, sensory input, and it may be experienced by individuals after periods of hyperreactivity (Lane, 2002; Liss et al., 2006). Individuals who are sensory seeking often engage with sensory input repeatedly and/or for sustained periods of time, and it may be a stimulatory or regulatory strategy associated with RRBs, sensory hyperreactivity and/or hyporeactivity (Lidstone et al., 2014; Pellicano et al., 2013; Schulz & Stevenson, 2019). Sensory experiences can be complex and although some sensory experiences can be enjoyable for individuals, other experiences can be very distressing, impacting on quality of life and correlating with mental health conditions, such as anxiety and depression (Carpenter et al., 2018; Elwin et al., 2012; Forsyth & Trevarrow, 2018; Green et al., 2012; Hwang, 2019; MacLennan et al., 2020, 2021; Rossow et al., 2021). It is therefore unsurprising that difficulty with sensory input has been suggested to be a barrier for autistic adults engaging in spaces, both public and occupational (Amos et al., 2019). Thus, understanding the complexities of sensory experiences has important implications for autistic people's physical and mental wellness, social inclusion, and future prospects.

Previous qualitative findings have shown that autistic adults experience sensory hyperreactivity across multiple domains, such as finding sounds too loud and painful, becoming distracted by nearby conversations, as well as having aversions to competing sounds, bright colours, bright or flickering lights, light touch, clothing, overpowering scents, and food tastes and textures (Chamak et al., 2008; Jones

✉ K. MacLennan
kerenmaclennan@gmail.com

[1] School of Psychology and Clinical Language Sciences, University of Reading, Earley, Reading RG66BZ, UK

[1] The terms used in this paper are based on the preferred terms that have been outlined by the autistic community (Kenny et al., 2016).

et al., 2003; Robertson & Simmons, 2015). Additionally, sensory hyperreactivity can result in autistic adults feeling overwhelmed, and this can be exacerbated when experiencing heightened stress and depleted energy levels (Chamak et al., 2008; Robertson & Simmons, 2015; Smith & Sharp, 2013). This can create a vicious cycle, where sensory hyperreactivity creates stress, which amplifies sensory hyperreactivity, leading to more stress (Smith & Sharp, 2013).

However, existing research has provided much less insight into experiences of sensory hyporeactivity and seeking. Recent research has shown that although sensory hyporeactivity may be less pronounced in adulthood, it is still present (Hwang et al., 2019). Qualitative research has suggested that autistic adults experience sensory hyporeactivity to pain, hunger, temperatures, scents, flavours, as well as certain sounds (Chamak et al., 2008; Elwin et al., 2012). As for sensory seeking, research has thought that it may be more prominent in childhood compared to adulthood (Kern et al., 2007). However, qualitative research has suggested that autistic adults seek out enjoyable and soothing sensory perceptual experiences, such as favourite music, and feeling certain textures such as cold, smooth surfaces (Jones et al., 2003; Robertson & Simmons, 2015). But, due to the underrepresentation of sensory hyporeactivity and seeking in research, there is an imperative need to understand more about autistic adults' experiences of these types of sensory reactivity.

Despite evidence suggesting that sensory reactivity differences persist into adulthood (Crane et al., 2009), the sensory experiences of autistic adults have been under-represented in research. Furthermore, sensory hyperreactivity is often a key focus of research, despite evidence that autistic adults experience varying patterns of sensory reactivity differences (Crane et al., 2009). Research has yet to comprehensively identify sensory input that is related to sensory reactivity differences in autistic adults, especially input relating to hyporeactivity and seeking, across modalities (e.g., vision, touch). Furthermore, it is yet to examine autistic adults' experiences of these sensory reactivity differences, also involving autistic individuals in the research process. Therefore, the present mixed-methods study aimed to elucidate the complex sensory experiences of autistic adults using a novel online survey approach. Firstly, we sought to understand more about elements of the sensory environment relating to sensory hyperreactivity, hyporeactivity, and seeking across sensory domains, such as visual, auditory, and tactile. Secondly, we sought to understand more about autistic adults' sensory experiences related to these sensory reactivity differences, to develop a theoretical model reflecting these experiences. Importantly, this research was co-produced with autistic adults following a participatory research framework (Pellicano et al., 2013), to ensure the research was shaped by autistic individuals and relevant and consistent with their values.

## Methods

### Design

This study adopted a mixed-methods design, using both quantitative and qualitative approaches, as well as principles of a participatory research framework (Pellicano et al., 2013). The research team included a doctoral researcher (KM) and an associate professor (TT), who specialise in autism and sensory research, as well as an autistic researcher (SOB), with lived experience and autism research expertise. Feedback from members of the autistic community, external to the research team, was sought at key stages of the projects to improve accessibility, such as the design of recruitment materials, the information sheet, and the questionnaire, as well as an insight group with four autistic adults to discuss the interpretation of results.

The data was collected using an online mixed-methods survey, including both closed and open-ended questions. Collecting the qualitative data using an online survey was chosen over other methods, such as focus groups or interviews. This is because qualitative surveys have the advantage of being able to capture what is important to participants using their own language and terminology (Frith, 2000), and this can easily be combined with the simultaneous collection of quantitative data online. Qualitative surveys are argued to achieve the depth and richness needed for qualitative research through a 'wide-angle lens'; gaining perspectives and experiences from a diverse range of voices from widely geographically dispersed populations (Braun et al., 2017; Toerien & Wilkinson, 2004). This is especially important when the group of interest are large or diverse (Braun et al., 2017), which is effective for research with autistic populations, due to their heterogeneous nature. Online methods also improve the feeling of anonymity, reducing social desirability, and also lessen the burden of participation as the survey can be completed flexibly in a time, pace, and place that suits the participant (Braun et al., 2020).

### Participants

The data of 49 autistic adults was included in the analysis, age range 20–55 years (mean = 34.5, SD = 10.6), although 14 adults chose not to disclose their age (see Table 1). All participants self-reported that they had been clinically diagnosed as autistic. None of the participants had significant hearing or visual impairments that could confound their sensory reactivity. Specific data on socioeconomic status

**Table 1** Demographic characteristics of participants

| | *N* |
|---|---|
| Gender | |
| Male | 11 (22.5%) |
| Female | 33 (67.5%) |
| Non-binary | 5 (10.0%) |
| Ethnicity | |
| White British | 19 (38.8%) |
| White European | 3 (6.1%) |
| White British/American | 1 (2.0%) |
| White non-specified | 21 (43.0%) |
| Ashkenazi Jewish | 1 (2.0%) |
| Latina | 1 (2.0%) |
| Not specified | 3 (6.1%) |
| Self-reported clinical diagnoses | |
| ASC | 49 (100%) |
| Anxiety | 21 (43.0%) |
| Depression | 14 (28.6%) |
| ADHD | 9 (18.4%) |
| Bipolar disorder | 4 (8.2%) |
| Anorexia nervosa | 4 (8.2%) |
| Intellectual disability | 2 (4.1%) |
| Borderline personality disorder | 1 (2.0%) |
| No diagnoses in addition to ASC | 14 (28.6%) |

*ASC* autism spectrum condition; *ADHD* attention deficit hyperactivity disorder




**Fig. 1** Flow diagram showing the number (n) of participants included at each stage

and educational attainment levels were not obtained for this study.

Eighty-three participants were originally recruited for the study; however, 34 participants did not proceed with the study after completing the demographic information and were excluded. Out of the 49 participants that were included in the study, 40 provided responses to the multiple-choice questions, 49 completed the first section of open questions, and 29 completed the full qualitative questionnaire (Fig. 1). The autistic adults were recruited via the Centre for Autism, University of Reading, participant database, and through Facebook and Twitter social media posts. All participants provided informed consent online before commencing with the study. Ethical approval was granted prior to the commencement of this study by the University of Reading Ethics Committee.

## Measures

We developed an online questionnaire including demographic questions followed by 34 questions to capture information about the sensory experiences of autistic adults; 28 were open ended and six were multiple choice. We also provided descriptions of sensory hyperreactivity, hyporeactivity and seeking, and these terms were used throughout the questionnaire. The questionnaire was designed to capture participants' general experiences of being sensory hyperreactive, hyporeactive, seeking and/or neutral to the sensory environment, as well as for each modality; visual, auditory, tactile, interoception, gustatory, and olfactory. The initial 4 questions asked broadly about (1) sensory hyperreactivity, (2) sensory hyporeactivity, (3) sensory seeking, and (4) neutral sensory experiences, e.g., "Describe your experience of being sensory hyperreactive". Followed by questions asking about sensory experiences relating to sensory modalities, e.g., "Describe your experiences of being hyperreactive to the visual environment." Additionally, the questionnaire included six multiple-choice questions that asked participants if they experienced sensory reactivity differences (hyperreactivity, hyporeactivity, seeking, and/or neutral) to pre-defined aspects of the sensory environment in each modality (e.g., visual: bright lights), and an 'other' option for them to add their own. These stimuli were identified from existing literature and tools (Brown et al., 2001; Schoen et al., 2008), and from a group of autistic adults during the development of the questionnaire. These closed questions were included to provide examples to assist in answering the qualitative questions and allowed participants who may struggle with open questions to still share their sensory experiences.

## Procedure

Autistic adults were invited to take part in an online questionnaire about their sensory experiences. Participants

Case 1:26-cr-00001-AHA Document 102-3 Filed 09/29/26 Page 88 of 150



were able to read the study information and then provide informed consent via an online form. It was also highlighted that although the answers to questions had to be their own, they should seek support with completing the questionnaire if required. Participants then completed the survey, which was anticipated to take between 15 and 60 min depending on the depth of information provided.

### Analysis

To address our research aims, we used a mixed-methods analysis approach. The data was analysed using Nvivo (Castleberry, 2012) primarily by one of the researchers (KM), but the development and interpretation of categories, codes and themes were discussed and confirmed by all members of the research team (SOB and TT), as well as the four autistic adults from the insight group.

To elucidate the elements of the sensory environment associated with sensory reactivity differences, including hyperreactivity, hyporeactivity, and seeking for each modality, we firstly analysed the multiple-choice data by calculating the percentage of participants that identified as having these experiences in each modality. Secondly, we analysed the qualitative data using content analysis, which is an objective systematic way of quantifying and describing data (Elo & Kyngäs, 2008; Krippendorff, 2018). The categories contain words and phrases that share meaning (Cavanagh, 1997). To achieve our aims, deductive, a priori coding was adopted to predetermine the categories of sensory reactivity differences and domain, however we adopted an unconstrained matrix where we used an inductive process to identify sub-categories of common stimuli and contexts within these bounds (Elo & Kyngäs, 2008).

Then, to understand more about autistic adults' sensory experiences, we analysed the data using thematic analysis; identifying patterns of meaning in the data (Braun & Clarke, 2006). We took an inductive approach so our analysis was driven by the data rather than preconceived coding or perceptions, and we adopted an iterative framework to develop meaning from the data (Srivastava & Hopwood, 2009). Thus, our approach was a continuous and deeply reflexive process, which recognised that categories and themes do not emerge on their own but are driven by what we as researchers aimed to know and how we interpreted the data. The framework proposes three questions as reference points, (1) What are the data telling me? (2) What is it I want to know? (3) What is the dialectical relationship between what the data are telling me and what I want to know? Through this cyclical approach, categories and themes were reflexively revised and refined, considering researcher biases, and incorporating insights from the analysis process and from checks with the research team and members of the autistic community. Once the final themes were developed, these were then adapted into a theoretical model. The importance of highlighting the interconnected nature of the themes was emphasised by the autistic adults in the feedback group. Therefore, the model is informed by the themes and provides enhanced representation of the lived experience of sensory reactivity differences for autistic adults.




**Fig. 2** Depicting the percentage of participants (n = 49) self-identifying as experiencing only sensory hyperreactivity, hyporeactivity, or seeking, or experiencing hyperreactivity and hyporeactivity, hyperreactivity and seeking, or hyporeactivity and seeking, or experiencing all three

## Results

### Quantitative Analysis

Responses to the multiple-choice questions found that 93.9% percent of the autistic adults identified as experiencing sensory hyperreactivity, 28.6% identified as experiencing sensory hyporeactivity, and 41.4% identified as experiencing sensory seeking (Fig. 2; see Table 2 for sensory input/contexts associated with sensory reactivity differences in each modality). Furthermore, 22.5% identified as experiencing only either sensory hyperreactivity, hyporeactivity, or seeking (20.5% hyperreactivity; 0% hyporeactivity; 2.0% seeking), 49.0% identified as experiencing 2 of these (4.1% hyperreactivity and hyporeactivity; 44.9% hyperreactivity and seeking; 0% hyporeactivity and seeking), and 24.5% identified as experiencing all 3. Although all participants reported qualitative experiences of sensory reactivity

**Table 2** Summary of quantitative analysis

| | Percentage % | | | |
|---|---|---|---|---|
| | Hyperreactive | Hyporeactive | Seeking | Neutral |
| Overall | | | | |
| Yes | 93.9 | 28.6 | 41.4 | – |
| No | 6.1 | 71.4 | 28.6 | – |
| Visual | | | | |
| Bright lights | 75.0 | 5.0 | 0.0 | 17.5 |
| Flashing lights | 75.0 | 0.0 | 0.0 | 22.5 |
| Bright colours | 27.5 | 0.0 | 30.0 | 40.0 |
| Low contrast images | 7.5 | 7.5 | 7.5 | 77.5 |
| Patterns | 35.0 | 2.5 | 35.0 | 30.0 |
| Auditory | | | | |
| Lots of conversations | 82.5 | 6.0 | 2.5 | 2.5 |
| Shopping centres | 26.0 | 5.0 | 5.0 | 20.0 |
| Public transport | 70.0 | 7.5 | 0.0 | 17.5 |
| Loud noises | 87.5 | 5.0 | 2.5 | 2.5 |
| Ambient noises | 40.0 | 7.5 | 10.0 | 47.5 |
| High pitch noises | 77.5 | 2.5 | 2.5 | 12.5 |
| Music | 75.0 | 0.0 | 60.0 | 15.0 |
| Tactile | | | | |
| Pressure differences | 47.5 | 5.0 | 32.5 | 17.5 |
| Clothing, | 75.0 | 0.0 | 15.0 | 15.0 |
| Different textures | 62.5 | 0.0 | 73.5 | 12.5 |
| Interoception | | | | |
| Cold temperatures | 42.5 | 12.5 | 7.5 | 27.5 |
| Hot temperatures | 55.0 | 15.0 | 2.5 | 20.0 |
| Changes in the weather | 47.5 | 10.0 | 2.5 | 35.0 |
| Physical pain | 35.0 | 30.0 | 5.0 | 25.0 |
| Gustatory | | | | |
| Spicy food | 37.5 | 10.0 | 30.0 | 25.0 |
| Food temperatures | 32.5 | 5.0 | 10.0 | 42.5 |
| Food textures | 65.0 | 2.5 | 17.5 | 22.5 |
| Favourite foods | 22.5 | 5.0 | 37.5 | 32.5 |
| Memorable foods | 20.0 | 2.5 | 25.0 | 45.0 |
| Chewing gum | 10.0 | 0.0 | 20.0 | 57.5 |
| Olfactory | | | | |
| Strong scents | 65.0 | 10.0 | 10.0 | 15.0 |
| Perfumes | 60.0 | 10.0 | 12.5 | 12.5 |
| Pollution | 45.0 | 7.5 | 0.0 | 40.0 |
| Flowers | 27.5 | 15.0 | 20.0 | 30.0 |
| Fresh air | 12.5 | 12.5 | 35.0 | 40.0 |

Percentage of participants in the multiple-choice responses who identified experiencing sensory reactivity differences to sensory stimuli for hyperreactivity, hyporeactivity and seeking, and in each modality (n = 40)

differences, 4.1% of the autistic adults identified as having no sensory reactivity differences.

## Sensory Hyperreactivity

Responses to the multiple-choice items showed that autistic adults identified they are commonly hyperreactive to bright and flashing lights (75%), loud noises (87.5%), lots of conversations (82.5%), high-pitch noises (77.5%), music (75%), public transport sounds (70%), clothing (75%), different textures (62.5%), hot temperatures (55%), food textures (65%), strong scents (65%), and the scent of perfume (60%).

## Sensory Hyporeactivity

Overall, in the multiple-choice items, sensory hyporeactivity was minimally selected as being experienced across domains. The most endorsed hyporeactive experiences were in the interoceptive domain, including being hyporeactive to physical pain (30%), and hot (15%) and cold (12.5%) temperatures.

## Sensory Seeking

Responses to the multiple-choice items showed that autistic adults identified they most commonly seek out music (60%), and different textures (73.5%). Other seeking experiences that some of the autistic adults endorsed included looking at patterns (35%) and bright colours (30%), feeling pressure differences (32.5%), favourite (37.5%) or spicy food flavours (30%), and the scent of fresh air (35%).

## Neutral Sensory Experiences

Responses to multiple-choice items found many of the autistic adults did not have any sensory reactivity differences associated with low contrast images (77.5%) or chewing gum (57.5%). Some of the autistic adults also identified having no sensory reactivity differences associated with looking at bright colours (40%) or patterns (30%), ambient noise (47.5%), memorable (45%) or favourite (32.5%) foods, or the scent of fresh air (40%), pollution (40%), or flowers (30%).

## Content Analysis

The qualitative data was then analysed using content analysis to create categories of sensory input/contexts that related to sensory reactivity in each modality. Table 3 shows sensory input/contexts associated with sensory reactivity differences in each modality. Example quotes for these categories can be found in the supplementary materials.

**Table 3** Summary of content analysis

| | Hyperreactive | Hyporeactive | Seeking |
|---|---|---|---|
| Visual | | | |
| Bright lights (e.g., artificial, sunlight) | 30 | – | – |
| Flashing lights | 12 | – | – |
| Cluttered/busy environments | 13 | – | – |
| Bright colours | 6 | – | 10 |
| Patterns | 5 | – | 9 |
| Motion/moving objects | 5 | – | 5 |
| Visual search (e.g., slow to see dangers or changes) | – | 7 | – |
| Complex images (e.g., nature scenes, artwork) | – | – | 9 |
| Ambient lights | – | – | 6 |
| Auditory | | | |
| Loud and/or unexpected sounds | 28 | – | – |
| Busy/chaotic auditory environments | 19 | – | – |
| Background noise | 18 | – | – |
| Sounds others cannot hear | 10 | – | – |
| High pitched noises | 6 | – | – |
| Out of tune sounds | 3 | – | – |
| Repetitive sounds | 3 | – | – |
| No response when distracted/focussed | – | 10 | – |
| Own music | – | – | 26 |
| Ambient sounds (e.g., fans or engines humming) | – | – | 3 |
| Tactile | | | |
| Light and/or unexpected touch from people | 29 | – | – |
| Clothing fabrics and labels | 24 | – | – |
| Tight clothing | 9 | – | – |
| Environmental textures (e.g., carpet, blankets, feathers) | 9 | – | 18 |
| Wet/greasy textures (e.g., rain, sweat, lotions) | 8 | – | – |
| Pressure (e.g., tight clothing, tight hugs) | – | – | 23 |
| Hot or cold items/surfaces | – | – | 10 |
| Interoception | | | |
| Temperature extremes | 17 | 11 | – |
| Pain | 4 | 15 | – |
| Body signals (e.g., hunger, needing the toilet) | – | 4 | – |
| Gustatory | | | |
| Food tastes | 18 | 8 | 24 |
| Food textures | 16 | – | 5 |
| Olfactory | | | |
| Strong odours | 31 | – | – |
| Perfumes | 12 | – | 5 |
| Food odours | 9 | – | 7 |
| Scented products | 8 | – | 6 |
| People and animals | 6 | – | 4 |
| Dirty home odours (e.g., bins) | 6 | – | – |
| Cigarette smoke | 5 | – | – |
| Pollution | 4 | – | – |
| Subtle odours | – | 9 | – |

Number of participants who reported experiences relating to sensory hyperreactivity, hyporeactivity, and seeking, in each modality (n = 49)

### Sensory Hyperreactivity

Content analysis found that the autistic adults commonly experience hyperreactivity to bright lights, both artificial and to sunlight, as well as to flashing lights, and busy, cluttered environments. Many also reported being hyperreactive to bright colours and patterns, and motion or moving objects. In the auditory domain, hyperreactivity to loud and/or unexpected sounds was the most reported, such as sirens, alarms, and dogs barking. But also, being hyperreactive in response to busy/chaotic auditory environments and to background noise, especially situations with multiple conversations, were commonly reported. In the tactile domain, many of the autistic adults reported being hyperreactive to touch from other people, especially when it is light or unexpected, as well as to different fabric textures and labels in clothing, being unable to wear some clothing because of this. Some of the autistic adults also reported being hyperreactive to tight clothing, and certain rough textures, such as carpets and feathers, and wet/greasy textures, such as sweat or lotions. Regarding interception, many of the autistic adults reported being hyperreactive to temperature extremes; being too hot or too cold. As for Olfactory, many of the autistic adults reported a range of individualistic food aversions and dietary restrictions due to being hyperreactive to certain food tastes and textures. Lastly, many of the autistic adults reported being hyperreactive to what they referred to as *strong odours*, as well as perfume, scented products, or food odours, which they often find unbearable and could result in them feel nauseated. Some of the autistic adults also reported being hyperreactive to people or animal smells, as well as dirty home odours such as bins/trash.

### Sensory Hyporeactivity

Experiences of sensory hyporeactivity were less commonly reported. However, content analysis found that some of the autistic adults reported they were hyporeactive to visual search or environmental changes, such as having difficulty findings an item they're looking for and being slow to notice changes or danger in their environment. Additionally, some of the autistic adults described experiences of auditory hyporeactivity in instances when they are hyper-focussed or concentrating on a task. Furthermore, many of the autistic adults reported their experiences of being hyporeactive to pain and consider themselves to have a high pain threshold compared to others. Additionally, the autistic adults also described their experiences of being hyporeactive to temperature and may be slow to notice if they feel too hot or cold, or if they touch something that is very hot or cold. Lastly, some of the autistic adults reported that they can struggle to smell subtle scents that other people report to have noticed.

**Table 4** Summary of main themes and sub-themes developed from thematic analysis relating to sensory reactivity in autistic adults

| Main theme | Sub-themes |
|---|---|
| Outcomes | Physical outcomes and responses<br>Feeling overwhelmed and disengaging<br>Mental health |
| Control | A desire for control and predictability<br>Difficulty with self-control |
| Tolerance and management | Moderated by mood<br>Soothing sensory input<br>Avoidance<br>Adaptation |
| The role of other people | Understanding<br>Support |

### Sensory Seeking

The content analysis found that many of the autistic adults described how they seek out to look at bright colours and patterns for extended periods of time, as well as complex images, such as scenes of nature or artwork. A few also reported that they seek out motion or moving objects, as well as ambient lighting. As for the auditory domain, the autistic adults commonly reported that they seek out music related to their individual music tastes and will often listen to the same song repeatedly. Regarding the tactile domain, many of the autistic adults described how they seek out pressure, such as by wearing tight clothing and getting tight hugs from trusted people, as well as seeking out certain textures, such as those that are soft or fluffy. Additionally, some of the autistic adults seek out the feeling of warm or cold surfaces on their skin. Relating to the gustatory domain, many of the autistic adults reported that they seek out certain food tastes and textures and would sometimes fixate on certain foods. Lastly, many of the autistic adults described how they continually seek out odours that they like, such as food scents, perfume, scented products, and aromatherapy.

### Thematic Analysis

The iterative approach to thematic analysis led to the development of four themes with 11 sub-themes, that related to sensory reactivity in autistic adults: "Outcomes", "Tolerance and management", "Control", and "The role of other people" (Table 4).

### Outcomes

Many of the autistic adults reported the impacts of having sensory reactivity differences. They described how sensory experiences can negatively impact their mental health, highlighting links to anxiety, self-harm, and eating disorders.

They also reported negative physical responses in response to aversive aspects of the sensory environment, and how these could affect their physical health. The autistic adults also described how sensory stimuli and environments can become overwhelming, which can make them feel like they have disengaged or 'shutdown'.

#### Mental Health

Several of the autistic adults reported the impact that sensory experiences can have on their mental health. Difficulties with sensory input was described to impact mood, causing stress and agitation:

> *"Bright lights such as ceiling lights are unbearable and make me feel very stressed."* SE007

Many of the autistic adults also reported that aversive sensory experiences were a cause for anxiety. They described how a range of experiences across modalities could trigger anxiety, such as loud sounds, unexpected touch, bright or flickering lights, disliked food tastes and textures, and strong scents:

> "When we had issues with our sewage system that persisted for a couple of weeks the constant smell made me agitated and anxious to the point I was experiencing suicidal ideation." SE016

Additionally, some of the participants reported links between sensory seeking experiences and mental health conditions, for instance, self-harming being described as a form of sensory seeking, and strong liking for certain foods being related to eating disorders:

> "I was bulimic for a number of years. This was a form of sensory seeking—I always binged on sweet foods and unlike most bulimics was always very present as I was eating the food." SE016

#### Physical Outcomes and Responses

Sensory experiences were reported to trigger a range of physical responses that can be intense and overwhelming. Sensory hyperreactivity is often experienced as physical pain, for instance due to sudden loud sounds or unexpected touch, and can induce headaches and nausea, for instance because of strong scents becoming overpowering:

> "Smelling a strong smell is like being tortured, time stops and I'm nearly sick." SE008
> "I'm easily startled by sound or touch, sounds physically hurt me."SE017

Additionally, difficulty with sensory stimuli had implications for physical health, such as auditory hyperreactivity impacting sleep, restrictive or repetitive eating due to difficulties with taste leading to nutritional imbalances, or medical difficulties due to being hyporeactive to pain:

> "I think over the years I learned to dissociate from pain and/or found it difficult to recognise or describe what my pain was. This led to many traumatic medical situations where I couldn't say that I was in pain..." SE038

#### Feeling Overwhelmed and Disengaged

Feeling overwhelmed due to sensory input was commonly reported by the autistic adults. Many described overwhelm arising from multi-sensory environments or complex and intense environments. A few of the participants also conveyed that being overwhelmed manifests in disengagement or 'shutdown', and they are no longer able to tolerate the sensory environment:

> "I can become overwhelmed in busy, crowded places. Often in these situations I will feel like everything around me is moving faster and feel a kind of disconnect (maybe even dissociation?) from it all." SE03
> "… all the loud environmental noise (which may seem like nothing to most people—air conditioning humming, projector buzzing, lights buzzing, plates clinking in a restaurant kitchen), can drive me into a shutdown. And then every sound is utterly overwhelming." SE040

### Tolerance and Management

The majority of the autistic adults reported a range of adaptive and maladaptive strategies that they use to cope with their sensory reactivity differences and the sensory environment. Many of the autistic adults described how they avoid aversive sensory stimuli or environments they struggle to cope with. However, they also described adaptations they make to be able to cope with sensory input in certain situations. Many of the adults also described how they seek soothing sensory input as a coping strategy, due to the calming effects they experience. However, the autistic adults also described how their ability to cope with sensory input is moderated by their mood, such as when feeling more relaxed, or tired and stressed.

#### Avoidance

Many of the autistic adults described how they avoid sensory stimuli and environments as a coping strategy. Avoidance was often described as the need to 'run away' and escape from aversive sensory input when it became too difficult to cope with it. Not being able to escape from aversive sensory

input or situations was often reported to be distressing. Some of the autistic adults mentioned certain environments they will avoid for sensory reasons:

> "Not being able to escape with summer becomes a big anxiety thing for me—most other negative sensory things can be fixed by leaving the room or going home, this can't, so it just becomes a constant background factor…" SE047
> "[I] never go into supermarkets because of visual overload…" SE048

Avoidance was also reported in the form of physical blocking behaviours, such as covering eyes, ear, or nose, or closing eyes or holding breath, in response to visual, auditory, or olfactory stimuli that are difficult to cope with:

> "In a crowded place I need to put my hands over my ears. I feel sick and can't focus on anything." SE027

#### Adaptations

Many of the autistic adults reported different ways they have had to adapt to be able to cope with sensory input in different situations or environments. Several of the adults described tools and strategies that help with their ability to cope, such as using sunglasses to lessen the effects of bright lights or using earplugs or headphones to lessen the impact of loud or busy sound environments, or altering their environments to cope with their sensory difficulties:

> "Going to grocery-store is the worst. The lights are always very bright and there are so many details to see. I cannot go in there without sunglasses and a baseball cap." SE032
> "I am very sensitive to all noise... I turn off everything possible and spend time in my quiet bedroom when life gets too noisy." SE029

Some of the autistic adults also talked about how their sensory reactivity to certain input has adapted over time, and this has meant they are better able to tolerate some sensory input that they previously struggled with:

> "I have only been able to tolerate multi-textured food in the past 10 years and still struggle with fruits such as apples as they have an unpredictable texture" SE007

#### Soothing Sensory Input

The majority of the autistic adults reported that they seek soothing sensory input as a way to cope with distressing situations or as a calming strategy when they are distressed. Some of the autistic adults described having 'toolkits' of sensory strategies that they could engage with when feeling distressed:

> "I always keep a fleecy blanket in my bag to wrap myself tightly in when in distress or just to hold and feel, I lie on my tummy on the floor and ask my husband (over twice my weight) to lie on top of me, love the warm weight of my pet guinea pigs." SE010

Enjoyable sensory experiences were also reported to be helpful in overshadowing aversive sensory input, for instance listening to music in headphones when in challenging noisy environments or feeling pleasant textures to detract from other input:

> "I seek comfort in small things (such as nice textures, I currently have a coin that I keep in my pocket to hold when I'm nervous) so that I can filter the sensory environment. It helps distract me from what is happening around me so that when I seek that input, I can avoid more intense or unpleasant inputs." SE018

#### Moderated by Mood

Several of the autistic adults reported that the extent of their sensory reactivity can depend on their mood and that this can change whether they are hyperreactive or neutrally reactive to certain sensory input. They described how their tolerance for sensory stimuli, such as sounds, touch, or bright lights, can be better if they are feeling more relaxed or rested. But equally, sensory experiences can be more distressing and aversive if already stressed and tired:

> "Sometimes if I'm relaxed things seem to be neutral. If I've slept well, and have had a relaxed day, I can tolerate most noises and lights well." SE015
> "When under stress I am hyperreactive to sound. When not stressed, loud environments make me very tired but I only experience them as in-the-moment unpleasant when stressed or tired." SE042

### Control

Many of the autistic adults reported how control was related to their sensory reactivity and sensory experiences. A desire for predictability and control over sensory stimuli was commonly described to effect how sensory stimuli is experienced. Similarly, the level of control over the sensory input and intensity of the input can affect whether it is perceived as an enjoyable or aversive experience.

#### A Desire for Control and Predictability

Frequently reported by the autistic adults was a difficulty with unpredictable sensory stimuli. They described how unexpected sensory events can be distressing, such as a sudden siren or being touched by someone. But also, sensory

stimuli that is not always the same can be challenging as the experience can be unpredictable:

> "Sirens and doorbells make me scared. I cannot concentrate if the noise around me is unpredictable." SE021
> "Fruit is the hardest for me because the tastes are so variable, such as one apple to the next." SE007

The autistic adults also reported how if they are in control of the intensity, then certain sensory experiences can be experienced as tolerable or enjoyable, such as enjoying music as long as they are in control of the volume:

> "I really like music and listen to it as much as I can during the day including during work and at all times on public transport and when shopping etc. I like being able to have full control of what I hear and how loud it is. I'm very specific in the music I listen to and will sometimes just listen to the same band/album/song for weeks..." SE022

#### Difficulty with Self-control

Several of the autistic adults also reported a difficulty with self-control when it comes to engaging with enjoyable sensory experiences. Although not all the autistic adults reported this as being a problem for them, some mentioned how this can be disruptive to their lives or a source of embarrassment:

> "I can easily be completely distracted by certain decorative lighting; I can regularly spend long periods of time in the lighting section of a department store and find it difficult to leave." SE046
> "Love being able to touch soft and squashy things. Sometimes [I] have little control and [it] can be embarrassing when I do it inappropriately." SE027

### The Role of Other People

Many of the autistic adults described how other people play a role in their sensory experiences. Other people were reported to be a source for self-understanding and making sense of the extent of sensory reactivity differences through comparison of their sensory experiences to other people. But also, sensory experiences can be impacted by other people's understanding or misunderstanding of sensory reactivity differences. Furthermore, close relationships were also reported to be a source of support for autistic adults in relation to their sensory reactivity differences.

#### Understanding

The autistic adults frequently reported their own sensory experiences in comparison to what others experience. This was often in the context of comparing if their experiences of sensory input were more or less than others, or if their tolerance of sensory experiences better or worse than others, as a way of understanding if sensory reactivity was comparative rather than different to others. In some cases, these comparisons were based on their own perceptions of the behaviour of others, whereas others were based on information of sensory experiences provided by individuals:

> "The lights in my dance studio flicker when first turned on. I close and cover my eyes to avoid this. Others don't seem to need to do this, though they note mild discomfort." SE010
> "When something happens where other people would feel pain I don't react as much and when people ask if everything [is] ok, I'm wondering if it should've hurt or not." SE033

However, a few of the autistic adults reported how their sensory reactivity differences and their responses to sensory input may be misunderstood by others:

"At work the tube lighting is strong, so I go to the bathroom and keep the lights off for 5 min at a time… I think my colleagues probably assume I have a bowel issue. (I don't…)" SE015.

#### Support

Some of the autistic adults described how other people, especially significant relationships, were a source of support for sensory reactivity differences. They reported that others can help them navigate environments that they are finding challenging due sensory input, or can help them avoid discomfort or injury, such as if they are hyporeactive to pain or temperature:

> "My partner will point out that I'm shivering before I've realised I'm feeling very cold. If my body is in pain it takes me time to realise, for example if my partner sits on my foot and it is in an awkward position, he'll notice, and I'll become aware it's painful once it has been pointed out." SE15

Several of the adults also reported how other people were a source for supporting enjoyable sensory experiences, such as providing sensory input to help when feeling distressed:

> "My [boyfriend] knows that if I have a meltdown the best help is to squish me as hard as he can until I feel ok again." SE039

### Model of Sensory Reactivity Differences in Autistic Adults

Due to the interconnected nature of the themes and subthemes developed in the thematic analysis, we propose a theoretical model depicting autistic adults' experience of sensory reactivity differences (Fig. 3). We propose that reactivity differences to sensory input, hyperreactivity, hyporeactivity, or seeking, can have short-term outcomes, including experiencing physical discomfort or becoming overwhelmed or overloaded by input, as well as long-term outcomes for mental and physical health. These outcomes can then feedback to influence reactivity to sensory input. However, there are certain moderators that influence these outcomes for autistic adults, including both personal and external moderators. Personal moderators include the level of control over input and how predictable sensory input is, the level of self-control when engaging with enjoyable sensory input, and the level of personal resources, including current mood and energy levels. External moderators include management strategies, including avoiding and having the opportunity to escape sensory input, making adaptations to tolerate input, and regulating using soothing sensory input, and also the level of self-understanding, and understanding and support provided by other people.

## Discussion

This novel co-produced, mixed-methods study, has provided new and comprehensive insights into the complex sensory experiences of autistic adults. As well as elucidating stimuli and contexts associated with sensory hyperreactivity, hyporeactivity and seeking, across modalities, our results have enhanced understanding of autistic adults' complex sensory experiences and informed the creation of a refined model from these experiences. Importantly, 96% of our sample identified as having sensory reactivity differences, supporting the persistence into adulthood (Crane et al., 2009), and highlighting the importance of researching sensory reactivity in autistic adults. Moreover, our results indicate that cooccurring sensory seeking and hyperreactivity (44.9%) was most experienced, whilst cooccurring sensory seeking and hyporeactivity was least experienced (0%). This supports that sensory seeking may be a strategy to regulate sensory input associated with hyperreactivity (Schulz & Stevenson, 2019), over being a stimulatory strategy associated with hyporeactivity.

### Sensory Input Related to Sensory Reactivity Differences

Our study adopted a novel mixed-methods approach to comprehensively outline sensory stimuli and contexts related to sensory reactivity differences in autistic adults. Although many of the sensory input identified, aligned with existing understanding, our results highlight the complexities of sensory reactivity differences across modalities, as well as the individualistic and contextual nature to sensory reactivity in autistic adults.

Our results echo existing research to indicate that sensory hyperreactivity is commonly experienced by autistic adults, with 93.3% of our sample self-identifying as being sensory hyperreactive. In line with previous research in autistic children and adults (Dickie et al., 2009; Robertson & Simmons, 2015; Schoen et al., 2008), we found that autistic adults experience hyperreactivity to a wide range of sensory input. However, our results importantly highlight that some sensory input commonly associated with sensory hyperreactivity are not endorsed by all individuals and are linked with personal preference, especially regarding colours and patterns, music, textures, tactile pressure, food tastes and textures, and scents, which individuals could be hyperreactive towards or seek out depending on their own personal preferences.

Our findings also provide a greater understanding of autistic adults' experiences of sensory hyporeactivity. Sensory hyporeactivity was referred to less than other sensory experiences, with only 28.6% self-identifying as being sensory hyporeactive. Sensory hyporeactivity may become less prominent in adulthood, as sensory hyperreactivity and seeking increases (Liss et al., 2006), alternatively it may be underreported due to difficulties in self-reporting, as hyporeactivity is characterised by not noticing sensory input (Smith & Sharp, 2013). The autistic adults in our study described experiences of auditory hyporeactivity due to inattention. This suggests that hyporeactivity to sensory input may be due to inattention rather than neural processing differences, which could account for the variegated experiences of auditory hyper- and hyporeactivity experienced by an individual (Funabiki et al., 2012).

Lastly, our findings elucidated experiences associated with sensory seeking for autistic adults. Previous research has suggested sensory seeking may diminish with age (Crane et al., 2009; Kern et al., 2007), however, our results found 41.4% of the autistic adults to still engage in a diverse range of seeking behaviours. Specifically, our results provide deeper insight into the wide range of sensory input that autistic adults seek out across modalities. Sensory seeking was commonly individualistic, which is important to consider when using standardised sensory assessments that may

Case 1:26-cr-00001-AHA Document 102-3 Filed 09/29/26 Page 96 of 150






**Fig. 3** Summary of main themes and sub-themes developed from thematic analysis relating to sensory reactivity in autistic adults

not be accurately capturing the extent of an individual's sensory seeking behaviours.

Overall, these findings have important implications for the development and interpretation of sensory assessments and the identification of support needs for autistic adults.

## Autistic Adults' Experiences of Sensory Reactivity Differences

Our results also provide a greater understanding of autistic adults' sensory experiences, a relatively under-researched area, and is the first known to understand sensory experiences related to all areas of sensory reactivity differences, including sensory hyperreactivity, hyporeactivity and seeking. Taking an iterative approach to thematic analysis, we developed themes relating to outcomes, the importance of control, tolerance and management, and the role of other people. Based on the interconnected nature of these themes, we propose a model of sensory reactivity experiences in autistic adults (Fig. 3). Although we are not the first to propose a model of sensory reactivity in autistic adults, and some of the findings are in line with these studies (see: Robertson & Simmons, 2015; Smith & Sharp, 2013), our mixed-methods approach and co-production with the autistic community has led to the development of some novel findings and a unique model, informed by our comprehensive results.

The autistic adults in our study described a range of outcomes related to their sensory reactivity differences. In our model, we propose that sensory reactivity differences can have short-term outcomes relating to physical responses and overwhelm. Our results importantly highlight autistic adults can become overwhelmed or overloaded due to sensory input and become disengaged with their circumstances or themselves. Sensory overload may result from hyperfocussing differences in autistic people, making it difficult to be able to divert attention away from aversive aspects of the sensory environment (Liss et al., 2006). This may contribute to 'Burnout', in which autistic individuals commonly experience chronic exhaustion and loss of skills, as well as experiencing heightened sensitivity to environmental stimuli and greater difficulty with tolerating or filtering out input (Raymaker et al., 2020).

Furthermore, our results suggest sensory reactivity differences have long-term outcomes relating to mental and physical health. Previous research has indicated that sensory hyperreactivity and hyporeactivity may be a risk factor for mental health conditions, such as anxiety in autistic adults (e.g., Hwang et al., 2019), and eating disorders in autistic women (Brede et al., 2020). However, our findings also suggest that sensory seeking, which is often considered to be an enjoyable experience, may also be associated with mental health conditions, as some autistic adults described links between their sensory seeking behaviours and self-harm and eating disorders. These findings are especially important as mental health conditions, such as anxiety, are disproportionately high in autistic populations (Buck et al., 2014). Moreover, our results highlight the physical impact of sensory reactivity differences. For instance, reduced food intake due to sensitivities towards food tastes or not noticing when hungry, can have consequences for physical health, or excessively listening to loud music can damage hearing.

Similarly to previous work (Robertson & Simmons, 2015), the autistic adults in our study described how they are more able to tolerate sensory input if they have control over the stimuli and it is less unpredictable. However, a novel finding in our study is that some of the autistic also described control in terms of their difficulties with self-control, such as finding it hard to disengage with certain enjoyable sensory input. Sensory reactivity differences are part of the diagnostic criterion for autism associated with restricted and repetitive behaviours (DSM-5 American Psychiatric Association, 2013), and research has found sensory seeking to relate to ritualistic/sameness behaviours in autistic children (Boyd et al., 2010). Therefore, our findings suggest these behaviours persist into adulthood.

Although various coping mechanisms and strategies for sensory reactivity differences have previously been shown in qualitative research (Robertson & Simmons, 2015; Smith & Sharp, 2013), we found avoidance, making adaptations, and engaging in soothing sensory strategies to be commonly used coping mechanisms/strategies. The autistic adults in our study emphasised the importance of being able to escape from unbearable sensory input to avoid sensory overload. Avoidance is often considered a maladaptive strategy for anxiety, due to avoidance impacting the ability to regulate arousal, which then increases and maintains anxiety, leading to more avoidance (Green et al., 2012; Joosten & Bundy, 2010; Lidstone et al., 2014; Mazurek et al., 2013). However, it may be an essential strategy for autistic individuals. Our results provide additional insights into the extensive use of adaptive strategies used by autistic adults, such as using earplugs/headphones to tolerate noisy environments, or sunglasses in bright environments. Furthermore, the autistic adults in our study also described how they engage with soothing sensory input as a regulation strategy. Our findings suggest that autistic adults also sensory seek across modalities, engaging with personally preferred scents, textures, and visuals that are experienced as soothing and enjoyable. Additionally, in line with previous work (Robertson & Simmons, 2015; Smith & Sharp, 2013), our results show listening to chosen music is a common strategy found to be soothing. Music has been identified as a common interest of autistic adults, and engagement with significant or 'special' interests is related to greater subjective wellbeing (Grove et al., 2018).

### Limitations and Future Directions

Although a key strength of our study was the online survey approach, facilitating the potential for a diverse range of perspectives and experiences from geographically dispersed populations, online research has some potential limitations. For instance, we were unable to provide support for individuals who may have struggled with the open-ended questions within the questionnaire. Although we encouraged respondents to seek support, this may have restricted participation in this study, especially for those without access to support, or individuals with higher support needs or intellectual disability (ID). Although 4% of our participants reported to have cooccurring ID, this is not representative of the autistic population, within which around 50–55% have cooccurring ID (Charman et al., 2011; Loomes et al., 2017). Autism research often underrepresents individuals with ID (Russell et al., 2019), and therefore future research should endeavour to understand the sensory experiences of these individuals.

## Conclusion

Our study demonstrates that sensory reactivity differences are prominent in autistic adults, and that they are complex, individual, interconnected, and experienced across a range of modalities. We propose a theoretical model of sensory reactivity differences informed by the experiences of autistic adults. Crucially, it highlights key moderating factors that may reduce the long-term impact of sensory reactivity differences on physical and mental health. Future work could be informed by our model and aim to understand more about the positive and negative impacts of the identified moderators of sensory reactivity differences. Our findings have important implications for support services and future research that aims to reduce the impact of sensory reactivity differences for autistic adults.

**Supplementary Information** The online version contains supplementary material available at https://doi.org/10.1007/s10803-021-05186-3.

**Acknowledgments** Special thanks to the autistic adults who participated in this study and those who provided feedback in the development of this project. Especially, to Aimee Fletcher, Jack Welch, Charlie Murphy and Hannah Steel for providing feedback on the findings and interpretations. Additionally, thanks to Anthony Haffey and Autism Berkshire for helping with recruitment. K. MacLennan and T. Tavassoli are funded by MQ and Autistica.

**Author Contributions** All authors contributed to the study conception, design, and material preparation. Data collection and analysis were performed by KM, SO'B and TT. The first draft of the manuscript was written by KM and all authors read and approved the final manuscript. Funding aquisition and supervision; TT.

**Declaration**

**Conflict of interest** The authors have no conflict of interest to declare that are relevant to the content of this article.

**Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long

as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

## References


Amos, G. A., Byrne, G., Chouinard, P. A., & Godber, T. (2019). Autism traits, sensory over-responsivity, anxiety, and stress: A test of explanatory models. *Journal of Autism and Developmental Disorders, 49*(1), 98–112. https://doi.org/10.1007/s10803-018-3695-6

Boyd, B. A., Baranek, G. T., Sideris, J., Poe, M. D., Watson, L. R., Patten, E., & Miller, H. (2010). Sensory features and repetitive behaviors in children with autism and developmental delays. *Autism Research, 3*(2), 78–87. https://doi.org/10.1002/aur.124

Braun, V., & Clarke, V. (2006). Using thematic analysis in psychology. *Qualitative Research in Psychology, 3*(2), 77–101. https://doi.org/10.1191/1478088706qp063oa

Braun, V., Clarke, V., Boulton, E., Davey, L., & McEvoy, C. (2020). The online survey as a qualitative research tool. *International Journal of Social Research Methodology*. https://doi.org/10.1080/13645579.2020.1805550

Braun, V., Clarke, V., & Gray, D. (2017). Innovations in qualitative methods. In B. Gough (Ed.), *The Palgrave handbook of critical social psychology* (pp. 243–266). Palgrave Macmillan. https://doi.org/10.1057/978-1-137-51018-1_13

Brede, J., Babb, C., Jones, C., Elliott, M., Zanker, C., Tchanturia, K., Serpell, L., Fox, J., & Mandy, W. (2020). "For me, the anorexia is just a symptom, and the cause is the autism": Investigating restrictive eating disorders in autistic women. *Journal of Autism and Developmental Disorders*. https://doi.org/10.1007/s10803-020-04479-3

Brown, C., Tollefson, N., Dunn, W., Cromwell, R., & Filion, D. (2001). The adult sensory profile: Measuring patterns of sensory processing. *American Journal of Occupational Therapy, 55*(1), 75–82. https://doi.org/10.5014/ajot.55.1.75

Buck, T. R., Viskochil, J., Farley, M., Coon, H., McMahon, W. M., Morgan, J., & Bilder, D. A. (2014). Psychiatric comorbidity and medication use in adults with autism spectrum disorder. *Journal of Autism and Developmental Disorders, 44*(12), 3063–3071. https://doi.org/10.1007/s10803-014-2170-2

Carpenter, K. L. H., Baranek, G. T., Copeland, W. E., Compton, S., Zucker, N., Dawson, G., & Egger, H. L. (2018). Sensory over-responsivity: An early risk factor for anxiety and behavioral challenges in young children. *Journal of Abnormal Child Psychology*. https://doi.org/10.1007/s10802-018-0502-y

Castleberry, A. (2012). *NVivo 10 [software program]* (Version 10) [Computer software]. QSR International.

Cavanagh, S. (1997). Content analysis: Concepts, methods and applications: Content analysis is a flexible methodology that is particularly useful to nurse researchers, asserts Stephen Cavanagh. *Nurse Researcher, 4*(3), 5–16. https://doi.org/10.7748/nr.4.3.5.s2

Chamak, B., Bonniau, B., Jaunay, E., & Cohen, D. (2008). What can we learn about autism from autistic persons? *Psychotherapy and Psychosomatics, 77*(5), 271–279. https://doi.org/10.1159/000140086

Charman, T., Pickles, A., Simonoff, E., Chandler, S., Loucas, T., & Baird, G. (2011). IQ in children with autism spectrum disorders: Data from the Special Needs and Autism Project (SNAP). *Psychological Medicine, 41*(3), 619–627. https://doi.org/10.1017/S0033291710000991

Crane, L., Goddard, L., & Pring, L. (2009). Sensory processing in adults with autism spectrum disorders. *Autism, 13*(3), 215–228. https://doi.org/10.1177/1362361309103794

Dickie, V. A., Baranek, G. T., Schultz, B., Watson, L. R., & McComish, C. S. (2009). Parent reports of sensory experiences of preschool children with and without autism: A qualitative study. *The American Journal of Occupational Therapy: Official Publication of the American Occupational Therapy Association, 63*(2), 172–181.

DSM-5 American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders 5 (DSM-5)*. American Psychiatric Publishing.

Elo, S., & Kyngäs, H. (2008). The qualitative content analysis process. *Journal of Advanced Nursing, 62*(1), 107–115. https://doi.org/10.1111/j.1365-2648.2007.04569.x

Elwin, M., Ek, L., Schröder, A., & Kjellin, L. (2012). Autobiographical accounts of sensing in asperger syndrome and high-functioning autism. *Archives of Psychiatric Nursing, 26*(5), 420–429. https://doi.org/10.1016/j.apnu.2011.10.003

Forsyth, A. S., & Trevarrow, R. (2018). Sensory strategies in adult mental health: A qualitative exploration of staff perspectives following the introduction of a sensory room on a male adult acute ward. *International Journal of Mental Health Nursing, 27*(6), 1689–1697. https://doi.org/10.1111/inm.12466

Frith, H. (2000). Focusing on sex: Using focus groups in sex research. *Sexualities, 3*(3), 275–297. https://doi.org/10.1177/136346000003003001

Funabiki, Y., Murai, T., & Toichi, M. (2012). Cortical activation during attention to sound in autism spectrum disorders. *Research in Developmental Disabilities, 33*(2), 518–524. https://doi.org/10.1016/j.ridd.2011.10.016

Green, S. A., Ben-Sasson, A., Soto, T. W., & Carter, A. S. (2012). Anxiety and sensory over-responsivity in toddlers with autism spectrum disorders: Bidirectional effects across time. *Journal of Autism and Developmental Disorders, 42*(6), 1112–1119. https://doi.org/10.1007/s10803-011-1361-3

Grove, R., Hoekstra, R. A., Wierda, M., & Begeer, S. (2018). Special interests and subjective wellbeing in autistic adults: Special interests and wellbeing in autism. *Autism Research, 11*(5), 766–775. https://doi.org/10.1002/aur.1931

Hwang (Jane), Y. I., Arnold, S., Srasuebkul, P., & Trollor, J. (2019). Understanding anxiety in adults on the autism spectrum: An investigation of its relationship with intolerance of uncertainty, sensory sensitivities and repetitive behaviours. *Autism*. https://doi.org/10.1177/1362361319868907

Jones, R. S. P., Quigney, C., & Huws, J. C. (2003). First-hand accounts of sensory perceptual experiences in autism: A qualitative analysis. *Journal of Intellectual & Developmental Disability, 28*(2), 112–121. https://doi.org/10.1080/1366825031000147058

Joosten, A. V., & Bundy, A. C. (2010). Sensory processing and stereotypical and repetitive behaviour in children with autism and intellectual disability: Sensory processing in autism. *Australian Occupational Therapy Journal, 57*(6), 366–372. https://doi.org/10.1111/j.1440-1630.2009.00835.x

Kenny, L., Hattersley, C., Molins, B., Buckley, C., Povey, C., & Pellicano, E. (2016). Which terms should be used to describe autism? Perspectives from the UK autism community. *Autism, 20*(4), 442–462. https://doi.org/10.1177/1362361315588200

Kern, J. K., Trivedi, M. H., Grannemann, B. D., Garver, C. R., Johnson, D. G., Andrews, A. A., Savla, J. S., Mehta, J. A., & Schroeder, J. L. (2007). Sensory correlations in autism. *Autism, 11*(2), 123–134. https://doi.org/10.1177/1362361307075702

Case 1:26-cr-00001-AHA Document 102-3 Filed 09/29/26 Page 99 of 150



Krippendorff, K. (2018). *Content analysis: An introduction to its methodology* (4th ed.). Sage.

Lane, S. J. (2002). Sensory modulation. In A. C. Bundy, S. J. Lane, & E. A. Murray (Eds.), *Sensory integration: Theory and practice* (2nd ed., pp. 101–122). F. A. Davis.

Lidstone, J., Uljarević, M., Sullivan, J., Rodgers, J., McConachie, H., Freeston, M., Le Couteur, A., Prior, M., & Leekam, S. (2014). Relations among restricted and repetitive behaviors, anxiety and sensory features in children with autism spectrum disorders. *Research in Autism Spectrum Disorders, 8*(2), 82–92. https://doi.org/10.1016/j.rasd.2013.10.001

Liss, M., Saulnier, C., Fein, D., & Kinsbourne, M. (2006). Sensory and attention abnormalities in autistic spectrum disorders. *Autism, 10*(2), 155–172. https://doi.org/10.1177/1362361306062021

Loomes, R., Hull, L., & Mandy, W. P. L. (2017). What is the male-to-female ratio in autism spectrum disorder? A systematic review and meta-analysis. *Journal of the American Academy of Child & Adolescent Psychiatry, 56*(6), 466–474. https://doi.org/10.1016/j.jaac.2017.03.013

MacLennan, K., Roach, L., & Tavassoli, T. (2020). The relationship between sensory reactivity differences and anxiety subtypes in autistic children. *Autism Research, 13*(5), 785–795. https://doi.org/10.1002/aur.2259

MacLennan, K., Rossow, T., & Tavassoli, T. (2021). The relationship between sensory reactivity, intolerance of uncertainty and anxiety subtypes in preschool-age autistic children. *Autism*. https://doi.org/10.1177/13623613211016110

Mazurek, M. O., Vasa, R. A., Kalb, L. G., Kanne, S. M., Rosenberg, D., Keefer, A., Murray, D. S., Freedman, B., & Lowery, L. A. (2013). Anxiety, sensory over-responsivity, and gastrointestinal problems in children with autism spectrum disorders. *Journal of Abnormal Child Psychology, 41*(1), 165–176. https://doi.org/10.1007/s10802-012-9668-x

Pellicano, E., Dinsmore, A., & Charman, T. (2013). *A future made together: Shaping autism research in the UK*. Institute of Education.

Raymaker, D. M., Teo, A. R., Steckler, N. A., Lentz, B., Scharer, M., Delos Santos, A., Kapp, S. K., Hunter, M., Joyce, A., & Nicolaidis, C. (2020). "Having all of your internal resources exhausted beyond measure and being left with no clean-up crew": Defining autistic burnout. *Autism in Adulthood, 2*(2), 132–143. https://doi.org/10.1089/aut.2019.0079

Robertson, A. E., & Simmons, D. R. (2015). The sensory experiences of adults with autism spectrum disorder: A qualitative analysis. *Perception, 44*(5), 569–586. https://doi.org/10.1068/p7833

Rossow, T., MacLennan, K., & Tavassoli, T. (2021). The relationship between sensory reactivity differences and mental health symptoms in preschool-age autistic children. *Autism Research*. https://doi.org/10.1002/aur.2525

Russell, G., Mandy, W., Elliott, D., White, R., Pittwood, T., & Ford, T. (2019). Selection bias on intellectual ability in autism research: A cross-sectional review and meta-analysis. *Molecular Autism*. https://doi.org/10.1186/s13229-019-0260-x

Schoen, S. A., Miller, L. J., & Green, K. E. (2008). Pilot study of the sensory over-responsivity scales: Assessment and inventory. *American Journal of Occupational Therapy, 62*(4), 393–406. https://doi.org/10.5014/ajot.62.4.393

Schulz, S. E., & Stevenson, R. A. (2019). Sensory hypersensitivity predicts repetitive behaviours in autistic and typically-developing children. *Autism, 23*(4), 1028–1041. https://doi.org/10.1177/1362361318774559

Smith, R. S., & Sharp, J. (2013). Fascination and isolation: A grounded theory exploration of unusual sensory experiences in adults with Asperger syndrome. *Journal of Autism and Developmental Disorders, 43*(4), 891–910. https://doi.org/10.1007/s10803-012-1633-6

Srivastava, P., & Hopwood, N. (2009). A practical iterative framework for qualitative data analysis. *International Journal of Qualitative Methods, 8*(1), 76–84. https://doi.org/10.1177/160940690900800107

Toerien, M., & Wilkinson, S. (2004). Exploring the depilation norm: A qualitative questionnaire study of women's body hair removal. *Qualitative Research in Psychology, 1*(1), 69–92. https://doi.org/10.1191/1478088704qp006oa

**Publisher's Note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

HEINONLINE

heinonline.com | support@heinonline.com

**CITATIONS:**

**Bluebook 22nd ed.**
Alice S. North, Ailsa J. Russell & Gisli H. Gudjonsson, High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities during Interrogative Interview, 19 J. FORENSIC PSYCHIATRY & PSYCH. 323 (2008).

**ALWD 7th ed.**
Alice S. North, Ailsa J. Russell & Gisli H. Gudjonsson, High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities during Interrogative Interview, 19 J. Forensic Psychiatry & Psych. 323 (2008).

**APA 7th ed.**
North, A. S., Russell, A. J., & Gudjonsson, G. H. (2008). High functioning autism spectrum disorders: an investigation of psychological vulnerabilities during interrogative interview. Journal of Forensic Psychiatry and Psychology, 19(3), 323-334.

**Chicago 18th ed.**
North, Alice S., Russell, Ailsa J., and Gudjonsson, Gisli H. "High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities during Interrogative Interview." Journal of Forensic Psychiatry and Psychology 19, no. 3 (2008): 323-334. HeinOnline.

**McGill Guide 10th ed.**
Alice S. North et al, "High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities during Interrogative Interview" (2008) 19:3 J Forensic Psychiatry & Psych 323.

**AGLC 4th ed.**
Alice S. North et al, 'High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities during Interrogative Interview' (2008) 19(3) Journal of Forensic Psychiatry and Psychology 323

**MLA 9th ed.**
North, Alice S., et al. "High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities during Interrogative Interview." Journal of Forensic Psychiatry and Psychology, vol. 19, no. 3, September 2008, pp. 323-334. HeinOnline.

OSCOLA 5th ed.
Alice S. North, Ailsa J. Russell & Gisli H. Gudjonsson, 'High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities during Interrogative Interview' (2008) 19 J Forensic Psychiatry & Psych 323 Export To:

**Date Downloaded:** Mon Sep 28 10:29:10 2026

**Source:** https://access.heinonline.com/HOL/Page?handle=hein.journals/jnlofncpy19&id=323

**Terms, Conditions & Use of PDF Document:**
Please note, citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper formatting. Your use of this HeinOnline PDF indicates your acceptance of William S. Hein & Co., Inc. and HeinOnline's Terms & Conditions: https://help.heinonline.com/kb/terms-conditions/ The search text of this PDF is generated from uncorrected OCR text. To obtain permission to use this article beyond the scope of your license, please use: https://www.copyright.com.

Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

*HeinOnline is a product of William S. Hein & Co., Inc. | 2350 North Forest Road, Getzville, NY 14068*

heinonline.com | support@heinonline.com

**CITATIONS:**

**Date Downloaded:** Mon Sep 28 10:29:10 2026

**Source:** https://access.heinonline.com/HOL/Page?handle=hein.journals/jnlofncpy19&id=323

**Terms, Conditions & Use of PDF Document:**
Please note, citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper formatting. Your use of this HeinOnline PDF indicates your acceptance of William S. Hein & Co., Inc. and HeinOnline's Terms & Conditions: https://help.heinonline.com/kb/terms-conditions/. The search text of this PDF is generated from uncorrected OCR text. To obtain permission to use this article beyond the scope of your license, please use: https://www.copyright.com.

Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

*HeinOnline is a product of William S. Hein & Co., Inc. | 2350 North Forest Road, Getzville, NY 14068*

*The Journal of Forensic Psychiatry & Psychology*
Vol. 19, No. 3, September 2008, 323–334

Routledge
Taylor & Francis Group

## RESEARCH ARTICLE

# High functioning autism spectrum disorders: an investigation of psychological vulnerabilities during interrogative interview

Alice S. North, Ailsa J. Russell* and Gisli H. Gudjonsson

*Institute of Psychiatry, Kings College, London, UK*

(*Received 1 November 2006; final version received 1 February 2007*)

Forensic psychologists and psychiatrists are commonly asked to ascertain the reliability of statements made by suspects to the police during questioning and to assess an individual's vulnerability to providing information which is inaccurate, unreliable, and misleading during police interview. Autism spectrum disorders (ASD) are characterised by qualitative impairments in social communication and interaction, and a restricted or repetitive pattern of behaviours, interests, and activities. It is not clear whether people with ASD are more vulnerable at interview, or more prone to respond negatively to interrogative pressure, when compared with the general population. In the present study, 26 individuals with high functioning ASD, and 27 gender- and IQ-matched controls, were compared on measures of interrogative suggestibility and compliance as well as on measures of anxiety, depression, the extent to which they feared negative evaluation by others, and whether they had a suspicious outlook. There were no significant between-group differences on the measures of suggestibility, but the group with ASD were rated as significantly more compliant than the controls in terms of both parental and self-report, and also had higher scores on measures of depression, anxiety, fear of negative social evaluation and paranoia. Bi-modal distribution of suggestibility scores within the ASD group indicates that individual characteristics should be taken into account when considering an assessment. Individuals with ASD may be more eager to please or to avoid conflict and confrontation than controls, and may be more prone to respond compliantly to requests and demands.

**Keywords:** autism spectrum disorders; police interview; suggestibility; compliance

## Introduction

Suspects cope with police interviews and custodial confinement in different ways. Research in this area has helped to clarify the circumstances

*Corresponding author. Email: spjtajr@iop.kcl.ac.uk

ISSN 1478-9949 print/ISSN 1478-9957 online
© 2008 Taylor & Francis
DOI: 10.1080/14789940701871621
http://www.informaworld.com

under which false confessions and potential miscarriages of justice can arise, and has subsequently helped bring about official acknowledgement of individuals who are psychologically vulnerable (Home Office, 1985, 2004).

Vulnerabilities in the context of a police interview have been studied in individuals with impaired mental state or low intellectual ability (see Clare & Gudjonsson, 1995; Gudjonsson, 2003). Particular attention has also been given to psychological vulnerabilities such as abnormally high interrogative suggestibility and/or compliance (Gudjonsson, 2003). Interrogative suggestibility is defined by Gudjonsson and Clark (1986) as 'the extent to which, within a closed social interaction, people come to accept messages communicated during formal questioning, as the result of which their subsequent behavioural response is affected' (p. 84). Compliance has been defined as 'the tendency of the individual to go along with propositions, requests, or instructions, for some immediate instrumental gain' (Gudjonsson, 1992, p. 137). A number of factors have been found to be associated with both suggestibility and compliance, including general intellectual ability (e.g., Gudjonsson, 1988a; Gudjonsson & Clare, 1995), memory (e.g., Gudjonsson, 1987, 1988a), low self-esteem, fear of negative evaluation by others, and high levels of anxiety (Gudjonsson, 1988b; Wolfradt & Meyer, 1998).

Autism spectrum disorders (ASD) are characterised by qualitative impairments in reciprocal social interaction and communication, and a restricted, stereotyped, or repetitive pattern of interests and behaviours persisting from the early developmental period. Intellectual ability can fall across the spectrum, and delay/deviance in language development can be marked or mild. There is a growing literature on the validity of the number of diagnostic categories subsumed under the generic label of ASD, particularly where intellectual function falls in the average range (Volkmar et al., 1998). There is increasing awareness of heterogeneity within diagnostic groups and evidence for a lack of unity in relation to the expression of the triad of impairments, indicating that research and clinical studies seeking precise classification within the traditional diagnostic framework may be misleading (Happe, Ronald, & Plomin, 2006). Consequently, the study of trait-like symptoms occurring as part of a spectrum consistent with normality is increasingly being viewed as potentially more informative. Combined with increasing rates of ASD diagnosis, greater understanding and study of the traits represented by difficulties in social communication and repetitive behaviours in the general population are more pertinent than ever.

In terms of offending behaviour and contact with the criminal justice system for individuals with ASD, the literature is primarily confined to single (e.g., Everall & LeCouteur, 1990) or small group (e.g., Barry-Walsh &

Mullen, 2004) case reports, as well as prevalence studies in maximum security psychiatric settings – the findings of which suggest that high functioning ASD may be over-represented among this population (Hare, Gould, Mills, & Wing, 1999; Scragg & Shah, 1994). Siponmaa, Kristiansson, Jonsson, Nydén, and Gillberg (2001) similarly found an over-representation of individuals diagnosed with high functioning ASD in a community study of juvenile offenders. In addition to the debate about the use of diagnostic categories, rapidly fluctuating prevalence rates of ASD in the population mean that it can be difficult to draw definitive conclusions from this type of epidemiological research.

A report prepared for the All Party Parliamentary Group on Autism (Loynes, 2001) commented on the lack of information available about the number of people with ASD involved with the criminal justice system, either as victims or perpetrators of crime. Howlin (1997) outlines a taxonomy of reasons for criminal behaviour in this group, comprising: exploitation by others, disruptive behaviour following interruptions to routines, behaviour deriving from difficulties understanding social cues, and obsessional tendencies/morbid interests. The lack of large-scale epidemiological research in this area means that this taxonomy has not as yet been evaluated, although many single and small group case reports are consistent with the proposed framework. Woodbury-Smith et al. (2005) did explore the relationships between the main cognitive deficits associated with ASD and offending behaviour by comparing a group of offenders with ASD, non-offenders with ASD, and general population controls on a number of cognitive paradigms, including theory of mind and executive function. They found few between-group differences, but did establish that the ASD offending group were relatively disadvantaged in their ability to rate fear accurately on a facial affect recognition task when compared with the non-offending ASD group and general population controls.

There is evidence, then, that individuals with high functioning ASD do come into contact with the criminal justice system and, in particular, may be over-represented in the secure hospital population. However, little is known about the numbers of people with ASD in prison settings, or being detained and interviewed by the police.

In terms of vulnerability during interview, individuals with high functioning ASD may not necessarily be recognised as immediately vulnerable by the police, by virtue of having an apparently competent use of language and presenting as intellectually able. However, these individuals may face considerable difficulties in understanding and coping with police demands, and may also experience high levels of distress in the context of the closed social situation of an interrogative interview. By definition, this group will have difficulty decoding aspects of social

interaction, and consequently in using this information to inform their own behaviour – particularly those aspects involving non-verbal means of communication. In relation to the known risk factors for vulnerability during interrogation, there is some evidence that memory deficits may be present in high functioning groups with ASD (Bowler, Matthews, & Gardiner, 1997). There is also evidence that individuals with ASD may be particularly prone to developing anxiety disorders (Green, Gilchrist, Burton, & Cox, 2000; Sofronoff, Attwood, & Hinton, 2005) and more vulnerable to low self-esteem and depression (Ghaziuddin, Weidmer-Mikhail, & Ghaziuddin, 1998; Howlin, 2002). Some authors have suggested that this may arise from individuals paradoxically having a greater insight into their own impairment, which causes them to feel set apart socially and inadequate (Hare & Paine, 1997; Howlin, 2002). There is also evidence to suggest that individuals with ASD may show greater levels of suspicion or mistrust of others (e.g., Blackshaw, Kinderman, Hare, & Hatton, 2001). Conversely, this may help them to question and resist police demands and to present as rigid and unwavering in their responding.

The current study aims to establish whether individuals with ASD perform poorly on measures of interrogative suggestibility and compliance, when compared to general population (IQ-matched) controls. Elevated scores on measures of these constructs might indicate that individuals with ASD could have more difficulty coping with a real-life interrogative situation than people from the general population of a similar intellect.

## Method and measures

An independent groups design was used to assess interrogative suggestibility and compliance in 26 individuals with high functioning ASD, and 27 gender- and IQ-matched controls. Participants with ASD were recruited from a specialist clinic carrying out diagnostic assessments and from an existing database of people with a diagnosis interested in participating in research studies. Local clinicians and researchers provided information on the suitability of participants. Diagnosis of ASD was made according to ICD-10 criteria by consultant psychiatrists with expertise in this area. Diagnostic assessment was supplemented by information gathered from the Autism Diagnostic Interview (ADI-R; Lord, Rutter, & Lecouter, 1994) in 14 (54%) of the cases and by the Autism Diagnostic Observation Schedule (ADOS; Lord, Rutter, DiLavore, & Risi, 1999) in four (15%) of the cases. All participants in the ASD group had been ascribed a diagnosis of Asperger's syndrome, indicating that they had not had a delay in the acquisition of spoken language in addition to the triad of impairments. The participants with ASD had a mean age of 34.73 ($SD$ = 11.13, range = 18–61), and 21 (80.7%) were male. At the time of testing, most participants were

either in private residences or supported accommodation, although seven (27%) were inpatients in a specialist unit for people with ASD.

A similar number of control participants were recruited from a control database at the Institute of Psychiatry, London. The control participants had a mean age of 33.93 ($SD = 11.93$, range = 18–61) and 21 (77.7%) were male. Of the ASD group, eight (30.7%) had been arrested/cautioned by the police compared with four (14.8%) of the general population controls.

All participants spoke English as their first language. Exclusion criteria included current acute psychotic illness, substance misuse, head injury or neurological illness, a measured IQ below 70 points, or a systemic medical illness that might hinder performance. None of the participants in the ASD or control groups were known personally to the researcher, and all participants were paid for their time and expenses. Similar numbers of ASD and non-ASD participants were invited to take part in the study, with equivalent numbers declining to take part. Prior to recruiting, ethical approval for this study was obtained from the joint Institute of Psychiatry and South London and Maudsley NHS Trust Ethics Committee.

The Gudjonsson Suggestibility Scale 2 (GSS 2; Gudjonsson, 1997) is a standardised research and clinical tool measuring individuals' suggestibility in response to leading questions and negative feedback. Four different types of scores can be calculated. 'Yield 1' is the extent to which the person succumbs to the 15 misleading questions when these are first presented. 'Yield 2' is the extent to which the person responds differently to the same questions after being informed that some of his or her answers were wrong and the questions are repeated. 'Shift' is made up of the changes in the person's answers to any of the 20 questions after negative feedback. Yield 1 and Shift combine to give the total suggestibility score, with the range of scores being from 0 to 35. Higher scores indicate greater suggestibility. Additionally, a participant's recall memory of a narrative (that serves as the witness event) and the degree to which participants confabulate can also be assessed by the GSS 2. Participants' responses were recorded on tape and subsequently transcribed. Clear non-discretionary scoring guidelines are provided in the manual, and the interviewer was trained by the author of the GSS 2 prior to the study. Good retest reliability and validity of the scales has been well documented (see Gudjonsson, 2003).

The Gudjonsson Compliance Scale (GCS; Gudjonsson, 1989) is a 20-item self-report scale which measures the extent to which an individual is compliant in a range of situations. This measure comprises true/false statements. Scores range from 0 to 20, with a higher score indicating greater compliance. Normative data are available for the GCS. The Gudjonsson Compliance Scale Form E (GCS-Form E; Gudjonsson, 1997) purports to

assess compliance from an informant's perspective; true/false responses to the 20 GCS items are provided by an informant who knows the participant well. In the current study, the parents of individuals within the AS group were asked to fill in Form E. This was because the GCS had not been used in this population before.

Three measures of mental state were also included: the Hospital Anxiety and Depression Scale (Snaith & Zigmond, 1994) to assess anxiety and depression; the Brief Fear of Negative Evaluation Scale (Leary, 1983) to measure the extent to which an individual feared negative reactions from others/social evaluative anxiety; and the Paranoia Scale (Fenigstein & Vanable, 1992) to measure trait suspiciousness/tendencies to mistrust others.

**Results**

One participant in the ASD group was unable to complete self-report measures.

Scores on the measures of suggestibility (GSS 2) and compliance (GCS) were first compared to published norms (Gudjonsson, 1997) and were found to be generally in line with these. However, the distribution of several variables on the GSS 2 did not appear normal. Scores were skewed towards the low end of the scale on Yield 1 in both groups. This was also apparent on Shift and total suggestibility scores for the ASD group, with scores on the latter measure having a bimodal representation – that is, the majority of participants scored towards the low end but there was a distinct sub-group of higher scorers.

Distribution-free, non-parametric Mann Whitney U tests were conducted to explore specific group differences in terms of types of suggestibility and compliance. The results are shown in Table 1. After controlling for multiple comparisons using a Bonferroni correction, the ASD group was found to have significantly higher scores on the GCS than controls. No group differences were found for the various scores of the GSS 2.

To check the reliability of self-reported compliance in the ASD group, participants were asked if a parent could complete the GCS Form E on their behalf. Information was available for 15 of the 26 participants. Agreement was examined using an intra-class coefficient statistic. This was .67 and significant at the .05 level, indicating a satisfactory level of agreement between the total scores on the GCS from self-report and parental report.

Using the Mann Whitney U test, significant between-group differences were also found on the Hospital Anxiety ($U = 166$, $p < .01$, two-tailed) and Depression ($U = 181$, $p < .01$, two-tailed) Scale, the Paranoia Scale

Table 1. Between–group differences on the GSS2 and GCS.

| | ASD ($n$ = 26) Median (range) | Control ($n$ = 27) Median (range) | U values |
|---|---|---|---|
| GSS2 | | | |
| Immediate recall | 20.5 (8–35.5) | 22 (7–32.5) | 300.5 |
| Total confabulations | 2.5 (0–6) | 3 (0–7) | 339.5 |
| Delayed recall | 20.3 (4.5–33.5) | 22.5 (3.5–29.5) | 298.5 |
| Total confabulations | 3 (0–5) | 3 (0–7) | 329 |
| Yield 1 | 2 (0–13) | 3 (0–12) | 332.5 |
| Yield 2 | 4 (0–12) | 6 (0–13) | 293 |
| Shift | 3 (0–11) | 4 (0–10) | 330.5 |
| Total suggestibility | 5.5 (0–22) | 6 (0–20) | 350 |
| GCS | 13 (6–20) | 8 (3–14) | 130*** |

***$p < .001$ (one–tailed).

(U = 105, $p < .001$, two-tailed), and the brief Fear of Negative Evaluation Scale (U = 120, $p < .001$, two-tailed) after controlling for multiple comparisons using a Bonferroni correction ($p < .0125$, two-tailed). The ASD group were more depressed (ASD median, range = 6,0–16; control median, range = 2,0–10), anxious (ASD median, range = 8,0–20; control median, range = 4,0–10), and paranoid (ASD median, range = 43,21–77; control median, range = 28,18–52) than controls, and scored higher on the Brief Fear of Negative Evaluation Scale (ASD median, range = 44,18–77; control median, range = 29,15–53). None of these variables were found to have a significant association with the GSS 2 or GCS.

## Discussion

Individuals with ASD were found not to differ significantly from people in the general population of a similar intellect in terms of the extent to which they yielded to misleading questions or changed their answers following negative feedback on the measure of interrogative suggestibility (the GSS 2). This was contrary to expectations for a group with social communication impairments, difficulties inferring mental states, reports of memory difficulties, and high anxiety levels. What might account for this finding?

First, research has consistently shown that low intellectual ability and poor memory are associated with suggestibility (Clare & Gudjonsson, 1993; Gudjonsson, 1988a). The experimental and general population control groups in the current study did not differ on measures of verbal IQ or memory performance on the GSS2, and it may simply be that this ‘common

ground' supersedes other differences. Second, perhaps particularly surprising was the absence of significant differences between groups on the Shift, a measure of the degree to which answers given change following negative feedback. The Shift index score has been found in previous research to be particularly associated with anxiety (e.g., Gudjonsson, 1988b; Tata, 1983), and significantly higher levels of trait anxiety and a tendency to fear negative disapproval were found in the ASD participants. There is a growing understanding about the role of executive function deficits in the profile of ASD, particularly in the areas of planning and cognitive shift (Ozonoff et al., 2004). It is plausible, then, that the group with ASD, although susceptible to many of the risk factors for increased suggestibility, were not able to shift their responses and presented as rigid or unwavering. An alternative hypothesis suggests that due to social communicative impairments and/or impaired theory of mind, participants with ASD may have failed to recognise that the motivations or intentions of the interviewer were to elicit a different response by providing negative feedback. These hypotheses require further investigation, but it is plausible that the influence of executive function and/or theory of mind impairments on interrogative suggestibility might outweigh the effects of other, more established factors such as anxiety.

Individuals with ASD also had significantly higher scores on the depression subscale of the Hospital Anxiety and Depression Scale and on the Paranoia Scale. There is relatively less research concerning suggestibility and these variables. However, the current results would support the findings of Sigurdsson, Gudjonsson, Kolbeinsson, and Petursson (1994) that depression does not elevate suggestibility, and the theoretical argument that suspiciousness may be associated with a more resistant cognitive set (Gudjonsson & Clark, 1986). It may be that individuals with ASD were predisposed to adopt a less trusting approach than controls, and thus may have been more inclined to doubt leading questions and negative feedback. It is also possible that higher levels of depression within the ASD group may have led participants to withdraw and give more evasive answers, such as 'I don't know' or 'I'm not sure', which on the GSS2 would be scored as a non-suggestible response.

Individuals with ASD did score significantly more highly than controls on a measure of compliance. Satisfactory agreement between self and parent ratings of compliance in the ASD group suggests that the high scores in the ASD group were not due to difficulties completing the measure or an inaccurate self-perception of compliance. Despite this additional information, there are considerable difficulties inherent in measuring compliance using self-report methods, in particular where an individual has been suspected of or interviewed with respect to a crime, as they may seek to present themselves as not accountable for their behaviour. However, the present data are in line with previous research

demonstrating that, unlike suggestibility, compliance is not significantly associated with intelligence (Gudjonsson, 1989), and is not believed to be negatively associated with a suspicious cognitive set (Gudjonsson, Sigurdsson, Brynjolfsdottir, & Hreinsdottir, 2002). In addition, the current results may also be consistent with research linking low self-esteem and compliance (Gudjonsson et al., 2002). Self-esteem was not directly measured in this study, although higher rates of depression in the ASD group might denote this. It is not inconceivable that individuals with low self-esteem may feel less able to challenge a request or demand made by an authority figure.

In summary, these findings partially support the case presented in the literature review that individuals with ASD may be more vulnerable in an interrogative interview than people in the general population. As a group they were not found to yield more readily to misleading information, or to respond to direct negative feedback by the interviewer. However, the results suggest that individuals with ASD may be more eager to please or avoid conflict and confrontation, and therefore may respond compliantly to the requests or suggestions of others, despite not necessarily agreeing. In a police interview a tendency to respond in this way may, in some circumstances, disadvantage a suspect. In the worse case, it could lead to a statement that is erroneous and self-incriminating (Gudjonsson, 2003). ASD group members' relatively high compliance score may also indicate that they are more easily led, manipulated, or coerced into criminal activity by peers (Gudjonsson & Sigurdsson, 2004), which offers some evidence in support of Howlin's (1997) taxonomy proposal of deliberate exploitation by others as being one reason why people with ASD may commit crimes.

Although between-group differences on the GSS 2 were not found, this does not mean that suggestibility need not be examined in suspects with ASD. Indeed, a proportion of participants with ASD were found to score towards the high end of the suggestibility scale. Assessment of these psychological vulnerabilities should therefore principally relate to information from police transcripts, such as the manner in which questions were phrased and how the interviewee responded to challenges. Gudjonsson (2003) recommends that psychological tests of suggestibility and compliance may then be useful supplements to an assessment of intellectual ability and mental state, and provide important information about the strengths and vulnerabilities of an alleged offender.

**Acknowledgements**

Thanks to Martin Anson and Lindsay Richardson, who assisted with recruitment, and the participants in the study. The study was undertaken as part of the requirements of the D. Clin. Psychology at the Institute of Psychiatry, Kings College London.

## References


Barry-Walsh, J., & Mullen, P.E. (2004). Forensic aspects of Asperger syndrome. *Journal of Child Psychiatry and Psychology*, *15*, 96–107.

Blackshaw, A.J., Kinderman, P., Hare, D.J., & Hatton, C. (2001). Theory of mind, causal attribution and paranoia in Asperger Syndrome. *Autism*, *5*, 147–163.

Bowler, D.M., Matthews, N.J., & Gardiner, J.M. (1997). Asperger's syndrome and memory: Similarity to autism but not amnesia. *Neuropsychologia*, *35*, 65–70.

Clare, I.C.H., & Gudjonsson, G.H. (1993). Interrogative suggestibility, confabulation, and acquiescence in people with mild learning disabilities (mental handicap): Implications for reliability during police interrogations. *British Journal of Clinical Psychology*, *32*, 295–301.

Clare, I.C.H., & Gudjonsson, G.H. (1995). The vulnerability of suspects with intellectual disabilities during police interviews: A review and experimental study of decision-making. *Mental Handicap Research*, *8*, 110–128.

Everall, I.P., & LeCouteur, A. (1990). Fire-setting in an adolescent boy with Asperger's syndrome. *British Journal of Psychiatry*, *157*, 284–287.

Fenigstein, A., & Vanable, P.A. (1992). Paranoia and self-consciousness. *Journal of the Personality and Social Psychology*, *62*, 129–138.

Ghaziuddin, M., Weidmer-Mikhail, E., & Ghaziuddin, N. (1998). Co-morbidity of Asperger's syndrome: A preliminary report. *Journal of Intellectual Disability Research*, *4*, 279–283.

Green, J., Gilchrist, A., Burton, D., & Cox, A. (2000). Social and psychiatric functioning in adolescents with Asperger's syndrome compared with conduct disorder. *Journal of Autism and Developmental Disorders*, *30*, 279–293.

Gudjonsson, G.H. (1987). The relationship between memory and suggestibility. *Social Behaviour*, *2*, 29–33.

Gudjonsson, G.H. (1988a). The relationship of intelligence and memory to interrogative suggestibility: The importance of range effects. *British Journal of Clinical Psychology*, *27*, 185–187.

Gudjonsson, G.H. (1988b). Interrogative suggestibility: Its relationship with assertiveness, social-evaluative anxiety, state anxiety and method of coping. *British Journal of Clinical Psychology*, *27*, 159–166.

Gudjonsson, G.H. (1989). Compliance in an interrogation situation: A new scale. *Personality and Individual Differences*, *10*, 535–540.

Gudjonsson, G.H. (1992). *The psychology of interrogations, confessions, and testimony*. Chichester, UK: John Wiley & Sons.

Gudjonsson, G.H. (1997). *The Gudjonsson Suggestibility Scales manual*. Hove, UK: Psychology Press.

Gudjonsson, G.H. (2003). *The psychology of interrogations and confessions: A handbook*. Chichester, UK: John Wiley & Sons.

Gudjonsson, G.H., & Clare, I.C.H. (1995). The relationship between confabulation and intellectual ability, memory, interrogative suggestibility and acquiescence. *Personality and Individual Differences*, *19*, 333–338.

Gudjonsson, G.H., & Clark, N.K. (1986). Suggestibility in police interrogation: A social, psychological model. *Social Behaviour*, *1*, 83–104.

Gudjonsson, G.H., & Sigurdsson, J.F. (2004). The motivation for offending and personality. *Legal and Criminological Psychology*, *9*, 69–81.

Gudjonsson, G.H., Sigurdsson, J.F., Brynjolfsdottir, B., & Hreinsdottir, H. (2002). The relationship of compliance with anxiety, self-esteem, paranoid thinking and anger. *Psychology, Crime and Law*, *8*, 145–153.

Happe, F., Ronald, A., & Plomin, P. (2006). Time to give up on a single explanation for autism. *Nature Neuroscience*, *9*, 1218–1220.
Hare, D.J., Gould, J., Mills, R., & Wing, L. (1999). *A preliminary study of individuals with autistic spectrum disorders in three special hospitals in England*. London: National Autistic Society.
Hare, D.J., & Paine, C. (1997). Developing cognitive behavioral treatments for people with Asperger's syndrome. *Clinical Psychology Forum*, *110*, 5–8.
Home Office. (1985). *The Police and Criminal Evidence Act 1984 (s.60(1)(a) and s.66(1)) codes of practice A-E(Rev. ed.)*. London: HMSO.
Home Office. (2004). *The Police and Criminal Evidence Act 1984 (s.60(1)(a) and s.66(1)) codes of practice A–F*. London: HMSO.
Howlin, P. (1997). *Autism: Preparing for adulthood*. London: Routledge.
Howlin, P. (2002). Autistic disorders. In P. Howlin & O. Udwin (Eds.), *Outcomes in neurodevelopmental and genetic disorders*. (pp. 136–168). Cambridge, UK: Cambridge University Press.
Leary, M.R. (1983). A brief version of the Fear of Negative Evaluation Scale. *Personality and Social Psychology Bulletin*, *9*, 371–375.
Lord, C., Rutter, M., DiLavore, P., & Risi, S. (1999). *Autism Diagnostic Observation Schedule–generic (ADOS)*. Los Angeles: Western Psychological Services.
Lord, C., Rutter, M., & LeCouter, A. (1994). Autism Diagnostic Interview–Revised: A revised version of a diagnostic interview for carers of individuals with possible pervasive developmental disorders. *Journal of Autism and Developmental Disorders*, *24*, 659–685.
Loynes, F. (2001). The Impact of Autism. Report prepared for the All Party Parliamentary Group on Autism. Published: Autism.org.uk.
Ozonoff, S., Cook, I., Coon, H., Dawson, G., Joseph, R.M., Klin, A., et al. (2004). Performance on Cambridge Neuropsychological Test Automated Battery subtests sensitive to frontal lobe function in people with autistic disorder: Evidence from the Collaborative Programs of Excellence in Autism Network. *Journal of Autism and Developmental Disorders*, *34*, 139–150.
Scragg, P., & Shah, A. (1994). Prevalence of Asperger's syndrome in a secure hospital. *British Journal of Psychiatry*, *165*, 679–682.
Sigurdsson, J.F., & Gudjonsson, G.H. (in press). Motivation for offending and personality: A study among young offenders on probation. *Personality and Individual Differences*.
Sigurdsson, E., Gudjonsson, G.H., Kolbeinsson, H., & Petursson, H. (1994). The effects of ECT and depression on confabulation, memory processing, and suggestibility. *Nordic Journal of Psychiatry*, *48*, 443–451.
Siponmaa, L., Kristiansson, M., Jonsson, C., Nydén, A., & Gillberg, C. (2001). Juvenile and young adult mentally disordered offenders: The role of child neuropsychiatric disorders. *Journal of the American Academy of Psychiatry and the Law*, *29*, 420–426.
Snaith, R.P., & Zigmond, A.S. (1994). *The Hospital Anxiety and Depression Scale manual*. Windsor, UK: NFER-Nelson.
Sofronoff, K., Attwood, T., & Hinton, S. (2005). A randomized controlled trial of a CBT intervention for anxiety in children with Asperger syndrome. *Journal of Child Psychology and Psychiatry*, *46*, 1152–1160.
Tata, P. (1983). *Some effects of stress and feedback on interrogative suggestibility: An experimental study*. Unpublished M. Phil. thesis, University of London.
Volkmar, F.R., Klin, A., & Pouls, D. (1998). *Nosological and genetic aspects of Aspergers Syndrome*, *28*, 457–463.

Wolfradt, U., & Meyer, T. (1998). Interrogative suggestibility, anxiety and dissociation among anxious patients and normal controls. *Personality and Individual Differences*, *25*, 425–432.

Woodbury-Smith, M.R., Clare, I.C.H., Holland, A.J., Kearns, A., Staufenberg, E., & Watson, P. (2005). A case-control study of offenders with high functioning autistic spectrum disorders. *Journal of Forensic Psychiatry and Psychology*, *16*, 747–763.

# Repeated movements and behaviour (stimming)

*Many autistic people use repeated movements (like hand flapping or spinning) and/or repeated behaviours (like saying a word or listening to a song on repeat) for sensory stimulation, to keep calm or to express joy. This is an example of one of the core characteristics of autism needed for a diagnosis. These actions are often beneficial and usually harmless, but there can be situations when a person needs support.*


- What do we mean by repeated movements and behaviour?
- The purposes and benefits to autistic people
- When support may be needed
- Insight from autistic people
- Links, resources and article sources


## What do we mean by repeated movements and behaviour?

Repeated movements and behaviour are also known as 'stimming'. Stimming is short for 'self-stimulating behaviour'; it can also be described as 'self-regulating' behaviour. Autistic people may also describe a single way of stimming as a 'stim', and a set as 'stims'.

Many people (autistic and non-autistic) stim. Playing with a pen, twirling your hair, tapping and whistling are all forms of stimming. But autistic people may stim more, and the purpose and importance of stimming (to them and their wellbeing) may be different to non-autistic people.

Examples of stimming:

- **Movement/balance**: hand flapping, rocking, swinging, jumping, spinning
- **Sight**: watching spinning toys, patterns, glitter, colours or lights (possibly making the light flicker); repeated blinking
- **Hearing**: listening to the same song on repeat; tapping ears; repeating sounds, words or phrases (known as 'echolalia'- some sources consider this to be a form of communication)
- **Touch**: hair twirling, scratching, rubbing, touching fabrics
- **Smell and taste**: sniffing, licking or chewing objects.

Some stims are more noticeable than others. For example, flapping your hands to express joy is more noticeable than twirling your hair or a pen to regulate anxiety, or repeating words of phrases in your head.

Autistic women and girls may stim in less noticeable and/or more socially accepted ways than autistic men and boys. This can be a reason why people don't notice they are autistic, which can affect their ability to get an autism diagnosis.

**In an autism assessment**

Repeated movements and behaviour (stimming) are considered part of 'restricted and repetitive behaviours and interests' (RRBIs), one of the two core characteristics in the criteria for an autism diagnosis.

'RRBIs' also includes Focused and dedicated interests and Preference for order, predictability or routine. When autistic people describe their lived experience, they usually refer to these topics separately rather than grouping them together like the diagnostic criteria.

The diagnostic criteria describe these behaviours and interests in a negative way as 'restricted and repetitive', but autistic people generally describe them in a positive way, explaining the purpose and benefits to them (though certain forms of stimming can be harmful – see the section below, When support may be needed.)

## The purposes and benefits to autistic people

Autistic people have explained that stimming has a range of purposes and benefits:

- sensory input and enjoyment (for example, listening to sounds/music, touching fabrics and watching lights that you enjoy and/or that relax you)
- staying calm ('self-regulating' your emotions or 'self-soothing' by doing things that calm you)
- to express joy or other emotions (for example, flapping your hands with happiness or excitement, or rocking in distress.)

Every autistic person is different, so their movements and behaviours may not have the same meaning or purpose as another autistic person's. For example, one person rocking may be distressed and is trying to regulate their emotions, but another person may be rocking simply because they enjoy the feeling.

In the past, the purposes and benefits of stimming were not well understood. Because of this, people tried to make autistic people stop stimming, so they could seem less autistic. Autistic people have described this as a form of enforced masking, which can lead to negative outcomes including anxiety and distressed behaviour.

If stimming is harmless, there is no reason to prevent an autistic person from doing it.

## When support may be needed

**Stimming due to distress**

If an autistic person is stimming to distract them from, or to regulate (manage) their level of distress, it is important to consider what is causing them to feel distressed. They may need support to identify the cause and to address it.

**Obsessive-compulsive behaviour**

It can be challenging to tell the difference between autistic stimming behaviour and obsessive-compulsive behaviour that may be a sign of obsessive-compulsive disorder (OCD). They may look the same but can have very different purposes.

For example, an autistic person may repeatedly flick a light switch on and off because they like the sensation of flicking the switch and the visual input of the light turning on and off. Someone with OCD may do the same action because they feel compelled to and/or because they believe something bad will happen if they don't do it (a certain number of times, for example.)

In general, obsessions and compulsions for people with OCD are distressing and unwanted, whereas behaviours in autistic people such as stimming and engaging in their interests are often positive, soothing and purposeful.

**Harmful or dangerous stims**

Some autistic people may stim in ways that are harmful to them. This is sometimes called 'self-injurious behaviour' (behaviour that injures them). Examples include picking skin or nails (potentially until they bleed), pulling hair (potentially pulling it out), and banging or hitting their head.

If an autistic person is stimming in harmful ways, support should aim to address the cause of any distress the person is feeling. It may be possible to support the person to replace harmful stims with safe stims that serve the same purpose for them.

Trying to stop a distressed autistic person stimming without addressing the cause of their distress or finding an alternative way for them to express or regulate their emotions may not work and may make the person more distressed.

Some parents of autistic children have shared general advice for supporting autistic children with harmful or dangerous stims, including:

- Identify and treat any underlying health conditions that are causing pain, such as tooth pain or migraines.
- Watch for certain behaviours that often happen before dangerous repetitive behaviours. For example, pulling hair as a sign of building up to self-hitting. Identify the signs and help to reduce the trigger (for example, moving from a noisy to a quiet space).
- Only if the stim is impacting others: give the person a place to stim, or offer some alternatives; for example, spinning or time on a swing to replace throwing behaviours.
- If a stim becomes dangerous and has a sensory cause/purpose, then seek professional support to find safe alternatives; for example, replacing self-injurious behaviours with deep pressure.

## Insight from autistic people

"If I see something I'm excited by, I'll flap. If I'm distressed or trying to calm myself down, I might rock. If I'm really distressed, I might rub my hair. There are visual stims – for example, I'll watch this glitter fall for a really long time. ... Feeling soft materials – lovely soft materials – that can be a stim. Stimming is what we do in order to cope with our environment and it's also what we do to express the emotions that we're feeling inside of us."
– **Sara Gibbs**, Autism - stimming in 3-ish minutes

"It should be said that while stimming isn't all about the rocking and flapping, there's nothing wrong with rocking or flapping at all, nor with other stereotypical stims like children playing with toys 'wrong' by – shock horror – lining them up or focusing on details their non-autistic peers don't care about. If it's not harming anyone, then it's not harming anyone and it shouldn't be stigmatised."
– **Georgia Harper**, Stimming, stigma and stereotypes

"Parents, educators and psychologists are still trying to stop children from 'stimming'. I believe it is good to be taught how to manage 'stimming' but trying to stop it altogether is harmful and shows no understanding of the reasons why people like me 'stim'. ... Some people seem to think that if you can get rid of the outward behaviours of autism you get rid of autism. This is just not true."
– **Alex Lowery**, Why stimming is a big part of my life

"I remember spinning All. The. Time. I remember that one of my favourite activities was to position myself in the middle of the living room, fully outstretch my arms as though flying, and start spinning. I even had a routine that pertained to this. It was helpful if music was playing in the room (which was pretty often); that enhanced the pleasurable effect, as did the fact that the carpeting wasn't one solid colour; it had patterns on it."
– **Laina Eartharcher**, Sifting through the US CDC's official diagnostic criteria for autism

"Stimming is a great way to combat sensory processing [challenges]. Humming ... doodling. Output blocks input. It's why many autistic people will look away from you when they're talking, they won't make eye contact. If I look at you, I won't listen to what you're saying; if I look away from you, I can pay attention."
– **Agony Autie**, Stimming, what's that?

"[My stims] have long been something of an embarrassment to me. ... I am worried about what other people think. I am concerned genuinely that a six-foot-tall man, with probably his eyes closed, or wearing dark glasses, rubbing the tag on a partly ripped, worn out T-shirt, is going to have his appearance and actions misinterpreted. If they are, then the police will likely be involved. My personal safety is at risk for innocently stroking a piece of material. Heaven help me if I were to make a Wookie noise too."
– **Kieran Rose**, An autistic frequency (stimming)

## Links, resources and article sources

National Autistic Society +

Other advice, information and support +

Article sources +

National Autistic Society

**What is autism content survey**

1. Introduction

Please provide some feedback on this webpage. Any data you share – including personal information - will be kept safe and deleted after use. Please see our privacy policy for further details.

Create your own online survey with SmartSurvey.

Keep up to date with all the great things we're doing

Subscribe for updates



We are registered as a charity in England and Wales (269425) and in Scotland (SC039427). The National Autistic Society is also a company limited by guarantee, registered at Companies House (01205298). VAT registration number: 653370050. © The National Autistic Society 2026

NEW MEXICO LAW REVIEW

Volume 47
Issue 1 *Winter*

Winter 2017

# Protecting Persons with Mental Disabilities from Making False Confessions: The Americans with Disabilites Act as a Safeguard

Lauren Rogal
*Georgetown University Law Center*

Recommended Citation
Lauren Rogal, *Protecting Persons with Mental Disabilities from Making False Confessions: The Americans with Disabilites Act as a Safeguard*, 47 N.M. L. Rev. 64 (2017).
Available at: https://digitalrepository.unm.edu/nmlr/vol47/iss1/4

This Article is brought to you for free and open access by The University of New Mexico School of Law. For more information, please visit the *New Mexico Law Review* website: www.lawschool.unm.edu/nmlr

# PROTECTING PERSONS WITH MENTAL DISABILITIES FROM MAKING FALSE CONFESSIONS: THE AMERICANS WITH DISABILITIES ACT AS A SAFEGUARD

Lauren Rogal*

## ABSTRACT

*Individuals with mental disabilities are uniquely vulnerable to making false confessions under police interrogation, prompting a cavalcade of devastating consequences for both the individual confessors and the cause of justice. A growing body of evidence shows that mental disabilities impair the ability of sufferers to withstand the pressures of interrogation, as well as understand and invoke their Constitutional rights during questioning. Most current reform efforts focus on piecemeal legislation on the State level, such as mandatory electronic recording of interrogations. This article argues that Title II of the Americans with Disabilities Act provides an existing, nationwide framework for meaningful protection. Title II requires all public entities, including law enforcement agencies, to reasonably modify their activities in order to prevent discrimination against persons with disabilities. This article establishes that Title II generally applies to interrogation of the mentally disabled and proposes evidence-based options for reasonable modification of interrogation practices to reduce the risk of false confessions. Finally, it explores the limitations of the Title II framework and suggests regulatory measures to ensure strong protection for individuals with mental disabilities during police questioning.*

## INTRODUCTION

In the hit Netflix documentary "Making a Murderer," officials from the Manitowoc County Sheriff's Department interrogate a teenager named Brendan Dassey about the vicious rape and murder of 25-year-old Teresa Halbach.[1] It is

* Clinical Teaching Fellow, Georgetown University Law Center 600 New Jersey Ave NW #533 Washington, DC 20001; Email: lr575@law.georgetown.edu; Phone: 202-661-6547.

1. *See* Matt McCall, *'Making a Murderer' Raises Questions About Interrogation Technique From Chicago*, CHI. TRIB. (Jan. 7, 2016), http://www.chicagotribune.com/news/local/breaking/ct-reid-confession-technique-met-20160106-story.html. *See generally Making a Murderer: Indefensible* (Netflix broadcast Dec. 18, 2015).

Dassey's fourth interrogation in a 48-hour period.[2] He has an IQ of between 69 and 74.[3] Officials inform his mother that they wish to question her son as a witness against his uncle, not as a suspect.[4] Over the course of three hours, investigators provide case details to Dassey and convince him to repeat elements of their narrative.[5] As New York Magazine reported, "it's pretty clear that it's the investigators, not Dassey, who are providing the vast majority of the 'details' of the murder, and that they simply keep wearing him down until he tells them what they want to hear. It's infuriating to watch."[6]

Brendan Dassey was charged two days later with sexual assault and murder along with his uncle, Steven Avery,[7] who is the primary subject of the Netflix documentary. Dassey recanted his statements,[8] unsuccessfully sought to have them suppressed at trial, and was subsequently convicted.[9]

While the veracity of Dassey's specific confession remains disputed,[10] persons with mental disabilities such as his are at particular risk of making false admissions, including outright confessions, under police interrogation.[11] In a 2004 study of 125 proven false confessions, nearly thirty percent involved at least one

---

2. Brief of Defendant-Appellant at *79–80, State v. Dassey, 2013 WI App 30, 346 Wis.2d 278, 827 N.W.2d 928 (Table) (No. 2010AP3105), 2011 WL 6286867.

3. *Id.* at *78 (indicating an IQ of 74); *Making a Murderer: Indefensible* (Netflix broadcast Dec. 18, 2015) (evidencing Dassey's verbal IQ as 69 and overall IQ as 73, as given by the judge).

4. Brief of Defendant-Appellant at *81, State v. Dassey, 2013 WI App 30 (No. 2010AP3105).

5. *See, e.g.*, Calumet County Sheriff's Department Complaint No. 05-0157-955 at 584–87 (Mar. 1, 2006) (stating that investigators ask Dassey what happened to the victim's head, and Dassey responds that his uncle cut her hair. When the questioners ask "What else was done to her head?" Dassey says that his uncle punched the victim. When the questioners persist, Dassey says that he and his uncle stabbed the victim. Finally, an interrogator says, "All right, I'm just gonna come out and ask you. Who shot her in the head?" Dassey says that his uncle did, and the interrogator asks why Dassey did not report this sooner. Dassey responds, "Cuz I couldn't think of it.").

6. Jesse Singal, *The Science Behind Brendan Dassey's Agonizing Confession in Making a Murderer*, N.Y. MAG.: SCI. OF US (Jan. 11, 2016, 8:13 AM), http://nymag.com/scienceofus/2016/01/science-behind-brendan-dasseys-confession.html.

7. State v. Dassey, 2013 WI App 30, ¶¶ 2–3, 346 Wis. 2d 278, 827 N.W.2d 928.

8. *Teen Recants Murder Confession: Brendan Dassey Says He Didn't Rape a Photographer and Help His Uncle Kill Her*, ASSOCIATED PRESS (Apr. 24, 2007), http://host.madison.com/news/local/teen-recants-murder-confession-brendan-dassey-says-he-didn-t/article_088c183d-b85d-5483-8e16-d6a6cc9c373c.html.

9. *Dassey*, 2013 WI App 30, ¶ 2.

10. *See* Ryan Felton, *Controversial Making a Murderer Lawyer: 'I Don't Get Netflix at Home'*, GUARDIAN (Jan. 20, 2016, 10:29 EST), http://www.theguardian.com/culture/2016/jan/20/making-a-murderer-lawyer-len-kachinsky-i-dont-get-netflix-at-home (explaining Dassey's trial attorney believed he "didn't meet most" criteria of a false confession and that "his overall demeanor and everything else in that recording was going to convince a jury he was guilty[.]" Laura Nirider, co-director of the Center on Wrongful Convictions of Youth at Northwestern University School of Law, disagrees: "I don't know what [the trial attorney]'s looking at. But Brendan's confession fits the profile of a [false] confession to an absolute T.").

11. Confessions differ from admissions in that confessions include an acknowledgment of guilt, whereas admissions may include incriminating facts (e.g. the person's location at the time of the crime) but fall short of acknowledging guilt. For simplicity, this article refers to both types of statements as "confessions."

mental disability.[12] A 2010 review of DNA exonerations involving false confessions revealed that forty-three percent of false confessors suffered from mental disabilities.[13] This susceptibility arises from both interrogation techniques, which liberally use deception and psychological manipulation, and mental disabilities themselves, which frequently foster suggestibility and inattention to long-term consequences. Mental disabilities also undermine the protectiveness of legal safeguards against coercive interrogation, such as *Miranda* warnings. As a result, persons with mental disabilities are significantly disadvantaged with regard to police interrogation relative to non-disabled individuals.

The Americans with Disabilities Act[14] ("ADA") exists precisely to address this sort of disadvantage, but few courts have applied the law to interrogations of the mentally disabled. This article examines the ADA's potential to provide meaningful protection in this context. It concludes that the ADA applies to interrogations of the mentally disabled and entitles them to "reasonable modification" of interrogation practices in order to alleviate those disadvantages. Such reasonable modifications may include the mandatory presence of counsel during questioning or police training in and application of appropriate interrogation methods for the mentally disabled.

Because the ADA requires a showing of discrimination, it is appropriate to begin by exploring the relationship between mental disabilities and false confessions. The first section of this article describes common interrogation tactics, their effect on the mentally disabled, and how mental disabilities undermine the effectiveness of existing legal safeguards that could protect against false confessions. The second section then turns to the ADA, applying each of the law's components and examining some ideas for reasonable modification. Finally, the third section concludes by identifying weaknesses in the ADA framework and providing suggestions for reform.

## I. Mental Disabilities and False Confessions

Persons with mental disabilities are at particular risk of making false confessions, with devastating consequences. First, persons with mental disabilities are particularly susceptible to the methods and pressures of interrogation. Second, mental disabilities impair the ability of individuals to understand and invoke their Constitutional rights, which are supposed to protect against coercive interrogations. Finally, the criminal justice system is ill equipped to identify false confessions and prevent their use as evidence against the mentally disabled.

### *A. Susceptibility to False Confessions*

Mental disabilities render individuals particularly vulnerable to the methods and pressures of police interrogation.[15] Law enforcement officers are trained and permitted to use a range of deceptive tactics such as inventing evidence, overstating certainty of guilt, and implying that suspects will somehow benefit from making

12. *See* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. REV. 891, 970–73 (2004).

13. Brandon L. Garrett, *The Substance of False Confessions*, 62 STAN. L. REV. 1051, 1095 (2010).

14. 42 U.S.C. §§ 12101–12213 (2012).

15. *See* Garrett, *supra* note 13, at 1064.

admissions.[16] Compared to the general population, persons with mental disabilities display greater suggestibility, tendency towards acquiescence, and inattentiveness to long-term consequences, which makes them especially vulnerable to deceptive tactics.[17]

### 1. Interrogation Methods Explained

Interrogation is a process designed to elicit information, often against the interrogated party's self-interest. Beyond this accepted maxim, there is disagreement about whether the purpose of modern interrogation methods is to learn the truth or simply extract confessions.[18] Unquestionably, skilled interrogators carefully impose a variety of psychological pressures on the suspect to achieve their goal.[19] A study of five hundred hours of police interrogations concluded that "contemporary interrogation strategies . . . are based on the manipulation and betrayal of trust."[20]

The most prevalent interrogation method in the United States is the "Reid Technique."[21] Developed by John E. Reid & Associates, the Reid Technique was initially popularized by a 1962 training manual that is now in its fifth edition (the "Reid Manual").[22] In a 2007 study of police departments in municipal areas with more than 150,000 inhabitants, approximately two-thirds of respondents indicated that their department had trained at least some officers in this trademarked[23] method of questioning suspects.[24]

The Reid Technique prescribes physical isolation of the subject[25] followed by a nine-step interrogation process.[26] First, the interrogator confidently asserts that the suspect is guilty of the offense.[27] Second, the interrogator provides a sympathetic, face-saving explanation for the crime that shifts moral culpability to the victim,

---

16. *See* Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & HUM. BEHAV. 3, 12 (2010).

17. *See id.* at 20–22.

18. *See* FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS 8 (4th ed. 2001); Kassin et al., *supra* note 16, at 6 ("The purpose of interrogation is therefore not to discern the truth, determine if the suspect committed the crime, or evaluate his or her denials. . . . [T]he single-minded purpose of interrogation is to elicit incriminating statements, admissions, and perhaps a full confession in an effort to secure the conviction of offenders.").

19. Miranda v. Arizona, 384 U.S. 436, 449–55 (1966) ("[T]he police . . . persuade, trick, or cajole him out of exercising his constitutional rights."); Kassin et al., *supra* note 16, at 6.

20. Richard A. Leo, Miranda*'s Revenge: Police Interrogation as a Confidence Game*, 30 L. & SOC'Y REV. 259, 259–60 (1996).

21. *In re* Elias V., 188 Cal. Rptr. 3d 202, 211 (Cal. Ct. App. 2015) (calling the Reid training manual "the leading law enforcement treatise on custodial interrogation"); Marvin Zalman & Brad W. Smith, *The Attitudes of Police Executives Toward* Miranda *and Interrogation Policies*, 97 CRIM. L. & CRIMINOLOGY 873, 896, 919–20 (2007).

22. FRED E. INBAU ET AL., CRIMINAL CONFESSIONS AND INTERROGATIONS (1st ed. 1962); FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS (5th ed. 2013).

23. THE REID TECHNIQUE OF INTERVIEWING AND INTERROGATION, Registration No. 1714266; THE REID TECHNIQUE, Registration No. 1714267.

24. Zalman & Smith, *supra* note 21, at 900 (explaining the research methodology), 920.

25. *See* INBAU ET AL., *supra* note 18, at 51, 57–58.

26. *Id.* at 209.

27. *Id.* at 213.

accomplice, or any other plausible candidate.[28] In steps three through six, the interrogator rejects any protestations of innocence and transitions towards a confession.[29] In the seventh step, the interrogator offers two explanations for the person's guilt, one of which is more socially acceptable.[30] At this point, the suspect is encouraged to acknowledge culpability and assert the more socially acceptable reason.[31] In the final two phases, the suspect repeats and the interrogator documents the admissions.[32]

The Reid Technique generally involves deceit.[33] The interrogator cultivates a false sense of security by feigning sympathy for the suspect's predicament, rationalizing the crime, blaming others, and implying that the suspect will benefit from a confession ("minimization" techniques).[34] Other techniques aim to intimidate the suspect: the interrogator may invent incriminating evidence, misrepresent weak evidence as incontrovertible, repeatedly insist on the suspect's guilt, and flatly reject any alibi or alternative explanation, however reasonable ("maximization" techniques).[35]

While acknowledging the occurrence of false confessions, the authors of the Reid Manual dismiss the claim that their techniques might be responsible.[36] Indeed, the authors claim that the Reid Technique actually benefits innocent suspects by establishing the truth of their innocence.[37] They do, however, acknowledge that the purportedly innocuous Reid Technique may prove overwhelming to people with mental impairments.[38] The following section explores the vulnerability of such suspects in detail.

### 2. Mental Disabilities Under Interrogation

Mental disabilities, particularly intellectual impairments and psychotic disorders, render individuals especially vulnerable to false confessions. These conditions tend to make sufferers more compliant with police requests, more

28. *Id.*

29. *Id.* at 213–15.

30. *Id.* at 353.

31. *Id.* at 364.

32. *Id.* at 214.

33. Miriam S. Gohara, *A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques*, 33 FORDHAM URB. L.J. 791, 809 (2006).

34. *See* Kassin et al., *supra* note 16, at 12.

35. *See id.*

36. INBAU ET AL., *supra* note 18, at 426–29. For example, the authors declare it "absurd" to believe that introducing nonexistent evidence during an interrogation would induce an innocent person to confess. "[T]he natural human reaction would be one of anger and mistrust toward the investigator. The net effect would be the suspect's further resolution to maintain his innocence." Similarly, the authors theorize that in order for a suspect to become falsely convinced of his or her own guilt in the course of the interrogation, the suspect would need to (1) believe himself or herself capable of the crime and (2) suffer from a condition associated with memory loss, such as epilepsy, multiple personality disorder, or drug-induced blackouts. This confluence of circumstances, they assert, is highly unlikely. Research, meanwhile, has documented numerous cases of precisely this type of "internalized false confession."

37. *Id.* at 229.

38. *Id.* at 429 ("These suspects may not have the fortitude or confidence to challenge such evidence and, depending on the nature of the crime, may become confused as to their own possible involvement if the police tell them evidence clearly indicates they commited the crime.").

suggestible to police-generated narratives, and less able to communicate exculpatory information. As a result, the mentally disabled are more likely to make untrue but damaging admissions under questioning.[39]

Scholars have documented three basic types of false confessions.[40] "Voluntary false confessions" occur without police inducement and are generally prompted by a wish for notoriety, a desire to protect the perpetrator, or a psychotic break from reality.[41] "Compliant false confessions" are made in order to escape the stress of interrogation or obtain some other benefit.[42] Finally, "internalized false confessions" occur when the process of interrogation convinces a suspect of his culpability, even if he has no memory of the crime.[43] Intellectual disabilities, psychotic disorders, and other serious mental health conditions are contributing factors in compliant and internalized false confessions.

Intellectual disabilities are generally characterized by poor perceptual reasoning, verbal comprehension, memory, abstract thought, and problem solving.[44] Individuals with intellectual disabilities typically have IQ scores two standard deviations or more below the population mean (i.e. below 65-75), though clinical judgment is necessary to interpret test results based on the individual's adaptive functioning.[45] Sufferers often exhibit gullibility, naiveté, obliviousness to risk, and a tendency to follow others.[46] Studies indicate that persons with intellectual disabilities are also predisposed to accept and incorporate information communicated by others into their own beliefs and memories.[47] In the interrogation context, these tendencies may be exacerbated by communication impairments that impede sufferers from providing accurate information and a coherent narrative of key events.[48] When persons with intellectual disabilities are questioned, they are less likely to understand their situation and correctly interpret police questions, and more likely to believe fictitious accounts of the evidence.[49]

---

39. Kassin et al., *supra* note 16, at 20–22.

40. Saul M. Kassin, *The Social Psychology of False Confessions*, 9 SOC. ISSUES & POL'Y REV. 25, 27 (2015).

41. Gilsi H. Gudjonsson & John Pearse, *Suspect Interviews and False Confessions*, 20 CURRENT DIRECTIONS PSYCHOL. SCI. 33, 35 (2011).

42. *Id.*

43. *Id.*

44. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 37 (5th ed. 2013) [hereinafter DSM-V].

45. *Id.*; Previous versions of the DSM put greater emphasis on IQ scores in diagnosing intellectual disabilities. Nancy Haydt et. al., *Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance on IQ Ceilings in* Atkins *(Death Penalty) Cases*, 82 UMKC L. REV. 359, 379 (2014). In the context of Title I of the Americans with Disabilities Act, the Equal Employment Opportunity Commission's informal guidance defines an intellectual disability as an IQ threshold of below 70-75, coupled with impairments in adaptive functioning, beginning before the age of eighteen. *Questions and Answers about Persons with Intellectual Disabilities in the Workplace and the Americans with Disabilities Act (ADA)*, U.S. EQUAL EMP. OPPORTUNITY COMM'N, https://www.eeoc.gov/laws/types/intellectual_disabilities.cfm (last visited Jan. 7, 2017).

46. *Id.* at 38.

47. Kassin et al., *supra* note 16, at 9.

48. *See* DSM-V, *supra* note 44, at 42.

49. *See* Kassin et al., *supra* note 16, at 21.

Psychotic disorders, including schizophrenia, impair the ability of sufferers to ascertain reality and distinguish it from delusions and hallucinations.[50] Individuals with these disorders are therefore less likely to accurately report exonerating information and perhaps more susceptible to delusions about the outcome of confessing. In one illustrative case, a schizophrenic Michigan man contacted Detroit police about a well-publicized murder, offering to help crack the case.[51] Police visited the psychiatric hospital several times to question Eddie Joe Lloyd.[52] After numerous conversations, he expressed a desire to help "smoke out" the real perpetrator by confessing to the crime in writing and on tape.[53] The investigating officers permitted him this delusion and encouraged the confession.[54] Entirely on the basis of his confession, which contained police-fed details about the crime, Lloyd spent seventeen years in prison before exoneration by DNA evidence.[55]

Other mental disabilities, such as bipolar, depressive, and attentional disorders, can also increase vulnerability to police interrogation. Bipolar disorder often causes symptoms similar to psychotic disorders; during periods of mania, sufferers exhibit obliviousness to risk, recklessness, distractibility, and delusional self-belief.[56] Depression, on the other hand, frequently causes feelings of excessive or misplaced guilt, which may reach delusional or near-delusional levels,[57] as well as memory and concentration impairments that are often initially mistaken for dementia.[58] These symptoms may facilitate internalization of inaccurate police narratives of events. Similarly, attentional disorders are characterized by impulsive decision-making without consideration of the consequences.[59] Research indicates that inattentiveness to long-range consequences increases the risk of false confessions in order to obtain a short-term reward (such as the termination of the police questioning).[60]

The convergence of modern interrogation practices, which center around isolation, pressure, and deception, and mental disabilities, which increase suggestibility and impede accurate communication, heightens the risk of false confessions. In general, persons with serious mental disabilities are less able to comprehend their situation and withstand the pressures of the interrogation process than non-disabled suspects. As the next section describes, mental disabilities also

---

50. DSM-V, *supra* note 44, at 87.

51. *Eddie Joe Lloyd*, NAT'L REGISTRY OF EXONERATIONS, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3387 (last visited Sept. 6, 2016); Jodi Wilgoren, *Confession Had His Signature; DNA Did Not*, N.Y. TIMES (Aug. 26, 2002) http://www.nytimes.com/2002/08/26/us/confession-had-his-signature-dna-did-not.html.

52. NAT'L REGISTRY OF EXONERATIONS, *supra* note 51.

53. Wilgoren, *supra* note 51 (quoting Lloyd as saying, "I was trying to help. I was thoroughly tricked. Inveigled, enticed, tricked. Sometimes the pressures on you to sign a statement is not them twisting your arm. It can be psychological and mental.").

54. NAT'L REGISTRY OF EXONERATIONS, *supra* note 51.

55. *Id.*

56. DSM-V, *supra* note 44, at 124–29.

57. *Id.* at 123–25, 162–64.

58. *Id.* at 164.

59. *Id.* at 61.

60. *See* Kassin et al., *supra* note 16, at 33.

undercut the legal safeguards designed to protect suspects in the interrogation process.

### B. Mental Disabilities Render Legal Safeguards Ineffective

Notwithstanding the Reid Manual's assertion that its methods are innocuous, courts have long acknowledged the coercive and risky nature of police interrogation.[61] Accordingly, safeguards have evolved to protect individuals and deter misconduct in the course of interrogation.[62] Constitutional safeguards include: (1) the privilege against self-incrimination,[63] which entitles suspects to a warning of their rights before interrogation, and (2) the right to assistance of counsel,[64] which protects suspects from interrogation under some circumstances without the presence of an attorney. Suspect statements obtained in violation of either safeguard are generally inadmissible in court.[65] This section describes the parameters of these safeguards and their capacity to protect individuals with mental disabilities.

#### 1. *Miranda* Warnings

The first protection for suspects is the Fifth Amendment's privilege against self-incrimination.[66] The self-incrimination clause has a convoluted history[67] but entered a new era with the Court's *Miranda v. Arizona* decision.[68] *Miranda* generally requires law enforcement to deliver prophylactic warnings at the outset of a custodial interrogation and suppresses statements made in the absence of *Miranda* warnings.[69]

*Miranda* involved four consolidated cases of individuals who confessed under "incommunicado interrogation . . . in a police-dominated atmosphere."[70] The eponymous petitioner was an indigent 23-year-old with an eighth-grade education and described by the Court as a "seriously disturbed individual."[71] After being identified in a lineup, Miranda was interrogated and confessed to kidnapping and rape.[72]

---

61. Miranda v. Arizona, 384 U.S. 436, 457–58 (1966); *see also* Rothgery v. Gillespie, 554 U.S. 191, 217 (2008) (stating that pre-trial interrogations are "critical stages" for the purpose of the Sixth Amendment right to counsel).

62. *See generally Rothgery*, 554 U.S. 191; *Miranda*, 384 U.S. at 444.

63. "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law. . . . " U.S. CONST. amend. V.

64. "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense." U.S. CONST. amend. VI.

65. Miranda v. Arizona, 384 U.S. 436, 479 (1966); Massiah v. United States, 377 U.S. 206-207 (1964).

66. *See* U.S. CONST. amend. V.

67. *See* John Fabian Witt, *Making the Fifth: The Constitutionalization of American Self-Incrimination Doctrine, 1791–1903*, 77 TEX. L. REV. 825 (1999) (providing a detailed historical examination of the self-incrimination clause).

68. 384 U.S. 436 (1966).

69. *Id.* at 444.

70. *Id.* at 445.

71. *Id.* at 457; State v. Miranda, 401 P.2d 721, 726 (1965).

72. State v. Miranda, 401 P.2d at 723.

The Court held that custodial interrogation is inherently coercive due to the imbalance of power and information between law enforcement and suspects.[73] Controversially, it issued specific policy prescriptions rather than a case-specific holding.[74] *Miranda* requires police, prosecutors, and prison guards to issue warnings prior to custodial interrogation, with the caveat that legislatures could devise and implement any equally effective alternative.[75] *Miranda* warnings inform suspects that they have the right to silence, that their statements may be used against them, that they have the right to an attorney's assistance and presence at all times during questioning, and that the state will appoint an attorney if the suspect cannot afford to retain one.[76] A suspect can invoke or waive the *Miranda* rights at any point during questioning.[77] When a suspect invokes the right to silence, police must cease any attempt at questioning until a significant period of time has passed.[78] If a suspect invokes the right to an attorney, police must cease all attempts at questioning, or provide the suspect with a lawyer.[79]

*Miranda* warnings are required only in the limited circumstance of custodial interrogation.[80] Custody generally occurs when a "reasonable person" would not feel free to terminate the interrogation and leave.[81] This standard assesses objective reasonableness, and does not vary based on the suspect's age or experience with the police.[82] Court rulings have also carved out exceptions to the definition of custody, such as when the suspect voluntarily travels or accompanies police to the site of questioning – even if he does so in the capacity of victim or witness and does not realize an interrogation will ensue.[83]

Research indicates that adults with serious mental disabilities have an impaired understanding of *Miranda* warnings relative to non-disabled adults.[84] The miscomprehension is both literal[85] (not understanding the meaning of the words) and abstract[86] (not understanding the reasons why one might invoke these rights).

73. Miranda, 384 U.S. at 457–58. The Court also stressed that the American accusatory system requires that the state produce evidence against the suspect from its independent labors, rather than by the "cruel, simple expedient of compelling it from his own mouth." *Id.* at 460.

74. *See* Miranda, 384 U.S. at 467; Laurie Magid, *The Miranda Debate: Questions Past, Present, and Future*, 36 HOUS. L. REV. 1251 (1999) (providing an account of the controversy).

75. Miranda, 384 U.S. at 467.

76. *Id.* at 468–74.

77. *Id.* at 474.

78. *Id.* at 473–74.

79. *Id.* at 474.

80. *Id.* at 444.

81. Yarborough v. Alvarado, 541 U.S. 652, 653 (2004).

82. *Id.* at 654.

83. Oregon v. Mathiason, 429 U.S. 492, 494–95 (1977).

84. Kassin et al., *supra* note 16, at 8; *see also* Virginia G. Gooper & Patricia A. Zapf, *Psychiatric Patients' Comprehension of* Miranda *Rights*, 32 L. & HUM. BEHAV. 390, 401 (2008).

85. Richard Rogers et al., *Knowing and Intelligent: A Study of Miranda Waivers in Mentally Disordered Defendants*, 31 L. & HUM. BEHAV. 401, 411, 415 (2007) (finding that after hearing their rights, nearly 20% of subjects in a 2007 study cited the cost of an attorney as a reason to waive the right to counsel, demonstrating that they lacked literal understanding of the warnings just issued).

86. *Id.* at 411 (finding that over half (54.1%) of subjects who opted to waive their right to silence could not generate a single nonpsychotic reason to exercise this right. Even among those who opted to exercise their right, over a quarter (27%) could not provide a nonpsychotic reason for this decision.).

Moreover, in contrast to non-disabled persons, previous experience with the justice system does not improve mentally disabled individuals' understanding of their rights.[87]

In order to exercise *Miranda* rights, a suspect must invoke them explicitly and unequivocally.[88] A statement such as "maybe I should talk to a lawyer" or refusal to sign a *Miranda* waiver do not meet this standard.[89] Likewise, a suspect's near-total silence for an extended period does not suffice to invoke the right to remain silent.[90] For an individual with a mental disability that impairs verbal abilities, communication skills, and confidence, the requirement of clarity and directness is a disadvantage.

Generally a suspect must exercise *Miranda* rights explicitly, but those same rights can be waived *im*plicitly.[91] The government must establish the validity of a defendant's waiver of *Miranda* rights by the preponderance of the evidence.[92] Waivers, whether explicit or implicit, are only valid if made knowingly, voluntarily, and intelligently.[93] This inquiry has two parts. First, the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception."[94] Second, a waiver must be made with "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."[95] This, in turn, is determined by the totality of the circumstances.[96]

While this appears to be a reasonably rigorous test, in practice "the Court has focused almost entirely on the voluntariness of the waiver."[97] Courts often require only a minimal factual understanding of *Miranda* rights, rather than an appreciation of their implications.[98] Taken to its logical conclusion, this means that

---

87. *Id.* at 414.

88. Davis v. United States, 512 U.S. 452, 459 (1994).

89. United States v. Plugh, 648 F.3d 118, 125 (2nd Cir. 2011) (holding an unequivocal refusal to waive rights though the signing of a written waiver does not constitute an invocation of those rights); *Davis*, 512 U.S. at 462 (finding that the statement "maybe I should talk to a lawyer" is not an clear invocation of the right to counsel). *But see* Ballard v. State, 24 A.3d 96 (Md. Ct. App. 2011) (holding that the statement, "You mind if I not say not more and just talk to an attorney about this," was an unequivocal invocation of the right to counsel).

90. Berghuis v. Thompkins, 560 U.S. 370, 379–82 (2010) (holding no invocation by a suspect who was near-silent for two hours and forty-five minutes).

91. Edwards v. Arizona, 451 U.S. 477, 485–86, 486 n.9 (1981) (holding a waiver is implied if the suspect reinitiates communication with police after invoking his or her rights); North Carolina v. Butler, 441 U.S. 369, 371–76 (1979) (holding that a waiver may be implied where the suspect speaks to interrogators without invoking his or her rights, provided that the suspect understood the warnings).

92. Lego v. Twomey, 404 U.S. 477, 489 (1972).

93. Miranda v. Arizona, 384 U.S. 436, 444 (1966).

94. Colorado v. Spring, 479 U.S. 564, 573 (1987); Moran v. Burbine, 475 U.S. 412, 421 (1986).

95. *Spring*, 479 U.S. at 573 (quoting *Moran*, 475 U.S. at 421.)

96. *Id.*

97. Michael C. Mims, *A Trap for the Unwary: The Sixth Amendment Right to Counsel After* Montejo v. Louisiana, 71 LA. L. REV. 345, 353 (2010).

98. *See, e.g.*, Sanford v. State, 962 S.W.2d 335, 347 (Ark. 1998) (finding a valid waiver where a mental health expert testified that the defendant understood "some aspects of probably every statement" on the waiver form); People v. Cheatham, 551 N.W.2d 355, 367 (Mich. 1996) ("To knowingly waive *Miranda* rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him.").

it would suffice for a suspect to understand that they can consult an attorney even if the suspect does not understand what an attorney is or the role an attorney might play.[99]

This reductive approach is convenient for finders of fact due to the difficulty in ascertaining a mentally impaired person's actual level of comprehension at the time of the waiver. Indeed, courts weigh a range of factors that may or may not be probative of a person's understanding of the warnings. For example, courts tend to give great weight to the impressions of the police, and to contemporaneous indications that individuals understand the warnings, such as the suspect's willingness to initial a waiver form.[100] For reasons discussed above, mentally disabled persons may mistakenly believe they understand their rights or may feign understanding out of embarrassment or fear of upsetting the police. Courts also frequently cite the suspect's experience in the criminal justice system as a positive factor in finding a valid waiver,[101] even though research shows that such history does not generally increase *Miranda* comprehension among the mentally impaired.[102]

### 2. The Right to Counsel

In addition to *Miranda* rights, the Constitution provides a right to counsel during interrogation under the Sixth and Fourteenth Amendments.[103] This serves to "protect the fundamental right to a fair trial"[104] by promoting parity between the government and the accused.[105] Criminal defendants have the right to assistance of counsel in federal and state prosecutions at all critical stages in a criminal proceeding, including pre-trial interrogations.[106] This right is both broader and

---

99. Kassin et al., *supra* note 16, at 8.

100. *See, e.g.*, United States v. Taylor, 745 F.3d 15, 23 (2nd Cir. 2014) (stating in dicta that, "In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights."); Garner v. Mitchell, 557 F.3d 257, 263 (6th Cir. 2009) (finding a valid waiver principally because police had no reason to believe that the suspect misunderstood the warnings); Moore v. Dugger, 856 F.2d 129, 134 (11th Cir. 1988) (noting the suspect was calm and responsive and did not appear confused); *Sanford*, 962 S.W.2d at 347 (noting the defendant initialed a waiver form and did not ask any questions about the form); Robinson v. United States, 928 A.2d 717 (D.C. 2007) (noting the defendant stated that he understood his rights, initialed a waiver form, and did not express confusion about his rights).

101. *See, e.g.*, U.S. v. Richardson, 265 F. App'x. 52, 56 (3rd Cir. 2008) (finding a valid waiver where the defendant had a low IQ and learning disabilities but had a variety of jobs and previous arrests); Smith v. Mullin, 379 F.3d 919, 933–34 (10th Cir. 2004) (finding a valid waiver where the defendant had the cognitive abilities of a twelve-year-old but had experience in the justice system); Henderson v. DeTella, 97 F.3d 942, 949 (7th Cir. 1996) (finding a valid waiver where a defendant had limited comprehension abilities but a significant criminal record); Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995) (finding a valid waiver where the defendant had an IQ of 68, but had numerous experiences with law enforcement and *Miranda* warnings).

102. Rogers et al., *supra* note 85, at 414–16.

103. Gideon v. Wainwright, 372 U.S. 335, 343–44 (1963) (incorporating the Sixth Amendment right to counsel to the states); Johnson v. Zerbst, 304 U.S. 458, 468–69 (1938) (discussing the entitlement to counsel in federal cases).

104. Strickland v. Washington, 466 U.S. 668, 684 (1984).

105. Mims, *supra* note 97, at 348.

106. Rothgery v. Gillespie, 554 U.S. 191, 217 (2008) (stating that pre-trial interrogations and other confrontations with the police are "critical stages" for the purpose of the Sixth Amendment right to counsel).

narrower than the right to counsel under *Miranda* and its progeny. Unlike under *Miranda*, the Sixth Amendment right to counsel applies to both custodial and non-custodial interrogations, but only attaches at the time of indictment,[107] and only applies where conviction will definitely result in actual imprisonment[108] or a suspended term of imprisonment.[109]

Once the accused invokes the Sixth Amendment right to assistance of counsel, agents of the state may not interrogate the defendant or "deliberately elicit" incriminating disclosures from the defendant unless the defendant has counsel present or validly waives this right.[110] When an indicted defendant is not in state custody, police and prosecutors may continually pressure him to answer questions without counsel present, provided that the defendant is informed of the right to counsel at each occasion.[111] To stop police questioning, the defendant must explicitly invoke the right to counsel at every confrontation.[112]

In order for a person to exercise the Sixth Amendment entitlement to counsel during questioning, the law therefore requires him to: (1) understand that the police are adversaries rather than allies, (2) understand that he has the right to an attorney during questioning, (3) understand the role and potential benefit of an attorney's presence, (4) withstand persistent police badgering to proceed without an attorney, and (5) clearly and firmly express his desire for an attorney. Together, these requirements entail a high level of perceptiveness, cognition, and memory – all of which may be undermined by mental disabilities.

The standards for a valid waiver of the Sixth Amendment right to counsel mirror those under *Miranda*.[113] Indeed, even after Sixth Amendment rights have attached, a waiver of *Miranda* rights suffices to demonstrate a valid waiver of the Sixth Amendment right to counsel.[114] As a result, similar problems arise for defendants with mental disabilities in both contexts. While the waiver must technically be knowing, intelligent, and voluntary, the court inquiry tends to focus on the voluntariness and only superficially address the person's comprehension.[115]

---

107. *Id.* at 213.

108. Argersinger v. Hamlin, 407 U.S. 25, 40 (1972).

109. Alabama v. Shelton, 535 U.S. 654, 674 (2002).

110. *See* Massiah, *supra* note 65 at 206.

111. Montejo v. Louisiana, 556 U.S. 778, 794–95 (2009).

112. *Id.*

113. Patterson v. Illinois, 487 U.S. 285, 291–92 (1988) (holding that a waiver must be given knowingly, intelligently, and voluntarily); *id.* at 297 (rejecting the notion that "the Sixth Amendment is 'superior' to the Fifth or that it should be 'more difficult' to waive"); Brewer v. Williams, 430 U.S. 387, 403 (1977) (holding that the State did not produce evidence to show a "knowing and intelligent waiver" of Sixth Amendment rights).

114. *Patterson*, 487 U.S. at 296–97.

115. Mims, *supra* note 97, at 356.

### C. *The Absence of Corrective Measures to Protect the Mentally Disabled*

False confessions are likely to result in wrongful convictions.[116] The American criminal justice system does not have adequate means to identify and counteract the effect of false confessions on investigators and finders of fact. The investigative process is unlikely to identify false confessions as such, in part due to confirmation bias by law enforcement. While the Fifth Amendment requires suppression of "involuntary" confessions, the voluntariness inquiry does not adequately protect persons with mental disabilities. As a result, once a false confession is made, it frequently devastates the case of the accused.

#### 1. Detection of False Confessions by Law Enforcement

Investigators who extract false confessions are not likely to identify them as such. Because accusatory interrogations generally occur when police already suspect culpability, confirmation bias often operates when a confession is made.[117] Moreover, research shows that investigators overestimate their ability to distinguish truth from fabrication.[118] Compared to laypeople, law enforcement personnel report greater confidence[119] and exhibit greater bias towards believing guilt,[120] but perform no better in distinguishing true and false confessions and only slightly better than chance.[121] These psychological factors work against investigators accurately identifying false confessions.

While the Reid Manual emphasizes the need for corroboration of confessions,[122] this corroboration may not consist of physical evidence or other independent proof of guilt.[123] Rather, corroboration frequently consists of details in the confession that correspond to the crime scene. The problem is that innocent suspects may actually have acquired – and internalized – this information from the police, media, or rumors.[124] Moreover, while consistencies between a confession and

---

116. Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C.L. REV. 891, 921–22 (2004) (explaining the disadvantages that mount from a false confession); *id.* at 995–96 (reporting that 81% of innocent defendants who made false confessions and took their cases to trial were convicted, regardless of the exculpatory evidence).

117. *See* Carole Hill et al., *The Role of Confirmation Bias in Suspect Interviews: A Systematic Evaluation*, 13 LEGAL & CRIMINOLOGICAL PSYCH. 357, 368 (2008); *see also* Saul M. Kassin et al., *"I'd Know a False Confession If I Saw One": A Comparative Study of College Students and Police Investigators*, 29 L. & HUM. BEHAV. 211, 218 (2005).

118. Kassin et al., *supra* note 117, at 218.

119. *See id.* at 212 (providing a compendium of studies on the ability of investigators to distinguish truth from deception).

120. *Id.* at 218.

121. *Id.* at 216.

122. Inbau et al., *supra* note 18, at 432.

123. *Id*. at 433.

124. Brandon L. Garrett, *Contaminated Confessions Revisited*, 101 VA. L. REV. 395, 408–10 (finding that 94% of false confessions made by DNA exonerees were contaminated with details that supposedly only the perpetrator would know).

crime scene are seen as ironclad proof, inconsistencies are often disregarded as deliberate fabrication, evasion, or faulty recollection by the suspect.[125]

Because of investigator biases and the frequent unavailability of independent corroboration, law enforcement is all too likely to interpret false confessions as reliable. Defendants who have made false confessions must therefore hope that the court will exclude their confession from evidence at trial.

### 2. Suppression of Involuntary Confessions

The due process clauses of the Fifth and Fourteenth Amendments prevent the admission into evidence of "involuntary" statements made by a defendant to law enforcement.[126] Because this standard requires a preliminary showing of objectively coercive behavior by law enforcement, it does not adequately protect persons with mental disabilities.[127]

In 1936, the voluntariness standard was introduced with the landmark decision in *Brown v. Mississippi*[128], which suppressed an uncorroborated confession elicited by police violence.[129] A decade later, the Court suppressed a confession procured through non-violent but still abusive methods,[130] reasoning that the American adversarial system of justice compels the state to prove its case through independent investigation, rather than compelling it from the suspect's mouth.[131] "Protracted, systematic and uncontrolled . . . interrogation . . . is subversive to the accusatorial system. It is the inquisitorial system without [that system's] safeguards."[132] Therefore, the Court declared, "a confession . . . must be the expression of free choice."[133]

This voluntariness test was further developed in two subsequent cases. In 1961, *Rogers v. Richmond* stated explicitly that confessions elicited by physical or

125. *See* Inbau et al., *supra* note 18, at 434 (explaining that guilty suspects may acknowledge their guilt but lie about details to conceal their true motivations for the crime); *id.* at 440 (explaining confessions may omit information in order to minimize moral guilt or due legitimate memory lapse caused by drugs, alcohol, or trauma).

126. The voluntariness standard developed as an interpretation of the due process clause because, at the time of the seminal cases, the Fifth Amendment's protection from compulsory self-incrimination applied only to federal criminal proceedings. *See* Brown v. Mississippi, 297 U.S. 278, 285 (1936); *see also* Malloy v. Hogan, 378 U.S. 1, 10 (1964) (holding that the Fourteenth Amendment prevents the states from abridging the Fifth Amendment protection from compulsory self-incrimination).

127. Daniel Harkins, *Revisiting* Colorado v. Connelly*: The Problem of False Confessions in the Twenty-First Century*, 37 S. ILL. U. L.J. 319, 329 (2013).

128. 297 U.S. 278 (1936).

129. *Id.* at 286 ("It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these petitioners, and the use of the confessions thus obtained as the basis for conviction and sentence was a clear denial of due process"). The accused, two black tenant farmers, confessed to murdering a white man after police brutally whipped them over the course of several days and repeatedly hung one suspect from a tree. *Id.* at 281–83. The confessions were the only evidence of culpability. *Id.* at 284.

130. Watts v. Indiana, 338 U.S. 49, 52–54 (1949) (holding that six days of nine-hour, nighttime interrogations were "so grave an abuse of the power of arrest as to offend the procedural standards of due process").

131. *Id.* at 54–55.

132. *Id.* at 55.

133. *Id.* at 53.

psychological coercion cannot stand regardless of their reliability[134] and that the reliability of a confession is not probative of its voluntariness.[135] The Court also stated the voluntariness test as whether "the behavior of the State's law enforcement officials was such as to overbear [the suspect's] will to resist" the interrogation.[136] This, in turn, depends on the "totality of the circumstances" of a given interrogation,[137] including its length and location.[138] The Court's 1986 decision in *Colorado v. Connelly* declared that a defendant must first show police impropriety in order to show that a confession was involuntary.[139] The *Connelly* defendant approached a police officer and, without prelude, confessed to a murder, provided specific details, and led police to the victim's body.[140] A psychiatrist testified that the defendant, a schizophrenic, had hallucinated a divine command to either confess or commit suicide.[141] The Court nevertheless deemed the confession admissible, holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"[142] and such coercion must be "causally related to the confession."[143]

The voluntariness test thus contains two distinct inquiries. First, there must be coercive overreach by law enforcement. Second, this coercion must overwhelm the suspect's ability to resist the interrogation. The preliminary showing of coercion depends on objective factors, such as the length, location, and other conditions of the interrogation, without regard to the defendant's mental capacity, limitations, and fragility.[144] "A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective."[145]

---

134. Rogers v. Richmond, 365 U.S. 534, 540–41 (1961) (explaining that coerced confessions are inadmissible "not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system–a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against the accused out of his own mouth").

135. *Id.* at 543–44.

136. *Id.* at 544.

137. Haynes v. Washington, 373 U.S. 503, 513 (1963).

138. *See, e.g.*, Mincey v. Arizona**,** 437 U.S. 385, 398–99 (1978) (considering that defendant was sedated in an intensive-care unit during the interrogation); Greenwald v. Wisconsin**,** 390 U.S. 519, 519–21 (1968) (considering that defendant was deprived of food, sleep, and medicine for over twelve hours).

139. Colorado v. Connelly, 479 U.S. 157, 167 (1986).

140. *Id.* at 160–61.

141. *Id.* at 161.

142. *Id.* at 167.

143. *Id.* at 164.

144. *See* United States v. Salameh, 152 F.3d 88, 117 (2nd Cir. 1998) (holding that while the defendant's alleged torture by Egyptian law enforcement immediately prior to his interrogation by US agents "would likely weaken one's mental state, one's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents of the United States engaged in some type of coercion"); United States v. Guerro, 983 F.2d 1001, 1003–04 (10th Cir. 1993) (reversing the suppression of a confession where the defendant was described by the trial court as "more suceptible to suggestion, intimidation – even though it may not have been overt – than any witness I have ever seen in my experience on the bench").

145. United States v. Chrismon, 965 F.2d 1465, 1469 (7th Cir. 1992) (regarding a defendant with low intelligence).

Case 1:26-cr-00001-AHA Document 102-3 Filed 09/29/26 Page 131 of 150



This two-part test provides insufficient protection to persons with mental disabilities. By requiring an objective showing of police coercion, it disregards the particular impact of conventional interrogation techniques on persons with mental disabilities.[146] For example, courts have generally accepted the use of deception and trickery by police during interrogation.[147] As described above, such methods put the mentally disabled at heightened risk of false confessions.[148]

The weakness of the voluntariness test is the final failure in a system that consistently overlooks the vulnerability of mentally disabled individuals. First, interrogation tactics exploit their suggestibility and other symptoms. Second, individuals with mental disabilities have more difficulty understanding and exercising their Constitutional rights. Finally, once mentally disabled persons falsely confess, the criminal justice system is ill equipped to protect them from the consequences. As a result of these factors, persons with mental disabilities are at a distinct disadvantage in the context of interrogation as compared to the non-disabled. The Americans with Disabilities Act exists precisely to remedy this type of disadvantage.

## II. The Americans with Disabilities Act as a Safeguard Against False Confessions

Title II of the Americans with Disabilities Act of 1990 ("ADA") has potential to protect persons with mental disabilities during police interrogation. The ADA is a sweeping statute with the objective of eliminating discrimination against the disabled; it requires public entities to "reasonably modify" their practices to prevent discrimination on the basis of disability.[149] While few courts have addressed the rights of mentally disabled persons in police interrogation under the ADA, this article concludes that the statute offers a plausible framework for meaningful protection.

### *A. Overview of the ADA and Title II*

The ADA was enacted as a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[150] It significantly expanded the protections of the Rehabilitation Act of 1973, which forbids discrimination on the basis of disability by federal executive agencies and federally financed programs and entities.[151] The ADA extended this prohibition to the realms of private employment, all government activities, public accommodations and commercial facilities, and telecommunications.[152]

146. Harkins, *supra* note 127, at 329–30; *see supra* Part IA.

147. Gohara, *supra* note 33, at 805 ("Few federal courts have circumscribed the use of specific deceptive interrogation techniques, and only in rare cases have federal courts deemed deceptive interrogation practices coercive.").

148. *Id.*

149. 42 U.S.C. § 12101(b)(1) (2009).

150. *Id.*

151. 29 U.S.C. § 794(a) (2014).

152. *See* Miranda Oshige McGowan, *Reconsidering the Americans with Disabilities Act*, 35 GA. L. REV. 27, 62 (2000) (comparing the approaches of the Rehabilitation Act and the ADA).

In the years following the ADA's passage, courts progressively narrowed the scope of its application, particularly the statutory definition of disability.[153] Two Supreme Court rulings created an "inappropriately high" standard for individuals to access the statutory protections.[154] In response, Congress passed the ADA Amendments Act of 2008 ("2008 Amendments") for the express purpose of restoring the original intent of the ADA.[155]

Title II of the ADA prohibits discrimination against or exclusion of persons with disabilities from the services, programs and activities of a public entity.[156] Public entities must reasonably modify their policies and practices to avoid discrimination, unless doing so would fundamentally alter the nature of the public activity.[157] The following sections examine whether Title II demands such modification of police interrogation practices for persons with mental disabilities and how such modifications might look in practice.

### *B. Is Modification of Police Interrogation Practices Required by Title II?*

Title II mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[158] Therefore, in order for Title II to require modification of police interrogation practices for the mentally disabled, the following must be true: (1) the interrogated person is a qualified individual with a disability; (2) police interrogation is an activity of a public entity; and (3) the individual under interrogation is denied the benefits of interrogation or otherwise faces discrimination in the course of interrogation as a result of the disability. Each component is addressed in turn below.

153. *See* Sutton v. United Air Lines, Inc., 527 U.S. 471, 481–82 (1999) (holding that the determination of whether an individual has a disability must consider the impact of corrective measures and that guidance to the contrary from the Equal Employment Opportunity Commission violated the plain language of the ADA) *superceded by statute*, ADA Amendment Acts of 2008. Pub. L. No. 110-325, Stat. 3553 (2008); Toyota Motor Mfg., , Inc. v. Williams, 534 U.S. 184, 185 (2002) (holding that an impairment that hinders the performance of manual tasks is only a disability if it is a "permanent or long term" and "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives").

154. *See* Sutton v. United Air Lines, Inc., 527 U.S. 471, 481–82 (1999) (holding that the determination of whether an individual has a disability must consider the impact of corrective measures and that guidance to the contrary from the Equal Employment Opportunity Commission violated the plain language of the ADA) *superceded by statute*, ADA Amendment Acts of 2008. Pub. L. No. 110-325, Stat. 3553 (2008); Toyota Motor Mfg., , Inc. v. Williams, 534 U.S. 184, 185 (2002) (holding that an impairment that hinders the performance of manual tasks is only a disability if it is a "permanent or long term" and "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives").;ADA Amendment Acts of 2008, Pub. L. No. 110-325, 112 Stat. 3553 (2008).

155. The ADA Amendments Act of 2008 is subtitled "An Act to restore the intent and protections of the Americans with Disabilities Act of 1990." Pub. L. No. 110-325, 112 Stat. 3553 (2008)

156. 42 U.S.C. § 12132 (1990).

157. 28 C.F.R. § 35.130(b)(7) (2011).

158. 42 U.S.C. § 12132 (1990).

1. Qualified Individual with a Disability

Title II only protects a "qualified individual with a disability."[159] The ADA defines this term as an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[160] This requirement therefore has two subparts: (1) the presence of a disability within the meaning of Title II, and (2) the eligibility of the individual to participate in police interrogation.

*a. Disabilities under the ADA*

The ADA's definition of disability spans a broad range of impairments.[161] A disability refers to "a physical or mental impairment that substantially limits one or more of the major life activities of [the sufferer]; a record of such an impairment; or being regarded as having such an impairment."[162] The regulations expressly include "any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, or specific learning disabilities" as well as drug addiction and alcoholism.[163] In addition to this expansive definition, the ADA's rules of construction require the term to be interpreted "in favor of broad coverage . . . to the maximum extent permitted [by the statute]".[164]

While encompassing a wide spectrum of conditions, the definition contains a severity requirement: the impairment must substantially limit a major life activity[165] such as caring for oneself, learning, reading, concentrating, thinking, communicating, or working.[166] Even this limiting language, however, must be interpreted in favor of broad coverage per the 2008 Amendments.[167] For example, the episodic nature of an impairment does not prevent it from constituting a disability if it meets the severity threshold when symptomatic.[168] Likewise, the substantial limitation inquiry may not consider any mitigation of symptoms achieved through medication, other assistive technology, or "learned behavioral or adaptive neurological modifications."[169]

*b. Eligibility for Interrogation*

In addition to the existence of a disability, Title II protection requires the person to otherwise meet the "essential eligibility requirements" to participate in the

159. *Id.*
160. *Id.* § 12131(2).
161. *Id.* § 12102(1)(A)–(C).
162. *Id.*
163. 28 C.F.R. § 35.104 (2011) (defining "disability").
164. 42 U.S.C. § 12102(4)(A) (2012).
165. *Id.* § 12102(1)(A).
166. *Id.* § 12102(2)(A).
167. *Id.* § 12102(4)(B).
168. *Id.* § 12102(4)(D).
169. *Id.* § 12102(4)(E)(i)(IV).

public entity's activity.[170] The Department of Justice's guidance on Title II states that the essential eligibility requirements may vary widely and in some cases be quite minimal.[171] For example, in cases where a public entity makes its service or activity available to all members of the public upon request, the only eligibility criterion is requesting access.[172]

In the case of an involuntary activity, such as arrest or imprisonment, the government may recognize eligibility simply by compelling the person's participation. For example, the Eighth Circuit considered a paraplegic's ADA claim regarding post-arrest transportation to the police station and determined that the plaintiff met the essential eligibility requirements simply by virtue of the arrest.[173] Applying this reasoning to police interrogation, which is frequently involuntary, the essential eligibility requirement is the mere fact of the interrogation. In certain cases, of course, an acute mental disability may render an individual incapable of responding intelligibly to questions. Law enforcement officers are unlikely to knowingly attempt interrogation of such individuals, who may reasonably be considered ineligible for police questioning and would therefore not require modification of interrogation practices. Short of this extreme circumstance, virtually all persons subject to interrogation, therefore, meet the eligibility requirements irrespective of any mental disability. As such, those with sufficiently severe mental disabilities are "qualified individual[s]" for Title II protection.

### 2. Activity of a Public Entity

The second statutory requirement of Title II is that police interrogation be an activity of a public entity.[174] The broad definition of "public entity" includes "any department, agency . . . or other instrumentality of a State or States or local government".[175] While few courts have addressed whether Title II applies to police interrogation specifically, the overwhelming weight of related case law supports this application.

The Supreme Court has held that Title II applies to correctional and other involuntary activities.[176] In *Pennsylvania. Dep't of Corr. v. Yeskey*, a state prisoner sued under the ADA after being excluded from a prison boot camp program due to his history of hypertension.[177] The state contended that the language of Title II, particularly the terms "eligibility" and "participation," connote *voluntary*

170. 28 C.F.R. § 35.104 (2012).

171. *Id.* § 35.104 app. B.

172. *Id.*; *see also* Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1195 (10th Cir. 2007) (deeming a deaf inmate eligible for phone services and televised circuit viewing of courtroom proceedings because such services are available to all inmates); Concerned Parents to Save Dreher Park Ctr. v. City of W. Palm Beach, 846 F. Supp. 986, 990 (S.D. Fla. 1994) (concluding that a city-sponsored recreation program had such a broad spectrum of activities and offerings that the only criterion for participation is a request to particpate).

173. Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998).

174. 42 U.S.C. § 12132.

175. 42 U.S.C. § 12131(1)(b) (2012).

176. Pennsylvania. Dep't of Corr. v. Yeskey, 524 U.S. 206, 211 (1998). Federal regulations issued by the Department of Justice in 2010 specifically provide for the application of Title II to detention and correctional activities. 28 C.F.R. § 35.152 (2012).

177. *Yeskey*, 524 U.S. at 208.

participation in the activity and therefore do not apply to prisoners held against their will.[178] The Court, however, rejected this interpretation and held that the voluntariness of participation is irrelevant to the application of Title II.[179] Expressing support for a liberal application of the ADA to public activities, Justice Scalia wrote for the majority, "the fact that the statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."[180] Lower courts, citing *Yeskey*, have applied Title II to a range of involuntary police activities. The Eighth Circuit concluded that transportation of an arrestee to the police station falls within the scope of the ADA.[181] A federal district court similarly held that Title II covers the apprehension by police of a bipolar man pursuant to an involuntary commitment order.[182] Likewise, at least two cases, explored in depth below, have specifically found that police interrogation comes within the scope of Title II.

The first case, *Calloway v. Boro of Glassboro Department of Police*,[183] dealt with interrogation at a police station.[184] In that case, Cora Calloway, a deaf and functionally illiterate woman, voluntarily went to her local police station to report a physical assault by her neighbor.[185] The neighbor, when questioned by police about the accusation, claimed that Calloway had assaulted the neighbor's child.[186] Unable to locate a sign language interpreter, the police officers proceeded to question Calloway with the assistance of an uncertified interpreter (an acquaintance of the sergeant).[187] Calloway subsequently sued and the court "express[ed] no hesitation in placing station-house investigative questioning, an 'ordinary operation of a public entity,' within the ambit of the [ADA]."[188]

In the second case, police went to the home of a deaf family in response to a 911 report of a domestic dispute.[189] The officers handcuffed Robert Seremeth, which prevented him from communicating in sign language or writing, and proceeded to wake and interview his four children without an interpreter.[190] Even though the sheriff's office had a contract for professional interpretation services, which would have provided a qualified interpreter within the hour, the responding officers instead opted to summon a fellow officer who was studying introductory sign language but lacked the requisite skills to communicate with the family.[191]

---

178. *Id.* at 211.

179. *Id.*

180. *Id.* at 212 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985).

181. Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998)912 (considering where a paraplegic sought damages for injuries he sustained while being transported in a police van that did not have wheelchair restraints).

182. Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 238 (M.D.Pa. 2003).

183. 89 F. Supp. 2d 543 (D.N.J. 2000).

184. *Id.* at 554.

185. *Id.* at 547.

186. *Id.*

187. *Id.* at 548.

188. *Id.* at 555.

189. Seremeth v. Bd. of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 335 (4th Cir. 2012).

190. *Id.*

191. *Id.* at 335–36.

Seremeth later sued and the Fourth Circuit determined that "in light of *Yeskey*'s expansive interpretation, the ADA applies to police interrogations"[192] and "the investigation of criminal conduct."[193]

### 3. Discrimination Due to Disability

The third prerequisite for modified services is that the disability causes the sufferer to be "denied the benefits" or otherwise discriminated against by the public entity.[194] There are strong arguments that mentally disabled individuals are both denied the benefits of interrogation and otherwise discriminated against in the interrogation context. As a preliminary matter, it is clear that interrogation has at least the potential to provide benefits to individuals. The police department in *Calloway* contended that investigative questioning does not come under the language of Title II because it confers no benefit on the suspect.[195] The district court rejected this argument, explaining that police questioning provides the clear benefit of an opportunity "to provide information to the police concerning the commission of crimes, whether in a witness or suspect capacity."[196] More specifically, it gives suspects an opportunity to assert one's innocence and provide exculpatory information.[197] A disability that impedes a suspect from taking advantage of these opportunities can therefore be said to deprive the suspect of the benefits of police questioning.

There is a second form of discrimination as well. Title II regulations specifically provide that, "[a] public entity may not . . . utilize criteria or methods of administration [of its programs] . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."[198] If the objective of interrogation, per the Reid Manual, is to learn the truth and secure justice, not elicit a confession,[199] then standard interrogation practices undermine this objective with respect to persons with mental disabilities.[200] For example, if the interrogation process manipulates a suspect into implicating himself (or an innocent third party) in a crime, the truth may go undiscovered and the perpetrator unpunished.

All the elements of Title II generally apply to police interrogation of individuals with mental disabilities who come under ADA protection, so long as the disability meets the severity threshold and they are capable of partaking in police questioning. It is also clear that police interrogation constitutes an activity of a public entity, despite the fact that participation is often mandatory. Finally, mental disabilities may deny sufferers the benefits of interrogation, such as the opportunity

192. *Id.* at 338.

193. *Id.* at 339.

194. 42 U.S.C. § 12132 (2014).

195. Calloway v. Boro of Glassboro Dep't of Police, 89 F. Supp. 2d 543, 555 (D.N.J. 2000).

196. *Id.* at 556.

197. Inbau et al., *supra* note 18, at 8 ("Unfortunately, there are occasions when an innocent suspect is interrogated, and only after the suspect has been accused of committing the crime will his or her innocence become apparent . . . based on his or her behavior or explanations. . . . ").

198. 28 C.F.R. § 35.130(b)(3)(ii) (2015).

199. Inbau et al., *supra* note 18, at 8.

200. *See supra* Part I.

to assert their innocence and provide exculpatory information, and undermine the truth-seeking purpose of interrogation. Having established that the statute protects persons with mental disabilities during interrogation, it is time to explore the substance of that protection.

### *C. Reasonable Modifications Generally*

Title II compels public entities to make reasonable modifications to their activities where necessary to avoid discrimination on the basis of disability, unless the modification would fundamentally alter the nature of the activity.[201] Such modifications must afford "meaningful access" to the public program.[202] This section first examines the meaning of reasonable modification before assessing specific modifications to interrogation practices.

Neither Title II nor its regulations define or otherwise elaborate upon the meaning of reasonable modification. Courts often turn to the provisions of the Rehabilitation Act and Title I of the ADA for guidance, since the requirement of reasonable modification generally mirrors the reasonable accommodation standard.[203] All sources agree that the reasonableness of a modification is a highly fact-specific inquiry.[204] Indeed, regulations under Title I state "it may be necessary . . . to initiate an informal, interactive process" with the disabled employee to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."[205] The Ninth Circuit has extended the interactive process requirement to public entities under Title II, obligating them to conduct an investigation and consult experts to determine appropriate accommodations.[206]

---

201. 28 C.F.R. § 35.130(b)(7) (2015).

202. Alexander v. Choate, 469 U.S. 287, 301 (1985) (holding that section 504 of the Rehabilitation Act "requires that an otherwise qualified handicapped individual be provided with meaningful access to the benefit" afforded others).

203. McGary v. City of Portland, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) (stating that reasonable accommodation under Title I and reasonable modification under Title II create identical standards); Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 775, 783 (7th Cir. 2002) (noting that the ADA and Rehabilitation Act have the same standards for reasonable accommodation); Staron v. McDonald's Corp., 51 F.3d 353, 355–56 (2nd Cir. 1995); Helen L. v. DiDario, 46 F.3d 325, 331 (3rd Cir. 1995) (stating that the ADA public entity provisions and regulations are patterned after those of the Rehabilitiation Act); *see also* Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 931 (8th Cir. 1994) (interpreting the reasonable modification standard with reference to Rehabilitation Act cases).

204. Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1085–86 (11th Cir. 2007) (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997)); Crowder v. Kitagawa, 81 F.3d 1480, 1485–86 (9th Cir. 1996) (citing the Rehabilitation Act case of *Chalk v. United States Dist. Court*, 840 F.2d 701, 705 (9th Cir. 1988)); *Staron*, 51 F.3d at 356.

205. 29 C.F.R. 1630.2(o)(3) (2015). Several circuits have interpreted this interactive process as mandatory for employers under certain circumstances. *See, e.g.* Jones v. United Parcel Serv., 214 F.3d 402, 408 (3rd Cir. 2000); Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 871 (6th Cir. 2007); Ballard v. Rubin, 284 F.3d 957, 960–64 (8th Cir. 2002).

206. Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001) (holding that a public entity "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation"); Wong v. Regents of the Univ. of California, 192 F.3d 807, 818 (9th Cir. 1999) ("Because the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards. As we have observed in

Despite the fact-intensive nature of the reasonableness determination, certain factors appear consistently in the case law. The first factor is the modification's practical burden on the public entity. In assessing the question of reasonable accommodation under the Rehabilitation Act in the employment context, the Supreme Court stated that accommodation is not reasonable if it causes "undue financial and administrative burdens."[207] Likewise, regulations under Title I of the ADA create an exception for "undue hardship," which it defines as "significant difficulty or expense." The regulations require difficulty and expense to be assessed in light of a non-exhaustive list of factors, including the net cost, overall financial resources of the covered entity, and the impact of the accommodation on the entity's ability to operate.[208] For example, if the public entity provides similarly modified services in other circumstances, they do not cause an undue burden under Title II.[209]

Another factor in determining reasonableness is whether the accommodation presents a health or safety risk to third parties. In the context of police activities, courts have regularly acknowledged a Title II exception for exigent circumstances.[210] A widely-cited Fifth Circuit opinion held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve suspects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."[211] In that case, law enforcement responded to a woman's emergency call requesting that her nephew be hospitalized for mental health treatment, as he was intoxicated, armed with a knife, and threatening suicide.[212] After unsuccessfully warning the suspect to disarm and stand down, an officer shot and wounded him.[213]

---

the employment context, 'mere[] speculat[ion] that a suggested accommodation is not feasible' falls short of the 'reasonable accommodation' requirement; the Acts create a 'duty to "gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary to enable [the individual to meet the standards in question]."'").

207. Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 287 n.17 (1987) (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412 (1979)).

208. 29 C.F.R. § 1630.2(p)(2) (2015).

209. *See* Soto v. City of Newark, 72 F. Supp. 2d 489, 496 (D.N.J. 1999) (concluding that it was not an undue hardship for a public facility to provide a sign-language interpreter for a wedding because the facility regularly provided interpreters for other events).

210. *See* Bahl v. Cty. of Ramsey, 695 F.3d 778, 785 (8th Cir. 2012) (finding that, in the matter of a deaf motorist questioned without an interpreter, public safety concerns rendered accommodation unreasonable); Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1086 (11th Cir. 2007) (waiting for an interpreter before questioning a motorist suspected of a DUI was unnecessary given the exigencies of the situation); *cf.* Waller *ex rel.* Estate of Hunt v. City of Danville, 556 F.3d 171, 175 (4th Cir. 2009) (declining to rule definitely on whether an "exigent circumstances" exception to the ADA exists and instead stating exigent circumstances help determine reasonableness). Courts also frequently cite the dicta of *Rosen v. Montgomery County Maryland*, 121 F.3d 154, 156–58 (4th Cir. 1997), to support the exigent circumstances exception. *See, e.g.* Bircoll v. Miami-Dade Cty., 410 F. Supp. 2d 1280, 1283–84 (S.D. Fla. 2006). In *Rosen*, a deaf plaintiff alleged violations of the ADA where arresting officers made no effort to communicate in writing and ignored his requests for an interpreter and a TTY telephone so he could contact his lawyer. 121 F.3d at 156. The *Rosen* court expounded at length upon the Title II, including the exigent circumstances exception, but ultimately resolved the case on the basis that the plaintiff had not claimed a legally congnizable injury. *See id.* at 158.

211. Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000).

212. *Id.* at 797.

213. *Id.*

The suspect sued under Title II of the ADA and Section 504 of the Rehabilitation Act.[214] While his claim failed due to exigent circumstances, the Fifth Circuit noted that, "once the area was secure there was no threat to human safety . . . [law enforcement officers] would have been under a duty to reasonably accommodate [the suspect's] disability . . . "[215] In *Calloway* and *Seremeth*, law enforcement claimed that the exigent circumstances exception applied to the interrogations. The *Calloway* court rejected this argument by distinguishing secure station house questioning from police operations in the field, where "well-established exigencies necessitate certain action for the protection of the public."[216] The *Seremeth* court similarly reasoned that because domestic disturbance calls are often dangerous, the officers were "obligated to assure themselves that no threat existed against them, Seremeth's children, or anyone else [by questioning the inhabitants]. . . . Moreover, the exigency justified keeping Seremeth handcuffed behind his back, as is standard procedure in dangerous situations."[217]

In addition to modifications that pose a practical burden or public safety risk, public entities need not implement modifications that would "fundamentally alter" the nature of the program.[218] Some courts consider this as part of the reasonableness analysis,[219] while others examine the question only after determining that the accommodation is reasonable.[220] The pivotal case on fundamental alterations is *PGA Tour, Inc. v. Martin*,[221] in which the Supreme Court considered whether allowing a professional golfer to use a golf cart rather than walk between shots would fundamentally alter the nature of the PGA Tour.[222] The Court held that it would not, because "the use of carts is not inconsistent with the fundamental character of golf, the essence of which has always been shotmaking."[223] The opinion explains that the walking requirement has changed over time and varies between tournaments, while the shotmaking feature has remained constant.[224] The operative principle, therefore, is that an accommodation does not fundamentally alter the activity if the alteration comports with how the same activity is conducted in other contexts.[225]

---

214. *Id.* at 797–98.

215. *Id.* at 802.

216. Calloway v. Boro of Glassboro Dep't of Police, 89 F. Supp. 2d 543, 555–556 (D.N.J. 2000).

217. Seremeth v. Bd. of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 340 (4th Cir. 2012).

218. 28 C.F.R. § 35.130(b)(7) (2011).

219. *See* Darian v. Univ. of Mass. Bos., 980 F. Supp. 77, 88 (D. Mass. 1997).

220. *See* Pathways Psychosocial v. Town of Leonardtown, 133 F. Supp. 2d 772, 789 (D. Md. 2001).

221. 532 U.S. 661 (2001).

222. *Id*. at 661; *but see* Falchenberg v. New York State Dept. of Educ., 338 F. App'x 11 (2nd Cir. 2009) (holding that the teaching student's request for a certification exam that would not require knowledge of spelling, puncutation, and other writing fundamentals would fundamentally alter the specific certification test, without discussing whether these elements are a fundamental part of teacher certification generally), *cert. denied*, 558 U.S. 1136 (2010); *Darian*, 980 F. Supp. at 88 (examining the impact of the accommodation with respect to the specific school's standards rather than educational programming generally).

223. *PGA Tour*, 532 U.S. at 663.

224. *Id.* at 683–85.

225. *See* Alboniga v. Sch. Bd. of Broward Cty., 87 F. Supp. 3d 1319, 1338 (S.D. Fla. 2015) (reasoning that a school board could not claim that allowing a service animal in the building fundamentally altered its activities when it had previously allowed a service animal on site without significant disruption).

Case 1:26-cr-00001-AHA Document 102-3 Filed 09/29/26 Page 140 of 150



Taken together, the rules and case law indicate that a modification is reasonable and required under Title II if: (1) it does not pose unreasonable financial or administrative burdens; (2) it does not pose an immediate health or safety risk to others, and (3) it is already incorporated into the activity in certain contexts. The next section applies these standards to potential modifications of police interrogation practices in order to protect persons with mental disabilities.

### D. *Modifications to Police Interrogation for the Mentally Disabled*

Experts have suggested a range of modifications to reduce the risk of false confessions, particularly for vulnerable populations such as the mentally disabled.[226] These suggestions include the mandatory presence of counsel or another professional advocate, and police training in and application of appropriate questioning practices for vulnerable populations.[227] These recommendations would significantly alleviate discrimination without imposing undue hardship on law enforcement or fundamentally altering the nature of interrogation. Before exploring whether they constitute reasonable modifications, it is appropriate to first examine the only major case to date that has addressed reasonable accommodation in this context.

#### 1. *Folkerts v. City of Waverly*, Iowa

Travis Folkerts, a 33-year-old man with a severe intellectual disability, was interrogated over allegations of lascivious conduct with a minor.[228] The investigating officer, aware of Folkerts's disability though not the full extent of his limitations, "more fully explained" his Miranda rights and interrogated him in a conference room rather than the station's regular interrogation room.[229] The officer estimated that he asked ten non-leading questions, "because it seemed apparent that it would be easy to get [Folkerts] to say something that he did not do." [230] At some point during the encounter, Folkerts asked the officer to call his mother/guardian.[231] After Folkerts told his mother that he was nervous, she asked the officer if he wanted her to come to the station, noting that her presence might make her son even more nervous.[232] The officer told the mother he would rather she not be there if it would just cause her son to be more nervous.[233] Folkerts's mother later claimed that the officer never informed her that her son was in legal trouble or undergoing interrogation.[234]

Folkerts' guardians later filed a variety of claims against the city and investigating officer, including a claim alleging failure to make reasonable accommodations under [Title II].[235] The trial court declined to decide whether the ADA applied to the interrogation, but stated that "any burden to provide reasonable

226. Kassin et al., *supra* note 16, at 25–30.
227. *Id*. at 30–31.
228. Folkerts v. City of Waverly, 707 F.3d 975, 979–80 (8th Cir. 2013).
229. *Id.* at 979.
230. *Id.*
231. *Id.*
232. *Id.*
233. *Id.*
234. *Id.* at 979–80.
235. *See id.* at 979–80..

accommodation was made," particularly by the phone call to Folkerts' mother/guardian.[236] Summary judgment was granted in favor of the defendants. The Eighth Circuit affirmed, finding that:

> no reasonable jury could conclude that the defendants failed to make reasonable accommodations for Travis's disability. [The investigator] altered his questioning style, more fully explained the *Miranda* rights, interviewed Travis in a less intimidating room, drove Travis to his parents' home and explained the situation to them, and arranged alternative and friendlier booking procedures. The dispositive accommodation [was the] phone call to [Folkerts' mother/guardian]. [237]

The *Folkerts* courts identified two potentially effective modifications: (1) tempering the mode of interrogation and (2) involving a third-party advocate for a disabled person. Both approaches have potential to offset the disadvantages faced by the mentally disabled during interrogation. In Folkerts' case, the tempered mode of questioning provides the stronger argument that the investigator accommodated Folkerts' disability. Conversely, the court's conclusions regarding the investigator's call to Folkerts' mother are untethered from both the purpose of Title II and the evidence regarding interrogation of the mentally disabled. The purpose of Title II is to eliminate discrimination by actually accommodating the disability, but the *Folkerts* courts appear content to assess the effort level put forth by the public entity. The Eighth Circuit reasoned that calling Folkerts' mother/guardian was a "dispositive accommodation."[238] While it may have been a commendable effort by the officer, it did not provide Folkerts with any meaningful assistance, in part because his mother did not understand the situation.[239] It is the equivalent of a public entity expending great effort – but failing – to build an access ramp for a wheelchair-bound individual. Moreover, even if Folkerts' mother had been present, the existing evidence reveals that the presence of a relative is generally ineffective in assisting the person under interrogation.[240] This is akin to providing an access ramp that does not generally support wheelchairs.

The following sections explore two possibilities for meaningful accommodations: (1) the presence of counsel or other professional advocate, and (2) training in and application of appropriate questioning practices for vulnerable populations.

236. Folkerts v. City of Waverly, No. 10–cv–2041 EJM, 2011 WL 6328681, at *5 (N.D. Iowa Dec. 16, 2011).

237. *Folkerts*, 707 F.3d at 984.

238. *Id*.

239. The Eighth Circuit opinion in particular seems to take the position that the mother/guardian should have inferred that her son was under suspicion and interrogation by virtue of the fact that he was at the police station and "nervous." Yet Folkerts could have been at the police station in the capacity of a crime victim, witness, or simply someone who appeared in need of assistance. These scenarios are particularly plausible for severely disabled individuals, who have a disproportionate amount of contact with police, and would have reasonably made Folkerts nervous. *See* Follette et al., *nfra* note 275, at 44.

240. *Kassin et al., supra* note 16, at 30.

2. Mandatory Presence of Counsel or Other Professional Advocate

The most effective modification would likely be the mandatory presence of counsel during interrogation. As Chief Justice Warren wrote in *Miranda*, "with a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial."[241] Counsel can intervene to stop questioning if it becomes manipulative and advise the suspect to remain silent rather than confess.

The presence of counsel meets all of the standards of reasonableness previously discussed. With respect to the practical burden, this modification would not require the police to provide or pay an attorney. Indeed, this would subvert the very purpose of the modification, which is to provide an advocate for the person under interrogation. Rather, the modification would simply require the police to refrain from interrogation until counsel can be retained or the individual becomes constitutionally entitled to free counsel upon indictment.[242] If an exigent circumstance exists – such as a missing person or ticking bomb – then the police could proceed without counsel.

In general, there is no undue hardship or fundamental alteration to the activity if the public entity regularly provides or allows the accommodation in other circumstances not involving a disability. It is difficult to imagine a case where this is truer than the presence of counsel during interrogation. First, and most obviously, interrogation occurs in the presence of counsel whenever the suspect invokes his or her constitutional right to have counsel present. In addition, a number of states have either rules of evidence or child-protection laws that prohibit interrogation of children without the presence of counsel or a parent/guardian.[243]

A less protective version of this modification would be to mandate the presence of any trained, professional advocate, such as a mental health practitioner. Studies show that mandating the presence of nonprofessionals, such as relatives, is generally ineffective in protecting the person under interrogation. Such individuals tend to behave passively and encourage cooperation with the authorities.[244] Researchers have observed this both in the U.S., where some state laws require the presence of a parent during the interrogation of a juvenile, as well as in the United Kingdom, where the law requires the presence of an "appropriate adult" during

241. Miranda v. Arizona 384 U.S at 470 (1966) (citing *Crooker v. State of California*, 357 U.S. 433, 443–48 (1958) (Douglas, J., dissenting)).

242. *See supra* Part I. Subsection B.

243. *See, e.g.,* W. VA. CODE § 49-4-701(l) (2016) (statements by juveniles under fourteen to law enforcement are not admissible unless made in the presence of counsel; statements by juveniles over fourteen but under sixteen are not admissible unless made in the presence of counsel or the juvenile's parent or guardian.").; 705 ILL. COMP. STAT. ANN. 405/5-170(a) (2012) (juveniles under thirteen at the time of the act of which they are accused may not be questioned about certain crimes except in the presence of counsel); COLO. REV. STAT. 19-2-511(1) (1997) (statements by juveniles in custody are inadmissible unless made in the presence of counsel or a parent or guardian advised of the juvenile's rights).

244. Kassin et al *supra* note 16, at 30.

interrogation of persons with mental disabilities.[245] The presence of counsel or another professional advocate is thus necessary to offset the disadvantages faced by the mentally disabled during interrogation.

3. Police Training in and Application of Modified Questioning Practices

The guilt-presumptive, confrontational, and deceptive nature of interrogation practices increases the vulnerability of the mentally disabled and makes false confessions more likely. Training in and application of alternative questioning techniques may reduce this risk, particularly if it focuses "not only on the limits of human lie detection, false confessions, and the perils of confirmation biases – but on the added risks to individuals who are . . . mentally retarded, psychologically disordered, or in other ways vulnerable to manipulation."[246] Specific modifications may include limiting the duration of interrogations,[247] and avoiding false evidence ploys and "minimization" tactics that normalize the crime and imply leniency.[248]

Applying such modifications would not burden law enforcement by reducing the effectiveness of interrogation.[249] A variety of jurisdictions have implemented reforms to reduce the deceptive and psychologically coercive aspects of interrogation.[250] In 1984, the British Parliament enacted the Police and Criminal Evidence (PACE) Act after a spate of high-profile false confession cases.[251] PACE introduced safeguards such as audio and/or video recording of interrogations,[252] mandated breaks for food[253] and rest,[254] and placed an affirmative burden of proof on law enforcement to show beyond a reasonable doubt that confessions were not obtained by "oppression" or "in consequence of anything said or done which was likely . . . to render [the confession] unreliable. . . . "[255] In the early 1990s, the Home Office developed an interviewing model called PEACE,[256] which "abandons the

245. *Id.*; [INSTITUIONAL AUTHOR] Police and Criminal Evidence Act, Code of Practice C, §1.7(b) (1984) (Eng.) [hereinafter Code C] (an "appropriate adult" can be (1) a relative, guardian or other person responsible for the suspect's care, (2) someone "experienced in dealing with mentally disordered or mentally vulnerable people but who is not . . . employed by the police", or (3) if these options are unavailable, any "responsible" adult not employed by the police); *Id.* § 11.17 (the observed inefficacy of this statute is particularly notable because the interrogator must inform the "appropriate adult" that they are not expected merely to observe, but to advise the suspect, observe that the questioning is conducted properly and fairly, and facilitate communication with the suspect).

246. *Kassin et al., supra* note 16, at 30.

247. *Id.*, at 28 (suggesting that in proven false confession cases, the average interrogation lasted over sixteen hours).

248. *Id.* at 28–30.

249. *Id.* at 27–28.

250. *Id.*

251. Philip S. Gutierrez, *You Have the Right to [Plead Guilty]: How We Can Stop Police Interrogators from Inducing False Confessions*, 20 S. CAL. REV. L. & SOC. JUST. 317, 346 (2011).

252. *See* POLICE AND CRIMINAL EVIDENCE ACT, CODE OF PRACTICE E (1984) (Eng.).

253. Code C § 12.8.

254. *Id.* § 12.2.

255. Police and Criminal Evidence Act, §76(2) (1984) (Eng.).

256. Christian A. Meissner et al., *Accusatorial and Information-Gathering Interrogation Methods and Their Effects on True and False Confessions: A Meta-Analytic Review*, 10 J. EXP. CRIMINOLOGY 459, 463 (2014) (indicating PEACE is an acronym for Preparation and Planning, Engage and Explain, Account, Closure, and Evaluate).

accusatory confrontational approach and its use of trickery and deceit, and instead employs a less oppressive approach for interviewing suspects, which asks them what happened rather than asking them to confess."[257] Investigators are prohibited from deceiving suspects.[258] The use of psychologically manipulative tactics fell "without a corresponding decline in confession rates."[259] Confessions are also more likely to be truthful than those elicited by accusatorial, deceptive techniques.[260] New Zealand and Norway have also adopted the PEACE approach as national policy.[261]

Electronic recording of interrogations is a vital component of this modification. It provides judges with an objective and accurate account of the interrogation from which to determine whether the investigator used appropriate techniques.[262] Such a record is particularly crucial for interrogations of mentally disabled individuals, who may have difficulty recalling or articulating the sequence of events, leaving the judge only with the interrogator's perspective. As of August 2015, fourteen states and the District of Columbia had adopted legislation mandating the electronic recording of interrogations,[263] demonstrating that this is neither unduly burdensome nor a fundamental alteration to police practices.

The modifications explored in this section are not the only possibilities under Title II. In the absence of a specific request for a particular modification, public entities generally have discretion regarding how they ensure that persons with disabilities have meaningful access to their programs.[264] As *Folkerts* demonstrates, courts have largely unfettered discretion in reviewing the adequacy of such modifications in the context of interrogation. It is the position of this article that such discretion should be guided and tempered by the considerable body of evidence regarding the susceptibility of persons with mental disabilities to false confessions. The Department of Justice could advance this cause by issuing evidence-based guidance on reasonable modifications for interrogations of the mentally disabled. Establishing a baseline for how to accommodate persons with mental disabilities during interrogation would assist both police in fashioning modifications and courts in assessing the adequacy of such modifications.

### III. Limitations and Reforms

This section discusses two significant limitations to the ADA's potential to protect persons with mental disabilities from making false confessions. First, as

257. Gutierrez, *supra* note 251, at 347.

258. Meissner et. al, *supra* note 256, at 463.

259. Kassin et al., *supra* note 16, at 27.

260. Meissner et al., *supra* note 257, at 481 (finding that information-gathering interrogation approaches "showed superior diagnosticity by significantly increasing the elicitation of true confessions and significantly reducing the incidence of false confessions" compared to accusatorial approaches).

261. Kassin et al., *supra* note 16, at 28.

262. *See False Confessions & Recording of Custodial Interrogations*, INNOCENCE PROJECT, http://www.innocenceproject.org/free-innocent/improve-the-law/fact-sheets/false-confessions-recording-of-custodial-interrogations (last visited Sept.. 15, 2016).

263. *Id.* The states are Connecticut, Illinois, Maine, Maryland, Michigan, Missouri, Montana, Nebraska, New Mexico, North Carolina, Ohio, Oregon, Vermont, and Wisconsin.

264. *See* Seremeth v. Bd. of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 340-341 (4th Cir. 2012) (stating that reasonable modifications need not represent "best practices").

discussed above, is the question of when the obligation to provide reasonable modification is triggered. Second, the remedies available under the ADA may provide little practical help to someone who has falsely confessed during an interrogation that was conducted in violation of the ADA.

### *A. Determining the Trigger for Modification*

Authorities generally agree that a public entity only needs to provide reasonable modification when it has knowledge of the disability and need for accommodation.[265] Some courts have gone farther and held that only a direct request for accommodation triggers the legal obligation.[266] In either case, the nature of mental disabilities may undermine the ability of sufferers to access modified interrogation practices.

Title II and its regulations do not specify the level of knowledge that a public entity must have of a disability in order to trigger the reasonable modification requirement. In the absence of such a directive, there are three options for trigger points: (1) when the public entity receives a request for accommodation, (2) when the public entity has actual knowledge of the disability and need for accommodation, and (3) when the public entity has constructive knowledge of the disability and need for accommodation.

In general, the Eleventh Circuit has taken the most restrictive approach to the trigger question,[267] holding in *Rylee v. Chapman* that "the [public entity's] duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation."[268] Yet a closer reading of the case suggests more nuance than the foregoing statement suggests. The *Rylee* plaintiff claimed that law enforcement failed to accommodate his hearing impairment by providing an interpreter during his arrest, booking, interrogation, and initial hearing.[269] The court, in dismissing the claim, continually reiterates not only that there was no request, but also that the police had no reason to believe accommodation was necessary.[270]

---

265. *See* Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1196 (10th Cir. 2007); Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999) (noting that "public entities are not required to guess at what accommodations they should provide").

266. *See* Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009).

267. *See* id.; Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) (holding that an employee could not establish a claim for failure to accommodate because she did not make a "specific demand" for accommodation); Wood v. President and Trustees of Spring Hill Coll. in City of Mobile, 978 F.2d 1214, 1222 (11th Cir. 1992) (finding that, in a case brought under the Rehabilitation Act, any error in jury instructions regarding reasonable accommodation was harmless because the schizophrenic plaintiff never alleged that she asked her college for accommodation; thus, "it is clear that reasonable accommodation was simply not an issue in this case.").

268. *Rylee*, 316 F. App'x at 906.

269. *Id.* at 902–903.

270. *Id.* at 906 (noting that Rylee's wife had informed the 911 operator that her husband could read lips; that there was no evidence that the arresting deputies believed he could not read lips; that upon his arrival at the station house, Rylee was asked if he could read lips by the booking officer and responded affirmatively; that during his interrogation, the investigating officer wrote down his questions after verifying that the man could read and write; and that at his subsequent court appearance, he had his uncle present as an interpreter and thus did not need a court-provided interpreter).

Most authorities, in contrast, take the position that knowledge is sufficient to trigger the ADA requirements. In the employment context, the Equal Employment Opportunity Commission has issued official guidance indicating that constructive knowledge[271] of an employee's need for accommodation is sufficient to trigger the employer's obligation under Title I if the employer also knows or should know that the disability prevents the employee from requesting accommodation.[272]

Likewise, several circuits have held that a specific request is unnecessary if the disability is already known, either because the disability is obvious or because the disabled individual or a third party has informed the public entity. [273] A public entity must also have knowledge that the disabled individual requires accommodation.[274] While this knowledge typically arises from the individual's request for accommodation, it may also be self-evident due to the nature of the disability.[275] For example, the Tenth Circuit found a triable issue of fact as to whether law enforcement officers knew that a functionally deaf man required accommodation based upon the discovery of cochlear implant batteries in his possession.[276] The general rule, therefore, is that authorities must accommodate when the disability is obvious or disclosed, regardless of whether disclosure took the form of a formal request.

This jurisprudence raises important issues for persons with mental disabilities. First, the existence, nature, and extent of mental disabilities are often not "obvious." Some symptoms of mental disability, such as confusion, nervousness, and poor verbal skills, overlap with behaviors that non-disabled individuals may exhibit when subjected to the stressful and disorienting experience of police interrogation.[277] Second, many individuals with severe mental disabilities are unaware of or unable to articulate their impairment.[278] Finally, individuals may be

---

271. "Constructive knowledge" refers to "knowledge that one using reasonable care or diligence should have." *Constructive Knowledge*, BLACK'S LAW DICTIONARY (10th ed. 2014).

272. U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOCCM S 902 INTRO., ENFORCEMENT GUIDELINES: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT (2002).

273. Robertson, 500 F.3d at 1196-97 (applying the jurisprudence of Title I claims, which hold that an employee must disclose non-obvious disabilities to the employer in order to trigger the right to reasonable accommodation, to Title II cases involving public entities); Chisolm v. McManimon, 275 F.3d 315, 330 (3rd Cir. 2001); Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2nd Cir. 2008) (holding that an employer has a duty to accommodate an obvious disability, in a Title I employment context); *See* Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 283 (1st Cir. 2006) ("[S]ometimes the [person]'s need for an accommodation will be obvious; and in such cases, different rules may apply.")

274. *Robertson*, 500 F.3d at 1197 (citing *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 164 (5th Cir. 1996)).

275. *Robertson*, 500 F.3d at 1197; *Kiman*, 451 F.3d at 283.

276. *Robertson*, 500 F.3d at 1196–97.

277. INBAU ET AL., *supra* note 18, at 158–59 (describing common behaviors of both truthful and deceptive suspects); William C. Follette, Deborah Davis & Richard A. Leo, *Mental Health Status and Vulnerability to Police Interrogation Tactics*, 22 CRIM. JUST. 42, 44 (2007).

278. Lisette van der Meer et al., *Insight in Schizophrenia: Involvement of Self-Reflection Networks?*, 39 SCHIZOPHRENIA BULL. 1352, 1352 (2013) (weakinsight is a common feature of psychotic disorders and correlates with poor prognosis); Tania M. Lincoln et al., *Correlates and Long-Term Consequences of Poor Insight in Patients with Schizophrenia. A Systematic Review*, 33 SCHIZOPHRENIA BULL. 1324, 1324

reluctant to disclose their disability to police, either because mental disabilities are often characterized by problems with assertiveness or because they do not realize the potential benefit of disclosure.[279] Indeed, they may expect disclosure to result in mistreatment.

On the other hand, the actual or constructive knowledge standard would likely result in ADA coverage in egregious cases. Brendan Dassey, for example, attended special education classes and the interrogators felt compelled to verify that he, at the age of sixteen, understood the difference between truth and a lie.[280] Likewise, schizophrenic Eddie Joe Lloyd was institutionalized in a mental hospital at the time of his interrogation.[281] In such cases, interrogators have constructive if not actual knowledge of the disability. Department of Justice regulations could assist in clarifying the knowledge standard. The first step would be to indicate that constructive knowledge suffices to trigger the Title II obligation in the case of mental disability – particularly for involuntary activities. Regulations could also require police, when there is reason to believe that the suspect suffers from a mental disability, to undertake some inquiry to determine the severity. These reforms would facilitate broader coverage of Title II's protections for persons with mental disabilities in a context where the consequences of non-accommodation are potentially devastating to both the individual and the cause of justice.

### *B. Finding an Adequate Remedy for Violations*

Another limitation is that remedies available under the ADA are unlikely to repair the potentially catastrophic consequences of a false confession. If a mentally disabled person undergoes an interrogation that violates the ADA, Title II may allow the person to vindicate their rights through a lawsuit for compensatory damages and/or injunctive relief,[282] but there are several limits to the practical availability and usefulness of such remedies.

Compensatory damages, including damages for pain and suffering, are generally available to victims of ADA violations. However, if the violator is a State (as opposed to a municipality or county), the Eleventh Amendment may preclude

(2007) (indicating between 50% and 80% of schizophrenia sufferers partially or totally lack insight into their condition).

279. Morgan Cloud et al., *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. CHI. L. REV. 495, 513–14 (2002) (explaining that many mentally retarded individuals become adept at concealing their disability).

280. Interview of Brendan Dassey by Calumet County Sheriff's Department Investigator Mark Wiegert, at Two Rivers Police Dept.(Mar. 24, 2006).

281. Wilgoren, *supra* note 51.

282. 42 U.S.C. § 12133 (2012) (entitling victims of Title II violations to the same sources of redress available under Section 794a of the Rehabilitation Act, which ban disability discrimination in federally funded programs); 29 U.S.C. § 794a(a)(2) (2012) (entitling victims of Rehabilitation Act violations to the same remedies available under Title VI of the Civil Rights Act of 1964, which bans racial discrimination in federally funded programs); Cannon v. Univ. of Chi., 441 U.S. 677, 703 (1979) (finding an implied private right of action under Title VI); Franklin v. Gwinnett Cty. Pub. Schs., 503 U.S. 60, 70–71 (1992) ("[A]bsent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute."); *C.f.* Barnes v. Gorman, 536 U.S. 181, 189 (2002) (indicating punitive damages may not be awarded in suits under § 202 of the ADA and § 504 of the Rehabilitation Act).

monetary damages under Title II.[283] More crucially, the possibility of damages will neither deter nor remedy violations. Deterrence is unlikely because the individual investigators generally have no personal liability.[284] Damages are also of limited assistance to someone who has been convicted and imprisoned due to a false confession arising from an ADA-violating interrogation.[285]

Injunctive relief is a "drastic and extraordinary remedy, which should not be granted as a matter of course."[286] When a statute such as the ADA provides for equitable remedies, the seeker of an injunction must show that (1) he has (or is likely to) prevail on the merits, (2) he has (or is likely to) suffer irreparable harm in the absence of an injunction, (3) the balance of equities is in his favor, and (4) the injunction serves (or does not disserve, in the case of a permanent injunction) the public interest. [287] For a permanent injunction, one must also show the insufficiency of monetary damages and other remedies at law.[288] Theoretically, a mentally disabled criminal defendant could seek an injunction to prevent the evidentiary use of a confession that was obtained in violation of the ADA. The hurdles would be high, however. It would be particularly difficult to show the likelihood of success on the merits in the absence of significant case law in this area, and convince a court to disregard the risk of a guilty person going free as a result of the injunction.

Is there any effective remedy? There are two possible avenues to suppress the confession at trial. The first is through state exclusionary rules. While the Court-created exclusionary rule only applies to confessions obtained in violation of the Constitution and not federal statutes such as the ADA, state rules are sometimes broader. For example, the Texas Code of Criminal Procedure expressly forbids admission of any evidence obtained in violation of federal statutes.[289] Other states, such as Pennsylvania and Arkansas, do not expressly preclude admission based on federal statutory violations, but contain general exclusionary language that may cover ADA violations.[290] Such rules may ultimately prove to be effective remedies for Title II violations. A second possibility is to leverage the ADA violation in order to suppress the confession as involuntary. While the voluntariness test does not

283. Tennessee v. Lane, 541 U.S. 509, 531 (2004) (finding that Title II valid abrogated immunity with respect to lawsuits specifically concerning access to courts and judicial services); United States v. Georgia, 546 U.S. 151, 159 (2006) (holding that a prisoner could seek damages from the state for ADA violations to the extent that his claims alleged independent violations of the Constitution, but leaving unsettled the permissibility of claims alleging Title II violations that are not also Constitutional violations); *see* U.S. CONST. amend. XI (shielding states from private lawsuits by citizens unless the state waives or Congress validly abrogates sovereign immunity).

284. Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc); *see also* Miller v. King, 384 F.3d 1248, 1277 (11th Cir. 2004).

285. *See* Nancy Leong & Aaron Belzer, *Enforcing Rights*, 62 UCLA L. REV. 306, 348-49 (2015).

286. Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165 (2010).

287. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (setting forth the requirements for a preliminary injunction); eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (articulating the four-factor balancing test for a permanent injunction).

288. *eBay*, 547 U.S. at 391.

289. 1966 Tex. Crim. Stat. 38.23.

290. Pa.R.Crim.P. 581 (suppressing evidence obtained "in violation of the defendant's rights"); Ark. R. Crim. P. 16.2 (forbidding the admission of "illegally obtained" evidence if "the violation upon which it is based is substantial").

reliably protect the mentally disabled because it requires a preliminary showing of objectively coercive police behavior,[291] the defendant could argue that the ADA violation constitutes the necessary coercion. With the coercion prong thus satisfied, the court would then consider the mental disability as a factor in its analysis of whether to suppress the confession.

## CONCLUSION

As Brendan Dassey completes his eleventh year in prison, it bears consideration on how the application of Title II during his interrogation might have affected his fate. Dassey's enrollment in special education classes provided at least constructive knowledge that he suffers from a mental impairment that substantially affects his ability to learn, but it did not preclude him entirely from participating in police questioning.[292] Dassey thus met the definition of a qualified person with a disability. Since there were no exigent circumstances at the time of his interrogation(s), this article posits that the Sheriff's Department should have desisted until counsel was present or altered the manner of questioning to be less manipulative. If the former had occurred, Dassey likely would not have confessed at all, forcing the government to "produce the evidence against him by its own independent labors. . . . "[293] If the latter had occurred, there would likely be more confidence in the veracity of any confession Dassey might have made.

Similarly, Eddie Joe Lloyd may have avoided seventeen years imprisonment if the ADA had been applied to his interrogation. Lloyd's residence at a psychiatric facility provided at least constructive knowledge to police that he suffered a serious mental disability that impeded his ability to care for himself, entitling him to modifications under Title II. Requiring the presence of an attorney would, again, likely have prevented any confession at all, either because no questioning would have occurred or because an attorney would have disabused Lloyd of his delusions about the likely use of a confession. Alternatively, a modified questioning approach would have, at a minimum, created an electronic record of the entire encounter and alerted finders of fact to Lloyd's motivation for the confession.

Because the impact of false confessions can be so singularly devastating for suspects, sufficient protections must be available to mitigate the acute vulnerability of persons with mental disabilities. While Constitutional safeguards offer the optimal remedy for exclusion of confessions from evidence, they do not reliably protect the mentally disabled due to (1) an impaired understanding of rights, (2) an impaired ability to exercise rights, and (3) insufficient judicial consideration of mental disabilities in suppression proceedings and decisions. While criminal justice

291. Colorado v. Connelly, 479 U.S. 157,167 (1986).

292. Dassey's participation in special education programs means that he was determined to be an eligible "child with a disability" under Wisconsin law. W.S.A. § 115.782(3); Wis. Adm. Code § PI 11.35(2). Under the state's special education eligibility criteria, a child has an intellectual disability if he has an intelligence test score of two or more standard deviations below the mean as well as "significant limitations in adaptive behavior." Wis. Adm. Code § PI 11.36(1)(b). This is substantially similar to the DSM definition and the criteria cited in the EEOC's informal guidance on intellectual disabilities. *Infra* note 45. Because Dassey had been deemed eligible for special education under Wisconsin law, he would likely be considered an individual with a disability for ADA Title II purposes.

293. Miranda v. Arizona, 384 U.S. 436, 460 (1966).

reformers seek legislative change on the state level, such as mandatory electronic recording of confessions, the ADA provides an existing fifty-state framework for meaningful protection. Widespread and meaningful implementation of this framework will likely require the Department of Justice to issue standards clarifying that law enforcement must reasonably modify interrogation practices when there is constructive knowledge that a suspect has a mental disability, along with evidence-based standards for such modification. Such action is appropriate in order to protect persons with mental disabilities from the catastrophic and pronounced risk of false confessions.