LITSON

John R. Glover
615.985.8187
jr@litson.co

July 8, 2026

Stuart Allen
Assistant United States Attorney
United States Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Stuart.Allen@usdoj.gov

**Re: *United States v. Brian Cole, Jr.*, No. 26-cr-0001 (AHA)**
**Discovery Deficiencies and Request for Supplementation**

Dear Mr. Allen:

We write on behalf of defendant Brian J. Cole, Jr. concerning the government's discovery obligations under Federal Rule of Criminal Procedure 16, *Brady v. Maryland*, *Giglio v. United States*, and the Court's Protective Order (ECF No. 12). Having reviewed the productions to date, including the supplemental production accompanying your June 30, 2026 letter, the defense has identified materials that were not produced, were produced only in derivative or summary form, or are referenced in the file but not provided. The items below are material to the preparation of the defense within the meaning of Rule 16(a)(1)(E), and several fall within the government's disclosure obligations under *Brady* and its progeny.

We recognize that the government has made substantial productions, so it is possible that some of these materials have already been produced in a form we have been unable to identify within the volume of documents produced. If any of the materials below have already been produced, we request that you identify the production in which they were included, together with the file name and Bates number.

We ask that the government supplement its production as set out below, or state its position as to each item, within twenty-one (21) days, so that the parties may confer before the defense seeks relief from the Court.

## 1. Cell-Site Data and 2025 Re-Analysis

a. The 2025 re-analysis record: the EC, 302, and/or FD-1057 documenting the November 2025 identification of Mr. Cole, including what was re-examined and how Mr. Cole was connected to the January 5 data.

b. The custom decoding program written to decode the T-Mobile data — the "new computer program" publicly described as the breakthrough that led to Mr. Cole's identification: the source code, build and version history, documentation, and validation and testing materials, including any error-rate, verification, or reliability analysis and any peer or technical review; and the identity, employing agency, and CAST/CART assignment of the law-enforcement officer who authored it, together with that person's relevant training, qualifications, and prior casework, and whether the program has been used, validated, or disclosed in any other matter.

c. Records of the undercover operation referenced in connection with the "program."

d. The 2022 re-analysis materials in native form: the "T-Mobile Reanalysis Instructions," the Review Log, and the device-specific 2022 comments for IMSI [redacted].

e. The CAST PowerPoint circulated by email attachment in late October 2025.

f. The Rule 902(11) certification for the 795-device DNC Timing-Advance dataset (the certification produced covers the tower dump and predates the Timing-Advance file).

g. The basis for the azimuth change at tower 126187: who changed Sector B's azimuth from 345° to 90°, when, and on what basis, including the underlying January–February 2021 drive-test data.

h. The cable-swap inquiry for tower 40225 / WDC085B: T-Mobile's response to the CAST request to check for a cable or sector swap, and any record addressing the FBI location estimate that plots opposite the stored azimuth.

i. The antenna sheet for the cell carrying the 8:23–8:24 session: azimuth, horizontal beamwidth, downtilt, and site latitude/longitude (cell 144340 at ~295° or 40225 at ~255°).

j. Confirmation of the cell identity assigned to the 8:24 session in the government's detention memorandum, Dkt. 17, at page 6, reconciled against the produced ECI/eNB data.

k. Per-session network data for the x9370 line on January 5, including serving cell-site, and any PCMD/NELOS data, with a statement of what survives retention.

l. The serving/originating cell for the 8:43 p.m. voice call, and the serving cell for both calls to [redacted] (12:20 p.m. and 8:43 p.m.).

m. The Google geofence returns specific to Mr. Cole.

n. The Sprint 2703(d) order detail: the 24 nationwide locations referenced in the order.

o. The underlying Google geofence/reverse-location returns, the commercial ad-tech geolocation returns (Cuebiq, InMarket, Skyhook, Veraset), and the raw Sprint/AT&T/Verizon cell-tower-dump returns (not summaries) underlying the POI and AOI masters.

p. The source for the quoted "new and specifically tailored algorithms" and "opaque to investigators" statement: author, form, and date.

q. All communications between the government (including the FBI, CAST/CART personnel, the U.S. Attorney's Office, or any other Department of Justice or Executive Branch component) and any journalist, reporter, or other representative of The Wall Street Journal — including but not limited to Sadie Gurman and C. Ryan Barber, the bylined authors of "How a Tech-Savvy Officer Finally Cracked the Jan. 6 Pipe-Bombs Case" (Dec. 15, 2025) — concerning this case, the T-Mobile cell-site data, the custom decoding program described in that article, or the circumstances of Mr. Cole's identification and arrest, together with any related internal communications, notes, or authorizations for such disclosures.

r. All records concerning the prior characterization of the T-Mobile cell-site data as "corrupted" or otherwise unusable — including the basis for any representation to that effect (see, e.g., the June 2023 congressional testimony describing provider data as corrupted), any communications with T-Mobile regarding the readability or integrity of the data, and any record reconciling that characterization with the government's subsequent ability to decode the same data.

2. **Capital Ale House Records and Egress/Geolocation Evidence**

a. The complete Capital Ale House merchant subpoena return, and the case agent's December 9 and December 11 emails assessing the order.

b. Egress evidence for Mr. Cole and the asserted video vehicle: toll/E-ZPass records for Mr. Cole and for the asserted video vehicle; Mr. Cole's cell-site/CSLI and device geolocation on the egress corridor; vehicle telematics; and out-of-D.C. LPR returns (Fairfax County/VSP/Arlington/broader MPD) on the I-66/Route 50/I-395/I-495 corridors.

3. **Cole's Phone, Interrogation, and Arrest Records**

a. The complete, final Samsung S10e extraction and review logs (not only the "initial review" referenced in the SITREP).

b. Any pre-recording statements or 302s, and any communications regarding interrogation strategy.

c. Any competency or psychological assessment accompanying the produced Miranda and prompt-presentment waivers.

d. The Apple Watch collected during the December 4 search and any associated Apple account records.

4. **Identification and Footwear Evidence**

a. The FBI's shoe-size methodology (the "Shoe Measurements" folder contains two files with no interpretive report).

b. Both photogrammetry shoe-length reports: the March 9, 2021 report (12.37″ ± 0.5; examiner Imel; 266O-WF-3366725/HQQ210305004) and the superseded February 9, 2021 report (13.4″ ± 0.5; HQQ210208001/Serial 631), and the basis for both "known" sidewalk references (35.75″ and 33.75″) and the conversion from outsole length to shoe size.

c. The underlying video frames used for the shoe measurement (e.g., the "Ivy St. North" 7:30 p.m. clip).

d. Any document comparing the estimated size of the suspect to Mr. Cole's actual size.

e. Any gait or other biometric comparison run on Mr. Cole or on any other person of interest.

f. The eyewitness-description records, including operational updates noting eyewitnesses who described the suspect as a white male.

**5. Device and Bomb Forensics**

a. The quantitative powder analysis: the quantity of energetic material in each device, or a statement that quantity could not be determined.

b. Any record of the on-site decision to conduct a second water-cannon disruption rather than transport to Quantico; the post-incident bomb-technician reports; and identification of the FBI representative who directed the second disruption.

c. The latent-print and DNA examination reports for the devices.

d. Forensic examination of the recovered timer(s): make, model, and any lot/component detail, with comparison to the item purchased by Mr. Cole (Walmart item 007239700900).

e. Chain-of-custody records for the device components, and any FBI record addressing the erased DNC overnight footage.

**6. Vehicle and License-Plate-Reader (LPR) Evidence**

a. The white Ford Focus renter identity: Serial 115 and Serial 117 (the Avis-facility interview of [redacted] in full, and the Avis rental agreement for VA plate [redacted].

b. The full VOI1 (gray Subaru) canvass 302s: Serials 420, 328, 522, 527, 619, 623, and 627 in full (for example the index for Serial 328 cuts off at "TANG provided the f"); and any document identifying or excluding VOI1 as a specific vehicle or plate, including as plate [redacted].

c. The full VOI2 file: the second vehicle of interest (sightings ~8:19–8:20 p.m. and ~9:38 p.m.), including all associated 302s, route reconstruction, and any identification analysis.

d. The complete per-plate LPR return for VA plate [redacted] across all dates and locations, including the Constitution Ave NW/15th read (8:47 p.m., 1/5) and the K St NW/27th read (7:13 a.m., 1/6): with reader IDs, GPS coordinates, timestamps, and any images; and the underlying vehicle-specific plate query that generated those reads (which Serial 201 states was not incorporated into the produced master).

e. A full-holdings LPR search for the four plates [redacted], [redacted], [redacted], and [redacted] across MPD/VSP/Arlington/Fairfax County for 1/5–1/6/21 (the produced set reflects only three readers).

f. The excluded LPR holdings identified in Serial 201: the NC/DE/PA citywide MPD captures; any Virginia-filtered citywide capture; the 8:16–8:20 p.m. Independence & 3rd four-minute report; Serial 616/1A644 readings; and the vehicle-specific plate queries stated to be "not incorporated" into the master.

g. The complete LPR photographs for Serials 616, 689, and 1218, and confirmation whether the photographs beyond the "first 200" for Serial 1218 were ever collected or produced.

h. Other-jurisdiction and out-of-master LPR returns: VSP/Arlington/PWC/PG/NTIC/NCR returns; the broader MPD holdings referenced as "positive but not 1/5–1/6"; and the source reads behind FR4241 (I-295 S/B, 9:48 p.m.) and UPC5689 (4th/Tingey SE, 6:13 p.m.).

i. The FBI 302s that Serial 201 identifies as defining the LPR collection scope ("as described in the referenced 302's").

j. The VOI canvass video: the VOI1 grand-jury video (Oracle, Wells Fargo, Bank of America, Homewood Suites); any pending or uncollected canvass video; and the identified missing footage for 8:15–8:25 p.m. (LOC / Cannon House).

k. The underlying camera feeds: the USCP/MPD/Library of Congress/Ring camera feeds cited in the timeline (specific camera numbers, *e.g.*, 4471, 4472, 3171, 809, 810, 799, 763, 766, 1501, 3179, 3502, 5061, 703), not merely the summary timeline.

l. The "white 4-door hatchback" work: the LPR/camera checks for a white 4-door hatchback referenced in the POI#1 tasking note, and any resolution of that descriptor.

m. Authoritative vehicle records: Ohio BMV title/registration for the white 2014 Ford Focus SE (VIN [redacted]; Ohio plate [redacted]), including status as of 1/5/21; VA DMV/title records for the Kerkhoff Subaru(s); and confirmation whether the Ohio and Virginia records reflect the same individual.

n. Any materials bearing on the identity of POI1 and POI2; the materials underlying the association or non-association of Mr. Cole with VOI1, VOI2, POI1, or POI2; and the Serial 203 blue-Nissan analysis in full.

**7. Surveillance Video of the RNC and DNC Pipe-Bomb Locations**

a. All surveillance and closed-circuit-television (CCTV) video depicting the Republican National Committee and Democratic National Committee Headquarters and their immediate vicinity—including the locations where the pipe bombs were placed and all approaches to those locations—for the continuous period from approximately 7:30 p.m. EST on January 5, 2021 through the discovery of the devices on the afternoon of January 6, 2021. This request extends to footage from every source within the government's possession, custody, or control, including FBI-collected video, U.S. Capitol Police and Metropolitan Police Department cameras, DNC and RNC building and business security cameras, pole cameras, and any private or third-party cameras, in native format with metadata—not excerpts, clips, or compilations. The defense requests the complete footage regardless of whether it depicts the defendant, so that the defense may independently assess every person who was present at, approached, or passed the placement locations throughout the full period.

**8. Records Concerning Shauni Kerkhoff and Daniel Dickert**

***A. Device extractions and forensic completeness***

1. The complete GrayKey full-file-system extraction of Kerkhoff's iPhone 12 Mini (model A2176, S/N [redacted], IMEI [redacted])—the SHA-256-verified master image on DEWFMaster_15860973 (Item 1B81) and the archive tapes (Item 1B83), together with the AXIOM portable case provided to the DMX and CAIR units. Because this was a full-file-system acquisition, the government possesses the complete recoverable universe of data on the device, including messages and attachments (including deleted-but-recoverable), call logs, contacts, calendar, notes, voice memos, and email; photographs and videos with EXIF GPS and timestamps; the iOS location stores (Significant Locations, cached cell/Wi-Fi positions, Maps history); Safari and browser history and cached search terms; third-party application databases; joined Wi-Fi and Bluetooth history; keychain credentials; the iOS "knowledge"/device-usage timelines; and health and motion data. This extraction shall include all native attachment files referenced in the produced January 5–6, 2021 message thread from Kerkhoff's extraction, in native format with intact metadata (including EXIF) and with hash values and source-file information: IMG_9808.png (Jan. 6, 6:18:59 a.m. EST); IMG_3628.jpeg (Jan. 5, 5:11:14 p.m.); IMG_3623.MOV (Jan. 5, 3:44:22 p.m.); IMG_4283.PNG and IMG_4284.PNG (Jan. 5, 10:22:06 a.m.); and IMG_1647.png, IMG_6762.png, and

IMG_8051.png (Jan. 5, approximately 6:26 a.m.); together with any additional attachments referenced in the thread. All reside under private/var/mobile/Library/SMS/Attachments. This metadata is material: the one image the defense possesses from Kerkhoff's phone (IMG_3611) carries embedded GPS/location data from January 4, 2021, so any image captured during this period may likewise carry location data. *Serial 52.*

2. The AXIOM portable case and the underlying geolocation and artifact output for the January 5, 2021 window—not the summary — so that the defense may independently assess the bases for the conclusions that the device reflected "minimal activity" and "no geolocation," and whether any 2021 data survived on a 2025 extraction.

3. The File System Events and Unified Logs, reprocessed and produced. These categories were excluded from the AXIOM parse (Initial Processing) but contain device-activity timestamps; the government's "minimal activity / no geolocation" conclusion was reached without them. The raw data resides on the master image.

4. Written confirmation that the examiner searched the correct interval. The examination was set to UTC. The window of interest—7:30 to 8:30 p.m. EST on January 5, 2021—corresponds to approximately 00:30 to 01:30 UTC on January 6, 2021. Please confirm that the examiner searched 00:30–01:30 UTC and not 7:30–8:30 UTC.

5. The full extraction of PSR-1's (Daniel Dickert (hereinafter "Dickert")) iPhone 12 Pro (S/N [redacted], IMEI [redacted]), beyond the nine files selected by Dickert and his counsel to provide to the government, or the government's basis for taking only a consent handoff — including the native "DEWF-CONSENT-iPhoneFiles" submitted to the NVRA Evidence Control Center and to SA [redacted]. *Serials 74, 52.*

6. Any extraction of Dickert's prior iPhone 7 (S/N [redacted], IMEI [redacted]), including the native 7:37 p.m. "Bella" video (IMG_3636.MOV) presently located only as a single screenshot. *Serial 52.*

7. Kerkhoff's iPhone 7 Plus (S/N [redacted], IMEI [redacted]) — the device that captured IMG_3611 produced by the government, which bears embedded GPS coordinates: the

forensic extraction reports and chain of custody if it was seized or imaged, and its disposition if it was not. *Serial 74.*

8. Confirmation whether a U.S. Capitol Police–issued iPhone was assigned to Kerkhoff, and whether that device was identified, preserved, and extracted. In light of SA [redacted] finding that the iPhone 12 Mini "was not the one being used during this time period" and Officer DesCamp's account, the USCP-issued device was plausibly her active device during the relevant period. *See Serial 26 (FD-302, USCP Ofc.* [redacted]*, 11/7/2025).*

### *B. Location evidence*

1. The iOS Team Awareness Kit ("ITAK" or "TAK") location tracks for the USCP-issued phone for January 5–6, 2021. TAK position ("CoT") reports are stored server-side under a configurable retention policy and are replayable and exportable to KML/GPX, so the tracks may reside on a USCP or FBI-accessible TAK Server even in the absence of the relevant device. The defense requests: (a) the ITAK/TAK tracks for that device on the night of January 5–6, 2021; (b) USCP's TAK Server retention and archiving policy for the relevant period, to establish whether 2021 tracks survive; and (c) whether Kerkhoff was issued or wore any other device (e.g., an Apple Watch) that logged location or motion, including any call, text, and location records for a USCP work-phone number. *Serial 26; CART/AXIOM analysis report.*

2. 10.The Verizon grand jury subpoena and returns for the line ending [redacted] — the digital 1A attached to Serial 30, comprising Grand Jury subpoena #GJ20251107136668 (served on Verizon via VSAT by SA [redacted] on November 8, 2025) and Verizon's returns (received November 10, 2025): subscriber and account records, device/IMEI history, and all call detail records; and confirmation whether any historical cell-site data was requested or produced, and, if not, whether a Section 2703(d) order or warrant was sought. *Serial 30.*

3. To the extent the Serial 30 returns are incomplete, full Verizon subscriber, call-detail, and device history for [redacted] for December 2020 through January 2021, to identify the handset/IMEI actually active during the window (Apple registration data cannot establish active use). *#36002.1.*

4. Any connected-device / NumberShare (or equivalent) provisioning on the account, to resolve whether either Apple Watch (the Nike+ 38mm and the Series 4 40mm, each listed as GPS-only in #36079.1) was cellular-enabled. *#36079.1.*

5. Cell-site/CSLI for the number(s) associated with Kerkhoff (Serial 5) and for the [redacted] line for January 5–6, 2021 (approximately 3:00 p.m. to 8:30 a.m.), or confirmation that none was obtained.

6. Cell-site data for Dickert's numbers, including subscriber and toll records for Dickert's second line, [redacted] (Omnipoint Communications), held March 2013–August 2025; and subscriber identification and records for [redacted] (the number that called Dickert at 6:26 p.m. on January 5). *Serial 10.*

### *C. Apple productions*

1. The actual iCloud content returns for the non-end-to-end-encrypted categories, together with the legal process authorizing them. #36002.1 reflects Messages in iCloud = Yes, iCloud Photos = Yes, Advanced Data Protection = No (so Apple held the keys), and iCloud Backup = No.

2. The Find My / "devices signed in" data (Find My Friends = Yes per #36002.1), showing which devices were actively signed into the account during the window, as distinct from historical registration.

3. IP and login logs. The Registration IP is listed "Unavailable," and the AMS billing-profile-create IP is blank with a note that IP is retained approximately 18 months; the defense requests whatever IP data existed closer in time or in other Apple systems. *#36002.1; #36079.1.*

### *D. Associated accounts and identifiers*

1. Records, and the underlying legal process, for the linked email accounts identified in #36002.1: [redacted] (also the Apple logon/recovery email in #36079.1), [redacted] and [redacted] *#36002.1; #36079.1.*

2. Resolution of the eleven "Sign in with Apple" private-relay addresses listed in #36002.1 — that is, the third-party services to which each relay corresponds.

3. The fuller Google production. #36083.1 is only the Google Payments customer profile; the defense requests the broader Google account records — content, login/IP history, location history, YouTube TV / Android Pay activity, and recovery phone and email — together with any Google/Waze subpoena or preservation returns.

4. The full contents of [redacted] — a Google account named for the residence that holds the Blink camera credentials — and identification of its account holder. *#35911.1.*

5. All remaining Kerkhoff subpoena and preservation returns referenced in the file not otherwise addressed above: Meta (case #20482263); Snapchat; TransUnion; Garmin; Signal; and Amazon.

***E. Camera and pet-service records related to Kerkhoff***

1. Furbo / Tomofun (account [redacted] furbo.com login created April 29, 2024; application tokens dating to 2019): account data, cloud recordings and clips, still captures, and access/event logs for January 5–6, 2021. *#35911.1.*

2. Blink (residence account [redacted] created November 8, 2022): footage and event logs for January 5–6, 2021. *#35911.1.*

3. Nest (com.nestlabs.jasper.release): confirmation whether a Nest camera existed in January 2021 versus a recent login (session artifacts date to November 2–6, 2025), and any responsive footage or logs. *#35911.1.*

4. Rover (account [redacted] created December 19, 2020): booking history, sitter/walker identities, timestamps, and GPS walk tracks for January 5–6, 2021. *#35911.1.*

5. Any additional home-camera footage from the residence — the defense understands two interior cameras and one exterior camera were running on January 5, 2021 — to the extent not captured by the Blink, Nest, or Furbo returns above.

***F. Data-broker, VPN, and social-media accounts related to Kerkhoff.***

1. Records reflecting the Optery and NordVPN accounts. The Optery account [redacted] created October 24, 2024,

modified October 31, 2025) corroborates the FD-498; the NordVPN account is reflected in device-level tokens spanning 2022 to 2025. The defense further requests the Optery payment records showing who paid to remove Kerkhoff's name and identifiers from public databases in 2020–2021. *#35911.1.; FD-498.*

2. Instagram account data for the handles [redacted] (created November 17, 2020) and [redacted] (created January 28, 2022, still active), and records of any social-media accounts deleted in 2020–2021. *#35911.1.; FD-498.*

### *G. Reports, interviews, CIA records, and the polygraph examination*

1. The complete polygraph examination file (November 6, 2025; examiner DiJoseph; Series 1 "Terrorism" result = DI, Deception Indicated): the full audio and video recording of the entire session (from arrival at approximately 2045 through the conclusion of the post-test), including any recording or monitoring by SAs [redacted] and [redacted], who listened to the interview by cellular phone; the polygraph charts and raw physiological data and the native instrument/software case file; the numerical and/or algorithmic scoring; the question-formulation worksheets (relevant, comparison, and irrelevant questions); all pre-test and post-test notes; and the reviewing examiner's (Gundersen) notes and worksheet. Kerkhoff alleges that this examination was a roughly three-hour interrogation during which the breathing tubes were swapped and she was told she "failed," rendering the complete charts, examiner's report, recording, and question set material to the defense. *FD-498;* Compl. & Demand for Jury Trial, *Kerkhoff v. Blaze Media LLC*, No. 1:26-cv-01078-RDA-WEF, ¶¶ 134–137, 191 (E.D. Va. filed Apr. 21, 2026).

2. The FBI's memorialization of PSR-3's statement that he could not rule PSR-2 in or out — any FD-302, electronic communication, email, or notes documenting that statement; the underlying comparison materials (Main Casefile Serials 3550 and 3555). *June 30, 2026 letter (ECF 58-3).*

3. The full 1A attachments to the Dickert interview — the interview notes, the "map of the parking area," and the message screenshots. *Serial 52.*

4. The FBI's complete work-up of Kerkhoff as a suspect—the "media lead," the November 4, 2025 "The Blaze" article, all tips, leads, and

analyses, and the record of the effort to rule her in or out. *FD-498; June 30, 2026 letter; Serial 77.*

5. Any communications between the government (including the FBI, the U.S. Attorney's Office, or any other Department of Justice or Executive Branch component) and any journalist, reporter, or other representative of The New York Times concerning Shauni Kerkhoff—including any records reflecting information provided to, solicited from, or received from any such person, and any related internal communications, notes, or memoranda.

6. The CIA employment/background records requested by the FBI on 11/7/25; the 11/9/25 voicemail tip; and the 11/8 7-Eleven footage.

7. The FBI's communications with the CIA concerning this matter, including how the November 6, 2025 interview of Kerkhoff at CIA headquarters was arranged.

8. All versions and drafts of the ODNI memorandum concerning Kerkhoff (referenced in the file in approximately April 2025), and all records of its transmittal. Kerkhoff alleges that an ODNI unit drafted the memorandum, that it was passed as an "unfinished" draft among Trump-administration agencies and the White House, and that it was ultimately shared with the CIA. Compl. ¶¶ 128, 202, 242.

9. The complete handwritten and typed notes of the November 14, 2025 USAO interview of Kerkhoff, including AUSA Jocelyn Ballantine's notes.

10. Dickert's full USCP file (only a USIS Background Investigation Summary has been located).

### *H. Residence and vehicle search; the laptop*

1. CART's on-site review of the Apple laptop (reviewed but not seized during the November 6, 2025 consent search) — any report, preview or triage output, logs, worksheets, notes, screenshots, or partial copies; the laptop's make, model, and serial number; the scope and terms of the review; the legal authority relied upon; and whether either party had any other iCloud-synced computers. *Serial 68.*

### *I. Native originals, USCP records, and independent corroboration*

1. The native originals underlying records produced only as screenshots or scans — the native USCP timekeeping records and the complete badge-swipe record for Kerkhoff (all readers, entries and exits — not only the last-out swipe at 3:47 p.m. on January 5 and the first-in swipe at 7:48 a.m. on January 6), duty assignments, radio logs, and any CCTV depicting her on January 5–6, 2021; and the native message data (produced as a scanned printout). This request further includes Kerkhoff's and Dickert's USCP time records for January 5 and 6, 2021, and their native phone records (only a two-day text spreadsheet for Kerkhoff has been located, labeled "UTC+0," running from ~4:39 p.m. EST January 5 to ~12:46 p.m. January 6, with embedded images stripped; nothing comparable has been produced for Dickert). To the extent USCP holds these records, the defense requests that the government produce them or facilitate their production.

### *J. Vehicle records and Starlink*

1. Title, registration, and ownership history for the Kerkhoff 2020 Subaru Crosstrek (VIN [redacted]; plate [redacted]), and the full Starlink grand-jury subpoena (GJ20251113136829, served 11/13/25; documented at Serial 59) and its return (VIN – [redacted]).

2. The basis for the November 2025 Starlink subpoena: the record or communication in the Kerkhoff subfile that prompted the 11/13/25 grand-jury subpoena on VIN [redacted], the vehicle otherwise being absent from her POI file.

### *K. Forensic disk-wipe record*

1. The September 13, 2022 CART disk-wipe log (OpenText/Tableau TX1) recording a one-pass wipe of a 32 GB OCZ Rally2 USB drive, and the surrounding CART forensic file.

## 9. FirstNet Records and Law-Enforcement-Device Cross-Reference

a. The FirstNet/AT&T records: what survives of the January 5 FirstNet/AT&T location data described as lost or corrupted, and confirmation of what still exists (DOJ produced an email chain indicating some FirstNet returns were sent in response to subpoena for January 5 and 6, 2021).

b. FirstNet records for Kerkhoff and Dickert: agency-issued work lines and any personal subscriber line or paired Apple Watch.

c. The underlying records for the 186 numbers of interest and the 51 numbers closed as "law enforcement officers or persons on the exclusion list."

**10. POI Files and Index/Structural Records**

a. A log of POI subfiles reviewed but not produced (39 individualized subfiles produced against a 7,557-file MASTER POI LIST).

b. The abandoned-lead files: the Nike Air Max Speed Turf owner who worked in the area of the crime and drew a documented "deep dive," and the March 2021 advertising-ID (AdID) match for which physical surveillance was tasked, including the resolution of each.

c. A subject-level index of the grand-jury subpoena returns in Production 6 (Bates-stamped, not identified by subject).

d. A camera-by-camera route index (contained in USCP_Police_Cameras.docx and the TTK FacilityInfo spreadsheet on the Genetec system).

e. The MAC-address/Wi-Fi router canvass returns: the network logs of devices that touched the RNC, DNC, and Capitol Hill Club networks, referenced in the POI#1 tasking note.

**11. Financial and Purchase Records**

a. The Home Depot "pipe bomb holdings" record for the 10/23/2020 galvanized cap (Shelby Township, MI) and the stated basis for tying it to Mr. Cole.

b. The footwear-channel subpoena returns: the Dick's Sporting Goods return and the Foot Locker records (only one of six charges itemized; the other five represented as purged).

c. Any subpoena return on the group order of the Nike Air Max Speed Turf model (e.g., the Philadelphia Eagles group order).

d. Financial records for Brian Cole Sr., to the extent they bear on accounts opened under Brian Cole Jr.'s Social Security number.

## 12. Inaccessible and Non-Rendering Files

A significant volume of the files the government has produced cannot be opened. Attached as **Exhibit 1** is a spreadsheet, generated from the defense's document-review platform, itemizing 2,164 produced files that do not render, each identified by production/upload name, file path, file name, and extension. The affected files span numerous formats, including PDF documents, spreadsheets (.xlsx), Google Earth mapping files (.kml), video (.avi and .asf), email stores (.mbox), and vCard contact files (.vcf), among others. Of particular concern, the non-rendering set includes 231 .kml mapping files and 81 PDF documents — categories that may bear directly on the cell-site and geolocation evidence central to this case.

a. As to those files that are password-protected, the defense requests the passwords, decryption keys, or other credentials necessary to open them. **(See Exhibit 2.)**

b. As to those files that do not open for reasons the defense has been unable to determine, the defense requests that the government re-produce each in a usable, native format with intact metadata, or identify why the file cannot be opened.

c. To the extent the government contends that any listed file need not be produced — for example, as a system- or program-generated file rather than substantive content — the defense requests that the government so identify it, so that the parties may narrow any dispute to the files that carry discoverable content.

The foregoing items are material to the preparation of the defense under Rule 16(a)(1)(E), and several fall within the government's disclosure obligations under *Brady* and *Giglio*. Many are already within the government's possession, custody, or control; others are held by third parties from whom the government has obtained, or can obtain, the records. To the extent any responsive material — including cloud-stored camera footage subject to short retention periods — remains within the control of a third-party provider, the defense requests that the government take steps to preserve it pending production.

Please supplement the government's production, or advise us of the government's position as to each item, **within twenty-one (21) days**, so that the parties may meet and confer. Nothing herein waives, and the defense expressly reserves, all rights, including the right to move to compel under Rule 16(d) and to seek appropriate relief for the loss or destruction of evidence. We are available to confer at your convenience.

Sincerely,

*/s/ John R. Glover*

John R. Glover

Cc: Charles Jones
Jocelyn Ballentine
Alex Little
Zack Lawson