**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:26-cr-00001-AHA** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

# GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 1

ARGUMENT ........ 16

I. The Defendant Voluntarily Confessed ........ 17

A. Applicable Law ........ 17

B. Analysis ........ 18

i. The Defendant's Proffered Post-Arrest Autism Diagnosis Does Not Impact the Voluntariness of His Confession ........ 18

ii. The Conditions of the Interview Heavily Favor Voluntariness. ........ 26

iii. The Agents Properly Emphasized the Strength of the Evidence and Downplayed the Severity of the Defendant's Crimes ........ 29

iv. The Agents' Suggestions that Confessing Would Benefit the Defendant Were Appropriate and Not Coercive. ........ 32

v. The Agents Did Not Make Misrepresentations or Deceive the Defendant. ... 36

vi. The Agents Accurately Referenced that the Defendant's Family Members Were Legally Required to Appear in Washington, D.C. and at No Point Threatened to Arrest or Take them into "Custody." ........ 38

vii. The Defendant's Feelings of Stress and Anxiety When Questioned by the FBI About His Crimes Are Not Evidence of Coercive Police Activity. ........ 40

II. The Defendant Validly Waived His Right to Prompt Presentment ........ 43

## INTRODUCTION

The United States respectfully opposes defendant Brian J. Cole, Jr.'s motion to suppress his entire video-recorded custodial interview. ECF No. 102. The defendant, as a 30-year-old, employed, high-school-educated adult, voluntarily confessed his role in planting two pipe bombs outside of the Republican National Committee (RNC) and Democratic National Committee (DNC) headquarters in Washington, D.C. on January 5, 2021. Before he confessed, the interviewing agents had provided a sobering summary of the overwhelming evidence of his guilt, and after knowingly and voluntarily waiving his *Miranda* and prompt presentment rights, the defendant admitted his guilt and shared that he had been living with remorse for nearly five years, unable to tell anyone what he had done.

The defendant now claims that his detailed confession was compelled by agents who used "psychologically coercive" tactics, and who ignored indications that the defendant is autistic. At most, the defendant's proffered post-arrest Level 1 autism diagnosis indicates deficits in social interaction skills, not intellectual or mental impairment, and it did not impact the voluntariness of his confession. And notwithstanding the defendant's dramatic editorializing, the recorded interview demonstrates that the defendant spoke cogently, understood the questions put to him, and provided responsive and appropriate answers. The D.C. Circuit requires "egregious facts" that offend the civilized system of justice before a confession can be found involuntary. The facts here are inoffensive, unremarkable, and non-coercive. The defendant made a free and unconstrained choice to admit his guilt, and the Court should deny the motion to suppress his confession.

## BACKGROUND

The defendant is charged by indictment with planting pipe bombs outside the headquarters of the RNC and DNC in Washington, D.C. on January 5, 2021. ECF No. 106. The defendant

was arrested for these crimes near his home in Woodbridge, Virginia, in the morning on December 4, 2025.

Before the defendant's arrest, the Federal Bureau of Investigation (FBI) had developed significant evidence establishing that the defendant constructed and planted the pipe bombs, which an FBI explosive examiner determined were viable devices. A license plate reader detected the defendant's vehicle entering the area of the DNC and RNC shortly before surveillance video showed a masked and hooded suspect walking the area and planting the bombs. The defendant's cellphone interacted on multiple occasions with cell sites near the DNC and RNC at times when video showed the suspect walking within the relevant cell site's coverage area wearing gloves and carrying a backpack. Between 2018 and 2020, the defendant had used credit and debit cards to purchase various components and ingredients identical to those used to make the bombs, including pipes, end caps, wiring, steel wool, and timers, as well as equipment consistent with manufacturing pipe bombs like safety glasses, wire strippers, a machinist's file, protective gloves, and disinfecting wipes. After January 5, 2021, through at least mid-2022, the defendant continued to purchase similar components including pipes, end caps, wiring, steel wool, alligator clips, and a timer.[1] Based on this evidence, a federal magistrate judge issued an arrest warrant for the defendant.

The defendant was arrested at approximately 6:58 a.m. on December 4 and was transported to the FBI Washington Field Office for a post-arrest interview. During court-authorized searches of the defendant's home and vehicle, law enforcement recovered more pipes, end caps, and wiring, a drill set and drill bits, wire strippers, a funnel, and work gloves, among other evidence, from inside the defendant's bedroom area and the trunk of his vehicle. After the defendant was arrested,

---

[1] The government has summarized the pre-arrest evidence in greater detail in previous pleadings. *See, e.g.*, ECF No. 50 at 2-15.

FBI agents served multiple members of his family with subpoenas to testify in Washington, D.C. the next day.

At the FBI Washington Field Office, the defendant was taken to an interview room for an interview with two FBI agents.[2] The interview was video recorded. Upon entering the interview room at approximately 9:12 a.m., the defendant's handcuffs were removed, he was seated in a padded chair, and the agents[3] offered him food, soda, and water. ECF No. 102-1 ("Tr.") 2:22-24, 3:17-24; ECF No. 102, Ex. B, Video 4 at 6:00-7:29.[4] The agents also asked the defendant whether he preferred to be called Mr. Cole or if they could call him by his first name. Tr. 3:9-16.



The defendant expressed that he was "scared" and hoped this was "a misunderstanding," to which the agents replied that they were "here trying to figure out the truth" but recognized "this is an intimidating situation and we're trying to make it as less intimidating as possible. So just let

---

[2] Prior to the interview, the interviewing agents had reviewed the defendant's Prince William County school records. According to the records, the defendant attended C.D. Hylton High School as a full-time student and graduated in 2013. The records reflected no medical diagnoses, no cognitive or other disabilities, no developmental deficits, and no specialized or individualized programming. A health information form submitted in 2004 indicated only that the defendant had a speech issue, wore glasses, and had seasonal allergies.

[3] For simplicity, because the agents interposed questions freely and there is no apparent relevance to which agent asked each question, this brief refers to the agents collectively.

[4] The agents offered the defendant food or drink on numerous occasions throughout the interview. Tr. 3:17-24, 7:24-25, 8:10-12, 51:25, 52:23-24, 58:15-18, 87:11-14, 96:4-23, 130:20-21, 138:8-23, 139:10-11, 154:23-24, 155:3-156:3, 157:24-25.

us know, honestly, if you need a break." Tr. 4:1-23.[5] The agents then provided the defendant a summary of "what today looks like for you so you kind of clearly know what's going to happen today" and explained that they would give the defendant "an opportunity to speak with us this morning" and "then later on this afternoon we'll likely be in front of a judge." Tr. 5:4-11.

The agents explained that before asking "substantive questions," they needed to "make sure you kind of like understand your rights today," and the defendant indicated that he understood. Tr. 4:24-5:3. The agents told the defendant that talking to them was "completely voluntary," that they were "interested in knowing your side of the story" and "things that happened in your life going back five plus years ago," and that "being forthright" would "really benefit you in the long run." Tr. 6:8-22. The defendant stated that he understood. Tr. 6:22.

The agents provided the defendant with a standard FBI "Advice of Rights" form listing each of the defendant's rights in writing, which he "must understand" "[b]efore" the agents ask questions, including "the right to remain silent," "the right to talk to a lawyer for advise before we ask you any questions," "the right to have lawyer with you during the questioning," and "the right to stop answering at any time" during the interview. Tr. 7:13-19; Exhibit A, *Miranda* Waiver. The defendant expressed that this was "a lot to process," and the agents replied that they "completely get it," asked the defendant, "are you feeling ok?" and offered the defendant time before beginning so he would not "be worked up." Tr. 7:20-8:16. After about a minute, the defendant told the agents, "[y]ou can start." Tr. 8:19; Video 4 at 12:00-13:12. The agents read the Advice of Rights form aloud verbatim to the defendant and asked if he was interested in speaking to them without a lawyer; the defendant replied, "yes," and at 9:21 a.m. he signed the

[5] The agents offered the defendant breaks numerous times throughout the interview. Tr. 4:14-23, 7:20-25, 8:11-12, 55:12-13, 56:22-23, 59:19-20, 86:2-12, 95:23-25, 99:21-22, 138:1-14.

form under the header "CONSENT" and the statement, also read aloud by the agents: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Tr. 9:1-10:9.

After the defendant signed the written *Miranda* waiver, the agents explained that the defendant was there "because of the evidence we found regarding your activities in Washington, D.C. on January 5th, 2021," at which point the defendant immediately provided a continuous narrative of his whereabouts that evening, nearly five years earlier:

> I was at the protest … I was only there for an hour … The protest that happened on – in front of the -- you know, the one that -- when they protested that Donald Trump lost -- that Donald Trump lost the 2021 election. But I didn't -- I didn't agree with what people [were] doing, like just telling half the country that they -- that their -- that they just need to ignore it. … I didn't think that was a good idea, so I went to the protest. And I -- I wasn't – I'm not a very sociable person, so I didn't really talk to anyone or do anything, just hung around. And then after that I left. I went to -- now before I went to the protest, I told my mom that I was going to a place called Capital Ale House… And Capital Ale House was – it's -- it used to be in the building that was next to the office where I work…And now it's -- now it's Kelly's Oyster Bar…I told -- I went to DC because -- you know how things were volatile back then because families, families disowning each other because of political opinions and all that, I didn't want to deal with that, especially since my family has hard core Democrats in it… I didn't want to tell them that I was going to a protest in support of Trump because, like I said, I didn't agree with just ignoring half the country, half the people who voted for him, right? … So after I was done with -- after I was done with just standing around and doing stuff like that, I got in my car and I left. I went to Capital Ale House and then I went back home.

Tr. 12:19-14:19.

After this explanation, the agents asked the defendant questions about his background, and the defendant told the agents where he grew up, where he went to high school, about his family, and about his work at his father's company in Fairfax, Virginia, where he handled data entry and had been working since age 14. Tr. 14:24-20:5. He also told the agents about his hobbies, including YouTube streaming and computer games, and that he had twice built his own home computer. Tr. 28:23-29:19, 30:1-15. The agents asked additional questions about the defendant's

comments concerning political disagreement within his family. The defendant explained that many of his family members had strong political views and that he "was never really in agreement" because he supported "right-leaning candidates." Tr. 24:19-25:25. He did not discuss politics often with his family to avoid conflict. Tr. 26:10-27:5. After the 2020 election, "when it first seemed like something was wrong" and "stuff started happening," the defendant began following the issue closely on YouTube and Reddit and felt "bewildered." Tr. 46:17-20, 47:16-19, 48:4-20. The defendant supported Trump in 2016 and 2020 but "never really followed anything as closely as the, as the results of the 2020 election … before, or since." Tr. 47:3-8, 48:14-17.

The defendant explained that on January 5, 2021, he traveled to Washington, D.C. "alone" and did not tell anyone. Tr. 36:3-11. The defendant lied to his mother about where he was going because he "didn't know how she was going to react" to him attending a protest supporting Trump. Tr. 39:1-13. According to the defendant, "no one" knew his political views, including his family. Tr. 39:16-25. He again stated that he attended a protest about the election, Tr. 37:12-21, and explained that he felt that "politicians" and "Congress," who he referred to as "the people up top," including "[p]eople on both sides, public figures," should "at the very least … address" people's concerns "that their votes are … being thrown away." Tr. 45:3-25. The defendant described the purported protest as "a bunch of people walking about," including "a guy carrying a confederate flag." Tr. 43:12-18. He stated that he stayed at the protest for one hour. Tr. 42:12-21.

The interviewing agents briefly left the interview room and, upon returning, explicitly told the defendant they had "collected a lot, a lot of evidence" and knew that the defendant had placed the pipe bombs at the RNC and DNC. Tr. 54:4-15. The defendant appeared visibly anxious, repeatedly saying "woah" and "wait a minute" before telling the agents to "please tell me this is a misunderstanding." Tr. 54:16-55:7; Video 7 at 7:50-10:20. They told the defendant to "take a

minute" and said they were not there to "judge" him but only to "know the truth." Tr. 55:12-24. The defendant adamantly denied planting the pipe bombs and asked the agents to "give me a minute to process this." Tr. 56:4-13. The agents responded, "take your time," "[w]e're not going to ask you any additional questions until you feel ready to respond," "if you want to start talking or you want us to start asking questions, we'll wait for your cue," and "[w]e'll just sit here and give you a minute. No rush. Keep breathing." Tr. 56:14-23. The agents added that the bombs did not go off and "no one got hurt." Tr. 57:9-11. The agents reiterated that they had developed "a sufficient amount of evidence tying you to be the one to place these devices" and offered to walk through the evidence and ask questions and answer the defendant's questions. Tr. 58:2-5.

The defendant continued to appear visibly anxious and said, among other things, "I don't know what to do," "there has to be a chance that I'm innocent," and "I'm trying to – fuck. I'm trying [to] process this." Tr. 58:6-9, 60:19-61:7; Video 7 at 16:15-16:27; Video 8 at 9:00-10:00. The agents then provided the defendant a blanket, which the defendant wrapped himself in. Tr. 61:15-18; Video 8 at 10:25-10:55. The defendant told the agents that he doesn't "get into trouble," he does his "best to keep my life as simple as possible," and "anything that deviates from routine" he "stay[s] away from." Tr. 61:19-62:2. However, "all the stuff from the – from the 2020 election all the way to that night … that night, that was, that was the first time I ever actually really deviated from that." Tr. 62:4-19. The defendant described himself as "super introversive…I wake up … go to work, do work, come back. If there's anything, if there's anything in between, it's like inconsequential stuff." Tr. 63:9-64:11. When asked "what changed from the election to the night of the 5th that led you out of your routine to, to act differently," the defendant answered:

> Just looking at it all… I just didn't think that stuff was -- I just didn't think that ignoring people's grievances was a good thing… Because (indiscernible) you're calling people conspiracy theorists, you're saying that they're, you know, bad people. They're -- Nazis. They're fascists. You know, and, you know, they're --

> even if you're on the other side, even if you're on the other side, you don't just do that to people. You don't tell them that, that all that stuff -- that all that stuff is, like, worth it. Like, if there's -- if they feel that, you know, something as important as voting in the federal election is being tampered with, is being, you know, being -- you know, relegated, null and void …then, like, someone needs to speak up, right? … Someone up top.

Tr. 64:12-65:24. When the agents asked a follow-up question about the defendant's thinking in planting the bombs, the defendant responded, "please don't say I did…If there is even a chance that the evidence can point to someone who's not me, if there's even a small chance, right?" Tr. 66:6-15. The agents responded: "there's not." Tr. 66:16.

As the interview continued, the defendant maintained that he did not plant the pipe bombs and stated that he bought pipes because he was doing "DIY stuff," although he could not recall what it was. Tr. 68:5-23. The agents reminded the defendant that they knew what he built and just wanted to know why. Tr. 70:18-25. The defendant again denied planting the devices and claimed that he attended the protest. Tr. 73:3-18. The agents told the defendant that he "can't convince us that you didn't do it" because "[w]e have video. We have your car. We have you buying all these different pieces to make devices." Tr. 73:19-23. The defendant continued to deny responsibility, stating "if there's even a small chance that I am innocent … I have to take it." Tr. 74:16-17. The agents told the defendant, "the evidence we have is overwhelming." Tr. 74:20.

The agents showed the defendant a picture of a Nike Air Max Speed Turf shoe, Tr. 77:20, which the suspect is seen wearing on surveillance video. The defendant told the agents that he "used to have a pair" but "grew out of them" and "threw them away." Tr. 77:20-78:1. The defendant stated that he did not recall if he wore those shoes on January 5, 2021, but he recalled purchasing the shoes using a Capital One debit card. Tr. 79:8-80:2.[6] The agents asked the

[6] Toward the end of the interview, the defendant clarified that he may have purchased the shoes at the Nike store at Potomac Mills mall or at a Foot Locker store. Tr. 153:4-22. The

defendant whether he ever purchased a timer from Walmart, which the defendant denied, adding, "I'm not much of a Walmart person." Tr. 80:16-25.[7] The defendant then agreed he had purchased pipes "for the DIY" project but denied purchasing end caps. Tr. 81:7-17.[8] The defendant also admitted purchasing alligator clips but claimed it was for a "science experiment." Tr. 81:23-82:6.

After these denials, the agents emphasized to the defendant that they had records of his purchases of "all these components." Tr. 82:18-23. The agents added that "coming forward today will help you in multiple ways. We can tell people that he was stand-up. He told us the truth the first time we approached." Tr. 84:6-9. The defendant again repeated that he went to a protest, and the agents replied that they knew this was not true "because we know where your phone was and you were at the RNC and DNC. That's not where the protest was. I know exactly what times you were in DC, and I know exactly your location. I know your location. I know where you were that night. We know you were not at the Capitol at a protest. I know that." Tr. 84:25-85:6.

The defendant told the agents that he did not "know what to do" and asked to "take a sip of water." Tr. 85:23-25. The agents then offered to give the defendant some time, and the defendant agreed that he needed time "to process all of this." Tr. 86:2-4. The agents left the room. Tr. 86:21. While alone, the defendant told himself to "relax," stated "they got something wrong," and told himself to "do whatever you can to clear your name. You can get out of this." Tr. 86:22-87:7; Video 10 at 8:50-14:35. After approximately ten minutes, the agents returned and asked the defendant how he was doing; the defendant stated he had a "giant pain in his stomach." Tr. 87:20;

---

defendant's Capitol One card records reflect Foot Locker purchases in 2018 and 2019 for $186.56 and $169.60.

[7] The defendant's Capitol One debit card records show that he purchased two timers from Walmart on June 3, 2020.

[8] The defendant's credit and debit card records show that he purchased black iron and galvanized end caps from Home Depot on October 22, 2019, and March 10, June 20, July 8, and November 16, 2020.

Video 10 at 8:50-Video 11 at 00:01. When the defendant continued to deny planting the devices, the agents told him that his statements to that point were "not consistent with what we see" in the evidence, including purchases of multiple timers, 9-volt snap battery connectors, 1 by 8-inch galvanized pipe, black iron end caps, galvanized end caps, alligator clips, 14-gauge red wire, and 14-gauge black wire. Tr. 88:2-14. The agents emphasized that "this isn't going away" and explained that other agents were going out to "talk to your family to interview them, ask them any questions so we can understand even more than we already know, to make sure there's no ongoing threat, and that we know everything possible about the night of the 5th." Tr. 89:20-90:2. If the defendant told the truth, however, the agents could "pull back and, you know, maybe not bring everyone that you know down to DC to interview them because we already know the truth." Tr. 90:10-14. The agents continued, "hopefully that will help you down the line when you have to deal with the consequences of this action. All of those things, all of those things will help you and help your family." Tr. 90:18-23.

The defendant claimed that he was "telling you guys the truth already." Tr. 91:5-6. At this point, the agents asked the defendant if he wanted to end the interview. Tr. 91:18-19. The defendant responded that "everything is just blank" and "a little too much to process." Tr. 91:20-23. The agents suggested that the defendant look at video footage from the night of January 5, 2021. Tr. 91:24-92:3. When the defendant was shown a still image of surveillance video of the suspect close in time to the planting of the bombs, he stated that he did not recognize the person and had not previously seen the video. Tr. 92:8-11. The agents informed the defendant that "lying to federal agents is breaking the law. That's another crime. Do you understand that? … [W]e know you haven't told us the truth so far. So more lies just makes it worse, okay?" Tr. 92:16-23. The agents asked the defendant again, "is this individual you?" Tr. 93:3. This time, the defendant

paused for approximately fifteen seconds, placed his head face down on the table, and answered, "yes." Tr. 93:3-5; Video 11 at 12:58-13:20. The agents told the defendant, "it's over," "[t]ake a breath," and "let your mind breathe," and added that he had "admitted to something that's been – you've been holding in for a long time. Okay? And you did it in the first day that we approached you about it." Tr. 93:10-23. They explained that if the defendant walked them through the details of that night, "we might not have to bring" his family members "down into DC. They might be interviewed, but we might not have to drag them all here." Tr. 94:2-7.

The agents also explained the defendant's options: he could either continue the interview, go through the evidence, answer their questions, and likely go to the courthouse the next day, or he could appear before a judge that afternoon where "[t]hey read all the charges, tell you, you know, your rights." Tr. 94:20-95:20. The defendant asked for "some time to process," and the agents left the room. Tr. 95:21-25. Another agent offered the defendant more food and drink, and the defendant requested water, which was provided. Tr. 96:4-25. When the interviewing agents returned approximately 25 minutes later, the defendant again expressed concern about how his family would react. Tr. 98:23; Video 12 at 00:08-Video 13 at 8:00. The agents responded that they understood but added that today the defendant needed to focus on himself, as his family is "going to love you no matter what. They're family, okay, and they know you." Tr. 99:5-11.

The defendant asked how much longer the interview would take if he opted to continue, and the agents told him likely "a few more hours" but added that they could take breaks, and the defendant would be "in control." Tr. 99:17-100:1. The defendant then stated, "I like talking to you guys," and "I want to keep talking to you guys." Tr. 100:2-21. The agents provided the defendant an FBI form titled "Waiver Concerning Timing of Initial Appearance Before the United States Magistrate Judge." Tr. 100:24-25. The form explained that the defendant has a right to be

brought without unnecessary delay before a judge to be advised of the charges against him and of his rights, including the right to counsel, the right to remain silent, and the right to a preliminary hearing, as well as the circumstances under which he may secure pretrial release. Exhibit B, Presentment Waiver. The agents explained that the "form is saying that you, Brian, are waiving your initial appearance this afternoon…for a period not to exceed 24 hours from the time [you] signed this waiver," "by law you're supposed to basically appear before court almost immediately after arrest," but the form "waiv[es] that right" so the defendant can "stay here and talk to us. Does that make sense?" Tr. 101:1-9. As the agents spoke, the defendant reviewed the form for more than a minute then asked, "These are my rights, even if I signed it, right?" Tr. 101:14-18; Video 13 at 14:40-16:00. The agents confirmed that they were and proceeded to read aloud the rights on the form, including the right to counsel and to remain silent, and added that "this is just saying, you still have all those rights, and you've had all those rights today. This is just saying, you're waiving the right to go for at least 24 hours to go to the judge." Tr. 101:20-102:16. The defendant signed the initial appearance waiver at 12:13 p.m. Tr. 102:19-20; Exhibit B.

The agents then attempted to revisit the surveillance video, but the defendant told them, "I don't want to watch it." Tr. 102:21-24. Later in the interview, the defendant reacted similarly to viewing pictures of his devices, stating "I don't like looking at it." Tr. 104:6-11. The defendant told the agents, "What I did that day was just the dumbest thing I've ever done in [my] life." Tr. 103:2-3.[9] He added, "something just snapped in me." Tr. 103:6-7.

[9] On December 12, 2025, after he was detained pending trial, the defendant used the same language in a recorded phone call with his parents, stating, "what I did four years ago, that was the dumbest thing I've ever done in my life." The defendant's parents immediately directed the defendant not to talk on the phone "about nothing dealing with your case" because it was recorded and told the defendant, "you didn't do nothing." The defendant agreed.

Over the next approximately 1.25 hours, the defendant walked the agents in detail through his construction, transportation, and planting of the pipe bombs.

***Construction of the Pipe Bombs.*** The defendant explained that the idea to use pipe bombs came from his interest in "looking at history" on YouTube, including "medieval history, modern history, Cold War history, World War I, World War II," and specifically "the Troubles in Ireland" where such devices were used. Tr. 129:1-130:14. The defendant decided to make the pipe bombs and bring them to Washington, D.C. during the "weeks before" January 5, 2021. Tr. 150:16-24. The defendant made the black powder in the devices using charcoal, Lilly Miller sulfur dust,[10] and potassium nitrate that he purchased from Lowes. Tr. 104:24-105:24. The defendant mixed these ingredients in a "Pyrex" bowl and "used a spoon or a ladle or a measuring cup" to "pour[] it" in the devices. Tr. 144:10-145:10. According to the defendant, he learned to make the black powder from a video game called Civilization V that listed the ingredients, and he viewed "different science videos on YouTube" to assist him in creating the devices and in understanding "how explosions work" in "a tight, confined space." Tr. 104:12-105:24, 140:16-141:3.[11] Regarding the construction of the devices, the defendant explained that he used "just a regular drill" and "just a drill bit" to drill the end caps on the devices, crimped the alligator clips "just with pliers," and used

[10] The defendant's Capitol One card records show that the defendant purchased Lilly Miller sulfur dust on January 14, 2018.

[11] A forensic review of a thumb drive recovered from the basement area of the defendant's home, where he lived, showed that the device contained a deleted copy of, among other files, the Anarchist Cookbook dated to 2016. The Anarchist Cookbook contains instructions on building homemade explosive devices. A forensic review of a hard drive recovered from the defendant's mother's bedroom showed that at various points in 2012, a user profile titled "Brian" conducted internet searches or visited webpages including "how to make a pipe bomb," "wikihow pipe bomb," "improvised explosive device," and "list of political manifestos." No digital content was recovered from the defendant's cellphone or computer; the former had been factory reset several hours before the defendant's arrest, and the latter had undergone an operating system re-installation hours before the arrest.

kitchen timers rather than alarm clock timers "because the kitchen timer was easier." Tr. 126:18-127:13. The defendant confirmed that he glued the paper clips to the timer so the timer would tick down and the paper clips would touch to complete the circuit, which he described as "basic electricity." Tr. 148:18-149:3. And the defendant confirmed that, as designed, the electricity would cause the battery to heat the steel wool and eventually ignite the explosive. Tr. 149:4-10. When asked where he kept the bombmaking materials, the defendant explained that he hid them in a closet connected to his "old bedroom," which he described as "messy back then," so they would not be found by a family member. Tr. 141:19-142:18. The defendant stated that he assembled the devices in "the hours before I went" to Washington, D.C. on January 5, 2021, and that he cleaned the devices with disinfectant wipes. Tr. 126:13-17, 149:25-150:14.

When asked about the number of components he had purchased, the defendant explained that he would question himself and "repeatedly threw [them] away" during "brief moments of clarity," and that he ultimately stopped buying components because he realized he was "doing something that's stupid." Tr. 106:14-107:8, 125:1-6.

***Transportation and Placement of the Pipe Bombs.*** The defendant stated that he transported the devices to Washington, D.C. on January 5, 2021, inside a shoe box in the back seat of his Nissan Sentra. Tr. 108:6-18. When the agents asked if the defendant used two shoeboxes, the defendant clarified, "No, one." Tr. 108:17-18. The defendant explained that he wore a mask and hood that evening to avoid identification, he wore gloves to avoid leaving fingerprints, and he wore his own eyeglasses. Tr. 131:11-16, 133:5-19. The defendant stated that he wore the Nike shoes on January 5 because he "rarely wore them" and "just thought that they were unfamiliar" so that people would not recognize them. Tr. 153:21-4.

When the defendant arrived in the city, he parked his car on D Street, Southeast, between 2nd Street and 3rd Street and Folger and Providence Parks, which the defendant described as "where I usually park when I go to DC because … that park, that park there's barely any traffic." Tr. 119:11-120:3. The defendant placed one of the devices in his backpack, exited his car, and walked toward the DNC. Tr. 110:23-111:5. The defendant sat down on a bench, took out his phone to "take my mind off of it" because "I thought that this was just going to end badly," and "it was that one moment of just, am I really fucking doing this?" Tr. 111:6-112:2. The defendant explained that he "turned the kitchen timer" on the first device "right up to the end" (60 minutes) and planted the device near the DNC. Tr. 112:11-20. The defendant then went "right back to my car and g[ot] the other one," placed it in his backpack, and walked to the RNC, where he looked for a place to plant the device, set the timer for 60 minutes, and placed the bomb. Tr. 112:21-25, 113:14-114:2, 116:12-24. The defendant showed the agents on a map how he left the area of the RNC and returned to his car. Tr. 120:11-121:2. He explained that he had used Google Maps to look up these locations in advance but did not use it while walking the area. Tr. 113:5-22.

After planting the devices, the defendant "just got in my car, went to Capitol Ale House, and went home" via "the bridge near the National Harbor." Tr. 114:7-16. The defendant told the agents that he had not tested the devices before planting them and did not know how large an explosion they would cause. Tr. 145:11-21. The defendant stated that when he learned that the devices did not explode, he was "pretty relieved," and he asserted that he placed the devices at night because "no one would have been around." Tr. 115:18-23, 123:12-16.

After the defendant walked the agents through his crimes, the agents returned to his motive. The defendant explained that "something just snapped" after "watching everything, just everything getting worse." Tr. 121:3-10. The defendant wanted to do something not to Congress but "to the

parties" because "they were in charge." Tr. 121:14-18. According to the defendant, he "really just wasn't thinking about" how the parties would react when the bombs exploded, although he hoped "there'd be some news about it." Tr. 121:19-122:8. When previously asked why he placed the devices at the RNC and DNC, the defendant answered, "I really don't like either party at this point." Tr. 103:13-14. When asked later if his crimes were related to "the January 6th certification," the defendant answered, "No." Tr. 137:7-9. The defendant then confirmed that he did not know about or attend a protest on the night of January 5. Tr. 137:10-18.

The defendant also provided the agents with a detailed accounting of his actions and mental state after committing the crimes, explaining that he "wanted to block everything out"; that when he saw himself on the news he "just froze" because "when you see yourself committing a crime, it's just, even if I was wearing all that stuff, I recognized myself"; that he disposed of the hoodie and backpack; and that he wondered "when are they going to find me?" Tr. 117:7-118:5, 123:17-20, 130:23-131:10, 146:1-6. The defendant "couldn't bear to tell anyone"—"not my family, not my coworkers, no one. So I just kept it. … Just kept it and went on with my life." Tr. 115:3-11. He added, "I don't know how many times I wanted to turn myself in. … So, so many times." Tr. 151:5-14. At the end of the interview, the agents told the defendant they were not going to require his family members to appear in Washington, D.C. because he was so forthright with them. Tr. 152:10-13. The FBI notified the family members that they had been relieved of their obligation to appear the next day, and none did.

## ARGUMENT

The defendant, as a 30-year-old, employed, high-school-educated adult, made voluntary, knowing, and intelligent decisions to waive his *Miranda* and prompt presentment rights and confess to his crimes. The defendant now claims that his detailed confession was coerced, relying

on a proffered post-arrest Level 1 autism diagnosis. But, as the recorded interview demonstrates, the defendant, throughout the interview, spoke cogently and intelligently, understood the questions put to him, and provided responsive and appropriate answers, demonstrating no intellectual or mental impairment. The defendant also made his confession under conditions that confirm its voluntariness. This was a conversational interview that followed *Miranda* warnings and a written waiver, and the agents stayed well within the bounds of judicially accepted questioning. The agents properly emphasized the strength of the evidence and downplayed the severity of the crimes, both accepted strategies commonly known as the Reid approach. They appropriately suggested that confessing would benefit the defendant and encouraged him to tell the truth without offering illusory promises of leniency. The facts here are inoffensive, unremarkable, and non-coercive. The defendant made a free and unconstrained choice to admit his guilt, and the Court should deny his motion to suppress.

## I. The Defendant Voluntarily Confessed

### A. Applicable Law

"A confession is inadmissible as a matter of due process if under the totality of the circumstances it was involuntarily obtained." *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008) (quoting *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991)). "Voluntariness turns on whether 'the defendant's will was overborne' when he gave the statement." *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). "[T]he test for this is whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *Id.* (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)). Courts look to the totality of the circumstances, including, among other factors, "the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning." *Id.* at 1305-06.

For a court to find a statement involuntary, "coercive police activity is a necessary predicate." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). A showing of coercive police activity requires "egregious facts," *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012), that demonstrate police conduct sufficient to render a defendant's will "overborne and his capacity for self-determination critically impaired," *Schneckloth*, 412 U.S. at 225; *United States v. Roberson*, 573 F.Supp.3d 209, 221 (D.D.C. 2021) (court must determine whether defendant's "will was overborne and his capacity for self-determination critically impaired as a result of egregious and coercive police conduct"). This is "a high bar." *United States v. Green*, 569 F.Supp.3d 13, 24 (D.D.C. 2021); *see, e.g.*, *United States v. Yunis*, 859 F.2d 953, 961-66 (D.C. Cir. 1988) (*Miranda* waiver voluntary where defendant questioned over four days, suffered from seasickness in a "hot and cramped detention room," and lacked any familiarity with *Miranda* rights prior to being informed and signing written waiver). The inquiry focuses on whether the confession was obtained by means "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). On the other hand, "[s]tatements made where the circumstances are less than 'egregious' are usually voluntary." *United States v. Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016) (Wilkins, J., concurring in part and dissenting in part). The government need only "establish the voluntariness of a confession by a preponderance of the evidence." *Reed*, 522 F.3d at 359.

### B. Analysis

#### i. The Defendant's Proffered Post-Arrest Autism Diagnosis Does Not Impact the Voluntariness of His Confession.

In support of suppression, the defendant makes a limited factual proffer that forms the "backdrop" for his theory: several weeks after his arrest and confession, for the first time in his life, the defendant was diagnosed with "Autism Spectrum Disorder, Level 1 (Requiring Support)."

ECF No. 102 ("Def.'s Mot.") at 12; ECF No. 52-1. Indeed, the word "autism" or "autistic" appears 37 times in the defendant's 40-page motion to suppress. The defendant's motion, however, goes far beyond this proffered fact. According to the defendant, his recently diagnosed Level 1 autism is "clinical[ly] marke[d]" by "constrained mental faculties," "cognitive limitations," and "mental impairment" that left him during the interview without "the capacity to evaluate anything at all." Def.'s Mot. at 6, 15, 21, 25. These are attorney arguments, not facts, and they are untethered either to the defendant's proffered diagnosis, which does not include an accompanying intellectual impairment, or to the hours of video-recorded interactions he had with the interviewing agents, which demonstrate that no such impairment exists.[12]

Even assuming the proffered diagnosis, the defendant's autism does not undermine the voluntariness of his confession. The defendant cites social science articles and blogs on autism, *id.* at 9 n.2, 26 n.6, 27 nn.7-10, 30 nn.11-12, and attaches them as exhibits, ECF No. 102-3. Absent from the motion, however, is any discussion of the various federal circuit and district court decisions holding that where, as here, the evidence demonstrates that the defendant understood the

[12] To date, the defense has refused the government's requests to provide information supporting the post-arrest diagnosis or describing the characteristics of the condition and declined to state even whether the diagnosing doctor will testify at the suppression hearing, despite representing in the suppression motion that the defense "will offer testimony concerning autism spectrum disorder." Def.'s Mot. at 39. The government has been provided only a four-sentence letter signed by the doctor stating that he evaluated the defendant over two days in December 2025 and "[b]ased on that evaluation [he] diagnosed [the defendant] with Autism Spectrum Disorder, Level 1 (Requiring Support) and Obsessive Compulsive Disorder." ECF No. 52-1. The only additional statement in the letter was a suggestion that the Court not draw an incriminating inference from the defendant's repetitive wiping of his cellphone—which the doctor incorrectly indicated was limited to "junk files"—because such conduct "is consistent with" his OCD diagnosis. *Id.* A forensic review showed that between December 2020 and December 2025, the cellphone recorded 943 events identified as a "factory reset" or "wipe," including a "wipe" event approximately three hours before the defendant's arrest on December 4, 2025.

questions put to him, responded appropriately, and otherwise displayed no mental or intellectual impairment, an autism diagnosis does not impact the voluntariness of a confession.

"In instances where defendants have autism, courts consider whether the defendants' mental capacities impacted the voluntariness of their statements." *United States v. Lee*, No. 1:25-cr-330 (RDA), 2026 WL 2097809, at *5 (E.D. Va. July 20, 2026). To do so, courts assess whether the defendant demonstrated a mental limitation or comprehension deficit suggesting that he did not understand the nature of the situation or was otherwise especially susceptible to coercion due to the condition. *See, e.g.*, *United States v. Chapman*, 185 F.4th 875, 889-90 (9th Cir. 2026). Where the circumstances indicate that the defendant was high functioning, understood the questions asked, and responded appropriately, an autism diagnosis does not impact voluntariness. *See, e.g.*, *id.* The Third Circuit's recent decision in *United States v. Anthony* is illustrative. No. 24-2983, 2025 WL 3110789 (3d Cir. Nov. 6, 2025). There, the court affirmed denial of the defendant's effort to suppress his statements to police based on "his learning disorders and autism spectrum disorder (ASD) diagnoses," among other things. *Id.* at *1. The defendant's *Miranda* waiver was voluntary, knowing, and intelligent, the court held, because there was evidence that the defendant, *inter alia*, "is an adult, signed a written waiver form," "was responsive to questioning throughout the interrogation," "had progressed through the eleventh grade with periods of academic success," was "at the high-functioning end of the autism spectrum," "did not exhibit symptoms that would interfere with his ability to listen to, comprehend, and respond appropriately to spoken language or to demonstrate an ability to accurately understand … information provided to him about his legal rights in the context of a police interview," and "ASD tends to manifest as lack of comfort with social interaction, not as a comprehension deficit." *Id.* at *2-3 (cleaned up); *see also Chapman*, 185 F.4th at 879, 882, 889-90 (affirming that defendant's

autism, OCD, and attention deficit disorder did not render *Miranda* waiver and subsequent statements involuntary, emphasizing that because defendant "understood what was happening when he waived his rights" and had taken his medication that day, the "diagnoses did not cause him to be susceptible to coercion"); *Lee*, No. 1:25-cr-330 (RDA), 2026 WL 2097809, at *5 (rejecting argument that defendant's autism undermined voluntariness because defendant "demonstrated an understanding and awareness of the questions asked and the circumstances around the questioning that did not give his interviewers or the Court pause about the nature of his responses," and defendant "was 36 years old," "maintained employment as an auditor," "was advised of his rights," was "not deprived of sleep, water, food, or other necessities," and "[t]he tone of the interview was friendly and conversational").[13]

The facts of this case fit squarely within the relevant authorities. At the time of the interview, the defendant was an employed 30-year-old adult who had graduated high school as a full-time student over 12 years earlier and had not, prior to his arrest and confession, been diagnosed with autism (or had relevant symptoms noted in his school records). *See Lee*, No. 1:25-cr-330 (RDA), 2026 WL 2097809, at *5; *Roberson*, 573 F. Supp. 3d at 221 (defendant's "age and education militate against" a finding of involuntariness, as defendant "was twenty-seven years old and had a high school education"). Moreover, the defendant's video-recorded interview demonstrates an absence of mental or intellectual impairment.

[13] *See also, e.g.*, *United States v. Dzionara-Norsen*, No. 21-454-cr, 2024 WL 191803, at *2 (2d Cir. Jan. 18, 2024) (rejecting defendant's involuntariness claim based on autism where defendant "was coherent and appeared to understand the agents' questions and statements"); *United States v. Orgil*, No. 24-11796, 2025 WL 1949619, at *3 (11th Cir. July 16, 2025); *United States v. Ricker*, 983 F.3d 987, 990, 993 (8th Cir. 2020); *State v. Glenn*, 244 A.3d 1023, 1025, 1031 (Me. 2021).

Dr. Rachel Orr, a clinical neuropsychologist who is board certified by the American Board of Professional Psychology, reviewed the defendant's interview and other records and opined that "there is no available information to show functional impairment." Exhibit C, Report of Rachel L. Orr, PsyD, ABPP-CN ("Orr Rep.") at 11. Dr. Orr observed that the defendant "appears to understand questions and comments directed to him (evident in consistently on-topic responses), responds consistently to direct questions, uses complex language, and uses mature vocabulary in appropriate context." *Id.* at 10; *see Chapman*, 185 F.4th at 889-90; *Anthony*, No. 24-2983, 2025 WL 3110789, at *2-3; *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005) (fact that defendant was "not a minor," had "completed the eleventh grade," and "did not have difficulty understanding the questions put to him" were all "characteristics weigh[ing] in favor of the voluntariness of his confession"). Moreover, Dr. Orr noted examples of the defendant conversing "[a]t an even more advanced level," including "perspective-taking" and "self-awareness," clarifying details to provide relevant background, and recognizing that others may lack the knowledge he has, thus requiring explanation. Orr Rep. at 10. This, according to Dr. Orr, is consistent with the defendant's proffered post-arrest Level 1 autism diagnosis, which, if supported, reflects the mildest form of autism and does not specify any intellectual impairment. *Id.* at 9-10; *see, e.g.*, *United States v. Pecoraro*, 568 F.Supp.3d 169, 180 (N.D.N.Y. 2021) (post-arrest ASD diagnosis "with deficits in social communication but without intellectual impairment" and claimed "reflexive deference to authority" did not render confession involuntary); *United States v. Hinrichs*, No. 4:23CR3005, 2025 WL 1687835, at *3 n.8, *8 (D. Neb. June 5, 2025) (defendant's

diagnosis of "Autistic Spectrum Disorder, without accompanying intellectual impairment, requiring support" did not render statements involuntary).[14]

The defendant's motion does not address precedents concerning autism and voluntariness. Instead, the defendant conflates autism with mental and cognitive disabilities and relies only on authorities addressing the latter, without attempting to explain why those authorities are relevant to a defendant whose intellectual functioning is not impaired. *See, e.g.*, Def.'s Mot. at 26-29. Autism diagnoses are based "primarily on social and behavioral symptoms," not intellectual functioning. Orr Rep. at 13. Autism "is not interchangeable with a diagnosis of Intellectual Disabilty or characterization of being intellectually impaired," and "it would not be appropriate to equate" the defendant's proffered autism with "mental deficiency," "cognitive impairment," or any of the other similar labels in the defendant's motion. *Id.* In one especially notable example of this improper conflation, the defendant represents that "autistic individuals are disproportionately likely to give 'compliant false confessions'—confessions made to 'escape the stress of interrogation'—because the techniques of custodial questioning render them 'more compliant with police requests, suggestible to police-generated narratives, and less able to communicate exculpatory information.'" Def.'s Mot. at 26 (quoting Lauren Rogal, *Protecting Persons with Mental Disabilities from Making False Confessions: The Americans with Disabilities Act as a Safeguard*, 47 N.M. L. Rev. 64, 66-69 (2017)). The Rogal law review article, however, concerned persons with "mental disabilities, particularly intellectual impairments and psychotic disorders," not autism, which is not mentioned even once in the article. *Protecting Persons*, 47

[14] Dr. Orr also noted as a "strength[]" in the defendant's "functioning within everyday life" that he reported building home computers. Orr Rep. at 10. In *United States v. Guillen*, the Tenth Circuit, in finding a voluntary *Miranda* waiver, emphasized that the defendant had both "taught himself how to build a sophisticated explosive device from homemade materials" and "built his own computer." 995 F.3d 1095, 1123 (10th Cir. 2021). The same aptitudes are present here.

N.M. L. Rev. at 68-69. In reality, the opposite of the defendant's claim is true: "research has repeatedly found no difference between autistic individuals and neurotypical individuals in suggestibility, even in children." Orr Rep. at 11-12 (citing studies). The defendant misstates the literature a second time when he claims that "[h]igh levels of suggestibility … are common traits among autistic individuals in general." Def.'s Mot. at 26-27 (citing Alice S. North, Ailsa J. Russell & Gisli H. Gudjonsson, *High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities During Interrogative Interview*, 19 J. Forensic Psychiatry & Psych. 323 (2008)). The North study "actually found that autistic individuals were no more vulnerable to interrogative suggestibility than their typical counterparts, a finding" that has been "replicated." Orr Rep. at 12.

Even in cases (unlike this one) involving a defendant with an actual "diminished mental capacity," that factor "does not by itself insulate" the defendant from a voluntariness finding. *United States v. Rang*, 919 F.3d 113, 118 (1st Cir. 2019); *see United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) ("Generally, we have concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled."). The defendant's mental capacity is just one circumstance in the totality that courts must consider. *Rang*, 919 F.3d at 118. In *Rang*, for example, the First Circuit affirmed the lower court's finding of voluntariness despite "testimony from a licensed and board-certified clinical neuropsychologist who evaluated Rang's cognitive abilities that Rang has an impaired ability to understand complex or abstract concepts, to apply logic, and to use sound judgment." *Id.* at 117-18 (internal quotation omitted). Rang's interview showed that he was "responsive and followed the thread of the questioning – even crafting lies when it appeared to help him – supporting the district court's conclusion that Rang gave coherent answers which signaled his understanding of the questions asked." *Id.* at 118

(internal quotation omitted). So too here, the defendant was sufficiently intelligent to make a voluntary decision to speak to the police (and repeatedly lie to them), and "[t]he Constitution guards against compulsion by the state, not poor decision-making by defendants." *Id.* at 120; *see United States v. Hall*, 969 F.2d 1102, 1105-09 (D.C. Cir. 1992) (finding voluntary consent given by defendant with IQ of 76 and minimal schooling where defendant refused to answer questions and lied to officers, an "evasive maneuver" that "hardly fits the profile of a subject so overborne by the mere police presence that she lacked all ability to make voluntary choices"); *Yunis*, 859 F.2d at 966 ("[c]ourts have often held" that defendants with "extremely low intelligence" can voluntarily waive *Miranda* rights if they understood those rights and were not coerced).[15]

Finally, as the defendant appears to acknowledge in his motion (at 24), the interviewing agents did not know he had Level 1 autism when they interviewed him. A claimed psychological condition "does not render [a defendant's] statements involuntary unless the agents took advantage of" it. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995); *see also United States v. Ordonez-Zometa*, 141 F.4th 531, 553 (4th Cir. 2025) (no evidence defendant's mental state was "exploit[ed]" or "manipulated in order to coerce him into a confession," which is a "necessary predicate to finding that a confession is not voluntary" (citing *Connelly*, 479 U.S. at 167); *Anthony*, No. 24-2983, 2025 WL 3110789, at *3 (voluntary waiver by autistic defendant where "detectives did not take advantage of a known or apparent mental disability"). Attempting to sidestep this

[15] *United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005) (waiver by defendant with low IQ and numerous mental disorders was voluntary where he indicated that he understood rights and "nothing in the record" contradicted this); *United States v. Turner*, 157 F.3d 552, 554, 555 (8th Cir. 1998) (defendant with IQ in "low-average to borderline range" was "clearly intelligent enough to understand his rights" (internal quotation omitted)); *Henderson v. De Tella,* 97 F.3d 942, 948-49 (7th Cir. 1996) (despite "below-average I.Q. and limited reading abilities," defendant's conduct showed he "was able to comprehend what his rights were and to waive them knowingly and voluntarily").

problem, the defendant suggests that the agents were on "notice" of the defendant's autism because he told them he likes routine, struggles in conversation, and was distressed after he was confronted about his crimes and told the evidence against him. Def.'s Mot. at 25-26. However, as Dr. Orr makes clear, "there was no evidence of impairment during the session," the defendant's preference for routine was "nonspecific," the interview "could be challenging for anyone," and the defendant's stress indicators were "no different than those expected by a neurotypical individual who may be anxious." Orr Rep. at 6, 11, 16. The defendant demonstrated "signs of generalized anxiety quite typical and expected for the circumstance, with no clinical indications of … dysregulation, psychological decompensation, or 'shut down.'" *Id.* at 17.

At bottom, there is no evidence that the defendant is intellectually or mentally impaired, and the video-recorded interview affirmatively establishes that he understood the questions asked and gave appropriate answers. The defendant's proffered post-arrest Level 1 autism diagnosis, if supported, does not impact the voluntariness of his confession.

**ii. The Conditions of the Interview Heavily Favor Voluntariness.**

Further supporting voluntariness, "[t]he conditions of the interview" provide multiple "indicia of a lack of coercion." *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). Upon entering the interview room, the agents removed the defendant's handcuffs and provided him with a comfortable chair and food and drink. The defendant "agreed to the interview. The agents did not pressure him to do so in any way." *United States v. Hallford*, 816 F.3d 850, 858 (D.C. Cir. 2016). And although being arrested and taken to "a confined space with [two] law enforcement officers could easily engender feelings of unease," *Roberson*, 573 F.Supp. at 223, this is "inherent in any custodial interrogation," *see United States v. Murdock*, 667 F.3d 1302, 1306 (D.C. Cir. 2012); *Oregon v. Hass*, 420 U.S. 714, 722-23 (1975) ("[The defendant] properly sensed, to be

sure, that he was in 'trouble'; but the pressure on him was no greater than that on any person in like custody or under inquiry by any investigating officer."); *Linnen v. Poole*, 766 F.Supp.2d 427, 450 (W.D.N.Y. 2011) ("[T]here was nothing unusual about the interview room in which Linnen was questioned to suggest that the location itself was somehow inherently coerced.").

The tone of the interview underscores the voluntariness of the confession. As the video demonstrates, the agents' questioning "was 'not the least bit aggressive in content, tone, or body language.'" *Roberson*, 573 F.Supp.2d at 221-22 (quoting *United States v. Kelsey*, 917 F.3d 740, 751 (D.C. Cir. 2019)). "The agents asked straightforward questions in conversational tones." *Hallford*, 816 F.3d at 858; *United States v. Harris*, No. 19-358 (RC), 2021 WL 1167263, at *2 (D.D.C. Mar. 26, 2021) (fact that interview "was conducted in a calm and conversational fashion" weighed in favor of voluntariness). At no point did the agents yell at the defendant or show even slight hostility toward him. Instead, "the agents treated [the defendant] with both kindness and respect" and "attempted to ensure that he was comfortable" throughout, *United States v. Lieu*, 298 F.Supp.3d 32, 49 (D.D.C. 2018), repeatedly offering him food, drink, breaks, and sources of comfort. Indeed, assuming the defendant's proffered diagnosis is supported, the agents conducted the interview in a manner that was "supportive and helpful for someone with a diagnosis of ASD." Orr Rep. at 14 (providing multiple examples of neuro-affirming characteristics of interview).

Moreover, before asking substantive questions, the agents ensured that the defendant understood his *Miranda* rights by explaining the concept of waiver, reading each specific right aloud to him, and providing the rights in writing, which the defendant understood and signed. "A waiver of *Miranda* rights is 'highly probative' of the voluntariness of subsequent statements." *Kelsey*, 917 F.3d at 751 (quoting *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)); *United States v. Wright*, 233 F.Supp.3d 165, 176-77 (D.D.C. 2017); *Harris*, No. 19-358 (RC), 2021 WL 1167263,

at *2. *Miranda* warnings "tend[] in the direction of a voluntariness finding" because they bear on (1) "the coerciveness of the circumstances" by showing "that the police were aware of the suspect's rights and presumably prepared to honor them," and (2) "the defendant's susceptibility" by showing "that the defendant was aware he had a right not to talk to the police." 2 Wayne R. LaFave, et al., *Criminal Procedure* § 6.2(c) (4th ed. 2015); *see United States v. Baugham*, 449 F.3d 167, 175 (D.C. Cir. 2006) (LaFave is a "leading treatise").[16]

The length of the interview also supports voluntariness. When the interview began, the defendant had been detained for just over two hours, and in total the interview lasted slightly more than four hours. Stated simply, this "interview looks nothing like the week-long detention in *Chambers v. Florida*, 309 U.S. 227, 235-38 (1940), that the Supreme Court has cited as indicative of involuntariness[,] … [n]or does it resemble the 36-hour continuous interrogation in *Ashcraft v. Tennessee*, 322 U.S. 143, 153 (1944), that the Court has likewise cited as weighing against voluntariness." *United States v. Pelice*, No. 22-246 (JDB), 2025 WL 3538700, at *4 (D.D.C. Dec. 10, 2025) (citing *Schneckloth*, 412 U.S. at 226); *see also United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011) (five-hour interview "not indicative of coercion," as "interviews lasting several hours (as opposed to entire days) are not considered to be of 'great duration,' and are therefore not indicative of coercion." (quoting *United States v. Williams*, 612 F.3d 417, 422 (6th Cir. 2010) ("[I]t is not even clear that a 24-hour interrogation amounts to one of 'great duration'" (cleaned up)).

[16] The defendant, understandably, does not appear to challenge his *Miranda* waiver. "In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted); *accord Lieu*, 298 F.Supp.3d at 48 ("[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver") (quoting *Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

In sum, the "tone of the interview was cordial, its length was reasonable, and the defendant was not deprived of any essentials," all of which "are indicia of a lack of coercion" and a "finding of voluntariness." *Hughes*, 640 F.3d at 438.

**iii. The Agents Properly Emphasized the Strength of the Evidence and Downplayed the Severity of the Defendant's Crimes.**

The defendant refers throughout his motion to the so-called Reid approach to interviewing, insinuating that such questioning is somehow presumptively suspect. *See, e.g.*, Def.'s Mot. at 27 (describing "Reid-style" questions as "dangerous"). The defendant goes so far as to suggest that Reid-based questioning caused him to falsely confess. *See id.* at 13 n.4 (stating that "[f]alse-confession scholars have long identified … the Reid technique specifically … as [a] principal risk factor[] for eliciting confessions from innocent suspects"). This critique is without merit.

While the defendant claims that the agents overwhelmed him with "[a]ssertions of infallible certainty and one-sided presentation of the evidence," Def.'s Mot. at 15-16, "[c]learly there is nothing improper with confronting the suspect with the actual evidence against him," 2 LaFave, et al., *supra*, § 6.2(c); *see also, e.g.*, *Ray v. Duckworth*, 881 F.2d 512, 518 (7th Cir. 1989) ("[a]n interrogating officer's act of merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct"); *United States v. Murdock*, 491 F.3d 694, 699 (7th Cir. 2007). This is precisely what the agents did here by highlighting the strength of the location and purchase history evidence, and it was not coercive. Moreover, the agents' recitation of the evidence was hardly "one-sided," as the defendant repeatedly denied his guilt and offered his own version of events. If the defendant felt "trapped" after hearing the agents describe the evidence against him, *see* Def.'s Mot. at 16, that was the product of a guilty conscience, not police coercion.

To appreciate the restrained approach in this case, consider what courts across the country have permitted in other cases. Indeed, the law allows agents to affirmatively *misrepresent* their evidence to secure a confession. That is because, "[o]f the numerous varieties of police trickery, … a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992); *see United States v. Green*, 569 F.Supp.3d 13, 24 (D.D.C. 2021) (although detectives "misled" defendant about evidence, "the Supreme Court has held that police tactics of that kind are permissible under the Due Process Clause." (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) and *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012)). To name only a few of these permissible tactics, courts have found confessions voluntary where police falsely told a suspect that his hand tested positive for heroin,[17] falsely told a suspect that a murder victim was still alive and had identified the suspect,[18] falsely told a suspect that non-existent witnesses had been found,[19] falsely told a suspect that forensic evidence had linked them to the crime scene,[20] and falsely told a suspect that an accomplice had confessed and implicated them.[21] The agents' statements here—that the evidence of the defendant's guilt is overwhelming and he cannot convince them of his innocence—were not false and, in any event, pale in comparison to tactics found non-coercive in other cases.

Similarly, the agents' expressions of disbelief and their suspicions that the defendant was lying to them during the interview are not evidence of coercion. According to the defendant, the

[17] *See, e.g.*, *Mohammed*, 693 F.3d at 198.

[18] *See, e.g.*, *United States v. Whitfield*, 695 F.3d 288, 302 (4th Cir. 2012).

[19] *See, e.g.*, *United States v. Little*, 119 F.4th 750, 776 (10th Cir. 2024); *Ledbetter v. Edwards*, 35 F.3d 1062, 1066 (6th Cir. 1994).

[20] *See, e.g.*, *United States v. Sturdivant*, 796 F.3d 690, 697 (7th Cir. 2015) (DNA); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (fingerprints).

[21] *United States v. Ceballos*, 302 F.3d 679, 694 (7th Cir. 2002); *United States v. Velasquez*, 885 F.2d 1076, 1088 (3rd Cir. 1989).

agents "systematically eliminated every answer but confession" and "falsely foreclose[d] every response but one." Def.'s Mot. at 15-16. This dramatic editorializing does not convert the agents' actual statements into coercive police conduct. In fact, the agents told the defendant that they knew he was lying because they knew his phone's location, which was consistent with the RNC and DNC and not the Capitol, and they knew he purchased the bomb components. It is expressly "permissible to elicit further statements by claiming not to believe' a defendant's denials." *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993). Indeed, "continuing to question a suspect after the suspect claims he is innocent" not only "does not constitute coercion" but "is often necessary to achieve the truth," as was the case here. *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810-11 (9th Cir. 2003); *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987) ("an interrogator can legitimately express his disbelief at a defendant's story in order to elicit further comments or explanations.").

The defendant complains that the agents, in urging him to tell the truth, emphasized that "no one got hurt" and that this was "one dumb mistake" that could be "put behind" them. Def.'s Mot. at 21-22. He makes the dubious assertion that the agents' statements minimizing his blameworthiness "do[] not merely invite confession," they "manufacture[]" confession. *Id.* at 22. The defendant's suggestion that minimization forced him to falsely confess is made, again, without even the thinnest support. *See id.* The claim appears to be premised on the defendant's false-confessions expert, who declares minimization an "implied promise" of leniency that is "apt to make an innocent person confess to a crime he did not commit." *Id.* at 22-23. This is not the law.

Generally, "only certain types of promises, when not kept, will render a resulting confession involuntary." *United States v. Hunter*, 912 F.Supp.2d 388, 400 (E.D. Va. 2012) (citing *United States v. Shears*, 762 F.2d 397, 401-02 (4th Cir. 1985) (collecting cases from various

circuits)). "These promises are limited to explicit statements by the questioning official that he will do, or not do, a specific act, in exchange for the confession." *Id.* (citing *Shears*, 762 F.2d at n.5). "Given this narrow view of a binding promise, confessions are rarely found to be involuntary on that basis." *Id.* (collecting cases from various circuits). Where, as here, agents merely express "opinions concerning the criminality of [the defendant's] conduct and how it would be viewed by others" and offer "repeated assurances that [they] understood how [the defendant] must have felt" and viewed the conduct as less culpable, such statements, while "no doubt persuasive and inducing," are not "a *quid pro quo* promise" to the defendant "in exchange for a confession" and do not render the confession involuntary. *Id.* at 401. Nor are statements urging the defendant to come clean and tell the truth problematic, as "[t]he practice of encouraging a suspect to be honest is well-established in the circuits as noncoercive conduct." *United States v. Pena*, 115 F.4th 1254, 1263 (10th Cir. 2024) (collecting cases).[22]

**iv. The Agents' Suggestions that Confessing Would Benefit the Defendant Were Appropriate and Not Coercive.**

According to the defendant, the agents impermissibly "promised [him] concrete benefits" to confess. Def.'s Mot. at 19. In fact, the agents accurately described some of the general positives of telling the truth, including that "being forthright" would "really benefit you in the long run," "you can help yourself by telling us the truth," "coming forward today will help you in multiple ways," and "if you do tell us the truth, we can tell our bosses and the people that are involved in

[22] The defendant cites *United States v. Lopez* as finding coercion "where agents minimized the offense as a 'mistake'" and "promised leniency." Def.'s Mot. at 23 (citing *United States v. Lopez*, 437 F.3d 1059, 1066 (10th Cir. 2006)). This understates the facts of *Lopez* beyond recognition. The agent in *Lopez* promised the defendant that "he would spend fifty-four fewer years in prison if he would confess to killing [the victim] by mistake"—a "promise … of the sort that may indeed critically impair a defendant's capacity for self-determination." *Id.* at 1065. There is no comparison between the facts of *Lopez* and the agents' statements in this case.

this case that he was straightforward with us on day one," which "hopefully … will help you down the line when you have to deal with the consequences of this action."

These statements are non-coercive. For one, these were not express promises of leniency. *See United States v. Villalpando*, 588 F.3d1124, 1129 (7th Cir. 2009) (offer to "go to bat" for defendant and "work this out" so "we don't have to charge you" did not "represent[] a solid offer of leniency" for confessing). But "even if [the] statements, which at most imply [the agents] could help [the defendant] with charges if [he] cooperated, amounted collectively to an implied promise of leniency, it was not objectively coercive." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016). "Generally, such promises are coercive only if they are broken or illusory, and promises to recommend leniency and speculation that cooperation will have a positive effect do not make subsequent statements involuntary." *Id.* (cleaned up). Indeed, "a promise of leniency in exchange for cooperation usually is permissible." *Id.* (cleaned up). Likewise, an officer's "promise to inform the prosecutor" of the defendant's cooperation "do[es] not support a finding of coercion." *Stokes*, 631 F.3d at 808; *see also, e.g.*, *United States v. Monteer*, 83 F.4th 1119, 1123 (8th Cir. 2023). The agents in this case simply made "statements to the effect that it would be to a suspect's benefit to cooperate," which are "common sense factual observations" that are "not improperly coercive." *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995); *see also, e.g.*, *United States v. Maytubby*, 130 F.4th 1194, 1199 (10th Cir. 2025).

The defendant nevertheless cites three cases that he represents involve "promises" that were "precisely" similar to the agents' statements here and which "rendered confessions involuntary outright." Def.'s Mot. at 20.[23] Comparing these precedents to the facts of this case is

[23] The defendant also cites (at 19 and 21) the D.C. Circuit's language in *United States v. Powe* concerning "direct or implied promises, however slight." 591 F.2d 833, 840 (D.C. Cir. 1978). That quote comes from the Supreme Court's 1897 decision in *Bram v. United States*, which

illuminating, but not in the way the defendant suggests. *Sharp v. Rohling* involved a promise that the defendant "would not go to jail despite her confession," a "false or misleading" "get-out-of-jail-free card" that "induced her confessional statements" by making "clear there would be no cost of disclosure." 793 F.3d 1216, 1230-34 (10th Cir. 2015). *United States v. Lall* found the defendant's *Miranda* waiver involuntary where the detective told the defendant, before the defendant made incriminating statements, that "any information" the defendant "shared with the police would not be used to prosecute him" and "that he was not going to pursue any charges against him." 607 F.3d 1277, 1281-83 (11th Cir. 2010). And *Lopez*, discussed above, involved a promise that the defendant "would spend fifty-four fewer years in prison if he confessed to killing [the decedent] by mistake." 437 F.3d at 1065. These cases illustrate what coercive promises of leniency look like: calculated illusions that "critically impair a defendant's capacity for self-determination," *id.* at 1064-65, not, as here, general allusions to the benefits of telling the truth.

Given the absence of a coercive promise in this case, the defendant falls back to claim that the agents made "promises delivered through deception." Def.'s Mot. at 20. "[T]his case," the defendant asserts, is one in which the agents "couple[d] the prospect of cooperation with misrepresentations—about the evidence, the law, or the consequences of speaking." *Id.* at 20-21. This solemn charge is supported by two purported falsehoods—the agents told the defendant the evidence against him is "overwhelming" (it is), and the agents told the defendant "the fiction that

held, "a confession shall be deemed involuntary if it was 'extracted by any sort of threats or violence (o)r obtained by any direct or implied promises, however slight, (o)r by the exertion of any improper influence.'" *Powe*, 591 F.2d at 840 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). The Supreme Court more than 30 years ago clarified that "this passage from *Bram* … under current precedent does not state the standard for determining the voluntariness of a confession," which must be "viewed in a totality of the circumstances." *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991).

confessing would spare his family from custodial interrogations" (it did, although the "fiction" is that anyone mentioned "custody"). *Id.* at 21. These claims fall well short.

Again, the cases on which the defendant relies are illustrative. In *United States v. Young*, the agent "did not merely inform Young that cooperation would be viewed favorably by the prosecutor," but instead repeatedly and falsely "told Young he had spoken with a federal judge who had reviewed the case" and "would tell the judge whether Young had cooperated and that cooperation would" lower his sentence, thereby coercing his confession. 964 F.3d 938, 944-46 (10th Cir. 2020). *United States v. Anderson* found coercion based in part on the agent's "false and/or misleading" statements to the defendant that he had to choose between having counsel present during the interview or cooperating, creating "a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the police agents." 929 F.2d 96, 100 (2d Cir. 1991). As discussed, this case did not involve falsehoods, much less falsehoods comparable to those that have supported coercion.

The real core of the defendant's claim is not law but "social science," which he asserts is "less forgiving than the case law." Def.'s Mot. at 19. According to the defendant's false-confessions expert, "promises of leniency (whether implicit or explicit)" are "prohibit[ed] in American police interrogation." *Id.* at 19; ECF No. 102-2 at 20-21. This sweeping claim not only is inconsistent with legal precedent around the country, but the "social science" underlying the claim is, according to the expert's report, his own book, which has been cited by courts to underscore "[t]he absence of solid empirical data" that "counsels against admitting false-confession expert testimony" and "demonstrates how false-confession experts are largely unable

to offer predictive, falsifiable theories." *United States v. Begay*, 497 F.Supp.3d 1025, 1076 (D.N.M. 2020) (citing Richard A. Leo, *Police Interrogation and American Justice*, 4-5 (2008)).[24]

**v. The Agents Did Not Make Misrepresentations or Deceive the Defendant.**

While "[s]ignificant police deception may bear on whether a statement or confession has been coerced," "the agents here engaged in neither deception nor trickery." *Hallford*, 816 F.3d at 858. There is simply "no indication" that "law enforcement made false statements about evidence or false promises." *Pelice*, No. 22-246 (JDB), 2025 WL 3538700, at *4. The defendant nevertheless claims that the agents, by telling him that "lying to federal agents is breaking the law," somehow "pervert[ed] federal law" and engaged in a form of "[t]rickery"—that is, a "lie[] about a defendant's legal rights." Def.'s Mot. at 16-17. He characterizes the agents' statements as telling "a man in the act of asserting his innocence" that "any continued denial would *itself* be criminally prosecuted." *Id.* (emphasis in original).

The defendant is factually incorrect. At the time the agents warned him about the perils of lying to federal agents, the defendant had already provided and maintained repeatedly a false story about his whereabouts on January 5. In other words, the defendant had not merely "assert[ed] his innocence" but had made "affirmative, discursive and voluntary statements to Federal criminal investigators" that Department of Justice policy expressly identifies for prosecution. U.S. Dep't of Justice, *Criminal Resource Manual* § 916, https://www.justice.gov/archives/usam/criminal-resource-manual-916-false-statements-federal-investigator (last visited Nov. 13, 2026). Thus,

[24] *See United States v. Begay*, 310 F.Supp.3d 1318, 1354-56 (D.N.M. 2018) (excluding Dr. Leo's false-confession testimony under *Daubert* because it vouches for defendant's credibility, lacks relevance, would not assist trier of fact, has no error rate, and was not shown to be reliable, and collecting cases excluding Dr. Leo's testimony on similar grounds); *Brown v. City of Chicago*, No. 18 C 7064, 2023 WL 2561728, at *12 (N.D. Ill. Mar. 17, 2023) (excluding part of Dr. Leo's proffered false-confessions testimony based on "two pages of a book he has written" and "no data" (citing Leo, *Police Interrogation and American Justice*)).

when the agents told the defendant that lying to federal agents is breaking the law and that more lies would make it worse, they were providing accurate information, not "perverting" federal law.

The defendant is also mistaken on the law. He offers no legal authority for his claim that a false statement warning is "trickery"; the claim rests on his false-confessions expert. Def.'s Mot. at 17. That is because "[a]dmonishing a suspect to tell the truth during an investigatory interview by informing him of the statutory penalty under 18 U.S.C.A. § 1001 for making false statements does not constitute coercive police conduct rendering a statement involuntary." *United States v. Braxton*, 112 F.3d 777, 782 (4th Cir. 1997); *Rivers v. United States*, 400 F.2d 935, 943 (5th Cir. 1968); *United States v. McVicker*, 979 F.Supp.2d 1154, 1185 (D. Or. 2013). While such admonitions may be "sobering, and may even be intimidating," they "do not deliver a threat and are not inherently coercive." *United States v. Sater*, 477 F.Supp.3d 372, 385 (M.D. Pa. 2020).[25]

Nor does the defendant's emphasis on "timing"—*i.e.*, that the defendant, after being warned that more false statements would make things worse, finally admitted his guilt—move the needle. Def.'s Mot. at 17. "[I]t is not enough to show that the authorities' representations were the but-for cause of a confession." *United States v. LeBrun*, 363 F.3d 715, 725 (8th Cir. 2004) (citing *Schneckloth,* 412 U.S. at 224 (under a but-for causation test, "virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind")); *Holland*, 963 F.2d at 1051 ("[C]ausation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because it can almost always be said that the interrogation caused the confession." (quotation omitted)). "Thus,

[25] The cases cited by the defendant (at 17) simply recognized that "extreme forms of deception or chicanery" can undermine voluntariness. *United States v. Graham*, No. 3:13–cr–11–TCB, 2014 WL 2922388, at *9-10 (N.D. Ga. June 27, 2014); *see also Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002). This case, like those cases, does not involve any such deception.

the issue is not causation, but the degree of improper coercion," and there was no improper coercion here. *Holland*, 963 F.2d at 1051.

Although the agents did not mislead the defendant, the defendant, for his part, exercised his will repeatedly to deny his culpability, affirmatively provide a false cover story, and make provably false claims to not have purchased certain bomb components (*e.g.*, timers and end caps) that he later admitted using to construct the bombs. This is further indicia of voluntariness, as the D.C. Circuit and others have made clear. *See, e.g.*, *Hallford*, 816 F.3d at 859 (refusal to consent to search was "strong evidence that [defendant's] will was not 'overborne'"); *United States v. Cooper*, 499 F.2d 1060, 1064 & n.11 (D.C. Cir. 1974); *Burney v. Broomfield*, 175 F.4th 1089 (9th Cir. 2026); *United States v. Graham*, 982 F.2d 273, 275 (8th Cir. 1992) (evidence "not reflective of an overborne will" where defendant "answered some questions" but "dodged questions about her identity"); *United States v. Jones*, 411 F.Supp.2d 1262, 1270 (D.N.M. 2005) (emphasizing that defendant "demonstrated an ability to defy the supposed wishes of the agents by initially telling them that he had nothing to do with the alleged" crimes).

**vi. The Agents Accurately Referenced that the Defendant's Family Members Were Legally Required to Appear in Washington, D.C. and at No Point Threatened to Arrest or Take them into "Custody."**

The defendant's suggestion that the agents "improperly used [his] family as leverage" by "threat[ening] to arrest family members" without "probable cause to do so," Def.'s Mot. at 18, rests on his categorically incorrect representation that the agents "told [the defendant] his family would be brought into custody unless he complied," *id.* at 23; *see also id.* at 21 (claiming agents told defendant "that confessing would spare his family from custodial interrogations"). No such threats were made, as the transcript and video demonstrate.

The agents did tell the defendant that if he told the truth, the agents "might not have to bring" his family members to Washington, D.C. But the defendant fails to provide the Court with the necessary context for this statement. Each of the defendant's family members was under subpoena and legally required to appear in Washington, D.C. the next day. The agents simply informed the defendant that telling the truth "might" avoid those family members having to appear, as they were obligated to do. This was true. After the interview, the government notified the family members that they had been relieved of their obligation to appear in Washington, D.C., and none did.[26]

The defendant cites a litany of cases for the uncontroversial proposition that law enforcement cannot baselessly threaten to arrest a defendant's family members unless he cooperates. Def.'s Mot. at 18-19. The law is equally clear, however, that "an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to … accurately depict the situation to the suspect." *United States v. Hufstetler*, 782 F.3d 19, 24 (1st Cir. 2015); *United States v. Jacobs*, 63 F.4th 1055, 1059 (6th Cir. 2023) (statement not coerced where police threatened to get warrant and search father's car and house because "a threat to perform a lawful search isn't objectively coercive."). Thus, the agents' suggestion that the defendant's family members would be required to appear in Washington, D.C. absent further action by the government was not coercive because it was true.[27]

[26] The defendant admits in a footnote that the "agents never said they would 'arrest' his family." Def.'s Mot. at 36 n.13. However, he preemptively accuses the government of "split[ting] hairs" by focusing, as it does now, on the absence of a factual basis for his claim. *Id.* The terms "arrest" and "custody" are legal concepts, and the government does not split hairs by relying on their meanings.

[27] *See also United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006) ("a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from" an "unwarranted threat to arrest" without probable cause); *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003); *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir.

**vii. The Defendant's Feelings of Stress and Anxiety When Questioned by the FBI About His Crimes Are Not Evidence of Coercive Police Activity.**

Much of the defendant's motion focuses on the stress and anxiety he experienced after his arrest and during his FBI interview, suggesting that the defendant somehow "los[t] the capacity to evaluate anything at all." *See, e.g.*, Def.'s Mot. at 21. While there is no question that the defendant was distressed after his arrest and when confronted with the evidence of his guilt, this does not evince coercion.

As an initial matter, the defendant's motion emphasizes that the agents who executed his arrest warrant did so at gunpoint. Def.'s Mot. at 2-4, 33, 36. The agents were arresting the defendant based on substantial evidence that he manufactured, transported, and planted improvised explosive devices, that he purchased far more bombmaking components than were used to create the January 5 devices, and that he had a registered firearm. Unsurprisingly, the law reflects the sensible conclusion that a reasonable display of force under circumstances like these is not coercive. In *United States v. Gallardo-Marquez*, the defendant claimed that "the manner in which he was arrested" was coercive, citing, *inter alia*, that "a group of armed policemen entered his home at 6:30 in the morning" while "he was in bed and was not wearing any clothes." 253 F.3d 1121, 1123 (8th Cir. 2001). The Eight Circuit rejected the argument, explaining that "[t]he police had information that" the defendant "possessed firearms and that he had threatened the life of a police officer, thus, their pre-dawn 'raid' on [his] residence was reasonable." *Id.*; *see United States v. Williams*, 760 F.3d 811, 816 (8th Cir. 2014) ("a 'police-dominated' atmosphere arising from the execution of a search warrant by a group of armed agents likewise is not sufficient to establish an overborne will"); *United States v. Griffith*, No. 21-244-2 (CKK), 2023 WL 2401621, at *4 (D.D.C.

---

2001); *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986).

Mar. 8, 2023) (officer drawing sidearm during initial traffic stop is "mild compared to the far more severe circumstances the Court of Appeals has held are not coercive").

Turning to the interview, the defendant repeatedly highlights that, once confronted about his crimes, he experienced various forms of "distress." Def.'s Mot. at 5-6, 9, 13, 26. But nervousness and anxiety are inherent to a post-arrest custodial interview, and "apprehension is a natural response when unexpectedly approached by law enforcement officers." *Roberson*, 573 F.Supp.3d at 222-23; *see also* Orr Rep. at 16 (noting that FBI interview "would be stressful or anxiety-provoking for anyone" and that "verbalization" of being "scared," "fidgeting and shaky behavior, gastrointestinal upset, and paced breathing" are all general symptoms of anxiety). A defendant cannot simply point to "his fragile mental state and the onset of [a] panic attack" without more. *Hughes*, 640 F.3d at 438-39; *see United States v. Bailey*, No. 1:08cr00230-2, 2008 WL 11329506, at *6 (M.D.N.C. Sept. 12, 2008) (statements voluntary where defendant "hyperventilating and crying profusely" to point that detective asked defendant whether he "needed emergency medical service" before defendant made incriminating statements). Moreover, as the video shows, the defendant's apparent "distress" was limited to the period during which he was denying his guilt. That is, the defendant's anxiety was heightened while he was lying to federal agents, but after confessing, the defendant visibly relaxed, his distress subsided, and his answers to questions became calm and clear. *See* Orr Rep. at 17 ("[T]he observable signs of anxiety in Mr. Cole largely disappeared following his self-identification, revealing … a more relaxed and calm demeanor for the remainder of the session," during which "his fidgeting, shaking, and repetitive speech were all largely absent."). And contrary to the defendant's claimed "autistic shutdown," Def.'s Mot. at 29, the defendant displayed "no behavior … consistent with such a

reaction or characterization." Orr Rep. at 18 (providing examples of acute distress or dysregulation in autistic individuals).

In any case, there is no evidence that the agents "manipulated" the defendant's distress to obtain a confession, which is a "necessary predicate to finding that a confession is not voluntary." *Ordonez-Zometa*, 141 F.4th at 553; *see also Hunter*, 912 F.Supp.2d at 401-02 (rejecting argument that "severe emotional distress" during entirety of interview, including crying and "difficulty breathing," rendered confession involuntary because, although defendant was "thoroughly distraught" and "appearing at times emotionally out of control," this was not the result of coercion). On the contrary, each time the defendant appeared to be in distress, the agents paused, expressed concern and understanding, and offered the defendant breaks, a blanket, and other sources of comfort. "These are indicia of a *lack* of coercion." *Hughes*, 640 F.3d at 438 (emphasis added) ("When the panic attack occurred, the troopers offered the defendant water and suggested that he might want to eat something to help mitigate the symptoms."); *Linnen*, 766 F.Supp.2d at 450 ("When petitioner did show signs of becoming upset, the detectives backed off and allowed him to compose himself before continuing to question him.").

At bottom, while the defendant is correct that each of his claims "standing alone" does not establish coercion, he is incorrect that the "sum" of non-coercive interviewing techniques is coercion. *See* Def.'s Mot. at 23. Each of the challenged aspects of the interview reflects police questioning that has been considered and found acceptable by courts. The facts in this case support the conclusion that the defendant's "incriminating statements were not the result of police coercion, but instead attempts to mitigate the damage once he realized he couldn't avoid responsibility for his crimes." *Jacobs*, 63 F.4th at 1060.

## II. The Defendant Validly Waived His Right to Prompt Presentment

The defendant also attacks his confession because it was made, in part, more than six hours after his arrest, thus allegedly violating his right to prompt presentment before a magistrate under Federal Rule of Criminal Procedure 5(a). Def.'s Mot. at 32-34[28]; *see* 18 U.S.C. § 3501(c) (creating six-hour post-arrest safe harbor for voluntary confessions); *Corley v. United States*, 556 U.S. 303, 332 (2009) (confessions made more than six hours after arrest before presentment subject to suppression if delay "unreasonable or unnecessary"). Here, the defendant's prompt presentment claim fails because he chose—on two separate occasions—to voluntarily, knowingly, and intelligently waive the right to prompt presentment.

First, the D.C. Circuit "has held that a valid *Miranda* waiver constitutes a waiver of the need for compliance with Rule 5(a)." *United States v. Cooper*, 504 F.2d 260, 265 (D.C. Cir. 1974) (Fahy, J., concurring) (citing *Frazier v. United States*, 419 F.2d 1161 (1969)); *United States v. Poole*, 495 F.2d 115, 120 (D.C. Cir. 1974)). So too have other federal circuits. *See, e.g.*, *United States v. Childs*, 944 F.2d 491, 496 (9th Cir. 1991); *United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982); *United States v. Jackson*, 712 F.2d 1283, 1287 (8th Cir. 1983). As the defendant's written *Miranda* waiver, made before any supposed coercion even took place, was voluntarily, knowing, and intelligent (a conclusion the defendant does not challenge), the defendant's prompt presentment right was not violated.

Second, the defendant separately and expressly waived prompt presentment after reviewing and signing the FBI Waiver of Right to Presentment Without Unnecessary Delay form.

[28] Six hours after the defendant's 6:58 a.m. arrest was 12:58 p.m., which is captured in Video 16 at approximately 6:30 and at Tr. 138:16. The defendant is simply wrong in claiming that 55 of the 161 pages of transcript transpired after the six-hour mark or that "[n]early all" of the confession was "extracted after 12:58 p.m." Def.'s Mot. at 34.

There is no basis to question the validity of this waiver. The agents explained that the defendant could either continue the interview or go to the courthouse that afternoon to make an initial appearance and be read the charges and his rights. The defendant asked for "some time to process," and the agents left the room. When they returned, the defendant told them, "I want to keep talking to you guys." The agents provided the defendant a written form explaining his prompt presentment right and that a judge would advise him of his rights to counsel, to remain silent, and to a preliminary hearing, among other things, and explained the waiver orally. The defendant reviewed the form and asked, "These are my rights, even if I signed it, right?" The agents confirmed this, read aloud the rights on the form, including the rights to counsel and to remain silent, and added that "this is just saying, you still have all those rights, and you've had all those rights today" but are simply "waiving the right to go for at least 24 hours to go to the judge." The defendant signed the written waiver. This was a quintessential voluntary, knowing, and intelligent waiver of a right.

According to the defendant, however, his written waiver was just "a piece of paper," the agents "misrepresented the form," and he had no understanding of what he was signing. Def.'s Mot. at 34-35. But the defendant's purportedly "dispositive" fact—that he asked the agents, "[t]hese are my rights, even if I signed it, right?" *id.* at 35—is presented without context and misleading. The waiver form, which the defendant did not attach to his motion, lists the rights that a judge would advise him of at presentment, and the video shows that the defendant reviewed the form for over a minute. Thus, the defendant's question about retaining rights after signing was plainly a request for confirmation that, even if he signed the waiver form, he still retained the rights not to talk and to counsel. This was correct, and the agents confirmed as much. It is unclear why, with this exchange recorded and documented, the defendant would now claim to be "[a] man who believe[d] he retain[ed] the right he" is captured on video waiving. Def.'s Mot. at 35. The

defendant also repeats his dramatized account of the interview, claiming that the agents "extracted" his presentment waiver while he was in "physical pain" and "at the bottom of [a] collapse." Def.'s Mot. at 37. The Court can watch the video; no such thing happened, and the waiver is valid.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion to suppress his video-recorded interview.

Respectfully Submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
STUART D. ALLEN (D.C. Bar No. 1005102)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530