SEACOAST
NEUROPSYCHOLOGY

Rachel L. Orr, PsyD, ABPP-CN
Licensed Psychologist
Board Certified Clinical Neuropsychologist

November 13, 2026

*In the matter of*
United States of America, Plaintiff,
v.
Brian Cole, Jr., Defendant.
Case No. 1:26-cr-00001

**Reason for Referral:**

I have been retained by counsel for the United States of America to conduct an expert review of materials within and related to Defendant Brian Cole Jr.'s Motion to Suppress Statements and Incorporated Memorandum of Law (ECF 102), hereafter referred to as The Motion, as well as to offer an opinion for the Court given my expertise in clinical neuropsychology and on the subject matter of Autism Spectrum Disorder.

**Qualifications and Expertise:**

I earned my undergraduate degree from the University of New Hampshire (2009), and thereafter I earned a Master of Science (2011) and Doctorate in Psychology (PsyD) in Clinical Psychology from Loyola University Maryland (2015). I completed clinical practica, predoctoral internship, and postdoctoral fellowship focused on neuropsychology and related services (e.g., specialized pediatric and geriatric provision of neuropsychological services, neurorehabilitation), and my training was conducted across multiple settings and sites, including outpatient, acute inpatient, long-term care, residential, community mental health, and private practice settings, and with institutions such as Johns Hopkins Hospital, Kennedy Krieger Institute, VA Boston Healthcare, and the Harvard Partners Consortium at Massachusetts General Hospital and Brigham and Women's Hospital.

I became licensed as a psychologist in 2016. I am currently a licensed psychologist in New Hampshire, Maine, and Alaska. I am also authorized to practice psychology within participating jurisdictions through PSYPACT, for both in-person and telehealth services within participating states (40+) and Washington, D.C. I am Board Certified by the American Board of Professional Psychology (ABPP) within the specialty of Clinical Neuropsychology, which required multiple stages of peer review of my competence in the specialty. I currently serve as one of the peer reviewers within that process, among other professional roles outlined below.

I have performed hundreds of neuropsychological evaluations and have consistently maintained clinical and forensic practice with individuals across the lifespan. Although I have experience with examinees of all ages, I specialize in neurodevelopmental disorders, including Autism Spectrum Disorder (ASD) in particular. Much of my work has focused on the complex interplay of neurodevelopmental, environmental, and psychological factors contributing to a person's functioning. The majority of my forensic cases have involved neurodevelopmental factors as a primary focus (70%+), and my forensic experience has spanned family, civil, and criminal court proceedings, including capital murder casework in pre-trial and post-conviction proceedings. I also conduct independent educational evaluations (IEEs) for school districts in my

community, and I have served as an expert consultant for due process related to special education by local districts as well.

I currently serve as the Complaint Officer on the Board of Examiners of Psychologists for the state of Maine, and before that I served on the Ethics Committee for the New Hampshire Psychological Association, among other leadership roles. I serve as a reviewer for practice samples for neuropsychologists seeking board certification through ABPP-CN, as referenced above. I am a peer reviewer for the *Child Neuropsychology* medical journal and an incoming member of the 2027 Editorial Board for the *Journal of Pediatric Neuropsychology*. I have authored or co-authored manuscripts and a book chapter related to neuropsychological and psychological topics, including ASD, and I have given multiple presentations on ASD in particular to professionals within the field and leaders in the community (e.g., senior leaders of the Department of Defense, including a Commander, now Captain, of the United States Navy).

Outside of neuropsychological evaluations and consultations, I currently serve as a Neuropathology Research Consultant for a non-profit research organization based in Baltimore, Maryland, and I was previously an adjunct instructor for multiple courses at the University of New Hampshire.

**Records Reviewed:**

ECF 52-1: Letter of diagnoses authored by David Black, PhD, dated 01/27/2026
ECF102: Defendant Brian Cole Jr.'s Motion to Suppress Statements and Incorporated Memorandum of Law, filed 09/29/2026
ECF 102-1: Defendant Interview Transcript (hereafter, Tr.), conducted 12/04/2025
ECF 102-2: Report authored by Richard A. Leo, PhD, JD, dated 09/24/2026, filed 09/29/2026
ECF 102-3: Autism Articles, filed 09/29/2026
Video of Law Enforcement Interview with Brian Cole, Jr., conducted 12/04/2025
Brian Cole, Jr.'s Educational Records from Prince William County Public Schools (Virginia)

The opinions offered herein have been developed in the context of my clinical training and expertise as documented on my curriculum vitae, and alongside my general knowledge of the scientific literature in my field (some examples of which are cited in the Appendix). As such, my opinions are offered as being accurate and warranted at the level of reasonable psychological certainty.

**Summary of Findings:**

I reviewed the Motion and its exhibits, the 12/04/2025 interview video and transcript, Dr. Black's diagnostic letter, and Mr. Cole's available educational records. Based on that review, I find there is not enough information to substantiate Mr. Cole's diagnosis of ASD, level 1, under criteria within the *Diagnostic and Statistical Manual of Mental Disorders, Fifth ed., Text Revision,* or *DSM-5-TR* (American Psychiatric Association [APA], 2022).

The features that may be associated with Autism are not unique to Autism, and they may reflect other conditions or factors related to the context of the interview. It is unclear whether other diagnostic possibilities have been effectively considered or ruled out. It is also unclear under which procedures or bases the diagnosis of Autism Spectrum Disorder was established,

nor is it clear whether symptoms were (a) present in the developmental period, i.e., childhood, or that the symptoms (b) cause clinically significant impairment, both of which are required in order to meet the diagnostic criteria. There is no information available regarding symptoms during childhood, nor is there information about impairment from the available records.

Mr. Cole also does not exhibit impairment in his behavior, nor does he reference any clear, objective indicators of impairment in his everyday life. Even presuming the diagnosis of ASD is supported, the level 1 specifier and the absence of intellectual impairment indicate mild symptoms, and his behavior during interview and report of his day-to-day functions all support a mild ASD presentation as well.

Furthermore, the literature does not support the assertion that autistic individuals are more suggestible or vulnerable to influence or pressure. The findings on compliance, or agreeable nature, are mixed and not wholly supported. Several of the sources cited and relied upon within the Motion do not even address Autism but are instead focused on Intellectual Disability, of which I have no indication that Mr. Cole exhibits. Autism and Intellectual Disability are separate diagnoses with different criteria altogether, and there is no information in Dr. Black's diagnostic letter or in the available records to suggest that Mr. Cole is intellectually impaired.

Finally, again presuming the diagnosis of Autism is supported, the agents' approach and the interview environment are as neuro-affirming, or supportive for an autistic individual, as they can be under the circumstances. Mr. Cole's signs of anxiety are typical for the situation and for the display of generalized anxiety (i.e., not unique to ASD), and his repetitive behaviors and paced breathing reflect adaptive self-regulation. At no point do I observe dysregulation, psychological decompensation, or "shutting down" behaviors. While I have seen autistic individuals "shut down" and otherwise experience reactions that serve as barriers to functioning in the task before them, Mr. Cole exhibits none of these during the videotaped interview session. As such, Mr. Cole's ability to engage meaningfully with the agents is not compromised at any point.

Bolded text hereafter represents known facts and/or core findings within respective content areas, including:

I. Autism Spectrum Disorder (ASD): Diagnosis and Functioning
II. ASD and Degree of Vulnerability within Law Enforcement (LE) Interviews
III. Autism Spectrum Disorder and Intellectual Disability Are Not the Same
IV. Interview Factors

## I. Autism Spectrum Disorder (ASD): Diagnosis and Functioning

a. **Mr. Cole was diagnosed with Autism Spectrum Disorder (ASD)[1], level 1 (requiring support), and Obsessive-Compulsive Disorder (OCD) by David Black, PhD, on the basis of an evaluation reportedly conducted on 12/16 & 12/19/2025.**

Regarding Autism Spectrum Disorder (ASD) specifically, there are a number of criteria that need to be met in order to establish a diagnosis according to the *DSM-5-TR* criteria (APA, 2022, pp. 56-57). These criteria require certain behaviors and social patterns to be evident, symptoms to be present during the developmental period (i.e., childhood), that the symptoms cause functional impairment, and that impairments in development more globally or due to Intellectual Disability (ID) do not better account for the symptoms.

First, individuals must exhibit (1) *all of the three* social symptom classes outlined below, and (2) *at least two of the four* behavioral patterns:

1) Social symptoms and features: The individual must exhibit "persistent deficits in social communication and social interaction across multiple contexts," including all three of the following areas:
   i. "Deficits in social-emotional reciprocity," such as problems with conversational back-and-forth, reduced sharing of interests and emotions with others (e.g., problems with perspective-taking and theory of mind), and failure to initiate or respond to direct social interactions;
   ii. "Deficits in nonverbal communicative behaviors used for social interaction," such as abnormalities or deficits in eye contact, gestures, or integration of nonverbal behaviors, and/or deficits in understanding nonverbal behaviors and utilizing them; and
   iii. "Deficits in developing, maintaining, and understanding relationships," such as problems making and/or maintaining friendships, problems adapting behavior to the social context, and/or absence of interest in others altogether.

2) Behavioral symptoms and features: The individual must exhibit "restricted, repetitive patterns of behavior, interests, or activities," including at least two of the four following areas:
   i. "Stereotyped or repetitive motor movements, use of objects, or speech," such as echoing others, repeating motor mannerisms, using idiosyncratic phrasing (i.e., unique, odd),
   ii. "Insistence on sameness, inflexible adherence to routines, or ritualized patterns of verbal or nonverbal behavior," such as "extreme distress" at changes or transitions, rigid thinking and/or behavior, compulsion to do things the same way repeatedly,
   iii. "Highly restricted, fixated interests that are abnormal in intensity or focus," such as strange or developmentally inappropriate interests,

[1] For fluidity, the diagnosis of Autism Spectrum Disorder may also be referred to as "Autism" or "autistic" within this document, both of which are synonymous in the field and autistic community.

obsession or preoccupation with certain topics, interests, or activities, and/or

iv. "Hyper- or hyporeactivity to sensory input or unusual interest in the sensory aspects of the environment," such as sensory sensitivities to sound, textures, visual input, etc., reduced responsiveness to pain or temperature, or seeking of certain sensory input or conditions, such as being enveloped/enclosed or seeking pressure.

For both of the aforementioned criteria, the *DSM-5-TR* require symptoms to be present "currently or by history" and reference that the examples provided in the text are "illustrative, not exhaustive" (APA, 2022, p. 56); I adapted some of the examples outlined above in a manner consistent with the criteria and my clinical experience with the manifestation of Autism in everyday life. There are a variety—or spectrum—of ways that the symptoms listed above may manifest in behavior, contributing to the heterogeneous presentation of Autism across multiple people even if they have the same diagnosis.

In addition to the social and behavioral criteria outlined above, there must be information that these symptoms were present within the developmental period (i.e., childhood), as ASD is a neurodevelopmental disorder, and these symptoms must also contribute to "clinically significant impairment in social, occupational, or other important areas of current functioning" (APA, 2022; p. 57).

Further, the criteria require that the symptoms "are not better explained" by Intellectual Disability (ID) or Global Developmental Delay.

Furthermore, the criteria within the *DSM-5-TR* outline a number of additional descriptors, or "specifiers" (APA, 2022; p. 57), which "may" be added to the diagnostic identification, including the degree of "severity" and support need (level), whether intellectual or language impairments are present or not, and whether the diagnosis is associated with particular behavioral traits that may warrant special clinical attention (e.g., catatonia). Although not every provider gives information about each of these specifiers in my clinical experience, it is generally customary to at least communicate the level of symptom severity for each case. Further, in my experience, providers seem to consistently specify when accompanying intellectual or language impairment are present (alongside the relevant co-occurring diagnosis being listed, e.g., Intellectual Disability, Language Disorder). In fact, the *DSM-5-TR* outlines that "understanding the (often uneven) intellectual profile of a child or adult with autism spectrum disorder is necessary for interpreting diagnostic features" (APA, 2022; p. 59), highlighting the importance of understanding intellectual functioning and citing the intellectual factor if relevant.

There are many considerations for differential diagnosis as well; that is, several conditions have similar or overlapping features as ASD which may need to be teased apart, and several conditions commonly co-occur with Autism, requiring clarification. The *DSM-5-TR* provides discussion of 10 conditions within the "Differential Diagnosis" section and provides guidance on the differentiation and/or addition of a co-occurring diagnosis with ASD (APA, 2022; pp. 66-67).

Dr. Black's diagnosis communicates that Mr. Cole met criteria for Autism Spectrum Disorder with level 1 severity, and no additional specifiers are identified.

b. **Mr. Cole exhibits some features of Autism upon observation, and during the interview he describes patterns in his everyday life that can be associated with Autism as well. However, there is not enough information provided to substantiate the diagnosis of ASD according to the criteria outlined in the *DSM-5-TR*.**

Observation of Mr. Cole's interview with two agents reveals some behaviors and traits that can be characteristic of and/or observed in Autism, both in his nonverbal communication and from his self-report. Within his nonverbal communication, Mr. Cole seems to exhibit inconsistent eye contact, restricted range of affect, reduced display of descriptive gestures, and atypical/mechanical speech tone. Some repetitive patterns can also be observed, such as subtle rocking of his upper body and repetitive language. Mr. Cole also describes a tendency to follow routines, reduced social interaction, and difficulty with conversation.

At the same time, these nonverbal behaviors and descriptions of his tendencies are not exclusive to Autism. For example, some of these behaviors may be seen commonly in the context of law enforcement interviews at baseline (e.g., averted eye contact) or may be indicative of other conditions. Inconsistent eye contact and reduced social interaction may be seen in individuals with social anxiety (e.g., Social Anxiety Disorder), and reduced social interaction can be a diagnostic feature of certain personality disorders (e.g., Schizoid Personality Disorder). Atypical or mechanical speech production can be related to a medical etiology or a developmental speech disorder. Social anxiety, personality dysfunction, and communication disorders (e.g., Language Disorder, Speech-Sound Disorder) may all impact one's engagement in conversation as well, which Mr. Cole referenced as an area of potential difficulty. Individuals with OCD, with which Mr. Cole is reportedly diagnosed, may exhibit repetitive patterns of speech or motor behaviors as part of their symptomatic compulsions (generally exhibited in an effort to alleviate and/or neutralize anxiety associated with intrusive thoughts). Given the aforementioned possibilities, it would be important to understand whether Dr. Black considered such factors, as none of these behaviors (nor any singular behavior) is pathognomonic for ASD on its own.

Furthermore, even though the aforementioned features can be seen in Autism, the frequency, severity, and functional impact of those features are unclear based on the limited information provided. For example, there are individuals who follow routines or develop habits, and doing so can help people be more successful and meet demands of their everyday life. There is no information available to suggest that Mr. Cole's preference for routines is problematic, inflexible, or a source of "severe distress" if disrupted, as described in the diagnostic criteria of the *DSM-5-TR*. All that Mr. Cole does communicate during interview is that he tries not to deviate from routine, (e.g., Tr., pp. 61-62), which is nonspecific. Similarly, although Mr. Cole references having "trouble maintaining conversation like this," (Tr., p. 63), the agents are not engaged in the kind of reciprocal, back-and-forth exchange to which that diagnostic criterion of Autism refers (i.e., an unstructured, informal, social exchange); instead, they are asking questions during a law enforcement interview following his arrest, which could be challenging for anyone. His report of difficulty engaging with them, in the absence of information about his

functioning in other, more typical social contexts, renders it unclear whether Mr. Cole's presentation meets this diagnostic criterion. There is simply not enough information that these features of behavior referenced cause "clinically significant impairment" or that the features are distinct from typical behavior.

Collateral reports could also help establish whether impairment was present during the developmental period or is present from symptoms currently. For example, educational records (e.g., special education records) or medical records could serve as a source of information about Mr. Cole's functioning in the past, contemporaneously documented by individuals other than Mr. Cole and his family. Collateral report from parents/caregivers or family could also help establish whether his functioning is impaired by symptoms currently.

While some educational records are available for my review, the information is fairly limited and does not provide much information about Mr. Cole's functioning. For example, there is no reference during the interview or within his educational records that he required special education services or Section 504 Accommodations for a disability, the records of which would possibly provide information about functional impairment or the severity of developmental Autism symptoms (i.e., to meet the criteria for "clinically significant impairment"). His educational records document a medical screening from fourth grade (age 9, 08/2004) in which there was reference to a possible problem with "speech" as part of his development, but this was crossed out, seemingly self-corrected (Educational Records, p. 26). The following page, documenting a "Comprehensive Physical Examination Report" by a physician, offers that his "systems examination" of physical elements (including "neurological") was "WNL," a common abbreviation for "within normal limits" or average (Educational Records, p. 27). The physician also provided no comments—possibly implying no concerns—regarding any domains of "estimated developmental level," including "cognitive development, speech/language development, social/emotional development, and/or health behaviors/health habits" (Educational Records, p. 27).

Aside from records, collateral reports would likely have been available and important for his case specifically, as Mr. Cole reportedly still lived with his family. As stated in the *DSM-5-TR*, "diagnoses [of Autism Spectrum Disorder] are most valid and reliable when based on multiple sources of information, including clinician's observations, caregiver history, and, when possible, self-report" (APA, 2022; p. 60).

Within Dr. Black's diagnostic letter, there is also no information as to whether and how he determined that the symptoms were "present in the early developmental period," as they "must be," per the *DSM-5-TR* (APA, 2022; p. 57). There is no report that Mr. Cole was ever diagnosed with Autism prior to 12/2025, rendering it important to independently verify whether Dr. Black's evaluation yielded information to establish the developmental criterion in particular.

Convergence of sources of information and developmental history are particularly important for adults, where relying on self-report alone may be limited by the individual's insight, dependent on autobiographical memory, impacted by communication deficits, or influenced by personal motivations or secondary gain (e.g., to acquire a legal outcome, money, attention; essentially, secondary gain refers to external or internal motivations of the individual to appear

either more functional or more impaired in order to achieve a certain goal). Factors associated with secondary gain are particularly relevant within forensic evaluations, as legal involvement of any kind has been exhaustively shown within the research literature to impact the validity of a person's report and even their engagement in the direct examination process. Thus, reliance on self-report alone is not ideal to ensure the validity of findings in these kinds of evaluations.

Taken together, there is not enough information from the available sources (videotaped interview, Mr. Cole's report, educational records, and/or Dr. Black's diagnostic letter) to determine whether Mr. Cole (i.) exhibits all three of the required social criteria, (ii.) exhibits at least two of the four required behavioral criteria, (iii.) experiences "clinically significant functional impairment" associated with the symptoms, and (iv.) whether differential diagnoses (i.e., alternative explanations or co-occurring conditions) have been effectively considered.

c. **Relatedly, it is unclear whether Mr. Cole's evaluation was conducted in a manner consistent with the standards of clinical practice for ASD evaluations, particularly with adults. There was no information available regarding the procedures utilized, measures administered, records reviewed, or collateral information acquired, if any.**

As an experienced clinician specializing in this condition, clinical evaluations for Autism generally include:

- direct observation of the individual over a period of time sufficient to allow for a variety of behaviors or social opportunities,
- direct test administration related to a number of areas, including but not limited to: intellectual functioning, verbal and nonverbal abilities, attention, processing speed, executive functioning, social cognition, memory, learning, emotional/psychological functioning, social and behavioral functioning, and adaptive skills,
- thorough clinical interviews across a range of factors and domains of functioning (e.g., developmental and medical history, educational history, social and family functioning, family history, adaptive skills, behavioral and interpersonal patterns across contexts),
- collateral reports from parents/guardians or caregivers (to establish and/or characterize symptoms during the developmental period, as well as to provide information regarding current functioning), and
- review of available records; collateral records often provide objective indicators of functioning and information about what others may have observed or been concerned about at a given time (e.g., teacher comments; medical notes).

It is unclear whether any of these procedures were included as part of Mr. Cole's evaluation with Dr. Black. For example, it is unclear to what degree and for what length of time Dr. Black met with Mr. Cole, whether any test measures were administered and related to which domains of functioning, the scope of interview, whether any collateral report from parents, caregivers or others were acquired, and what additional, if any, records were reviewed beyond what I understand to be available.

While there is no explicit requirement within the *DSM-5-TR* of formal neuropsychological assessment, there is reference to the importance of cognitive functions within an individual Autism profile, specifically: "understanding the (often uneven) intellectual profile of a child or

adult with autism spectrum disorder is necessary for interpreting diagnostic features" (APA, 2022; p. 59). The diagnostic chapter on ASD also references the common co-occurrence of ADHD and cognitive or learning problems in ASD (e.g., related to executive functioning), again pointing to the importance of direct neuropsychological assessment to quantify these functions to in empirical ways. In turn, direct cognitive assessment would be particularly important if there were to be suggestion of cognitive, intellectual, or mental impairments as being part of Mr. Cole's presentation.

Discussion above (point *b*) outlines the importance of collateral report from parents, caregivers, or others, as well as the importance of independently converging multiple sources to verify what may be self-reported.

Finally, the importance of a thorough and sufficiently broad clinical approach helps determine whether and to what degree other life experiences—such as trauma/victimization, personal events, cultural factors, or medical history, for example—may contribute to an adult's current functioning, particularly given the many years of experiences they have accumulated. A thorough and sufficiently broad approach can also assist in the consideration of differential diagnosis and in ensuring that symptoms attributed to Autism are, in fact, developmental in origin, contribute to impairment, not explained by other factors, and otherwise meet criteria for diagnosis in full.

d. **Dr. Black provided the specifier of "level 1 (requiring support)" for Mr. Cole's diagnosis of ASD. Level 1 is the lowest degree of severity and support need, relative to levels 2 or 3, which warrant "substantial" or "very substantial support" (*DSM-5-TR*).**

   **Dr. Black did not list a specifier of "accompanying intellectual impairment" with Mr. Cole's diagnosis of ASD, and he also did not provide a co-occurring diagnosis of Intellectual Disability (ID). Based on the *DSM-5-TR* criteria, these factors reasonably imply that Mr. Cole does not exhibit intellectual functioning significantly below expectations for age with accompanying adaptive impairment (the latter reflecting the two core criteria for ID diagnosis; APA, 2022, p. 37).**

   **Accordingly, the designation of Mr. Cole's Autism as (a) constituting *level 1* severity and the fact that his Autism diagnosis is (b) *not* specified as occurring with accompanying intellectual impairment <u>both</u> imply less impairment and higher level of functioning compared to many other autistic individuals, such as those who have greater severity levels (2 or 3) or who do have co-occurring ID. As cited in the Autism chapter within *DSM-5-TR*, "In general, [autistic] individuals with lower levels of impairment may be better able to function independently" (APA, 2022; p. 64).**

Autism Spectrum Disorder is a *heterogenous* condition that manifests very differently across each individual, "hence the term *spectrum*" (APA, 2022; p. 60). Features of Autism can also manifest differently within a single individual at different points in time and/or in different contexts. The levels of severity and other specifiers, such as whether the individual's disorder

has accompanying intellectual or language impairment (among others), help clinicians and others to best understand the unique presentation of a single individual's Autism presentation.

e. **Consistent with the specifier of level 1 severity and the absence of intellectual impairment, there is information to support the conclusion that Mr. Cole functions adequately in multiple areas, and/or that impairments he may exhibit are likely mild.**

For example, during the videotaped law enforcement (LE) interview from 12/04/2025, Mr. Cole is able to follow directives, remain seated for extended periods of time, maintain attention for a sustained period, wait his turn to speak, ask appropriate questions, and communicate his needs, such as requesting the restroom or for a moment to "process" when needed (Tr., pp. 56, 58, 139). Relatedly, Mr. Cole displays no behaviors suggestive of distractibility from external or internal stimuli, nor any disinhibition. He appears to understand questions and comments directed to him (evident in consistently on-topic responses), responds consistently to direct questions, uses complex language, and uses mature vocabulary in appropriate context (e.g., "scant," "bewildered;" Tr., pp. 21, 48). Mr. Cole communicates coherently, he is able to describe a non-routine event with fair clarity (Tr., pp. 20-21), and he is not circumstantial, disorganized, or over-inclusive in what he shares. He seems to be a fair historian of his own personal history, such as by readily reporting where he resided and attended school, his family members' job roles and places of residence, and his personal activities and interests with specificity (Tr., pp. 15-20). His recall for dates, time frames/durations, and historical details also appears adequate.

At an even more advanced level, Mr. Cole provides relevant background information to clarify details, and he demonstrates insight into the idea that others may not have the same background knowledge as he does about things. For example, he shares that a particular landmark is different now than it was back in 2021, and he readily provides additional detail about a video game he references due to recognition that others may not know about the topic (Tr., pp. 13- 14, 104). He also cites behavior that suggests anticipated reactions of others, conveying some degree of perspective-taking (Tr., p. 38-39). He clarifies information if the agents communicate something that does not match his conveyance (even in subtle ways), and he shows no difficulty disagreeing with the agents at several points (Tr., p. 23, 105, 108). Further, Mr. Cole demonstrates a degree of self-awareness, apologizing when he could not explain his emotions with more detail (Tr., p. 26).

Aside from what can be observed during the videotaped interview, Mr. Cole describes a number of strengths in his functioning within everyday life. He reports a history of "average" performance in school, and there is no information in the available educational records that he required specialized instruction via special education services, or even accommodations through a Section 504 Plan. He has acquired his driver's license, and he seems to have entered the community and navigated independently (alone) on a regular basis prior to his arrest (Tr., p. 38). His report suggests that he maintained employment for a sustained period of time (albeit for his family), a role which has included handling financial duties, entering data, and directly interfacing with customers (Tr., pp. 20-21). Mr. Cole also reports using a manual to build a computer by himself in four days, which he alluded was a long time "for [him]," implying he had done so before (Tr., p. 30).

Further, despite his report of reduced social interaction, Mr. Cole describes behavior revealing an ability to adapt and preserve the social relationships he does have, such as refraining from discussing his political beliefs with family (or others for that matter) to avoid confrontation (Tr., pp. 26-27, 36), a pattern that many individuals—even neurotypical ones—struggle to do.

Overall, although unidentified impairments are referenced within the Motion, Mr. Cole's behavior during the interview reveals a number of functional strengths in his ability to pay attention, regulate behavior, and communicate adequately within the one-on-one setting; as such, there was no evidence of impairment during the session. Similarly, he describes a number of functional skills in his everyday life, again with no aspects of his report, nor information from his available records, clearly revealing of impairment. In sum, there is no available information to show functional impairment.

## II. <u>ASD and Degree of Vulnerability within Law Enforcement (LE) Interviews</u>

a. **The literature does not support the assertion that autistic individuals are more suggestible to LE-generated narratives than neurotypical individuals (i.e., those without ASD), or that suggestibility is a "common trait" among autistic individuals. Instead, research has repeatedly found no difference between autistic individuals and neurotypical individuals in suggestibility, even in children (Bruck et al., 2007; North et al., 2008; Maras et al., 2012).**

It is cited within the Motion that "autistic individuals are disproportionately likely to give 'compliant false confessions'—confessions made to 'escape the stress of interrogation'—because the techniques of custodial questioning render them 'more compliant with police requests, suggestible to police-generated narratives, and less able to communicate exculpatory information'" (ECF 102, p. 26), with citation to a legal commentary by Rogal (2017). However, the focus of Ms. Rogal's commentary is actually *not* individuals with Autism, but rather on individuals with intellectual impairments, or "mental disabilities," as referenced in her article. In fact, the specific quote cited above—from the Motion (p. 26)—can be found within the Rogal (2017) commentary, and it explicitly references "mental disabilities, particularly intellectual impairments and psychotic disorders[2]." The reference to "compliant false confessions" (ECF 102, p. 26) is also rooted in similar comparison to ID (Rogal, 2017; p. 69). These characteristics and conditions do not apply to Mr. Cole based on the information available.

Ms. Rogal's entire publication, cited several times as a source for assertions about the vulnerability of autistic individuals, is an over-arching commentary on "mental disabilities" and false confessions, and nowhere within her commentary does she even mention Autism. Similarly, research and case examples cited in Rogal (2017) as support for her arguments, particularly related to the aforementioned points, also do not focus on Autism. For example,

---

[2] Quote in full: "Mental disabilities, particularly intellectual impairments and psychotic disorders, renders individuals especially vulnerable to false confessions. These conditions tend to make sufferers more compliant with police requests, more suggestible to police-generated narratives, and less able to communicate exculpatory information. As a result, the mentally disabled are more likely to make untrue but damaging admissions under questioning" (Rogal, 2017; pp. 68-69).

Rogal (2017) references "persons with mental disabilities" (p. 65), "mental disabilities… which frequently foster suggestibility" (p. 66), "the relationship between mental disabilities and false confessions" (p.66), "common interrogation tactics, their effect on the mentally disabled," and "mental disabilities under interrogation" (p. 68). Research by Drizin & Leo (2004), also cited within Rogal (2017) as supporting concerns for vulnerability to false confessions, is focused largely on intellectual impairments as well, similarly never mentioning Autism within its 119 pages.

Research that *does* include autistic individuals also does not support what is asserted within the Motion as it relates to suggestibility, or the tendency to yield to leading questions or shift position in response to negative feedback, such as the idea that "autistic individuals…[are] 'suggestible to police-generated narratives'" (ECF 102, p. 26) or that "high levels of suggestibility… are common traits among autistic individuals in general" (ECF 102, p. 27). North, Russell, and Gudjonsson (2008), the article cited for the latter assertion, actually found that autistic individuals were no more vulnerable to interrogative suggestibility than their typical counterparts, a finding replicated by Maras and Bowler (2012). Research in children has also found no differences between autistic children and neurotypical children in their vulnerability to suggested information either (Bruck et al., 2007). Thus, although the literature on suggestibility within autistic individuals may be limited overall, the studies available do not support the finding that autistic individuals are more suggestible.

b. **The literature provides some evidence that autistic individuals may be more compliant—or outwardly agreeable even if they privately disagree—than neurotypical individuals, but even this research is mixed and inconsistent (North et al 2008; Maras & Bowler, 2012; Chandler et al., 2019). Further, the inclination toward compliance has not been correlated with behavioral compliance, i.e., action (Chandler et al., 2019).**

For example, studies have—at times—found that autistic individuals may be more compliant, or agreeable and likely to go along with requests or demands, than neurotypical individuals as rated by self-report and report of informants, as well as based on an experimental study requesting autistic individuals comply with a benign but unreasonable request (North et al., 2008; Chandler et al., 2019). However, it is important to note that self-reported ratings of compliance were significantly predicted by low self-esteem, suggesting a potential moderator of compliance within autistic individuals (i.e., suggesting that the reason autistic people may appear more compliant could possibly be explained by a low sense of self-worth). In one study (Chandler et al., 2019), autistic individuals also tended to be more behaviorally compliant to a benign but unreasonable request than neurotypical counterparts, but this was *not* associated with their self-reported or informant-reported tendencies toward compliance; thus, even when autistic individuals perceived themselves or were perceived by others to be more compliant and agreeable, such perception did not translate into behavior in any systematic/predictable manner. Adding to the inconsistent findings related to compliance in Autism, other researchers found no difference between autistic and neurotypical individuals in compliance (Maras & Bowler, 2012).

Thus, while there is some evidence that autistic individuals may be rated as more compliant or agreeable or may behave with more compliance to benign but unreasonable requests in an

experimental setting, there is inconsistency in these patterns, there are other factors which may moderate—or predict—the relation, and there is even inconsistency *within* the individuals who are rated as more compliant but may behave differently in action.

c. **Recommendations from the literature consistently point to the importance of considering suggestibility, compliance, and/or vulnerability to false confessions on an individualized basis, while considering multiple, dynamic, and often interactional factors rather than singular dispositional factors of the individual like a particular diagnosis (see Review by Gudjonsson, 2021; Chandler et al., 2019; North et al., 2008).**

## III. Autism Spectrum Disorder and Intellectual Disability Are Not the Same

a. **Mr. Cole's Autism diagnosis is not interchangeable with a diagnosis of Intellectual Disability or characterization of being intellectually impaired.**

The diagnoses of ASD and ID are not one and the same. Autism and ID have separate and distinct diagnostic criteria at their core, wherein one relies primarily on social and behavioral symptoms (ASD) and the other relies primarily on intellectual functions and adaptive skills (ID). As noted above, ASD offers a specifier to designate whether an individual has co-occurring intellectual impairment or not, revealing that they are not assumed to co-occur at baseline. Research fairly consistently suggests that less than half of autistic individuals sampled had co-occurring Intellectual Disability (i.e., generally, 33% to 39%; Shaw et al., 2025), though such research has generally focused on large pediatric samples (with limited data for adults available). Nonetheless, it is well documented in the literature and, presumably understood by most healthcare professionals, that autistic individuals do not automatically have Intellectual Disability or exhibit intellectual impairment on the basis of their diagnosis of Autism alone.

b. **As noted previously, Dr. Black does not offer any indication that Mr. Cole exhibits cognitive weaknesses, has accompanying intellectual impairment, or meets criteria for a diagnosis of ID. Therefore, there is no basis on which to compare or correlate Mr. Cole's unique case to those involving Intellectual Disability or related descriptors.**

For example, it would not be appropriate to equate Mr. Cole's presentation of Autism with the case of someone who is "mentally disabled," a "mentally vulnerable suspect," a "[defendant with] 'apparent mental deficiency,'" someone with "cognitive limitations," an "intellectually disabled" person, a person "with cognitive impairment," or someone with "fragile mental and emotional condition" (ECF 102, pp. 28-29).

c. **Relatedly, as outlined within Section II above, professional articles or research about the general vulnerability of individuals with "mental disabilities," as in Rogal (2017), Drizin & Leo (2004), and Kassin (2014[3]; all cited within Document 102), do not apply to Mr. Cole.**

---

[3] Although Kassin (2014) suggests that Autism is a "strong source of vulnerability" when "confronted by authorities pressing for a confession" (p. 114), citing work by Gudjonsson (2003), the original source cites the personal

## IV. Interview Factors

a. **Presuming a diagnosis of ASD is supported for Mr. Cole, there are many characteristics of the agents' interview behavior, interpersonal style, and structure which are "neuro-affirming" or "neurodiversity-affirming," meaning supportive and helpful for someone with a diagnosis of ASD. From a clinical perspective, these characteristics serve to foster an environment, under the circumstances, that is conducive to flexible and meaningful engagement between the agents and Mr. Cole during the interview.**

For example:

- The agents outline a general plan of what would occur and describe what would happen before it transpires (Tr., pp. 5-7, 95, 98, 99, 154, 155). For many autistic individuals who rigidly adhere to routines or experience distress with changes from their expectations, this approach of providing advance warning and opportunity to "preview information" ahead of time can be very beneficial.
- Relatedly, from a sensory perspective, one of the agents also tells Mr. Cole that he is going to move closer to him to see the video before he does so (Tr., p. 92), which may limit a sense of overwhelm or sensory over-stimulation for Mr. Cole; the agent's sudden, close proximity otherwise could have impacted Mr. Cole negatively.
- The agents offer choices about multiple things (Tr., pp. 94-98), which likely foster a greater sense of autonomy than may be expected given the circumstances. Autonomy can be particularly important for autistic individuals, as many are focused on their own, egocentric experiences and preferences; in turn, the feeling of losing control or not getting one's way can lead to stress, increasingly rigid behavior, and even heightened emotionality. Fostering a sense of autonomy for someone with ASD can limit emotional distress and render the individual better able to regulate and remain calm.
- Although Mr. Cole declines on multiple occasions, the agents continue to offer breaks, food, beverages, and comfort items (Tr., pp. 3-8, 52, 96, 138, 154-157), which likely limits Mr. Cole from becoming unduly hungry, thirsty, overloaded from social/verbal input, or uncomfortable from a sensory perspective.
- In particular, the opportunity for Mr. Cole to utilize a blanket in which to envelop himself (Tr., pp. 59, 61), is likely a particularly helpful comfort from a sensory processing perspective, as it is well-known that many autistic individuals find benefit, comfort, and self-soothing from the feeling of being cocooned or enveloped. The texture may have provided helpful tactile input as well. For example, many autistic individuals (perhaps observed most often in children) prefer to cover themselves nearly completely with blankets, keep their hoods up, and enjoy sitting under tables, in closets, or in cocoon-like swings, some which are available in the course of their therapies (e.g., occupational therapy) or which can even be purchased for the home. In my observation of the

---

vulnerabilities to consider as being "mental illness" (e.g., schizophrenia), "learning disability" (e.g., Intellectual Disability), and "personality disorder" (e.g., maladaptive behavior traits; p. 317). Autism is referenced only once as an example of a situation where social problems may be observed but intellect was intact, contrasted with someone whose social functions were intact but intellect impaired. The author argued for the importance of cognitive assessment as a result.

videotaped interview session and from my clinical perspective, Mr. Cole appears to experience a sense of emotional comfort from the blanket, albeit perhaps limited by the circumstances.

- The agents' communication style is also very supportive and neuro-affirming in a general sense, as their calm, balanced, and regulated volume limits the introduction of any unfamiliar emotions or social complications that Mr. Cole would have needed to interpret in the moment (which may have been hard, thrown him off, unsettled him, etc.). Mr. Cole may have been quite impacted and thrown off in a negative manner by a more confrontational, challenging, or emotionally charged interview, particularly given his reported aversion to confrontation in general.
- Aside from their tone, the content of the agents' communication and the course of their approach likely fosters a less demanding social environment for someone who may experience social mishaps, experience social discomfort (possibly due to those impairments), and/or have limited experience with novel social situations overall. For example, the agents begin with benign questions about his residences, school, and family, all of which are likely to be more familiar and "easy" for Mr. Cole to discuss (Tr., pp 14, 15). In turn, that process of rapport development may serve to reduce Mr. Cole's anxiety about the novel, unsettling experience into which he had transitioned, out of routine, that morning. For an autistic person, the time immediately before and after a transition and immersion in something new or "a change" are often the most challenging and stressful, and the agents utilize the initial time to allow Mr. Cole to self-regulate and become accustomed to the situation, well before shifting to topics with more salient or difficult content.
- The agents allow Mr. Cole multiple opportunities to take time and process—whether cognitively, emotionally, or otherwise—the information that they had been sharing (Tr., pp. 5, 11, 55-61, 85, 86, 95). They speak at a normal pace and never speak over or interrupt Mr. Cole, nor do they provide a high volume of information at once. Autistic individuals can be particularly vulnerable to information overload or over-stimulation in general, and the pace and demeanor of the agents during the interview likely limits opportunity for overload/overstimulation. Further, they do not shift quickly to new topics or points of discussion, the transition of which could have been abrupt and challenging for an autistic individual who may struggle to shift his mindset (as many do). Again, they allow time to process, and they even offer to and do repeat information or break it down for him at multiple points.
- The agents also acknowledge how novel, "scary," etc., the experience of being arrested and interviewed under these circumstances is, and they validate all of the emotions that Mr. Cole expresses (Tr., pp. 6, 7, 11, 56-58). Further, the agents do not impose any interventions on or try to stop Mr. Cole's efforts to self-regulate, nor do they draw attention to any repetitive behaviors that he exhibits, including those which could have been reflective of stimming. These patterns—wherein potential stimming and self-soothing behaviors are accepted, permitted without judgment, and not sought to be modified—are all neuro-affirming practices for autistic individuals.
- The agents also speak in a clear, direct, and explicit fashion, without innuendos, sarcastic tone, or implied meanings. Autistic individuals often have difficulty with implicit meanings or "reading between the lines," and they often miss or misinterpret subtle inferences. While it is difficult to tell from the interview to what extent Mr. Cole may

tend to be more literal in his own thinking, it is nonetheless a supportive, neuro-affirming approach for the agents to communicate in the clear fashion that they do.

In a more general sense, Mr. Cole is interviewed in a seemingly quiet, comfortable, and underwhelming environment, which also reduces sensory overwhelm and factors that could have been distressing or dysregulating for an autistic individual. There are no visual stimuli all over the walls, nor any windows to a busy hallway. There are no instances when other individuals can be heard talking or yelling outside the room. Mr. Cole's handcuffs are removed upon entering the interview room, and at no point do others react or behave as if they expect him to exhibit problematic conduct (e.g., by telling him to wait to stand up from the table or requiring LE to come escort him out of the room, etc.). In fact, the agents gently guide him by the shoulders out of the room when it seems as if he may become sick (Tr., p. 58), which I perceive to suggest care and concern for his well-being overall. In contrast, some of my experiences interviewing detained individuals have involved very different environmental circumstances, including those with high distractibility and interruption, which in turn may impact attention, processing, and mood.

For Mr. Cole, particularly within the context of Autism and the common sensory sensitivities that can be present, the context of the environment and the behavior of the agents are all likely as neuro-affirming as they can be under the circumstances.

b. **In the context of an interview that would be stressful or anxiety-provoking for anyone, there is no information suggesting that Mr. Cole's reactions are atypical or outside the realm of common anxiety responses. Further, the behavior displayed by Mr. Cole is not consistent with any type of "shut down," dysregulation, or psychological decompensation, based on my experience witnessing such episodes in clinical practice.**

It would be common and expected for someone to voice that they were nervous, scared, or "out of [their] depth" (Tr., p. 72), in such a situation, or for them to fidget, shake their leg, or shift body position in conveyance or manifestation of anxiety. Gastrointestinal upset—including abdominal pain, indigestion, and nausea—is also a very common manifestation of acute or anticipatory anxiety. Many individuals experience perceived or actual changes in breathing when anxious also, and efforts to regulate breathing by pacing breaths (i.e., voluntary slowed breathing) are common coping mechanisms, generally allowing more control of the physiological response and mitigating acute emotional decompensation or hyperventilation (Laborde et al., 2022). All of these behaviors—such as verbalization that he is scared, fidgeting and shaky behavior, gastrointestinal upset, and paced breathing evidenced by Mr. Cole—are no different than those expected by a neurotypical individual who may be anxious[4].

[4] In fact, such generalized behaviors are found as symptoms on commonly used, validated, and reliable measures of anxiety within the field of psychology.

 

c. **There was reference in the Motion to Mr. Cole's repetitive speech as "stimming" (ECF 102, pp. 8-9), subsequently defined as "the self-regulating repetition characteristic of an autistic person in acute physical and emotional distress." However, repetitive behaviors are not exclusively representative of distressed emotional state (Charlton et al., 2021; Morris et al., 2025).**

**When repetitive motor or speech behaviors are evident during an anxiety-provoking situation for the individual—as likely in Mr. Cole's case, or anyone in a law enforcement interview—they are likely to reflect the individual's efforts to self-regulate. In turn, given Mr. Cole's over-arching presentation and his ability to continue the interview without problem, his manifestations of potential stimming behaviors are likely conveyance of Mr. Cole's ability to self-regulate and utilize adaptive strategies when anxious.**

**Relatedly, there is no point at which it appears—from a clinical perspective—that Mr. Cole becomes emotionally dysregulated, psychologically decompensated, or "shut down."**

Clinical observations from the course of Mr. Cole's full videotaped interview suggest signs of generalized anxiety quite typical and expected for the circumstance, with no clinical indications of what I would consider dysregulation, psychological decompensation, or "shut down." In fact, Mr. Cole retains the ability to engage in interview and to utilize multiple coping strategies in an adaptive manner, all prior to identifying himself in the video that the agents showed him. Furthermore, the observable signs of anxiety in Mr. Cole largely disappear following his self-identification, revealing what I would describe clinically as a more relaxed and calm demeanor for the remainder of the session. His posture relaxes to a point that he is able to rest back in his chair and lean forward onto the table, and his fidgeting, shaking, and repetitive speech are all largely absent.

While the Motion seemed to characterize his behaviors as "autistic shutdown[5]" (ECF 102, p. 29), there is no behavior displayed by Mr. Cole which would be consistent with such a reaction or characterization, having seen many instances of dysregulated, "shut down," and acutely emotional behaviors among autistic individuals in my clinical experience. For example, autistic individuals may—under acute distress or when they become dysregulated—exhibit reactive behaviors like verbal escalation, exhibit refusal, use accusatory, threatening, or profane language, destroy property, or even become physically aggressive. In other cases, autistic individuals may become "shut down," such as by physically turning their body away from the interviewer, becoming tearful or crying, becoming unresponsive, or trying to elope/leave the area. Mr. Cole displays none of the aforementioned behaviors. He retains the ability to engage in a meaningful manner with the agents throughout the session.

Respectfully submitted,

Rachel L. Orr, PsyD, ABPP-CN

Rachel L. Orr, PsyD, ABPP-CN
Licensed Psychologist
Board Certified Clinical Neuropsychologist
Seacoast Neuropsychology

[5] "Autistic shutdown" is not a validated construct within the empirical literature, instead more commonly used throughout social media, blogs, and/or informal discussions online.

## APPENDIX OF REFERENCES

American Psychiatric Association (APA). (2022). *Diagnostic and statistical manual of mental Disorders, Fifth ed., text revision* (*DSM-5-TR*). American Psychiatric Publishing. https://doi.org/10.1176/appi.books.9780890425787

Bagnall, R., Cadman, A., Russell, A., Brosnan, M., Otte, M., & Maras, K. L. (2023). Police suspect interviews with autistic adults: The impact of truth telling versus deception on testimony. *Frontiers in Psychology, 14*, Article 1117415. https://doi.org/10.3389/fpsyg.2023.1117415

Chandler, R. J., Russell, A., & Maras, K. L. (2019). Compliance in autism: Self-report in action. *Autism, 23*(4), 1005–1017. https://doi.org/10.1177/1362361318795479

Charlton, R. A., Entecott, T., Belova, E., & Nwaordu, G. (2021). "It feels like holding back something you need to say:" Autistic and non-autistic adults accounts of sensory experiences and stimming. *Research in Autism Spectrum Disorders, 89*, 101864. https://doi.org/10.1016/j.rasd.2021.101864

Drizin, S. A., & Leo, R. A. (2004). *The problem of false confessions in the post-DNA world. North Carolina Law Review, 82*(3), 891–1007. https://scholarship.law.unc.edu/nclr/vol82/iss3/3/

Gudjonsson, G. H. (2003). *The psychology of interrogations and confessions: A handbook.* John Wiley & Sons. https://doi.org/10.1002/9780470713297

Gudjonsson, G. H. (2021). The science-based pathways to understanding false confessions and wrongful convictions. *Frontiers in Psychology, 12*, Article 633936. https://doi.org/10.3389/fpsyg.2021.633936

Kassin, S. M. (2014). *The psychology of confessions. Annual Review of Law and Social Science, 10*, 193–217. https://doi.org/10.1146/annurev-lawsocsci-110413-030933

Laborde, S., Allen, M., Borges, U., Dosseville, F., Hosang, T., Iskra, M.,… & Javelle, F. (2022). Effects of voluntary slow breathing on heart rate and heart rate variability: a systematic review and a meta-analysis. *Neuroscience and Biobehavioral Reviews*. https://doi.org/10.1016/j.neubiorev.2022.104711

Maras, K. L. & Bowler, D. M. (2012). Brief report: Suggestibility, compliance, and psychological traits in high-functioning adults with autism spectrum disorder. Research in Autism Spectrum Disorders, 6(3), pp. 1168-1175.doi: 10.1016/j.rasd.2012.03.013

Morris, I. F., Sykes, J. R., Paulus, E. R., Dameh, A., Razzaque, A., Vander Esch, L.,… & Zelazo, P. D. (2025). Beyond self-regulation: Autistic experiences and perceptions of stimming. *Neurodiversity, 3*, 1–13. https://doi.org/10.1177/27546330241311096

National Institute for Health and Care Excellence. (2021). Autism spectrum disorder in adults: Diagnosis and management (Clinical Guideline CG142). https://www.nice.org.uk/guidance/cg142

North, A. S., Russell, A. J., & Gudjonsson, G. H. (2008). High functioning autism spectrum disorders: An investigation of psychological vulnerabilities during interrogative interview. *The Journal of Forensic Psychiatry & Psychology, 19*(3), 323–334. https://doi.org/10.1080/14789940701871621

Otgaar, H., Schell-Leugers, J. M., Howe, M. L., Vilar, A. D. L. F., Houben, S. T. L., & Merckelbach, H. (2021). The link between suggestibility, compliance, and false confessions: A review using experimental and field studies. *Applied Cognitive Psychology, 35*, 445–455. https://doi.org/10.1002/acp.3788

Rogal, L. (2017). *Protecting persons with mental disabilities from making false confessions: The Americans with Disabilities Act as a safeguard. New Mexico Law Review, 47*(1), 64–98. https://digitalrepository.unm.edu/nmlr/vol47/iss1/4

Shaw, K. A., Williams, S., Patrick, M. E., Valencia-Prado, M., Durkin, M. S., Howerton, E. M.,… & Maenner, M. J. (2025). Prevalence and early identification of autism spectrum disorder among children aged 4 and 8 years: Autism and Developmental Disabilities Monitoring Network, 16 sites, United States, 2022. *MMWR Surveillance Summaries, 74*(SS-2), 1–22. https://doi.org/10.15585/mmwr.ss7402a1